USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/2/09

CST EVALUATION: Aafia Siddiqui                    15 MARCH 2009

Saathoff M.D.

**Gregory B. Saathoff M.D.**
Diplomate, American Board of Psychiatry and Neurology
P.O. Box 800657
Charlottesville, Virginia 22901

**MEMO ENDORSED**
*P. 47*

FORENSIC PSYCHIATRIC EVALUATION

15 March 2009

Re: United States v. Aafia Siddiqui, Criminal Case No. 1:08CR00826

## INTRODUCTION

Aafia Siddiqui is a 37 year old female of Pakistani descent, charged with Attempted Murder of Officers and Employees of the United States, Attempted Murder of United States Nationals, Armed Assault of United States Officers and Employees, Discharge of a Firearm During a Crime of Violence, and three counts of Assault of United States Officers and Employees. Under the jurisdiction of the United States District Court, Southern District of New York, she was initially assessed and treated at MDC Brooklyn during August and September of 2008. While there, she reported significant psychiatric symptoms that ultimately led to an order pursuant to Title 18, U.S.C. 4241(b), ordering her transfer to FMC Carswell for assessment of competency to stand trial. While there, she was deemed incompetent to stand trial in November of 2008. I was asked by the United States Attorney's Office for the Southern District of New York to provide an independent psychiatric evaluation of Ms. Siddiqui to determine her current competency to stand trial. On 12 and 13 FEB, I conducted a psychiatric evaluation of Ms. Siddiqui at the Federal Medical Center (FMC) Carswell in Fort Worth, Texas. The evaluation was attempted in three separate interview sessions and one period of extended observation for a total of four hours. The timing and length of interview sessions was determined by Ms. Siddiqui's repeated refusal to be evaluated and request for prayer time as well as the FMC's visiting schedule for medical evaluations. My evaluation is based on examination interviews of Ms. Siddiqui, interviews of medical, nursing and security personnel at MDC Brooklyn, FMC Carswell, and review of documents cited herein.[1]

## SUMMARY OF FORENSIC PSYCHIATRIC OPINION

Based upon my evaluation of documents, audiofiles, videotape, and interviews that have been made available to me as of 15 MAR 2009 it is my professional judgment that Ms. Siddiqui is competent to stand trial and does not suffer from any mental illness that would preclude her from assisting her attorneys, should she desire to do so. As a result of my observation and interviews with Ms. Siddiqui, my review of documents and audio files and my interviews with personnel at the MDC Brooklyn and the FMC Carswell who have had significant contact with her, I am in agreement with her treating psychiatrist and evaluating psychologist that she has most likely fabricated reported psychiatric symptoms to give credibility to her claims that she suffers from a mental disorder.

---

[1] See Appendix 1

GOVERNMENT
EXHIBIT
A
08 Cr. 826 (RMB)        (ID)

1

An accurate assessment for a mood disorder, thought disorder or other psychiatric condition can be particularly challenging. Some psychiatric symptoms are subjective and therefore more difficult to assess. Evaluations are further complicated when the presence of symptoms results in either monetary gain or release from legal liability. Just as in any difficult medical diagnosis, the most accurate examination benefits from multiple, independent, and objective sources of information. While the patient interview is always a central and necessary starting point, it serves as only one information source. That interview is completely dependent on statements and behavior witnessed by the interviewer. Consequently, it is only as valid as the examined individual is truthful. In order to ensure the validity of an assessment, the best evaluations include multiple, objective information sources. These sources are in the form of truly objective information that can limit the amount of distortion and bias that can be caused by only one or a few sources of information. When illuminated by a number of objective perspectives, the clinician is best able to provide an accurate assessment of the true clinical condition. In this report, as in any forensic psychiatric evaluation of a detained individual, review of contemporaneous documents and interviews with relevant security and medical personnel are necessary to achieve an accurate picture of an individual's condition and will be referenced accordingly.

The symptoms that Ms. Siddiqui has claimed in support of her refusal to continue with the legal process do not bear up under close scrutiny for the following reasons:

1. Observable behavioral evidence of anxiety, mood and cognitive disorders claimed by Ms. Siddiqui such as increased insomnia, decreased weight, amnesia, inability to read, inability to write and increased crying spells are contradicted by interviews of security and medical personnel at the MDC Brooklyn and the FMC Carswell, as well as objective monitoring documentation. A thorough review of the MDC Brooklyn log book for the two months she was detained there reveals that contrary to her claims, objective measures of her mental health such as time spent eating, sleeping, praying, writing, reading and attending to hygiene actually improved while the amount of time she was observed to be crying actually decreased.

2. Claimed psychotic symptoms that have included delusions and auditory and visual hallucinations have been inconsistent and have not been accompanied by behaviors typically expected to accompany those symptoms. Review of documentation and interviews with staff contradict her reports of psychotic behaviors while at MDC Brooklyn and FMC Carswell. Review of the videotape of her physical examination at MDC Brooklyn reveals that at the time of the exam she was keenly aware of the purpose of the examination, the purpose of the cameras and the fact that members of the team were actually MDC Brooklyn personnel, not the dark angels that she later referenced. In fact, transcripts of her statements during the forced exam demonstrate that she repeatedly exhorted the staff to keep the cameras running for most of the exam so that others could later view treatment she felt was disrespectful to her.

3. Ms. Siddiqui has consistently refused to be assessed for purposes of the court. She has been selectively uncooperative when attempts have been made to examine her through physical exams, psychiatric interviews and through psychological testing. Her repeated refusals to comply with psychological testing, to cooperate with psychiatric examiners sent by the government, and to answer most of their questions demonstrate an awareness that such cooperation could lead to an assessment of competency. Despite improvement that she attributed to answered prayers

2

Saathoff M.D.                    CST EVALUATION: Aafia Siddiqui                    15 MARCH 2009

made to Allah, she clearly indicated that she would continue to refuse to cooperate with any reassessment of competency, and that the original determination of incompetency obtained in NOV 2008 should stand.

4.  Psychotic symptoms of the magnitude claimed by Ms. Siddiqui are characteristic of individuals with major mental illnesses requiring psychotherapy and medication treatment. Remarkably, these dramatic hallucinations and delusions involving flying infants, dark angels, a dog in her cell and children visiting her in her room have largely resolved after she was found to be incompetent to stand trial. Ultimately, these purported psychotic symptoms have disappeared without the use of any psychotherapy or antipsychotic medication.

5.  Although her comments to mental health professionals have suggested that she does not understand the basic elements of the judicial process, Ms. Siddiqui's comments to non mental health professionals have revealed understanding of the charges against her and the role of prosecution and defense attorneys as well as the role of prosecution expert witnesses who have been ordered by the court to perform an assessment.

## MATERIALS REVIEWED OR RELIED UPON

For this report, the sources of information relied upon are listed in Appendix I.

## QUALIFICATIONS

I am currently an Associate Professor of Research in Psychiatric Medicine and Associate Professor of Emergency Medicine at the University of Virginia School of Medicine. I serve as the Executive Director of the University of Virginia Medical School's Critical Incident Analysis Group (CIAG). As an officer in the Medical Corps of the United States Army Reserves, I was deployed as a military psychiatrist overseas during the first Gulf War, where I assessed American soldiers with trauma-related symptoms. Since 1991, I have provided prisoner psychiatric care and teaching/training for medical students and residents of the University of Virginia's School of Medicine. This clinical teaching and training has occurred in medium and maximum security prisons for both men and women who suffer from major mental illness. I have given presentations at national and international meetings regarding psychiatry.

I have conducted on-site research interviews with Kuwaiti survivors of Iraqi torture as a result of the Iraqi occupation of Kuwait in 1990-1991, and later served as a Visiting Professor in Psychiatry at the King Faisal Specialist Hospital in Riyadh, Saudi Arabia. On three separate occasions during the period 2008-2009, I have interviewed released Guantanamo detainees and rehabilitation professionals at the Prince Mohammed Bin Naif Care and Rehabilitation Center.

In a consultant capacity, I serve as the Conflict Resolution Specialist for the Critical Incident Response Group (CIRG) of the Federal Bureau of Investigation. In this role, I have consulted with the CIRG's Crisis Negotiation Unit and the National Center for the Analysis of Violent Crime since 1996.

## PERSONAL HISTORY OF DEFENDANT[2]

### FAMILY HISTORY

Aafia Siddiqui is a 37 year old female who was born in Karachi, Pakistan on 2 MAR 1972. According to her interview at the Craig Joint Theater Hospital, she speaks English, Urdu, Arabic, and Pashtun. Educated in Zambia, Pakistan, Houston, TX and Cambridge, MA, she then obtained a BS in Biology and was married around 1995. This marriage to anesthesiologist Mohammed Amjid Khan lasted approximately seven years. She has stated that this was a marriage arranged by her parents. In 1999, along with her husband and her sister Fowzia, Ms. Siddiqui established the Institute of Islamic Research and Teaching.

For the majority of their marriage, the couple lived in the Boston area until they moved to Pakistan for a time in 2001-2002, at which point they obtained a divorce. In her 22 JULY 2008 interview, Ms. Siddiqui related that she visited her ill father in Karachi, Pakistan around October 2001, accompanied by both of her children. According to Ms. Siddiqui, her husband then moved from their house in Malden, MA back to their apartment in the Boston area. While in Karachi, her father passed away. Ms. Siddiqui related in her 22 JULY 2008 interview that her husband joined her there in 2002, but pressured her to move back to the Boston area, where she then home-schooled her children for four to five months before returning to Karachi, Pakistan to live with her mother, due to marital problems.

She and her husband have had three children. Maryam (b. 1996) and Ahmed (b. 1998) were both born in the United States, and Suleman (b. 2002) was born in Pakistan. She has been inconsistent about their current whereabouts. When interviewed at the Craig Joint Theater Hospital in on 22 JULY 2008, she at times stated that her children were dead, and at other times indicated that they live with her sister Fowzia in Pakistan.

The Grand Jury indictment charged that Ms. Siddiqui departed the United States in June 2002, returned to this country on 25 DEC 2002, and then departed the United States again on 2 JAN 2003. According to Ms. Siddiqui, around 2003 she met Ammar al-Baluchi and married him in Pakistan prior to her capture and detention. She reported that she has not seen him since her arrest. According to government records and a 3 SEP 2008 letter written by Ms. Siddiqui's former attorney, Elizabeth Fink, she was detained by the Afghani National Police on 17 JULY 2008 with various documents, chemicals, and a computer thumb drive. She was also in the company of an eleven year-old boy whom she claimed was an orphan unrelated to her. Later DNA testing proved that she in fact was the mother of the boy, Ali. The indictment also charges that on or around 18 JULY 2008, in Ghazni, Afghanistan, a team of military officers and FBI agents were waiting in a room partitioned by a curtain. According to the indictment before the Grand Jury, she had apparently been left unguarded and undetected on the other side of the curtain, where she was able to pick up an M-4 rifle and fire upon the interview team.

---

[2] Although Ms. Siddiqui has provided only limited information when asked to provide background history to personnel at MDC Brooklyn or FMC Carswell, she did reveal a much more detailed history to FBI Special Agents in July 2008 while detained at the Craig Joint Theater Hospital in Afghanistan. Most of the historical details in this section of the report were documented from FBI interviews while detained in Afghanistan.

Saathoff M.D.                CST EVALUATION: Aafia Siddiqui            15 MARCH 2009

Although her mother currently lives in Pakistan, her father is deceased. Based upon her interview on 22 JULY 2008 at the Craig Joint Theater Hospital, her father was Mohammad Salay Siddiqui, who lived much of his life in Karachi, Pakistan. Dr. Siddiqui, a Doctor of Neurosurgery and industrial health, reportedly died in 2002. Aafia Siddiqui's mother is Ismat Siddiqui (nee Faroochi). Now retired, Ismat Siddiqui previously performed social work in Karachi. Her brother is Mohammad Azi Siddiqui, an architect who lives in Sugarland, TX. Her sister, Fowzia Siddiqui, married Nassar Jamali. Although now residing in Pakistan, Fowzia has lived in the United States and studied at Harvard. Her employment history in the United States includes positions at Brigham and Women's Hospital in Boston, and Sinai Hospital in Baltimore. During the time that she has been at MDC Brooklyn and FMC Carswell in Fort Worth, TX, Ms. Siddiqui has had the opportunity to speak on the phone with her brother, sister and Pakistani officials. In addition, since her move to FMC Carswell, her brother and Pakistani officials have visited her. Transcripts of telephone conversations while at FMC Carswell indicate that she has declined the opportunity to have her mother and sister visit her, stating that she would rather await repatriation to Pakistan where she can rejoin her family.

EDUCATIONAL HISTORY

Although Ms. Siddiqui was born in Pakistan, her initial primary school education occurred in Zambia until the age of 8, when she returned to Karachi, Pakistan for her remaining primary and secondary school education. She ultimately moved to the United States to live with her brother in Houston, TX when she was 17 years old. According to the FBI interviews in Afghanistan, she enrolled at the University of Houston to study Political Science. Her parents reportedly pressured her to obtain an advanced education, and wanted her to become an MD. After three semesters of college at the University of Houston, Ms. Siddiqui transferred to MIT in Boston, where she changed her major to Biochemical and Biophysical Studies. She reported that she was also interested in anthropology and psychology. According to the MIT Entrepreneurship Center Website[3], she received the Carroll L. Wilson Award for her paper entitled "Islamization in Pakistan and its Effects on Women" in 1992 and was originally scheduled to graduate in 1994. Following her 1995 graduation from MIT with a BS in Biology, she studied at Brandeis University, where she received a PhD in neuroscience in 2001 for her dissertation, entitled "Separating the Components of Imitation". In her 22 JULY 2008 interview in Afghanistan, she noted that she worked with Robert Sekular, PhD, while at Brandeis. During the interview that I conducted with her on 13 FEB 2009, she spoke about the challenges of her graduate school experience. She indicated that had it not been for the support of an unnamed dean, she would have never completed her PhD because of the demoralization that she felt from other graduate students who attempted to discourage her. She referred to the dean as a "wise man" who gave her the confidence to move forward towards her PhD.

EMPLOYMENT HISTORY

Ms. Siddiqui did not answer questions that I asked her relating to employment history. She has spent much of her life pursuing higher education (see above) and also has worked both in and out of the home, depending upon the ages of her children and her educational and occupational demands. She has provided employment history information to FBI agents who interviewed her

---

[3] http://entrepreneurship.mit.edu/wilson/awardees.html (accessed on 8 MAR 2009)

Saathoff M.D.                    CST EVALUATION:  Aafia Siddiqui                    15 MARCH 2009

following her detention in Afghanistan, although it is not clear that she is a reliable informant regarding her job history, based upon her initial attempts to mislead agents regarding the identity of her son and the identity of her second husband.  An accurate employment history will require verification of information from collateral sources.

## MILITARY HISTORY

None

## MEDICAL HISTORY

Ms. Siddiqui has had three pregnancies resulting in live births. She has reported a history of excessive menstrual bleeding, according to the history provided at FMC Carswell. She sustained a gunshot wound to the abdomen while in Afghanistan in July of 2008, and was treated surgically and without complication while hospitalized at Craig Theater Joint Hospital at Bagram Air Force Base before her transport to MDC Brooklyn on 4 AUG 2008. She was provided wound care while at MDC Brooklyn. After approximately two months at MDC Brooklyn, she was transferred to FMC Carswell for assessment of Competency to Stand Trial. She remains at FMC Carswell up until the present time.

## SUBSTANCE USE HISTORY

No evidence of any substance abuse history was noted.

## LEGAL HISTORY

Ms. Siddiqui was named by the FBI as an al Qaeda operative and facilitator in 2004 prior to her arrest in Afghanistan in July 2008.  She stated to me during my interview of 13 FEB 2009 at FMC Carswell that prior to the current period, she has never been charged with a crime.

## PRE-ARREST MENTAL HEALTH HISTORY

No prior mental health history exists, according to review of medical records and interviews with Ms. Siddiqui.

## FAMILY MENTAL HEALTH HISTORY

Review of documentation from MDC Brooklyn, FMC Carswell does not indicate any family history of mental illness for Ms. Siddiqui.

## MENTAL STATUS EXAM

During my interviews on 12 and 13 FEB 2009 with Ms. Siddiqui, she wore a tan colored robe and cream colored shawl.  Because she refused to meet with me in a separate room for the interview and mental status examinations, all of my interactions with her occurred with her sitting on the bed or standing in the doorway. Her door was open into the patient hallway at all

6

times. Her FMC Carswell psychiatrist, Dr. Kempke, was also present in her room during part of my interview.  Her hygiene and grooming appeared to be excellent. She did not report any physical discomfort during the interview sessions, although she complained that she was uncomfortable being interviewed by anyone from the court, and repeatedly stated that she would not speak with me. Despite that, she did speak at some length about a number of issues.

Ms. Siddiqui sat cross-legged with what appeared to be an open Koran on her lap. She sat on her bed with her back to the door. Her speech was spontaneous and normal in rate and volume (although at one point she spoke so softly that I needed to move my chair closer in order to hear her.)

When asked to describe her mood, Ms. Siddiqui stated that she did not know and refused to answer. However, she expressed anger and frustration that I had been sent by the court to assess her competency.  At times she covered her face in her hands and appeared to sob, but when she then turned to see if I was in the room, she did not appear to have been crying, as her eyes were not reddened, she did not reach for a tissue and there were no tears noted. When facing me while sitting or standing during my attempted interview with her, eye contact was at times quite good, and at other times poor. Following Dr. Kempke's request to answer my questions, she responded angrily, stating "This is the stuff you are torturing me with. Just go away! Dr. Kempke I never want to see you again in my life!  You are here for torture!"  She again feigned crying. She also appeared frustrated and sighed when stating that no one seemed to believe her claims of being dead. During the course of the two days that I observed and interviewed her, her affect vacillated between irritation, anger, frustration and helplessness when she was aware of my presence. These affects were congruent with her statements. When unaware of my presence, she appeared to be bored and yawned while sitting in the dining room at a table with another patient. When Dr. Powers and I were outside of her field of vision, she laughed and conversed with other patients while waiting in line to enter the dining room.  She did not smile or laugh when aware of my presence, even after Dr. Kempke attempted to inject levity into the interview.

Ms. Siddiqui expressed an understanding of my role after I introduced myself, stating that she felt she had already made herself clear to Dr. Johnson the day before that she would not cooperate with a court evaluation.

My attempted three interviews on 12 and 13 FEB were initially rebuffed by Ms. Siddiqui, who alternatively pleaded with me and angrily directed me to leave her alone, as she would refuse to answer questions related to any assessment requested by the court.  After persistent questioning, she did engage in some discussion, choosing to answer some questions while refusing others. She did not initiate conversation and seemed uncomfortable during the interview situation.

## REVIEW/ANALYSIS

Ms. Siddiqui's case is notable for assessments that have been made in Afghanistan, New York and Texas.  Her assessments in the United Stated have been substantially complicated by her refusal to cooperate with her attorneys and mental health professionals. Because of her desire to be repatriated to Pakistan and her interest in avoiding criminal prosecution, Ms. Siddiqui has had a strong motivation to appear incompetent.

Because of the length and breadth of Ms. Siddiqui's protean presentation, it is important to methodically assess various elements of her complex presentation.[4] Ms Siddiqui's uses of deception, evasiveness, expressions of paranoia and isolation as well as her public expression of psychotic symptoms and claims of torture have had a significant impact on the assessment process. Her dramatic, yet inconsistently expressed hallucinations and delusions. Symptoms referable to mood disorder and cognitive dysfunction have further complicated the picture for those responsible for evaluating her. Her high levels of interpersonal and intellectual skills and ability to negotiate terms of her assessment have paradoxically served to impede assessment. Remarkably, she has improved significantly subsequent to the determination that she was incompetent to stand trial, even though she continues to receive no form of treatment.

What follows is a point-by-point assessment of the issues outlined above. This detailed review will provide the court with my understanding of this complex presentation. In addition, it will provide the basis for my determination that Ms. Siddiqui is currently competent to stand trial.

## DECEPTION

Through a careful review of documents, telephone transcripts while in MDC Brooklyn and FMC Carswell, and interviews with medical and security personnel, it is clear that Ms. Siddiqui is willing to engage in purposeful deception when taking part in activities and speaking with authorities and family members. While being interviewed in the hospital at Bagram by the FBI, she admitted that she used the name of Majid Kahn when opening a United States post office box. Following her detention with a young boy in Afghanistan and according to the FBI interview of SA Sercer while at the Craig Joint Theater Hospital, Ms. Siddiqui denied any familial connection with the child. "She did not know his last name, but he was a young boy in her community that was a Punjabi or Saanidi orphan. She claimed that she surrounded herself with young children because it made her feel better about the absence of her own children from her life." It was not until subsequent DNA testing revealed the boy to be her oldest son that she admitted the truth. Special Agent Sercer reported that she at first denied that she knew Baluchi, and that only after confrontation did she acknowledge that Baluchi was in fact her second husband.

Following her transport to the United States, she continued to engage in deceptive statements. The constant observation and documentation in the log book at MDC Brooklyn provides documentation of the care she received. Contrary to the comprehensive record and interviews with staff, she reported that she was not receiving adequate care and that she was mentally and physically deteriorating, citing decreased food intake, changes in sleep and inability to read and write.

Ms. Siddiqui claimed she was eating less. This is reflected in concerns of her attorney, Elizabeth Fink, in her letter to the court dated 9 AUG 2008, which stated that she was "neglecting" her food tray. Based upon her statements, security officers expressed concern in the log book on 29 AUG 2008 that she was beginning to engage in a hunger strike.

---

[4] Kucharski, L.T., Ryan, W, Vogt, J, & Goodloe, E (1998). Clinical symptom presentation in suspected malingerers: An empirical investigation. Journal of American Academy of Psychiatry and Law, 26(4),579-585.

Saathoff M.D.　　　　　　　　　CST EVALUATION: Aafia Siddiqui　　　　　　　15 MARCH 2009

While at FMC Carswell, she made a serious claim that the institution was not providing her with food. In a 15 October 2008 call with brother, she stated:

> ...and another thing is that they have stopped my food. They are giving me the same old thing. But by the grace of God I am managing. Just letting you know that they are not giving me anything. The rest of the things are in the hands of God.

Shawna Brooks, who served as the physician's assistant (PA) while Ms. Siddiqui was at MDC Brooklyn, told me the following during my interview with her on 21 JAN 2009:

> We needed to make sure that she maintained her weight. [I told her that] "even though you say that you're not eating, the log says you are." [Because she would] claim that she wasn't being given any food, [while unobserved] I would watch her eat. She would later claim that we wouldn't let her eat.

Despite her claims to the contrary, and her frequent refusals to be weighed, the record shows that Ms. Siddiqui in fact gained weight over the course of her stay at MDC Brooklyn. Those records indicate that she weighed 90 lbs on admission to MDC Brooklyn on 4 AUG 2008 and had actually gained 5 lbs in less than two months, when weighed on 1 OCT 2008. Review of the videotape and transcript of the 9 SEP 2008 forced medical examination demonstrates that she verbally and physically resisted being weighed to the extent that she refused to stand, prompting the medical staff to obtain her weight while seated in her wheelchair. Because of her repeated and continued refusals to allow staff to obtain measurements of vital signs and weights at FMC Carswell, it is not possible to obtain any record of her current weight. Documents from FMC Carswell demonstrate that she regularly purchases a wide range of food items from the commissary. My interviews with Carswell medical and security professionals reflect that she has been observed eating regularly.

Ms. Siddiqui was quite critical of the medical care that she received at MDC Brooklyn, stating that her abdominal wound became infected as a result. In a 29 AUG 2008 phone conversation with her brother, she claimed that she received an antibiotic which then was not administered to her. She told her brother, "I tried to put myself in their trust ..." According to PA Brooks, Ms. Siddiqui repeatedly attempted to refuse medical care, but Brooks insisted upon and obtained regular assessments. As a matter of precaution, PA Brooks prescribed an antibiotic:

> She signed many refusals for medical care. She would start to refuse to have me see her. She had typical bacteria in her wound, [but] refused to take her antibiotics due to the potential for side effects. [She] then claimed that we wouldn't treat her infection.

Insomnia was another frequent complaint of Ms. Siddiqui. These complaints to Mental Health personnel were reflected in their notes. Detailed review of the logbook, however, reveals that there was no appreciable change in the amount of time she spent sleeping. In fact, her sleep in September was slightly greater than that in August. PA Brooks visited Ms. Siddiqui's cell

9

regularly, and often observed the inmate to be sleeping, only to return later to perform her exam and interview of the inmate. According to the interview that I conducted with PA Brooks, Ms. Siddiqui was apparently unaware of those visits. "Many times when I came, she was sleeping, but [when I saw her later that day] she would claim, 'I don't sleep'."

In my interviews with medical and security personnel at MDC Brooklyn and FMC Carswell, staff members noted Ms. Siddiqui's superior intelligence and excellent memory for names and faces, as well as for prior conversations with them, and even international phone numbers. In addition, she was noted to regularly read the Koran and often asked for and received writing materials. However, in telephone conversations with her brother and Pakistani officials, she complained of serious memory problems. In a 9 OCT 2008 call to her brother, just one day following a long meeting with Pakistani officials who were reported in Pakistani newspapers to be complimentary of her mental and physical condition, she stated, "Whenever I try to read the Quran, I am not able to do that. Just pray to Allah, so that he can show me a better way." In a 23 OCT 2008 call with Hussain, she stated, "I do pray but I can't read or write. I have tried a lot. I try to read the Quran from what I know from before, but I can't read a lot."

Extremely critical of the care that she has received, Ms. Siddiqui has claimed that she has been medically neglected, but also has had medication treatment forced upon her. These are serious accusations that have understandably been upsetting to her brother. In a 23 OCT 2008 call with her brother, she stated: "When I am in need of treatment, they don't give it to me. But otherwise they force me to take the medications and torture me. Well, God will take care of their actions." In my reviews of documents and interviews with medical and security personnel at both MDC Brooklyn and FMC Carswell, in addition to my interviews with Ms. Siddiqui herself, I have found no support for her statements. Records indicate that although the antidepressant Celexa had been prescribed, Ms. Siddiqui took the medication for only a brief period in early October, refusing it thereafter. After months of noncompliance, documents reveal that her medication was ultimately discontinued. Ms. Siddiqui did not report to me that she had ever been forced to take medication. She attributed her improvement without the use of medication or therapy to intervention from Allah.

In my interview with Dr. Kempke, the psychiatrist at Carswell, she reported that Ms. Siddiqui's dramatic presentation and claims of hallucinations and delusions were a great concern to her. As a consequence, Dr. Kempke provided Ms. Siddiqui with the opportunity to stay on an inpatient unit with psychiatric patients with serious illnesses. This unit allows much more freedom than Ms. Siddiqui experienced while at MDC Brooklyn, such as the ability to come and go from an unlocked room that she shares with another inmate. Over time, and following receipt of information relating actual events, Dr. Kempke was struck by the fact that Ms. Siddiqui had not been truthful. "I realized that she was conning me when I received the collateral information..." Dr. Kempke repeatedly used the term "calculating" when describing Ms. Siddiqui's approach to her interactions with other inmates and staff.

## ISOLATION

From the time that she was first detained by Afghan authorities, while sitting next to the boy she claimed to be an unrelated orphan (later proven by DNA to be her son), Ms. Siddiqui has

selectively isolated herself.  A review of the initial news conference videotape in Afghanistan demonstrates that Ms. Siddiqui covered her face with a veil, often obscuring her eyes by securing the veil alternatively with her right and left hands.  Despite the fact that she was non-communicative, with her face remaining hidden from the camera, she demonstrated a clear awareness of the proceedings. At one point, she attempted to redirect a questioner away from her son. Later in the video, while obscuring her veiled face with her right hand, she used her left hand to attempt to grab nearby documents that had been recovered from her.

During her detention at MDC Brooklyn, it was noted that Ms. Siddiqui was selective with her interactions, particularly with mental health professionals. In a note from Dr. Schlessinger dated 10 SEP 2008, she indicated that Ms. Siddiqui "abruptly moved away when psychology approached." During my 21 JAN 2009 interview with her, PA Brooks noted that Ms. Siddiqui would often turn her back to the door, and was extremely selective in her decisions to speak with others. At times, she would request to see Ms. Brooks, only to send her away when Brooks arrived.  Documentation from security officers indicated that as time progressed, she was also noted to often stay under her blanket even while awake, thus limiting opportunities for assessment by medical and mental health personnel.

Based upon my review of documents and interviews with mental health and security staff, while at FMC Carswell, Ms. Siddiqui has refused most assessments and made only rare appearances at her treatment team reviews.  She has refused to participate in recreation or therapy with other patients, and has been noted to sit on her bed with her back to the doorway. When Dr. Johnson attempted to interview her, she often refused to look at Dr. Johnson, putting her fingers in her ears and ordering Dr. Johnson to depart the area. Upon my attempted interviews with Ms. Siddiqui, I also found her to isolate herself in her room, with her back to me during the initial stages of the interview. She refused my attempts to offer a private conference room for the interview, and repeatedly directed me to leave, stating that she would not cooperate with me or anyone else sent by the court.

Isolation can be symptomatic of serious mental illness. Indeed, in the context of hallucinations, delusions, claims of insomnia and poor appetite, it can represent paranoia as one component of a psychotic process.

After my review of documents as well as interviews with personnel at MDC Brooklyn and FMC Carswell, it appears that Ms. Siddiqui has employed isolation in a way that has obstructed or impeded her mental health assessment while in New York, and her competency evaluation while in Texas. Her isolation has been selective, and directed mainly toward mental health professionals.  One of the nurses who spent the most time with her, Dorota Tucker, RN, stated: "[She has a] good memory. She talks very little to us. Interactions are minimal, but are on her terms."  On 12 FEB 2009, Troy Whitehead, an RN at FMC Carswell, stated to me:

> [She has] very little interaction. [She] gets along with her
> roommate very well. No one messes with her, no bizarre behavior,
> no sleep disturbances. Good memory... When she first got here
> [she said] "I will not even look at you, go!" We didn't restrict her.

Another Carswell nurse, Cassidy Brown, RN, related the following to me in my interview on 12 FEB 2009:

> When she isolates, it is a form of management. She manages us, we don't manage her. [She] smiles and laughs with officers, but will turn it off when mental health nurses come into the room. Her statements [about hallucinations and delusions] are not congruent with her behavior. [I] never felt that she needs medication.

Upon Ms. Siddiqui's arrival to FMC Carswell, Leslie Powers, PhD, was assigned to evaluate the inmate's competency to stand trial. According to my review of Carswell documents as well as my interviews with Dr. Powers on 12 and 13 FEB 2009, Ms. Siddiqui often isolated herself from mental health staff, rebuffing repeated attempts at evaluation, including her repeated refusal to comply with psychological testing evaluation. As a consequence, and with only limited clinical information available to her within the time allotted, Dr. Powers assessed Ms. Siddiqui to be incompetent. In retrospect, and as of 13 FEB 2009, Dr. Powers stated to me that she felt Ms. Siddiqui's selective isolation from evaluating personnel does not reflect a symptom of major mental illness, but rather that Ms. Siddiqui "strategically placed herself in a position of power and control."

EVASIVENESS

Just as physical isolation is not necessarily a behavioral manifestation of major mental illness, neither are statements or behaviors that are evasive in nature. In order to accurately assess the motivations behind evasive statements and actions, it is important to review as much collateral material as possible, in addition to examining the individual who demonstrates evasiveness.
Although family and officials generally encouraged her to comply with assessment and evaluation, Ms. Siddiqui occasionally received other advice. In a 4 NOV 2008 call with her brother, while her initial competency evaluation was still underway, he instructed Ms. Siddiqui that "it is better that you talk less with other people. " She responded, "No I don't talk much," and he replied, "We don't know who all are there."

Psychological testing provides one important means for assessment. In my 12 FEB 2009 interview with Dr. Powers, she expressed frustration about Ms. Siddiqui's repeated successful attempts to evade assessment through psychological testing:

> I brought up this issue every other day after she first arrived. [I] tried many different ways to get her to participate. She has always declined. [She] first claimed that I would hurt her if she took the test. Later [she] said that she was afraid that I would punish her if she gave a 'wrong' answer. I tried many ways. [I said] I just want to know about you.

Despite her statements to me on 13 FEB 2009 that she had improved in her mental health as a consequence of prayer, Ms. Siddiqui repeatedly refused my requests to comply with psychological testing. These statements also occurred in the presence of Dr. Kempke, who was at

times in the room with both of us.   Regarding the Personality Assessment Inventory that I attempted to provide to her, she stated to me that because it would help us obtain an objective determination of her ability to function, "it is there to get me in trouble."  In my interview with Dr. Kempke on 13 FEB 2009, Dr. Kempke noted that Ms. Siddiqui is not interested in discussing her symptoms in any detail. She reportedly answers many questions with the statement "I don't know." Dr. Kempke also stated to me:

> She no longer emphasizes delusions or children. [I] have never been able to get her to describe the delusion [of whether she is truly dead].   She didn't want to answer any questions about competency. Very willing to answer some questions, but refuses to answer any question about the court. 'Just tell them you can do the worst to me.'

Although she had previously reported quite dramatic visual and auditory hallucinations, on 12 and 13 FEB 2009 she refused to answer my questions about these, but did state that these experiences were no longer occurring. According to Dr. Powers, these phenomena seemed to dissipate without the benefit of medication, and were coincident with Dr. Johnson's first attempted assessment in January 2009.

Although she did make a number of statements to me over the course of my time with her, on 12 and 13 FEB 2009 Ms. Siddiqui was unwilling to answer many of my questions during my evaluation, stating that she would not assist me or anyone else who was "sent from the court." At times, she attempted to evade my questions by physically moving to the doorway. As indicated in my mental status examination provided within this document, she answered many of my questions, including basic questions and requests such as "date of birth," "current date," and responded to my requests to perform simple intellectual tasks by either refusing to respond or stating "I don't know."

Evasion can occur in the form of statements or behaviors. Perhaps the most dramatic example of evasion occurred within the context of Dr. Johnson's visits, and in particular her visit to FMC Carswell in FEB of 2009, just prior to my visit. Dr. Kempke, Dr. Powers, security and nursing staff and inmate nursing assistants all spoke to me about Ms. Siddiqui's dramatic attempts to physically and verbally evade Dr. Johnson's questions. Dr. Powers reported to me on 12 FEB 2009 that more than at any other time, "yesterday she was the most agitated with Dr. Johnson. She resorts to wailing, not violence" when on the ward. During Dr. Johnson's interview, Ms. Siddiqui physically exited her room to avoid Dr. Johnson. Contrary to established procedure, she loudly intruded into the nursing station where she begged the mental health staff to intervene to stop Dr. Johnson from questioning her. This public display was the most prominent seen from Ms. Siddiqui, and could be described as "agitation', according to the staff who witnessed it.  In her comments to me during my FEB 2009 assessment, Ms. Siddiqui expressed anger at both Dr. Johnson and myself, stating that she would refuse to comply with us or anyone else sent by the court.

Ms. Siddiqui's avoidance of Dr. Johnson was so specific and so dramatic that according to Officer Purvis, on the day following Dr. Johnson's visit, Ms. Siddiqui went with other inmates to

the downstairs cafeteria instead of staying in her room and eating on the ward, as was her usual habit. Although unobserved by Ms. Siddiqui, I was able to observe her in the cafeteria. Although she did not eat with the other inmates, she sat at a table for six with one other inmate. Officer Purvis reported to me on that day, 12 FEB 2009, that Ms. Siddiqui told her that she was extremely concerned that Dr. Johnson would be back to interview her for a third day. As a result, she chose to join other inmates off the ward during their mid-afternoon meal. Officer Purvis stated that to her knowledge, Dr. Johnson was the only person who Ms. Siddiqui ever attempted to evade in such a manner.

## INCONSISTENCY

One feature of Ms. Siddiqui's presentation has been inconsistency[5] of statements that she has made to personnel at MDC Brooklyn and FMC Carswell, as reflected by my document review and interviews. According to my interview with PA Brooks, Ms. Siddiqui claimed during the forced exam that included blood samples on 9 September 2009 that the staff "could be injecting something into me." The following day, however, she revealed that she understood the intended purpose by inquiring privately of PA Brooks the results of her blood work.

Although she reported dramatic delusions and hallucinations, and had professed a lack of understanding to Dr. Powers regarding the legal process, within a week of her arrival she met with Pakistani officials who visited the facility in Texas in order to talk with her. Describing a 2.5-3 hour meeting, Pakistani officials reported to the news media that she was "calm", "composed", "active" and "alert". Another official reportedly described her to be "completely in excellent mental health." Contrary to the statements feigning a lack of understanding of the legal process she made to Dr. Powers, newspapers quoted Pakistani officials as saying that she was "anxious that her rights [be] protected, [she] receive a fair trial, [and] have an attorney enjoying her confidence."

Despite this level of stability, and observations by Carswell personnel that she was regularly reading her Koran and making notations, on 17 October the Carswell record reflected her complaint that she "can't read or write – first started when she was brought here." Later she stated that it started when she was being tortured.

Despite the fact that she has received only a few doses of antidepressant medication during October of 2008, and no treatment with antipsychotic medication or any form of psychotherapy, her symptoms have varied greatly over time. Dr. Powers noted the disappearance of hallucinations around the time of Dr. Johnson's visit. Dr. Powers stated to me on 12 FEB 2009 that "The claims of auditory hallucinations [stopped]. I saw their course. Now she is focused more on political issues."

## PUBLIC EXPRESSION OF PSYCHOTIC SYMPTOMS

When experienced by individuals who are psychotic, delusions and hallucinations are sometimes reported to others. Thorough evaluation of these subjective experiences requires both listening to what the patient has to say, as well as obtaining as much collateral information as possible. When

---

[5] Rogers, Clinical Assessment of Malingering and Deception,(2008) Third Edition, The Guilford Press p.63.

an individual is experiencing hallucinations or delusions, behavior can also be affected.  Those who are delusional may engage in activities or avoid activities as a reflection of their delusions. Those who experience hallucinations can become so preoccupied with those hallucinations that they can be seen responding to internal stimuli. When unobserved, individuals experiencing true hallucinations may be seen speaking or gesturing in a way that demonstrates they are distracted or preoccupied by the hallucinations.  While those who have a long history of experiencing hallucinations, such as patients with chronic paranoid schizophrenia, may be able to ignore hallucinations, they are much more difficult to ignore when occurring within an acute process. Therefore, significant hallucinations can often be reflected not only in statements that individuals make, but also in their behavior.  Taken in context, this behavior can sometimes appear to be bizarre, as when a hallucinating individual is seen to be talking or gesturing in response to a hallucination, or carrying out some type of activity as a result of a command.

Of note, other than the verbal expressions claiming hallucinations and delusions made in telephone calls or to others including security personnel, administrative personnel or BOP staff, no bizarre behaviors were described to me by those at MDC Brooklyn and FMC Carswell whom I interviewed.[6] I did not speak to a single individual who felt that he/she saw Ms. Siddiqui behave in a way consistent with hallucinations or delusions. In fact, I did not interview anyone at MDC Brooklyn or Carswell who felt that Ms. Siddiqui was in fact experiencing hallucinations or delusions.[7] For that matter, in the opinion of Dr. Powers, Dr. Kempke, and the nursing staff at FMC Carswell, they do not believe that she suffers from a major mental illness.

Although her behavior observed by mental health staff at Carswell has not been consistent with one who is experiencing delusions or hallucinations, her statements about these experiences have at times been quite prominent, albeit inconsistent. She has reported that her children have visited her at night in her room. In fact, Dr. Powers, Mr. Whitehead, Ms. Brown and Ms. Tucker noted that she complained consistently that they were so noisy that they kept her up at night.  In order to verify, the nursing staff documented her sleep patterns and found that she in fact slept soundly through the night, despite her claims to the contrary. The statements about these experiences, however, were quite dramatic. In a 23 October 2008 phone call with her brother, she stated:

> I have told everyone over here and I also spoke to Dr. Powells (sic) today as she had come here and I also told the unit people that I saw my little baby in here. But he is still little. I don't understand how he is still so small. The thing is that he is very skinny. But if he was here at night...since it was night maybe they let him come because he is a baby and he doesn't talk and then took him away. I don't know. I don't know where he lives or anything.

In a subsequent call with her brother on 26 NOV 2008, she volunteered that, "I am trying to not tell a lot of staff because that is against their rules to let children come at night. But it is like if God wills she can come here or else that they are just sending her and taking her back, but [they] do not let me talk." Later in the same call she claimed that she had instructed staff not to scare

---

[6] She did make a statement at MDC Brooklyn referring to her desire to save food for her son, but there is no evidence that she actually attempted to carry this out.

[7] It should be noted that Dr. Guerrero Cohen was not available to meet with me at the time that I visited MDC Brooklyn, and I was therefore unable to interview her.

Saathoff M.D.                    CST EVALUATION: Aafia Siddiqui                    15 MARCH 2009

the children who visit her nightly on the ward. In that same phone call, her brother questioned her about these nightly "visits" from her child. Of note, in the same conversation she appears not to know whether her child who visits her is a male or a female:

| | |
|---|---|
| Brother: | Who brings her to show you? |
| Aafia:[8] | Who? Uh, do you mean her? |
| Brother: | Yes |
| Aafia: | Nobody brings her. |
| Brother: | Okay, okay. |
| Aafia: | I don't know how it works? But uh I don't know. Nobody uh I haven't seen her [UI mumbling] holding or anything. |
| Brother: | Okay |
| Aafia: | *But this that somehow. I mean she is able to. So it is that dear God can do everything but about baby it is that he is very thin. He is very thin, I mean so sad.* |
| Brother: | But he is alive |
| Aafia: | See uh his...I thought that he was dead. But you know he is just comes. I don't know I am confused now. |

Contrary to her statement to her brother that she has avoided speaking with staff about this, in fact she was occasionally quite vocal to others when claiming that her children were coming to visit her at night. According to Cassidy Brown, RN, during my interview of 12 FEB 2009, Ms. Siddiqui was present at a community meeting when one patient made an announcement with the psychotic claim that food in the commissary would be free of charge. During the following community meeting, Ms. Siddiqui uncharacteristically made an announcement to assembled patients and staff. In my interview of 12 FEB 2009, Dr. Powers reported that Ms. Siddiqui caused uproar among the truly psychotic patients who then requested that they also be allowed to visit with their children during the night:

> The first time I heard her mention children was when she was at the community meeting (once monthly. [It] may have been the 5[th] or 12 of December, or in November. It was not long after she arrived. She had been to these meetings before and had been silent. [She is] generally unassuming, and usually speaks softly. [She] raised her hand at the meeting of fifty to sixty people and said "I just wanted everyone here to know that your kids can come and visit on the unit, because mine do." I had to do damage control.

In a call with her brother on 17 DEC 2008, Ms. Siddiqui again spoke about visits from imaginary children, as well her refusal to accept treatment:

---

[8] This is not the spelling used by the original transcriptionist. The original spelling was incorrect, and was spelled "Afia"

16

> The thing is that talking always makes things worse. Everyone is
> trying to drag me back to the world I have left. I am just you
> know…what do I do? I am at much more peace thinking that there
> is a next life but they want to make me go back, which doesn't help.
> They were asking a lot of question about the kids. I told them…but
> I still believe that if they leave the children peacefully somehow, I
> am not interested in anything. I am not going to take the treatment
> that they are asking me to take.  I have told them earlier and told
> them again. I am telling you this again now.

Despite the dramatic nature of the hallucinations of her children on their nightly visits, Ms.
Siddiqui was declined to be specific when asked about the hallucinations.  As she mentioned to
her brother in the 17 DEC phone conversation above, the mental health staff attempted to
appreciate the character and quality of the hallucinations. According to my interviews on 12 and
13 FEB 2009 with both Dr. Powers and Dr. Kempke, when questioned about the hallucinations,
Ms. Siddiqui responded vaguely, with answers of "I don't know." Also, as demonstrated in the
26 November 2008 call above when she changed the gender of her child in the same sentence,
she was inconsistent, evasive, and without specificity in answering questions about her
hallucinations. Dr. Powers recalled their first meeting on Ms. Siddiqui's arrival at the facility:

> At first, the focus was on her children and those hallucinations. [She
> told me that her] 'child came as an infant. 'How did he walk?' I
> would ask.  [She responded] 'I don't know.' [I asked] 'How did he
> get in?'[and she again responded] 'I don't know'.

Her reports that she experienced several states of death were also quite public in nature. Because
this was such a significant part of her verbal presentation of mental illness, I will address it
separately in a subsequent section.  Similar to the reports of hallucinations made at MDC
Brooklyn and FMC Carswell, these statements that she had died were often quite public in
nature. In her interviews on 12 and 13 FEB 2009, Dr. Powers related that Ms. Siddiqui at one
point stated that she was no longer dead, except for her dominant hand and arm. As a
consequence, she made a point of signing her name in front of staff members somewhat
awkwardly and dramatically with her left hand.  Later that same day, Dr. Powers observed Ms.
Siddiqui adjusting her scarf with her dominant hand. According to Dr. Powers, Ms. Siddiqui's
claim of a dead right arm was short-lived.

In addition to publicly voiced complaints of hallucinations and delusions, Ms. Siddiqui also
made other claims about cognitive dysfunction that I will address is a subsequent section.
Although the nursing staff and medical staff at FMC Carswell came to believe that she did not
suffer from a major mental illness, the public nature of her comments about her functioning and
degree of disturbance are relevant.  While at MDC Brooklyn, PA Brooks noted to me in our 21
JAN 2009 interview that Ms. Siddiqui resisted a cursory evaluation at the time of her transfer:
"Before she left, I had to get weights on her. She first screamed and yelled 'I'm having a
breakdown.'"

Despite his repeated assurance that her conversation was not confusing to him, Ms. Siddiqui, in a 23 OCT 2008 call with Asif Hussain related that "I just keep talking randomly without any sense." In my interviews with her on 12 and 13 FEB 2009, she spoke to me in a clear and coherent way. Despite that, she stated "I don't know what I have talked about. It was probably another bunch of my nonsense." Although she stated that her hallucinations had resolved spontaneously without any form of medication or psychotherapeutic treatment, she continued to speak of being dead, and made other statements as if to self-diagnose a serious mental disorder involving a purported inability to communicate:

> I don't make sense to anyone here. No one listens to me. Now when I make sense, people want to hurt me.

> When I was in college, I could speak properly, but now I can't explain myself. People tell me that I am crazy. That proves that I am insane.

> People here all think I am crazy. I am dead, but I want to be like a dead person. The peaceful way is the right way.

## INTEREST IN NEGOTIATING

During her time in custody, Ms. Siddiqui has occasionally spoken of her interest in negotiating some type of acceptable arrangement alternatively with law enforcement, Pakistani officials and mental health professionals, including myself.  This attribute reflects certain higher level intellectual and interpersonal strengths. For example, according to the statements made to the FBI on 26 JULY 2008, she inquired about the child (Ali) who was picked up with her in Afghanistan. (In reality this was her oldest child, although at the time she continued to maintain that he was an orphan unrelated to the family.) She asked if Ali was "in the custody of the U.S. Government. Siddiqui offered a deal that if [the agent] saw to it that Ali was released, she would help the United States government with their quest to find the root of who is targeting them in Afghanistan. When asked to be specific as to what details would be given, Siddiqui replied that she would help the United States find people who are wanting to disrupt peace. She continued that she could give elements within the Inter-Services Intelligence (ISI) of Pakistan. She will do so by being part of a Task Force that includes [the agent] and a small number of additional Americans. No people of Jewish or Indian descent, or members of a foreign government having a conflict of interest can be part of the group, or she will not participate."

Another example of attempted negotiation occurred when Ms. Siddiqui was interviewed on 31 JULY 2008. She stated that she "would like to be a proponent of peace and offers help with getting to the roots of the issues. She would like to help find a terrorist targeting the U.S. [She] does not know any specifically at this time, but believes [she] can infiltrate them."

In my interview with Dr. Powers, she indicated that from the first day, she was struck by the high level of negotiation skills that Ms. Siddiqui demonstrated:

> Looking back in hindsight – first interaction – we had been alerted
> that a high profile case was coming. She claimed that she could not
> submit to a strip search. [The] lieutenant had already gathered a
> team to do the strip search. They secured a video camera. [We] went
> in with her to a holding area. [She had a] high pitched voice,
> hysterical presentation, claimed that she had been killed at MDC,
> and would be killed again. While wailing, [she] tried to negotiate the
> strip search, maintaining her shawl. She spent 20 minutes.  The
> negotiation was a very rational thought process. "No cameras, no
> cameras! That is why I am dead."  I was firm with her about the
> need to be strip searched. The strip search went uneventful[ly].  No
> wailing, she got on her scrub suit. In retrospect, this seemed odd
> behavior for someone who was psychotic.

Ms. Siddiqui initiated interpersonal negotiations with prison staff even after having only brief
initial contact.  Shortly after her arrival to FMC Carswell, a 4 OCT 2008 from her counselor
Linda Coleman demonstrated that she displayed clear goal directed behavior in that she
requested postage, received a call from her brother, and asked to call son.  Notably, Ms. Coleman
wrote that Ms. Siddiqui "reinforced the fact that she will not tell on me for helping her."

In my 12 FEB 2009 interview with Cassidy Brown, RN, Ms. Brown related that Ms. Siddiqui has
been able to arrange a hospitalization that has been largely on Ms. Siddiqui's terms:

> [I have seen] no bizarre behavior. [She] sleeps at night
> despite [her] complaints that [her] children were bothering
> her. I sometimes have seen her talking in the nurse's station
> [with officers]. She gets her way. Staff bend over backwards
> for her. She refuses vital signs, no weights, no vital signs,
> [and] tries to seek out weaker staff.  [She] won't let us
> weigh her.

In her 23 OCT 2008 telephone conversations with Asif Hussain regarding her interest in
returning to Pakistan, she promises him prayers in return: "If you take me to Pakistan, I will pray
for you day and night" later reassuring him, "Okay, God willing, I want to go home and basically
just want to stay at home".

In my interview with her on 13 FEB 2009, she pleaded with me to leave her alone and let her
remain at FMC Carswell:

> I only argued with my mother.  That is the worst thing I've done.
> She forgave me.  Now I don't know. I am dead.  If they let me just
> be a dead person like I am, then I won't do anything. I don't like to
> make trouble…
>
> I am not interested in politics. I hate it. I studied a little bit about
> how it works. They don't look at people like human beings. I don't

19

plan to go into politics. Can I somehow guarantee people that I am not interested in violence anymore?

If you leave me alone, then whatever God has written for me, let it be. I am not looking to make trouble for anybody. They misunderstood me.

## CLAIMS OF TORTURE

In my 13 FEB 2009 interview with Dr. Kempke, she noted that upon arrival at FMC Carswell, Ms. Siddiqui emphasized that she had been tortured. Dr. Kempke was concerned about Ms. Siddiqui's reports that she had been held in cages and raped:

My original opinion was that this was a traumatic episode. I believed her story was concerned about possible head injury. She has spoken of being held in cages, and we were concerned about aggravating any trauma. Her stories about children being tortured caused us all to be sympathetic.

As a consequence of these claims by Ms. Siddiqui, Dr. Kempke stated that she was "more concerned with the rape accusation [and] wanted to err on the side of caution" [by placing her on the mental health unit with its open, non-restrictive environment. Even during this time, when Dr. Kempke believed Ms. Siddiqui to be reporting her psychotic symptoms truthfully, "nothing made me concerned that due to mental illness she was a danger to self or others." In that same interview, Dr. Kempke noted that she was surprised that Ms. Siddiqui acclimated so quickly to her surroundings; "It surprised me that after her claims about men and prior abuse, she is as comfortable as she is around men. Initially, she was clear that she wouldn't interact with men."

Dr. Powers also was initially quite struck by Ms. Siddiqui's vivid yet limited reports of torture and dramatic verbal statements regarding hallucinations and delusions. In her interview with me, Dr. Powers stated that these claims influenced her decision on writing the initial competency evaluation. "There was a time when writing the report – I wondered, is this a weird response to torture?" Dr. Powers now questions the veracity of Ms. Siddiqui's presentation. "She's definitely got a racket going on. She is not sophisticated enough to carry through symptoms. She has a lack of sophistication – surprising."

Ms. Siddiqui speaks often about torture as a concept, and uses the word to describe a range of slights, ranging from the behavior of Pakistani officials to her treatment on the unit at FMC Carswell. In a 9 OCT 2008 call with her brother, she referred to Pakistani officials as follows: "they do say that they are doing their part but they probably want to torture us so that we just go quiet." In a 26 JAN 2009 call with Asif Hussain, she described the court-ordered competency evaluation of Dr. Johnson as "pure torture." She also spoke with inmate nursing assistant Hernandez about her complaint that Dr. Johnson's visit felt like "torture." When Dr. Kempke and I were in her room on 13 FEB 2009, during my attempted assessment for competency, she stated that she would refuse to comply with any assessment ordered by the court, and further accused Dr. Kempke and myself of "torturing" her.

Saathoff M.D.                    CST EVALUATION: Aafia Siddiqui                    15 MARCH 2009

Although there are psychological testing instruments that can assist in assessing symptoms relating to trauma, such as those seen in Post-Traumatic Stress Disorder, Ms. Siddiqui has refused to comply with any testing. Her lack of cooperation in providing relevant history has prevented FMC Carswell's mental health staff from making a determination based upon a trauma-induced disorder. In my 13 FEB 2009 interview of Dr. Kempke, I learned that although this was a diagnostic consideration for FMC Carswell initially due to Ms. Siddiqui's initial statements, this is no longer a strong diagnostic consideration.

COGNITIVE COMPLAINTS

Notably, Ms. Siddiqui has claimed symptoms that are not normally associated with major mental illness. Although these cognitive complaints can be found in those including head-injured individuals, individuals suffering from substance abuse disorders, people with metabolic disorders, seizure disorders, mass-occupying lesions in the brain and in those who are experiencing the side effects of potent psychoactive medications, it is not apparent that Ms. Siddiqui fits into any of those categories. Although it is possible for cognitive symptoms to co-exist with psychotic symptoms, it is interesting that Ms. Siddiqui began emphasizing cognitive symptoms, including confusion and problems with memory following her arrival at FMC Carswell.

As stated previously, she has reported confusion and memory impairment. The admission note of Dr. Kempke on 3 OCT 2008 reflected the following:

> She was unable to tell me the title of her thesis, what year she obtained her degree, what level degree, and when asked if she went to MIT she turned aside, and said something that made me think she could no longer remember. She became very confused about her pregnancies, saying 'three, no' then 'I am sure one was my sister's but she was mine.' I asked if she had adopted the child. She clarified 'legally, you mean' and with more intensity she explained 'no, I babysat' and went on to describe working on her thesis at home.

> She was not able to be sure about ever having been psychiatrically hospitalized – again, with the vagueness of post memory, but alert to ask if this is a psychiatric hospital.

Dr. Power's handwritten note on 23 OCT 2008 indicated that Ms. Siddiqui claimed to have forgotten her age. When asked to state the current date during my interview on 13 FEB 2009, Ms. Siddiqui stated "I don't know and I don't want to know." She also stated that she did not know the month. She refused to subtract seven from 100, refused to spell the word "house", refused to identify simple objects and refused to repeat three words I provided.

This picture of poor memory is in marked contrast to the detailed information that Ms. Siddiqui provided to FBI agents after she was sent to the Craig Joint Theater Hospital at Bagram Air Field

in JULY of 2008.  While there, she was able to speak in some detail about her background, relating specific events, addresses, phone numbers and names. Although there were times that she professed ignorance of certain facts, such as the identity of her son and her marriage to Ammar al-Baluchi, she later admitted that she in fact knew these things despite her initial denials.

In addition, a review of documents and interviews with FMC Carswell staff also revealed a much different assessment than would have been suggested by Ms. Siddiqui's presentation to Dr. Kempke and me.  Dr. Powers and the nursing staff of FMC Carswell (Whitehead RN, Brown RN, Tucker RN) confirmed for me on 12 FEB 2009 that Ms. Siddiqui is of superior intelligence and has an excellent memory.  Based upon their statements, she is able to recall phone numbers, provide her registry number and the correct date for commissary purchase forms that she uses regularly.  During my 13 FEB 2009 interview of Dr. Kempke, she related that contrary to her initial assessment reflecting severe memory impairment, Ms. Siddiqui in fact demonstrated excellent cognitive functioning:"[She shows] no evidence of short term/long term memory problems associated with her time after detention. She remembers things exactly. [She] has an excellent memory."

During that same interview on 12 FEB 2009, Dr. Powers indicated to me that Ms. Siddiqui regularly attends to the news that she hears from the television set in the common room across the hall. This allows her to follow current events without need for newspapers: "Her room is catty corner from the "new" TV room – and it is loud. She is being updated on every political thing that is going on. This is how she stays up to date – [that] could explain why she has no need to read newspapers."

On 12 FEB 2009, Cassidy Brown, RN, related to me that Ms. Siddiqui is extremely sharp, with excellent memory and understanding of how the system works.  She said Siddiqui is "high functioning, [she] gets her commissary and is able to keep it."  On the same date, Dr. Powers concurred with that assessment; stating that Ms. Siddiqui regularly and appropriately ordered a full range of products for hygiene, meals, and for writing purposes.  She contrasted Ms. Siddiqui with inmates on the ward who are suffering from real mental illness: "Someone who is depressed doesn't care.  Someone who is psychotic orders things irrationally."

EXPRESSIONS OF PARANOIA

During her time spent at Craig Joint Theater Hospital, MDC Brooklyn and FMC Carswell, Ms. Siddiqui has expressed her lack of trust in people from some other ethnic and religious groups. When being interviewed by FBI agents at the Craig Joint Theater Hospital on 31 JULY 2008, the following is reported:

> Siddiqui has read books on spies from India and the Pakistani Inter Security Intelligence (ISI), but she has not read much about the FBI. Siddiqui is no longer mad at Americans since she was treated well, although there are many "Jews" within the FBI and in the hospital where she is staying. She can tell the differences by the

way they look and has noticed that most of the time those that look like they are Jewish are the ones who are not nice to her.

Despite these earlier positive statements toward Americans, she was at times noted to revert to anger. According to Officer Medina, whom I interviewed in January 2009 while visiting MDC Brooklyn, Ms. Siddiqui expressed a hatred of Americans: "She was talking to someone on the phone, and stated that she hated Americans."

Ms. Siddiqui was at times quite verbal regarding her feelings about people in certain ethnic or religious groups, whether in a letter written in early 2009 to the FMC Carswell warden, or when speaking to certain select security officers that she trusted. Lieutenant Ortiz, a security officer at MDC Brooklyn recalled a number of long conversations that they had during the night shift when he visited her cell. In contrast to mental health personnel, Ms. Siddiqui was extremely forthcoming to Lieutenant Ortiz, who recounted the following for me during my 13 JAN 2009 visit:

> I remember one morning when she requested my presence. I saw her on both sides. This would have been a few days after 9/9. She started to talk to me. She would call me like a lending ear. She asked me if I knew the race of various individuals. She told me that she was incarcerated unjustifiably. She wanted to know if Mr. Karem was Jewish. She said that America is under the control of the Jewish authorities and that she is here because of the Jews. She told me that she knows more than we believe she does. She told me that she was well trained. I didn't know much about the reason that she was here. She started telling me that she was shot by an FBI agent. My concern that night, and the reason that I gave her so much time, was that she volunteered a lot of information. My concern was that she wouldn't damage or hurt herself.
>
> At certain points of time I asked her if she was going to kill herself, but she said 'it won't be long now.'
>
> She proceeded to tell me that she had a master's degree, and that she was very intelligent. Her main objective was to get me to believe that the Jewish religion was trying to do me harm and to get to her through her son. She tried to convince me that our government was being overrun and controlled by the Jews. She was convinced that Mr. Desmond was acting under the authority of the Jewish authorities who control our government.
>
> She mentioned 9/11, saying that it was inevitable, and that it was a long time in coming. She said that she knew Osama Bin Laden. She also told me that she wanted me to look at her hands, saying that they were swollen, saying 'I want you to see what your people have done to me.'
> I never saw her behave in a bizarre way. I never heard her make bizarre statements, either on the east side or on the west side. I

never heard her use profanity. The first four or five times, I would give her 30-45 minutes at a time. I would cut it shorter over time as I knew that she was stable.

What was important to her was that her food was halal, and that she was able to practice her religion. She tried to get me to approve that she wouldn't have to strip out when she had visits. Her feeding was important to her, and her medical attention. Initially, she got the sense that she knew she was being transferred.

Most of our conversations happened on the west side, after the beginning of September. She never asked for how to get materials from the outside. She mentioned that she studied in America. She did not talk about the crime she was charged with. She said that she was shot by an agent. She told me not to believe everything that I read about her charges.

The distrust that she expressed for groups of people appeared to be quite strong and ingrained. This however, appeared to be longstanding in duration, and was not generalized to groups that she trusted, such as fellow Muslims, and those who were not Indian, Jewish or American. In addition, she expressed an unhappiness and distrust for hospital personnel at FMC Carswell when speaking with her brother in a phone conversation on 4 NOV 2008. A careful reading reveals an apparent frustration about the patient role, rather than a fixed, false belief that these hospital workers had specific plans against her:

> I know those people are after me...they always keep pestering me to get my flu shots and other things. They are only most bothered about all these things. They have driven me crazy. Nobody else is bothered and doesn't even understand. Even if I want to tell anybody, what do I tell them?

There were occasions when Ms. Siddiqui expressed strong distrust for certain people at FMC Carswell. Demonstrating a detailed ability to remember names, Ms. Siddiqui produced a neatly handwritten list of Carswell personnel whom she did not trust. I spoke with Dr. Powers about this, who stated that Ms. Siddiqui's behaviors toward the people on the list did not necessarily reflect a paranoid stance. Because her behavior toward these individuals always appeared to be rational and appropriate, Dr. Powers did not feel that this list represented true paranoia but instead may have been another attempt to appear mentally ill and psychotic, thereby validating an assessment of incompetency. In fact, while at FMC Carswell and according to both Dr. Powers and Dr. Kempke, the only person that truly appeared to induce anxiety in Ms. Siddiqui was actually Dr. Johnson, who was ordered by the court to conduct a re-assessment of Ms. Siddiqui's competency to stand trial. In my interview the following day with Ms. Siddiqui, she reserved her harshest words for Dr. Johnson, as well as for Drs. Kempke and Powers, who did not intercede on her behalf while Dr. Johnson pursued Ms. Siddiqui in the hallway and in the nurse's station. She also stated that "Dr. Powers is a liar. She told me the study [competency assessment] was over." She also became fairly animated with me, and expressed great

Saathoff M.D.                    CST EVALUATION:  Aafia Siddiqui                    15 MARCH 2009

exasperation at my and Dr. Johnson's need to conduct a competency assessment, stating "I am not going to tell you anything...the person who sent you and that lady has no wisdom!"

REPATRIATION TO PAKISTAN

Based upon a transcript review of telephone conversations, as well as statements made by Pakistani officials who visited Ms. Siddiqui on 8 OCT 2008, Ms. Siddiqui strongly desired to be returned back to Pakistan, and believed that this was a distinct possibility.

In a 23 OCT 2008 call with Asif Hussain, he suggested that her mother and sister be brought to FMC Carswell to visit with her. She responded by stating: "Don't bring them [mother, sister] here. You try to send me there. Don't bring them here. I don't want to meet with them here in this country...I don't know what they are going to do to them after bringing them here. None of them should come here..." During that same call, Asif Hussain speculated on the outcome of a ruling of incompetency:

> Asif:   What if your thing [competency ruling] comes back next week?
> Aafia:  Yeah
> Asif:   They might come and ask us to take you and then we will come and get you immediately.
> Aafia:  Okay
> Asif:   We are ready to take you over there, okay?
> Aafia:  Okay
> Asif:   You just keep up your hopes as it might take a month or 10 days or a bit more or less
> Aafia:  Okay
> Asif:   Don't lose your hope.  Eat and drink well.  Try and cooperate with them.
> Aafia:  I am cooperating with them but I won't get treated here
> Asif:   Okay.  But tell me one thing...
> Aafia:  Because they have told me clearly by their actions that they will give me something by saying it is for my treatment.

On the same date, 23 OCT 2008, she had the following conversation with her brother:

> Aafia:  No, New York. I mean, I don't want to go to New York. They are after me over here and also over there [New York].  I told them that I want to go to Pakistan
> Ali:    Yes, People are getting confused as to whether you want to be here or there.
> Aafia:  Are they mad?  Are these people mad to think that someone wants to stay in a prison?  Those people are crazy who is saying that I want to be here.  They are really mad.  Out of their heads.
> Ali:    Well, you know.

25

> **Aafia:** Well, what do I even say? How would I want to stay in
> prison and wouldn't want to go home? That is just insane.

Ms. Siddiqui met with a delegation of Pakistani officials on 8 OCT 2008, soon after arriving at FMC Carswell.  In press reports[9] following the meeting, demands were expressed to release Ms. Siddiqui.  The 8 OCT 2008 online edition of GEO Pakistan[10] read as follows:

> Senator Mushahid Hussain demanded from the United States to
> release Dr Aafia Siddiqui immediately.
>
> Talking with Geo News after meeting with Dr Aafia Siddiqui here
> on Tuesday, he said that we demand from America for immediate
> release of Dr Aafia Siddiqui.
>
> Regarding the meeting with Dr Aafia, senator Mushahid Hussain
> told that Dr Aafia Siddiqui is in good health and she is completely
> in excellent mental health.
>
> He said that Aafia Siddiqui's morale is high and she denied all the
> allegations charged on her.

Another press report[11] in the Associated Press of Pakistan of the same date provided more specificity regarding both the health of Ms. Siddiqui and her interest in repatriation:

> In Washington, Faqir Asif Hussain said that Dr. Siddiqui, who was
> pleased to meet the delegation, appeared in a good state of mind
> and in better physical health than when he met her in August in
> New York. But she was anxious that her rights were protected and
> she received a fair trial and have an attorney enjoying her
> confidence.
>
> Dr Siddiqui told the delegation that charges pending against her
> were not true.
>
> On behalf of the embassy, Asif Hussain assured her that
> Ambassador Haqqani and his team of diplomats are striving for her
> repatriation to Pakistan on humanitarian basis. She thanked the
> embassy for the support extended to her.
>
> ...Asked as to what was Dr. Aafia's biggest concern, Faqir
> Hussain felt she wanted to go back to Pakistan at the earliest and

---

[9] <http://www.geo.tv/10-8-2008/26444.htm>(accessed on 15 MAR 2009)
[10] <http://www.geo.tv/10-8-2008/26445.htm> (accessed on 15 MAR 2009)
[11] <http://74.125.47.132/search?q=cache:Cmje7UUF58wJ:www.drAafia.org/2008/10/09/pakistani-lawmakers-meet-dr-Aafia-in-texas-and-call-for-her-release/+%22pakistani+lawmakers+meet+Dr.+Aafia%22&cd=2&hl=en&ct=clnk&gl=us&client=firefox-a>
(accessed 15 MAR 2009)

Saathoff M.D.                      CST EVALUATION: Aafia Siddiqui                      15 MARCH 2009

was concerned about her children. She is also concerned about strip searches.

In my interview with Dr. Kempke on 13 FEB 2009, she recalled her reaction upon finding out Ms. Siddiqui's desire to return directly to Pakistan, and bypassing the legal process entirely: "I was surprised that she emphasized the interest in returning back to Pakistan." On my 13 FEB 2009 interview, I asked Ms. Siddiqui if she wanted to return to Pakistan, but she did not respond in the same way that she had responded to Pakistani officials. "Why do you bring up Pakistan? This world is all the same. There are worse places than this place. I just want to be put in some prison and be forgotten. It's better for everybody."

## DELUSIONS OF DEATH

While Ms. Siddiqui's verbal reports of hallucinations of seeing her children visit in her room at the prison have been quite dramatic, the most remarkable statements have involved the issue of her own status. Delusions can best be thought of as firmly held, false beliefs. These are held "despite objective and obvious contradictory proof or evidence and despite the fact that other members of the culture do not share the belief."[12] Delusions of death are exceedingly uncommon, however. In Kaplan and Sadock's Comprehensive Textbook of Psychiatry, there is one reference to nihilistic delusions[13]. These are defined to be "Depressive delusions that the world and everything related to it have ceased to exist." Ms. Siddiqui's evolving statements about her experience of death did not occur within the context of depressive symptoms that one would have expected, such as significant changes in appetite, weight, sleep, hygiene and anhedonia. In fact, a detailed day-by-day, week-by-week review of the log book from MDC Brooklyn reveals that Ms. Siddiqui's time spent reading, sleeping, eating, writing and attending to hygiene remained remarkably stable over time.

In reviewing documents from MDC Brooklyn and FMC Carswell, and to interview security and medical staff from the institutions, one is faced with myriad descriptions of Ms. Siddiqui's statements that she is either dead, going to be killed, dying or alive. Whether she refers to her body being dead or her dominant hand, the statements are inconsistent and generally unaccompanied by displays of emotion.

In my interview of MDC Brooklyn's Officer Pemberton, she stated that Ms. Siddiqui "used to cry. I only saw her angry after the forced cell move. Also, when asked to go to court. She would say "I'm dead already." She didn't act dead, she prayed all day. After her abdominal wound had largely healed, Ms. Siddiqui informed PA Brooks that she was refusing her visits. Ms. Brooks did not feel that Siddiqui's claim was genuine. Brooks responded by stating "until you are dead, I will be here every day." During her stay at MDC Brooklyn, the statements regarding death became fairly casual, as documented in this note of 23 SEP 2008 which records Ms. Siddiqui as saying "It's kinda pointless that I'm talking to you because people don't believe me that I'm dead."

---

[12] Kaplan & Sadock, Comprehensive Textbook of Psychiatry, 8th Edition, Lippincott Williams & Wilkins, 2005, p 851.
[13] Ibid p. 856.

27

Saathoff M.D.                    CST EVALUATION: Aafia Siddiqui                    15 MARCH 2009

In a prior section of this report, I have referred to Dr. Powers' statements that Ms. Siddiqui claimed that her death had migrated only to her dominant hand, requiring her to use only her non-dominant hand for a time when attempting to sign her name when the staff was present. According to Dr. Powers in her February 2009 interview with me, this phase of single-limb death was short-lived. Within a day, Ms. Siddiqui was again using both arms and hands in daily activities. On 10/9, which is one day after she spent two to three hours with Pakistani representatives, she claimed "I have been dead several times."

At times, even during the course of a single sentence, she would make a statement that she felt she needed to correct. In a phone call with her brother on 16 OCT 2008, the conversation with her brother was recorded as follows:

> Ali:    I just want to come this time and we don't need to talk on a specific subject. I just want to sit and...
> Aafia:  These are the things that have kept me alive. If I am alive, that is. But I am not.
> Ali:    For us you are alive. Whatever condition you are in. you are alive and it is a very big thing for us
> Aafia:  Yes thank god

In the course of my interview with Ms. Siddiqui on 13 FEB 2009, she made the following separate, wide-ranging statements to me regarding the death issue.

> Half of my problems are gone because they are finishing me.

> I don't need to harm myself, I am already dead.

> I want the court to send another execution order.

> I am not dead enough.

> Ok, I'll stop eating and in a couple of days and I will be gone.

> Sometimes I forget that I am dead, that's when my problems start.

> I'm dead, leave me alone.

> Sometimes I forget that I am dead, that's when I make mistakes.

> I am dead, but I want to be like a dead person.

> If they just let me be a dead person like I am, then I won't do anything

When I asked her about suicidality, she responded incredulously:

> Suicidal? You're crazy, I don't need to harm myself – I am already
> dead! Still they want to harm me. [I asked who?] Your group!
> Whomever you represent! This is crazy, ridiculous.

At another point in the interview, I asked her "When did you die?" She stated that "I'm not going to tell you because you won't believe me."

I spoke with numerous security officers and medical personnel at both MDC Brooklyn and FMC Carswell. Every one of these professionals expressed the belief that Ms. Siddiqui was not serious about what she was saying about the issue of death. Skepticism was also demonstrated by at least one Pakistani official. In a 26 JAN 2009 telephone conversation with Asif Hussain, he confronted her claims about being dead, prompting her to laugh:

> Asif:   I don't believe the thing you said about you being dead.
> Aafia:  I am (laughs)
> Asif:   (laughs)
> Aafia:  Nobody believes me. I laugh because I have to insist on the
>         truth, right? Yeah that's fact.
> Asif:   You are an educated woman
> Aafia:  But nobody believes me because I am in the mental unit. I
>         am insane, so nobody believes me. But I am not. Anyways,
>         I am not going to argue on that. (laughing)

While interviewing Ms. Siddiqui in her room on 13 FEB 2009, Dr. Kempke entered for a time, and made the following statement to Ms. Siddiqui:

> One question the court wants to ask is that they wonder that you
> might be competent, and that you are making up symptoms.   I
> would say that in my opinion, I think that you are competent.

Ms. Siddiqui somewhat responded angrily to Dr. Kempke's statement:

> I am not dead enough for them! Everyone has been nice but it is
> the court that makes them bad. I have tried to be good to people
> and they stab me in the back.  I am grateful to the judge for killing
> me

## BIZARRE STATEMENTS

In my interviews with personnel at MDC Brooklyn and FMC Carswell, it was consistently reported to me that Ms. Siddiqui's behavior fell within the normal range of inmates that are detained in those facilities.  These personnel were uniform in their statements that they never witnessed any bizarre behavior whatsoever.  Officer Felder, in her 13 JAN 2009 interview with me at MDC Brooklyn provided the following statement reflecting the statements of other MDC security officers: "I saw no bizarre behavior. No problems with hygiene. She ate and slept, and she read the Koran." "I never saw anything to lead me to believe that she was mentally ill."

Saathoff M.D.                    CST EVALUATION: Aafia Siddiqui                    15 MARCH 2009

In my review of the MDC Brooklyn log book, an entry of 12 SEP 2008 is notable in that it includes a statement written by the psychologist, Dr. Guerrero Cohen. The statement reflects a "brief" encounter according to Dr. Guerrero Cohen, and quotes Ms. Siddiqui's statement that she saw a man at her window instructing her to sit by the window and wait for her son. The note is remarkable for its description of behavior that could be termed bizarre. Dr. Cohen's note is remarkable for its detail:

> Reviewed log above and spoke briefly with i/m [inmate]. Ms. Siddiqui was crying saying that the video that was taken of her during the medical examination will be placed on the internet to shame her in front of the whole world. Ms. Siddiqui stated that the man who told her that her son was in danger showed himself by the window facing the parking lot. She has been sitting by that window waiting for him, in case he shows up, to get a phone number for her son or more news about her son from him. Ms. Siddiqui stated she cannot go to court because we 'killed' her by videotaping her naked.

Officer Washington was responsible for minute by minute constant monitoring of the cell. Prior to Chief Psychologist Dr. Guerrero Cohen's arrival, Ms. Siddiqui's behavior had been unremarkable. There had been no sitting at the window whatsoever and no behavior that would have suggested that Ms. Siddiqui was experiencing hallucinations at the window. Based upon officer Washington's contemporaneous entries in the log, and in her 13 JAN 2209 interview with me, it is clear that the behaviors Ms. Siddiqui described to Dr. Guerrero-Cohen did not in fact occur at all. Dr. Guerrero Cohen accepted behaviors claimed by Ms. Siddiqui at face value, rather than thoroughly reviewing the log book or discussing the marked discrepancy with the officer's entries. Officer Washington described the situation that day in the following way:

> She used Dr. Guerrero to solidify her craziness. She was talking about being on the internet and being shamed by her family.

> This didn't seem like other mentally ill people, because she picked who she wanted to tell these stories to. The first time, I was surprised.

> Dr. Guerrero read the log book but didn't talk with me about my observations. Although the inmate told the psychologist that she had been looking out of the window waiting for the man to appear at the window - that was not true. She reported behaviors to Dr. Guerrero that I didn't see.

> She [Siddiqui] was disturbed that I was writing things down.

According to mental health staff at FMC Carswell, at no time did the behaviors appear to be a response either to hallucinations or delusions. As reported to me on 12 FEB 2009 by Dr. Powers

30

Saathoff M.D.                    CST EVALUATION: Aafia Siddiqui                    15 MARCH 2009

and Cassidy Brown, RN, claims of these types of behaviors (such as her statement that nightly imaginary visits by her children were keeping her awake at night) were proven to be false when sleep monitoring was performed by Carswell nursing staff. Although she was occasionally agitated and angry when undergoing her forced exam or when being interviewed by Dr. Johnson, these behaviors were consistent with her goal to avoid court-ordered evaluations.

In contrast to her unremarkable behavior, Ms. Siddiqui's statements relating to the character of purported hallucinations and delusions were at times markedly bizarre. In particular, her reports about dark angels, cameras, flying babies, walking and talking infants, a dog in her cell, floating men and the like were admittedly very unusual.

In her 13 FEB 2009 interview with me, Dr. Kempke related her initial impression of Ms. Siddiqui, based upon the inmate's statements to her." The worst I saw her was at the beginning. She went on and on, rambling about death and angels." Ms. Siddiqui referred to good and bad angels while at MDC Brooklyn on 28 SEP 2008 but then later spoke about "dark angels" while at FMC Carswell on 14 OCT and 17 OCT 2008. These comments were in relation to her forced medical exam of 9 SEP 2008 that she described. Of note, a review of the actual videotape reveals that she was aware that the team in black was MDC Brooklyn female staff. During the videotaped exam and cell move, she pointedly referred to individuals on the team by name and at no time did she refer to them as angels.[14] One of the MDC Brooklyn staff members interviewed by me on 13 JAN 2009, Officer Pemberton, recalled the experience of the forced exam:

> She referred to me as "that woman." At first she thought I was nice, until after the forced cell move...She never called me by my name. She told a Lieutenant; 'this woman doesn't do anything, all she does is watch me.' The next day she apologized for her actions. I don't take it personally, because it is a job.

When authorized by administrative policy, video cameras are used at certain times within correctional settings as a means to help insure the rights of inmates and to protect staff members from false accusations. As in the case of the Craig Joint Theater Hospital, cameras are also used for continuous monitoring. Ms. Siddiqui at times expressed strong feelings about the use of cameras. This is understandable, given her consistent and genuine concerns about modesty. In addition, Ms. Siddiqui's initial news conference in Afghanistan with her son had been videotaped and was made available to the press. Although she did not speak to me about this event, based upon her uncommunicative behavior at that news conference and her refusal to show her face to the camera, it appears that this was a negative experience that she would not have requested.

According to my MAR 2009 interviews with FBI agents who interviewed her in Afghanistan, she was aware of a camera that constantly monitored her in her hospital room. At no time did she express any misunderstanding about its purpose, or demand that it be removed or turned off. In my 13 JAN 2009 interview at MDC Brooklyn, Officer Drake commented about the use of cameras at her intake exam on 4 AUG 2008:

---

[14] Ms. Siddiqui did use the word "devils", but this word appeared to have been used as an epithet.

31

> She showed no indication of bizarre behavior or need for mental
> health consultation. We used three cameras so that she could not
> make false allegations.  She saw the cameras as they were
> operating.  She was aware, but did not comment about them.  It
> didn't seem to bother her.

In my 13 JAN 2009 interview of officer Carter, she commented on the use of cameras on another
occasion:

> I only sat in on her a few times. They came with a wheelchair. She
> did not resist. I saw her videotaped with a camera.  She was aware
> that she was being videotaped and did not make any unusual
> comments. They took her to have a shower. She did not resist. This
> was on the east side.

In my 13 JAN 2009 interview with officer Wilkins, she described the follow-up exam that
involved some negotiation with the use of the camera.  This occurred prior to Ms. Siddiqui's
transfer to FMC Carswell:

> This was videotaped also, and she didn't like the cameras.  She
> screamed and yelled, and I told her that the camera was going to be
> there. She was acting calm then screamed when she saw the
> camera until I told her that I would move the camera back but still
> keep it on.  She then calmed down, and allowed us to go through
> with the exam.

According to Dr. Cohen's note of 12 SEP 2008, Ms. Siddiqui stated that she could not go to
court because of her voiced concern that the 9 SEP 2008 videotaped forced exam would be
shown on the internet. Expressing concerns that the video "showed her in front of the world", Dr.
Cohen was concerned that this represented a deteriorating mental state.

By the time that she arrived at Carswell MDC, she was claiming that the cameras had in fact
been lethal weapons, screaming during the FMC Carswell intake according to documentation of
2 OCT 2008, "that's what killed me!"

As reflected in Dr. Powers' note of 17 OCT 2008, Ms. Siddiqui provided a more full explanation
of the role of the cameras:

> She continue to repeat several times that she is already dead.  She
> was asked to talk more specifically about the matter and she stated
> it was not the dark angels that killed her, it was the three cameras.
> She stated 'I looked into the camera and I knew that I was being
> killed.'

Because of the specificity of these statements, and their relationship to the videotape of the
forced exam, I reviewed the forced medical exam videotape and read the transcript of the tape.

32

Remarkably, Ms. Siddiqui did not refer to the cameras as instruments of death. In fact, she repeatedly exhorted the staff to keep the cameras running so that a record could be produced documenting the brutality of her treatment in the United States, particularly due to the fact that this exam was occurring during Ramadan. It was only when PA Brooks and others attempted to remove her clothing in order to conduct her abdominal examination that she demanded for the sake of modesty that the cameras be turned off.

## MOOD SYMPTOMS

It is not uncommon for newly incarcerated individuals to experience symptoms reflecting depression. In addition to subjectively depressed mood, one can also see changes in appetite, weight, sleep, hygiene, interpersonal engagement, and other activities. Suicidality can emerge, as can increased frequency of crying spells. For someone who is incarcerated in a cell with constant monitoring, opportunities for activity are limited but available. In these circumstances, a decrease in reading, writing and praying are examples of changing behaviors that can reflect an emerging depression.

Ms. Siddiqui was felt to be deteriorating while at MDC Brooklyn, according to concerns expressed by her attorneys and mental health staff. Understandably, her bizarre statements as well as her repeated refusals to be examined required evaluation. Unfortunately, she thwarted those attempts by MDC Brooklyn personnel.

One of the benefits of constant observation is that it allows for a comprehensive, yet specific description of behaviors. In a detailed and comprehensive review of the MDC logbook, I found no evidence of marked deterioration based upon those documented behaviors that included eating, sleeping, crying, reading, engaging in personal hygiene, praying and the like.

In fact, Ms. Siddiqui was noted to be crying less in September (2.1% of total time) compared to August (3.2% of total time). Writing behavior increased from 1.1% in August to 1.2% in September. Reading time increased by 20% in September compared to August. Her time spent eating also improved from August to September, with an increase of seven hours compared to the previous month. She was noted to be praying 36% more in September and reading 20% more in September compared to August. Her sleep increased by 1% during the month of September. The amount of time spent attending to personal hygiene increased from 2.8% to 3.8%. In addition to increased attention to personal hygiene in September, she was also noted to clean her cell much more in September, spending 1.2% of her time in September compared to 0.3 % in August. While compulsive cleaning can be a symptom of Obsessive Compulsive disorder, or as a manifestation of other anxiety disorders, there is no indication that Ms. Siddiqui is obsessed with cleaning, based upon my interviews with mental health staff at FMC Carswell. Her pacing behavior, at less than 1% of total time, remained essentially constant.

There were some decreases in time spent in activities in September compared to August. Her lack of cooperation is reflected by a 25% decrease in time speaking with officers, mental health personnel and legal personnel. Her 56% decrease in time spent with medical services is reflection of both her lack of cooperation as well as decreased need for wound care as she continued to heal.

Saathoff M.D.                    CST EVALUATION:  Aafia Siddiqui                    15 MARCH 2009

In summary, Ms. Siddiqui's alarming statements about hallucinations and increasingly adamant refusal to cooperate with medical exams and assessments, complaints of decreased eating, sleeping, reading, etc were *not at all* accompanied by evidence of deterioration in observable behaviors.  Remarkably, she actually improved in those behaviors in September compared to August, when she ate more, slept more, read more, wrote more, attended to hygiene more and cried less.

UNDERSTANDING OF COMPETENCY

In my interview with Dr. Powers on 12 FEB 2009, she related that because of her lack of cooperation Ms. Siddiqui has been very difficult to evaluate.  In my interviews with Ms. Siddiqui on 12 FEB and 13 FEB 2009, I also found Ms. Siddiqui hostile to the idea of a court ordered evaluation for competency. She angrily stated that the prior incompetency determination should have been sufficient. Furthermore, she stated that Dr. Powers was a "liar! She told me the study was over!"  Dr. Johnson's attempts to evaluate Ms. Siddiqui for competency were met with agitation. Ms. Siddiqui reportedly placed her fingers in her ears and wailed, shouting that she would not listen to anything that Ms. Siddiqui was saying."

Although a direct assessment of competency is thwarted by Ms. Siddiqui's refusal to cooperate, one can gain a deeper appreciation of her understanding of the legal process through interviews and review of documentation.   While at MDC Brooklyn during the earliest days of her confinement, Ms. Siddiqui expressed confidence to PA Brooks about her legal case. Over time, as her optimism waned, her behaviors changed as well.  PA Brooks related the following to me in her interview of 21 JAN 2009:

> [I] saw her a day or two after she arrived, and then a day or two
> before she left. Saw her, [she was] pleasant when I first met her.
> [She] made comments that she spoke with her lawyers and said
> that her lawyers advised her that she shouldn't have to be at MDC
> for long...

> The more she realized that her lawyers couldn't get her out, she
> started asking to see her son. She started refusing the meds and
> asked me to take them away – then accused me.

> She really thought she was going home. Lawyers were coming to
> get her. [As time went on, she] realized that she would be held
> accountable.

In a 9 OCT 2008 phone call with her brother, one day after meeting with Pakistani officials who visited in Texas, Ms. Siddiqui appeared to discuss legal strategy:

> "the thing is that we have very strong evidence to win the case,
> but we will not win it through this system...its very strong,
> ...listen, tell them that he has to make the point, internationally,

> that I was shot…I was a prisoner in the third government country..
> ok? They shot me and took me. They are abducting people from
> other people's prisons. Even the Afghans have written…they have
> given public statements that they have refused to give me to them.
> ..the public statement is in the media.

On 16 OCT 2008 in a telephone conversation with her brother, he brought up the subject of legal proceedings.

> Ali:    yes another thing is that she just wanted to talk to you and
>          explain about attorneys and this kind of stuff. The legal
>          things and all but it seems you are not interested.
> Aafia:  yes, I am not interested in this at all
> Ali:    yes, that s what I told her that she is not interested so what
>          can I do?

In that same phone conversation, Ms Siddiqui expressed significant interest in the outcome of the competency evaluation that was underway:

> Aafia:  I don't get a bad feeling about Dr. Powell's study
> Ali:    What?
> Aafia:  I said I don't get a bad feeling
> Ali:    Yes yes
> Aafia:  But the thing in my mind is I don't whom she will order it
>          to and if she will do the right thing.  And it will all come
>          when she comes back and I will try to see if I can do it. But
>          then let's see. It is all in the hands of God…Because time is
>          running out.

As the date of the competency evaluation report neared, Ms. Siddiqui related the following in a telephone conversation with her brother on 8 NOV 2008.

> I don't know what they are doing. I think their evaluation must be
> done. It's been a month since I have been brought here…people
> over here don't know anything about it. I have prayed to God but I
> can't think of a place I want to be put now. I can't determine for
> Pakistan or somewhere else.

## SYMPTOMS AS SOLUTIONS

While symptoms of mental illness present great problems for those who suffer from mental illness, in some cases symptoms can instead serve as *solutions*.  In her 21 JAN 2009 interview with me, PA Brooks noted that after being presented with documentation of charges for having kicked her during the forced medical exam, Ms. Siddiqui claimed that she was unable to read the paper, and then proceeded to tear up the document. "When they presented my write-up to her, she said she couldn't read anymore." The penalty would have been significant, with loss of 180

days phone privileges. However, Dr. Guerrero-Cohen, citing a psychotic condition that included hallucinations and delusions, determined on 17 SEP 2008 that the charges should be dropped, and therefore Ms. Siddiqui was not held accountable for her assault on PA Brooks.

Despite evidence to the contrary, Ms. Siddiqui's claims that she was unable to read or write while at FMC Carswell served to thwart attempts by Dr. Powers to administer psychological testing. In her 12 FEB 2009 interview with me, Dr. Powers related that Ms. Siddiqui used this and other excuses to justify her refusal to cooperate.

Dr. Powers also related to me that Ms. Siddiqui's claim that her death had migrated to her dominant hand, and therefore prevented her from writing in the process of evaluation. It also provided her with a dramatic opportunity to demonstrate a disability, when she was noted to awkwardly sign her name with her non-dominant hand. As evidenced by the use of her dominant hand later that same day in fixing her scarf and appropriate used of gestures during the time that I interviewed her, this solution was short-lived and quickly abandoned.

As indicated earlier, the presence of social isolation can be a serious symptom of mental illness. According to the mental health staff at FMC Carswell, Ms. Siddiqui has effectively used this as a tool to thwart assessment, and helped lead to the initial determination of incompetency.

In my interviews with Drs. Kempke and Powers on 12 and 13 February, they both spoke about the content of Ms. Siddiqui's reported hallucinations and delusions. Hallucinations and delusions that reflect children who are mistreated or in need can evoke sympathy in the listener.

Although Ms. Siddiqui's claims of deterioration at MDC Brooklyn, in that she was reading less, sleeping less, eating less and crying more have been demonstrated on review to be without merit, these reported behaviors were a concern for evaluating professionals. Similarly, Ms. Siddiqui's claim of sitting and waiting next to her cell window in response to a hallucination about her son, although demonstrably false, evoked a compassionate response by Chief Psychologist Guerrero Cohen, according to Officer Washington.

When an individual is medically ill, a refusal for treatment can be dangerous if not life threatening. According to my interview with PA Brooks on 21 JAN 2008, Ms. Siddiqui's refusals of medical treatment only began occurring regularly after it was clear that her wound had sufficiently healed. PA Brooks found Ms. Siddiqui to be appropriately concerned about her abdominal wound during the time that it required attention. Her consistent refusals for treatment only occurred after the wound had largely healed.

Ms. Siddiqui's agitation when approached by Dr. Johnson and refusal to answer basic cognitive questions when interviewed by me were both obstacles to assessment. Ms. Siddiqui's refusals to comply with Dr. Johnson, myself or "anyone that the court sends" are examples of symptoms that serve as solutions, if the goal is to prevent a re-assessment of competency.

Saathoff M.D.                    CST EVALUATION:  Aafia Siddiqui                    15 MARCH 2009

CURRENT DIAGNOSTIC CONSIDERATIONS

In my interviews with Dr. Kempke and Dr. Powers, conducted on 12 and 13 FEB 2009, they described an evolution of their understanding of Ms. Siddiqui and the varying symptoms that she has demonstrated.

In contrast to their initial evaluations, they have obtained more information from collateral sources and have also witnessed changes in Ms Siddiqui's presentation that are not consistent with the signs and symptoms of major mental illness.  According to both, they felt that her lack of cooperation has thwarted accurate assessment since her arrival.

Dr. Powers made the following statement to me:

> Yesterday during the whole Sally Johnson evaluation, she said Dr. Powers when I ask you to stop talking, you walk away, and this Dr. Johnson... [does not!]

> She tries symptoms, and then drops them. She is like malingerers I have seen, who say 'I don't know, I don't want to talk to you.' Based on what I now know from collateral sources, malingering is high on my differential diagnosis. I think she was upset at first getting here. I think that she is reactive in her emotions.

Dr. Kempke echoed the assessment of Dr. Powers:

> In December, I was under the impression that she was depressed and psychotic. Now she gives the appearance of being more calculating in what she says.

> Even though she hasn't been given antipsychotics, she has improved. I had thought that her brother would become helpful in resolution of her symptoms. I was surprised that she emphasized the interest in returning back to Pakistan.

> I am a clinical psychiatrist. I am not a forensic psychiatrist. I am not going to claim whether to diagnosis someone as competent. I am the most easily conned person on the unit.  I realized that she was conning me when I received the collateral information from Dr. Johnson

> By week three, no longer worried that she was refusing the antidepressant. I initially believed her to be naïve, but after Dr. Johnson/s first visit, I noticed a difference in her. The refusal to speak with someone with training, and [also her capability] of making a decision. Clearly she demonstrated that she was calculating. This woman is very smart. After Dr. Johnsons first

37

Saathoff M.D.                    CST EVALUATION: Aafia Siddiqui                    15 MARCH 2009

visit, I was concerned. She clearly demonstrated how calculating she was after Dr. Johnson's second visit.

Dr Johnson's visit really revealed her lack of cooperation. If she has been psychotic in the last 3 months, I have not seen it. At no time have a seen her homicidal, suicidal, with evidence of thought disorder, negative symptoms, response to internal stimuli, poor grooming, vegetative symptoms. We were worried at first, but we have seen that she has full range of affect. She has been able to laugh and display anger.

I think she had adjustment d/o when she first came. I have not seen her hallucinate because hallucinations have not been evident...Based on what I now know from collateral sources, malingering is high on my differential diagnosis. I think she was upset at first getting here.  I think that she is reactive in her emotions, with response to stress.

## SUMMARY

At this time and based upon my review of all documents provided to me and interviews conducted, I am in agreement with Ms. Siddiqui's current treating psychiatrist Dr. Kempke and her evaluating psychologist, Dr. Kempke.  Like them, I do not see convincing evidence of major mental illness in Ms. Siddiqui.  Her constellations of varied, dramatic and evolving symptoms that she uses to "crowd the canvas"[15] are much more consistent with malingered mental illness than true major mental illness.  Motivations to malinger generally involve either circumventing punishment or seeking pleasure.[16]  In Ms. Siddiqui's unique case, malingered symptoms have provided a dual solution in that a finding of incompetency could serve to both prevent prosecution while at the same time facilitating rapid repatriation.

Because of her desire to be repatriated to Pakistan and her interest in avoiding criminal prosecution, Ms. Siddiqui has had a strong motivation to appear incompetent. Ms Siddiqui's use of deception, evasiveness, expressions of paranoia and isolation have served to thwart an accurate assessment. Her public expression of psychotic symptoms and claims of torture initially influenced mental health professionals to assume that these symptoms were real and required assessment.  However, her occasional bizarre public statements have had the appearance of overacting.[17]  In addition, her inconsistencies during telephone conversations have at times been striking, when she changed the genders of her hallucinatory child in mid-sentence.[18]  Her dramatic, yet inconsistently expressed hallucinations and sudden onset[19] delusions have evolved and decreased significantly despite the absence of antipsychotic or psychotherapeutic treatment.

[16] Rogers, Clinical Assessment of Malingering and Deception,(2008) Third Edition, The Guilford Press, p. 53.

[17] Wachpress, Berenberg & Jacobson, (1953), Simulation of psychosis. Psychiatric Quarterly, 27, 463-473.

[18] Anderson et.al, An experimental investigation of simulation and pseudo-dementia, (1959) Acta Psychiatrica Neurologica Scandinavia, (34)(132),1-42.

[19] Gundez-Bruce et al, (2005), Duration of untreated psychosis and time to treatment to response for delusions and hallucinations. American Journal of Psychiatry, 162(10), 1966-1969.

Saathoff M.D.                    CST EVALUATION: Aafia Siddiqui              15 MARCH 2009

Her claims of serious deterioration at MDC Brooklyn are belied by a thorough examination of the log book, which remarkably demonstrated improvement in her level of function over the course of her two months there. Her cognitive complaints[20] have been myriad, short-lived and readily contradicted by observation of her high level of functioning. She has consistently demonstrated high level interpersonal and intellectual skills as evidenced by her ability to effectively negotiate for privileges. She herself reports that she has improved significantly since her arrival at FMC Carswell, attributing it to her prayers to Allah.

Due to the above stated reasons and based upon the interviews conducted and documents reviewed that are listed in Appendix I, it is my opinion that Ms. Siddiqui has sufficient present ability to consult with her lawyer(s) with a reasonable degree of rational understanding and maintains a rational as well as factual understanding of the proceedings against her.

I am in agreement with Dr. Kempke and Dr. Powers that Ms. Siddiqui is currently competent to stand trial.

---

[20] Bash, L & Alpert,M, (1980) The determination of malingering.  Annals of the New York Academy of Science, 347, 86-99.

Saathoff M.D.                    CST EVALUATION: Aafia Siddiqui                    15 MARCH 2009

**Appendix I**

| | |
|---|---|
| 1. | Ph.D. Dissertation by Defendant, Feb. 2001 |
| 2. | Sekuler R, Siddiqui A, et al. Reproduction of seen actions: stimulus-selective learning. Perception, 2003. 32: 839-854. |
| 3. | Medical Administration Record, H26-H141, July-August 2008 |
| 4. | Video (afghan_press_conference.wmv), Press Conference, Afghanistan, July 17, 2008 |
| 5. | Transcription of Defendant Statement, H227- H228, Jul. 19, 2008 |
| 6. | Transcription of Defendant Statement, H197-H201, Jul. 21, 2008 |
| 7. | Transcription of Defendant Statement, H229 - H230, Jul. 20, 2008 |
| 8. | Transcription of Defendant Statement, H231- H237, Jul. 22, 2008 |
| 9. | Transcription of Defendant Statement, H238- H241, Jul. 23, 2008 |
| 10. | Transcription of Defendant Statement, H242-H246, Jul. 24, 2008 |
| 11. | Transcription of Defendant Statement, H247, Jul. 25, 2008 |
| 12. | Transcription of Defendant Statement, H248-H253, Jul. 26, 2008 |
| 13. | Transcription of Defendant Statement, H254-H259, H321-H326, Jul. 27, 2008 |
| 14. | Transcription of Defendant Statement, H396-H403, Jul. 29, 2008 |
| 15. | Transcription of Defendant Statement, H404-H407, Jul. 30, 2008 |
| 16. | Transcription of Defendant Statement, H408-H414, Jul. 31, 2008 |
| 17. | Sealed Complaint, Jul. 31, 2008 |
| 18. | Transcription of Defendant Statement, H415-H421, Aug. 1, 2008 |
| 19. | Visiting Log for Inmate Aafia Siddiqui, Aug. 1, 2008 – Dec. 12, 2008 |
| 20. | Transcription of Defendant Statement, H422-H424, Aug. 2, 2008 |
| 21. | Log Book, Special Watch, Aug. 4 – Sep. 14, 2008 |
| 22. | Transcription of Defendant Statement, H450-H455, Aug. 3, 2008 |
| 23. | Memo, Medical Status of Aafia Siddiqui, H11, Aug. 3, 2008 |
| 24. | Discharge Note, H12, Aug. 3, 2008 |
| 25. | Radiologic Examination Report, H13-H14, Aug. 3, 2008 |
| 26. | Patient Lab Inquiry, H15-H23, Aug. 3, 2008 |
| 27. | Progress Note, H24-H25, Aug. 3, 2008 |
| 28. | Staff Notes, Medical College of Georgia (MCG), H1-H4, Aug. 4, 2008 |
| 29. | General Evaluation, MCG, H5-H8, Aug. 4, 2008 |
| 30. | Transcription of Defendant Statement, H202-H203, Aug. 4, 2008 |
| 31. | Psychology Data System (PDS), Intake Screening, Aug. 4, 2008 |
| 32. | Press Release, Department of Justice, Aafia Siddiqui Arrested for Attempting to Kill United States Officers in Afghanistan, Aug. 4, 2008 |
| 33. | Prisoner Remand, Aug. 4, 2008 |
| 34. | Acknowledgment of Inmate Part 3-4, Aug. 4, 2008 |
| 35. | Intake Screening Form, Aug. 4, 2008 |
| 36. | Medical Duty Status, Aug. 4, 2008 |
| 37. | Health Screen, Aug. 4, 2008 |
| | |
| 39. | Article: Female 'terror' scientist Aafia Siddiqui facing US court after extradition, Jenny Booth, Times Online, Aug. 5, 2008 |
| 40. | Inmate Personal Property Record, Aug. 5, 2008 |
| 41. | Inmate Load Data, Aug. 5, 2008 |
| 42. | Medical Attention Form, Aug. 5, 2008 |
| 43. | Security/Designation Data, Aug. 5, 2008 |
| 44. | Administrative Detention Order, Aug. 5, 2008 |
| 45. | Inmate Profile, Aug. 5, 2008 |
| 46. | Inmate Discipline Data, Aug. 5, 2008 |
| | |
| 48. | Inmate Food Intake Record, Aug. 5 – Aug. 10, 2008 |
| 49. | Clinical Encounter, Aug. 6, 2008 |
| 50. | Clinical Encounter – Administrative Note, Aug. 6, 2008 |
| 51. | Inmate Profile, Aug. 7, 2008 |

| | |
|---|---|
| 52. | PDS, Administrative Contact: Staff Info, Aug. 8, 2008 |
| 53. | PDS, Brief Counseling Session, Aug. 8, 2008 |
| 54. | Joint Automated Booking System, Inmate Images, Aug. 8, 2008 |
| 55. | Clinical Encounter, Aug. 9, 2008 |
| 56. | Inmate Food Intake Record, Aug. 10 – Aug. 16, 2008 |
| 57. | PDS, Reading Material Delivered, Aug. 11, 2008 |
| 58. | PDS, Sexual Abuse: Unavailable Information, Aug. 11, 2008 |
| 59. | Authorization for Release of Health Information Pursuant to HIPAA, Aug. 11, 2008 |
| 60. | PDS, Document Data, Aug. 11, 2008 |
| 61. | Inmate Profile, Aug. 11, 2008 |
| 62. | Clinical Encounter, Aug. 12, 2008 |
| 63. | Clinical Encounter – Administrative Note, Aug. 12, 2008 |
| 64. | Medical Report, Aug. 12, 2008 |
| 65. | MDC Brooklyn Laundry Clothing Issue and Exchange Form, Aug. 12, 2008 |
| 66. | Clinical Encounter – Administrative Note, Aug. 13, 2008 |
| 67. | Bacterial Culture Report, Aug. 13, 2008 |
| 68. | PDS, Decline of Mental Health Services, Aug. 14, 2008 |
| 69. | Medical Report, Aug. 14, 2008 |
| 70. | PDS, SHU Review, Aug. 15, 2008 |
| 71. | Clinical Encounter – Administrative Note, Aug. 15, 2008 |
| 72. | Medical Report, Aug. 15, 2008 |
| 73. | Inmate Food Intake Record, Aug. 17 – Aug. 23, 2008 |
| 74. | Radiology Report, Aug. 18, 2008 |
| 75. | Clinical Encounter – Administrative Note, Aug. 19, 2008 |
| 76. | Letter from Sheldon Feit, Aug. 19, 2008 |
| 77. | PDS, Administrative Contact; Response to I/M, Aug. 21, 2008 |
| 78. | PDS, Medical Consult: Response, Aug. 22, 2008 |
| 79. | Clinical Encounter, Aug. 22, 2008 |
| 80. | Clinical Encounter, Aug. 23, 2008 |
| 81. | PDS, Crisis Intervention Session, Aug. 23, 2008 |
| 82. | Pre-Trial Inmate Review Report, Aug. 23, 2008 |
| 83. | PDS, Administrative Contact: Declined follow-up, Aug. 24, 2008 |
| 84. | Clinical Encounter, Aug. 25, 2008 |
| 85. | PDS, Administrative Contact: Staff Info, Aug. 25, 2008 |
| 86. | PDS, Mental Health Contact, Aug. 27, 2008, Hess |
| 87. | PDS, Mental Health Contact, Aug. 27, 2008, Cohen |
| 88. | Authorization for Release of Medical Information, Aug. 27, 2008 |
| 89. | Memo, from S Jones, Special Housing Record, Aug. 27, 2008 |
| 90. | Inmate Food Intake Record, Aug. 27 – Aug. 30, 2008 |
| 91. | Clinical Encounter, Aug. 28, 2008, Beaudouin |
| 92. | Clinical Encounter – Administrative Note, Aug. 28, 2008, Beaudouin |
| 93. | Clinical Encounter, Aug. 28, 2008, Brooks |
| 94. | Clinical Encounter – Administrative Note, Aug. 28, 2008, Brooks |
| 95. | Translated Call Transcript, Aug. 29, 2008 |
| 96. | PDS, Mental Health Contact, Aug. 29, 2008 |
| 97. | PDS, Suicide Risk Assessment, Aug. 29, 2008 |
| 98. | Clinical Encounter, Aug. 29, 2008 |
| 99. | Clinical Encounter – Administrative Note, Aug. 29, 2008 |
| 100. | Clinical Encounter, Aug. 30, 2008 |
| 101. | Clinical Encounter – Administrative Note, Aug. 30, 2008 |
| 102. | Clinical Encounter, Aug. 31, 2008 |
| 103. | Clinical Encounter – Administrative Note, Aug. 31, 2008 |
| 104. | Inmate Food Intake Record, Aug. 31 – Sep. 6, 2008 |
| 105. | PDS, Mental Health Contact, Sep. 1, 2008 |
| 106. | Clinical Encounter, Sep. 1, 2008 |
| 107. | Clinical Encounter – Administrative Note, Sep. 1, 2008 |

Saathoff M.D.                    CST EVALUATION:  Aafia Siddiqui                    15 MARCH 2009

| | |
|---|---|
| 108. | Indictment, Sep. 2, 2008 |
| 109. | PDS, Psychiatry Consult: Response, Sep. 2, 2008 |
| 110. | Clinical Encounter, Sep. 2, 2008, Campos |
| 111. | Clinical Encounter, Sep. 2, 2008, McLean #1 |
| 112. | Clinical Encounter, Sep. 2, 2008, Beaudouin #1 |
| 113. | Clinical Encounter – Administrative Note, Sep. 2, 2008, Beaudouin |
| 114. | Clinical Encounter, Sep. 2, 2008, Beaudouin #2 |
| 115. | Clinical Encounter – Administrative Note, Sep. 2, 2008, Beaudouin |
| 116. | Clinical Encounter, Sep. 2, 2008, McLean #2 |
| 117. | Indictment, Sep. 2, 2008 |
| 118. | Criminal Docket for Case 1:08-cr-00826-RMB, Sep. 2, 2008 |
| 119. | PDS, Mental Health Contact, Sep. 3, 2008 |
| 120. | Clinical Encounter, Sep. 3, 2008 |
| 121. | Clinical Encounter – Administrative Note, Sep. 3, 2008 |
| 122. | Clinical Encounter – Administrative Note, Sep. 3, 2008 |
| 123. | Letter from E Fink, Sep. 4, 2008 |
| 124. | PDS, Interview Attempt / Mental Health contact, Sep. 4, 2008 |
| 125. | Clinical Encounter, Sep. 4, 2008 |
| 126. | Clinical Encounter – Administrative Note, Sep. 4, 2008 |
| 127. | Memo, from E Fink to R Berman, Sep. 4, 2008 |
| 128. | PDS, Interview Attempt / Mental Health Contact, Sep. 5, 2008 |
| 129. | Clinical Encounter, Sep. 5, 2008, Beaudouin |
| 130. | Clinical Encounter – Administrative Note, Sep. 5, 2008, Beaudouin |
| 131. | Clinical Encounter, Sep, 5, 2008, Sommer |
| 132. | Clinical Encounter – Administrative Note, Sep. 5, 2008, Sommer |
| 133. | Clinical Encounter, Sep. 5, 2008, Brooks |
| 134. | Clinical Encounter – Administrative Note, Sep. 5, 2008, Brooks |
| 135. | Clinical Encounter, Sep. 6, 2008 |
| 136. | Clinical Encounter – Administrative Note, Sep. 6, 2008 |
| 137. | PDS, Mental Health Contact, Sep. 8, 2008 |
| 138. | Memo, R Berman, Sep. 8, 2008 |
| 139. | Inmate Food Intake Record, Sep. 8 – Sep. 13, 2008 |
| 140. | PDS, Interview Attempt / Mental Health Contact, Sep. 9, 2008 |
| 141. | PDS, Confrontational Avoidance, Sep. 9, 2008 |
| 142. | PDS, Psychiatry Visit, Sep. 9, 2008 |
| 143. | Clinical Encounter, Sep. 9, 2008, McLean #1 |
| 144. | Clinical Encounter, Sep. 9, 2008, Beaudouin |
| 145. | Clinical Encounter – Administrative Note, Sep. 9, 2008, Beaudouin |
| 146. | Clinical Encounter, Sep. 9, 2008, McLean #2 |
| 147. | Clinical Encounter, Sep. 9, 2008, Brooks #1 |
| 148. | Clinical Encounter, Sep. 9, 2008, Brooks #2 |
| 149. | Video, Forced Medical Exam and Cell Move, Aafia Siddiqui, Sep. 9, 2008 |
| 150. | Transcript of Video, Forced Medical Exam and Cell Move, Aafia Siddiqui, Sep. 9, 2008 |
| 151. | PDS, SHU Review, Sep. 10, 2008 |
| 152. | PDS, Mental Status Eval: Response to Staff Referral, Sep. 10, 2008 |
| 153. | Clinical Encounter, Sep. 10, 2008 |
| 154. | Clinical Encounter – Administrative Note, Sep. 10, 2008 |
| 155. | Letter to Court from MDC Warden Cameron Lindsey, Sep. 10, 2008 |
| 156. | Memo, to R Berman from C Lindsey, Sep. 10, 2008 |
| 157. | Incident Report, Sep. 11, 2008 |
| 158. | PDS, Suicide Risk Assessment, Sep. 11, 2008 |
| 159. | Incident Report, Sep. 11, 2008 |
| 160. | Inmate Rights at Discipline Hearing, Sep. 11, 2008 |
| 161. | Notice of Discipline Hearing Before the (DHO), Sep. 11, 2008 |
| 162. | Medical Report, Sep. 11, 2008 |
| 163. | PDS, Deteriorated Mental Status, Sep. 12, 2008 |

| | |
|---|---|
| 164. | Inmate Discipline Data, Chronological Disciplinary Record, Sep. 12, 2008 |
| 165. | Inmate Food Intake Record, Sep. 14 – Sep. 20, 2008 |
| 166. | PDS, Brief Counseling Session, Sep. 14, 2008 |
| 167. | Log Book, Special Watch, Sep. 14 – Oct. 2, 2008 |
| 168. | PDS, Mental Health Contact / Brief Counseling, Sep. 15, 2008 |
| 169. | Clinical Encounter, Sep. 16, 2008 |
| 170. | PDS, Brief Counseling, Sep. 16, 2008 |
| 171. | Memo to D Garcia from Dr. Guerrero-Cohen, Sep. 17, 2008 |
| 172. | PDS, Memo to DHO: Incident Reports, Sep. 17, 2008 |
| 173. | PDS, Mental Status Monitoring, Sep. 17, 2008 |
| 174. | PDS, Mental Status Monitoring, Sep. 18, 2008 |
| 175. | Memo, Competency to Stand Trial, Sep. 19, 2008 |
| 176. | PDS, Mental Status Monitoring, Sep. 19, 2008 |
| 177. | PDS, Mental Status Monitoring, Sep. 20, 2008 |
| 178. | PDS, Mental Status Monitoring, Sep. 21, 2008 |
| 179. | Clinical Encounter, Sep. 22, 2008 |
| 180. | Inmate Food Intake Record, Sep. 22 – Sep. 27, 2008 |
| 181. | PDS, Mental Status Monitoring, Sep. 22, 2008 |
| 182. | PDS, Mental Status Monitoring, Sep. 23, 2008 |
| 183. | PDS, Mental Status Monitoring, Sep. 24, 2008 |
| 184. | Email Conversation between Bryan Muilee, Dominique Raia, and Felizardo Agustin, Sep. 25-26, 2008 |
| 185. | PDS, Mental Status Monitoring, Sep. 25, 2008 |
| 186. | PDS, Mental Status Monitoring, Sep. 26, 2008 |
| 187. | PDS, Mental Status Monitoring, Sep. 27, 2008 |
| 188. | PDS, Mental Status Monitoring, Sep. 28, 2008 |
| 189. | Inmate Food Intake Record, Sep. 28 – Oct. 2, 2008 |
| 190. | Individual Custody and Detention Report, Sep. 29, 2008 |
| 191. | PDS, Mental Status, Sep. 30, 2008 |
| 192. | Clinical Encounter, Sep. 30, 2008 |
| 193. | Inmate Intra-Complex Transfer, Sep. 30, 2008 |
| 194. | Clinical Encounter – Administrative Note, Sep. 30, 2008 |
| 195. | Consent to Use SRI Antidepressant, Sep. 30, 2008 |
| 196. | Medical Administration Record, Oct. 2008 |
| 197. | Order, Oct. 1, 2008 |
| 198. | PDS, Medical Examination Attempt, Oct. 1, 2008 |
| 199. | Inmate Intra-Complex Transfer, Oct. 1, 2008 |
| 200. | Letter from Lord Ahmed of Rotherdam to Atty Gen. Michael Mukasey, Oct. 1, 2008 |
| 201. | Clinical Encounter, Oct. 1, 2008 |
| 202. | Carswell AIMS Form, Oct. 1, 2008 |
| 203. | PDS, R&D Screen, Oct. 2, 2008 |
| 204. | Order, Oct. 2, 2008 |
| 205. | Federal BOP In-Transit Data Form, Oct. 2, 2008 |
| 206. | Acknowledgment of Inmate Parts 1-4, Oct. 2, 2008 |
| 207. | Acknowledgment / Receipt of Inmate Account Card, Oct. 2, 2008 |
| 208. | Notice of Right to File for Compensation for Work-Related Injury, Oct. 2, 2008 |
| 209. | Uniform Basic Safety Regulations, Oct. 2, 2008 |
| 210. | Pre-Trial Inmate Interview Form, Oct. 2, 2008 |
| 211. | Federal Prison System Pretrial Inmate Work Waiver/Notice of Separation, Oct. 2, 2008 |
| 212. | Intake Screening Form, Oct. 2, 2008 |
| 213. | Email from E Mejia to E Chapman, Oct. 2, 2008 |
| 214. | Medical Duty Status, Oct. 2, 2008 |
| 215. | Health Screen, Oct. 2, 2008 |
| 216. | Medication Reconciliation and Order Form, Oct. 2, 2008 |
| 217. | PDS, Arrival at Carswell, Oct. 2, 2008 |
| 218. | Chronological Record of Medical Care, Oct. 2, 2008 |
| 219. | Forensic Communication Tracking, Oct. 2-Oct. 23, 2008 |

220.     Letter from S Kuntsler to D Delrio, Oct. 3, 2008
221.     Progress Notes, Oct. 3, 2008
222.     Inpatient Psychiatric Evaluation, Oct. 3, 2008
223.     Order, Oct. 3, 2008
224.     Medical Records, Oct. 3, 2008
225.     Message from Z Qureshi to M Kelly, Oct. 3, 2008
226.     CIM Clearance and Separatee Data, Oct. 3, 2008
227.     Sentence Monitoring Computation Data, Oct. 3, 2008
228.     Memo, Request for FBI Rap Sheet, Oct. 3, 2008
229.     Clearance Data, Oct. 3, 2008
230.     Inmate Discipline Data, Chronological Disciplinary Record, Oct. 3, 2008
231.     Inmate Education Data, Transcript, Oct. 3, 2008
232.     Multidisciplinary Patient Admission Assessment, Oct. 3, 2008
233.     Radiologic Consultation Request/Report, Oct. 3, 2008
234.     Chronological Record of Medical Care, Oct. 3, 2008
235.     Translated Call Transcript, Oct. 3, 2008
236.     Forensic Communication Tracking, Oct. 3 – Nov. 26, 2008
237.     Translated Call Transcript, Oct. 4, 2008
238.     Email from L Coleman, Oct. 4, 2008
239.     Record Copy, Central File, Oct. 5, 2008
240.     Letter from E Chapman to R Berman, Oct. 6, 2008
241.     Administrative Order, Oct. 6, 2008
242.     Clinical Record, Oct. 6-8, 2008

244.     Patient Problem List, Oct. 7, 2008
245.     Medical Record, Oct. 8, 2008
246.     Carswell Patient Admission Assessment, Oct. 8, 2008
247.     Sexual Assault Assessment, Oct. 8, 2008

249.     Admission Screening, Advance Directive Checklist, Oct. 8, 2008
250.     Consent to Admission for Mental Health Treatment, Oct. 8, 2008
251.     In-Patient History and Physical, Oct 8, 2008
252.     Report of Medical Examination, Oct 8, 2008
253.     Medical Record, Oct. 8, 2008
254.     Psychiatric Progress Note, Oct. 8, 2008
255.     Medical Treatment Refusal, Oct. 8, 2008
256.     Tetanus Toxoid Declination, Oct. 8, 2008
257.     Carswell MDS Admission Classification, Oct. 8, 2008
258.     Translated Call Transcript, Oct. 9, 2008

261.     Clinical Encounter – Administrative Note, Oct. 9, 2008
262.     M-1 Unit Chart Completeness Check List, Oct. 9, 2008
263.     Carswell AIMS Form, Oct. 9, 2008
264.     HIV Counseling Documentation, Oct. 9, 2008
265.     Fax Cover Page and Series of Newspaper Articles ffrom R Berman to Warden Chapman, Oct. 9, 2008
266.     Progress Notes, Oct. 9-10, 2008
267.     Letter from M Garcia to L Powers, Oct. 10, 2008

269.     Medical Record, Oct. 10, 2008
270.     Progress Notes, Oct. 11, 2008
271.     Medical Record, Oct. 13, 2008
272.     Medical Record, Oct. 14, 2008
273.     Clinical Encounter, Oct. 14, 2008
274.     Inpatient Nutritional Assessment Form, Oct. 15, 2008
275.     Administrative Order, Oct. 15, 2008

| | |
|---|---|
| 276. | Medical Record, Oct. 15, 2008 |
| 277. | Individual Treatment Plan, Oct. 15, 2008 |
| 278. | Attendance Sheet, Oct. 15, 2008 |
| 279. | Translated Call Transcript, Oct. 15, 2008 |
| 280. | Medical Record, Oct. 16, 2008 |
| 281. | Translated Call Transcript, Oct. 16, 2008 |
| 282. | Medical Record, Oct. 17, 2008 |
| 283. | Nursing Assessment, Oct. 17, 2008 |
| 284. | Medical Directive, Oct. 17, 2008 |
| 285. | Interview with L Powers, Oct. 17, 2008 |
| 286. | Medical Record, Oct. 21, 2008 |
| 287. | Inmate Activity Record, Oct. 22, 2008 |
| 288. | Pre-Trial Inmate Review Report, Oct. 22, 2008 |
| 289. | Phone Call Transcription 08-90279054-1023-P-B, Oct. 23, 2008 |
| 290. | Phone Call Transcription 08-90279054-1023-P-A, Oct. 23, 2008 |
| 291. | Medical Record, Oct. 24, 2008 |
| 292. | Email from C Anthony to L Powers, Oct. 28, 2008 |
| 293. | Clinical Dental Records, Oct. 29, 2008 |
| 294. | Inmate Assessment Plan, Academic Progress and Goals, Oct. 24, 2008 |
| 295. | Medical Treatment Refusal, Oct. 24, 2008 |
| 296. | Medical Treatment Refusal, Oct. 26, 2008 |
| 297. | Medical Treatment Refusal, Oct. 27, 2008 |
| 298. | Nursing Assessment, Oct, 27, 2008 |
| 299. | Translated Call Transcript, Oct. 31, 2008 |
| 300. | Therapeutic Documentation Care Plan, Oct-Nov. 2008 |
| 301. | Medical Administration Record, Nov. 2008 |
| 302. | Nursing Assessment, Nov. 1, 2008 |
| 303. | Declination for Vaccine, Nov. 2, 2008 |
| 304. | Translated Call Transcript, Nov. 4, 2008 |
| 305. | Forensic Evaluation FMC Carswell conducted by Dr. Leslie Powers, Nov. 6, 2008 |
| 306. | Nursing Assessment, Nov. 6, 2008 |
| 307. | Medical Treatment Refusal, Nov. 8, 2008 |
| 308. | Inmate Profile, Nov. 10, 2008 |
| 309. | Medical Record, Nov. 12, 2008 |
| 310. | Individual Treatment Plan, Nov. 12, 2008 |
| 311. | Translated Call Transcript, Nov. 12, 2008 |
| 312. | Treatment Team Meeting, Nov. 13, 2008 |
| 313. | Cover Note, Siddiqui Evaluation, from L Powers and S Bridges, Nov. 14, 2008 |
| 314. | Progress Notes, Nov. 14, 2008 |
| 315. | Medical Treatment Refusal, Nov. 14, 2008 |
| 316. | Letter from E Chapman to R Berman, Nov. 14, 2008 |
| 317. | Administrative Order, Nov. 17, 2008 |
| 318. | Email, Request from J Rosiles to D Roerick, Nov. 17, 2008 |
| 319. | Psychiatric Progress Note, Nov. 17, 2008 |
| 320. | Forensic Study Checklist, Nov. 17, 2008 |
| 321. | PDS, Report, Nov. 17, 2008 |
| 322. | Translated Call Transcript, Nov. 17, 2008 |
| 323. | Letter from C Maldonado Jr. to Lord Ahmed of Rotherdam, Nov. 18, 2008 |
| 324. | Note from Christopher LaVigne, Nov. 20, 2008 |
| 325. | Medical Treatment Refusal, Nov. 22, 2008 |
| 326. | Translated Call Transcript, Nov. 26, 2008 |
| 327. | PDS, Interview, Nov. 28, 2008 |
| 328. | Vital Signs Flow Sheet, Nov. 30, 2008 |
| 329. | Medical Treatment Refusal, Nov. 30, 2008 |
| 330. | PDS, Interview, Dec. 2, 2008 |
| 331. | Translated Call Transcript, Dec. 2, 2008 |

| | |
|---|---|
| 332. | Progress Notes, Dec.4 – Dec. 13, 2008 |
| 333. | Translated Call Transcript, Dec. 9, 2008 |
| 334. | Carswell Interdisciplinary Patient Education Record, Dec. 10, 2008 |
| 335. | Treatment Team Meeting Progress Notes, Dec.10, 2008 |
| 336. | Cover Note from L Powers to C LaVigne, Dec. 11, 2008 |
| 337. | Health Problems, Generated Dec. 12, 2008 |
| 338. | PPDs, Generated Dec. 12, 2008 |
| 339. | Medication Summary, Generated Dec. 12, 2008 |
| 340. | Inmate Psychology Profile, Dec. 12, 2008 |
| 341. | Psychiatric Progress Note, Dec. 15, 2008 |
| 342. | Translated Call Transcript, Dec. 17, 2008 |
| 343. | Medical Treatment Refsual, Jan. 11, 2009 |
| 344. | MDC Brooklyn Interview, Officer Thimot, Jan. 13, 2009 |
| 345. | MDC Brooklyn Interview, Officer Doctor, Jan. 13, 2009 |
| 346. | MDC Brooklyn Interview, Officer Medina, Jan. 13, 2009 |
| 347. | MDC Brooklyn Interview, Officer Washington, Jan. 13, 2009 |
| 348. | MDC Brooklyn Interview, Officer Vincent, Jan. 13, 2009 |
| 349. | MDC Brooklyn Interview, Officer Felder, Jan. 13, 2009 |
| 350. | MDC Brooklyn Interview, Officer Lopez, Jan. 13, 2009 |
| 351. | MDC Brooklyn Interview, Officer Lombardo, Jan. 13, 2009 |
| 352. | MDC Brooklyn Interview, Officer Wilkins, Jan. 13, 2009 |
| 353. | MDC Brooklyn Interview, Lt Drake, Jan. 13, 2009 |
| 354. | MDC Brooklyn Interview, Lt Ortiz, Jan. 13, 2009 |
| 355. | MDC Brooklyn Interview, Officer Carter, Jan. 13, 2009 |
| 356. | MDC Brooklyn Interview, Officer Hayward, Jan. 13, 2009 |
| 357. | Interview, Sally Johnson MD, Jan. 13, 2009 |
| 358. | Progress Notes, Jan. 14, 2009 |
| 359. | Medical Treatment Refusal, Jan. 18, 2009 |
| 360. | Telephonic interview, Shawna Brooks, Physician's Assistant MDC Brooklyn (now at Butner FCC), Jan. 21, 2009 |
| 361. | Medical Treatment Refusal, Jan. 25, 2009 |
| 362. | Translated Call Transcript, Jan. 26, 2009 |
| 363. | Inmate Center Report, Jan. 29, 2009 |
| 364. | FMC Carswell, Psychiatry Encounter Note, Kempke MD, Jan. 30, 2009 |
| 365. | FMC Carswell, Progress Note, Powers PhD, Feb. 11, 2009 |
| 366. | Interview, Sally Johnson MD, Feb. 11, 2009 |
| 367. | FMC Carswell Interview, Aafia Siddiqui, Feb. 12, 2009 |
| 368. | FMC Carswell Interview, Kempke MD, Feb. 12, 2009 |
| 369. | FMC Carswell Interview, Leslie Powers, PhD, Feb. 12, 2009 |
| 370. | FMC Carswell Interview, Cristin Ross RN, Feb. 12, 2009 |
| 371. | FMC Carswell Interview, Dorata Tucker RN, Feb. 12, 2009 |
| 372. | FMC Carswell Interview, Troy Whitehead RN, Feb. 12, 2009 |
| 373. | FMC Carswell Interview, Cassidy Brown RN, Feb. 12, 2009 |
| 374. | FMC Carswell Interview, Officer Purvis, Feb. 12, 2009 |
| 375. | FMC Carswell Interview, Aafia Siddiqui, Feb. 13, 2009 |
| 376. | FMC Carswell Interview, Inmate Nursing Assistant Sylvia Hernandez, Feb. 13, 2009 |
| 377. | FMC Carswell Interview, Inmate Nursing Assistant Manuelo Hernandez, Feb. 13, 2009 |
| 378. | FMC Carswell Interview, Leslie Powers, PhD, Feb. 13, 2009 |
| 379. | FMC Carswell, Psychiatry Progress Note, Kempke MD, Feb. 15, 2009 |
| 380. | FMC Carswell, Conversation Documentation, Tatterton PhD, Feb. 26, 2009 |
| 381. | FMC Carswell, Progress Note, Gregg PhD, Mar. 8, 2009 |
| 382. | FMC Carswell, Medical Treatment Refusal, Mar. 8, 2009 |
| 383. | Telephonic Interview, SA Mehta Said, Mar. 9, 2009 |
| 384. | Telephonic Interview, Marty Leeth, Mar. 9, 2009 |
| 385. | Telephonic Interview, SA Bruce Kamerman, Mar. 10, 2009 |
| 386. | FMC Carswell, Memo from Dr. Yanez to Dr. Powers, Mar. 12, 2009 |

Saathoff M.D.                    CST EVALUATION: Aafia Siddiqui                    15 MARCH 2009

387.    Telephonic Interview, SA Angela Sercer, Mar. 13, 2009
388.    Photocopied Evidence, H327-H395, Dates unlisted
389.    Photocopies, Items Recovered from Defendant upon Detention by Afghan National Police, H1-H82,
        H487-H525, Dates unlisted
390.    Preliminary Translations of Documents Recovered from Defendant, H-456-486, Dates unlisted
391.    Unit Admission and Orientation Program Checklist, Dates unlisted
392.    BEMR Records, Allergies, Dates unlisted
393.    Forensic Interview, Dates unlisted

Docket and file on consent
of the parties.

SO ORDERED:
Date: 7·2·09    Richard M. Berman
                Richard M. Berman, U.S.D.J.