USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/2/09

0 8 cr 826

FORENSIC EVALUATION

**MEMO ENDORSED**
*f.35*

Name: Aafia Siddiqui
Date of Birth: 03/02/1972
BOP Register Number: 90279-054
Case Number: 08 Cr. 826 (RMB)
Date of Report: 03/16/2009

<u>Identifying Information:</u> Aafia Siddiqui is a 37-year old married, Pakistani female, who is currently housed within the Federal Bureau of Prisons at the Federal Medical Center (FMC) in Carswell, Texas. This report will outline the results of a forensic psychiatric evaluation completed for the purposes of assessing Ms. Siddiqui's current competence to stand trial. The evaluation was requested by Assistant U.S. Attorneys David Raskin and Chris LaVigne of the United States Attorney Office for the Southern District of New York. The evaluation was performed pursuant to a court order issued 12/23/08, by the Honorable United States District Judge Richard M. Berman, of the United States District Court for the Southern District of New York. The court ordered that subject to the rules and regulations of the U.S. Bureau of Prisons and upon adequate notice to and approval of the Wardens at FMC Carswell and the Metropolitan Detention Center (MDC) in Brooklyn, New York: (1) the Mental Health Professionals, retained by the Government and defense counsel, shall be permitted access to FMC Carswell and MDC Brooklyn, New York (MDC Brooklyn) for purposes of conducting the Evaluations; (2) the Mental Health Professionals shall be permitted to interview Aafia Siddiqui, the defendant, for purposes of the Evaluations; (3) the Mental Health Professionals shall be permitted to interview any other individuals at FMC Carswell and MDC Brooklyn relating to the competence and mental health treatment of Aafia Siddiqui, the defendant, for purposes of the Evaluations; (4) the Mental Health Professionals shall be permitted to review, inspect, and/or copy any documentation or information at FMC Carswell and MDC Brooklyn relating to the competence of Aafia Siddiqui, the defendant, for purposes of conducting the Evaluations; (5) the Mental Health Professionals are permitted to discuss the evaluations with the Government, the Court, defense counsel, and treating or examining psychiatrists, psychologists, or mental health staff at FMC Carswell and MDC Brooklyn; and (6) any report (the"Reports") generated by the Mental Health Professionals are confidential and may be shared only with the Government, the Court, defense counsel, and treating or examining psychiatrists and psychologists and the Wardens at FMC Carswell and MDC Brooklyn. The Report shall be submitted to the Court under seal until further order of the Court.

At the start of this evaluation, Ms. Siddiqui was represented by Elizabeth Fink, appointed counsel, assisted by Sara Kuntsler and Gideon Oliver. During this evaluation Defense Attorney Fink informed this evaluator that she was filing a request for consideration to be replaced as counsel. Following a conference on 02/23/09, this evaluator was informed that new counsel, Dawn Cardi, had been appointed to represent Ms. Siddiqui. She is assisted by Chad Edgar. The U.S. Attorneys assigned to this case are David Raskin and Chris LaVigne.



GOVERNMENT
EXHIBIT
B
08 Cr. 826 (RMB)
(ID)

Ms. Siddiqui is charged in a seven count indictment filed on 09/02/08, with a series of offenses that are alleged to have occurred on or about 07/18/08, in Ghazni, Afghanistan. These offenses include Attempted Murder of United States Nationals, in violation of Title 18, U.S. Code, Sections 2332(b)(1) and 3238; Attempted Murder of United States Officers and Employees, in violation of Title 18, U.S. Code, Sections 1114(3) and 323(b); Armed Assault of the United States Officers and Employees, in violation of Title 18, U.S. Code, Sections 111(a)(1), 111(b) and 3238; Discharge of a Firearm During Crime of Violence, in violation of Title 18, U.S. Code, Sections 924(c)(1)(A)(iii), 924(c)(1)(B)(ii) and 3238; Assault of United States Officers and Employees (Interpreter One), in violation of Title 18, U.S. Code, Sections 11(a)(1) and 3238; Assault of United States Officers and Employees (FBI Special Agent One), in violation of Title 18, U.S. Code, Sections 111(a)(1) and 3238; and Assault of United States Officers and Employees (US Army Officer Two), in violation of Title 18, U.S. Code, Sections 111(a)(1) and 3238.

On 10/01/08, the court ordered that a hearing would be conducted to determine whether Aafia Siddiqui, the defendant, is medically fit and mentally competent to understand the nature and consequences of the proceedings against her or to assist properly in her defense, pursuant to Title 18, U.S. Code, Section 4241(a)(b). Ms. Siddiqui was transferred from MDC Brooklyn, New York to FMC Carswell, Texas on 10/02/08, for the purposes of undergoing a court ordered competency evaluation. An initial competency evaluation was completed at FMC Carswell by Leslie Powers, Ph.D., and subsequently Dr. Powers submitted a report dated 11/06/08 to the court rendering her initial opinion in regard to Ms. Siddiqui's competency. Following submission of that report, Ms. Siddiqui continued to be detained at the inpatient mental health unit (M1) at FMC Carswell for observation and additional evaluation as outlined in the court order listed above.

Evaluation Procedures and Collateral Information Reviewed: For the purposes of this evaluation, extensive collateral information was received and reviewed. This evaluator traveled to Texas to interview Ms. Siddiqui during two separate visits to FMC Carswell, January 22nd and 23rd, 2009, and February 10th and 11th, 2009. Initially during each of those days and several additional times throughout each day, this evaluator identified herself, who had retained her, the purpose of the evaluation, and the limits of confidentiality. Ms. Siddiqui's initial statements and subsequent verbalizations and behavior supported that she had a clear understanding of the identity of this evaluator and the purpose of the interviews. It should be noted that overall Ms. Siddiqui was extremely uncooperative with the evaluation process. She indicated verbally that she would not cooperate with the evaluation and that she had no intent of cooperating with any additional evaluations ordered by the court. She demonstrated a variety of behaviors to emphasize her intent and these will be discussed in the body of this report. Ms. Siddiqui is not viewed as a reliable historian in regard to symptom report and had been intentionally vague in providing details in response to questions since the time of her arrest. It is this evaluator's opinion that the lack of cooperation by Ms. Siddiqui is volitional and not a symptom of mental illness.

Written collateral materials were made available to this evaluator by the U.S. Attorney's Office. A summary of materials provided, in the order received by this evaluator, is as follows: a copy of the Forensic Evaluation Report dated 11/06/08, completed by Leslie Powers, Ph.D., Forensic

Psychologist, reviewed by Robert Gregg, Ph.D., Chief Psychologist; the medical records completed from the time Ms. Siddiqui was taken into custody on 07/18/08 until the time she was transferred into the care of Federal Bureau of Prisons at MDC Brooklyn on 08/04/08; Federal Bureau of Investigation reports dated 07/27/08 through 08/08/08; Psychology Data System notes of Defendant from on or about 08/23/08 to 09/15/08; clinical encounter notes of the defendant from on or about 08/23/08 to 09/10/08; a copy of the Criminal Complaint and Indictment against the defendant as well as various orders issued in this case; medical records from FMC Carswell as well as transcriptions of two telephone calls the defendant made while at FMC Carswell; additional pages related to the defendant's medical care while at MDC Brooklyn from on or about 08/04/08 until 08/22/08; a 09/08/08 letter to the court from MDC Brooklyn Warden Cameron Lindsay; copies of certain documents and items recovered from the defendant when she was detained by Afghan National Police (Bates labeled 1-82 and 487-523); preliminary translations of certain of the documents recovered from the defendant (Bates labeled 456-86); a copy of Aafia Siddiqui's dissertation entitled "Separating the Components of Imitation"; additional materials provided by FMC Carswell and MDC Brooklyn including complete copies of Aafia Siddiqui's medical file, psychological file, and central file; an article co-authored by Aafia Siddiqui, entitled "Reproduction of Scene Actions: Stimulus Selective Learning" which was published in Perception 2003, Volume 32, pages 138-854; additional material provided by FMC Carswell and MDC Brooklyn, which included two discs labeled MDC phone calls and FMC Carswell phone calls (some of these recordings were in Urdu); draft transcript and translation of these phone calls; additional information provided by FMC Carswell and MDC Brooklyn including copies of the log books maintained on Ms. Siddiqui while she was detained at MDC Brooklyn (from 08/05/08 to 10/02/08); copies of the Special Housing file on Ms. Siddiqui while she was detained at MDC Brooklyn; copies of Incident Reports on Ms. Siddiqui while she was detained at MDC Brooklyn; copies of some documents retrieved from a thumb drive found in Ms. Siddiqui's possession (bearing labels 557-604); a recent order entered by the court permitting additional evaluation of Aafia Siddiqui's competency to stand trial dated 12/24/08 and issued by the Honorable Robert M. Berman; a transcript of Ms. Siddiqui's 12/02/08 telephone call from FMC Carswell; notes by Dr. Greg Saathoff of 01/13/09 interviews of certain MDC Brooklyn staff who observed inmate Siddiqui and made inmate entries to the log book; a list of names provided by Ms. Siddiqui to SOS Officer Henley on 01/03/09; a copy of a letter submitted to FMC Carswell Warden Elaine Chapman; a copy of items purchased by inmate Siddiqui through the commissary at FMC Carswell between 10/01/08 and 02/10/09; copies of additional medical records and progress notes obtained from FMC Carswell beginning 01/14/09; copies of academic transcripts for Ms. Siddiqui from Massachusetts Institute of Technology and Brandeis University; a list of individuals in contact with Ms. Siddiqui while in transport to the United States;

additional transcripts of telephone calls made by Ms. Siddiqui from FMC Carswell; ongoing access to the current FBOP medical record being maintained at FMC Carswell; a CD containing two additional phone calls made by Ms. Siddiqui from FMC Carswell; a draft transcription of the second of these conversations (01/26/09); a second copy of her college transcripts; additional medical records of treatment in Afghanistan (labeled H9-H10 and H119-H141); a letter dated 10/06/08, from Warden Elaine Chapman at FMC Carswell to Judge Berman;

various court documents including the Indictment, a Court Order dated 09/04/08, by the Honorable Richard M. Berman, U.S. District Judge; a letter to Judge Berman from Elizabeth Fink dated 09/03/08, with an unsigned letter dated 09/02/08, from defense retained psychologist Antonia Cedrone, Ph.D.; a letter from Christopher LaVigne, AUSA to Judge Berman, dated 09/05/08; an order by Judge Berman dated 09/08/08, asking for a forensic evaluation at MDC Brooklyn; a letter from Warden Cameron Lindsay to Judge Berman dated 09/10/08; two letters to Judge Berman from Christopher LaVigne dated 09/11/08; a letter to Judge Berman dated 09/16/08 from Elizabeth Fink, referencing a phone call with Ms. Siddiqui; a 09/19/08 letter to Judge Berman from AUSA David Raskin; an order dated 10/02/08, issued by Judge Berman; a 10/06/08 order issued by Judge Berman; a 10/15/08 order, issued by Judge Berman; an 11/17/08 order issued by Judge Berman; an order dated 11/19/08, issued by Judge Berman; additional photographs of selected items recovered from the defendant by the Afghan National Police (labeled 147-196); reports of examinations (labeled 204-209); interview reports of the defendant at Craig Joint Theater Hospital at Bagram Air Field, (labeled 536-556); a CD compiling Ms. Siddiqui's medical documents; a DVD and draft of Afghan press conference (labeled 696-697); a financial affidavit by Ms. Siddiqui; a letter dated 09/03/08 by Elizabeth Fink with attachments, including a report by Antonia Cedrone; an additional FBI interview with Ms. Siddiqui; an additional medical record (labeled 698-702); copies of all court transcripts from 08/05/08 - 02/23/09; and several additional pages of psychological and medical record notes from FMC Carswell, completed between 01/30/09 and 03/12/09.

Extensive in person and/or telephone interviews were conducted for the purposes of collecting additional collateral information and clarifying written information that had been provided. Individuals interviewed included the following FMC Carswell staff: Robert Gregg, Ph.D., Chief Psychologist; Veronica Tetterton, Ph.D., Staff Psychologist; Leslie Powers, Ph.D., Forensic Psychologist; Judith Cherry, M.D., Chief Psychiatrist; Camille Kempke, M.D., Staff Psychiatrist; David Griffin, Clinical Social Worker; Chris McGehee, Clinical Social Worker; Y. Tami Yanez, Ph.D., Forensic Psychologist; Kristy Dromgoole, Ph.D., Staff Psychologist; Mr. Roberts, R.N.; Dr. Nahla Lorenzi, Internist; Warden Elaine Chapman; Maria Douglas, Ph.D., Executive Assistant; Nurse Manager Michelle Brown Stephensen; John Schwake, R.N.; Correctional Officer Forbis; Correctional Officer Jean; Saquita Frazier, Case Manager; Linda Coleman, Correctional Counselor; Janet Taylor, Dietician; Veronica Dums, Visiting Room Correctional Officer; Mr. Honshein, Recreational Therapist; Troy Whitehead, R.N.; Regina Warren, Visiting Room Correctional Officer; Evonne Marufo, Lieutenant; C. Keel, R.N.; Mr. McNeary, Acting Unit Manager; Ms. Ross, Unit Secretary; Mr. Demetri Ivey, SIS Officer; Mr. Tim Holder, SIA Officer. Law enforcement agents and staff observing Ms. Siddiqui in Afghanistan and in transit to the United States included: Agent Mehtab Syed; Agent Jodi Almodovar; Agent Bruce Kamerman; Agent Marti Leeth; Gena Piazzi, M.D.; Agent Angela Sercer. Clinicians and attorneys involved in this case included: Gregory Saathoff, M.D.; Elizabeth Fink, Defense Attorney; AUSA David Raskin and AUSA Chris LaVigne and current Defense Attorneys Dawn Cardi and Chad Edgar. MDC Brooklyn staff included:: Diane Guerrero-Cohen, Ph.D., Chief Psychologist; Rich Desmond, JTT; Corinne Ortega, Ph.D., Staff Psychologist; Dana Williams, Ph.D., Staff Psychologist; Robert Beaudouin, M.D.; Ben Beard, Unit Manager; Lorie Nicholas, Ph.D., Staff Psychologist; Kari Schlessinger, Ph.D., Staff Psychologist; Diane McLean, M.D., Staff Psychiatrist; Peter Goldstein, M.D.; Parry Hess, Ph.D., Staff

Psychologist; Troy Brandwisch, R.N.: and Physician Assistant C. Brooks.

This evaluator was initially asked by defense counsel Elizabeth Fink, to speak with defense retained experts, but none contacted this evaluator. Ms. Fink also initially stated she would attempt to arrange phone interviews with Ms. Siddiqui's family members, but this was not accomplished while she was still representing Ms. Siddiqui.

This evaluator spoke with Ms. Siddiqui's new Defense Attorneys, Dawn Cardi and Chad Edgar on 03/11/09. They had not yet seen Ms. Siddiqui but plan to do so the week of 03/16/09. They stated they would attempt to arrange family interviews with Ms. Siddiqui's brother and sister, would determine if they wanted this evaluator to speak with any defense retained experts, and after seeing Ms. Siddiqui, would alert this evaluator if they had any additional information or concerns they wish the evaluator to consider.

Background Information: The information presented in this section is a composite of that obtained from review of collateral information and through the evaluation procedures as outlined above.

In summary, available information indicates that Aafia Siddiquii was born on 03/02/72, in Multan, Pakistan. She is one of three children born to Mohammad and Ismat Siddiquii. Her father was a physician but died of cardiac problems sometime in 2002 or 2003. Her mother continues to reside in Karachi, Pakistan, and is reportedly in ill health. Ms. Siddiqui has one brother, Mohammad, who resides in Houston, Texas and apparently works as an architect. She also has one sister, Fouzia, who is a physician (neurologist) who trained or worked in the U.S., but is currently living in Pakistan. As a young child Ms. Siddiqui apparently moved with her family to Zambia, Africa, but returned to Pakistan to complete her elementary and high school education. No additional information has become available about her early life.

Following completion of high school, Ms. Siddiqui traveled from Pakistan to the United States (1991), to Texas, and enrolled in college at the University of Houston. As a freshman she pursued classes in Political Science. She successfully applied to and transferred to MIT to complete her undergraduate degree in Biology, graduating in 1995, with a GPA of 4.4 (on a 5.0 scale). She subsequently obtained her Master of Science degree in 1998, and her Ph.D. in Neuroscience from Brandeis University in 2001. She remained in the United States until June 2002.

Ms. Siddiqui has been married twice. Her first marriage was to Mohammad Amjad Khan, a physician and anaesthesiologist, who currently resides in Karachi, Pakistan. It appears that Ms. Siddiqui became acquainted with him as early as 1994, and they were married through an arranged marriage, via telephone, in November of 1995. Mr. Khan subsequently traveled to the United States to meet Ms. Siddiqui's mother, sister, and brother. In December 1995, Ms. Siddiqui moved to Boston with her husband. Three children were born to that union. These include Mohammad Ahmed (date of birth 11/29/96), Mariam Bint Khan (date of birth 09/05/98), and Suleman Lnu (date of birth 09/03/03). The older two children were born in the United States and have U.S. citizenship. The youngest son was born in Pakistan. Apparently Ms. Siddiqui remained married to Mr. Khan for

approximately seven years. They divorced after a period of unsuccessful religious counseling in Pakistan. Ms. Siddiqui retained custody of the children and initially accepted child support payments from Mr. Khan. Ms. Siddiqui claims she subsequently married Ali Mohammed (Ammar AL Baluchi). Available information indicates that she had been married to him for about a month before he disappeared and allegedly was taken into custody in Afghanistan. Collateral information indicates that at one point she stated she had heard he had divorced her after being taken into custody, but this has not been verified. She indicates that she believed him to be a businessman but denied knowing specifically what he did for a living. Collateral data indicates that she claims she did not know that he was the nephew of Khaled Sheik Mohammed and was involved with al- Qaeda until after he was taken into custody and she saw it on the news.

Ms. Siddiqui references an abusive relationship with her first husband, but does not provide any details except for one incident involving him throwing a baby bottle that hit her and cut her lip, requiring sutures. Information provided by her first husband, however, contradicts this. Though he admits to the bottle throwing incident, he describes her as a difficult and violent individual, who eventually neglected the care of their children in pursuit of her radical ideas.

During the time Ms. Siddiqui lived in the Boston area, she describes becoming active in running the Dawah Resource Center with other women in that area. She describes the Center as a nonprofit organization providing resource materials regarding Islam. She subsequently renamed the Resource Center the Institute of Islamic Research and Teachings, and her first husband and sister agreed to be part of the organization, at least on paper. Other work history is limited. She does admit to a short period of employment as a lab technician at the Karachi Institute of Technology in Pakistan, although she did not share her background with her employer, and allegedly had a lower level job than she could have been capable of holding. ████████████████████ she claims she was tasked with providing information on germ warfare and translating documents. She minimizes her expertise in the research area.

In the fall of 2001, after 9/11, apparently Ms. Siddiqui claims she told her first husband that she wanted to take the children and return to Pakistan because she felt it was unsafe for them to remain in the United States. Alternatively, she claimed the trip to Pakistan was to visit her ill father. Collateral information supports that she did return to Pakistan and subsequently, when her first husband returned to Pakistan, she made an effort to encourage him to use his spare time to go to work for the Taliban in a hospital in Afghanistan. He refused to do this and returned to the United states. He claims he did convince her family to send her back to the US for a while, but as noted, despite counseling, they eventually were divorced. Her first husband claims her family members assisted her in retaining custody of their children. Mr. Khan indicates that he has not been allowed to see his children since their divorce, but states he has caught glimpses of them and Ms. Siddiqui, and reports seeing them in various places such as Ms. Siddiqui's mother's home, in the company of her sister, and at one occasion at an airport, over the years since that time. He states he has continued to pursue avenues to regain access to his children. He has since remarried.

Collateral information indicates that around 2002, Ms. Siddiqui was approached by Majid Khan who

asked her to return to the United States to open a post office box for him. She agreed to do so and returned to the Maryland area, between 12/25/02 and 01/02/03, to do this. Ms. Siddiqui reports that she later found out Majid was a bad guy and a member of al-Qaeda, and thinks he informed against her. She claims that subsequently she became aware that she was being sought by the FBI. She reportedly left her mother's home, against her mother's wishes, and went into hiding. She remained in hiding until her arrest in July 2008. She has given vague accounts of her actual whereabouts during her period in hiding stating she took an oath not to disclose that information (and will be punished by Allah if she breaks her oath), but claims she was provided shelter by different individuals.

Various accounts are suggested as to what transpired from approximately 2003, when she went into hiding, until the time Ms. Siddiqui was taken into custody in Afghanistan on 07/17/08. Accounts range from her disappearing in a taxi with her children, to possibly being taken into custody, detained and tortured, to her hiding her children with her sister in Pakistan, and heading off to comply with a Fatwa, join an Islamic radical group and serve a religious cause. In one account, she describes being recruited, because of her background in biology and neuroscience, to conduct research on germs and bacteria warfare. It appears that at least part of that time she remained in Pakistan. She described conducting research through books and the internet, and translating documents. She tended to downplay her knowledge or usefulness to any cause and claimed she was unaware of the al-Qaeda affiliation of her associates.

In regard to the charged offenses, Ms. Siddiqui indicates that she traveled from Pakistan to Afghanistan a few days prior to her being taken into custody. She claims she traveled to the province of Ghazni, apparently in the company of her oldest child, allegedly in search of her second husband. She alleges she had been told he had been released and was in Afghanistan.

Collateral information indicates that on or about 07/17/08, Ms. Siddiqui was detained by the Afghan National Police in Ghazni, Afghanistan. She was accompanied by a young boy, whom she originally described as a war orphan that she had taken care of for the preceding two years, but who ultimately turned out to be related to her (through DNA testing) and is thought to be her oldest son. In her possession at the time she was detained, were various documents, chemicals and a computer thumb drive. Included in the documents were handwritten notes that referred to a mass casualty attack listing various locations in the United States. Other notes referred to construction of dirty bombs, chemical and biological weapons, and other explosives, and noted mortality rates associated with these. Electronic documents available on the thumb drive included correspondence that referred to specific cells and attacks by certain cells, referred to enemies including the United States and discussed recruitment and training. After being taken into custody, Ms. Siddiqui and the boy were taken to a press conference by Afghan police.

On 07/18/08, a team of officers and employees of the United States, including two FBI special agents, a United States Army Warrant Officer (Army Officer One), a United States Army Captain (Army Officer Two), and United States interpreters went to interview Ms. Siddiqui at the Afghan National Police compound. The interview team was taken to a meeting room where unknown to

them, Ms. Siddiqui was unrestrained behind a curtain. One of the Army officers (Army Officer One) placed his M-4 rifle (which was loaded but on safe) on the floor next to the curtain, and it is alleged that Ms. Siddiqui obtained the rifle, attempted to fire and fired at U.S. Army Officer Two and other members of the U.S. Interview Team. She reportedly repeatedly stated her intent and desire to kill Americans. As the incident began to unfold, an interpreter (Interpreter One) intervened, in an effort to restrain Ms. Siddiqui, who allegedly fired shots that missed striking anyone. She was shot by the Army Warrant Officer in response to her actions, but despite being wounded, continued to struggle.

Ms. Siddiqui was subdued and taken into custody. Medical assistance was provided. She was treated for a gunshot wound to the right side of her abdomen with an exit wound of the left flank. She was transported to the Craig Joint Theater Hospital in Bagram, where she was medically stabilized. From that point in time, she was kept under direct observation and guarded. As she recovered from her injuries, she elected to converse at length with various agents/law enforcement personnel who were watching her. She shared a fair amount of information about her life and her beliefs. This information, as noted, was available for the purpose of this evaluation. On 08/04/08, she was cleared for transfer to the United States to face her current charges. She was accompanied in transit by law enforcement and medical staff, and continued to converse with them throughout the trip.

Upon arrival in the United States on 08/04/08, Ms. Siddiqui was committed to MDC Brooklyn, New York. She remained there until her transfer to FMC Carswell, Texas on 10/02/08.

Ms. Siddiqui has repeatedly denied any past psychiatric history. She denies any outpatient or inpatient mental health treatment and has stated that she has never taken any psychotropic medication prior to her current period of incarceration. She denies any family history of psychiatric problems. She denies any history of alcohol or substance abuse or dependence.

Ms. Siddiqui presents herself as a devout Muslim.

Although Ms. Siddiqui has described her first husband as physically abusive to her and their children, she has not provided any specific details beyond describing the above mentioned incident where he threw a baby bottle at her, cutting her face. As noted, her husband does not deny that particular incident but does deny any history of other physical abuse to her or the children. He describes her as a short tempered and violent individual, although he indicates that her small size resulted in her not being a physical threat to him.

Although Ms. Siddiqui has made comments during her recent period of incarceration referencing torture to herself and her children, detailed conversations she had with various individuals since the time of being taken into custody do not appear to support that. She presented a general chronological account of her whereabouts and living situations during the time period in which she was missing from her family home and that does not include any periods of detention or torture. She has not disclosed clear information about her children. She has alternatively claimed the whereabouts of her

children are unknown, or that they are in the care of her sister. It is known that her oldest son, who was taken into custody with her in Afghanistan, has been returned to Pakistan. In conversation to one agent she indicated that sometimes one has to take up a cause that is more important than one's children.

No information was available in regard to any criminal history outside of that associated with her current charges.

Ms. Siddiqui did not provide any history in regard to previous experience with the legal system in the United States or Pakistan prior to the current charged offenses. Records support some involvement in custody proceedings in Pakistan, but it is unclear where this issue was addressed.

Once taken into custody and stabilized for her immediate medical problems, as noted Ms. Siddiqui was flown to the United States. During the period of her convalescence and the flight she was observed and involved in conversations with numerous medical, military and law enforcement personnel. Review of available collateral information outlining observations and conversations, and interviews with persons involved, consistently present a picture of Ms. Siddiqui as an individual who, between the time of being taken into custody in Afghanistan and arriving in New York, did not display any overt signs or symptoms of mental illness. She is consistently described as an intelligent and at times manipulative and dramatic woman, who showed goal directed and rational thinking. She was fluent in English, Urdu and Arabic, and demonstrated no problems processing information or responding appropriately to questions when she chose to answer them. Although she presented with some dysphoria and occasional crying, and appropriate concern about her situation (particularly early on when she was concerned about what had happened to her son), she did not appear to be overly anxious. There was no evidence that she was responding to internal stimuli. She talked about her personal and religious belief systems. It was the impression of those who were in conversation with her, that although she showed some ethnic and religious prejudices, her thinking was not inconsistent with her identified peer group. She was not entirely forthcoming in her conversation and presented false information such as not admitting the identity of her son. She was not viewed as psychotic or delusional.

During that same time period Ms. Siddiqui expressed at least a basic understanding of her legal situation, in that she understood she had been taken into custody and was facing charges in the United States that included Attempted Murder. She asked questions related to her charges and the possible penalties. She appeared to understand her rights when they were read to her and opted not to talk about her legal situation without an attorney being present. She inquired about an attorney being appointed to represent her. Although arrangements were made based on medical examination, to manage her pain and medical well being on the flight, there were no specific indications identified on assessment at that time to indicate she required any specific psychiatric intervention or management. At times, she attempted to manipulate within her situation and to play one staff member against another, and reported inaccurate accounts of what was said to her by others. Similar behavior continued into her early interactions once taken into custody in the United States, as demonstrated in an initial incident where she maneuvered to exchange cooperation with being

fingerprinted and going through routine procedures for personal interaction with a family member (her brother). Prosecuting and defense attorneys were present at that time. Ms. Siddiqui conversed with her brother in Urdu. Available staff understanding the conversation noted she took a negative stance toward her attorneys because of they were Jewish.

Course in Custody/Institution: At the time of Ms. Siddiqui's transport from Afghanistan to the United States she was viewed as medically stable. The physician monitoring her care conducted a complete physical examination prior to her being placed on the flight. The status of her surgically repaired gunshot wound was assessed and she was viewed as able to fly. She did not require any significant medical intervention during the flight, although she was given symptomatic treatment for abdominal discomfort, constipation and basic wound care. Past medical history was essentially negative with the exception of the already identified gunshot wound. She had no history of surgeries prior to that time. She denied tobacco or alcohol use, or use of illicit substances. Review of systems was essentially unremarkable outside of mild symptomatic complaints associated with the gunshot wound. Physical examination showed her to be a thin individual, with some healing abrasions which were documented. There was evidence of some vaginal discharge and active menstrual bleeding. She was appropriately concerned about hygiene and was allowed to attend to that. Neurological exam showed no abnormalities. She was oriented to person, time, place and situation. She showed no abnormal motor functions. Gait was normal. Her mood was described as demonstrating flat affect with crying at times. The attending clinician described her being somewhat slow to respond initially and thought she was overly dramatic. When these issues were addressed, she became more cooperative and proceeded more efficiently throughout the remainder of the exam.

Upon admission to MDC Brooklyn an intake screening was completed by a male nurse with female staff present and reviewed by a physician. Review of systems at that time was completely negative, with the exception of admission of blood product transfusion, having one male sexual partner in the last five years, and the gunshot wound with open laparotomy. Mental status exam at that time showed her to be alert and oriented with normal psychomotor activity. She was cooperative and her mood was appropriate to context. Her thinking was goal directed and there was no evidence of abnormal thought content. She denied any history of mental health treatment or head injury. She denied any history of suicidal attempts or current suicidal ideation. PPD screening for tuberculosis was applied to her right forearm and subsequently determined to be negative. Prescriptions to continue ibuprofen for pain (which was minimal) and a laxative as needed were issued. She was subsequently evaluated on 08/06/08 by a physician's assistant (PA) in regard to abdominal pain. Vital signs were determined to be normal and her abdominal wounds were dressed. A CT scan of her abdomen and pelvis were ordered and completed. Outside of the presence of a possible kidney stone, no other findings unassociated with her injuries were noted, with the exception of possible ovarian cysts.

Laboratory studies completed showed mild anemia, with a hemoglobin of 11.2 (normal range 11.5-15) and hematocrit of 33.6 (normal range 34-44).

Ms. Siddiqui was followed for routine medical complaints including wound care, by the medical

staff at MDC Brooklyn. Her wounds appeared to be healing well. Early on, she expressed concern that she may have lost a kidney during her abdominal surgery in Afghanistan. It was clarified with her that this was not the case and that both kidneys were present and operative. She was able to accurately process that information.

Daily medical monitoring was conducted by PA Brooks. It was the PA's impression that at the time of admission, Ms. Siddiqui did not believe she would be in U.S. custody long. She presented as manipulative, but cooperative. Initially, she had no issues with undressing to have her wounds checked. She discussed her American education and expressed that she did not want antibiotics if not necessary because of her awareness about development of resistance. She said she would not be there long and her lawyers had told her that she could make a fuss, but she did not intend to do so. She was able to joke about her appearance if she could not keep up with her usual hair removal. It was PA Brooks' impression that as several weeks passed and Ms. Siddiqui realized she was not going anywhere, she became angry and less cooperative. She began to refuse care and decreased her eating. She stopped communicating with staff. PA Brooks clarified with Ms. Siddiqui that she would continue necessary medical monitoring and care, and did so. PA Brooks perceived that as Ms. Siddiqui realized she had less control of her situation, she began to verbalize "crazy" things. Inconsistent with her statements, however, and her overt presentation of depression when seen by mental health staff, she remained attentive to her appearance and hygiene, covering her hair, and overall continued eating, sleeping, reading, praying, and seeking out getting her day-to-day needs met through administrative or unit staff. She appeared selective in how she presented to whom. PA Brooks did not observe her to cry or appear as if she had been crying excessively. When she was directly questioned about any unusual claims such as visual hallucinations, she seemed unable to expand on her symptoms.

Following her admission to MDC Brooklyn, Ms. Siddiqui also underwent a detailed psychological screening by a Ph.D. psychologist. It is interesting to note that on screening interview no mental status items were identified as noteworthy. She was viewed as psychologically stable. She was cooperative with the interview but guarded in discussing any issues related to her charges and legal situation, stating that she would like to wait until she's able to speak with an attorney. She expressed concerns about being able to access legal representation. Ms. Siddiqui also expressed concerns about being mistreated in the future and about any procedures that would expose her body. She requested examination by female staff. She cooperated in reviewing her educational history. She identified herself as divorced but refused to discuss any history of domestic violence or sexual victimization or to elaborate on her children. She denied a personal history of mental illness or use of any type of psychotropic medications, and also denied a family history of mental illness. She did not appear to be overtly suicidal and stated that as a Muslim suicide is forbidden. She denied any drug abuse or alcohol use history. She appeared calm and controlled without signs of acute distress or psychomotor agitation or retardation. She was polite and cooperative, maintained good eye contact and smiled socially. Mood was mildly dysphoric but there was no indication of major depression. She did not appear hopeless in her thinking. Speech and thought processes were coherent, logical, well organized and goal directed. There was no sign of formal thought disorder. She did not appear paranoid or delusional. Her concentration and attention were within normal limits. She requested

access to a Koran and that was given to her.

Ms. Siddiqui was housed in an observation unit, in an individual cell, and she was monitored by onsite correctional staff as well as undergoing routine reassessment by psychological and psychiatric services and general medical services.

Ms. Siddiqui was seen in court on two occasion, 08/05/08 and 08/11/08. After that, she refused to attend scheduled hearings. After her first appearance in court she was appointed representation by Elizabeth Fink. Subsequently Ms. Fink and her associates Ms. Kuntsler and Mr. Oliver, had the opportunity to meet with Ms. Siddiqui at MDC Brooklyn. Ms. Fink reports that the meetings progressed adequately until such time that it was required that Ms. Siddiqui be stripped searched after her legal visits. Ms. Fink reports that she perceives the strip searches were traumatic experiences for Ms. Siddiqui. Subsequently, Ms. Siddiqui decided to refuse legal visits and later refused legal mail.

Available records indicate that post the initial strip search, Ms. Siddiqui described feeling extremely uncomfortable with the strip search. She felt it was "torture" and "immoral" and asked that it be performed differently. She presented her ideas about alternative ways to conduct a strip search without her having to totally undress. In response to her concerns, staff attempted to explore whether Ms. Siddiqui had any history of sexual abuse but she would not cooperate with answering questions in that area. It is noted that she did attend one additional court hearing on 08/11/08, after the initial strip search.

After that court hearing, Ms. Siddiqui reported that her attorney advised her against talking to psychology services. She did accept some reading materials from them. Although she exhibited a dysphoric mood, her speech was logical and goal directed, and she showed no signs of formal thought disorder. There was no loosening of association and she denied any auditory or visual hallucinations. No evidence of delusional thinking was elicited and her memory appeared to be grossly intact. She did not appear suicidal.

Around 08/21/08, Ms. Siddiqui reported concern about her children and her belief that they were being held for interrogation. She stated that she found being incarcerated stressful and was having some trouble sleeping. She asked to see a medical doctor and was subsequently seen by Dr. Goldstein. During that evaluation she admitted some mild depressive symptoms related to the gravity of her legal difficulties and some residual abdominal pain. She did not view herself as having suicidal thoughts and was not seen as severely depressed. She stated that sleep and appetite were poor and she had been experiencing some nightmares but did not want to take antidepressant medication. She reiterated that her distress was related to the charges and incarceration. At that period of time she was noted to be alert, oriented and cooperative with the interview. She showed some anxiety and depression, and speech was appropriate and of normal rate and tone. Her mood was dysphoric but she demonstrated normal thought processes and no delusional thinking or hallucinations were noted. Subsequently Ms. Siddiqui expressed concern about the status of her son and requested to speak to the FBI to bargain with them for the return of her son to Pakistan.

Apparently it was about the same time that Ms. Siddiqui asked the operations lieutenant to save the turkey from her meal tray and place in the refrigerator, so that she could send it to her son at a later date.

From around that point in time, Ms. Siddiqui became less cooperative with staff, particularly with any clinical staff. On 08/27/08, staff psychologist Parry Hess attempted to assess her in light of the occasional odd statements which she had been making to correctional staff who were observing her. Early in the morning on 08/27/08, she allegedly claimed to staff that her son's dog was eating off of the food tray in her cell. Dr. Hess noted that despite those odd verbalizations, she was unwilling to talk to him. He observed her for an extended period and noted that when speaking to correctional and unit staff, she spoke in a clear coherent manner, making appropriate inquiries and exhibiting good comprehension. Review of the logs noted that she had some crying episodes and was demonstrating some sleep disturbance. He persisted in trying to evaluate her and his note outlined his differential diagnostic assessment that included the possibility of Malingering. It is of note, that later when asking to see psychology staff, Ms. Siddiqui specifically stated she did not want to see Dr. Hess.

Dr. Guerrero-Cohen, who had been monitoring Ms. Siddiqui, asked Dr. Diane McLean, Psychiatrist, to evaluate her. Ms. Siddiqui was polite with Dr. McLean. She reported seeing her child in her cell, but would not elaborate any other details. She appeared depressed and ruminative about her son. Medication ( an antidepressant) was discussed but Ms. Siddiqui refused, stating the medication would not fix the problem with her son. On follow up, she refused to clarify if the supposed hallucination still existed and refused to provide any history. The antidepressant Celexa was prescribed but no antipsychotic medication was ordered due to Dr. McLean's inability to clarify if Ms. Siddiqui was actually hallucinating.

Dr. McLean notes that the content of her note was released to Ms. Siddiqui's attorneys and made its way into the Urdu media and the Nation. Ms. Fink also shared the information with the court and Ms. Siddiqui appears to have become aware of the working diagnosis of Major Depression, Severe, with Psychotic Features. Dr. McLean indicates that at no time did she connect the possible diagnosis to Ms. Siddiqui being tortured as she had no history or information in regard to torture at any time during her evaluation of Ms. Siddiqui.

Ms. Siddiqui subsequently refused several meals and verbalized anger at her attorneys because they were not making an adequate effort to help her determine what had become of her son. She made a phone call to her brother, with some conversation that appeared morbid in content. She was subsequently evaluated by psychology staff. At that time she was viewed as suffering from a Depressive Disorder, not otherwise specified (08/29/08). Subsequent to that, she was noted to increase her food intake but continued to demonstrate some insomnia and periods of crying.

On 09/09/08, Ms. Siddiqui refused required medical examination. She had been refusing to allow staff to assess her physical status and the decision was made that it was necessary for a use of force team be utilized to conduct the medical evaluation. Extended effort was made to encourage Ms.

Siddiqui to cooperate with a medical evaluation but when she refused, a use of force team (all female) was mobilized and ultimately used to enable PA Brooks to conduct a medical evaluation and to have blood drawn for analysis.

PA Brooks described that during the forced cell move incident , Ms. Siddiqui was very aware of the cameras and wanted to get her statements on tape. She perceived that, at least to a degree, Ms. Siddiqui viewed herself as a martyr rather than a prisoner.

The use of force incident was video taped and this evaluator had the opportunity to review the tape. The procedures used were consistent with appropriate use of force techniques as utilized in the Federal Bureau of Prisons. All staff appeared to act professionally. Sensitivity to Ms. Siddiqui's concern for modesty was evident. Throughout the use of force procedure, however, Ms. Siddiqui expressed anger and ridicule towards the United States and the various staff members involved. She kicked the PA and attempted to bite her arm. A thorough medical assessment was completed and laboratory studies drawn. She was then returned to a cell. It is interesting to note that despite her irritation at the use of force procedure, upon return to her new cell she was involved in routine activities such as cleaning her cell, praying, and seeking her property. Post the use of force, she was relocated into the West Building on the eighth floor. She subsequently indicated to staff that she was writing her will. She was noted to be reading documents and newspapers and to be selective with whom she spoke. She appeared to be eating but continued to be uncooperative with psychological interviews.

On 09/11/08, Ms. Siddiqui was noted to be crying and requesting phone calls. She also claimed for the first time that she saw a man standing outside of her door who told her that her son was in danger and she needed to protect him. She would not communicate with the psychologist but did speak with a unit manager on site. Ms. Siddiqui had received several incident reports in regard to her behavior during the use of force and reported that she felt harassed by the paperwork being given to her in regard to these. She was not held accountable for her behavior.

From that point in time, despite her unwillingness to converse at any length with staff, Ms Siddiqui was viewed as being significantly depressed and subsequently was labeled as psychotic by the psychology and psychiatric staff at the institution. She continued to be evaluated by various psychologists with Dr. Diana Guerrero-Cohen, Chief Psychologist, and Dr. Diane McLean, Psychiatrist, both attempting to evaluate her and provide any needed intervention. Although she was not particularly forthcoming in her conversation with them in regard to discussing any symptoms, their assessment was of severe depression with psychosis. Dr. McLean did clarify that the working diagnosis was not considered a firm diagnosis due to inadequate information and inconsistencies in Ms. Siddiqui's presentation, such as her continuing routine activities like eating, sleeping, praying, reading, and attending to hygiene, which did not seem consistent with severe depression.

It is noted that on 09/16/08, she accepted legal mail and conducted a 15 minute call with her attorney. She was apprised at that time that her son had been taken to Pakistan and was in the

custody of her family. On 09/23/08 she refused to go to court. Ms. Siddiqui indicated that she was simply waiting to be taken to heaven or hell, and expressed beliefs that her baby was dead and would try to visit her at her window. She reported that bad angels were banging on her door and windows at night, and trying to take her with them.

Dr. McLean believed more intensive observation and evaluation were indicated. Following receipt by the court of the preliminary opinions of Drs. Guerrero-Cohen and McLean that Ms. Siddiqui was suffering from Major Depressive Disorder with psychosis, and the request of her attorneys and U.S. Attorney's Office to have a more comprehensive competency to stand trial evaluation, Judge Berman issued an order to have a 4241 evaluation conducted at FMC Carswell, Texas.

As noted, prior to transfer to FMC Carswell, Dr. McLean prescribed an antidepressant, Celexa, to Ms. Siddiqui, but she refused to take it.

Review of officer logs from MDC Brooklyn provides detailed information about Ms. Siddiqui's behavior. It is noted that from the start, she expressed awareness and understanding of general rules and regulations. She made efforts to establish phone lists. She spent time reading, praying, sleeping, eating, attending to personal hygiene and conversing with correctional staff. She initially asked for legal calls and was provided them. At times, though infrequently, she was noted to cry and mentioned having a nightmare. On 08/23/08, she wanted Lt. Jones to take the lunch meat off her tray and put it in the refrigerator for her son. She later wanted to bargain for getting her son sent back home. She accepted her legal mail. On 08/27/08, she asked if the officer took the food tray her son's dog was eating off of, and claimed the dog was in the cell with her. Shortly thereafter, she was noted to discuss phone call issues with a different staff. On 08/29/08, Ms. Siddiqui stated her plan to refuse all treatment and expressed her interest to retain a Muslim attorney. She was noted to be eating and writing. On 09/06/08, it is noted she was declining medical care. Notes on 09/09/08, comment on the force cell move - afterward she asked for property, cleaned her new cell and acted normally. On 09/10/08, she states she would not talk to anyone Jewish. She told officers that last night she saw a man outside her window, who told her that her son was in danger. When she was served incident report papers after the force cell move, she said she didn't want them and slid them back under her door. On 09/12/08, she coherently sought information about her son, then stated Mr. Desmond (SIS) was out to kill her son. She claimed the video from forced cell move would be put on the internet. She said she was waiting for the man to reappear at her window with more information about her son. She was noted to be sleeping, eating, and praying. On 09/13/08, she . stated she wanted to see any psychologist except Dr. Hess. On 09/15/08, she apologized for her behavior toward her attorneys via staff. On 09/16/08, she took social correspondence and said she wanted to go to heaven. On 09/18/08, she was noted to be sleeping, eating and praying. She made a phone call to the Consulate and was noted to be reading newspapers and praying. On 09/19/08, she was noted to be sleeping, working, and writing, and told the Imam she wouldn't go to court because she was dead. On 09/25/08, she took newspapers, mail, and was reading and taking notes. On 09/30/08, she was cleaning and reading. On 10/01/08, she accepted postcards, envelopes and newspapers, and read them.

Ms. Siddiqui arrived at FMC Carswell on 10/02/08 and was seen by Dr. Leslie Powers, Forensic Psychologist, in the Receiving and Discharge (R&D) area. At that time she was fixated on not allowing the staff to conduct a strip search and claimed, when she saw the camera, that was what had killed her the last time. Eventually she agreed to a strip search done by a female staff member, without cameras, which was completed without incident. She refused to cooperate with medical staff in assessment of her gunshot wound. Dr. Powers explained the limits of confidentiality of the forensic evaluation. Ms. Siddiqui denied suicidal ideation, claiming she was already dead. Diagnosis was deferred and a decision was made to place her in the medical unit for observation. The plan at that time was to move her to the mental health seclusion area for continued evaluation after she was medically cleared.

While on the medical unit, Ms. Siddiqui underwent an initial psychiatric evaluation by Dr. Camille Kempke. She also underwent medical evaluation by Dr. Lorenzi. Laboratory studies completed at that time continued to show mild anemia. Prescriptions were written to continue acetaminophen 500mg two tablets TID PRN, omeprazole 20mg one tablet daily, and citalopram (Celexa) 20mg once daily. EKG showed normal sinus rhythm. A physical examination was attempted by the doctor on call, but Ms. Siddiqui refused to cooperate. She subsequently agreed to an exam by Dr. Lorenzi (who was a female Muslim). The physical exam was positive for an old abdominal scar. She was described as presenting with some flight of ideas and tangential thinking. Vaginal exam showed a small labial nodule.

Upon examination, Dr. Lorenzi determined that Ms. Siddiqui was medically stable on admission. She spoke with her in Arabic. She described her to this evaluator as a "true believer" and felt she would be able to be influenced to do anything if it was couched in religious terms.

Dr. Kempke, Staff psychiatrist, also saw Ms. Siddiqui shortly after admission. At the time of Dr. Kempke's initial interview, Ms. Siddiqui claimed that she did not know what she had been given or what was true, and the judge had ordered the death penalty for her. She claimed "They killed me, I can tell you how but no one believes me. My daughter and my baby come to see me...They told me they would kill the little girl and rape her. They say they killed my son. They shot me. I did die but they put me on machines and gave me blood." Mental status exam showed no abnormal movements. She was noted to be fluent in English, speech was of normal rate, rhythm and tone. Her affect was noted to be labile, with frequent tearing when she discussed her children. She seemed confused. Her presentation was initially assessed to be one of psychosis. Dr. Kempke recommended against housing her in the seclusion area and wanted her continued in the medical surgical area despite the fact that there was no clear medical reason to do so. Her medication prescriptions from MDC Brooklyn were continued.

It appears that while housed in the medical surgical unit, Ms. Siddiqui accepted approximately five doses of antidepressant medication.

On 10/08/08, Ms. Siddiqui was transferred to the M1 unit in the mental health division, to proceed

with her psychiatric evaluation in regard to her competency to stand trial. Once there, she was housed in a two person room near the officers' station. Her roommate was another Muslim patient, who was indefinitely committed as not competent to stand trial and carried the diagnosis of Chronic Schizophrenia. Ms. Siddiqui adapted relatively well to the unit. Initial problems focused around obtaining a tray that was acceptable to her. She accepted one with fish one evening and subsequently experienced gastrointestinal upset. She suggested that someone might be trying to poison her. At that time she was being fed on the unit. She then attempted to negotiate having several common fare style trays sent to the unit so she could choose her tray. This was not viewed as an acceptable intervention and for a short period of time she was given, at her request, regular trays from which she could choose which items she wanted to eat. Eventually, the decision was made to allow her to leave the unit with the rest of the inmates to go to the dining hall where she could select her own food from the line. This seemed to resolve any food concerns. She has continued to eat under this plan up to the present time. It is noted that Ms. Siddiqui has regularly ordered and consumed food items from the commissary. She completes her own orders and picks up the items under escort.

After initial medical evaluation, Ms. Siddiqui made it very clear that she was not willing to cooperate with any additional medical, psychological, or psychiatric evaluations. She refused vital signs and weights, and refused to speak at any length with psychology staff conducting her evaluation.

Review of her first 30 days at FMC Carswell shows that Ms. Siddiqui refused to comply with any psychological testing. She tended to spend most of her time in her room, sitting on her bed, standing or praying. She asked, and was given, a copy of the Koran. She stated she could not read very well, though she was observed reading. She told a variety of staff members that she had seen her baby downstairs and requested to be able to go see him. Later she reported that her baby had walked into her room during the night and that he appeared thin. She reported this to a few other inmates on the unit, including doing so in a group meeting, and also conveyed this to her brother, asking that he convey it to Dr. Powers and the Consulate. She consistently refused to take any psychotropic medication.

During the evaluation period, Ms. Siddiqui did initiate in a number of phone calls with her brother Mohammad Siddiqui and accepted numerous visits from him. She also spoke by phone with, and was visited by, members of the Pakistan Consulate. She cooperated with strip searches for each visit and did not demonstrate any negative reaction or decrease in her functioning as a result.

Audio and written transcripts of Ms. Siddiqui's phone conversations were reviewed. It is noted that inmates within the BOP are informed that their nonlegal phone calls are recorded and it is evident, through review of the tapes, that Ms. Siddiqui was aware of this. Throughout the conversations, she does appear oriented and alert, remembers names and information about the callers, and previous conversations. She is noted to present differently to different callers within the same time period. (i.e. as noted in conversation with her brother versus the Pakastani Consulate on 10/23/08). After this evaluator's first visit, Ms. Saddiqui identified the evaluator and purpose of the evaluation to the Consulate and told them not to believe anything the evaluator might say.

Review of the Forensic Evaluation Report submitted by Dr. Powers, dated 11/06/08, and discussion with Dr. Powers revealed that at the time the initial evaluation was completed she had not yet received a significant portion of the collateral information that was available to this evaluator as outlined at the beginning of this report. According to Dr. Powers, defense counsel provided verbal information to her that suggested Ms. Siddiqui may have been detained and tortured for a significant period of time prior to her arrest, raising the possibility of Posttraumatic Stress Disorder (PTSD) as a possible etiology of Ms. Siddiqui's claimed symptoms. Complete information was also not obtained in regard to the use of force episode that occurred at MDC Brooklyn. As already noted, Ms. Siddiqui was not cooperative with the evaluation. Given her claimed symptoms, as well as the limited information that was available, the diagnostic impression that had been initiated at MDC Brooklyn (Major Depressive Disorder, Severe with Mood Congruent Psychotic Features, Code 296.24) was continued as a working diagnosis. A rule out diagnosis included in the differential was Posttraumatic Stress Disorder, Code 309.81. Dr. Powers' opinion at the time the report was submitted to the court, was that Ms. Siddiqui was not currently competent to proceed as the result of mental disease which rendered her unable to understand the nature and consequences of the proceedings against her or to assist properly in her own defense. Dr. Powers stated that she based her opinion on very limited information due to the lack of collateral information and Ms. Siddiqui's lack of cooperation. At the time of this evaluation, discussion with Dr. Powers suggests that she no longer views Ms. Siddiqui's presentation as consistent with either severe depression or psychosis. She indicated her intent to submit an update to the court upon her return from extended medical leave.

Behavioral Observations During Interviews: As noted, initially Ms. Siddiqui was extremely uncooperative with this evaluation process during both visits by this evaluator to the institution. Her behavior within the interview setting was inconsistent with behavior and verbalizations noted when she was unaware that she was under direct observation. Initially, she was approached by the nursing staff to request that she come to the conference room to begin the evaluation but she refused to leave her room. The evaluator subsequently went to her room with the nurse manager to introduce herself and explain the evaluation process. Ms. Siddiqui clearly stated that she did not want to be involved in the evaluation and she would not cooperate with the evaluation process. She indicated that she had already completed an evaluation in regard to her competency to stand trial and she had no intent of complying with any further evaluation. It was again explained to Ms. Siddiqui who the evaluator was and the purpose of the evaluation process. She then stated that the judge had already told her that she was dead and that she could not cooperate with the evaluation process because it would result in her daughter being raped and killed. When an effort was made to continue talking with her, she tried to leave the room and then sat on the floor indicating she would refuse to cooperate. She was encouraged to come to the conference room but refused to do so. She asked that the nurse supervisor remain in the doorway as long as the evaluator was there. She then bent over covering her face and attempted to appear as if she was sobbing, stating over and over again that her daughter would be raped and killed. This behavior was observed at some length and an effort was made to reassure her and she was asked to share more about her concerns for her daughter. She indicated that she was not going to listen to anything the evaluator had to say and that she was going to put her fingers in her ears so that she could not hear. She proceeded to do so and continued sitting on the floor.

What followed was an extended period of observation during which her symptom presentation did not appear consistent with any identifiable psychiatric diagnosis. She attempted to appear to be crying but no tears were evident. There was no evidence of any anxiety. Although she insisted she could not hear, she intermittently commented on something being said by the nursing staff to the evaluator, or the evaluator's direct verbalization. She periodically switched fingers, leaving one ear uncovered, thus it was obvious she was listening to the conversations. After a while she began talking about her children coming to visit her on the unit and persistently attempted to seek validation from the nursing staff in regard to this. When the nurse manager indicated that it was not permitted to have children or anyone visit on the unit and that all visitation had to occur in the visiting room, Ms. Siddiqui made comments such as "You're not going to stop them from coming are you? I told them to be very quiet and I've talked to all of the other inmates on the unit, they don't mind if they come." When the nurse manager did not engage in discussion on that topic, Ms. Siddiqui attempted to provide additional detail about this possible hallucinatory experience. When asked specific questions as to the size of her children and the clothing they were wearing, she described them as very small and described that her son was wearing a jumper or gym suit. When the nurse manager commented that the children might be small because Ms. Siddiqui was a small woman, she emphasized that that was not the case, and reiterated that her son was very small. She appeared very invested in getting the nurse manager to sympathize with her situation and believe her story.

It was also of note that when a second nursing staff member stopped at the doorway, Ms. Siddiqui had no trouble changing her line of comments. She acknowledged him, and turned to the nurse manager to comment that he was a very good nurse and had been very kind to her. Her affect was pleasant and calm. Upon this evaluator's attempt to resume asking questions, she returned to describing her alleged hallucinations and claiming her distress.

Ms. Siddiqui adamantly refused to answer any specific questions in regard to her history or her understanding of her legal situation, her relationship with her attorneys, or her familiarity with the legal process. Periodically Ms. Siddiqui would interject that she did not intend to be disrespectful, but that she could not cooperate because of what would happen to her daughter.

After approximately two hours, during which it was evident that Ms. Siddiqui was tired of sitting on the floor and keeping her fingers in her ears, the evaluator told her that we would stop for the moment, but we would resume as the day progressed. Later in the afternoon, two additional attempts were made to interview Ms. Siddiqui. Initially when given the option to continue the evaluation that afternoon or the following morning (but not given the option of not continuing at all), she elected to continue that afternoon. Shortly thereafter, however, she continued with the behavior of stating she was not going to listen to anything the evaluator said or asked, and that she was not going to cooperate. She made the statement that she would continue to put her fingers in her ears and not listen to the evaluator until her ears "turned red...even if it went on for ten hours."

On the third attempt to interview her, her roommate was in her room. When the evaluator pointed out that it was unfair for her to monopolize the room to continue the evaluation, when it would be

preferable to continue in the conference room, Ms. Siddiqui stopped her complaints regarding her fear that her daughter would be raped and killed. She calmly turned to her roommate and asked if she would mind finding another place to be for a period of time, such as the TV room. When her roommate did not immediately respond, she verbalized to her roommate that she had never asked any favors of her before so she was hopeful that she would cooperate and give her some privacy. Her roommate did cooperate and left the room. Once her roommate left, Ms. Siddiqui again indicated that she had no intention of cooperating with the evaluation and that she was not going to provide any history or answer any questions asked by the evaluator. She indicated that she wanted nursing staff to be present and would not go to the conference room. This evaluator pulled up a chair at the door of her room to attempt to continue the evaluation, but Ms. Siddiqui continued to refuse to cooperate. The interview was eventually terminated, with Ms. Siddiqui being told it would continue the following day.

During the second day of interview, Ms. Siddiqui was noted to be eating in her room, she was smiling and laughing with the unit officer, until such time when she was directly approached by this evaluator for continued interview. At that point she indicated that she was not going to be a part of the evaluation, stated that she was used to torture sessions and was not going to cooperate. She again put her fingers in her ears, stating "I can't hear you. I'm not listening." She closed her eyes and sat down in her chair. The evaluator again reviewed the reasons for the evaluation and the limits of confidentiality. She continued to keep her eyes closed and plug her ears, and refused to cooperate. At that point, the nurse manager again came by and she asked the nurse if she had to stay to talk with this evaluator. Ms. Siddiqui was told the evaluator would not continue the evaluation in her room and she would need to move to an office or conference room. With insistence, she did come into the nurse manager's office where again an attempt was made to review her history and to assess her understanding of the legal proceedings, and her readiness to work with her attorneys in her own defense. She adamantly refused to answer any questions in regard to these issues and refused to provide information even on very simple questions such as her age or the date. At one point, the nurse manager who had remained in the area took a break to go to the restroom, and Ms. Siddiqui stated she would not stay in the room with the evaluator, and stood out in the hall until the nurse manager returned. While in the hall, she was observed to be engaged in conversation with individuals not involved in the evaluation process, without any apparent distress. Continued efforts throughout the day to engage her in cooperating with the evaluation brought about similar behaviors, again not consistent with any specific psychiatric diagnoses as described below.

In between attempts at direct interview with Ms. Siddiqui on both visits to the institution, numerous staff from the medical, mental health, and correctional staff were interviewed and information from these discussions will follow. The opportunity also existed, as outlined above, to observe Ms. Siddiqui interacting with other inmates and staff on the unit. It was noted that during many of those interactions she did not appear to be in any distress. She was able to show a full range of affect, talking and laughing, and her thinking was noted to be goal directed. There was no problem with her memory noted during her verbalizations or interactions. Ms. Siddiqui verbalized her understanding of the evaluator's identity and purpose of the evaluation to several other staff throughout the initial visit to the institution and to the Pakistani Consulate after the interview.

Interview of nursing staff described Ms. Siddiqui as consistently refusing even routine requests such as vital signs or weights. She was not viewed as a behavior problem on the unit. When approached, she would politely reject any interaction.

During the second evaluation period (02/10-11/09) this evaluator again had multiple opportunities to observe Ms. Siddiqui outside of the actual interview setting. When approached to continue the competency evaluation process, she appeared distraught that the evaluator had returned and again refused to cooperate. Initially, rather than adamantly refusing she politely indicated that she did not want to be disrespectful but was not willing to participate in the evaluation. Again she insisted that she would not cooperate or listen to anything that the evaluator asked or had to say. The limits of confidentiality and the specifics of the evaluation process were again presented to Ms. Siddiqui. It was clear she understood the purpose of the evaluation and simply continued to express that she would not cooperate. She refused to go to a conference room to sit with the evaluator. Again the evaluator pulled up a chair in the hallway. At that time Ms. Siddiqui walked around the evaluator and sat down outside in the hallway. She continued to sit there and initially adamantly refused to talk to the evaluator. Her sitting in the hallway created a disruption for the rest of the inmates who were lining up to go to lunch. Ms. Siddiqui attempted to solicit the aid of numerous staff members who were walking in the hallway, including the officers, nurses, and eventually the acting unit manager to attempt to get them to intervene with the evaluator to discontinue any attempt at conducting the evaluation. Eventually, she moved out of the hallway and decided to pace the hallway instead. The evaluator offered to walk beside her and chat with her as she walked if she felt more comfortable doing that.

Ms. Siddiqui then returned to her room. At one point, a nurse approached her to ask if she would come to treatment team for a review in the nurses' station. Ms. Siddiqui refused. Subsequently in an effort to avoid to the evaluator, she went to the nurses' station and announced that she did want to go to the treatment team. When she entered the nurses' station she presented a fairly histrionic presentation and indicated that she did not want the evaluator to come to the treatment team to observe. She began to state that she was being tortured by the evaluator. Dr. Kempke came out of the team meeting and into the nurses' station to assess the situation. Ms. Siddiqui sat on the floor, again making claims she was being tortured and her daughter would be killed, and that she was dead and would not cooperate with the evaluation. Dr. Kempke had a brief interaction with Ms. Siddiqui, attempting to reassure her and then Ms. Siddiqui went into the treatment team. During that team review, Ms. Siddiqui chose only to express complaints about the evaluator and the evaluation process. She confronted Dr. Powers on why she just left her alone when she said she didn't want to cooperate during the initial evaluation and this evaluator insisted on continuing to conduct the evaluation. When the treatment team indicated that the meeting was over and that she could return to her room, she appeared aggravated that they were not willing to listen to her complaints for a longer period of time. As she left the nurses' station, she told the evaluator that she was angry and was not going to cooperate with the evaluation process. Nonetheless, several additional attempts were made to engage her in the evaluation process. She alternated between plugging her ears, talking for brief periods of time, or refusing to cooperate. It is interesting that at no time through the second evaluation period did she claim to be receiving visits by her children or indicate that her lack of

cooperation was due to her fear that her daughter would be raped and killed. She made less statements in regard to claiming that she was dead. During the second evaluation period she did take the opportunities to leave the unit whenever she could to avoid the evaluator. Later during the evaluation period, Dr. Kempke volunteered to see Ms. Siddiqui with the evaluator. A review of the issues to be assessed regarding competency to stand trial was done with Dr. Kempke, with the idea that both Dr. Kempke and the evaluator would attempt to engage Ms. Siddiqui in conversation. Ms. Siddiqui was willing to talk to Dr. Kempke, without the evaluator present, but would not respond to any questions in regard to her understanding of her legal situation or willingness to work with her attorneys.

<u>Mental Status Exam:</u> Mental status examination showed Ms. Siddiqui to be a small, thin woman, with dark hair, framing her face from beneath an ivory damask head scarf. When initially approached, she was calmly sitting in her room reading and eating. Her clothes were clean, and her hygiene and grooming appeared good. Her complexion appeared healthy and she did not appear to be malnourished. She appeared her stated age. There were no overt signs of anxiety, despite her disinterest in cooperating with the evaluation. Her gait was normal and there were no unusual tics, gestures or mannerisms noted. There was no evidence of psychomotor retardation or agitation, although she clearly took an obstructionistic approach to the evaluation. Her speech was of normal rate and tone, although there were times when she attempted to engage the sympathy of the nursing staff by whispering or speaking in a hesitant manner. She made extensive efforts to cry within the evaluation but was unsuccessful. Vocabulary showed above average intelligence. As described, she was uncooperative during much of the evaluation.

She was noted to be somewhat seductive and engaging with other staff, and later in the evaluation process, as noted, she showed some anger. She did not appear paranoid or guarded, but was clearly evasive. She refused to describe her mood. She did not appear overtly depressed or anxious. Review of the nursing and officer observations showed that she was sleeping and eating. She did not appear frightened and there was no evidence of flight of ideas or tangential thinking. Through direct and indirect observations she showed a broad range of affect and was able to smile and laugh, show anger and irritation, and mild distress. Despite initially verbalizing that her children were visiting her on the unit at night, there was no evidence that she was responding to internal stimuli. She did not appear to be hallucinating. Her presentation and description of her children visiting did not seem consistent with usual psychotic symptom presentation. There was no evidence that she was experiencing depersonalization or derealization. Her stream of thought as observed in conversations with other individuals seemed normal. Her thinking appeared goal directed and she was able to ask appropriate questions to attempt to achieve her goals. There was no loosening of association, no perseveration or thought blocking evident. When she spoke, she appeared to be able to speak and understand English without any problems.

Initially, Ms. Siddiqui attempted to present a preoccupation about her children, their safety, their visits to her housing unit, and her concern that her daughter could be raped and/or killed. She appeared to have abandoned these preoccupations later during the evaluation period. Intermittently, she expressed a statement that she was dead. At one point she said why would the evaluator want

to talk to her because she was dead anyway, but that if the evaluator wanted to talk to her, that was fine. Later, she commented to the Warden that she was dead, and the Warden in response reached out and touched Ms. Siddiqui's shoulder and said "no you are not dead, you are right here. If you are dead then does it mean I am dead too?" This made Ms. Siddiqui smile and she then engaged in a somewhat humorous discussion with the Warden around that issue.

Ms. Siddiqui, at one point, verbalized suspicion about the staff and inmates to staff member Henley, and had made a list of people who were likely to harm her. Despite this she did not appear to be overtly paranoid around any of them when they were on the unit. She would not cooperate with any formal questioning in regard to abstract thinking. She would not cooperate with interpreting proverbs or discussing similarities. Her general processing of information in observed conversations with staff and inmates appeared to demonstrate that she had the capacity for abstract thinking. She clearly understood the purpose of the evaluation. She did not cooperate with any formal testing of her intelligence. She demonstrated no problems with concentration or attention span. She was able to sit quietly for extended periods of time without any evidence of anxiety.

Indirectly, it was clear that Ms. Siddiqui was oriented to person, time, place and situation, although she refused to directly answer questions in regard to her orientation. She appeared aware of the time of day, was able to assemble for meal time appropriately and responded appropriately to counts. It was clear from one day to the next and from one evaluation period to the next, that she retained memory of the purpose of the evaluation and of the identify of the evaluator. She was also able to accurately reference various questions or issues that were raised during the evaluation process to other staff and in phone conversations. She refused to cooperate with any formal assessment of her memory. It was clear that Ms. Siddiqui had processed the rules and regulations at the institution. Despite her aggravation with the evaluation process, she maintained impulse control. She appeared to have made the decision that it would be in her best interest not to cooperate with the evaluation. She appeared to be aware that she had previously been found not competent to stand trial by Dr. Powers. As noted, she was not viewed as a reliable reporter of psychiatric symptomatology. She appeared to be genuinely surprised that this evaluator was persistent in attempting to complete the evaluation process. As noted, she directly confronted Dr. Powers on this issue by stating that she did not understand why, when she said she did not want to talk to Dr. Powers, Dr. Powers simply went away and that this evaluator persisted in trying to talk to her.

Due to the degree of lack of cooperation of Ms. Siddiqui, an effort was made to assess her level of functioning and understanding through a variety of methods outside of direct interviews. As noted, she was indirectly observed in conversations around a variety of issues with other healthcare and correctional staff. The opportunity existed to examine her thought processes in conversations and written documents. Staff were interviewed around their interactions with Ms. Siddiqui and their observations of her functioning. A number of interesting and valuable pieces of information came to light. One involved Ms. Siddiqui's interest in establishing an Advance Directive early in her stay at FMC Carswell. She clearly understood, after the intake screening, that establishing an Advance Directive was an option. When Social Worker McGehee followed up with her, she expressed a clear interest in refusing end of life care and expanding the Advance Directive to include not cooperating

with any medical, psychological or psychiatric intervention, or taking any psychotropic medication. Mr. McGehee provided her with information and she sought him out for follow up with completing the process. It is interesting that during his initial conversation she inquired about his religious beliefs and expressed interest in the fact that he was a social worker, claiming that she thought highly of social workers and that her mother was also a social worker. Mr. McGehee described that despite his initial impression that she was somewhat depressed. She claimed that she could not read things for herself although she appeared to have read through the materials he provided and was often noted to be reading on the unit. He found it unusual that she seemed so intent on establishing rapport with him. It was his assessment over the period of time he interacted with her in order to execute an Advance Directive, that she did understand the process and she was competent to establish the Directive.

A relatively new member of the nursing staff, who is African American, also described an interesting interaction with Ms. Siddiqui. He indicated that she sought him out to attempt to have him identify with her position as a minority. When he refused to commiserate with her, she did not again approach him for further conversations.

Observations of another nursing staff member included an incident in which Ms. Siddiqui claimed to be distressed and unable to interact with him because he a male. Later he observed her laughing and talking freely with a male officer in the officers' station.

The visiting room officers described how they had developed a relationship with Ms. Siddiqui after they figured out a way she was comfortable with the strip search. Rather than removing all of her clothes at one time, they had established a process where she would simply remove one item of clothing at a time and then would replace it. She seemed to cooperate with this process and expressed no obvious distress. They did not notice any significant anxiety or concern about the strip search process. There seemed to be no sequela to her expressed concerns about this at MDC Brooklyn. The visiting room officers also observed that she was undistinguishable from other non mental health inmates in her interactions with her brother or the consulate members in the visiting room. She showed a full range of affect and did not demonstrate any unusual verbalizations or behaviors in that setting.

Review of Ms. Siddiqui's writings do not show evidence of psychotic thought processes. Her dissertation and article are written in a way consistent with professional writing. Her essay on "I am not a Terrorist" gives insight into the development of her religious beliefs and world views, but again, does not show evidence of psychotic thought processes. During the evaluation period she did write a letter and give it to the Warden, warning her to read it in a private situation. The letter expressed views similar to those noted in the medical record by Dr. Kempke and are not dissimilar to those shared with various law enforcement personal on her flight to the United States. The gist of her message is that Americans are being used by Israel and India. She suggests that she has good ideas to bring about peace between th "Pak-Afghan" region. She suggests that the Warden only share her letter with African Americans or Hispanics and even that it should somehow be brought to the President's attention. As in other contexts she appears to be offering to bargain her services with the implication that she would be trading this for her freedom. Overall these writings and verbalizations seem more

consistent with her religious ideology and views of radical groups rather than as evidence of delusional thinking.

Following submission of the initial report by Dr. Powers, where she opined treatment would be necessary to restore Ms. Siddiqui's competence, the court expressed an interest in attempting to engage Ms. Siddiqui voluntarily in treatment. In an effort to respond to this, Dr. Powers asked Dr. Dromgoole, Staff Psychologist, to see Ms. Siddiqui from a counseling perspective. Dr. Dromgoole has significant experience in evaluating and treating individuals with PTSD. Interview of Dr. Dromgoole identified that Ms. Siddiqui was unwilling to engage in any ongoing counseling. Early on in the initial session, she made a point several times to tell Dr. Dromgoole that she was not lying. This raised concern on Dr. Dromgoole's part about the validity of her presentation. During that interview and observation, it was not Dr. Dromgoole's impression that Ms. Siddiqui demonstrated any of the signs or symptoms of PTSD.

Ms. Siddiqui had at least two interesting interactions with Warden Chapman at the FMC Carswell. The first, as noted above, involved her submitting a handwritten letter to the Warden just prior to the first evaluation visit, in which she attempted to clarify her wish to do something to help the United States. She also stressed a wish for the Warden to contact the SIS Officer so that Ms. Siddiqui could share her thoughts with him and get back in touch with an agent she had talked to earlier. She suggested that information might best be directed to the President. At another point in time during the second evaluation period (but before Ms. Siddiqui knew the evaluator had returned), the Warden stopped to check on Ms. Siddiqui. Ms. Siddiqui presented as happy and calm, and engaged in conversation. The Warden commented to her about her mood, and Ms. Siddiqui said she was actually very happy because she her evaluation was over. Shortly after that, when this evaluator reappeared to interview her, her demeanor markedly changed and she refused to cooperate.

Dr. Cherry, Chief Psychiatrist, described an interaction with Ms. Siddiqui, in which Ms. Siddiqui raised the question, when asked to sign something, as to why would anyone think she was competent to sign it. Dr. Cherry viewed that as an odd interaction and inconsistent with her experience in dealing with other paranoid or psychotic individuals. She described Ms. Siddiqui as having a presence about her implying she was very intelligent and wanted to control the situation.

Dr. Kempke was interviewed at length about her observations concerning Ms. Siddiqui and her notes in the medical record were discussed. Dr. Kempke identified that she had not been given any background information regarding this case prior to meeting Ms. Siddiqui. Her early impressions were developed out of her assumption that Ms. Siddiqui had been severely traumatized at MDC Brooklyn by being forced to undergo an involuntary gynecologic exam during the forced cell move. She assumed this could have caused a marked decompensation of her mental state in a woman who had previously been physically and sexually abused. She was also under the impression that Ms. Siddiqui had indeed been tortured for an extended period of time and had been forced to watch her children being tortured. When these issues were clarified ,that Ms. Siddiqui had not had a forced gynecologic exam, and that there was, by Ms. Siddiqui's own account, and review of available collateral information, no identified period of time in which she had been tortured, Dr. Kempke indicated that she would view Ms.

Siddiqui's symptom presentation in a different light. Dr. Kempke also had indicated that she now viewed Ms. Siddiqui as markedly improved over her presentation at the time of admission and no longer viewed her as being significantly depressed. She had not persisted in attempting to medicate her because she had perceived her as improving without any medication intervention. When Dr. Kempke made rounds with evaluator during the evaluation process, she was able to observe the unusual behavior Ms. Siddiqui presented to this evaluator and agreed that it was inconsistent with any clearly diagnosable psychiatric illness. Later, as noted below, she confronted Ms. Siddiqui on possibly feigning her symptom presentation.

As noted, interview of correctional staff on the unit and in the visiting room at FMC Carswell, did not reveal any observations of overt symptoms of mental illness.

Interview with Greg Saathoff, M.D., who was also involved in interviewing Ms. Siddiqui, was conducted. He visited FMC Carswell immediately after this evaluator's second trip. Initially he encountered a very similar lack of cooperation on Ms. Siddiqui's part. At one point, however, while he was attempting to interview Ms. Siddiqui, Dr. Kempke entered the room without Ms. Siddiqui's awareness. When Dr. Saathoff addressed Dr. Kempke it took Ms. Siddiqui by surprise and a rather comical but telling series of behaviors followed in regard to who would sit where. Dr. Kempke confronted Ms. Siddiqui with her impression that the validity of her psychiatric symptom picture was being questioned. Afterwards, Ms. Siddiqui did share some information about her experience in the United states, and the difficulties she experienced at Brandeis, however, when asked even simple mental status examination questions or direct questions in regard to competency assessment, she still claimed inability to or simply did not answer. She said to Dr. Saathoff that there is no one the court could send with whom she would cooperate. Her presentation, again, did not appear consistent with any usual psychiatric illness or symptom picture.

Impressions: Consistent with the classification system utilized in the Diagnostic and Statistical Manual Fourth Edition - Text Revision (DSM IV-TR) Ms. Siddiqui is viewed as follows:

Axis I:      Malingering    Code V65.2
             Possible Adjustment Disorder, with Mixed Disturbance of Emotions and Conduct,
             Resolved   Code 309.4
Axis II:     Possible Personality Disorder, Not Otherwise Specified, with Narcissistic, Histrionic,
             Paranoid and Antisocial features   Code 301.9

As defined in DSM IV-TR, the essential feature of Malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as evading criminal prosecution. As noted, Malingering may represent adaptive behavior - for example feigning illness while a captive of the enemy during war time. The DSM IV-TR outlines that Malingering is strongly suspected if any combination of the following is noted: (1) medico legal context in the presentation; (2) marked discrepancy between the person's claimed stress or disability and the objective findings; (3) lack of cooperation during the diagnostic evaluation and in complying with prescribed treatment regimen; or (4) the presence of Antisocial Personality Disorder. These are

not considered diagnostic criteria but rather are descriptive of the context in which Malingering is often identified.

Ms. Siddiqui's symptom picture has only come to light in the midst of her evaluation in her regard to her ability to stand trial. As noted, she does not give any history of previous psychiatric problems or diagnoses, or treatment with psychotropic medication. This history was verified by her brother in interview with Dr. Powers and was volunteered by Ms. Siddiqui during review of her history and medical history before the evaluation started. Following her arrest and well into her incarceration at MDC Brooklyn, she did not demonstrate any symptoms of mental illness. Her initial claims as to hallucinatory experiences ( a dog eating off her food tray, seeing her children in reduced physical size visiting her, and seeing a man outside her door who told her that her son was in danger) were presumed to be evidence of hallucinatory phenomena, despite her unwillingness or inability to provide any detail about those experiences. She did not report being particularly distressed as the result of these extreme symptoms. In regard to the statements about her children, she attempted to engage the nursing staff in supporting the perpetuation of their supposed visits but at the same time expressed a wish that they be changed from evening to daytime. Her report of visual hallucinations is suspect. It is not common for individuals to report seeing people who are reduced in size, and it is also unusual for psychotic individuals to be so forthcoming in volunteering the presence their symptoms while refusing to provide any additional detail. There has been no evidence during this evaluators interaction with Ms. Siddiqui or any clear documentation that Ms. Siddiqui appears to be responding to internal stimuli or actively hallucinating. After the first part of this evaluation, she stopped claiming she was seeing her children. It would be unusual for true hallucinatory experiences to stop so abruptly.

As noted, Ms. Siddiqui began verbalizing she was dead after the forced cell move at MDC Brooklyn. Her claim that she is dead was also initially interpreted as a possible delusion. Continued evaluation, including ongoing observations and interviews, and review of phone conversations, does not support that she actually believes her own statements. It certainly is possible that her statements that she's dead could have some meaning on a variety of levels such as she is in essence dead in the eyes of her family as the result of her arrest, that she is dead as the result of separation from her peer group as the result of her arrest, that she is dead in the sense that she has been separated from any future or ongoing access to her children as the result of her current legal situation. It does not, however, appear that she has a delusional idea that she is dead.

There are marked discrepancies, as described in this report, between Ms. Siddiqui's claimed symptoms and objective findings. She is selective in her presentations and presents as more distressed and uncooperative with clinical staff , particularly with anyone she perceives as directly involved in the forensic evaluation process, than she does with unit or administrative staff, or in her interactions with her brother. This is better understood when information from a variety of sources ( records, observations, log books, phone calls etc.) is reviewed. It is also unusual for a truly psychotic individual to have a need to claim she is not lying, or to be able to clearly articulate a symptom at the same time she is claiming to experience it, as was noted in her description of being confused and everyone perceiving her as such. It is important to note that her presentation has not unfolded as would be expected if she was indeed, severely depressed or psychotic.

Consistent with the identification of Malingering, is Ms. Siddiqui's significant lack of cooperation during the diagnostic evaluation and her refusal of treatment interventions despite her claimed symptoms. She also has adamantly refused to cooperate with any psychological testing that could further clarify the validity of her symptom presentation. During this evaluation she also was unable to expand upon her symptom description in a way consistent with usual report of visual hallucinations. Given her education, she is likely aware that there are a number of psychological instruments that are useful in detecting Malingering.

There is insufficient historical information available before the age of 15 and no clear adult history to support a diagnosis of Antisocial Personality Disorder. Ms. Siddiqui does demonstrate some antisocial personality features as outlined below.

An Adjustment Disorder is the development of emotional or behavioral symptoms in response to an identifiable stressor that occurs within three months of the onset of the stressor. These symptoms or behaviors are clinically significant as evidenced by marked distress that is in excess of what would be expected from exposure to the particular stressor. The predominant manifestations are both emotional symptoms such as depression and a disturbance of conduct. It appears possible that some of the presentation noted at MDC Brooklyn could be consistent with this diagnosis. Ms. Siddiqui did appear to demonstrate some depression and a change in behavior as she experienced continued incarceration and she realized that she was not going to be removed from her situation quickly. The gravity of her situation, her incarceration, the trauma of being shot, her reaction to institution procedures, and the separation from her support group and family are significant factors that may well have contributed to her presentation. It does not appear, however, that she is, at present, severely depressed. Her continued lack of cooperation is not viewed as secondary to psychiatric pathology, but instead, appears to be under her control.

A Personality Disorder is defined as an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture. This pattern is manifested by problems in at least two of the following areas: cognition; affectivity; interpersonal functioning; or impulse control. The pattern is viewed as inflexible and pervasive across a broad range of personal and social situations, and leads to clinically significant distress or impairment in social, occupational or other important areas of functioning. The pattern is stable and of long duration, and its onset can be traced back at least to early adulthood. The pattern is also not better accounted for as a manifestation or consequences of another mental disorder and is not due to the direct physiological effects of a substance or general medical condition. Insufficient information is available to diagnose Ms. Siddiqui with a Personality Disorder, but she does present with a number of traits as outlined here.

Ms. Siddiqui does appear to have a sense of entitlement and shows an arrogant attitude at times. She also has some periods of exaggerated expression of emotion. Paranoid traits that are evident include resistance to confide in others because of unwarranted fear that the information will be used maliciously against her and persistently bearing grudges. Antisocial characteristics include failure to conform to social norms with respect to lawful behaviors, deceitfulness as indicated by repeated lying, use of aliases, and lack of remorse. All of this has to be considered in a cultural context and in the

presence of her religious ideologic beliefs, and thus clarification of the presence or absence of this diagnosis will require further evaluation over time.

As noted, during the initial forensic evaluation completed on Ms. Siddiqui, she was diagnosed as suffering from Major Depressive Disorder, Severe, with Mood Congruent Psychotic Features and a rule out diagnosis of PTSD. In order to meet the criteria for the diagnosis of Major Depressive Disorder, an individual needs to demonstrate five or more of the identified symptoms that are present during the same two week period and represent a change from previous functioning. At least one of the symptoms is either depressed mood or loss of interest or pleasure. It does not appear at present that Ms. Siddiqui meets the criteria for this diagnosis. There are nine different areas that are addressed in consideration for the diagnosis of Major Depressive Episode. The individual must exhibit depressed mood most of the day, nearly every day as indicated by subjective report or observation made by others. It does not appear that at present Ms. Siddiqui is significantly depressed. She is not reporting feeling sad or empty at this time, and in fact most recently reported feeling happy to the Warden at FMC Carswell. She has not been noted to be persistently tearful in recent months. As described above, she has made an effort to appear to be crying but no tears are evident and she does this by hiding her face at the times she is trying to convince others that she's crying. Ms. Siddiqui has been consistently going about her daily activities on the unit. Although she spends considerable time in her room, she's noted to be reading, praying, eating, and taking care of hygiene. She's also noted to have appropriate interactions with selected staff (those not involved in the evaluation process) and to demonstrate a full range of affect. In her phone conversations she, herself, acknowledges that she is better.

Ms. Siddiqui appears to be adequately hydrated and does not appear malnourished. She continues to buy commissary items (food) and to eat her meals in the dining hall or on the unit. No continued disruption in her sleep pattern has been noted. Ms. Siddiqui does not demonstrate either psychomotor agitation or retardation on a daily basis. Her energy level appears to be adequate, she is not noted to appear fatigued. She does not express any particular feelings of worthlessness or excessive or inappropriate guilt. Although she intermittently claims an inability to think or concentrate, this has not been a recent complaint and observations support that she is adequately processing information within her environment.

Ms. Siddiqui has not verbalized suicidal ideation or demonstrated any suicidal behavior. Rather than reporting recurrent thoughts of death, she intermittently indicates that she is dead. This, however, is contradicted by comments that she makes that someone is killing her, is making her more dead, and by her response to confrontation on this issue such as her interaction with the warden, who confronted her statement recently.

In the initial forensic report the diagnosis of Major Depressive Disorder was qualified as being Severe with Mood Congruent Psychotic Features. This requires that the individual not only meets the basic criteria for the diagnosis of Major Depression, but also that they demonstrate delusions or hallucinations, and that the content is entirely consistent with typical depressive scenes, guilt, death or deserving of punishment. Review of Ms. Siddiqui's case at this time raises significant questions

as described above regarding the validity of her symptom course and report about delusions and hallucinations. During the last several weeks she is no longer reporting seeing her children coming on the unit to visit her. She has also decreased her statements in regard to being dead or having been killed.

Further consideration was given as to whether Ms. Siddiqui may actually meet the criteria for PTSD. In order to carry this diagnosis, an individual has to have been exposed to a traumatic event in which she experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, and integrity of self or others, and her responses should involve intense fear, helplessness or horror. Ms. Siddiqui's own account of her life and activities fails to identify such a traumatic event until the episode on 07/18/08, when she was shot. It is interesting that she has not described significant sequella in regard to being shot and that episode has not been identified as the source of trauma in anyone's concern that she has PTSD. Although she references physical abuse by her first husband, there does not appear to be sufficient details or supporting evidence at this time to assume that she experiences significant distress from this that this can be identified clearly as traumatic. There is no history of her responding with intense fear, helplessness or horror. Although she attempts at times to present the forced cell move at MDC Brooklyn as such an experience, review of the actual experience, and her behavior during that time, and review of her behavior immediately thereafter and since that time, does not support that she actually perceived the trauma as she implies.

A diagnosis of PTSD also requires that the traumatic event is persistently re-experienced as recurrent or intrusive distressing recollection of the event, recurrent distress and dreams of the event, acting or feeling as if the traumatic event were recurring , intense psychological distress upon exposure to internal or external cues that symbolize or resemblance an aspect of the traumatic event, and physiological reactivity on exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event. Ms. Siddiqui has not consistently presented complaints consistent with these criteria.

This diagnosis also requires persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness as indicated by at least three of the following: (1) efforts to avoid thoughts, feelings or conversations associated with the trauma; (2) efforts to avoid activities, places, or people that arouse recollections of the trauma; (3) inability to recall an important aspect of the trauma; (4) markedly diminished interest or participation in significant activities; (5) feelings of detachment or estrangement from others; (6) restricted range of affect; or (7) sense of a shortened future. Although Ms. Siddiqui has repeatedly talked about the forced cell move episode, her behaviors afterward to not define it as a lasting trauma. She has not discontinued activities such as visits with her brother and the Consulate, despite these requiring strip searches, since she has been at FMC Carswell, although she initially claimed strip searches were why she refused attorney visits and court appearances. She describes an ability to recall the forced cell move episode in detail. There has been no change in her interest or participation in activities on the unit. There is no evidence in her conversations with family members that she feels detached or estranged from them (as noted in her interactions with her brother). She shows a full range of affect. Her concerns about her future do not appear to be related to any kind

of traumatic episode but more so to the reality of her situation.

Finally, the diagnosis of PTSD requires that the individual show persistent symptoms of increased arousal as indicated by two or more of the following: (1) difficulty falling or staying asleep; (2) irritability or outbursts of anger; (3) difficulty concentrating; (4) hyper vigilance; or (5) exaggerated startle response. Again, it is important to review Ms. Saddiqui's claims of problems in these areas. At present she does not appear to be having difficulty with sleep. Staff have not noticed irritability or outbursts of anger, with the exception of her anger in regard to the persistence of evaluators in conducting the competency evaluation. Although she has expressed difficulty concentrating, she's been noted to read, take notes, and understand complex information. She has been noted to be very observant of her surroundings and suspicious of the motivations of those around her, but she has not demonstrated typical hypervigilance consistently seen with PTSD victims. She does not demonstrate any exaggerated startle response.

A diagnosis of PTSD does require that the symptoms described above be persistent for at least one month and that the disturbance causes clinically significant distress or impairment in social, occupational or other important areas of functioning.

Although it is not unusual for individuals entering the prison setting for the first time to find the environment stressful, and Ms. Siddiqui's earlier presentations may have been consistent with this, Ms. Siddiqui appears to be managing her current situation. She is not now demonstrating any significant impairment in sleep or appetite. She is not noted to be spending significant periods of time crying. She continues to express interest in removing herself from her situation and engaging people (family members and the international community) to support her cause. There is no doubt that she has significant concerns about her future and how her arrest and legal prosecution may impact her family, including her children, and her previous associates. She has been successful in adapting her environment to her needs, in that her claimed distress has resulted in modifications in the way she is managed. She is currently housed in a much less restrictive environment than she was during her time at MDC Brooklyn and her strip searches have been modified to accommodate her concerns for privacy.

Assessment of Ms. Siddiqui's competency to stand trial is complicated to some degree by her lack of cooperation with the evaluation process. As outlined above, this appears to be a choice on her part rather than an inability to cooperate as the result of any identifiable mental illness. Even individuals suffering from severe mental illness are generally capable of engagement in discussion about their symptom picture and about their legal situation and understanding of the court system. Even if Ms. Siddiqui was suffering from a Major Depressive Disorder or PTSD, those disorders in and of themselves would not necessarily preclude her ability to discuss her relationship with her attorneys or her understanding of her legal proceedings.

This evaluation has not identified a specific mental disease or defect that should interfere with Ms. Siddiqui's competence to stand trial. Although she has been unwilling to be involved in formal diagnostic assessment through the use of psychological testing, her educational abilities indicate that

she is of above average intelligence. There is no history that she had suffered any significant head trauma to result in any type of cognitive impairment, and her medical status including her review of symptoms, does not reveal any medical or neurological problems that would interfere with ability to actually comprehend the necessary information to proceed through a trial. Through conversations that she has had with various individuals, it is clear that she understands that she has had attorneys with significant experience appointed to represent her. She has identified her dissatisfaction with her attorneys because she perceives them to be Jewish and therefore not likely to act in her best interest. She has expressed her wishes to her family to obtain alternate counsel. Early on in the process, she also indicated that if she were found competent she would dismiss her current attorneys. It is not yet clear how Ms. Siddiqui will react to her newly appointed counsel, but it does not appear that she is suffering from a significant mental disease or defect that would interfere with her being able to do so if she chooses.

Early in the process Ms. Siddiqui expressed interest in clarifying what her charges are and determining maximum penalties for those offenses. She does appear to have at least a basic understanding of her charges and the fact they are serious charges.

Ms. Siddiqui did reside in the United States for an extended period of time and completed her undergraduate and graduate education within this country. It is likely that during that time she was exposed, at least on a basic level, to the operations of the criminal justice system through education, reading or exposure of those around her. Though no particular details are available in regard to this issue, the basic concern is whether she has the capacity to understand the proceedings against her. Ms. Siddiqui's intellectual level, educational background and the absence of significant mental illness that would interfere with her comprehension, support that she does have that capacity.

It appears Ms. Siddiqui has discovered that the initial reaction to her expressed symptoms has been to label her as seriously mentally ill. This has resulted in her being managed in a less restrictive environment and delaying her legal proceedings. It appears that she perceives this as a positive state at the present time, and thus does not see a need for change in her degree of cooperation. She has, as Dr. Powers described, "found a niche for herself at FMC Carswell." She avoids any significant interaction with anyone who is at all related with her court evaluation or return to court. She selectively interacts with individuals that she does not perceive to be directly involved in that process. She also makes an effort to align herself with staff that she perceives may be sympathetic to her situation. She has attempted to engage her family members and Consulate staff, in assisting her in locating alternative legal counsel, or being returned to Pakistan.

Ms. Siddiqui was in the courtroom at the time she was indicted on her current charges. At that time she had been medically assessed and there was no evidence that she was suffering from any mental disease or defect. She is fluent in English. There would be no reason she would not have been able to understand the charges against her. It is this evaluator's understanding that her attorney actually asked for the charges to be read in court so she would have the opportunity to hear them directly. She did have a few meetings and calls with her appointed counsel, giving her an opportunity to ask questions and discuss her situation.

While en route to the United States Ms. Siddiqui was read her rights and after that opted to not discuss her legal situation and the pending charges until after an attorney was appointed. In conversations throughout that flight, she was able to remind other individuals of that right. In that sense, it is clear she understands the adversarial nature of the criminal process and the role of defense counsel.

Ms. Siddiqui has expressed an awareness to various individuals of the charges against her. She has also described alternative accounts of the events to various individuals. There is no indication that she has any delusional ideas about her actions at the time of the events.

Ms. Siddiqui does not demonstrate any clear problem with memory. Her ability to respond to simple questions regarding her age, birth place, etc., are not consistent with someone actually suffering a memory impairment, but more an issue of her willingness to provide information. Within the interview sessions, during observed conversations, and through review of collateral, it is clear that her short term, intermediate and long term memories are intact. There is no indication that she could not remember or process information that is provided to her and retain it for a sufficient period of time to assist her attorneys and complete legal proceedings should she choose to do so.

Ms. Siddiqui has made several attempts to bargain with information in regard to her current situation. It appears that she has the capacity to understand the plea bargaining process should she choose to do so.

Ms. Siddiqui is aware that she has been charged with serious crimes, is facing prosecution, and has knowledge of the specific charges and potential penalties if convicted. She understands that the prosecution's account of what occurred is different than the account which she would like to put forth.

Ms. Siddiqui has demonstrated an ability to behave appropriately on the housing unit. At times, she has demonstrated histrionic behavior and expressed anger when she does not agree with tasks at hand. Nonetheless, even when expressing that she was stressed and upset with this evaluator's attempts to complete this evaluation, she still maintained appropriate behavior and sought staff support to attempt to accomplish her interests. It appears that she could control her behavior in a courtroom should she choose to do so.

Ms. Siddiqui's attorneys described limited interactions with her and briefly described a breakdown in their communication with her. They suggested this was related with her reaction to the strip search process. However, it is clear that the strip search process itself has not interfered with her continuing to visit others as demonstrated by her meeting in the visiting room with her brother many times, and it has not precluded her from choosing to meet with the Pakistani Consulate members. This supports that she is not so traumatized by the process that she is unable to meet with her attorneys within the structure of her current custody in the Federal Bureau of Prisons. Again, her unwillingness to meet with her attorneys seems to be a choice on her part rather than a product of any mental disease or defect.

Her initial attorney indicated that Ms. Siddiqui's dislike of Jews might be an interfering issue in working with her. Ms. Siddiqui herself, however, although making numerous statements about her dislike of Jews, has claimed acceptance of all religions. Should she refuse to work with Jewish attorneys, this would be viewed as a choice not as a result of a delusional idea.

Ms. Siddiqui is not suffering from any type of anxiety or impulse control disorder which would interfere with her ability to attend to proceedings during the trial. She appears to have sufficient impulse control to maintain proper courtroom decorum.

Ms. Siddiqui appears to be medically stable at this time.

An effort was made throughout this evaluation period to offer general information to Ms. Siddiqui about the courtroom process, principle courtroom personnel, available pleas, possible defenses, the plea bargaining process and the appeals process. It is this evaluator's impression that she listened to the questions and discussions about these issues, although she did not comment. She certainly understands the research process that could be used to attain information on subject areas where she may have a knowledge deficit. She also appears to understand that legal representation is designed to assist her in fairly moving through the legal process. She appears to be interested in retaining an attorney(s) to assist her in her situation, she simply does not wish to work with the initial attorneys who have been assigned to her. At the same time, early in the process she did verbalize an awareness that if viewed as competent she could ask to change her attorneys and also appears to understand that she can privately retain attorneys should she be able to financially do so. There is evidence in her conversations with her brother that she is motivated to have him continue to explore alternate legal representation and to raise funds for her legal defense.

Throughout the period of time Ms. Siddiqui has been in custody, she has shared information with various individuals that provides some insight in her current belief system in regard to her own activities and association with the activities of others that she views as supporting her religious beliefs. At the same time, it is clear that she understands that her belief system is not universally accepted and that behavior which she might view as acceptable or others view as acceptable in support of her cause, might be viewed as unacceptable and criminal in other context. Given the nature of her situation and the charges against her, it would not be unusual for her to have some fears and anxiety about her situation. She may also have some reality based concerns about how her current situation may be perceived or interpreted among her peer group, family, others in her country, and the international community. All of this is also couched in a strong religious belief system. It is quite possible that any of these factors may influence her decision making throughout the period of resolution of the legal proceedings against her. What is important to separate out, however, is that it does not appear that there is a mental illness that is interfering with Ms. Siddiqui's ability to make a choice as to how to proceed through the legal process.

Specifically in response to the question of the court in regard to her ability to stand trial, it is this evaluator's opinion that at this time Ms. Siddiqui is medically fit to stand trial. Her medical problems have been treated and stabilized. It is also this evaluator's opinion that Ms. Siddiqui is not presently

suffering from a mental disease or defect rendering her mentally incompetent to the extent that she is unable to understand the nature and consequences of the proceedings or assist properly with her defense. She has a rational and factual understanding of the proceedings against her and is able to assist her attorneys with a reasonable degree of rational understanding should she choose to do so. In summary, it is this evaluator's opinion that Ms. Siddiqui is competent to stand trial at this time.

Because this evaluation has not identified any specific mental health condition in need of immediate treatment, no psychotropic medication appears indicated at this time. It is possible that Ms. Siddiqui may choose not to cooperate with the legal proceedings or work with her attorneys. It is this evaluator's opinion that those decisions would, at this time, be conscious and voluntary decisions on her part and that she does have the capacity to choose differently within the situation.

As noted, there are gaps in historical information that may be able to be filled in through interviews with family. Additional information may be available after Ms. Siddiqui sees her new attorneys. Assessment of competency to stand trial focuses on assessment of an individual's current mental state and that anticipated to continue for a short time in the future. It is possible that her presentation may evolve over time. Should an extended period elapse before scheduling of the competency hearing, this evaluator would appreciate the opportunity to continue to review clinical information and records as they become available, and if necessary, revisit Ms. Siddiqui in closer proximity to the hearing to determine whether any change has transpired post submission of this report.

Caution should be taken to recognize that Ms. Siddiqui tends to appear as a frail and rather timid individual, and thus her potential for aggression towards herself or others might be underestimated. Given her expressed degree of devotion to her belief system, it is possible that she could perceive herself as a martyr for a cause. There is also information that she has taken actions to try to escape from custody prior to her transfer to the United States. It is recommended that adequate precautions be taken to protect her and other individuals throughout the resolution of her legal proceedings.

Sally C. Johnson, M.D.
Professor
Department of Psychiatry
University of North Carolina at Chapel Hill

Docket and file on consent of the parties.

Page 35 of 35
SO ORDERED:
Date: 7-2-09

Richard M. Berman, U.S.D.J.