

08 cr 826

# MEMO ENDORSED
p.13

## FORENSIC UPDATE

NAME: Siddiqui, Aafia     REG NO. 90279-054     DATE: May 4, 2009

### IDENTIFICATION AND REASON FOR REFERRAL:

Ms. Aafia Siddiqui is 37-year-old female of Middle Eastern decent from Karachi, Pakistan. She was sent to the Federal Medical Center (FMC), Carswell, by the United States District Court, Southern District of New York, pursuant to Title 18, U.S.C. § 4241(b) with questions regarding her competence to stand trial. Ms. Siddiqui is charged with Attempted Murder of Officers and Employees of the United States, Attempted Murder of United States Nationals, Armed Assault of United States Officers and Employees, Discharge of a Firearm During a Crime of a Violence, and three counts of Assault of United States Officers and Employees.

An initial report was submitted to the Court on November 6, 2008, which opined that Ms. Siddiqui was not competent to stand trial. She was diagnosed with Major Depressive Disorder, Severe With Mood Congruent Psychotic Features based on her depressive symptomology, her disinterest in participating in activities, and her self-report of appetite, sleep, and concentration difficulties. The specifier of Mood Congruent Psychotic Features was added due to her reports of alleged hallucinations of seeing her children. The November 6, 2008, report also took into account the reports given by her attorneys that Ms. Siddiqui was likely held hostage from 2003 until 2008 and was tortured, sexually abused, and beaten routinely. It was opined that more information was needed to understand her psychological response to this alleged trauma and a rule out of Posttraumatic Stress Disorder was given.

Prior to the initial interview, the nature and purpose of this Court-ordered evaluation was explained to Ms. Siddiqui. She was informed that during the course of this evaluation, the usual conditions of confidentially which apply to a doctor-patient relationship would not exist. She was informed any information obtained during the course of interviews, testing, and observation would be subject to inclusion in a report which would be submitted to the Court and both attorneys. Ms. Siddiqui indicated an understanding of this warning and agreed to proceed with the evaluation.

### EVALUATION PROCEDURES:

During the course of this evaluation, Ms. Siddiqui was interviewed by Leslie Powers, Ph.D., Forensic Psychologist. Other members of the forensic team, as well as correctional and medical staff, had the opportunity to observe her behavior during the course of this evaluation. Their comments and observations were considered prior to the preparation of this report.

For the November 6, 2008, report to the Court, collateral data had been requested from both the defense and prosecution in this case; however, the data received was minimal. Since that time, a great deal of information has been received. For this report, all prior information was reviewed as well as the following additional records:


GOVERNMENT EXHIBIT C
08 Cr. 826 (RMB) (ID)

FORENSIC EVALUATION
SIDDIQUI, AAFIA
REG NO. 90279-054

PAGE 2

- Electronic Videos from the Metropolitan Detention Center (MDC), Brooklyn, dated September 9, 2008 and October 1, 2008
- Scheduling Order, dated April 28, 2009 (2 pages)
- Afghan Press Conference Footage, no date given
- Picture Evidence of Items Presumably Found on the Defendant's person, no date given
- Telephone call from Defendant to her brother, Muhammad Siddiqui, August 28, 2008
- Clinical Encounter Notes, dated August 4, 2008 to September 22, 2008
- Log Book Records from MDC Brooklyn, dated from August 8, 2008 to September 15, 2008 (approximately 300 pages)
- Detention Orders from MDC Brooklyn, dated August 5, 2008 (2 pages)
- Memorandum for Assignment of Management Interest Group, dated August 5, 2008
- Sealed Complaint, dated July 31, 2008 (1 page)
- Special Housing Unit Record Reviews, dated from August 7, 2008 to August 8, 2008 (22 pages)
- 
- 
- 
- Telephone Language Transcription for a call from Aafia Siddiqui to her brother, Muhammad Siddiqui, dated August 29, 2008 (14 pages)
- Telephone Language Transcription for a call from Aafia Siddiqui to her brother, Muhammad Siddiqui, no date given (9 pages)
- Telephone Language Transcription for a call from Aafia Siddiqui to her brother, Muhammad Siddiqui, October 4, 2008 (11 pages)
- Telephone Language Transcription for a call from Aafia Siddiqui to her brother, Muhammad Siddiqui, October 9, 2008 (12 pages)
- Telephone Language Transcription for a call from Aafia Siddiqui to her brother, Muhammad Siddiqui, no date given (8 pages)
- Telephone Language Transcription for a call from Aafia Siddiqui to her brother, Muhammad Siddiqui, no date given (9 pages)
- Telephone Language Transcription for a call from Aafia Siddiqui to Asif Hussain, Representative from the Pakistan Embassy, October 23, 2008 (18 pages)
- Telephone Language Transcription for a call from Aafia Siddiqui to her brother, Muhammad Siddiqui, October 23, 2008 (12 pages)
- Telephone Language Transcription for a call from Aafia Siddiqui to her brother, Muhammad Siddiqui, October 31, 2008 (6 pages)
- Telephone Language Transcription for a call from Aafia Siddiqui to her brother, Muhammad Siddiqui, November 4, 2008 (9 pages)

FORENSIC EVALUATION
SIDDIQUI, AAFIA
REG NO. 90279-054

PAGE 3

- Telephone Language Transcription for a call from Aafia Siddiqui to her brother, Muhammad Siddiqui, no date given (7 pages)
- Telephone Language Transcription for a call from Aafia Siddiqui to her brother, Muhammad Siddiqui, November 17, 2008 (11 pages)
- Telephone Language Transcription for a call from Aafia Siddiqui to her brother, Muhammad Siddiqui, no date given (6 pages)
- Telephone Language Transcription for a call from Aafia Siddiqui to her brother, Muhammad Siddiqui, no date given (5 pages)
- Telephone Language Transcription for a call from Aafia Siddiqui to her brother, Muhammad Siddiqui, December 17, 2008 (11 pages)
- Telephone Language Transcription for a call from Aafia Siddiqui to her brother, Muhammad Siddiqui, no date given (9 pages)
- Telephone Language Transcription for a call from Aafia Siddiqui to Asif Hussain, Representative from the Pakistan Embassy, January 26, 2009 (17 pages)
- FBI Laboratory Report of Examination, dated September 2, 2008 (3 pages)
- FBI Laboratory Report of Examination, dated August 22, 2008 (2 pages)
- FBI Document "Transfer of Evidence," dated August 1, 2008 (2 pages)
- Craig Hospital Medical Records, dated July 2008 (23 pages)
- Inmate Injury Assessment and Follow-up, dated September 10, 2008 (1 page)
- Documents recovered from Aafia Siddiqui's thumb drive (47 pages)
- Academic Transcript from Massachusetts Institute of Technology, dated February 3, 2009 (1 page)
- Academic Transcript from Brandeis University, dated February 3, 2009 (2 pages)
- Financial Affidavit, dated August 5, 2008 (1 page)
- Draft Transcript of Use of Force, dated September 9, 2008 (20 pages)
- Letter to Warden Chapman, no date given (2 pages)
- Letter written by Christopher L. Lavigne to The Honorable Judge Berman, dated September 11, 2008 (2 pages)
- Letter written by Elizabeth M. Fink to The Honorable Judge Berman, dated September 16, 2008 (4 pages)
- Letter written by Christopher L. Lavigne to The Honorable Judge Berman, dated September 19, 2008 (6 pages)
- Letter written by Elizabeth M. Fink to The Honorable Judge Berman, dated September 23, 2008 (2 pages)
- Letter written by Elizabeth M. Fink to The Honorable Judge Berman, dated September 22, 2008 (4 pages)
- Letter written by Christopher L. Lavigne to The Honorable Judge Berman, dated September 30, 2008 (2 pages)
- Letter written by Antonia Cedrone, Ph.D. to Elizabeth Fink, dated September 2, 2008 (2 pages)

FORENSIC EVALUATION
SIDDIQUI, AAFIA
REG NO. 90279-054

PAGE 4

- Order, dated October 2, 2008 (1 page)
- Administrative Order, dated October 6, 2008 (1 page)
- Administrative Order, dated November 17, 2008 (1 page)
- Limited Unsealing Order, dated November 19, 2008 (2 pages)
- Incident Reports, dated September 9, 2008 (5 pages)
- Protective Order, dated March 12, 2009 (4 pages)
- Documentation of interaction with Defendant written by V. Tetterton, Ph.D., Staff Psychologist, dated February 26, 2009 (1 page)
- Documentation of interaction with Defendant written by T. Yanez, Ph.D., Forensic Psychologist, dated March 12, 2009 (1 page)
- Reproduction of Seen Actions... a publication written by Aafia Siddiqui, dated August 5, 2002 (17 pages)
- Separating the Components of Imitation, a dissertation written by Aafia Siddiqui, dated February 2001 (304 pages)
- Federal Bureau of Investigation Reports, dated from July 26, 2008 to August 8, 2008 (453 pages)
- Federal Bureau of Investigation Reports, dated from July 26, 2008 to July 28, 2008 (3 pages)
- Federal Bureau of Investigation Reports, dated from August 4, 2008 to September 7, 2008 (20 pages)
- Federal Bureau of Investigation Report, dated July 28, 2002 (2 pages)
- Federal Bureau of Investigation Reports, dated from April 16, 2003 to May 1, 2003 (4 pages)
- Federal Bureau of Investigation Reports – Hospital Security Log, dated August 5, 2008 (18 pages)
- Letter written to Dawn M. Cardi from David Raskin, dated March 18, 2009 (3 pages)
- Letter written to Dawn M. Cardi from David Raskin, dated March 26, 2009 (3 pages)
- Letter written to Dawn M. Cardi from David Raskin, dated April 23, 2009 (4 pages)
- Letter written to Dawn M. Cardi from David Raskin, dated April 28, 2009 (2 pages)
- Letter written to Dawn M. Cardi from David Raskin, dated May 4, 2009 (2 pages)
- Court Transcripts, dated August 5, 2008 (22 pages)
- Court Transcripts, dated August 11, 2008 (15 pages)
- Court Transcripts, dated September 4, 2008 (39 pages)
- Court Transcripts, dated September 23, 2008 (32 pages)
- Court Transcripts, dated November 19, 2008 (28 pages)
- Court Transcripts, dated December 17, 2008 (11 pages)
- Court Transcripts, dated February 23, 2009 (9 pages)
- The medical records generated during the course of Ms. Siddiqui's evaluation at FMC Carswell

FORENSIC EVALUATION
SIDDIQUI, AAFIA
REG NO. 90279-054

PAGE 5

COURSE OF EVALUATION:

When Ms. Siddiqui first arrived at FMC Carswell on October 2, 2008, she was placed on a medical unit for three days before being placed on the Mental Health Inpatient (M1) Unit, as is standard practice for defendants undergoing Court-ordered evaluations. During the first two months at FMC Carswell, Ms. Siddiqui spent most of her time in her room and socialized with staff and other inmates on a minimal basis. Although quiet, she has shown an increase in interpersonal interaction with others since that time but still spends the majority of her time in her room reading the Qur'an and praying. She is mostly noted to socialize with lower functioning inmates and in one case, she has been appointed by the Religious Services staff as a mentor for a low-functioning inmate who is interested in converting to Islam. She has been observed to be sitting in the common areas of the unit reading the Qur'an with this individual, and has helped her in other areas such as learning to secure her Hijab. During the last four months, Ms. Siddiqui has refused to attend monthly team meetings where individuals sent for forensic evaluations are provided the opportunity to meet with the members of their treatment team. She has also refused to attend her appointments in Psychology, stating, "I don't care if I get written up. I am not coming."

Many attempts have been made to speak with Ms. Siddiqui by this Forensic examiner several times per week throughout the examination period. For the first few months, these attempts were met with polite refusal. However, during the last month, she has begun to be more forceful towards these requests. For instance, during my last attempt to speak with her on April 29, 2008, she stated, "I am not talking to you and I want you to leave me alone." When I began talking to her, she preceded to leave the room and put her fingers in her ears. She has, however, requested to speak with some of the staff members in the mental health department, and seems to have established an exceptionally good rapport with two of them. Most of her conversations with these staff members revolve around her political ideas and the belief that these individuals have some ability to use their positional authority to communicate her ideas to members of the United States Government. While these political ideas are certainly radical at times, they do not appear to be irrational or delusional in nature and should be viewed in light of her extremist political motives. The content of her political views are often laced with anti-Semitic themes and her belief that the United States is playing a negative role in the improvement of world relations. The contents of her handbag when captured, the documents obtained from her computer thumb drive, and her past interpersonal associations indicate that her political views have been a significant focus of her life for some time.

As reported in the November 2008 report, Ms. Siddiqui has made some statements regarding her belief that she has seen her children on Unit M1. The first time she made this statement, she raised her hand and announced it to everyone at a community meeting that was filled with staff members and other Unit M1 inmates. At the time, staff noted it to be an odd method of relaying information from an individual that hardly utters a word to anyone. Several weeks later, she gathered some of

FORENSIC EVALUATION
SIDDIQUI, AAFIA
REG NO. 90279-054

PAGE 6

the nursing staff together to ask them if they could arrange for her children to visit her during the day because they were keeping her up at night. Because of this, nursing staff were asked to note her sleeping habits during the night and include this information in daily morning reports throughout the evaluation. Consistently, both nursing and correctional staff have noted Ms. Siddiqui sleeps through the night.

Ms. Siddiqui has also made some complaints regarding her belief that some staff members and inmates are trying to harm her in some way. She wrote a list of individuals ranging from nursing staff to an institution dentist that she believed were conspiring against her and gave it to an officer. Many of these individuals were interviewed and asked if they had any insight into why Ms. Siddiqui had included them in her note. In some cases, they had been involved in a disagreement with Ms. Siddiqui or had not given into her demands. For instance, Ms. Siddiqui originally responded favorably to a Special Investigative Services officer and asked if she could use the staff telephone to call her brother. When she was told she needed to use the inmate telephone, she told him he was Jewish and she no longer trusted him. She also maintained that her food was being poisoned, and accommodations were made to offer her the same tray as the rest of the inmates rather than a common fare tray given to those of the Muslim faith.

To rule out a diagnosis of PTSD, Ms. Siddiqui was offered services by a psychologist who specializes in trauma and abuse. During the initial session, Ms. Siddiqui reported no desire for treatment but wanted the therapist to know she was dead. When probed further, she reported she was dead because she had been shot and had to be resuscitated. Two more contacts were initiated by this psychologist but Ms. Siddiqui politely refused to participate on each occasion.

MENTAL STATUS:

Ms. Siddiqui is a 37-year-old, Pakistani female of petite build who appears her chronological age. Her hygiene and grooming throughout the evaluation period were adequate. Despite numerous attempts, she refuses to participate in any formal interviews with this examiner; however, she specifically requests to speak with other members of the Psychology staff, including another forensic psychologist. Her eye contact was poor during the last evaluation period but has improved considerably over the last few months. When she first arrived, she reported visions of her children but these reports have decreased considerably. During the course of this evaluation, she has displayed an appropriate range of emotions that are congruent to the situation or topics being discussed. She has been observed on the unit to be smiling and laughing with other inmates and with a select few staff members. She denied current suicidal or homicidal ideation.

DISCUSSION OF MENTAL HEALTH ISSUES:

As previously stated, the collateral information received for the November 2008 report to the Court was minimal and largely consisted of information provided by her attorneys who are no longer assigned to defend Ms. Siddiqui in this case. According to her attorneys at the time, Ms. Siddiqui

had likely been taken into custody by foreign Military Intelligence, and was routinely tortured, sexually abused, and beaten from approximately 2003 until 2008. In addition, her attorneys reported a strong likelihood that her children were also held captive with her and that the whereabouts of her two younger children were unknown. In the November 2008 report, it was noted Ms. Siddiqui presented with psychotic symptoms that included visual hallucinations such as seeing her children in the middle of the night and the belief that staff and inmates were going to harm her. She also described some odd beliefs, such as the belief that she was dead as a result of "dark angels" that had killed her. These symptoms were atypical but could have possibly been explained in light of a traumatic experience as a prisoner of war who not only suffered unspeakable abuse and torture, but was also made to watch the abuse and possibly the death of her own children.

Since the last report, collateral information was reviewed that clarifies some of Ms. Siddiqui's whereabouts from 2003 until her arrest for the instant offense in 2008. Ms. Siddiqui gave some indication of her whereabouts during this time when she was interviewed by the FBI. In 2005, she reported living with the Khawaja family and working at the Karachi Institute of Technology. In the Winter of 2007, she reported an attempt to look for her husband in Afghanistan and staying in Quetta. Mohammad Amjad Khan, Ms. Siddiqui's ex-husband, reported seeing either Ms. Siddiqui or their children on several occasions in 2003, 2004, and 2005. In July 2008, Mr. Khan claims to have seen his daughter Miriam in the care of the Siddiqui family even though Ms. Siddiqui has stated that her daughter is missing and is likely dead. While her accounts of her time are incomplete, her statements and other facts gathered seem to corroborate that she was not held captive from 2003 until 2008.

Muhammad Siddiqui reported his sister did not have a history of psychiatric problems that he was aware of and no records were presented to this examiner that indicated otherwise. The hospital security log kept at Bagram, Air Force Base after she was taken into custody on July 18, 2008, noted Ms. Siddiqui was alert and goal oriented as she maintained her daily hygiene, continued her daily prayers and Qur'an readings, and ate adequately. During this time, she was interviewed at length for several days by the FBI and no significant mental health concerns were observed.

On August 4, 2008, she was transported to the United States on a 20 hour flight and was accompanied by FBI agents. When these agents were interviewed for the purposes of this forensic evaluation, they both reported Ms. Siddiqui showed no signs of psychosis or psychological distress. Ms. Siddiqui was noted to be fully oriented and talkative throughout the trip. When she first arrived at the MDC Brooklyn, her intake screening did not reveal any signs of a psychiatric illness. Her mental status exam states she was alert and oriented with a goal directed thought process and normal thought content.

During her stay at MDC Brooklyn, a log book was completed by correctional staff who were assigned to watch Ms. Siddiqui around the clock. This log book was reviewed for signs of mental health issues and showed that on August 22, 2008, Ms. Siddiqui admitted to mild depressive symptoms "related to the gravity of her legal difficulties." The log book also shows that she was tearful during this time and reported being worried about her son. She did make an unusual statement about wanting to save her lunch meat from her tray to give to her son.

On August 29, 2008, Psychology Services was alerted that Ms. Siddiqui was refusing to eat. In both a telephone conversation to her brother, Mohammad, and during conversations with medical staff, she reported significant distress over the whereabouts of her son. However, after her brother Muhammad told her that her son was being cared for by her sister Fauzia, she began eating and reports of psychological distress decreased.

On September 2, 2008, Ms. Siddiqui reported to a medical staff member that she was depressed and anxious and her sleep was poor. She also stated she had seen her daughter in her cell. At no time was Ms. Siddiqui noted in the log book to be attending to any external stimuli that would be indicative of someone experiencing a visual hallucination. Further, a review of the log book revealed Ms. Siddiqui was asleep from 10:38 p.m. on September 1, 2008 until 4:36 a.m. on September 2, 2008. Additionally, she was reported to have fallen asleep again from 7:05 a.m. until 12:00 p.m. on September 2, 2008. This constitutes a combined total of 11 hours of sleep. During this time, she also took care of her basic hygiene and was reported to be eating adequately. In the following days, Ms. Siddiqui was reported in clinical encounters to say she was "fine" and was in no apparent distress.

Based on the limited collateral data available during the November 2008 report to the Court, it was suggested that if Ms. Siddiqui had been held captive as a political prisoner in the past, her being required to submit to strip searches and to undergo a Use of Force procedure could possibly result in a "re-traumatizing" event. Thus, this was offered as a possible explanation for her unusual psychological presentation. The Use of Force procedure involved Federal Bureau of Prisons officers at MDC Brooklyn who utilized the Federal Bureau of Prisons' Use of Force policy in order to conduct a medical evaluation of Ms. Siddiqui. This policy dictates that a video camera be used during this process. Ms. Siddiqui has explained in great detail many times during her evaluation that the officers were "dark angels" who came in and "killed her with the camera." However, after more information regarding her experience at MDC Brooklyn has become available, the Use of Force procedure and the strip search do not appear to be the traumatic experience originally reported by her attorneys. Her first strip search on record occurred on August 7, 2008. There was no change noted in log books regarding her mental status immediately after this strip search. Throughout that day, she was reported to be eating and sleeping adequately, with no signs of distress noted. A Clinical Encounter note dated August 9, 2008, did not indicate any psychological distress.

FORENSIC EVALUATION
SIDDIQUI, AAFIA
REG NO. 90279-054

PAGE 9

Her presentation during the Use of Force procedure was reported to be one of an angry individual who was violent and used obscenities during the action. It was also reported she made statements such as, "...go to hell, I'm not moving" and "...let me see your name because I'm going to sue you." A review of the transcript of the Use of Force procedure on September 9, 2008, showed Ms. Siddiqui requested to have a video recorder present, stating, "...get it on video. I want it on video so that the world can see how you treat people in this prison." Although she appeared to be angry when her clothing was removed for her medical examination, she still requested that a video camera be present after her clothing was removed. No psychotic thought process was noted during the Use of Force, but she did display intense anger toward the staff conducting the procedure and the United States in general. In the beginning, the content of her speech was focused on herself and her treatment but became increasingly generalized to the alleged political persecution of individuals with her religious beliefs by the United States. After the Use of Force procedure, she was reported to be crying later that day but was also reported to sleep well. She did not mention "dark angels" and instead clearly expressed her understanding that the Use of Force procedure was conducted by staff at the Federal Bureau of Prisons. On September 12, 2008, she first reports that staff "killed her" because they "videotaped her naked." However, during that same conversation, she reported her concern that the video would be placed on the internet to "shame her in front of the whole world."

Since her arrival at FMC Carswell, she has referred to the correctional officers who participated in the Use of Force as "dark angels" and refused to accept any explanation that they were correctional officers. In a telephone conversation with her brother Mohammad, she stated, "the lady in black clothes, I don't know what they were and they got three video cameras and they did worse things you know. And then they killed me. And then I was dead. I was gone and then they sent me here." However, during an interview of correctional staff that participated in the procedure, it was noted that she later apologized to staff members whom she had kicked and spat at during the Use of Force.

Other documentation from the night of the forced cell move indicate she was future-oriented and goal-directed, as she spoke with a unit manager and requested paperwork and information concerning Ramadan. She was also noted to be eating during the evening meal. The log book also reported Ms. Siddiqui to be sleeping from 9:00 p.m. until 11:00 p.m. that evening, and sleeping intermittently during the morning of September 10, 2008. Further, other log book entries from September 10, 2008, note she spent her time reading newspapers, sleeping, eating, and engaging in hygiene tasks. She was also noted to speak with selective MDC Brooklyn medical staff and appeared organized without psychotic content, as she was able to ask about her medical care.

Throughout Ms. Siddiqui's evaluation period at FMC Carswell, she has maintained she is unable to read or write because "she is dead." On one occasion, when asked to sign some documents, she asked if she could sign with her less-dominant hand because her dominant hand was "dead after the dark angels killed me." Ms. Siddiqui has been observed to be reading and writing on numerous

FORENSIC EVALUATION
SIDDIQUI, AAFIA
REG NO. 90279-054

PAGE 10

occasions since the Use of Force occurred. One day, I entered her room unannounced and noted she was sitting on her bed reading the Qur'an. When I remarked that I was sorry I was interrupting her reading, she insisted she could not read and was only "looking at the text." As previously noted, when a low-functioning inmate expressed an interested in her religious beliefs, she was observed sitting with this inmate and reading to her from the Qur'an. She has also been noted to be reading newspapers and taking notes as she read.

A conversation initiated by Ms. Siddiqui with one of the social work staff at FMC Carswell spoke of a possible reason for her strong opposition to the strip search procedure. She reported she felt she could be of assistance in peace negotiations with the Taliban because they know she is a "good Muslim woman" and her "refusal to submit peacefully to the strip search procedure has been reported in media in her country and has helped her reputation with her people."

A review of her telephone calls to her brother reveal an vested interest for Ms. Siddiqui to make sure certain aspects of her case were reported to the media, and she made several attempts to portray her experience as significantly worse than it actually was when she spoke with the Pakistani Consulate. During a January 26, 2009, conversation with Asif Hussain, a Representative from the Pakistan Embassy, she clearly attempted to portray her treatment at FMC Carswell as restrictive and cruel. She stated, "You people [the Pakistan Embassy] leave me here to die and be beaten and not talk to me." When Mr. Hussain attempted to give Ms. Siddiqui his telephone number so that she could call him, she refused to take the number, implying that the staff at FMC Carswell would not assist her in making a telephone call. She stated, "No, they won't [help me with the telephone call] because I do not have any rights here. You have to understand. They do whatever they feel like and I can't argue. I can't."

DISCUSSION OF COMPETENCY

In the November 2008 report to the Court, it was noted that Ms. Siddiqui stated the Court had already sentenced her to death and killed her so she does not believe she will be going back to Court for any additional hearings. However, a review of her conversations with her brother, Muhammad, indicates she has a better understanding of the Court process than she reveals to this examiner. The following statements from the telephone transcripts were noteworthy:

August 29, 2008 – "There are Pakistani legal groups. There is a doctor who is president of the Pakistani legal forum. They can get me a lawyer. They are out of New York. Can you convey this to the consulate because I can't call them?"

October 4, 2008 – "Even if you get the best attorney in the world and even if I could prove all this is false. All of it. It can be proven but it won't work. Brother, you don't understand the system... I don't believe their system anymore at all. I can't. I have seen it. First I had belief when I came. I

FORENSIC EVALUATION
SIDDIQUI, AAFIA
REG NO. 90279-054

PAGE 11

was very optimistic because I knew it was all wrong. Now I am not optimistic at all... If they want to give me a sentence for life imprisonment, do whatever, send me to some nasty place, they can try doing that whatever they want."

October 9, 2008 – "That is all bluff because they had just committed an international crime... They are going to get together to defend their soldiers. There is no way on earth that I am going [sic] get out of here." She also added, "Now we have to prove that this whole thing, the whole drama of me coming here, is against international law."

Based on the collateral evidence reviewed for this report, Ms. Siddiqui has only attended one hearing on her case since she has been in the United States. This appearance occurred on August 5, 2008, and she was able to display appropriate behavior during the Court proceedings. In fact, she acknowledged her understanding many times. In my opinion, her refusal to participate in her legal defense or to communicate with her attorneys is not indicative of a mental disease or defect that results in her inability to be a competent defendant. Rather, it is a volitional decision made by Ms. Siddiqui.

## DIAGNOSIS AND DISCUSSION

| Axis I:   | V65.2 | Malingering |
|-----------|-------|-------------|
| Axis II:  |       | No Diagnosis on Axis II |
| Axis III: |       | None |
| Axis IV:  |       | Pending Criminal Trial |
| Axis V:   |       | Current Global Assessment Functioning = 80 |

In the November 2008 report to the Court, Ms. Siddiqui was diagnosed with Major Depressive Disorder, Severe with Mood-Congruent Psychotic Features. This was based on her initial reports of alleged hallucinations of her children and supported by the possibility that these alleged hallucinations may be the product of a traumatic experience as a political prisoner. However, after new collateral data was reviewed, her report of seeing alleged hallucinations of her children are contradicted by evidence. When she reported these alleged hallucinations at MDC Brooklyn, the log book does not indicate she was attending to any external stimuli or exhibiting unusual behavior to support her claims. At FMC Carswell, she reports seeing her children at night and that her children are keeping her up all night but regular nightly rounds by nursing and correctional staff have shown her to be consistently sleeping through the night.

FORENSIC EVALUATION
SIDDIQUI, AAFIA
REG NO. 90279-054

PAGE 12

In the absence of any collateral documents concerning her mental health history, the diagnosis of Major Depressive Disorder in the November 2008 report was based on her depressive symptomology, her disinterest in participating in activities, and her self-report of appetite, sleep, and concentration difficulties. After nearly six months of observation and review of the extensive collateral evidence that has since been made available to me, it is my opinion that Ms. Siddiqui's response when she first arrived was due, in part, to a normal reaction to facing criminal prosecution and incarceration. Initially, she showed little, if any, psychological distress for the first two months in United States custody, despite having been monitored on a continual basis at both Bagram Air Force Base and MDC Brooklyn and interviewed extensively for hours at a time by an FBI investigator. When she did report experiencing sadness and tearfulness, Ms. Siddiqui stated it was "related to the gravity of her legal difficulties." Over time, she has been noted to be tearful and to present with dysthymic affect in situationally appropriate times but not outside the realm of a normal adjustment to a new situation.

In the November 2008 report, a diagnosis of Posttraumatic Stress Disorder was offered as a rule out to be considered as more information became available and Ms. Siddiqui was monitored over time. No evidence of political torture has been presented for this evaluation that would be an antecedent for this disorder. She has consistently been a poor historian, as she has steadfastly refused to provide any information that would clarify any questions regarding her exposure to trauma. She does not exhibit the psychological symptoms that would warrant a diagnosis of Posttraumatic Stress Disorder.

Based on a review of this case, it is my opinion that Ms. Siddiqui currently meets the diagnostic criteria for Malingering. According to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Test Revision (DSM-IV-TR), Malingering is the intentional production of or grossly exaggerated psychological symptoms motivated by external incentives such as evading criminal prosecution. The DSM-IV-TR also adds that malingering can represent adaptive behavior – for example, feigning illness while a captive of the enemy during wartime.

OPINION ON COMPETENCY:

In my professional opinion, Ms. Siddiqui is currently competent to stand trial. Ms. Siddiqui is not suffering from a mental disease or defect which would render her unable to understand the nature and consequences of the proceedings against her or to assist properly in her own defense.

FORENSIC EVALUATION
SIDDIQUI, AAFIA
REG NO. 90279-054

PAGE 13

Submitted by:

*[signature]*
Leslie Powers, Ph.D.
Forensic Psychologist

Reviewed by:

*[signature]*
Robert Gregg, Ph.D.
Chief Psychologist

---

Docket and file on consent of the parties.

SO ORDERED:
Date: 7·2·09  *[signature]*
Richard M. Berman, U.S.D.J.