USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/2/09

# MEMO ENDORSED
### p.18

## FORENSIC PSYCHOLOGICAL EVALUATION

| | |
|---|---|
| **NAME: AAFIA SIDDIQUI** | **CRIMINAL NUMBER 08 Cr 826(RMB)** |
| **DATE OF BIRTH: 03/02/1972** | **REGISTRATION # 90279-054** |
| **DATE OF REPORT: 6/20/09** | **DATE OF INTERVIEW: MAY 1, 2009** |
| **EVALUATOR: L. THOMAS KUCHARSKI, PHD** | |

### IDENTIFYING INFORMATION:

Dr. Aafia Siddiqui is a 37 year old, purportedly twice married and divorced Pakistani woman with 3 children who is charged with the alleged offenses of Attempted Murder of United States Nationals, Attempted Murder of United States Officers and Employees, Assault on United States Officers and Employees and Discharge of a Firearm During a Crime of Violence in violation of Title 18 U.S.C. sections 2332(b)(1), 3238, 1114(3), 323(b), 111(a)(1)(b) and 924(c)(1)(A)(iii). Dr. Siddiqui is alleged to have fired on members of the United States Military, Agents of the FBI and Interpreters, prior to being interrogated in Grazni, Afghanistan. Dr. Siddiqui was evaluated in order to assist the court with determining her competency to stand trial pursuant to Title 18 U.S.C. section 4241(b).

### STRUCTURE OF THE EVALUATION

Dr. Siddiqui was interviewed in her room at the Federal Medical Center in Carswell, Texas on May 1, 2009 for approximately one and a half hours. She was interviewed with the assistance of Chris McGee, MSW a social worker at FMC Carswell. Mr. McGee was identified as the staff member with the best rapport with Dr. Siddiqui. Initially the intention was that he would provide an introduction in order to facilitate cooperation but it became apparent that Dr. Siddiqui would not participate unless he remained present throughout the interview. Given her very guarded presentation and because of the potential that Dr. Siddiqui would not cooperate, notes were not taken during the interview. Prior to the interview Dr. Siddiqui was informed that I am a licensed psychologist. She was informed of the purpose of the interview and the limits of confidentiality of which she appeared to have at least a general understanding. Dr. Siddiqui initially refused to cooperate but with encouragement by Mr. McGee and this evaluator spoke about some elements of her history and current situation. She refused to discuss many important elements of her past particularly information about her children and the five year period preceding her arrest.

Collateral interviews were conducted with her brother Mohammad Siddiqui, her sister Fowzia Siddiqui, mental health staff at FMC Carswell including Dr.Robert Gregg, Dr. Leslie Powers, Dr.Tami Yanez, Dr. Camille Kempke and Chris McGee, MSW. Nursing staff and the officer who admitted me to the facility, who offered that he had worked on the unit where Dr. Siddiqui resided were briefly interviewed. Attempts were made to interview mental health staff at MDC Brooklyn but I was not allowed to do so. Her attorneys Dawn Cardi and Chad Edgar were consulted throughout the evaluation process. Asif Hussain, a representative of the Pakistani Embassy who met with Dr.

Defendant
Exhibit
DX 1

Siddiqui on a number of occasions was interviewed on June 16, 2009. The following documents were reviewed:

1. The Administrative Order of Richard M. Berman, United States District Judge, Southern District of New York, dated 11/17/08.
2. The Sealed Complaint.
3. The Criminal Indictment.
4. The Forensic Psychiatric Evaluation of Gregory B. Saathoff, MD dated 3/15/09.
5. Medical Records including Psychology Data System reports of psychologists at MDC Brooklyn dated 8/4/08 to 10/1/08. Notes from the Medical file including notes written by Physician Assistant Brooks and Staff Psychiatrist Dr. McLean. Report of Dr. Guerrero-Cohen to the Disciplinary Hearing Officer.
6. Medical records from FMC Carswell including Psychology Data System notes of psychologists, medical record notes of Staff Psychiatrist Dr. Kempke, nursing progress notes dated 10/2/08 to 5/1/09.
7. Transcripts of Court Proceedings dated 12/17/08; 2/23/09; 3/26/09; 4/28/09.
8. Transcripts of Telephone calls by Dr. Siddiqui to her brother Mohammed Siddiqui dated 8/29/08; 10/03/08; 10/04/08; 10/9/08; 10/15/08; 10/16/08; 10/31/08; 11/04/08; 11/12/08; 11/17/08; 11/26/08; 12/02/08; 12/9/08; 12/17/08; 1/26/09; 3/24/09; 3/25/09; 3/28/09; 4/15/09; 4/22/09; 4/30/09; 5/5/09; 5/11/09; 5/14/09; 5/16/09; 5/18/09 .
9. Transcripts of Telephone conversations between Dr. Siddiqui and Asif Hussain of the Embassy of Pakistan dated 10/2308; 1/26/09; 5/19/09.
10. Transcripts of the Use of Force conducted at MDC Brooklyn.
11. Video Tapes labeled Sept 9, 2008 Eval and October 1, 2008 Eval.
12. A letter written by Dr. Siddiqui to the Warden of FMC Carswell entitled "Please Read This in Private at Home."
13. The Observation Log Book maintained at MDC Brooklyn.
14. The Affidavit in Support of a Search Warrant.
15. FBI Investigative Reports identified as Bates Materials 1-82; 84-725.
16. The Abstract of Dr. Siddiqui's Doctoral Dissertation entitled "Separating the Components of Imitation and a scientific publication co-authored by Dr. Siddiqui entitled "Reproduction of Scene Actions: Stimulus Selective Learning.
17. A document entitled "Why I am Not a Terrorist."
18. Medical Records from Medical College of Georgia.
19. A Video of her Interrogation by Afghan Authorities.
20. A Video of a Press Conference Given by her sister Faucia in Pakistan.
21. Numerous newspapers, press, internet blogs related to her background, arrest and detention in the United States.
22. Her Visa application.

## CLINICAL AND SOCIAL HISTORY

Dr. Aafia Siddiqui is a 37 year old woman who was born in Pakistan to an upper middle class family. Her father, who died of a heart attack in August of 2002, was a physician and her mother a social worker. Her mother is still living but is reportedly in

2

poor health and suffers from dementia. Dr. Siddiqui has two siblings a brother Mohammed, an architect who resides with his family in Houston, Texas and a sister Faucia a neurologist who resides in Karachi, Pakistan. Dr. Siddiqui's history has been detailed in three prior reports to the court and will not be reiterated here. Suffice it to say that Dr. Siddiqui has no prior documented history of mental health difficulties or criminal involvement. She was educated in the United States beginning her studies in Houston but transferred to the Massachusetts Institute of Technology where she obtained a bachelor's degree in biology. She went on to complete her PhD in cognitive neuroscience at Brandeis University in Boston in 2001. Her dissertation research involved a study of the effects imitation has on perceptual learning and memory.

In 1995 Dr. Siddiqui married Mohammed Amjad Khan through an arranged marriage. At the time her husband was completing his studies and residency in medicine and anesthesiology. The couple resided in the Boston area. Three children were born of this union. Mohammad Ahmed, currently age 12, Mariam Bint Khan currently age 10, and Suleman currently age 5. There is evidence that this relationship was very abusive. Her husband admitted to only one incident of domestic violence and minimized it to authorities. But review of the interviews with two of her former professors at Brandeis and interview with her sister Fowzia reveal that Dr. Siddiqui regularly was observed to have bruises on her face, suggesting substantially more abuse than admitted by her husband and raising concern regarding the veracity of his report. It is also noteworthy that in an interview by authorities on March of 2002, ████████████████ reported that Dr. Siddiqui consulted him regarding reporting child abuse to the Department of Social Services. Dr. Siddiqui's son Ahmed is currently in the custody of her sister Fowzia.

The whereabouts of the other children are unknown although Mohammed Khan claims that he has seen them in Karachi on at least a couple of occasions. ████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████ Given the concerns raised above about the veracity of Mr. Khan's reports and the fact that his statements occur in the context of a prolonged custody dispute where he has lost custody and has been denied contact with his children, the accuracy of his report is not known.
████████████████████████████████████████████████████

Dr. Siddiqui purportedly married a second time in March or April of 2003. Approximately one month later Dr. Siddiqui's second husband Ammar Al Baluchi was arrested and transferred to Guantanamo Bay allegedly. Dr. Siddiqui claims that she was unaware of his alleged connections to Al-Qaeda or any other terrorist organization or that he is the nephew of Khaled Sheik Mohammad.

Dr. Siddiqui's clinical history is not well known. There appears to have been no serious psychiatric difficulties prior to 2001 although in the interview ████████ her

first husband characterized her as having a paranoid personality. She appeared to function at a high level completing her doctoral studies, organized several Muslim education and charitable activities and appeared to be adequately raising her children. This occurred in the context of potentially serious domestic abuse. Following the attacks of 9/11, Dr. Siddiqui informed her husband that she wished to return to Pakistan. One of the reasons given at that time was that she believed that following 9/11, Americans were intending to abduct Muslim children and were converting them to Christianity. The strength and pervasiveness of this belief is unknown but it represents a very paranoid idea.

There are conflicting reports regarding the whereabouts of Dr. Siddiqui and her children for the five year period preceding her arrest. Some of these reports claim that she was held in either Bagram or a secret facility by U.S authorities and was tortured, a report denied by U.S authorities. Dr. Siddiqui in one of the FBI reports denies being held in Bagram. However she refuses to fully disclose where she was during this time. There is fairly convincing evidence, as reported by her brother and sister, that in 2003 she suddenly disappeared. She stopped cashing child support checks around the same time. Following an argument with her mother who she and the children were living with, an agreement was reached that they would go to Islamabad to live with her uncle. She reportedly left in a cab, phoned her mother from the train station, agreeing to call again when she reached Islamabad. She apparently never made it to her uncle's residence.

Although she has refused to discuss this period at any length, in a document written allegedly by her uncle ████████████ her uncle reported in 2008 that she had been held captive and that her current captors were not as harsh as the former ones, that they allowed her infrequent outings. She reported that her previous captives kept her in isolation, wore masks and gloves and did not communicate with her. Noteworthy is the observation that her mother traveled to the United States in search of her daughter who she had learned was in U.S. custody from newspaper accounts in Pakistan. She also went to significant efforts to interview the reporters of the newspaper in an attempt to determine the source of their information. It is also noteworthy that Dr. Siddiqui spoke to Social Worker Chris McGee about being held in various camps, bases and prisons. Her being held captive was also referenced in her letter to the Warden listed above. At the time Mr. McGee believed that she came across as "very delusional. From the time she was first interviewed by agents, after she was shot, Dr. Siddiqui's thinking and speech is replete with themes of torture and fears that her children will be tortured.

What is reported is that Dr. Siddiqui became involved with a man named Abu Lubaba, who courted her using her concern for the protection of Pakistan against aggressive nations. Later she came to believe he was a "bad man." Abu Lubaba during this period issued a fatwa on Dr. Siddiqui to study germ and chemical warfare. ████

4

In July of 2008 Dr. Siddiqui traveled to Ghazni, Afghanistan reportedly in order to find her second husband. She traveled with a young boy, who turns out to be her son, Ahmed because she reported traveling alone would draw attention to her. This child, as determined by DNA testing turns out to be her son Ahmed. It is unclear why Dr. Siddiqui attempted to conceal his identity, a deception noted to be significant by Dr. Saathoff, but it is potentially the case that she feared for his safety. Dr. Siddiqui was arrested by Afghan police outside the residence of the provincial governor. On her possession were a flash drive and numerous written and copied documents related to chemical, biological weapons, materials related to an AIDS vaccine, articles on curing aging, numerous drawings and references to US landmarks. On July 18, 2008 US military personnel and FBI agents arrived at the Afghan facility in order to interrogate Dr. Siddiqui. It is at this facility where the alleged offenses occurred.

## CURRENT MENTAL STATUS

Dr. Siddiqui was interviewed in her room at the Federal Medical Center in Carswell, Texas. She was extremely guarded, willing to provide only limited information, and often refused to answer certain questions. She attempted to control the interview, spoke directly to Mr. McGee who was present, and had little eye contact with this evaluator although eye contact improved as the interview proceeded. Dr. Siddiqui's thinking was very tangential moving from topic to topic in a disconnected manner. Her thoughts were replete with numerous conspiratorial ideas, some of which are consistent with her radical political beliefs others not. For example she spoke at length about conspiracies by the Jews, Israel, India and the United States. She also related a number of beliefs that appeared delusional. For example she believed that she was being poisoned and that staff at the facility were intending to kill her. She related that it was known to the inmates that a specific unnamed staff member took psychotropic medications. She stated that he therefore could kill her in her sleep and would not be punished because he would get off on an insanity defense. She reported that she believed that during the forced medical evaluation where blood was taken, that she was also injected with an unknown substance. She spoke at length about being dead, having been killed during the strip searches performed at MDC Brooklyn. This report of being dead had a metaphorical quality as she also appeared to be aware that she was alive as she made many statements about not caring what happened to her in the future. She reported that the naked video of her during the strip search was put on the internet for everyone to view. This humiliation, the belief that she will never leave prison or see her children, that she has been shamed and thus would be an outcast in the Muslim world and her community appears to be what she is referring to as being dead. She believes that the Court is responsible for this humiliation and has "already killed her." She believes that she was responsible for the fate of other inmates in the unit in that her engagement with them resulted in them receiving disciplinary actions.

Throughout the records Dr. Siddiqui has denied being mentally ill and as having very poor insight into her mental illness. From time to time she questions whether she is 'going crazy" but this is related to the stress she is experiencing and not an acceptance of her current psychiatric difficulties. She admitted to brief fleeting visions of her children,

5

of a man standing outside her cell and of a dog eating off a plate. These visions appear to be hypnogogic experiences and not true visual hallucinations. They are not enduring experiences that typically characterize true visual hallucinations. There appears to be no auditory, tactile or olfactory hallucinations. Significant depression has been noted throughout her incarceration. The outward affective presentation of depression has vacillated and at the time of this interview may have diminished to some degree as she was able to smile, her energy level appeared adequate and she engaged in the discussion with some vigor. However there is profound hopelessness, helplessness and sadness particularly centered on the well being of her children. She has repeatedly denied suicidal ideation stating that her fate is in God's hands.

Sleep and appetite appear to be significantly disturbed. Dr. Siddiqui complains about concentration difficulties that limits her ability to read the Koran, although she spends significant energy trying to read the Koran. Social interaction is significantly limited. She spends much of her time isolated in her room. Dr. Siddiqui appears oriented to person, place and time although her understanding of her current circumstances appears to involve some delusional interpretation. Judgment appears limited particularly around her legal representation and cooperation. There are no significant intellectual deficits, no severe memory impairment, although some concentration and therefore short term memory deficits of minor proportion are likely. No abnormal movements were noted. Her speech was tangential but of normal rate. Records of her interviews with the FBI are suggestive of some grandiose thinking as are some of her writings. No symptoms of mania were observed. Her demeanor was quite paranoid. It is noteworthy that the interview with her brother revealed phenomena very characteristic of those with paranoid delusional disorder to be discussed more latter in this report. There is a rather dramatic, hysterical quality to Dr. Siddiqui's presentation.

## INFORMATION GATHERED FROM THE RECORDS AND OTHER REPORTS.

Review of the records from the MDC Brooklyn facility reveal that on admission Dr. Siddiqui denied a history of psychiatric disorder and treatment and current psychiatric difficulties. The Intake Screening conducted on 8/4/08 revealed that no symptoms were identified. This is in contrast to many extreme beliefs presented to the FBI agents enroute to the United States and at the Craig Military Hospital in Afghanistan. At that time she spoke about president Musharaf being involved in a conspiracy where secret police from India had infiltrated a madrassa in Pakistan and used a chemical bomb to kill thousands of children. She was surprised that the agent was unaware of this event. She spoke to agents about India building dams that resulted in many Pakistanis dying of thirst. These ideas were not elicited by Dr. Guerrero Cohen during the Intake Screening. While these may or may not be beliefs that have their origins in radical political dogma, they would have raised concern of possible delusional thinking had they been presented on admission to mental health staff.

However, routine evaluations by psychologists that are required by BOP policy for inmates held in administrative detention began to raise concerns regarding Dr. Siddiqui's mental stability. For example on 8/23/08 Dr. Siddiqui was evaluated by Dr.

6

Corrine Ortega who reported that she was tearful through the interview, believes her son is being tortured, and that Americans were trying to get her transferred so she will have to watch her son being tortured. Dr. Ortega reported that she was guarded and paranoid. On 8/24/08 Dr. Ortega reported that Dr. Siddiqui had been "crying in her cell last night. Stated that she wanted to speak to psychology but then stated that she didn't want to because she does not want Psychology to think she is crazy."

Numerous repeated evaluations by Dr. Guerrero-Cohen raised concerns of potentially serious psychiatric difficulties. On 8/27/08 Dr.Siddiqui reported that she had difficulties reading the Koran due to inability to focus and concentrate. She reported what I believe to be hypnogogic experiences of visions of a dog eating off her son's plate. It is noteworthy that review of the log book kept by the officer observing her reported that Dr. Siddiqui was at 2:20 a.m. "walking around with a strange look on her face." On 8/29/08 she "expressed intense anguish at the thought of her children being tortured or at risk of torture." On 9/3/08 she was reported to have been crying different times during the day." On 9/5/08 she is noted to have been crying intermittently throughout the day and night. On 9/8/08 it is reported that her "eating improved… exhibits decreased sleeping…cell cleaning, wiping mattress with a damp cloth and cleaning every part of her bed." It should be noted that later Dr. Siddiqui reports that keeping her cell clean was a means to have the "good Angels" rescue her and take her to heaven. It is to be noted that there are reports of her repeatedly cleaning her cell. On 9/11/08 Dr. Guerrero-Cohen was called by custody staff to evaluate Dr. Siddiqui. She did so outside of the view of Dr. Siddiqui listening to what she told the Operations Lieutenant. At that time Dr. Siddiqui was crying hysterically stating that she saw a man standing outside her cell who told her son was in danger.

On 9/12/08 Dr. Guerrero-Cohen interviewed Dr. Siddiqui and reported that Dr. Siddiqui presented with visual and auditory hallucinations and persecutory delusions. She observed that "her verbalizations were consistent with log entries which also reflect paranoid ideas as well as paranoid beliefs made to the PA on 9/10/08. Apparent lack of insight into her mental illness. Believes video placed on internet," referring to the video of the strip search or forced medical examination. "Verbalized that staff could be injecting something into her to make her break Ramadan."

On 9/14/08 Dr. Siddiqui informed Dr. Lori Nichols "you know they already killed me? They took my clothes off and made videos of me." On 8/27/08 Dr. Perry Hess reported that he was "unable to determine whether last night's irrational statements reflect fantasies, malingering or delusional beliefs." On 9/20/08 Dr. Kari Schlessinger reported that her review of the log book revealed "1 hour of sleep since yesterday." Dr. Guerrero-Cohen similarly noted on 9/15/08 that she slept a total of 5 hours in a 24 hour period, 2.15 hours between 1:45pm and 4:00pm and 2.45 hours this morning between 7-9:45 a.m. These reports are consistent with my review of the MDC log book and demonstrate significant diminished and disrupted sleep symptoms characteristic of a number of psychiatric disorders, particularly depression. It should be noted that this magnitude of sleep difficulty is difficult to fake as are a number of symptoms presented by Dr. Siddiqui.

Medical records from FMC Carswell reveal a similar pattern of beliefs and behavior that raises concerns regarding the presence of serious psychiatric difficulties. On admission she was evaluated by Dr. Leslie Powers who reported that Dr. Siddiqui was hysterical, crying, and fixated on strip searches stating "that's what killed me the last time." "They must have sent me here to prove that I am dead since I am still talking." She reported to Dr. Powers that the camera "killed her over and over." There are numerous comments of being dead in the record. It is clear that this is a very irrational statement bordering on if not indicative of a formal thought disorder. Formal thought disorder is another symptom of mental illness that is very difficult to feign.

On 10/3/08 Staff Psychiatrist Camille Kempke evaluated Dr. Siddiqui and reported that "her story remains consistent. She only sees her baby and young daughter. They only stay for a few moments (hypnogogic). Believes the Court does not have her daughter. She may be with the original people who kept her." She went on to report that her affect was very "labile, patient appears genuinely confused, rambling to a discussion of blood, her deceased father, upset with fight with her mother." Dr. Kempke went on to report "My opinion is that there is a 99% certainty that she is psychotic." On 1/30/09 Dr. Kempke wrote a four page psychiatric encounter note. During the interview of about an hour's duration Dr. Siddiqui related a number of her beliefs regarding elaborate conspiracies of Zionists having infiltrated all branches of state government, her efforts that would go against world peace, bad people who would do experiments which involved putting her in her current situation. She spoke of a kind woman psychiatrist who could "do things with her eyes." She reported that on the day she was picked up in Afghanistan she was participating in one of these experiments. Seemingly unrelated she reported "there are no glass bottles."

On 11/17/08 Dr. Kempke reported that Dr. Siddiqui stayed in her room afraid of being set up by other inmates and taken to M-3 where she would be poisoned. On 3/2/09 Dr. Kempke reported that Dr. Siddiqui presented as "awake, alert, cooperative...Speech run on, hard to interrupt, flight of ideas vs. tangential speech. Mood full range of affect. Worry about others. Possible delusions of paranoia, no current hallucinations (though possibly some illusions/hypnogogic phenomena at HS") (hour of sleep).

On 4/14/09 another evaluation by Dr. Kempke revealed beliefs of a spreading conspiracy, of being brainwashed by the "eyes" technique, reports that her room is bugged. Dr. Kempke reported that Dr. Siddiqui's "Speech run on, hard to interrupt, flight of ideas vs. tangential speech, possible delusions of paranoia." In spite of the claims by both Drs. Johnson and Saathoff that Dr. Kempke had come to view Dr. Siddiqui as much improved and likely to be malingering, this assessment that occurs a month after their evaluations and consultation, clearly indicates that she observed very serious psychiatric difficulties. Again several of these symptoms such as flight of ideas and tangential speech are very difficult to feign and those who attempt to malinger rarely think that these symptoms are characteristic of mental illness and therefore do not present with these symptoms. In contrast those with bona fide mental illness do present symptoms of this nature.

8

## COLLATERAL INTERVIEWS

On May 1, 2009 Dr. Gregg, Powers and Yanez were interviewed at FMC Carswell as was Chris McGee, MSW, Nurse Whitehead and the Correctional Officer who admitted me to the facility. I could not see his nametag clearly but he spontaneously reported that he had worked the unit where Dr. Siddiqui was housed. I also reviewed the report authored by Drs. Powers and Gregg in which they opined that Dr. Siddiqui was mentally ill and not competent to proceed. I discussed their findings as well as their overall impression of Dr. Siddiqui and the case. Each expressed a degree of uncertainty about Dr. Siddiqui's mental condition in light of the opinions offered by Drs. Saathoff and Johnson that they had only recently become aware of and that were in contrast to their opinion expressed in the initial report to the court. Mr. McGee who was present during the interview with Dr. Siddiqui reported that she was very tangential throughout the interview. He reported that on other occasions Dr. Siddiqui would bring up topics of being dead, "dead to her mother, dead to her religion." Dr. Siddiqui spoke to him about "being held in various camps, bases and prisons very briefly. Related a history of abuse. He stated that she spoke about her children...came out very delusional." Nurse Whitehead reported "very limited interaction from the get go, but inconsistent engages officers. Not disorganized no need for redirection."

Dr. Tami Yanez reported an interaction with Dr. Siddiqui where she attempted to warn her that Jews were trying to work behind the scenes and would do things that would ultimately affect unsuspecting African Americans and Hispanics. During another meeting Dr. Siddiqui informed her that if she were to tell everything she could save the lives of thousands of children but doing so would result in the death of her own children.

Interviews with her brother Mohammad Siddiqui revealed that Dr. Siddiqui reported experiences and beliefs particularly conspiratorial ideas, visions of her children, the belief that she was dead and that people were trying to harm her that were consistent with what was observed by clinical staff at MDC Brooklyn and FMC Carswell as well as this evaluator. It was his impression that his conversations with his sister were unusual and it was his belief that she is mentally ill. He reported that he believes his sister was abducted and held captive at least part of the time since her disappearance. Mohammad Siddiqui was initially approached by this evaluator to elicit his support in convincing his sister to cooperate and to provide information to her on the consequences of being found incompetent. During the initial interview, prior to my traveling to FMC Carswell I was aware that the Pakistani Embassy had been involved and that they were conveying to Dr. Siddiqui that if she were found incompetent she would be repatriated to Pakistan. After review of the reports of Drs. Johnson and Saathoff I was concerned that Dr. Siddiqui was potentially malingering and that if the secondary gain of being repatriated was removed and she had an accurate understanding of the consequences of being found incompetent that she was more likely to cooperate with my evaluation and her attorneys.

Mohammad Siddiqui agreed to try to educate his sister to the consequences of being found incompetent and to encourage her to cooperate in her defense. Her response to his efforts was to question whether "they had gotten to him too?" This response is

9

very noteworthy and diagnostically characteristic of those with delusional disorder. Those with delusional disorder rarely accept being mentally ill and typically will fold anyone who questions their beliefs into their perceived conspiracy. On another occasion Dr. Siddiqui similarly accused her brother of conspiring against her. He stated that "if he tries to put a positive spin on it" he's accused of conspiring. As a result Mohammad Siddiqui related that he no longer talks to his sister about these matters and tries to avoid discussions where his allegiance to her would be called into question.

On 6/16/09 Asif Hussain a representative of the Pakistani Embassy was interviewed. Mr. Hussain has visited with Dr. Siddiqui and has spoken to her on the phone on a couple of occasions. He reported that he last saw her 6/9/08. He first qualified is opinions by acknowledging that he is not a psychiatrist. He reported that when he saw her at MDC Brooklyn he thought she was "totally traumatized, unable to conduct herself." He found her to be very tangential "off beat, jumps to something not relevant, paranoid with whole world against her. She sees everything from a conspiracy point of view." He also reported that she had informed him about her visions of her children.

Review of the telephone transcripts of Dr. Siddiqui with her Brother Mohammad and Mr. Hussain reveals that during these conversations, similar beliefs and perceptions are reported. There is a great deal of hopelessness and fatalism expressed in these transcripts, in the medical record and in her interview with this evaluator. This hopelessness and fatalism extends to the court and future proceedings.

On 6/19/09 Dr. Camille Kempke was interviewed via telephone. She reported that she is the "only one she (Dr. Siddiqui) speaks to." In marked contrast to the report by other evaluators who had come to view Dr. Siddiqui as malingering, she reported: "I continue to believe she is grossly psychotic....can't follow her conversations" and that she continues to make statements such as "maybe I'm dead." This type of questioning and uncertainty about symptoms is in marked contrast to the clinical presentation of malingerers.

## CLINICAL FORMULATION

After review of the medical records, the forensic evaluations submitted by Drs. Johnson, Saathoff, Powers and Greg, my review of the transcripts of telephone conversations, collateral interviews with mental health staff, her brother, Mr. Hussain, my review of the 302 investigative reports of the FBI, Dr. Siddiqui's writings and materials found on her following her arrest it is my opinion that Dr. Siddiqui currently presents with a mental illness best characterized as a Delusional Disorder of the Paranoid Type. She is in my opinion also significantly depressed with symptoms of hopelessness, helplessness sleep difficulties and poor concentration. Notwithstanding Dr. Saathoff's analysis of the absence of sleep disorder it is indisputable that she evidenced significant sleep disorder during her stay at MDC Brooklyn, difficulties noted by a psychologist who reviewed the log before their attempts to evaluate her. While some of her beliefs are

consistent with radical political ideology, typical of Muslim militants dedicated to jihad, many others exceed political ideology.

For example her beliefs that Israel, the United States and India are conspiring to invade Pakistan, that Jews are responsible for 9/11 and have infiltrated American political and governmental organizations are not bizarre in the cultural context of militant jihad beliefs. However just because they are consistent with radical jihadist ideology does not exclude the possibility that they can be so extreme as to be of delusional proportions.

In contrast her beliefs that she was injected with a substance to make her break Ramadan, that she is being poisoned, that people use the "eye technique" to influence her, her belief that she is responsible for what happens to other inmates, that other inmates are trying to "set her up" so she can be poisoned, that an officer taking psychotropic medication could kill her and not be punished by getting off on an insanity defense, that the naked video of her strip searches and forced medical treatment were placed on the internet all represent examples of her delusional thought process. There are also some grandiose ideas that she can broker peace between the Taliban and Americans and other activities leading to world peace. Note that some of the materials found on her relate to an AIDS vaccine and cures for aging that she found of such special importance as to carry them with her. Some of her writings, developing viruses which would not affect children or women, or only certain ethnic groups, magnets to propel airplane propellers, using them even on gliders that don't have propellers, creating powerful poisons from opium, nicotine, cannabis, cocaine all appear grandiose and potentially frankly psychotic. I do not believe that the visual anomalies that Dr. Siddiqui experiences are visual hallucinations but represent hypnogogic experiences. Hypnogogic experiences are fleeting visual anomalies that are quite common particularly in sleep deprived and depressed people. Visual hallucinations are more sustained, persistent experiences that usually involve insects, snakes or other frightening organisms. They are common in drug withdrawal and in dementia.

Like many patients that suffer from delusional disorder, Dr. Siddiqui's behavior is not grossly disorganized. Her reported perceptions and beliefs do not globally impact on her everyday life. She is able to care for her basic needs, appear on the surface to be reasonably functional. By definition delusional disorder is characterized by nonbizarre beliefs that could have a basis in reality but are highly unlikely. Many of these beliefs have their origin in some reality based experience. Note that Dr. Siddiqui's picture and case is all over the internet, that torture is a very current concern, that naked pictures of detainees have been disseminated over the internet. In this regard behavioral consistency across situations and between various individuals is not relevant because delusionally disordered individuals only make manifest their pathology when the interaction taps the delusional content. By way of example a defendant I evaluated for the federal court for sending threatening communication, believed that he would impregnate 500 select women one who would give birth to the second coming of Christ. He also believed that he knew the location of Noah's ark. One of the women he had identified was the ice skater Katarina Wit. He stalked her around the world attending her performances and throwing roses on the ice rink. When his overtures were thwarted he began threatening.

His stalking was facilitated by the fact that he was an airline pilot for a major international airline. Another defendant who believed she was dying of kidney and thyroid disease brought a bomb to the federal court in Long Island in order to bring her delusionally based concerns to the attention of a federal judge. She was able to write and submit several motions to the court that presumably had legal merit. She was nonetheless not competent to proceed as she lacked a rational understanding. In another case of delusional disorder, the defendant who was charged with impersonating an immigration attorney suffered from the delusion that his daughter was killed by INS agents who, in turn, sold her identity to obtain a green card. This defendant was noted to have been a quite competent immigration attorney.

Those with delusional disorder deny being mentally ill convinced that their beliefs are real. When confronted regarding the lack of validity of their beliefs, that they represent delusions and that they are therefore mentally ill the typical response is to incorporate the accuser into the delusion, making them part of the conspiracy. This is what Dr. Siddiqui did when her brother tried to get her to understand the process and to cooperate. The following clinical description is taken from an abstract of the Comprehensive Textbook of Psychiatry and the Journal of Clinical Psychiatry.

**Clinical presentation (Manschreck, 1999; Manschreck, 2000; Fennig, 2005)**

- The mental examination is usually normal with exception of the presence of abnormal delusional beliefs.
- In general, patients are well groomed and well dressed without evidence of gross impairment.
- Speech, psychomotor activity, and eye contact may be affected by the emotional state associated with delusions.
- Mood and affect are consistent with delusional content; for example, patients with persecutory delusions may be suspicious and anxious. Mild dysphoria may be present without regard of type of delusions.
- Tactile and olfactory hallucinations may be present and may be prominent if they are related to the delusional theme (eg, the sensation of being infested by insects, the perception of body odor). Medical causes of tactile and olfactory hallucinations, such as substance intoxication and withdrawal, temporal lobe epilepsy, and others, should be ruled out. Auditory or visual hallucinations are uncommon but, if present, they are not prominent.
- The thought content is notable for systematized, well-organized, nonbizarre delusions that are possible to occur, such as delusions of being persecuted, being loved by a person of higher status, being infected, having an unfaithful spouse, and others. Delusional concepts may be complex or simple, but bizarre beliefs such as delusions of thought insertion, and thought control are more common in schizophrenia. Contrary to schizophrenia, the thought process is usually not impaired; however, some circumstantiality and idiosyncrasy may be observed.
- Memory and cognition are intact. Level of consciousness is unimpaired.
- Patients usually have little insight and impaired judgment regarding their pathology. Police, family members, coworkers, and physicians other than psychiatrists are usually the first to suspect the problem and seek psychiatric consultation. Seeking corroborative information, when permitted by the patient, is often crucial.
- Assessment of homicidal or suicidal ideation is extremely important in evaluating patients with delusional disorder. The presence of homicidal or suicidal thoughts related to delusions

should be actively screened for and the risk of carrying out violent plans should be carefully assessed. Reid (2005) pointed out that some types of this illness—erotomanic, jealous, and persecutory—are associated with higher risk for violence than others (Reid, 2005). History of previous violent acts as well history of how aggressive feelings were managed in the past may help to assess the risk.

1. American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR). Fourth Edition, Text Revision (DSM-IV-TR). *Washington, DC: American Psychiatric.* 2000.

2. Fennig S, Fochtmann LJ, Bromet EJ. Delusional and shared psychotic disorder. *Kaplan & Sadock's Comprehensive Textbook of Psychiatry. 8th ed.* 2005:1525-33.

3. Manschreck TC. Delusional disorder: the recognition and management of paranoia. *J Clin Psychiatry.* 1996;57, Suppl 3:32-8. [Medline].

4. Manschreck TC. Delusional and Shared Psychotic Disorder. *Kaplan & Sadock's Comprehensive Textbook of Psychiatry. 7th ed.* 2000:1243-64.

It is my opinion that there is very strong evidence that Dr. Siddiqui is not malingering. My opinion is based on the following:

1. First and most important, Dr Siddiqui denies being mentally ill. As can be seen from my resume I have spent a considerable part of my recent research career studying ways to detect malingering and denial of psychiatric disorder. It is virtually unheard of that a defendant attempting to portray herself as mentally ill and malinger psychiatric disorder would go to such efforts to deny mental illness. The opposite is almost universally true. Malingerers go to great lengths to convince evaluators that they suffer from extreme psychiatric symptoms. In spite of repeated reference to denial of psychiatric disorder cited by Dr. Johnson she opines that Dr. Siddiqui is malingering.

2. Dr. Siddiqui has avoided mental health professionals, on one occasion going so far as to retract her request to see psychology services at MDC Brooklyn for fear that they would "think she is crazy." Being viewed as crazy is exactly what the malingerer seeks. Malingerers go out of their way to draw attention to their feigned mental illness. Dr. Siddiqui does exactly the opposite, avoids mental health professionals and tries to conceal her psychiatric difficulties. On the trip to New York from Afghanistan she related a number of beliefs, mostly conspiratorial to FBI agents. On arrival at MDC Brooklyn she denied all symptoms. Her intake screening was devoid of any psychiatric concerns. As opposed to trying to impress mental health staff of her symptoms she concealed them. Mental health staff at MDC Brooklyn utilized an approach where they stayed out of view of Dr. Siddiqui while she conversed with correctional staff as a means of overcoming her unwillingness to openly discuss her symptoms with mental health staff. She has consistently refused mental health treatment or services.

3. Dr. Siddiqui presents with symptoms that are difficult to feign. Specifically, she has uniformly been viewed by mental health staff and lay persons as tangential, irrelevant, with flight of ideas. Maintaining a consistent thought pattern and speech that rambles to irrelevancies requires a high level of concentration, focus and persistence that is rarely possible. She evidenced significant sleep disorder at MDC Brooklyn with a documented record of one or two hours sleep over a significant period.

13

4. There is behavioral confirmation of her hypnogogic experiences. Note that the log book entry of the officer observing her noted that she was behaving strangely at 2:20 am on the morning she reported seeing the dog in her cell.

5. She has been extraordinarily consistent in her symptom presentation to mental health staff, her brother and Mr. Hussain. All reported that she reported being dead, her hypnogogic experiences and her conspiratorial ideas regarding Jews, India and the United States. All reported being informed about attempts to murder, poison or otherwise harm her. Malingerers have difficulty maintaining such consistency across different contexts. They usually don't see the need to convince other than mental health staff of their feigned symptoms.

6. Most malingerers attempt to convince evaluators that they experience ongoing auditory hallucinations, that are persistent, continuous, uncontrollable and that they are unable to adapt to the hallucinations. Malingerers are required to simply report that they are hearing voices, a presentation that requires little effort. Dr. Siddiqui has reported fleeting visual hypnogogic experiences common to those with depression and those who are sleep deprived. They are thematically related to her lost children and very connected to the worries and fears she has for their wellbeing. They are not persistent, pervasive nor do they dramatically impact her everyday behavior. This is in contrast to Dr. Saathoff's claim that their diminishing over time is evidence of malingering. This might represent the normal course of these experiences as she adjusts to her situation. However, since medical records from May 1st have not been provided from FMC Carswell in spite of requests it is not certain that such a diminution has occurred.

7. If Dr. Siddiqui is malingering she would be capable of fully understanding the consequences of being found mentally ill and incompetent. This would include the likelihood of involuntary treatment with antipsychotic medication, something she will find very difficult to accept. If not restored she will become subject to dangerousness proceedings pursuant to § 4246 and civil commitment potentially for the rest of her life. Therefore there is very little secondary gain to being found incompetent. Clearly Dr. Siddiqui is very intelligent and if not mentally ill would be very capable of assessing these risks. In her case, in reality there is no secondary gain and potentially a greater risk.

8. Dr. Saathoff in coming to his opinion that Dr. Siddiqui is malingering relied on a history of deception, specifically failing to disclose the true identity of her son, as part of his basis for coming to that conclusion. There are other more probable reasons that she did so other than a propensity to deceive including fear for the well being of her son. Dr. Saathoff cites one of my research papers in his discussion of malingering but he seems not to have read the recent literature, including some of my own recent work on psychopathy, antisocial personality disorder and malingering. The DSM-IV diagnostic manual advises that malingering be suspected whenever there is a diagnosis of antisocial personality disorder presumably because antisocial defendants have a propensity to deceive. Psychopaths represent an even greater propensity to deceive in that the clinical definition of psychopathy involves pathological lying and manipulation. I have shown

14

that reliably identified severe psychopathic defendants are only slightly more likely to malinger psychiatric disorder than are nonpsychopaths and those with any personality disorder are equally likely to malinger than those with antisocial personality disorder. In both cases nearly half of severe psychopaths and those with antisocial personality do not attempt to malinger psychiatric disorder as assessed by all validated measures of malingering. There is no useful relationship of a history of deception and a propensity to malinger that is diagnostically of any value and would withstand a <u>Daubert</u> or <u>Frye</u> like challenge.

9. Dr. Siddiqui is very guarded and refuses to speak in any detail about the domestic violence and any past trauma. Malingerers are overly forthcoming when discussing past trauma as they believe that trauma and abuse are etiologically significant. Those who are abused find it very difficult to speak about past trauma while malingerers are overly willing to address past trauma often bringing up traumatic experience without even being asked. Such a presentation is characteristic of malingering.

If Dr. Siddiqui is malingering she would readily admit to being mentally ill. She would go out of her way to engage mental health staff in an attempt to impress upon them the seriousness of her psychiatric difficulties. She would report ongoing persistent auditory hallucinations and would attempt to present behavior that would support her claims of hearing voices. She would readily talk about her traumatic past. She would not present with symptoms that are difficult to feign such as tangentiality. She would not present the same consistent symptoms to family members and others outside of the evaluation context. Dr. Siddiqui's presentation is diametrically opposed to everything we know about the clinical presentation of malingerers.

## CLINICAL OBSERVATIONS RELEVANT
## <u>TO COMPETENCY TO STAND TRIAL</u>

No direct formal assessment of Dr. Siddiqui's competency to stand trial was possible and no evaluator has been able to question her about her factual and rational understanding of the proceedings against her or to assess directly her ability to assist counsel. All of the opinions provided to the court have relied on collateral and observational information. In spite of her unwillingness or inability to engage evaluators, there is a great deal of information that can be relied upon to form opinions about each of the elements of competency to stand trial.

Dr. Saathoff and Dr. Johnson's basis of their opinion regarding competency to stand trial is that Dr. Siddiqui is malingering, is not mentally ill and therefore she is competent as incompetency is predicated on either a mental illness or mental defect. No mental illness, no mental defect <u>de facto</u> competent.

Dr. Powers and Gregg's basis for their opinion in the initial report to the court assumed a history of torture that was the etiology of post traumatic stress disorder (PTSD) and that this mental illness impaired Dr. Siddiqui's competency. When they were convinced that no torture had occurred they concluded that there could be no PTSD,

she was malingering, had no mental illness or mental defect therefore de facto competent. It is noteworthy that the original diagnosis provided to the court was major depression severe with mood congruent psychotic features with a rule out diagnosis of PTSD. Even if there is no history of torture or other significant trauma, a conclusion that cannot be reached based on the information I reviewed, the presence of a mental disorder other than PTSD cannot be discounted.

In the original report to the court Drs. Powers and Gregg reported based on their direct observation of Dr. Siddiqui that "Much of the content of her conversations were tangential and difficult to follow". Again this is a symptom that is difficult to feign, was noted by this evaluator on May 1, 2009 and has been noted by others including her brother and Mr. Hussain. This tangentiality in and of itself impacts upon Dr. Siddiqui's competency to stand trial as it affects her ability to rationally communicate with counsel, her ability to testify or allocate. It is unlikely that this symptom is feigned and it is likely that it continues until today.

Suffice it to say that Dr. Siddiqui is a very intelligent person with significant exposure to United States culture and institutions. It is highly unlikely that she does not possess a factual understanding of the operation of the court, the roles and functions of courtroom personnel, the available pleas, the meaning of important legal concepts, etc. It is therefore my opinion that Dr. Siddiqui most likely possesses a factual understanding of the proceedings against her or if she does not she is capable of being educated by counsel.

In contrast, it is my opinion that Dr. Siddiqui presents with a mental illness best characterized as a delusional disorder. She is also depressed. These delusions are distinct from her radical political beliefs. They include the belief that the court is part of a conspiracy to have her killed, tortured and/or have her witness the torture of her children. She believes the court was not only responsible for ordering the strip search and the forced medical treatment but was central in putting video of her naked on the internet. She believes that the court was responsible for injecting her with a substance designed to make her break Ramadan. She believes that the outcome of her trial is predetermined, that she will get the death penalty and has stated to this evaluator that there is no need to go to trial or work with her attorneys in her defense because of this predetermination. She requested that I inform the court to just impose the death penalty or whatever penalty it chooses and to not bother her with the formality of proceedings.

Dr. Siddiqui harbors a number of beliefs that may or may not represent delusions. The line between delusions and radical ideology may be obscure. What is clear is that many of the beliefs regarding the court exceed those that characterize radical Islam. Dr. Siddiqui also harbors the belief that she is dead, that she was killed by those who implemented the forced strip search and medical treatment, procedures ordered by the court. The metaphorical nature of this belief is captured by her comments to Asif Hussain, Dr. Kempke and Mr. McGee where she stated that she was "dead to her mother and dead to her religion." This metaphorical death results from her delusional belief that pictures of her naked were put on the internet and do not represent a delusion per se but

16

the consequences of a delusion. This belief represents a very irrational, disordered thought process that directly impacts her motivation to assist counsel and her rational understanding of the proceedings against her.

It is therefore my opinion that Dr. Siddiqui currently presents with a mental illness best characterized as a delusional disorder. She is also depressed. Her delusional beliefs directly involve the Court and significantly impair her ability to assist counsel. Specifically, she does not believe that the Court is engaged in a process of adjudicating her innocence or guilt. To her delusional way of thinking, the court process represents an extension of her history of being persecuted. She believes that the court process is irrelevant given that her arrest and prosecution are the result of a conspiracy. Her tangentiality significantly impairs her ability to communicate with counsel to testify in her own defense, to allocute if necessary and limits her ability to relate her account of the alleged offenses to defense counsel. As has been evident throughout the record, she is difficult to follow, she rambles to irrelevant issues, making her difficult to understand. Attempts to redirect her or to point out inconsistencies in her thought processes leads to distrust and incorporation of those who disagree with her into her delusional system. Thus far, it is apparent that she has rejected court-appointed counsel, private counsel and even Pakistani counsel. Her beliefs that the outcome of the proceedings is predetermined is based on her delusion that the court process is part of a conspiracy which significantly impairs her motivation to participate as she does not view the court process as meaningful.

She has refused to assist counsel even though not doing so could have a very serious adverse outcome irrespective of whether she is found competent or incompetent. It is therefore my opinion within reasonable psychological certainty that Dr. Siddiqui currently possesses a factual understanding of the proceedings against her but that her rational understanding and her ability to assist counsel are seriously adversely impacted by her mental illness. It is therefore my opinion that Dr. Siddiqui is currently not competent to stand trial.

## CLINICAL OBSERVATIONS RELEVANT TO RESTORATION OF COMPETENCY TO STAND TRIAL

Currently Dr. Siddiqui presents with a delusional disorder paranoid type and significant depression. There is limited research on the efficacy of various pharmacological treatments for delusional disorder. The research and my own experience suggests that antipsychotic medications are effective in about half of the cases studied. I have observed some very dramatic improvements with marked reduction in delusional thinking in patients treated with antipsychotic medications. There are no other know effective treatments for delusional disorder. Dr. Siddiqui is unlikely to initially voluntarily accept treatment. She has consistently refused treatment. If the court finds that Dr. Siddiqui is currently incompetent to stand trial it is recommended that she be committed to the custody of the Attorney General for restoration of competency to stand trial pursuant to Title 18 USC sec 4241(d). The court will need to consider the legality

and appropriateness of involuntary medication in relation to <u>Sell v United States</u>.

Respectfully Submitted,

L. Thomas Kucharski, Ph.D.
Licensed Psychologist
Chair Department of Psychology
John Jay College of Criminal Justice

Docket and file on
consent of the parties.

SO ORDERED:
Date: 7·2·09

Richard M. Berman, U.S.D.J.