USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC
DATE FILED: 7/6/09

# MEMO ENDORSED
### P. 8

## FORENSIC EVALUATION

**NAME:** Siddiqui, Aafia          **REG NO.** 90279-054          **DATE:** November 6, 2008

### IDENTIFICATION AND REASON FOR REFERRAL:

Ms. Aafia Siddiqui is 36-year-old female of Middle Eastern decent from Karachi, Pakistan. She was sent to the Federal Medical Center (FMC), Carswell, by the United States District Court, Southern District of New York, pursuant to Title 18, U.S.C. § 4241(b) with questions regarding her competence to stand trial. Ms. Siddiqui is being charged with Attempted Murder of Officers and Employees of the United States, Attempted Murder of United States Nationals, Armed Assault of United States Officers and Employees, Discharge of a Firearm During a Crime of a Violence, and three counts of Assault of United States Officers and Employees.

Prior to the initial interview, the nature and purpose of this Court-ordered evaluation was explained to Ms. Siddiqui. She was informed that during the course of this evaluation, the usual conditions of confidentially which apply to a doctor-patient relationship would not exist. She was informed any information obtained during the course of interviews, testing, and observation would be subject to inclusion in a report which would be submitted to the Court and both attorneys. Ms. Siddiqui indicated an understanding of this warning and agreed to proceed with the evaluation.

### EVALUATION PROCEDURES:

During the course of this evaluation, Ms. Siddiqui was interviewed by Leslie Powers, Ph.D., Forensic Psychologist. Other members of the forensic team, as well as correctional and medical staff, had the opportunity to observe her behavior during the course of this evaluation. Their comments and observations were considered prior to the preparation of this report. In addition, many of her telephone calls to her brother, Muhammad Siddiqui, were monitored.

Collateral Interviews:
- Sarah Kunstler, Defense Attorney, October 3 and 30, 2008
- Christopher LaVigne, Assistant United States Attorney, October 3 and 8, 2008
- Muhammad Siddiqui, brother of the defendant, October 9 and 17, 2008
- Mehtab Syed, Federal Bureau of Investigation Agent, November 6, 2008
- Jodi Almodovar, Federal Bureau of Investigation Agent, November 6, 2008

Review of Records:
- Order for Psychiatric Examination, dated October 1, 2008 (2 pages)
- Memo written by Dr. Zuhair Qureshi, dated October 3, 2008 (1 page)
- Criminal Indictment, dated September 8, 2008 (8 pages)
- Letter written by Christopher Lavigne to The Honorable Richard Berman, dated September 5, 2008 (1 page)
- Letter written by Cameron Lindsay to The Honorable Richard Berman, dated September 10, 2008 (2 pages)

Defendant
Exhibit

**FORENSIC EVALUATION**
**SIDDIQUI, AAFIA**
**REG NO. 90279-054**

## PAGE 2

- Letter written by Elizabeth M. Fink to The Honorable Richard Berman, dated September 3, 2008 (6 pages)
- Medical records from The Medical College of Georgia, dated August 4, 2008 (10 pages)
- Medical records from Bagram Airfield, Afghanistan, dated from July 18 - August 3, 2008 (approximately 120 pages)
- Federal Bureau of Investigation report, dated July 21, 2008 (2 pages)
- Federal Bureau of Investigation report, dated August 7, 2008 (2 pages)
- Federal Bureau of Investigation report, dated August 8, 2008 (2 pages)
- Bureau of Prisons Health Services Psychiatric notes, dated August 23, 2008 - September 10, 2008 (36 pages)
- Bureau of Prisons Psychology Data System notes, dated August 23 - September 15, 2008 (40 pages)
- United States Department of Justice Telephone Call Language Transcripts for a call made by Ms. Siddiqui to her brother, Muhammad Siddiqui, dated October 23, 2008 (12 pages)
- United States Department of Justice Telephone Call Language Transcripts for a call made by Ms. Siddiqui to Syed Hussain, a representative from the Pakistan Embassy, dated October 23, 2008 (18 pages)
- The medical records generated during the course of Ms. Siddiqui's evaluation at FMC Carswell

## BACKGROUND INFORMATION:

The information contained in this section is a composite of that obtained through direct interviews with Ms. Siddiqui and from the collateral sources listed above. She was viewed as a poor historian; therefore, information that was pertinent to the questions asked of the Court were verified with collateral sources.

Ms. Siddiqui was born on March 2, 1972, in Karachi, Pakistan. She has one sister, Fauzia Siddiqui, and one brother, Muhammad Siddiqui. Ms. Siddiqui reported living in Zambia, Africa until primary school. When she was 17 years old, she moved to Houston, Texas, to live with her brother Muhammad, and then moved to Boston, Massachusetts, to attend graduate school. While in graduate school, she met and married Mohammed Khan, an anesthesiologist of Pakistani decent, and this union produced three children: Maryam (age 12), Ahmed (age 10), and Suleman (age 5). Ms. Siddiqui and Mr. Khan reportedly divorced in 2002. Although it has been widely reported through various news sources that Ms. Siddiqui's oldest child, Mayam, is currently in the custody of her parents in Pakistan, the location of her two youngest children are believed to be unknown.

**FORENSIC EVALUATION**
**SIDDIQUI, AAFIA**
**REG NO. 90279-054**

**PAGE 3**

Regarding her education, Ms. Siddiqui attended the University of Houston for approximately one year and then transferred to the Massachusetts Institute of Technology, where she received a Bachelor's Degree in Biology in 1995. In 2001, Ms. Siddiqui received a Doctorate Degree in Neuroscience from Brandeis University.

**MEDICAL/PSYCHIATRIC HISTORY:**

Several attempts were made by a psychiatrist or psychologist to conduct a thorough psychological exam at the Metropolitan Detention Center (MDC) in Brooklyn, New York, but Ms. Siddiqui consistently refused to answer anything more than basic questions regarding her mental health functioning. When she was interviewed at FMC Carswell, she displayed similar guardedness; however, she was able to deny any history of mental health problems. When Muhammad Siddiqui was interviewed, he reported his sister had never sought treatment from a mental health professional and the family had not previously noted Ms. Siddiqui to have any mental health problems. He admitted, however, that he has had few contacts with his sister in the last three to four years. He did report that during his visits to FMC Carswell, the content of his sister's conversations were confusing and difficult to follow.

Regarding her medical history, no information was found to indicate Ms. Siddiqui had any significant medical problems until the summer of 2008, when she suffered gunshot wounds to her abdomen. She has been reluctant to allow medical staff to treat her; however, her last medical examination indicated her external wounds no longer required medical dressing and were believed to be healing well. She was also found to be suffering from excessive menstrual bleeding when she arrived at FMC Carswell but was placed on medication to regulate her menstrual cycle.

**COURSE OF EVALUATION:**

When Ms. Suddiqui arrived at FMC Carswell, she refused to submit to the visual search process, which involves disrobing, as required by Bureau of Prisons' policy. A Use of Force team was gathered and a video camera was brought in for documentation. When Ms. Suddiqui saw the video camera, she began to cry and scream loudly, stating that the camera had already killed her once. Eventually, she agreed to participate in the search voluntarily as long as it was done by a female officer and no video cameras were used. After completing the admission process, she was placed on the Medical/Surgical Unit for further evaluation due to her recent gunshot wounds. After three days, she was moved to the Mental Health Inpatient (M1) Unit, as is standard practice for defendants undergoing Court-ordered evaluations. There was some concern about her eating habits when she arrived because she had refused several meals at MDC Brooklyn and had an extremely thin appearance. When asked about her eating, she stated she was not refusing to eat but rather, she simply had no appetite. She continued to express her lack of appetite during her

FORENSIC EVALUATION
SIDDIQUI, AAFIA
REG NO. 90279-054

PAGE 4

stay at FMC Carswell. Ms. Siddiqui remained on Unit M1 throughout the evaluation, and has been routinely observed and monitored by medical, psychiatric, and psychological staff. She has spent most of her time in her room and isolated herself from the rest of the patients. Although she asked for a copy of the Koran, she stated she was unable to read it very well. Due to her religious affiliation, she requested a common fare tray, which is prepared following the dietary requirements of the Muslim religion. The first time she was served this tray, she reported her food had a "bitter taste" and reported experiencing severe abdominal pain immediately after eating one or two bites. The next day, she expressed the belief that her food was being poisoned and requested to receive the same tray as the other patients, stating, "If the tray has pork on it, I will move it out of the way and ask my God for forgiveness but I don't want to eat poisoned food." She later expressed to a staff member that she felt some of the nursing staff were trying to kill her by poisoning her food, and mentioned at least four nurses by name. She also shared this belief with her brother and a representative from the Pakistani Consulate during telephone conversations.

She also described experiencing auditory hallucinations during her evaluation period. She told several staff members that she had seen her baby downstairs, and requested she be able to go to see him. Days later, she reported her baby had walked into her room to see her the night before. When describing this incident, she began to cry and stated, "He was so thin and I don't think they are feeding him." She was unclear when asked about who was caring for her child, but continued to report that her child visited her in her cell on numerous occasions. She also reported this belief to other patients on her unit, as well as her brother and a representative from the Pakistani Consulate. This is consistent with her behavior when she was being housed at MDC Brooklyn, where she also reported seeing her children and expressed thoughts that the correctional and clinical staff were trying to harm her. Since her arrival at FMC Carswell, she has refused to consider any psychotropic medication and has been inconsistent in agreeing to participate in routine medical care.

MENTAL STATUS:

Ms. Siddiqui is a 36-year-old, Pakistani female of petite build who appears her chronological age. Her hygiene and grooming throughout the evaluation period were adequate. She consistently maintained poor eye contact. She was reluctant to participate in clinical interviews, and expressed prosecutory beliefs about the purpose of the evaluation. More specifically, she refused to talk to psychology staff when she first arrived, stating that the Court wanted her to be killed and the psychologists worked for the Court. When her brother Muhammad was enlisted to explain the purpose of the evaluation to her, she began to be slightly more forthcoming during clinical interviews. She continued to display difficulty in being oriented to her surroundings, despite numerous attempts to explain the location and purpose of her evaluation. When she would offer

**FORENSIC EVALUATION**
**SIDDIQUI, AAFIA**
**REG NO. 90279-054**

**PAGE 5**

accounts of her experiences during the last six months, she would often confuse the details and locations where these experiences occurred. Her attention and concentration were poor and, by her own admission, she gets confused easily when trying to process information. She reported, "I get confused and I think I confuse other people when I am talking. My brother even said I confused him when he came to visit." Her speech was quiet, with appropriate rate and tone, but the content of her speech was often preoccupied with thoughts that focused on her currently being dead. For instance, when asked a question, she would often respond, "It does not matter, I am dead anyway." Much of the content of her conversations were tangential and difficult to follow. She was also very difficult to redirect. She reported visual hallucinations of her children. She displayed some range of emotion, but her affect was frequently depressed during clinical interviews and she was often observed by other staff members to be crying in her room. Her psychomotor activity was characterized by normal movements and activity level, but she has reported that she is unable to read or write since she arrived at FMC Carswell because she is dead. She reported having difficulty sleeping and complained of a poor appetite. She denied current suicidal or homicidal ideation.

**CASE DISCUSSION:**

The details of Ms. Siddiqui's life from early 2003 until the summer of 2008 remain unclear. It has been reported by her attorneys that she was taken into custody by foreign Military Intelligence along with her three children. It has also been reported that when she was held hostage, she was treated as a political prisoner and was tortured, sexually abused, and beaten routinely. When asked about this period, Ms. Siddiqui's report seems to corroborate some of this information, although her account is tangential and frequently intertwined with other events that have occurred during her life. Although specific details of this experience remain unclear, it can be reasonably assumed that if one did endure this trauma, it would have a significant negative impact on the individual's mental health and their ability to cope with future psychological distress. Given this, the diagnosis of Post Traumatic Stress Disorder should be considered as more information becomes available and, if substantiated, should be regarded as a primary focus of clinical attention.

In addition, being held in captivity and tortured along with one's children would likely create a skewed view of the world that includes substantial elements of extreme fear and learned helplessness. Her current presentation certainly contains these elements. Her psychotic experiences have centered on visual hallucinations of her children, whom she reports are thin and have not been adequately fed. Her unusual behavior has included trying to save some of her own food for her children who are hungry. Her thoughts have included the belief that others are poisoning her food and trying to harm her. If Ms. Siddiqui and her children were held captive and tortured, these unusual experiences, thoughts, and behaviors are likely rooted in actual traumatic events.

**FORENSIC EVALUATION**
**SIDDIQUI, AAFIA**
**REG NO. 90279-054**

**PAGE 6**

Ms. Siddiqui meets the diagnostic criteria for Major Depressive Disorder, Severe with Mood Congruent Psychotic Features. She has been observed to display depressive symptoms, and has reported thoughts of hopelessness and death. She shows no interest in participating in activities on the unit, and frequently complains of an inability to think or concentrate. She also reports a decrease in appetite and sleep. Her hallucinations correlate with her depressive themes of worrying about her children and being harmed by others.

Ms. Siddiqui consistently refused to participate in any formal testing for this evaluation; however, she did report some unusual ideas about her Court case that are worth noting. She stated the Court had already sentenced her to death and killed her so she does not believe she will be going back to Court for an additional hearings. She also reported, "I don't understand this country. I cannot understand why they would sentence the victim of a crime to death. I was the victim here and they killed me." The "death" she speaks of involved Bureau of Prisons officers at MDC Brooklyn who utilized the Federal Bureau of Prisons' Use of Force policy in order to conduct a medical evaluation of Ms. Siddiqui. This policy dictates that a video camera must be used during this process. Ms. Siddiqui has explained in great detail many times during her evaluation that the officers were "dark angels" who came in and "killed her with the camera." She believes that these "angels" were acting on the commands of the Court as a sentence for her alleged criminal conduct. With regards to her ability to assist her attorney, she refused to receive legal mail from the attorneys working on her case and expressed her wish that her attorney not be allowed to visit her in prison. Her reasoning, although difficult to follow, appeared to be based on her belief that the attorneys have been an instrument in the same Court process that had already killed her.

Based on her educational background, she potentially possesses the aptitude to understand the basic tenants of the Court process. However, at this time, she is unable to process information in a rational manner due to psychosis. Further, Ms. Siddiqui believes her attorneys are working against her. As a result, in my opinion, she is unable to assist her attorneys in her defense.

**DIAGNOSIS AND PROGNOSIS:**

| Axis I: | 296.24 | Major Depressive Disorder, Severe With Mood Congruent Psychotic Features |
|---|---|---|
| | 309.81 | Posttraumatic Stress Disorder / Rule Out |
| Axis II: | | Diagnosis Deferred |
| Axis III: | | Gun Shot Wounds in Abdomen |
| Axis IV: | | Pending Criminal Trial |
| Axis V: | | Current Global Assessment Functioning = 35 |

FORENSIC EVALUATION
SIDDIQUI, AAFIA
REG NO. 90279-054

PAGE 7

Ms. Siddiqui's prognosis is guarded. She has consistently refused to consider taking medication to address her mental health symptomology. She has displays a significant distrust of her attorneys, medical personal, Court officials, and psychological examiners. This distrust prevents her from getting the proper medical attention for her wounds, from receiving appropriate intervention to treat her psychological distress, and from properly engaging with Court personnel involved in her criminal case. In addition, she currently lacks the motivation to improve her functioning, as she adamantly holds the belief that she is dead and will be tried in God's Court so it does not matter what happens to her here.

**RECOMMENDATIONS FOR THE COURT:**

While there is a probability that psychotropic medication would address the depression and psychotic symptoms that affect her competency, Ms. Siddiqui has steadfastly refused to consider this option. However, as she does not currently represent a danger to herself or others and does not require medication to ensure her safety or the safety of others in this institutional setting, we cannot forcibly medicate her on that basis. The primary purpose of medicating Ms. Siddiqui would be to restore her to competence to stand trial. Hence, the Court must determine whether forced medication is appropriate in this case based on the four criteria articulated by the Supreme Court in the *Sell vs. United States* decision. The FMC Carswell Forensic Treatment Team can advise the Court on three of these criteria.

First, in our opinion, psychotropic medication is a medically appropriate treatment for Ms. Siddiqui's depressive symptomology. Second, it is our opinion that medication can be prescribed which will be substantially unlikely to have side-effects which undermine the trial's fairness. Third, it is our opinion that no less-intrusive alternatives exist which will effectively treat Ms. Siddiqui's symptoms. The fourth criteria, whether forced medication is necessary to significantly further important governmental trial-related interests, is solely a legal question not properly addressed in a psychological report.

In summary, in my professional opinion, Ms. Siddiqui is incompetent to proceed at this time as a result of her mental illness. We are unable to proceed with treatment as a result of Ms. Siddiqui's refusal of medication, and it is necessary under *Sell vs. United States* for us to receive a Court Order to forcibly medicate her. Without this medication, Ms. Siddiqui will likely remain incompetent to proceed for the foreseeable future. At the Court's request, our chief psychiatrist, Judith Cherry, D.O., could provide the Court with a proposed plan for Ms. Siddiqui's psychiatric treatment based on the three criteria outlined above. Ms. Siddiqui's current mental condition is such that transporting her for a court appearance is not recommended. FMC Carswell has the capability for video conferencing, and this can be arranged if the court wishes.

**FORENSIC EVALUATION**
**SIDDIQUI, AAFIA**
**REG NO. 90279-054**

**PAGE 8**

**OPINION ON COMPETENCY:**

In my professional opinion, Ms. Siddiqui is not currently competent to proceed as a result of her mental disease, which renders her unable to understand the nature and consequences of the proceedings against her or to assist properly in her defense.

Submitted by:                                    Reviewed by:

Leslie Powers, Ph.D.                             Robert Gregg, Ph.D.
Forensic Psychologist                            Chief Psychologist

---

*Docket and file on consent of the parties.*

SO ORDERED:
Date: 7-6-09          Richard M. Berman
                      Richard M. Berman, U.S.D.J.