08 cr 826

**In The Matter Of:**

*USA   v.*

*SIDDIQUI*

Dockt + file on consent

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/6/09

*LESLIE POWER*

*June 26, 2009*

SO ORDERED:

Date: 7/6/09

*Richard A. Berman*

Richard M. Berman, U.S.D.J.

*FINK & CARNEY REPORTING AND VIDEO SERVICES*

*39 WEST 37TH STREET*

*NEW YORK, NY  USA  10018*

*(212) 869-1500   or   (800) 692-3465*

*Original File LAM06269.TXT, 189 Pages*
*Min-U-Script® File ID: 2029475144*

**Word Index included with this Min-U-Script®**

GOVERNMENT
EXHIBIT
O
08 Cr. 826 (RMB)          (ID)

Page 1

[1]
[2] UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
[3]
[4] UNITED STATES OF AMERICA,
[5]        Plaintiff,
                          Index No.
[6]   -against-       08CR.826(RMB)
[7] AAFIA SIDDIQUI,
[8]        Defendant.
[9]
[10]
                June 26, 2009
[11]            12:57 p.m.
[12]
[13] Deposition of LESLIE POWER, Ph.D., taken by
[14] Defendant, at Metropolitan Detention Center,
[15] 100 29th Street, Brooklyn, New York, before
[16] Linda A. Marino, Registered Professional
[17] Reporter, Certified Court Reporter, and Notary
[18] Public within and for the State of New York.
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 2

[1]
[2] Appearances:
[3]
[4]    U.S. ATTORNEY'S OFFICE
       SOUTHERN DISTRICT OF NEW YORK
[5]        Attorneys for Plaintiff
           1 St. Andrew's Plaza
[6]        New York, New York 10007
[7]    BY:  CHRISTOPHER LAVIGNE,
             ASSISTANT U.S. ATTORNEY
[8]
[9]
[10]
       DAWN M. CARDI & ASSOCIATES
[11]       Attorneys for Defendant
           2 Park Avenue - 19th Floor
[12]       New York, New York 10016
[13]   BY:  DAWN M. CARDI, ESQ.
            CHET EDGAR, ESQ.
[14]
[15]
[16]
    Also Present:
[17]
[18]   JOSE SANTOS, Videographer
[19]   CARLY WEINREB, Paralegal to Mr. Lavigne
[20]
[21]
[22]
[23]
[24]
[25]

Page 3

### L. POWERS

[2]    THE VIDEOGRAPER: We're now going
[3] on the record. The time is 12:57 p.m.
[4] on June 26, 2009. This is the videotape
[5] deposition of Leslie Powers, M.D., in
[6] the matter of United States of America
[7] versus Aafia Siddiqui, under the
[8] jurisdiction of the United States
[9] District Court, Southern District of New
[10] York.
[11]    This deposition is being held at
[12] 100 29th Street, Brooklyn, New York. My
[13] name is Jose Santos and I'm the video
[14] specialist, the court reporter is Linda
[15] Marino, and we both represent Fink &
[16] Carney Reporting.
[17]    May I have an introduction from
[18] counsel?
[19]    MR. LAVIGNE: Christopher
[20] Lavigne, Assistant United States
[21] Attorney, Southern District of New
[22] York.
[23]    With me at the table is Carly
[24] Weinreb, a paralegal in my office.
[25]    MS. CARDI: Dawn Cardi, from 2

Page 4

### L. POWERS

[2] Park Avenue, New York, New York,
[3] attorney for the Defendant, Aafia
[4] Siddiqui.
[5]    MR. EDGAR: Chet Edgar, associate
[6] of Dawn Cardi, of Dawn Cardi &
[7] Associates, 2 Park Avenue, New York, New
[8] York, for the Defendant, Aafia Siddiqui.
[9]    THE VIDEOGRAPHER: Will the
[10] reporter please swear in the witness?
[11]    (Witness sworn)
[12]    MS. CARDI: I think the record
[13] should reflect — go ahead.
[14]    MR. LAVIGNE: Yeah.
[15] Just for the record — and
[16] counsel can interject or add anything —
[17] the parties are here pursuant to the
[18] Court's June 24, 2009 Order, and both
[19] agreed to take the deposition of Leslie
[20] Powers in lieu of her appearance on July
[21] 6, 2009. The individuals present have
[22] stated their names.
[23]    We were informed that the
[24] Defendant, Ms. Siddiqui, refused to
[25] attend this deposition. And pursuant to

Government Exhibit O

Page 5

**L. POWERS**

[1]
[2] the Court's Order and the parties'
[3] agreement, we are proceeding in her
[4] absence.
[5]    The parties have also agreed that
[6] for purposes of this deposition, we will
[7] rely upon any exhibits that were
[8] submitted to the Court on Monday. And
[9] throughout the deposition, we'll refer
[10] to those documents by Bates number
[11] and/or exhibit number.
[12]    **MS. CARDI:** Yes, counsel consents
[13] to that and is prepared to move forward
[14] without the presence of Dr. Siddiqui.
[15]    As we understand it, she does not
[16] want to appear; and, therefore, we are
[17] going to proceed in her absence.
[18]    The record should reflect that we
[19] don't know whether or not she is
[20] competent to make that decision at this
[21] time, but we are going to go forward in
[22] light of the fact that we believe that
[23] — it's our position that she is
[24] incompetent, and, therefore, that we are
[25] — we can proceed in her absence.

Page 6

**L. POWERS**

[1]
[2]    We also did not want to have a
[3] force order signed because — I'm sorry,
[4] we did not want to have a force order
[5] signed because of the psychological
[6] condition, as represented to us, of Dr.
[7] Siddiqui. We did not want to have any
[8] additional trauma experienced on her
[9] behalf.
[10]    Okay.
[11]    **MR. LAVIGNE:** Ready?
[12]    **MS. CARDI:** Yeah.
[13]
[14] LESLIE POWERS, having been
[15] first duly sworn by a Notary Public of
[16] the State of New York (Linda A. Marino),
[17] was examined and testified as follows:
[18]                **EXAMINATION**
[19]                **BY MS. CARDI:**
[20]    **Q:** Good afternoon, Dr. Powers.
[21]    **A:** Good afternoon.
[22]    **Q:** My name is Dawn Cardi, and I
[23] represent Aafia Siddiqui. And this is my
[24] associate, Chet Edgar.
[25]    If there's any question, you

Page 7

**L. POWERS**

[1]
[2] don't understand please let us know, and we'll
[3] repeat the question. If you need an
[4] opportunity to have a break, please let us
[5] know, and we're happy to have a break.
[6]    So, Dr. Powers, tell me, before
[7] you testify today, what did you do to prepare
[8] for your testimony?
[9]    **A:** I reviewed the documents that I
[10] had access to and I've looked over the reports
[11] that have been submitted in the case.
[12]    **Q:** And can I assume that you looked
[13] over the documents that the Government
[14] provided to us in a letter — I don't know
[15] what the date of that letter is, excuse me.
[16]    Here, I'm going to show you this
[17] letter marked June 23, 2009. I'd just like
[18] you to look at this letter and tell me if
[19] those are the documents that you have reviewed
[20] prior to your testimony.
[21]    **A:** I'm not sure about the Bates
[22] labels. It's hard to know exactly what the
[23] numbers are, if I've seen these exact
[24] numbers. I have reviewed several documents
[25] with those labels.

Page 8

**L. POWERS**

[1]
[2]    I believe that these are the ones
[3] that I have reviewed, yes.
[4]    **Q:** Do you know if you've reviewed
[5] anything in addition to what's set forth in
[6] the letter from the Government dated June 23
[7] of 2009?
[8]    **A:** Again, not knowing what the —
[9] what documents are in the Bates labels, I
[10] reviewed the other reports that were submitted
[11] in the case, so those of Dr. Satoff, Dr.
[12] Johnson, and Dr. Kicharski.
[13]    Yes, Johnson and Satoff are in
[14] here. And the use of force video from the
[15] MDC, I'm not sure if that's contained in some
[16] of the labeled...
[17]    **Q:** Did you review that?
[18]    **A:** Yes, I did.
[19]    **Q:** Okay.
[20]    **A:** And the Government includes notes
[21] of two conversations with Dr. Powers. I'm not
[22] sure what that is.
[23]    **THE WITNESS:** Is that notes that
[24] you had with me or notes that I
[25] submitted or...

Page 9

**L. POWERS**

[1]
[2]    MR. LAVIGNE: I mean, we can — I
[3] think we can stipulate for the record
[4] those are notes — the Government's
[5] notes of conversation with Dr. Powers.
[6]    A: I have not reviewed those.
[7]    Q: Anything else there, Dr. Powers?
[8]    A: I don't believe so.
[9]    MS. CARDI: Just a question, the
[10] letter refers to the Bates numbers, that
[11] of the documents that Dr. Powers
[12] reviewed.
[13]    Could we just have a stipulation
[14] that the Bates numbers that, in fact,
[15] the Government provided the
[16] documentation to Dr. Powers or that of
[17] these particular documents with these
[18] Bates numbers?
[19]    MR. LAVIGNE: That's fine.
[20] I think we sent one e-mail last
[21] night just confirming it was 783 to 786,
[22] not 796, but that's fine.
[23]    MS. CARDI: Okay.
[24]    Q: Did you read Dr. Kicharski's
[25] article on malingering before your testimony?

Page 10

**L. POWERS**

[1]
[2]    A: I didn't read the article.
[3] I read his report.
[4]    Q: Did you read the treatise on
[5] delusional disorders by Resnick before you
[6] testified today?
[7]    A: No.
[8]    Q: Did you have any conversations
[9] with Dr. Satoff in preparation for your
[10] testimony?
[11]    A: I did not.
[12]    Q: How about Dr. Johnson?
[13]    A: No.
[14]    Q: Did you have any conversations
[15] with anyone in the Bureau of Prisons prior to
[16] your testimony today in regard to your
[17] testimony?
[18]    A: No, not with specific details,
[19] no.
[20]    Q: Did you — how long did you speak
[21] with the Assistant United States Attorney in
[22] preparation for your testimony today?
[23]    A: We met this morning for a couple
[24] hours.
[25]    Q: And did you talk to him on the

Page 11

**L. POWERS**

[1]
[2] telephone prior to that?
[3]    A: Yes; just briefly yesterday when
[4] I arrived, and earlier in the week just
[5] briefly to finalize the plans.
[6]    Q: So, what is your — what is your
[7] sort of educational background?
[8]    A: I have a bachelor's degree in
[9] behavioral and social science from the
[10] University of Maryland, and I have both a
[11] master's degree and a Ph.D. from the Graduate
[12] University in Santa Barbara, California in
[13] clinical psychology.
[14]    I did both predoctoral training
[15] and postdoctoral training with the Federal
[16] Bureau of Prisons, with a concentration in
[17] forensics.
[18]    Q: And when did you complete your
[19] education?
[20]    A: In 2005.
[21]    Q: And after your completion of your
[22] education, where have you been employed?
[23]    A: With the Bureau of Prisons; first
[24] at the Federal Correctional Institution in
[25] Fort Worth, and then by the Federal Medical

Page 12

**L. POWERS**

[1]
[2] Center at Carswell.
[3]    Q: And what were your duties and
[4] responsibilities at the Federal Correctional
[5] facility in Fort Worth?
[6]    A: I was a postdoctoral
[7] psychologist. I did both forensic evaluations
[8] and some clinical work.
[9]    My forensic evaluations involved
[10] competency evaluations and not guilty by
[11] reason of insanity evaluations, and I think I
[12] did a couple of dangerousness assessments
[13] while I was there.
[14]    Q: How long were you at FMC in —
[15] I'm sorry, in Fort Worth?
[16]    A: Two years.
[17]    Q: Since you've arrived at FMC
[18] Carswell, what are your duties and
[19] responsibilities?
[20]    A: I'm one of two forensic
[21] psychologists there. Because it's an
[22] inpatient unit and the only one for females in
[23] the United States, we get many studies for
[24] competency restoration.
[25]    We do also the same thing I did

Page 13

**L. POWERS**

[1]
[2] at Fort Worth, with competency, not guilty by
[3] reason of insanity. We also do
[4] dangerousness. We have a lot of commitments
[5] there since we have an inpatient unit. We do
[6] 43s, 46s, which are yearly evaluations for
[7] folks who have been committed because of
[8] mental illness.
[9]    **Q:** And what is your title?
[10]    **A:** Forensic psychologist.
[11]    **Q:** And who are your supervisors?
[12]    **A:** My supervisor is Dr. Robert
[13] Gregg.
[14]    **Q:** And after you found Dr. Siddiqui
[15] incompetent originally, did anyone suggest to
[16] you that the diagnosis you had was wrong or
[17] incorrect?
[18]    **A:** Yes.
[19]    **Q:** Okay.
[20] Can you explain?
[21]    **A:** Yes.
[22] I got a message from our central
[23] office saying that our forensic director of
[24] the Bureau had reviewed my report. He didn't
[25] make any — he didn't make any recommendations

Page 14

**L. POWERS**

[1]
[2] as to what I should have diagnosed her at —
[3] with, but had some things to say about my
[4] report.
[5]    **Q:** And who is that person?
[6]    **A:** I don't remember his name, but...
[7]    **Q:** Is he someone who has authority
[8] over you in terms of your job, your
[9] responsibilities?
[10]    **A:** Distantly, maybe.
[11] He's the — in the Bureau, the
[12] guy that handles all the forensic evaluations.
[13]    **MS. CARDI:** Could we leave a
[14] space in this deposition to get the name
[15] of that person going forward?
[16]    **MR. LAVIGNE:** Sure.
[17]    **A:** _____
[18]
[19]
[20] I've never met him, so I've never
[21] even had a conversation with him. This came
[22] through e-mail.
[23]    **Q:** How long after you issued your
[24] first report did this person contact you?
[25]    **A:** It was just within maybe a month.

Page 15

**L. POWERS**

[1]
[2]    **Q:** A month from when you did the
[3] report?
[4]    **A:** Uh-huh.
[5]    **Q:** And the first report was in May?
[6]    **A:** No, the first report was in
[7] October.
[8]    **Q:** October of 2008.
[9] Right?
[10]    **A:** It was in November.
[11]    **Q:** November.
[12] So, is it a month after the
[13] report was issued that you were contacted?
[14]    **A:** I'm not sure of the exact date,
[15] but it was shortly after. It was before
[16] February, I know.
[17]    **Q:** And what was the sum and
[18] substance of the questions that he raised in
[19] regard to your findings?
[20]    **A:** He wanted to know — basically,
[21] he didn't make any documents directly, he just
[22] sort of went through the report.
[23]    The one thing that stands out was
[24] that she — I had noted in my first report
[25] that she may or may not be intelligent enough

Page 16

**L. POWERS**

[1]
[2] at this point to be competent. I questioned
[3] her intelligence due to the fact that there
[4] were some speculation that she may have been a
[5] trauma survivor. And I did my research on
[6] trauma survivors; it does cause a lower — can
[7] cause intelligence — a lower intelligence.
[8]    So, one of the things that he
[9] said in the report that I remember — he just
[10] made little comments through, like, a word
[11] processor, where you can make comments on the
[12] side. He said: This is preposterous. She
[13] has been to, you know, numerous higher
[14] education facilities, institutions.
[15]    **Q:** Was that the only challenge to
[16] your first report?
[17]    **A:** There wasn't really a generalized
[18] overall theme to it. I think he just went
[19] through — and this was very bizarre to me
[20] because he's never been involved in a case
[21] before, but had just went through it and kind
[22] of critiqued some of the things that I had —
[23] that I had written, but I don't remember a
[24] general theme that he had.
[25]    **Q:** Other than this person

**L. POWERS**

[1]
[2] questioning your — that initial report, did
[3] anybody else question you about your findings?
[4] A: No.
[5] Q: Did anybody challenge you about
[6] the findings?
[7] A: No.
[8] Q: Did you at any time feel any
[9] pressure being placed upon you because you
[10] found Dr. Siddiqui incompetent?
[11] A: No.
[12] In fact, once this happened with
[13] Central Office, it made me more determined to
[14] prove that, you know, my first report was
[15] exactly what I should have submitted and that
[16] there wasn't anything wrong with it. I was,
[17] to be honest, offended by it because I thought
[18] it inappropriate. So, it just made me more
[19] determined to prove my point.
[20] Q: And since that time, has anyone
[21] in either the Government or any forum of the
[22] BOP had any discussions with you about
[23] changing your report?
[24] A: No, no.
[25] Q: Okay.

**L. POWERS**

[1]
[2] And that would, of course,
[3] include Dr. Gregg, who is your supervisor.
[4] Correct?
[5] A: Yes, absolutely.
[6] Q: And the warden at FMC Carswell?
[7] A: Uh-huh.
[8] Q: And the Government?
[9] A: No, nobody has ever, ever given
[10] any indication one way or the other.
[11] Dr. Gregg supervises my reports,
[12] and, as he does with everyone — I think it's
[13] Bureau policy that the Chief of Psychology
[14] supervise our report — so, I discussed the
[15] case with him as I was writing the report, but
[16] his style of supervision is very much — he
[17] puts a lot of trust in me and believes that
[18] I've done a thorough review and didn't —
[19] didn't question one way or the other, just
[20] kind of supported my diagnosis.
[21] Q: Would it be fair to say that the
[22] findings that you made in the first report,
[23] that you didn't change those findings until
[24] you read Dr. Satoff and Dr. Johnson's reports?
[25] A: That is absolutely inaccurate.

**L. POWERS**

[1]
[2] I didn't submit the second report
[3] — I did not read anybody's report before I
[4] submitted the second report.
[5] Q: So, you didn't see Dr. Johnson's
[6] report, you didn't see Dr. Satoff's report,
[7] before you submitted the second report?
[8] A: No.
[9] Q: Had you heard — I'm assuming you
[10] heard, however, that —
[11] A: Yes.
[12] Q: I just want to finish.
[13] — that both Dr. Satoff and Dr.
[14] Johnson had found Dr. Siddiqui competent.
[15] A: It was reported in the media.
[16] Q: Okay.
[17] And did you know on what basis
[18] they had found her competent?
[19] A: No.
[20] I didn't know any of the details.
[21] Q: Did you know the diagnosis of
[22] malingering?
[23] A: I believe that was also reported
[24] in the media.
[25] Q: And did you have any discussions

**L. POWERS**

[1]
[2] with anyone at the Bureau of Prisons once you
[3] read in the media that Drs. Johnson and Satoff
[4] had found Dr. Siddiqui competent and
[5] malingering?
[6] A: I'm sure that I had conversations
[7] about it, just factual, but nothing that would
[8] sway me one way or the other.
[9] Q: Would it be fair to say that —
[10] so, when was it time-wise, if you can put a
[11] time to it, that you determined that now Dr.
[12] Siddiqui was competent?
[13] A: I started questioning her
[14] competency when I — right before I left on
[15] medical leave, which would have been in
[16] February, and when I came back the end of
[17] March, really started questioning it, once I
[18] started getting the collateral evidence in.
[19] The first report, I had very
[20] little evidence, any kind of collateral.
[21] Since she wouldn't cooperate with me, that's
[22] really all I had to go on, was her
[23] interactions on the unit where she was living,
[24] her interaction with me, what — limited as it
[25] was, and the collateral, and I didn't have

---

Page 21

### L. POWERS

[2] very much collateral.

[3]　　Once I started receiving

[4] collateral and started kind of comparing that

[5] to her current presentation is when I started

[6] kind of questioning.

[7]　　Q: At the time that you wrote your

[8] first report, how many competency findings had

[9] you done at Carswell?

[10]　　A: I'd say at Carswell — just

[11] Carswell, not Fort Worth?

[12]　　Q: Uh-huh.

[13]　　A: Probably seventy.

[14]　　Q: And about how many had you done

[15] at Fort Worth?

[16]　　A: Probably thirty.

[17] Those are just guesses. I'm not

[18] sure.

[19]　　Q: And how many competency hearings

[20] have you testified at?

[21]　　A: Probably ten.

[22]　　Q: As of today?

[23]　　A: Yeah, I think so.

[24] This is just a guess, but I think

[25] it's probably ten, twelve.

---

Page 22

### L. POWERS

[2]　　Q: Okay.

[3] And how many people would you say

[4] you found incompetent?

[5]　　A: It's generally — with me,

[6] generally works to about five to ten percent

[7] are not competent.

[8]　　Q: And is that an average?

[9]　　A: Yeah.

[10]　　Q: And do the Bureau of Prisons have

[11] statistics about that percentage?

[12]　　A: I'm not sure.

[13] I have never read anything about

[14] it, to my knowledge.

[15]　　Q: And how many times have you

[16] changed your mind about the competency of an

[17] individual from saying that the person was

[18] incompetent to finding that they were then

[19] competent?

[20]　　A: Well, it's a difficult question

[21] because we do competency evaluations and then

[22] they send them for competency restoration and

[23] we're asked to do another report.

[24]　　Q: I'll refine my question.

[25] How many individuals have you

---

Page 23

### L. POWERS

[2] found — have you changed your mind from

[3] finding that the person was incompetent to

[4] finding that they're competent without any

[5] intervention of drugs or other assistance?

[6]　　A: This was my first time.

[7]　　Q: And was there something about

[8] this case that was so unique that this was the

[9] first time you made such a change?

[10]　　A: Yes.

[11] Normally, when someone is sent

[12] for a 42, 41B, they're sent for thirty days,

[13] and, so, we have thirty days to do the

[14] evaluation, which was the case for the first

[15] report. But because she stayed longer than

[16] that, much longer than that — I can't recall

[17] a case where I've had that much additional

[18] time past the first report with which to

[19] observe them. So, that was the only time that

[20] I can recall that that situation has been that

[21] way.

[22]　　Q: Did you — what was the reason

[23] why you found her now to be competent?

[24]　　A: That's an important question.

[25] The reason I think she's

---

Page 24

### L. POWERS

[2] competent now is based on the fact that she

[3] has demonstrated the knowledge of court

[4] proceedings through conversations that she's

[5] had with other people; she has had

[6] conversations, with her brother in particular,

[7] where she has talked about a legitimate

[8] defense.

[9]　　And the reasons that I had found

[10] her incompetent prior to this was with a

[11] possibility that she may have some sort of

[12] delusional process, a psychotic process that

[13] may interfere with her ability to assist

[14] counsel; namely, her refusal to meet with her

[15] first — Ms. Fink, that set of attorneys,

[16] because she's so traumatized by the strip

[17] search and by the forced cell move, and that

[18] was the result of a psychotic process.

[19]　　However, over time I began to

[20] believe that that wasn't the case; that she

[21] was not traumatized by those events, at least

[22] not to the degree that she initially led on

[23] that she was.

[24]　　Q: And what was it that convinced

[25] you that she was not traumatized by those

**L. POWERS**

[1]
[2] events?
[3]    A: Well, there were a couple
[4] things.
[5]    There were inconsistencies in the
[6] way that she described it. But, also, in the
[7] review of the log books from when she was at
[8] MDC, which is the first time, her reaction
[9] prior to and afterwards, after the forced cell
[10] movement and strip search, she did not appear
[11] to be in very significant distress, one that
[12] would warrant such a huge amount of trauma
[13] presentation that I was seeing when she first
[14] arrived or that she was reporting.
[15]    Also, I had the opportunity to
[16] review or to look at the video of the forced
[17] cell move. And what I expected to see was
[18] just a very depressed, sad, kind of a victim
[19] presentation of someone, and wasn't the case.
[20] She was very clearly yelling obscenities and
[21] very angry and asking for the video to be
[22] played so that the world could see what we
[23] were doing to her at the BOP.
[24]    Q: So, you would say — would it be
[25] fair to say that was the major reason why you

**L. POWERS**

[1]
[2] decided that she was competent now?
[3]    A: Well, all of the reasons I just
[4] described, yes.
[5]    Q: Okay.
[6]    A: That she was able to talk about
[7] court proceedings in a logical manner to her
[8] brother and that she was able to communicate
[9] with people on the unit in a manner that would
[10] indicate that she had a logical method of
[11] doing so.
[12]    Q: So, then, let me ask you this:
[13] How did you diagnose or how did you then deal
[14] with some of the symptoms that Dr. Siddiqui
[15] has exhibited from your first — her first
[16] arrival at Carswell to the present, such as,
[17] you know, sleep deprivation?
[18]    A: And your question is how did I —
[19]    Q: Yeah, how do you reconcile that?
[20] I mean, you have all of these
[21] symptoms that you report, I believe, in your
[22] report.
[23]    A: Right.
[24]    MR. LAVIGNE: Which report?
[25]    MS. CARDI: The most recent

**L. POWERS**

[1]
[2] report, May 4 of 2009.
[3]    Q: And I believe in your original
[4] report, which was November 14 of 2008, you
[5] pretty thoroughly go through a series of
[6] symptoms that Ms. — Dr. Siddiqui was
[7] exhibiting —
[8]    A: Yeah.
[9]    Q: — which in the first report
[10] suggested to you that she was incompetent?
[11]    A: That's right.
[12]    Q: So, how do you reconcile the
[13] symptoms that Dr. Siddiqui has exhibited, both
[14] as you report in your first report and as you
[15] report in your second report, and your finding
[16] of competency?
[17]    A: During the first evaluation when
[18] she came into our receiving and discharge
[19] area, she was very distraught. She spoke of
[20] — and my findings, my opinion, was based on
[21] her speaking of her seeing her children, her
[22] crying, her saying she couldn't read, her
[23] indicating that she suffered significant
[24] trauma, suggesting that — they were
[25] suggesting that, through her attorneys, that

**L. POWERS**

[1]
[2] this may have — she may have been a prisoner
[3] of war and that this use of force and strip
[4] search was so distressing to her because it
[5] may have retraumatized her.
[6]    So, those symptoms that I
[7] observed were that she was crying, she was
[8] visibly upset, she didn't want to submit to
[9] the strip search. Based on those things —
[10] she was also reporting that she wasn't
[11] sleeping well, which is another symptom of
[12] depression.
[13]    So, based on her presentation
[14] when she first arrived, my opinion at that
[15] time was that she was suffering from
[16] depressive disorder with psychotic symptoms.
[17] Her psychotic symptoms were congruent with her
[18] mood, meaning that she was sad about her
[19] children being missing so she was seeing
[20] visions of her children.
[21]    So, that's where I came up with
[22] those at the time. Since that time, before
[23] she left our institution, has reconciled and
[24] has — not reconciled, but she's gotten much
[25] better with those symptoms. She has not

**L. POWERS**

[1]

[2] exhibited the crying episodes, she's certainly

[3] observed to be reading, participating in

[4] things that she feels are important, and I

[5] just didn't see the depression issues after a

[6] while.

[7]     So, looking back, I would expect

[8] someone — it's very frequent that someone who

[9] first arrives will cry and become upset. So,

[10] I don't — I don't believe that that was the

[11] criteria in the latest report that would meet

[12] the criteria for major depressive disorder.

[13]     Q: So, it's your testimony now that

[14] she's not suffering from major depressive

[15] disorder.

[16]     Correct?

[17]     A: Yes.

[18]     Q: And she's not suffering from

[19] posttraumatic stress syndrome.

[20]     Correct?

[21]     A: That is correct, I do not believe

[22] she is.

[23]     Q: And why — based on what?

[24]     A: Because she just didn't exhibit

[25] the symptoms.

**L. POWERS**

[1]

[2]     Over time —

[3]

[4]

[5]

[6]

[7]

[8]

[9]     Q: Let's take major depressive

[10] disorder.

[11]     Why is it you don't think that

[12] she is suffering today from major depressive

[13] disorder?

[14]     A: Well, because over time, I've

[15] come to realize that some of the things that

[16] she was reporting were exaggerated or not true

[17] at all, like her lack of sleep — we were

[18] seeing her sleeping adequately — which is a

[19] sign of depression. Her distress was very

[20] much reduced. She did not have the same

[21] presentation at all with regards to her crying

[22] and her feelings of being — that would meet

[23] the standard for clinical depression.

[24]     Q: What is the standard for clinical

[25] depression?

**L. POWERS**

[1]

[2]     A: Well, if I could have the DSM, I

[3] can tell you specifically.

[4]     Q: Can you tell me from memory?

[5]     A: I can try, but I always use the

[6] book.

[7]     Q: (Handing)

[8]     A: Basically, someone that's, number

[9] one, clinical depressed is going to be pretty

[10] consistent. It may remit, but it's going to

[11] be pretty consistent over time, especially if

[12] it's not due to a stressor.

[13]     We often see people who are very

[14] depressed and exhibit those depressed symptoms

[15] — crying, upset, lack of interest in

[16] activities, those kind of things — but it's

[17] due to a major stressor. And once the

[18] stressor remits, then they're doing much

[19] better.

[20]     Let me find it. So, she — she

[21] was sleeping adequately, she didn't seem to be

[22] depressed most of the day; in fact, over time,

[23] she was observed to be laughing and joking,

[24] participated — she very much kept herself

[25] isolated, but there were times that she

**L. POWERS**

[1]

[2] participated, particularly with an inmate that

[3] she was trying to help out with teaching the

[4] Muslim religion, was observed to — was not

[5] observed to have, that I knew of, any eating

[6] problems after the initial thing where she was

[7] wanting to eat downstairs. There was an

[8] initial issue when she got there that she

[9] didn't want to eat off the common fare tray,

[10] and, so, that was an issue. That seemed to

[11] have went away over time. She did not seem to

[12] have increased agitation or retardation every

[13] day; she was very calm.

[14]     And this is without — without

[15] medication. She was not on antidepressant

[16] throughout that first stay there. And I just

[17] did not get overall her presentation that she

[18] was depressed. It definitely seemed to have

[19] gotten better, so I attributed that to just

[20] her adjustment at prison in the situation that

[21] she was in.

[22]     MR. LAVIGNE: Doctor, just for

[23] the record, what page are you looking at

[24] in the DSM?

[25]     THE WITNESS: 356.

**L. POWERS**

[1]

[2] MR. LAVIGNE: That's DSM-IV?

[3] THE WITNESS: IV-TR.

[4] Q: That is the diagnosis of, the

[5] elements for, major depression?

[6] A: Uh-huh.

[7] Q: When you say you received

[8] information about the fact that she had no

[9] problems with her eating, no problems anymore

[10] with her sleeping, where did you get that

[11] information from?

[12] A: From the nursing staff.

[13] And I had asked them on several

[14] occasions to monitor her sleeping since she

[15] had reported that she would be having these

[16] hallucinatory experiences at night, to monitor

[17] her sleeping.

[18] Every morning, we meet as a team

[19] on the unit with the nursing staff and get a

[20] report of anything that may have happened the

[21] night before. And consistently, it was not

[22] reported to me that she had any sleeping

[23] problems.

[24] Q: Would it be fair to say that

[25] unlike when Dr. Siddiqui was staying at the

**L. POWERS**

[1]

[2] Metropolitan Detention Center, where she was

[3] observed 24 hours a day, that she was not

[4] observed 24 hours a day by the staff at

[5] Carswell Correctional Facility?

[6] A: That is correct, there were not

[7] 24-hour-a-day logs.

[8] But the nurses do regular, I

[9] think thirty-minute, rounds at night.

[10] Q: And where is it — in which log

[11] would I find this reports of her sleeping at

[12] FMC Carswell?

[13] A: They just reported in the

[14] mornings with the logs.

[15] Q: Did they write it in the logs or

[16] did they just orally report it to you?

[17] A: They orally reported it to me.

[18] They keep just kind of nursing

[19] notes that they bring to rounds every morning,

[20] but they reported it to me.

[21] Q: And would you have a report over

[22] a 24-hour period as to how much time she did

[23] sleep versus how much time she didn't sleep?

[24] A: No.

[25] They reported to me whether she

**L. POWERS**

[1]

[2] was observed to be awake when they did

[3] rounds. That was the gist of it.

[4] Q: That was it.

[5] So, it's possible that she could

[6] have slept for a period of time, a short

[7] period of time, and been awake and then slept

[8] again and been awake, and you wouldn't really

[9] know that from the rounds report.

[10] Correct?

[11] A: Correct.

[12] Q: Or there could have been periods

[13] of time when she didn't sleep and when they

[14] saw her she had just fallen asleep.

[15] Correct?

[16] A: Of course.

[17] Q: And would it be fair to say that

[18] they don't necessarily spend a long period of

[19] time observing each individual in the unit —

[20] A: That's probably fair.

[21] Q: — to see whether or not they

[22] stay asleep?

[23] A: Uh-huh.

[24] Q: And didn't she complain both to

[25] Dr. Kemke and to others that she was having

**L. POWERS**

[1]

[2] difficulty sleeping during this very same

[3] period of time?

[4] A: Uh-huh, uh-huh.

[5] Q: And would it be fair to say that

[6] your — the reports of the nursing staff is

[7] basically anecdotal but not chronological?

[8] A: I'm not sure what you mean.

[9] Q: Let me withdraw.

[10] Did you take an opportunity to

[11] look at her sleeping patterns when she was at

[12] the Metropolitan Detention Center?

[13] A: I did.

[14] Q: And when did you do that?

[15] A: I did it before my last

[16] evaluation, and I reviewed it again before

[17] this testimony today.

[18] Q: Okay.

[19] So, when you say your last

[20] evaluation, you reviewed the logs before your

[21] most recent evaluation in May 2009?

[22] A: Yes.

[23] Q: Correct?

[24] A: Yes.

[25] Q: And when you reviewed the logs at

Page 37

[1] **L. POWERS**
[2] the Metropolitan Detention Center, didn't you
[3] observe in the logs that there were days when
[4] she would sleep for an hour or two hours and
[5] then not sleep the next day for two, maybe
[6] three hours, other days one hour?
[7] Wouldn't you call that sleep —
[8] an issue regarding sleep?
[9] A: What I observed in the log was
[10] that she slept during 24-hour periods a fairly
[11] consistent amount of time. Her sleep is
[12] interrupted and was interrupted by pill lines,
[13] by, you know, lieutenants coming by. But for
[14] the most part, on a daily basis she slept
[15] three to four hours. It may not have been
[16] consistently three to four hours, but she
[17] slept at least three to four hours a day.
[18] Q: How do you function on three to
[19] four hours of sleep on a daily basis?
[20] A: I can't answer that. I'm not
[21] sure.
[22] Q: I mean, is it your professional
[23] opinion that three to four hours of sleep on a
[24] daily basis is sufficient?
[25] A: It is for some people. People —

Page 38

[1] **L. POWERS**
[2] a lot of people require less sleep than
[3] others.
[4] Q: And, of course, you have no idea
[5] why Dr. Siddiqui is a person who requires more
[6] sleep or less sleep?
[7] A: No.
[8] Q: What would happen to a person
[9] over a period of time, do you think, if they
[10] don't — consistently only slept three or four
[11] hours a night?
[12] A: I'm not sure.
[13] Q: Wouldn't you consider that a
[14] symptom of depression if a person reported to
[15] you that they had that kind of a sleep pattern
[16] over a period of time?
[17] A: Sleep is definitely one of the
[18] criteria that we use.
[19] Q: And isn't it really sort of a
[20] primary criteria when you're looking at
[21] depression, the diagnosis of depression, what
[22] is the person's sleep pattern?
[23] A: I don't think that the DSM really
[24] gives one primary over another, but it is
[25] definitely a consideration.

Page 39

[1] **L. POWERS**
[2] Q: So, it would be fair to say, for
[3] example, that if we look at the log on August
[4] 9, 2008 from the MDC — I'll give you that
[5] log.
[6] **MS. CARDI:** And that's in Exhibit
[7] E, by the way, that I'm referring to.
[8] Q: Log No. 23, August 9, if you look
[9] at that entry, isn't it correct that Dr.
[10] Siddiqui slept one hour and eight minutes on
[11] August 9, from, 7 a.m. to 8:15 a.m.?
[12] A: No, that's not what I'm seeing on
[13] my page.
[14] August 9, she — it says she was
[15] sleeping — she was observed to be laying down
[16] at 11:15, observed to be sleeping at 1,
[17] observed to be sleeping until 4:30, woke up at
[18] 6:25, and then went back to sleep until 7:40.
[19] Q: So, how many hours of sleep
[20] during that 24-hour period of time did she
[21] have?
[22] A: Well, 1 to 4:30 — one, two,
[23] three, four — three hours; and then again
[24] from six, about two hours there.
[25] So, five hours.

Page 40

[1] **L. POWERS**
[2] Q: And that was interrupted, that
[3] sleep.
[4] Correct?
[5] A: Uh-huh.
[6] Q: What's the impact of interrupted
[7] sleep on an individual in a 24-hour period?
[8] A: I'm not sure.
[9] Q: In terms of determining whether
[10] or not that's a symptom of major depression.
[11] A: It could indicate that they're
[12] not sleeping well for a number of reasons.
[13] This environment is a very loud environment,
[14] so it's very common that we hear people in
[15] this environment not sleeping well. But it
[16] certainly — any sleep problems are indicative
[17] — could be indicative of one of the
[18] criterias for depression.
[19] Q: Did you do a log at all or a
[20] chart at all to figure out how much Dr.
[21] Siddiqui was sleeping and how much she was
[22] awake?
[23] A: No.
[24] Q: Did you do a log or a chart to
[25] determine whether or not her sleep was

Page 41

L. POWERS

[1]
[2] interrupted?
[3]    A: No.
[4]    Q: If somebody's sleep is
[5] interrupted on a regular basis, does that have
[6] any impact on their mental health?
[7]    A: I'm sure it could.
[8] Are you asking if the sleep
[9] causes mental health issues?
[10]    Q: No.
[11] First, the lack of sleep, does
[12] that impact on the mental health evaluation,
[13] her lack of sleep — her inability to sleep?
[14]    A: Her inability to sleep, does it
[15] impact my evaluation?
[16]    Q: Yes.
[17]    A: Yes.
[18] Like I said before, any time
[19] someone has sleep problems, I consider that
[20] with a depressive diagnosis, or there's
[21] several diagnoses.
[22]    Q: So, I guess my question to you
[23] is, if somebody sleeps, for example, as Dr.
[24] Siddiqui did, let's say for two hours, then
[25] wakes up, then sleeps another hour, hour and a

Page 42

L. POWERS

[1]
[2] half, how do you view that in terms of your
[3] diagnosis?
[4]    A: Again, it could be indicative of
[5] sleep problems. If it was consistent over
[6] time, it could be indicative of one of the
[7] criterias for depression, if it was consistent
[8] over time.
[9]    Q: When you say consistent over
[10] time, how much time are you saying?
[11]    A: That's really — the DSM doesn't
[12] really provide us with the information of a
[13] specific amount of time, it's just being
[14] pervasive enough to cause major problems over
[15] time in their functioning.
[16]    Q: Well, the sleep log presented by
[17] the MDC indicated and represented to you that
[18] she was having sleep issues, serious sleep
[19] problems when she was at the MDC and came to
[20] Carswell.
[21]    Correct?
[22]
[23]    A: No.
[24]    Q: Did you mention any sleep
[25] deprivation or — not sleep deprivation, sleep

Page 43

L. POWERS

[1]
[2] impairment issues in your first report?
[3]    A: I may have, yes, because she
[4] reported them to me.
[5]    Q: So, how long was Dr. Siddiqui
[6] there before you wrote this report in May of
[7] 2008?
[8]    A: I think she was there for three
[9] weeks, maybe.
[10]    Q: And, so, you had not either
[11] discussed with your staff or confirmed whether
[12] or not Dr. Siddiqui was having sleep issues
[13] when you represented it in the report and just
[14] took it as a self-report?
[15]    A: At that point, yes.
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 44

L. POWERS

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]    Q: She came to — my understanding
[13] is she came to Carswell with a diagnosis of
[14] major depression, psychotic disorder.
[15]    A: I don't know what she — she
[16] hadn't had an evaluation before she came to
[17] Carswell, so I'm not sure.
[18]    Q: How about the Bureau of Prisons
[19] psychiatrists here, did they diagnose her at
[20] MDC?
[21]    A: I'm not sure. I'd have to review
[22] the —
[23]    Q: Did you review any of those
[24] records before you wrote your first report?
[25]    A: I reviewed whatever I had sent to

Page 45

**L. POWERS**

[1]
[2] me.
[3] **Q:** Okay.
[4] And did you have any
[5] conversations with the treating psychiatrist
[6] from the MDC before you wrote your first
[7] report?
[8] **A:** No.
[9] **Q:** Have you had any conversations
[10] with the treating psychiatrist at the MDC
[11] before you wrote your second report?
[12] **A:** No.
[13] **Q:** Have you reviewed the sleep log
[14] from the Metropolitan Detention Center before
[15] you wrote your second report?
[16] **A:** Are you talking about just the
[17] log that we just talked about?
[18] Not sleep log, but just a log?
[19] **Q:** Well, the log from the
[20] Metropolitan Detention Center.
[21] **A:** Yes, I have reviewed that, yes.
[22] **Q:** But you haven't charted it?
[23] **A:** I haven't charted it, no.
[24] **Q:** So, your assumption that Dr.
[25] Siddiqui did not have sleep issues comes from

Page 46

**L. POWERS**

[1]
[2] — from which — what do you base that on?
[3] **A:** As I stated, I based it on the
[4] fact that the nurses reported in the mornings
[5] that she did not have problems, even after I
[6] asked them to pay special attention to her
[7] sleep patterns while she was at Carswell.
[8] **Q:** Didn't she report to Dr. Kemke
[9] that she was having problems sleeping?
[10] **A:** Yes.
[11] **Q:** And didn't you have access to
[12] those reports?
[13] **A:** I did.
[14] **Q:** How often did she report to Dr.
[15] Kemke that she was having problems sleeping?
[16] **A:** I'm not sure.
[17] I remember reading it in the
[18] medical record.
[19] **THE WITNESS:** You want that
[20] back?
[21] **MS. CARDI:** That's his.
[22] **Q:** Does Dr. Siddiqui sleep with a
[23] blanket over her head while at Carswell?
[24] **A:** I've never been — I never noted
[25] or had anyone note that to me, that she slept

Page 47

**L. POWERS**

[1]
[2] with a blanket over her head.
[3] **Q:** Dr. Kicharski comments in his
[4] report that his review of the log indicates
[5] that there are 24-hour periods when she barely
[6] sleeps at all and then sleeps a little bit,
[7] after reviewing the log.
[8] **A:** Uh-huh.
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20] **Q:** I'm going to show you Dr.
[21] Kicharski's report, Page 13, Paragraph 3, and
[22] it starts with: She evidenced significant
[23] sleep disorder at the Metropolitan Detention
[24] Center, Brooklyn, with documented record of
[25] one or two hours of sleep over a significant

Page 48

**L. POWERS**

[1]
[2] period.
[3] **A:** Right.
[4] He did not give specific dates
[5] for that, but he did in another section give
[6] dates which I had looked up and did not see
[7] that there was a huge difference in sleep. I
[8] didn't see that there was a huge concern over
[9] sleep on some of the dates that he gave.
[10] **Q:** You would concede that —
[11] withdrawn.
[12] You would concede, however, that
[13] if she was suffering from an inability to
[14] sleep or having sleep interruptions, that it
[15] would impact on her mental health and could
[16] impact on a diagnosis.
[17] **A:** No.
[18] That's just one clue. There's no
[19] diagnosis. I mean, you can get into the sleep
[20] disorders, which is a separate thing. But
[21] with regards to outside the realm of sleep
[22] disorders — sleep is just one component that
[23] in and of itself is not indicative of any one
[24] particular diagnostic criteria.
[25] **Q:** So, you talked about the issue of

[1] **L. POWERS**
[2] sleep.
[3]     What other — what other symptoms
[4] did Dr. Siddiqui exhibit when you first
[5] examined her that indicated to you that she
[6] was suffering from a mental disorder and was
[7] incompetent?
[8]     A: She was very distraught about her
[9] experience at the MDC and felt as though that
[10] she was tortured by the dark angels. Her
[11] explanation of that and the trauma that she
[12] appeared — that it caused her, she was very
[13] distraught, she was crying, she was very
[14] upset, and had a real — had a way of
[15] explaining it that wasn't — she didn't use,
[16] you know, the officers of the MDC, she said
[17] the dark angels. She made it seem as though
[18] it was a kind of out-of-reality kind of
[19] experience. Led me to believe that she was
[20] having some psychotic process.
[21]     And, as I said in my report, the
[22] first time I wasn't sure about the PTSD.
[23] That's why I gave it a rule-out. But had she
[24] been, as I state in my first report, a
[25] prisoner of war at some point, this could have

[1] **L. POWERS**
[2] been related to that, so I left it open in
[3] that first report about the PTSD diagnosis as
[4] a result.
[5]     She was also having
[6] hallucinations or reporting hallucinations of
[7] seeing her children. And at the time, that
[8] was pertinent because had she been a prisoner
[9] of war, that would have been congruent with
[10] what she was stating she was depressed about.
[11]     Q: Correct me if I'm wrong, from
[12] your perspective, your professional opinion is
[13] had she been tortured, had she been a prisoner
[14] of war or kept incarcerated in some fashion,
[15] that these symptoms would have been an
[16] indication of what?
[17]     A: Posttraumatic stress disorder,
[18] which could have had some implications for
[19] psychosis. There's not tons of research on
[20] war victims, but what is out there, psychotic
[21] symptoms relating to the trauma is not
[22] uncommon.
[23]     So, had that been the case, that
[24] would certainly — would certainly be a
[25] possible.

[1] **L. POWERS**
[2]     Q: What other diagnoses did you
[3] consider given those symptoms when you first
[4] — when she first a presented at Carswell?
[5]     A: Adjustment disorder.
[6] And a lot of times, we get folks
[7] coming in that are crying and upset. If that
[8] persists over time and they just are having a
[9] very difficult time adjusting, then I will
[10] consider an adjustment disorder. So, that was
[11] a possibility.
[12]     Q: And that was it, the two that you
[13] just mentioned.
[14]     Right?
[15]     A: Well, anytime somebody's
[16] reporting psychotic symptoms, I mean, there's
[17] a whole host of working diagnoses that I had
[18] with her when she came in. Reporting the
[19] psychotic symptoms, of course, you know, I
[20] file it, and it could be indicative of any
[21] kind of psychiatric disorder; schizophrenia,
[22] delusional disorder, any of those.
[23]     So, those are certainly things
[24] that I consider in the beginning. And then
[25] the process is, you know, over time, hopefully

[1] **L. POWERS**
[2] with collateral, with clinical interviews with
[3] the defendant, you can kind of start weeding
[4] through that and figure out and through
[5] testing and things like that.
[6]     So, I had several working
[7] diagnoses at the beginning based on her
[8] reports of being depressed and based on her
[9] reports of hallucinations.
[10]     Q: How did you rule out delusional
[11] disorder in your first report?
[12]     A: Delusional disorder is really —
[13] it's about nonbizarre delusions that are
[14] pervasive. I didn't see that with her.
[15]     What she was reporting was
[16] hallucinatory experiences, which are, you
[17] know, seeing her children and things like
[18] that. And, also, she was not reporting
[19] anything that would indicate that she was
[20] having bizarre or strange beliefs other than
[21] the use of force here at MDC, which indicated
[22] that the whole black angels issue, to me was
[23] explained under a psychotic disorder under
[24] depression.
[25]     So, that's why I diagnosed her

**Page 53**

L. POWERS

[1]
[2] with depression with psychotic features.
[3]
[4]
[5]
[6]
[7]
[8] :
[9]    Q: When she reported to you, right,
[10] you got reports from her, correct, that she
[11] was held captive and that she had been
[12] tortured?
[13]    Correct?
[14]    A: Are you talking about MDC or just
[15] in her past?
[16]    Q: When you were examining her, in
[17] her past, she reported to you those — those
[18] experiences.
[19]    Correct?
[20]    A: Uh-huh.
[21] At the time, I took those
[22] experiences as real product of what she
[23] probably went through. And I was getting
[24] three to four phone calls from Ms. Fink and
[25] her attorney, Ms. Kunsler, telling me pretty

**Page 54**

L. POWERS

[1]
[2] much that — with pretty good certainty that
[3] she had been a prisoner of war. So, those
[4] were not viewed as anything atypical, outside
[5] of the fact that she was likely a prisoner of
[6] war and was reporting actual events.
[7]    Q: Would it be fair to say you
[8] really don't know what happened to Dr.
[9] Siddiqui in those five years that she was
[10] missing?
[11]    A: Yes, that's fair, I don't know.
[12] But from looking at the FBI logs,
[13] there were some indications that she wasn't
[14] held captive during that entire time. But I
[15] don't know.
[16]    Q: When you say wasn't held captive
[17] during that entire time, there's nothing in
[18] the FBI logs, for example, that indicates
[19] whether or not she was held by the ISI in
[20] Pakistan.
[21]    Correct?
[22]    A: I don't recall reading that.
[23]    Q: So, she could have been held by
[24] Al Qaeda.
[25]    Correct?

**Page 55**

L. POWERS

[1]
[2]    A: I believe from what I read in the
[3] FBI reports, she reports actually being out
[4] and about; you know, reports seeing her
[5] sister's ad on a van. So, there were things
[6] — I didn't bring the little snippets that
[7] were in the FBI report — didn't get that she
[8] was actually held captive during that entire
[9] time, at least. She did — and the FBI
[10] reports indicate that she was out and about at
[11] times.
[12]    Q: So, you see her in the FBI
[13] reports as an accurate reporter?
[14]    A: Given — yeah, I assumed that was
[15] fairly accurate.
[16]    Q: Did you think that her
[17] description in the FBI reports indicated some
[18] thought disorder or tangentiality in the way
[19] she described things?
[20]    A: I didn't get that from the FBI
[21] reports.
[22]    Q: Would it be fair to say that if
[23] you look at the FBI reports, you can't tell
[24] where she was in 2003 or 2004 or 2005 or 2006
[25] or 2007 or 2008?

**Page 56**

L. POWERS

[1]
[2]    You can't tell?
[3]    A: No, she doesn't say where she was
[4] specifically during those times, but each year
[5] she mentions being — doing something during
[6] that year that wouldn't have been conducive to
[7] being captive.
[8]    Q: Like what?
[9]    A: She mentions, like I said, seeing
[10] her sister's — can I see my report?
[11]    I think I wrote about it in my
[12] report.
[13]    Q: Sure.
[14]    MR. LAVIGNE: Exhibit C.
[15] For the record, that's the
[16] redacted version.
[17]    A: She reported living with a
[18] certain family in —
[19]    Q: What page are we on?
[20]    A: I'm sorry, Page 7.
[21]    Q: Okay.
[22]    A: In 2005, she reported living with
[23] them and working at the Karachi Institute of
[24] Technology.
[25]    In the winter of 2007, she

**L. POWERS**

[1]
[2] reported looking for her husband.
[3]     And I think there was another
[4] place in there where she reports seeing her
[5] sister's ad on a bus or something, so she knew
[6] that her sister was practicing over there.
[7]     Q: So, that was sufficient for you
[8] to think that between 2003 and 2008 she was
[9] not held captive or under any threats or
[10] pressure from any individuals?
[11]     A: It was very vastly different from
[12] the original report that she was held captive
[13] during that entire time.
[14]     Q: And when you went back to do the
[15] second report, would it be fair to say you
[16] didn't really reach out to Mr. Edgar and I to
[17] ask whether or not — or our opinion of what
[18] had happened to her between 2007 and 2008 had
[19] changed in any way?
[20]     Correct?
[21]     A: I believe I did talk to you guys,
[22] but I don't think I specifically asked that
[23] question.
[24]     Q: Would it be fair to say that when
[25] we did have a conversation, that we did say

**L. POWERS**

[1]
[2] that what happened to her in those years was
[3] crucial, critical, in terms of a diagnosis?
[4]     A: Uh-huh.
[5]     Q: And it would be fair to say,
[6] then, that, for example, if she had been held
[7] captive by Al Qaeda, if she had been held
[8] captive by the ISI, if she had been held
[9] captive by the CIA, if any — or the Taliban
[10] or any other group or organization, that that
[11] would have an impact on your diagnosis?
[12]     A: There's no question.
[13]     Q: And how do you think that would
[14] impact on your present diagnosis of competency
[15] if this were accurate?
[16]     A: I'm not sure.
[17] I would — my opinion at this
[18] point is that she is competent based on her
[19] knowledge of the court system and the things
[20] that she — the statements that she made.
[21]     So, it would certainly impact me
[22] giving the PTSD diagnosis another shot, but
[23] whether that would impact her ability to
[24] assist her attorney, I'm not sure that that
[25] would — I'm not sure.

**L. POWERS**

[1]
[2]     Q: How did you — what about the
[3] report of the loss or murder or captivity of
[4] her children?
[5]     What impact does that have on
[6] your diagnosis?
[7]     A: As a mother, I can only assume
[8] that would be a very, very serious blow, very
[9] serious — causing distress to not know where
[10] your children are.
[11]     If there were documents presented
[12] to me that adamantly stated that this was all
[13] true, then I certainly would expect her to be
[14] in distress, and it would provide an
[15] explanation for some of her atypical symptoms
[16] that I...
[17]     Q: Would you then credit her
[18] reporting of her children visiting her room
[19] and her fears that she exhibits in regard to
[20] their safety, would you then credit those
[21] reports if you had some corroborating data?
[22]     A: Well, obviously, the fear of her
[23] safety. Her hallucinations are still
[24] questionable to me just because of the way
[25] that they were presented. But, you know,

**L. POWERS**

[1]
[2] obviously, if that were true and found out to
[3] be true, her reporting that she fears where
[4] her children are would certainly be a concern.
[5]     Q: I mean, would it be fair to say,
[6] Dr. Powers, that you have received no
[7] substantiation from any source as to what has
[8] happened to those two missing children?
[9]     Is that correct?
[10]     A: That is correct, other than just
[11] her ex-husband's beliefs that they're okay.
[12] That's it.
[13]     Q: And do you credit her
[14] ex-husband's beliefs that they're okay?
[15]     A: I didn't.
[16]     Q: Okay.
[17]     A: I didn't one way or the other.
[18] It wasn't that I didn't, I just...
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 61

[1]                     **L. POWERS**

[2]

[3]

[4]     Q: Don't you think that —

[5] withdrawn.

[6]     Dr. Siddiqui reports throughout

[7] her stay at Carswell her fears concerning the

[8] safety of those children, her fears concerning

[9] that they are dead, her fears about whether or

[10] not she can speak because if she speaks her

[11] children may be harmed.

[12]     A: Right.

[13]     Q: How do you reconcile that with

[14] your diagnosis?

[15]     A: I have, first of all, no

[16] verification that that's true one way or the

[17] other.

[18]

[19]

[20]

[21]

[22]

[23]     Q: Well, what verification do we

[24] have that they're not missing?

[25]     A: We don't know one way or the

Page 62

[1]                     **L. POWERS**

[2] other, that I'm aware of. I haven't seen any

[3] data one way or the other.

[4]     Q: Okay.

[5] And we know that one child, one

[6] of the three children, is not missing.

[7] Correct?

[8]     A: Uh-huh, her son.

[9]     Q: But the other two are gone, for

[10] all purposes.

[11] Correct?

[12]     A: I don't know if they're gone.

[13]

[14]     Q: You've never heard Dr. Siddiqui

[15] have any conversation with anyone where she

[16] told anyone where she thought her children

[17] were.

[18]     Right?

[19]     A: Yes, she has reported, but that

[20] doesn't — I mean, she's reported a lot of

[21] things. It doesn't necessarily mean it's

[22] true.

[23]     Q: When you are trying to figure out

[24] what is true in terms of the import it has on

[25] your diagnosis, how do you do that in a

Page 63

[1]                     **L. POWERS**

[2] situation like this?

[3]     A: It's very difficult, but in light

[4] of there's no other information whatsoever

[5] except for her self-report that her children

[6] are missing, it wasn't a huge factor.

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]     Q: Maybe I'm — correct me if I'm

[22] wrong. Some of the things that she reports to

[23] the FBI that are reported in the logs, which

[24] are called 302s, you believe that Dr. Siddiqui

[25] is accurate reporter.

Page 64

[1]                     **L. POWERS**

[2]     Correct?

[3]     A: Yes.

[4]     Q: And some of the things she

[5] reports in those very same logs you now

[6] question as whether or not they're accurate.

[7]     Correct?

[8] Am I just correct, yes?

[9]     A: Well, when I —

[10]     Q: Just answer, am I correct?

[11]     A: I can't answer it because I'm not

[12] qualified.

[13]     Q: Well, her report that her

[14] children are missing, she says that. You

[15] don't credit that.

[16]     Am I correct?

[17]

[18]

[19]

[20]     Q: In the FBI interviews or any

[21] time, you don't credit that.

[22]     Correct?

[23]     A: By not crediting it, I don't —

[24]     Q: You don't think it's true.

[25]     A: No, I didn't say that I don't

Page 65

**L. POWERS**

[1]
[2] think it's true. I don't know. So, I'm not
[3] judging one way or the other.
[4]    Q: Well, then, you would — you
[5] testified that she reported, for example, that
[6] she lived here, here, and here during certain
[7] years, and you credited that as accurate.
[8]    Correct?
[9]    A: Yes.
[10]    Q: She's also reported that her
[11] children are missing, they've been tortured,
[12] they are in danger. You have not credited
[13] that report.
[14]    Correct?
[15]    A: That is correct.
[16]    Q: And what is the basis for you to
[17] credit some information and not credit other
[18] information?
[19]    A: I'm not sure.
[20]    Q: And if, in fact, the information
[21] in regard to her children is, in fact, true
[22] and accurate, how does that impact on your
[23] present diagnosis of competency?
[24]    A: I don't think that it would
[25] impact my present diagnosis of competency or

Page 66

**L. POWERS**

[1]
[2] my opinion of competency, but it may impact my
[3] diagnostic opinions, in that I would — it
[4] would have a better explanation for some of
[5] her presentation when she first arrived at the
[6] MDC and — I'm sorry, at Carswell, and, also,
[7] the more congruent hallucinations.
[8]    Well, her moods would be a little
[9] more explained. I would expect someone who
[10] lost their children to be very sad and
[11] depressed.
[12]    Q: But what about her hypnogogic or
[13] hallucinatory experiences about the children?
[14]    A: I would look at it again, but I
[15] would think that someone who has hypnogogic
[16] hallucinations, that's not a diagnostic
[17] criteria.
[18]    Q: For what?
[19]    A: A disorder; maybe a sleep
[20] disorder. That's not — hypnogogic delusions
[21] are...
[22]    Q: Wouldn't it also be an element or
[23] a symptom for delusional disorder?
[24]    A: Hypnogogic hallucinations?
[25]    Q: Yeah.

Page 67

**L. POWERS**

[1]
[2]    A: I don't think so.
[3]    B: I mean, that's sleep-induced,
[4] when you're coming out of being asleep, I
[5] think that's a common phenomena. I don't
[6] think that's criteria for a delusional
[7] disorder.
[8]    Q: So, you wouldn't consider her
[9] reportage of those kinds of — what seemingly
[10] are bizarre experiences, correct, you would
[11] consider her reports are bizarre about seeing
[12] her children, hearing her children, her
[13] children coming and saving food for them?
[14]    A: If they were bizarre, they would
[15] fall under another category. It wouldn't be
[16] delusional, delusional nonbizarric disorder.
[17]    Q: So, what would they fall under?
[18] Which categories?
[19]    A: Psychotic disorders.
[20]    Q: And hasn't Dr. Kemke found that
[21] her diagnosis of Dr. Siddiqui is that she's
[22] psychotic?
[23]    A: Yes.
[24]
[25]

Page 68

**L. POWERS**

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 69

[1]                    **L. POWERS**
[2]
[3]
[4]
[5]
[6]
[7] 1
[8]    Q: I'm going to show you Bates Stamp
[9] No. 797, and I'm going to refer you to — one
[10] second.
[11]    I'm going to refer you to
[12] Paragraph 1 — I'm going to refer you to
[13] Paragraph 2 and 3, and I'd like you to —
[14] that's an interview of her husband — her
[15] ex-husband
[16]    A: Okay.
[17] You said Paragraphs 2 and 3?
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 71

[1]                    **L. POWERS**
[2] opinion about her diagnosis.
[3]    Q: Okay.
[4] Explain to me the role it would
[5] play.
[6]    A: As I said in the first report,
[7] her symptoms were very atypical, they weren't
[8] what we'd normally see with someone who did
[9] not have a trauma history. As I stated in the
[10] first report, if she were to be found to be a
[11] victim of war, a trauma victim, then her
[12] atypical symptoms could possibly be explained
[13] under that umbrella.
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 70

[1]                    **L. POWERS**
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]    Q: So, my question is: Does that
[15] corroborate for you in any way that, in fact,
[16] Dr. Siddiqui might have been in serious danger
[17] during that period of time?
[18]    A: It certainly seems to indicate
[19] that.
[20]    Q: Does that change in any way your
[21] professional opinion in regard to her
[22] competency?
[23]    A: It — I don't think that it would
[24] change my opinion with regard to her
[25] competency, but it may play a role in my

Page 72

[1]                    **L. POWERS**
[2]
[3]    Q: Is it — hypothetically, if Ms.
[4] Siddiqui, in fact, was in danger from whatever
[5] source, in serious danger, how would that
[6] impact on your diagnosis of her today?
[7]    A: I would consider PTSD more
[8] strongly.
[9]    Q: Okay.
[10] If you learned that her children
[11] had been held captive and murdered, how would
[12] that impact on your diagnosis today?
[13]    A: I would consider PTSD more
[14] strongly.
[15]    Q: If you learned that she was the
[16] victim of serious domestic violence in her
[17] first marriage, how would that impact on your
[18] diagnosis today?
[19]    A: Again, PTSD.
[20]
[21]
[22]
[23]
[24]
[25]

Page 73

[1]           **L. POWERS**

[2]

[3]

[4]

[5]

[6]

[7]    **Q:** She reports that she was subject

[8] to a fatwa and forced to do research for the

[9] sake of religion and mentions issues and an

[10] individual who ordered the fatwa.

[11]

[12]   **Q:** If that turned out to be true,

[13] how would that impact on your diagnosis of her

[14] today?

[15]

[16]

[17]

[18]   **MS. CARDI:** Bates No. 234.

[19]   **MR. LAVIGNE:** Okay.

[20]   **MS. CARDI:** And then Bates No.

[21] 400 and 401.

[22]   **A:** Again, I would consider PTSD.

[23]   **Q:** Okay.

[24] Doctor, did you have — I believe

[25] that you — did you review the reports from

Page 74

[1]           **L. POWERS**

[2] her professors at MIT and Brandeiss in regard

[3] to her being subjected to domestic violence in

[4] her first marriage?

[5]   **A:** I did.

[6]   **Q:** And would it be fair to say that

[7] they corroborate at least the reports of

[8] domestic violence in their reports by saying

[9] they observed injuries to her?

[10]   **A:** It could be, yes.

[11]   **Q:** How does that impact on your

[12] diagnosis and your findings in regard to Dr.

[13] Siddiqui today?

[14]   **A:** It's certainly consideration for

[15] a PTSD diagnosis.

[16]   **Q:** Would it be — would any of these

[17] things be a consideration for any other

[18] diagnosis, besides the PTSD diagnosis?

[19]   **A:** That's the only one, I think.

[20] You know, I would expect someone

[21] if their children were abducted to have

[22] depression, but it would be a situational

[23] depression, so it wouldn't necessarily meet

[24] the criteria for major depressive disorder.

[25]   So, PTSD, I think would be...

Page 75

[1]           **L. POWERS**

[2]   **Q:** If all these things are true,

[3] does it change your position about Dr.

[4] Siddiqui's competency today?

[5]   **A:** No, it does not.

[6]   **Q:** Is — I forgot to ask this, is

[7] sleep disorder a prodromal sign of mental

[8] illness?

[9]

[10]

[11]   **MS. CARDI:** Prodromal signs of

[12] mental illness.

[13]   **A:** I don't know what that means.

[14]   **MR. LAVIGNE:** Could you spell

[15] that?

[16]   **MS. CARDI:** P-R-O-D-R-O-M-A-L.

[17]   **Q:** Now let's talk about her

[18] tangential thinking, okay?

[19]   Describe for us what you

[20] understand tangential thinking to be.

[21]   **A:** Where they start out on one topic

[22] and jump from one topic to another.

[23]   **Q:** So, you report in your first

[24] report that when you met — first met, I

[25] believe, Dr. Siddiqui, that she exhibited

Page 76

[1]           **L. POWERS**

[2] tangential thinking.

[3]   Correct?

[4]   **A:** Uh-huh.

[5]   **Q:** How did she exhibit that to you?

[6]   **A:** Just as I just stated, she'd

[7] start out — it was specifically at the R&D,

[8] where she first came in. She was talking

[9] about the use of force and the dark angels and

[10] not wanting to submit to the strip search and

[11] was really jumping from one to the other so

[12] quickly it was hard for me to keep up with

[13] what she was saying at times.

[14]   **Q:** And did she at any other time

[15] exhibit tangential thinking when she was

[16] speaking with you?

[17]   **A:** Yeah, I spoke with her very

[18] little, but I think another time when I did

[19] have a conversation with her she did — was

[20] talking about her experience at the MDC and

[21] then jumped back to her experience at

[22] Carswell.

[23]   **Q:** And do you remember when that

[24] conversation occurred?

[25]   **A:** No, I don't, not without having

Page 77

**L. POWERS**

[1]
[2] my notes in front of me.
[3]       THE VIDEOGRAPHER: Excuse me,
[4] counsel.
[5]       You have five minutes of tape
[6] left.
[7]       MS. CARDI: Okay.
[8]       Q: Would it be fair to say that
[9] other individuals who are employed at Carswell
[10] have observed and reported her tangential
[11] thinking?
[12]       A: Yes.
[13]       Q: And that would include Mr. McGee,
[14] the social worker?
[15]       A: Yes.
[16]       Q: What do you understand or recall
[17] about his reports of her tangential thinking?
[18]       A: You mean just in — I don't know
[19] what you're asking.
[20]       Q: He reports that.
[21] Correct?
[22]       A: Uh-huh.
[23]       Q: That she thinks in a tangential
[24] manner, that she's hard to follow.
[25]       A: Yes.

Page 78

**L. POWERS**

[1]
[2]       Q: That she has to be redirected
[3] back to her point or the direction of the
[4] conversation. And he reports that on more
[5] than one occasion.
[6]       Correct?
[7]       A: Yes.
[8]       Q: Including recently.
[9] Correct?
[10]       A: Yes.
[11]       Q: And Dr. Kemke, who sees her quite
[12] often, also reports that she is subject to
[13] tangential thinking, that she is hard to
[14] follow, that she goes off point, that she has
[15] to be redirected back to the point.
[16]       Isn't that correct?
[17]       A: Yes.
[18]       Q: And Dr. Kemke, who sees her quite
[19] frequently, reports it on a more frequent and
[20] current basis.
[21]       Correct?
[22]       A: Yes.
[23]       Q: Isn't it also true that — that
[24] in reviewing some of the transcripts of her
[25] conversations with her brother — and I think

Page 79

**L. POWERS**

[1]
[2] you have reviewed some of those transcripts —
[3] that you see indications of tangential
[4] thinking with her brother, she goes off topic,
[5] she needs to be redirected —
[6]       A: Yes.
[7]       Q: — she can be very confusing.
[8] And that's true up until today,
[9] correct — the last time you saw her?
[10]       A: Yes.
[11]       Q: Would it be also true if you look
[12] at the transcripts of her conversations with
[13] the Pakistani Embassy, the representative
[14] there, there's an indication that she is also
[15] subject to tangential thinking in her
[16] conversations with the Embassy officials?
[17]       Correct?
[18]       A: Yes.
[19]       Q: So, tangential thinking is — how
[20] do you — what impact does Dr. Siddiqui's
[21] tangential thinking have on your diagnosis of
[22] Dr. Siddiqui?
[23]       A: It's a clue for a working
[24] diagnosis that could indicate a number of
[25] different diagnoses; mostly, psychosis.

Page 80

**L. POWERS**

[1]
[2]       Q: And psychosis, what kinds of
[3] diagnoses are you referring to?
[4]       A: Schizophrenia.
[5]       Q: Any other?
[6]       A: Uh-uh.
[7]       Q: Not delusional disorder?
[8]       A: No, delusional disorder doesn't
[9] have the component of tangential thinking.
[10]       Q: How about depression?
[11]       A: You can have some of that in
[12] depression; it's going to be viewed a
[13] different way, but you could have some of that
[14] in depression. It would be — it would be a
[15] clue, but I don't think that's necessarily a
[16] criteria for depression.
[17]       Q: If Dr. Siddiqui is psychotic,
[18] does that change your position about her
[19] competency?
[20]       A: It could, yes.
[21]       Q: Okay.
[22] In what way?
[23]       A: Because if someone's psychotic,
[24] they're not thinking reality, they're very
[25] much thinking outside of reality, and, so, it

Page 81

**L. POWERS**
[1]
[2] may be difficult for her to assist her
[3] attorneys.
[4]    Q: For example, could you give me an
[5] example of how it would be difficult for her
[6] to assist me if she's psychotic?
[7]    A: Well, because she would not be
[8] thinking in the moment rationally. She would
[9] be — hypothetically, she would be thinking of
[10] things that were irrelevant, maybe, to the
[11] situation or things that wouldn't help in her
[12] defense.
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]    Q: If she's suffering from
[22] tangential thinking, wouldn't it impact her
[23] ability to report information to her attorneys
[24] that we would need in order to properly defend
[25] her?

Page 82

**L. POWERS**
[1]
[2]    A: If she was — the key is if she's
[3] not redirectable. If she cannot be redirected
[4] at all, that would definitely be
[5] consideration.
[6]    Q: Have you seen anywhere in the
[7] reports that you've read that she's
[8] redirectable in any significant way?
[9]    A: I don't recall.
[10]    Q: And would it be fair to say that
[11] Dr. Kemke reports that she is not
[12] redirectable?
[13]    A: I think Dr. Kemke used those
[14] words.
[15]    Q: So, if she is not redirectable,
[16] then wouldn't that have an impact on her
[17] ability to assist me, her attorney, or any
[18] attorney in defending her?
[19]    A: It would be a concern, yes.
[20]    Q: And isn't it — wouldn't it be
[21] true that her tangential thinking and
[22] reporting would impact on whether or not she
[23] could allocute to a plea?
[24]    A: It could.
[25]

Page 83

**L. POWERS**
[1]
[2]    .
[3]
[4]    Q: Whether or not she would be
[5] capable of actually, intellectually,
[6] knowingly, and voluntarily, and waiving her
[7] rights and pleading guilty to a charge.
[8]    MR. LAVIGNE: Is the question if
[9] somebody suffers from tangential
[10] thinking —
[11]    MS. CARDI: Yes
[12] MR. LAVIGNE: — then all those
[13] things could be affected?
[14]    MS. CARDI: Correct.
[15]    MR. LAVIGNE: Okay.
[16]    A: Yes.
[17]    Q: And in what way?
[18]    A: If somebody suffers from
[19] tangential thinking, somebody's psychotic or
[20] hasn't been otherwise disordered, that it
[21] encompasses that, then it could affect their
[22] ability to understand the plea bargain process
[23] by them just not being able to think in
[24] reality; they're thinking about things that
[25] are irrelevant to the case rather than

Page 84

**L. POWERS**
[1]
[2] focussing on the case.
[3]    THE VIDEOGRAPHER: Excuse me,
[4] ma'am. I need to change tape.
[5]    MS. CARDI: You want to take a
[6] break?
[7]    THE VIDEOGRAPHER: Time is now
[8] 2:10 p.m. This marks the ending of Tape
[9] No. 1.
[10]    Off the record.
[11]    (Recess taken)
[12]    THE VIDEOGRAPHER: Time is now
[13] 2:26 p.m. This marks the beginning of
[14] Tape No. 2.
[15]    On the record.
[16]    Q: Okay, Dr. Powers, would it be
[17] accurate to state or would you agree that Dr.
[18] Siddiqui reports a fair amount of paranoid
[19] behavior?
[20]    A: Yes.
[21]    Q: And that she actually exhibits a
[22] fair amount of paranoid behavior?
[23]    A: She — yes.
[24]    Q: And give me, for us, what
[25] examples you think of when you answer that

Page 85

**L. POWERS**

[1]
[2] question affirmatively.
[3]    A: She at one point felt like she
[4] was being poisoned. Another point, she made a
[5] list of people she thought were out to harm
[6] her.
[7]    Q: Uh-huh.
[8] And does she also at one point
[9] fear that inmates were setting her up to be
[10] killed?
[11]    Do you recall that?
[12]    A: I — not specifically, no.
[13]    Q: And how about when she accuses
[14] the guards of trying to attack her?
[15]    A: I haven't read that.
[16]    Q: You haven't read that. Okay.
[17] Well, what do you make of these
[18] delusions?
[19]    A: I think that her — some of her
[20] beliefs are really not that incongruent with
[21] someone who is not familiar with our system
[22] here, doesn't know what the prison system is
[23] like, doesn't have an idea of who's on her
[24] side, who's not on her side.
[25]    And I felt like some of her

Page 86

**L. POWERS**

[1]
[2] paranoia is based on the fact that she is not
[3] from this country and maybe nervous about
[4] being incarcerated in this country.
[5]    Q: Then how do you account for the
[6] fact that she spent, you know, almost ten
[7] years being educated in the best — some of
[8] the best universities in this country with,
[9] you know, your opinion?
[10]    A: Well, she was incarcerated during
[11] this time, so I'm expecting that she — and
[12] she was also not accused of a federal crime at
[13] that time. So, I think that some of that
[14] element of delusional kind of thinking is, or
[15] what appears to be delusional thinking, is
[16] explained in the fact that she is a little
[17] nervous being held for a federal crime that
[18] involves kind of international issues.
[19]    Q: But she talks about really very
[20] paranoid behavior, that people are out to get
[21] her, in a way that's different from other
[22] defendants.
[23]    Correct?
[24] You know, more normal
[25] defendants.

Page 87

**L. POWERS**

[1]
[2]    A: She talks about delusional
[3] content in — repeat the question.
[4]    Q: Paranoid, she's paranoid that the
[5] judge is trying to destroy her, the guards are
[6] trying to destroy her; you know, people are
[7] trying to poison her food, she — the video of
[8] the forced search is going to be put over the
[9] internet; her attorneys are arms of the
[10] Government and out to, you know, harm her; her
[11] brother, if he doesn't agree with her, she
[12] accuses him of being part of the conspiracy to
[13] get her.
[14]    She talks about, you know, all of
[15] these — all of these descriptions. Your
[16] staff, yourself, you're part of the, you know,
[17] the armed — the Government who's out to get
[18] her and harm her.
[19]    How do you reconcile that
[20] paranoia with your diagnosis and your findings
[21] of competency?
[22]    A: Two things.
[23] One is that her basis of people
[24] being out to get her, I don't think — I've
[25] never had another case where the person was

Page 88

**L. POWERS**

[1]
[2] accused on such an international level. So,
[3] some of it, I think, can be viewed in light of
[4] a normal reaction being held under these
[5] circumstances.
[6]    The other thing is that I think
[7] she has shown consistently a vested interest
[8] in getting her story out. She has — when she
[9] talks to NBC, she is sure to share situations
[10] that have happened to her. And, so, I think
[11] she also has a vested interest in making sure
[12] that the media reports her as someone who's
[13] experiencing some significant trauma.
[14]    Q: So, it's the mere fact that she
[15] reports that to the Embassy weighs — how does
[16] that weigh in on all of the other examples of
[17] paranoid behavior?
[18]    A: She also reports that to other
[19] people who I believe she thinks can get the
[20] word out to the warden. If someone is truly
[21] paranoid — she picks very high profile people
[22] to report her paranoia to; the warden for,
[23] instance, the Consulate. She's asked her
[24] brother: Are you telling the media this?
[25]    Wanting him to. During the

Page 89

**L. POWERS**

[1]
[2] forced cell move: I hope you get a video and
[3] show the world what you're doing to me.
[4]     So, I think that there's an
[5] element of her presentation that is definitely
[6] motivated for the media.
[7]     **Q:** Don't some paranoid people, for
[8] example, want their fears and their — this
[9] paranoid mistreatment reported?
[10]     Isn't that — that's not — it's
[11] not mutually exclusive, is what I'm saying.
[12]     You can be paranoid, correct, and
[13] you can still want people to know —
[14]     **A:** Sure.
[15]     **Q:** — that you're being, you know,
[16] attacked or you're being — there's a great
[17] conspiracy against you, or the forces want to
[18] kill you, the FBI is listening through your
[19] walls.
[20]     **A:** Yes.
[21]     **Q:** And you can be very much
[22] paranoid.
[23]     Correct?
[24]     **A:** Yes.
[25]     **Q:** How did you decide here that

Page 90

**L. POWERS**

[1]
[2] that's not the case with Dr. Siddiqui?
[3]     **A:** Because there were specific
[4] examples of her being paranoid that didn't —
[5] her behavior didn't match what her report
[6] was.
[7]     Specifically with the dark
[8] angels, that was a very important key point in
[9] both of my reports in that she believed that
[10] these dark angels — even reporting she
[11] weren't sure exactly what the dark angels
[12] were, she reported to her husband as if they
[13] might be inhuman — unhuman form. Not to her
[14] husband, to her brother, sorry.
[15]     So, the idea that this delusional
[16] process of this forced cell move was, in her
[17] mind, this dark angels and the Court was
[18] killing her. When I looked at her behavior
[19] just after the forced cell move through the
[20] logs, it wasn't really indicative of someone
[21] who's trauma — who had been traumatized to
[22] the level that she was saying that she was
[23] traumatized.
[24]     Also, the video of the forced
[25] cell move did not — again, I said earlier in

Page 91

**L. POWERS**

[1]
[2] my testimony, I expected to see someone who
[3] was very traumatized, very beaten down, if you
[4] will, and she was very much in control of that
[5] situation with regards to verbally making
[6] statements and arguing and all that stuff,
[7] which is not at all what I would have expected
[8] to see given what she was reporting as
[9] delusional, dark angels, and those kind of
[10] things. It just didn't go.
[11]     **Q:** When you watched that video, you
[12] didn't think she was being traumatized?
[13]     **A:** No.
[14] I thought she was angry.
[15]     **Q:** But you did not think she was
[16] being traumatized?
[17]     **A:** No, I did not see that at all.
[18] She did not present as
[19] traumatized victim. She was very mad and
[20] demanding.
[21]     **Q:** Is it your testimony that
[22] traumatized victims are — don't get angry?
[23]     **A:** No.
[24]     **Q:** Or are not demanding?
[25]     **A:** No, it's not.

Page 92

**L. POWERS**

[1]
[2] But I've seen many forced cell
[3] moves, and her reaction to it was very
[4] different from what I usually see with other
[5] people.
[6]     **Q:** Give me an example.
[7]     **A:** Usually upset, crying, begging
[8] for them to please take the videos away, to
[9] please go out of her room, very upset; in not
[10] an angry way, cussing and demanding that they
[11] keep the video, making political statements
[12] about what they hope will happen with this
[13] video. I've never seen that before.
[14] --- - - - - -
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]     **Q:** Hasn't it been reported to you
[23] that during other strip searches, that she, in
[24] fact, has exhibited those very symptoms you
[25] described, of tears and anxiety and sadness

Page 93

**L. POWERS**

[1]
[2] and depression and all of those kinds of
[3] symptoms that you just previously described?
[4]     A: It's been described to me that
[5] she was angry and would not submit to a strip
[6] search.
[7]     And her attorneys, her original
[8] attorneys, Ms. Fink and her colleagues, were
[9] reporting that she appeared to be very sad.
[10]     Q: I mean, doesn't the Carswell
[11] report have examples during the strip search
[12] at Carswell where she begs them not to do it
[13] to her?
[14]     A: What do you mean the Carswell
[15] report?
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 94

**L. POWERS**

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]     Q: Are you aware of any reports at
[11] Carswell of Ms. Siddiqui's behavior when she
[12] has to be strip searched?
[13]     A: I observed her during her R&D
[14] initial strip search. She was very upset, she
[15] did not want to submit to the strip search,
[16] but once she was told that she had to, that
[17] was the only process.
[18]     She did it without too much
[19] fanfare, but it did take about an hour to get
[20] her to do it.
[21]     Q: And did she appear to you to be
[22] suffering from any trauma as a result of that?
[23]     A: Interestingly, when she was going
[24] through the strip search, no.
[25]     I noted to myself that it was

Page 95

**L. POWERS**

[1]
[2] interesting that — I was standing right
[3] outside the door during the strip search, and
[4] she came out very untraumatized. It didn't
[5] appear that the incident was traumatic at all
[6] to her, despite all of the hour-long process I
[7] had went through to get her to submit to the
[8] strip search.
[9]     Q: Did she shut down at all after
[10] the strip search?
[11]     A: I don't recall that she did, no.
[12]     Q: How do you explain her — well,
[13] withdrawn.
[14]     If Dr. Siddiqui had been
[15] subjected to torture or abuse at an earlier
[16] time, would that change your opinion about her
[17] behavior and symptoms that you observed in Dr.
[18] Siddiqui when, in fact, she was subject to
[19] strip search?
[20]     A: Yes.
[21]     Q: And in what way?
[22]     A: I would expect that someone who
[23] had been through a prisoner of war and torture
[24] experience over an extended period of time
[25] would have reliving of that trauma when asked

Page 96

**L. POWERS**

[1]
[2] to do something similar. That's kind of the
[3] hallmark of PTSD.
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 97

**L. POWERS**

[1]
[2]    MS. CARDI: But if she's been
[3] tortured or traumatized before —
[4]
[5]    MS. CARDI: — in that period of
[6] time and now she's reporting trauma, if
[7] that's accurate that she was, in fact,
[8] tortured or traumatized in that prior
[9] period of time, how does that impact —
[10] now she reports being traumatized.
[11]    How does that impact on your
[12] diagnosis or your finding of
[13] competency?
[14]    THE WITNESS: I got it.
[15]
[16]
[17]
[18]
[19]
[20]    MR. LAVIGNE: Ms. Siddiqui has
[21] reported trauma during strip searches.
[22]    MS. CARDI: Correct.
[23]    MR. LAVIGNE: So, how would the
[24] fact that she had been subjected to
[25] torture affect your view of the symptoms

Page 98

**L. POWERS**

[1]
[2] she expresses regarding the strip
[3] search?
[4]    Right?
[5]    MS. CARDI: Yes.
[6]    A: Again, that could be indicative
[7] of PTSD disorder. One of the hallmarks of
[8] that is reliving the trauma when you're
[9] exposed to something similar.
[10]    Q: How does that impact on her
[11] competency?
[12]    A: It doesn't necessarily impact on
[13] her competency.
[14]    We have many, many people who
[15] have PTSD that are competent to stand trial.
[16]    Q: So, if you found that to be true
[17] in this case, in Dr. Siddiqui's case, would
[18] that impact on your determination that she was
[19] competent?
[20]    A: No.
[21]    Q: And why not?
[22]    A: Because, as I've stated in my
[23] prior testimony, she does have a sense of what
[24] the court system is about, has spoken — had
[25] conversations about formulating a defense, and

Page 99

**L. POWERS**

[1]
[2] that would be outside of what you would expect
[3] to see PTSD symptoms causing problems with.
[4]    Q: Have you read of — how do you
[5] deal with Dr. Siddiqui's talking about being
[6] dead, feeling dead, already dead?
[7]    How do you deal with the theme of
[8] death in your diagnosis of Dr. Siddiqui?
[9]    A: Originally, in my first report, I
[10] thought that that might be indicative of,
[11] again, PTSD, so I gave it a rule-out,
[12] depending on how she viewed that trauma.
[13]    Over time, she has had
[14] conversations that contradicted the fact that
[15] she thinks she's dead. She reported in
[16] conversations with her brother, yeah, she's
[17] reported that she's been dead, but in other
[18] conversations she's reported different ways to
[19] formulate a defense. When she's reported to
[20] me: There's no sense in talking to the
[21] Court. I'm dead anyways.
[22]    So, it's just very inconsistent,
[23] her reports of death.
[24]    Q: Do you think it's a metaphor that
[25] she's using, or do you think she really thinks

Page 100

**L. POWERS**

[1]
[2] she's dead?
[3]    A: I don't believe she thinks she's
[4] dead. She's a smart lady and she knows that
[5] she's breathing, so it could be a metaphor.
[6]    But there have been enough
[7] inconsistencies. You know, she also reported
[8] she couldn't read or write, and she does that
[9] too, so...
[10]    Q: When Dr. Siddiqui said that she
[11] can — when Dr. Siddiqui reports that she's
[12] having a problem reading, do you interpret —
[13] did you interpret that as actually the ability
[14] to read the words or did you interpret that as
[15] having a hard time concentrating so that she
[16] could — had a difficulty reading?
[17]    Do you see the distinction?
[18]    A: Yes.
[19] But it was very clear when she —
[20] she didn't report she had difficulty reading,
[21] she said she could not read because she was
[22] dead.
[23]    Q: And were there other times that
[24] she reported that she could not read —
[25]    A: Yes.

Page 101

**L. POWERS**

[1]
[2] Q: — besides when she was dead —
[3] besides when she reported that the reason was
[4] she was dead?
[5] A: She reported during a team
[6] meeting that she couldn't read what we had for
[7] her, and she didn't give a reason.
[8] But she said she couldn't write
[9] with her dominant hand because that hand was
[10] dead. She could write with her left hand.
[11] Q: And what did you make of that
[12] report?
[13] A: At the time, it was just odd. It
[14] was another atypical symptom that I didn't
[15] know what to do with.
[16] But later, when she's writing
[17] long letters to people, it's clear that she
[18] was able to write.
[19] Q: Wouldn't somebody who's
[20] malingering or making up false symptoms then
[21] not write with that hand?
[22] Wouldn't you anticipate or expect
[23] that that person would stop writing with that
[24] hand?
[25] A: Yeah, that would generally be

Page 102

**L. POWERS**

[1]
[2] what we see unless the need to write the
[3] letter, whatever that purpose is, overrode the
[4] idea that she couldn't read or couldn't
[5] write.
[6] She wanted to let the warden know
[7] some things. I think that was one of her
[8] first letters that she had written. And, you
[9] know, for all accounts and purposes, I'm not
[10] aware of her telling the warden she couldn't
[11] write, so...
[12] Q: Did you inquire whether or not
[13] that was a symptom Ms. Siddiqui experienced
[14] sporadically or fleetingly as opposed to
[15] permanently?
[16] A: That was a source of many
[17] questions that I — many times that I tried to
[18] ask Ms. Siddiqui why she couldn't read, why
[19] she couldn't write, because it didn't make
[20] sense to me from the beginning. That was one
[21] of the questions that I had that I just
[22] couldn't figure out why she was reporting
[23] that. It didn't make sense in any diagnostic
[24] criteria.
[25] And her report was always that

Page 103

**L. POWERS**

[1]
[2] she was dead. She just didn't — she didn't
[3] give any explanation, just that: I'm dead. I
[4] don't read or write.
[5] In fact, on one particular
[6] occasion, she tried to hide from me that she
[7] could read. I observed her reading on several
[8] occasions, but at one point I walked into her
[9] room and said: Oh, I'm sorry to have
[10] disturbed your reading.
[11] This is after I stood outside her
[12] door for a few seconds and saw that she was
[13] reading. When I walked in, I said: I'm sorry
[14] to disturb your reading.
[15] She said: Oh, I wasn't reading.
[16] I was just looking at the text. I wasn't
[17] reading it, though. I can't read. I'm dead.
[18] And, so, then I asked a couple
[19] questions: Help me understand that. I don't
[20] understand.
[21] She was very vague: I'm dead.
[22] Q: If, in fact, she believes that,
[23] what does what mean?
[24] A: I don't know.
[25] Q: So, it really doesn't fit into

Page 104

**L. POWERS**

[1]
[2] any diagnosis for you?
[3] A: No, very unusual.
[4] Q: How about depression, does it
[5] figure at all into depression?
[6] A: No.
[7] Q: Could it be a hallucination?
[8] A: I've never heard of a
[9] hallucinator where somebody feels that their
[10] body is taken. It doesn't sound like a
[11] typical hallucination.
[12] Q: How about a paranoia, does it
[13] fall into any...
[14] A: No.
[15] It's a very unusual symptom to
[16] report.
[17] Q: Have you reviewed any of Dr.
[18] Siddiqui's writings prior to her being
[19] arrested?
[20] I mean that were on her person
[21] when she was arrested.
[22]
[23]
[24] :
[25] **MS. CARDI:** Not on her person,

Page 105

**L. POWERS**

[1]
[2] but I mean that she was found with
[3] certain writings.
[4] Q: Did you review any of those
[5] writings?
[6] A: Yes, some of them I did; the ones
[7] I was privy to.
[8] Q: Did you find any of those
[9] writings bizarre?
[10] A: No, not in particular.
[11] I thought it was radical, I would
[12] say. Not necessarily bizarre.
[13] Q: Did you think that her — sorry,
[14] I'll get to it. Oh, here.
[15] Do you think it was a little
[16] bizarre when she talks about developing a
[17] magnet to propel airplane propellers?
[18]
[19]
[20]
[21]
[22]
[23] MR. LAVIGNE: Do you recall
[24] that?
[25] THE WITNESS: I don't.

Page 106

**L. POWERS**

[1]
[2] A: I mean, I read a lot of things
[3] that she had written. I don't recall reading
[4] that, no.
[5]
[6]
[7]
[8]
[9]
[10] Q: Do you think it's a bizarre
[11] thought process that she thinks that one could
[12] develop a magnet to propel airline
[13] propellers?
[14]
[15] Q: Well, you can answer it, and the
[16] judge can rule.
[17] A: I don't know. I don't have a
[18] knowledge of — I don't know.
[19] Q: Did you think it was a little
[20] bizarre or did you — first, did you read
[21] about some of the — one part in her writing
[22] she talks about developing a virus that would
[23] attack — would not attack women and
[24] children?
[25] Did you think that — did you

Page 107

**L. POWERS**

[1]
[2] read that?
[3] A: I don't recall reading that, no.
[4] Q: Did you read about her thoughts
[5] about the Indians; her delusions that Indians
[6] are building dams in Pakistan where thousands
[7] of children are forced to die of thirst as a
[8] result of the Indians building dams?
[9] Did you think that was a little
[10] bizarre thinking?
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19] Q: Do you think she suffers from any
[20] grandiosity?
[21] A: I didn't really get too much of
[22] that. I know that she holds herself as an
[23] educated person, but I don't — I didn't get
[24] to the level that it would be a diagnostic
[25] criteria, no.

Page 108

**L. POWERS**

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22] MR. LAVIGNE: It's Government
[23] Exhibit HMED No. 170.
[24] A: I did read that, and I think it
[25] could be considered grandiose, but, at the

**L. POWERS**

[1]
[2] same time, I believe that she does possess a
[3] certain amount of power because this is a high
[4] profile case. I don't believe she could
[5] actually call up Barack Obama and talk to him,
[6] but I do believe because it's a high profile
[7] she might be not really clear about how much
[8] power she does wield.
[9]     **Q:** Did you see any other signs of
[10] grandiosity in her behavior or reports of
[11] grandiose behavior?
[12]     **A:** No.
[13] I know that she — many of her
[14] talks to Dr. Kemke came through this letter to
[15] the warden. She felt like she had the ability
[16] to kind of bring about some peace, but she
[17] also — when she, for instance, was talking to
[18] Mr. McGee about this, she had highlighted
[19] several current events and was very specific
[20] about different things that she could do to
[21] help bring peace about, and I believe that she
[22] does feel like she kind of has some political
[23] pull in order to bring these about, because,
[24] as she stated, she can speak to the Taliban
[25] and be kind of a liaison.

**L. POWERS**

[1]
[2]
[3]
[4]
[5]
[6]     **Q:** If she has no ability to speak to
[7] Obama or the Taliban or bring about world
[8] peace, wouldn't you consider that a little
[9] delusional?
[10]     **A:** Well, I think that if your
[11] average defendant was saying that, it would be
[12] very delusional. But because she is a high
[13] profile case and she was investigated as one
[14] of the top folks on the FBI list, I think that
[15] it's much less bizarre than you would expect
[16] from someone who is not.
[17]     **Q:** One of the things — and I'm
[18] going to refer to Page 323 Bates stamped, I
[19] guess, Exhibit D, Bates stamped 323. She says
[20] — on the bottom of Page 8, she says: If we
[21] use magnets, this research could be used to
[22] attack enemies on gliders. Siddiqui did not
[23] think that the idea she noted in reference to
[24] airplanes and gliders were practical, but she
[25] talked about it anyway.

**L. POWERS**

[1]
[2]     Isn't that kind of a bizarre
[3] thing for a Ph.D. in neuroscience to consider
[4] as a possible?
[5]     **A:** I don't think so.
[6] I think what's very clear about
[7] that is that she said she didn't think it was
[8] practical. Even she realized it was a little
[9] on the side of unusual.
[10]     I'm not clear on aerospace and
[11] how magnets might effect — I'm not sure about
[12] that, but I wouldn't expect that that would be
[13] something that I would consider.
[14]     **Q:** Dr. Siddiqui has been diagnosed
[15] by, I guess, you and Dr. Johnson and Dr.
[16] Satoff as malingering.
[17]     Correct?
[18]     **A:** Uh-huh.
[19]     **Q:** When did you first think that Dr.
[20] Siddiqui was malingering?
[21]     **A:** I started really considering that
[22] when I started receiving collateral evidence;
[23] her reports to the FBI that were not
[24] consistent, not consistent with some of the
[25] things that she's reporting to us; and she —

**L. POWERS**

[1]
[2] her reports of the forced cell move was not
[3] consistent with the logs that I received.
[4]     I viewed the videotape right
[5] towards the end, but I did get the logs of the
[6] forced cell move on the transcript. They were
[7] consistent with what I was reading there.
[8]     And she — her reports of being
[9] awake all night long, when that wasn't at all
[10] a consideration. She definitely wasn't awake
[11] all night long.
[12]     Her reports of seeing her
[13] children at night. She was not awake during
[14] those times. It was questionable to me that
[15] she would — that she missed her children
[16] desperately, and you would assume, as a mother
[17] I would assume, if someone was that
[18] traumatized by wondering where their kids are,
[19] they wouldn't request, then, that someone make
[20] sure they visit only during the day so that
[21] you could get sleep. That was odd. There
[22] were several odd things right in a row that
[23] happened.
[24]     Another big issue for me was that
[25] someone that is a victim of political trauma

**L. POWERS**

[1]
[2] you wouldn't expect would feel comfortable,
[3] especially if I'm trying to rule out PTSD,
[4] feel comfortable around military individuals,
[5] particularly military men, but, yet, Chris
[6] McGee, who is — who wears a Navy uniform
[7] every day and is an 04 or 05 in the military,
[8] she sought out routinely, which, you know, one
[9] of the hallmarks of PTSD is that someone tries
[10] to avoid situations that may make them relive
[11] the trauma.
[12]     So, there were several things
[13] right in a row that made me really start
[14] questioning, probably in February, once I
[15] started receiving collateral evidence in
[16] January and February.
[17]     Q: And, again, that's because you
[18] were only looking just to whether or not to
[19] rule out PTSD.
[20]     Correct?
[21]     A: Yes.
[22]     Q: You were not looking at whether
[23] or not she was psychotic, as she had been
[24] diagnosed by Dr. Kemke.
[25]     A: Yes.

**L. POWERS**

[1]
[2]     Q: Correct?
[3]     A: Yes, I was —
[4]
[5]
[6]
[7] · ·    · · ·
[8]
[9]
[10]
[11]
[12]
[13]
[14] ·
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**L. POWERS**

[1]
[2]     (Record read)
[3]     A: So, I'm not sure what you're
[4] asking me.
[5]     MS. CARDI: What was the question
[6] before that, for context?
[7]     (Record read)
[8]     A: I'd say yes.
[9]     Q: So, isn't it true that
[10] malingerers ordinarily make it very clear and
[11] tell everybody that they're mentally ill and
[12] are suffering from illness?
[13]     A: No.
[14]     Q: They don't?
[15]     A: Absolutely not.
[16]     Q: What do they do in regard to
[17] their mental illness?
[18]     A: In my opinion, I've had several
[19] cases where the person came in as wanting to
[20] portray that they were not — they were
[21] verbalizing that they were not mentally ill,
[22] but, at the same time, through the testing and
[23] the different assessments that we do, were
[24] really endorsing a lot of mentally ill
[25] symptoms. At the same time saying I don't

**L. POWERS**

[1]
[2] want to be mentally ill, when given tests of
[3] malingering, it was clear by the way they
[4] performed on these tests that they were, in
[5] fact, exaggerating or faking their symptoms.
[6]     Q: Well, Dr. Siddiqui, you know, she
[7] says she's not mentally ill.
[8]     Correct?
[9]     A: Uh-huh.
[10]
[11]
[12]         · ·
[13]
[14]     Q: Did you observe — well, have you
[15] read anything that indicates that Dr. Siddiqui
[16] gets upset when she's referred to as mentally
[17] ill?
[18]     A: I've heard her state that she was
[19] not mentally ill and I've read that in the
[20] record.
[21]     Q: If she were truly malingering,
[22] wouldn't she want to be found mentally ill?
[23]     A: What you're verbalizing is what
[24] you — how you — what you want a lot of times
[25] are two different things.

Page 117

**L. POWERS**

[1]
[2] What I found is it just depends
[3] on the level of sophistication of the
[4] malingerer. If I have a low functioning
[5] inmate, somebody who's mentally retarded,
[6] they're going to come in and act and want to
[7] be and they'll verbalize that they're mentally
[8] ill and they'll start out telling you right
[9] away.
[10] In my experience, folks that are
[11] more educated have a little bit more
[12] knowledge. And I would assume with Ms.
[13] Siddiqui's educational history in this
[14] specific topic she studied, she's very aware
[15] of what malingering assessments are, and are
[16] going to do just the opposite, which is
[17] actually more convincing and more difficult to
[18] discern.
[19] **Q:** What evidence do you have that
[20] Dr. Siddiqui is aware of what a malingering —
[21] what are the symptoms of malingering?
[22] **A:** I don't, I don't.
[23] **Q:** What evidence do you have that
[24] Dr. Siddiqui has ever read the DSM-III or -IV?
[25] **A:** I don't.

Page 118

**L. POWERS**

[1]
[2] **Q:** In your experience, people who
[3] malinger, do they tend to report
[4] hallucinations?
[5] **A:** They can, yes.
[6] **Q:** Auditory or visual?
[7] **A:** Both.
[8] **Q:** Would it be fair to say that Dr.
[9] Siddiqui, if she really wanted to malinger
[10] would have been more — withdrawn.
[11] Dr. Siddiqui reports periodically
[12] hearing her children, seeing her children, but
[13] she doesn't report it on a regular basis.
[14] Correct?
[15] **A:** Uh-huh, that's true.
[16] **Q:** Would it be fair to say that if
[17] she were malingering she would — you would
[18] expect that she would report this on a more
[19] frequent basis?
[20] **A:** No, not necessarily.
[21] I think in her case, it's more
[22] important for her to report it to key people
[23] than it is to report it on a consistent basis.
[24] **Q:** When you say key people, who do
[25] you mean?

Page 119

**L. POWERS**

[1]
[2] **A:** The people that she's identified
[3] are the most sympathetic with her, who are
[4] really not doing an evaluation.
[5] **Q:** But why wouldn't she report it to
[6] you?
[7] She knows you're doing an
[8] evaluation. It would be in her best interest
[9] to report it to you.
[10] No?
[11] **A:** She did report it to me.
[12] **Q:** But don't you think she would do
[13] it more frequently?
[14] **A:** She was refusing to talk to me.
[15] **Q:** That's what I'm saying. I mean,
[16] you're the person that's doing the evaluation.
[17] Right?
[18] **A:** Uh-huh.
[19] **Q:** So, you would be the one, I would
[20] think, that Dr. Siddiqui would want to
[21] convince that she was suffering from some
[22] mental disorder.
[23] Correct?
[24] **A:** (Witness nods)
[25] **Q:** Especially if she's malingering.

Page 120

**L. POWERS**

[1]
[2] **A:** That could be how it worked, it
[3] could not be. I'm not sure what she's
[4] thinking.
[5] But I know that she got plenty of
[6] face time for Dr. Kemke to put all of that in
[7] the notes.
[8] **Q:** Well, how do you explain the fact
[9] that she doesn't cooperate with you?
[10] **A:** She has consistently not
[11] cooperated with anybody that she thinks might
[12] have something to do with Court — that's what
[13] she said in the beginning — but I'm not sure.
[14] **Q:** As a person who's been diagnosed
[15] as a malingerer, one would expect that she
[16] would want to speak with you.
[17] Correct?
[18] **A:** That is generally how it goes,
[19] yes.
[20] **Q:** What attempts did you make during
[21] the time that Dr. Siddiqui was there to get
[22] her to talk to you?
[23] **A:** Many attempts.
[24] I would try to catch her in
[25] different places on the unit, thinking a

Page 121

**L. POWERS**

[1]
[2] different environment may be helpful. I tried
[3] pulling her aside in a treatment room on the
[4] unit. I tried letting her — what we call
[5] callout, which is an appointment, giving her
[6] an appointment to come see me in my office,
[7] and she has refused to come, after the initial
[8] report came out.
[9]     Q: Did you ever attempt to have
[10] anybody sit in with you at any of the
[11] interviews with Dr. Siddiqui?
[12]     A: She — no, not during my specific
[13] clinical interviews, no.
[14]     Q: Is there a reason you didn't do
[15] that?
[16]     A: It's just not normally something
[17] that I generally do as a practice.
[18]     Q: If a patient had become paranoid
[19] and spoke to you as part of her paranoid
[20] delusions, would you consider using someone
[21] else to come in with you to interview that
[22] person?
[23]     A: If I felt that that was a factor,
[24] I would even transfer the case. I mean, if
[25] they're not normally going to be speaking to

Page 122

**L. POWERS**

[1]
[2] me, I would transfer it to another
[3] psychologist, but another forensic
[4] psychologist. We have one other one, but she
[5] spoke to her one time and wouldn't speak to
[6] her either.
[7]     Q: Did Dr. Gregg ever make any
[8] attempt to talk to Dr. Siddiqui?
[9]     A: Yes, several times.
[10]     Q: And how do you explain that in
[11] the context of her being a malingerer?
[12]     A: I think that she was able to — I
[13] think that's the main context of her being a
[14] malingerer.
[15]     The first thing that I — the
[16] first clue that I get that somebody is
[17] malingering is they say: I don't know. I
[18] don't want to talk to you. I can't talk to
[19] you.
[20]     Thinking their inability to talk
[21] to me is going to somehow play a role in my
[22] report so that I will say that she's not able
[23] to communicate to the Court.
[24]     Q: We've talked a little bit about
[25] her tangential thinking, okay?

Page 123

**L. POWERS**

[1]
[2]     Would it be fair to say that it's
[3] really hard for malingerers to continue to
[4] think and then — to feign tangential
[5] thinking?
[6]     A: No, not at all.
[7]     Q: Why not?
[8]     A: Tangential thinking is going from
[9] one topic to the other. I can sit here right
[10] now and go from one topic to the other but it
[11] doesn't mean that I'm mentally ill. I think
[12] that is actually very easy to do, and I've
[13] seen it many times.
[14]     Q: But isn't it hard over a period
[15] of time to continue to feign tangential
[16] thinking on the same and similar topics as Dr.
[17] Siddiqui does?
[18]     A: I don't think — it may be hard.
[19] I don't think it's impossible. Certainly not
[20] outside of the realm of something that can
[21] happen.
[22]
[23]
[24]                                         ꞈ
[25]

Page 124

**L. POWERS**

[1]
[2]                                     ꞉
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]     Q: In the event that somebody has
[18] exhibited tangential thinking, like Dr.
[19] Siddiqui has —
[20]     A: Right.
[21]     Q: Okay.
[22]     — over a long period of time,
[23] how did you deal with that when you were
[24] coming — when you were doing your diagnosis
[25] of malingering?

Page 125

**L. POWERS**

[1]

[2] A: Very easily. Like I just said, I

[3] don't think it's impossible to feign

[4] tangential thinking. So, somebody feigning

[5] tangential thinking over time is not outside

[6] the realm of malingering. It could be that is

[7] the product of her malingering.

[8] Q: Is it common for somebody to

[9] exhibit tangential thinking over a period of

[10] time on the same or similar topics?

[11] A: Absolutely.

[12] I would not think that that — I

[13] would think that that would be the goal if you

[14] were going to do it on purpose.

[15] Q: Dr. Kemke's position is that —

[16] opinion is that — first of all, who is Dr.

[17] Kemke?

[18] A: Dr. Kemke is the staff

[19] psychiatrist for that unit.

[20] Q: And her duties and

[21] responsibilities is to treat Dr. Siddiqui.

[22] Correct?

[23] A: No.

[24] Q: No?

[25] A: She is not a treating physician

Page 126

**L. POWERS**

[1]

[2] for our 41B inmates.

[3] Q: Okay.

[4] A: Ms. Siddiqui did come in on an

[5] antidepressant, I believe, from MDC. So, Dr.

[6] Kemke was involved in that way, but she's not

[7] treating her.

[8] Q: Hasn't Dr. Kemke been one of the

[9] people who has been able to talk with Dr.

[10] Siddiqui the most?

[11] A: Yes.

[12] Q: And what do you attribute that

[13] to?

[14] A: Dr. Kemke has a different style

[15] than I have. Her style is much more collegial

[16] with Dr. Kemke, much more sympathetic, and

[17] mine is more of an evaluator role.

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25] ace

Page 127

**L. POWERS**

[1]

[2]

[3]

[4]

[5]

[6]

[7]

[8]

[9]

[10]

[11]

[12] Q: When Dr. Siddiqui was first

[13] admitted, it was Dr. Kemke's opinion that she

[14] was psychotic?

[15] A: When she was first admitted.

[16] Q: And it remains Dr. Kemke's

[17] opinion now that Dr. Siddiqui is grossly

[18] psychotic.

[19] Correct?

[20] A: It has changed over time, but I

[21] believe that is her current position.

[22] Q: And Dr. Kemke's opinion is that

[23] — are you familiar with the reasons Dr.

[24] Kemke gives for her opinion that Dr. Siddiqui

[25] is grossly psychotic?

Page 128

**L. POWERS**

[1]

[2] A: Is there a specific — something

[3] you're referring to?

[4] Q: I'm going to show you — I don't

[5] know what number this is.

[6] MS. CARDI: I can't read. I

[7] think this is October of —

[8] MR. LAVIGNE: It's October 3.

[9] MS. CARDI: I think it's October

[10] 3 of 2008. It's Bates stamped No. 46.

[11] Q: If you could read the second

[12] paragraph.

[13] A: The opinion is that there is a 99

[14] percent certainty she is psychotic. It is not

[15] clear what the etiology is, so the

[16] differential diagnosis includes all of the

[17] causes of psychosis, with the possible

[18] exception of substance abuse.

[19] Q: And have you discussed with Dr.

[20] Kemke or reviewed Dr. Kemke's notes to

[21] determine why Dr. Kemke holds this opinion?

[22] A: Yes, I have reviewed her notes.

[23] Q: And what is it that you

[24] understand is the reasons for Dr. Kemke having

[25] this opinion?

Page 129

[1] **L. POWERS**
[2] A: Ms. Siddiqui's —
[3]
[4]
[5] Q: From the very beginning to the
[6] present.
[7] A: It's changed.
[8] Q: Okay.
[9] Well, since October 3 of '08.
[10] A: It's changed since then.
[11] Q: Well, what did you think on
[12] October 3 of '08?
[13] A: She had only been there one day.
[14] Q: Right.
[15] A: So, on that first day?
[16] Q: Right.
[17] A: You cannot — I couldn't
[18] ethically diagnose somebody based on just
[19] their presentation after having spoke with
[20] them for fifteen minutes. It's really a
[21] working diagnosis at this point because you
[22] don't have enough evidence to rule anything
[23] out, so...
[24] Q: And Dr. Kemke's working
[25] diagnosis, it did continue to — it was her

Page 130

[1] **L. POWERS**
[2] opinion that Dr. Siddiqui was suffering from
[3] psychosis.
[4] A: At that moment.
[5] Q: And how about throughout —
[6] A: No.
[7] Q: — Dr. Kemke's treatment of Dr.
[8] Siddiqui?
[9] A: No.
[10] It has changed over time.
[11] Q: What is her last diagnosis of Dr.
[12] Siddiqui — most recent diagnosis?
[13] A: I'm not sure what her diagnostic
[14] evaluation of Ms. Siddiqui is specifically,
[15] but I know that it involves psychotic
[16] symptoms.
[17] Q: If I were to tell you it is her
[18] opinion that Dr. Siddiqui suffers from
[19] psychosis, would that in any way change your
[20] opinion about Dr. Siddiqui's diagnosis and/or
[21] her competency to proceed?
[22] A: No.
[23] Q: Why not?
[24] A: Because Dr. Kemke is lacing
[25] that. I mean, her first report, she made that

Page 131

[1] **L. POWERS**
[2] diagnostic note after having spoke with her
[3] for fifteen minutes. So, my — Dr. Kemke is a
[4] treating physician and not a treating
[5] physician in this case, she has not read any
[6] of the collateral evidence, spoken to any of
[7] the collateral witnesses, so I don't believe
[8] that she has all of the information necessary.
[9] Q: If you were to determine that Dr.
[10] Siddiqui presently holds that opinion that she
[11] is — sorry, that Dr. Kemke presently holds
[12] the opinion that Dr. Siddiqui is psychotic,
[13] would that change your opinion?
[14] A: No, absolutely not.
[15] Q: And why not?
[16] A: Because Dr. Kemke has wavered
[17] several times depending on who she's talking
[18] to, and she has — again, as I stated before,
[19] she's not read any of the collateral evidence,
[20] she's not spoken to any of the collateral
[21] witnesses, she's just observed Dr. Kemke — I
[22] mean, Ms. Siddiqui.
[23] Q: What collateral evidence do you
[24] think is critical to your determination not to
[25] consider Dr. Kemke's diagnosis of psychosis

Page 132

[1] **L. POWERS**
[2] with Dr. Siddiqui?
[3] What collateral evidence are you
[4] referring to?
[5] A: I'm referring to all the
[6] collateral evidence that I've received; the
[7] logs from MDC, the use of force transcript and
[8] the video, the interviews with the people who
[9] brought her over from Bhadram, the interviews
[10] with her brother.
[11] But none of those have been
[12] reviewed by Dr. Kemke.
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 133

**L. POWERS**

[1]
[2]
[3]
[4]
[5]　**Q:** Okay.
[6]　Dr. Siddiqui — Dr. Kemke bases
[7]　her diagnosis of psychosis on certain symptoms
[8]　and reports and observations and conversations
[9]　that she's made with Dr. Siddiqui.
[10]　Correct?
[11]　**A:** Correct.
[12]　**Q:** Qkay.
[13]　And you challenge that diagnosis
[14]　because you've said that you've reviewed
[15]　collateral evidence and you think that the
[16]　collateral evidence contradicts such a
[17]　diagnosis of psychosis.
[18]　**A:** Correct.
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 135

**L. POWERS**

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]　**Q:** Dr. Kemke finds Dr. Siddiqui to
[11]　be psychotic, okay, that's her finding, that
[12]　she's psychotic.
[13]　**A:** Her latest finding.
[14]　**Q:** Her latest finding. Okay.
[15]　What pieces of evidence
[16]　specifically do you think challenges that
[17]　finding?
[18]　**A:** That she's psychotic?
[19]　**Q:** Yeah.
[20]　**A:** As I've stated in my prior
[21]　testimony, the fact that she has
[22]　hallucinations, reports hallucinations, but
[23]　reports those hallucinations when she's
[24]　sleeping; the fact that she reports
[25]　hallucinations but then wants the nurses to

Page 134

**L. POWERS**

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]　**Q:** You enumerated a list of issues
[9]　in this hearing about whether or not Dr.
[10]　Siddiqui was held captive, whether she was
[11]　tortured, what happened to her children,
[12]　whether or not she actually had sleep issues,
[13]　whether or not she was paranoid, suffering
[14]　from true paranoia. You challenge those.
[15]　Correct?
[16]　**A:** Right.
[17]　**Q:** And in challenging those, that's
[18]　why you have determined that your diagnosis is
[19]　malingering.
[20]　**A:** That is true.
[21]
[22]
[23]
[24]
[25]

Page 136

**L. POWERS**

[1]
[2]　see if they can get her kids to come visit her
[3]　during the day; the fact that she sees these
[4]　— the dark angels and the use of force move
[5]　as sort of being a delusional experience when
[6]　that's not at all how she reports before or
[7]　after.
[8]　Those are the ones I can think of
[9]　off the top of my head.
[10]　**Q:** If all or any of those are not
[11]　accurate, your interpretation is inaccurate,
[12]　does that change your diagnosis of Dr.
[13]　Siddiqui — Dr. Kemke's diagnosis of Dr.
[14]　Siddiqui as psychotic?
[15]
[16]
[17]　**A:** I can't answer that.
[18]　**Q:** Okay.
[19]　**A:** Because some of those things are
[20]　factual based. I'm not sure how reading the
[21]　log could change.
[22]　**Q:** Many of the issues that you just
[23]　raised are factually based.
[24]　Correct?
[25]　**A:** Yes.

Page 137

**L. POWERS**

[1]
[2] Q: And we don't have any proof
[3] either way whether or not the facts upon which
[4] they are based are true or not.
[5] Correct?
[6] A: About her whereabouts when she
[7] was tortured?
[8] Q: Yes.
[9] Correct?
[10] A: Or if she was tortured.
[11] Yes, that is something we are not
[12] completely sure about even though there's some
[13] documents about it, but we don't have absolute
[14] proof for the entire years.
[15] Q: Okay.
[16] So, if — do you think that Dr.
[17] Kemke's diagnosis of psychosis is correct if,
[18] in fact, what has been reported by Dr.
[19] Siddiqui and reported by or suggested by other
[20] evidence indicates that she, in fact, was
[21] tortured or was held captive or was in fear of
[22] her life?
[23] A: No.
[24] Q: And explain why.
[25] A: I think that we would be looking

Page 138

**L. POWERS**

[1]
[2] at a PTSD diagnosis. I think that that would
[3] be very significant. I originally did not
[4] diagnose her with schizophrenia or delusional
[5] disorder because she just simply did not meet
[6] the criteria for those.
[7] However, she did meet the
[8] criteria, in my opinion, at the time for major
[9] depressive disorder with psychotic features;
[10] however, now that I've had a longer period of
[11] time to observe her, I do not believe she
[12] meets the criteria for major depressive
[13] disorder congruent with psychotic features.
[14] Q: How many diagnoses have you made
[15] of malingering in your career thus far?
[16] A: Probably twenty, thirty.
[17]
[18] .
[19]
[20] THE VIDEOGRAPHER: The time is
[21] now 3:21.
[22] Off the record.
[23] (Whereupon, Ms. Cardi and Mr.
[24] Edgar exited the room, and returned.)
[25] THE VIDEOGRAPHER: Time is now

Page 139

**L. POWERS**

[1]
[2] 3:22.
[3] On the record.
[4] Q: Dr. Siddiqui — Dr. Powers, I
[5] think that you have said that there are
[6] conversations with Dr. Siddiqui where she has
[7] formulated her defense.
[8] Am I correct?
[9] A: (Witness nods)
[10] Q: Can you give me examples of what
[11] you're talking about?
[12] A: Yes.
[13] In my report —
[14] THE WITNESS: Can I get a copy of
[15] my report?
[16] MR. LAVIGNE: Sure.
[17] This is Government Exhibit C.
[18] There you go (handing).
[19] A: In my report, I noted —
[20] Q: If you could just give me the
[21] page, that would be great.
[22] A: Starting on Page 10, I talked
[23] about different conversations that I had noted
[24] that she had with her brother.
[25] Q: Just read for me. I'm on Page

Page 140

**L. POWERS**

[1]
[2] 10. Just read for me where you're looking
[3] at.
[4] A: It's Page 8.
[5] Q: See, I'm looking at the wrong
[6] side. Sorry. Okay.
[7] A: Bottom.
[8] Q: You mean the August 29 entry?
[9] A: All of the entries that I quoted.
[10] Q: Where do you see her formulating
[11] a defense in these conversations?
[12] A: Talking about what kind of
[13] attorneys that she could use, her belief that
[14] she was not going to get a proper sentence
[15] because it was an international crime, and she
[16] was talking about different kinds of attorneys
[17] to get.
[18] Q: However, isn't it accurate that
[19] Dr. Siddiqui has refused to permit her family
[20] to hire even another attorney?
[21] A: I'm not sure about that. I don't
[22] know.
[23] Q: If you were to learn that she's
[24] refused to give them permission to hire
[25] another attorney, would that change your

Page 141

**L. POWERS**

[1]
[2] opinion about your diagnosis of her
[3] competency?
[4]    A: No, not just with that, no.
[5]    Q: Would it be fair to say that if
[6] she's suffering from delusional disorder, if
[7] she is, that she could be completely rational
[8] and coherent and understand the role of a
[9] lawyer, the role of a judge, the role of a
[10] prosecutor, and still not be rational or
[11] competent or able to assist in her own
[12] defense?
[13]    A: In general, somebody who has
[14] delusional disorder, that could be the case.
[15]    Q: Okay.
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]    Q: Before you said that Dr. Kemke

Page 142

**L. POWERS**

[1]
[2] was not Dr. Siddiqui's treating clinician.
[3]    Could you just define what her —
[4] what she is, in your view?
[5]    A: She's a psychiatrist for that
[6] unit for the studies and for the committed
[7] inmates who are on medication. All the
[8] inmates on that unit, with the exception of
[9] our forensic studies that are 41Bs and 42s
[10] on medication. And some of our 41Bs and 42s
[11] are on medication.
[12]    She's the treating psychiatrist
[13] if we have asked her to — if we conferred
[14] with her on the case and asked her to evaluate
[15] for medication.
[16]    Q: And did — was that done in Dr.
[17] Siddiqui's case?
[18]    A: In Dr. Siddiqui's case, she came
[19] in on an antidepressant, so that would
[20] automatically have Dr. Kemke evaluate her.
[21] But she stopped taking the antidepressant. I
[22] don't know, I think she might have taken it
[23] two or three times when she was there and has
[24] not taken them since.
[25]    Q: So, what was Dr. Kemke's role

Page 143

**L. POWERS**

[1]
[2] after she went off her antidepressant?
[3]    A: I'm not sure.
[4] You'd have to ask her. I don't
[5] — normally, she doesn't have a role with
[6] those inmates, so I'm not sure what she viewed
[7] her role to be.
[8]    Q: Did you use Dr. Kemke as a source
[9] of information when you were formulating your
[10] most recent report?
[11]    A: I viewed her notes.
[12]    Q: Did you speak with her personally
[13] about Ms. Siddiqui?
[14]    A: I speak with her every day.
[15] She's in the morning team meeting
[16] that we go to.
[17]    Q: I mean did you speak to her
[18] specifically about Dr. Siddiqui?
[19]    A: I did not.
[20]    MS. CARDI: I have no further
[21] questions.
[22]    Thank you, Dr. Powers.
[23]    MR. LAVIGNE: We can go off the
[24] record for five minutes.
[25]    THE VIDEOGRAPHER: Time is now

Page 144

**L. POWERS**

[1]
[2] 3:28. This marks the ending of Tape No.
[3] 2.
[4]    Off the record.
[5]    (Recess taken)
[6]    THE VIDEOGRAPHER: Time is now
[7] 3:41 p.m. This marks the beginning of
[8] Tape No. 3.
[9]    On the record.
[10]    **EXAMINATION**
[11]    **BY MR. LAVIGNE:**
[12]    Q: Dr. Powers, who are you employed
[13] by?
[14]    A: The Federal Bureau of Prisons.
[15]    Q: Were you hired by the United
[16] States Attorney's Office to conduct an
[17] evaluation in this case?
[18]    A: No.
[19]    Q: Is the United States Attorney's
[20] Office paying for your flight and lodging —
[21]    A: No.
[22]    Q: — in connection with your
[23] appearance here today?
[24]    A: No.
[25]    Q: How do you view your role in the

Page 145

**L. POWERS**

[1]
[2] — in this evaluation process of Ms. Siddiqui?
[3]    A: I'm a neutral party, I am not
[4] hired by either side, and my role is just to
[5] look at the evidence and to evaluate the
[6] Defendant and to formulate an opinion for the
[7] Court.
[8]    Q: Now, let's talk about the initial
[9] diagnosis that you gave.
[10]    How much time were you given for
[11] that diagnosis?
[12]    A: Thirty days.
[13]    Q: And was Ms. Siddiqui — when did
[14] Ms. Siddiqui arrive at FMC Carswell?
[15]    A: I don't remember the exact date.
[16] I think it was the second of October.
[17]    Q: When Ms. Siddiqui arrived, was
[18] she expressing symptoms of mental illness?
[19]    A: Yes.
[20]    Q: And was Ms. Siddiqui during that
[21] first thirty-day period cooperative with your
[22] forensic evaluation?
[23]    A: Not completely.
[24] She would talk to me a little
[25] bit, but very little, and would not

Page 146

**L. POWERS**

[1]
[2] participate in any testing in the normal
[3] process that we normally would do when we're
[4] evaluating someone.
[5]    Q: And at the time you made your
[6] initial report, did you have all of the — I
[7] believe what you refer to as collateral
[8] information as you do now?
[9]    A: No.
[10] When I made my initial report, I
[11] think I had maybe a hundred documents. Now I
[12] have a couple thousand, I think.
[13]    Q: Now, let's talk about what
[14] happened after you made that initial report.
[15]    After you made that initial
[16] report, did you include — you received
[17] additional information?
[18]    A: Yes.
[19]    Q: And did that include documents
[20] from the MDC?
[21]    A: Yes.
[22]    Q: Being the Metropolitan Detention
[23] Center?
[24]    A: Yes.
[25]    Q: Did that include the use of force

Page 147

**L. POWERS**

[1]
[2] video?
[3]    A: That came much later, but yes.
[4]    Q: And also documents of interviews
[5] of the Defendant.
[6]    Is that right?
[7]    A: Yes.
[8]    Q: So, as of — as of the date of
[9] your second report, May 4, 2009, had you
[10] continued to be at — were you at FMC Carswell
[11] during that period, between the submission of
[12] your initial report and the submission of your
[13] second report?
[14]    A: I was certainly employed by them,
[15] but I had to take medical leave for about a
[16] month and a half during that time, during
[17] February and March.
[18]    Q: And other than that month and a
[19] half period, were you working at the
[20] institution?
[21]    A: Yes.
[22]    Q: And during the time you were at
[23] the institution, how often would you observe
[24] Ms. Siddiqui, approximately?
[25]    A: Two or three times a week.

Page 148

**L. POWERS**

[1]
[2] I was up on the unit every
[3] morning for team. And if she was on the unit
[4] lining up for lunch or out and about, I would
[5] see her and try to talk to her.
[6]    Q: During that period, did you also
[7] speak with staff members about their
[8] observations of Ms. Siddiqui?
[9]    Q: Now, generally speaking, how did
[10]    Q: Now, generally speaking, how did
[11] Ms. Siddiqui's appearance the last time you
[12] saw her compare to her appearance the first
[13] time you saw her?
[14]    A: There was a vast difference.
[15]    Q: Tell us about that.
[16]    A: When I first saw her, she was
[17] very tearful, she had a very negative affect,
[18] meaning she was — her facial expressions, her
[19] body language during the time I first saw her
[20] at R&D was very indicative of someone who may
[21] be suffering from depression. She was upset.
[22]    By the time she left, she was
[23] frequently noted to be laughing; I saw her
[24] laughing on the unit. She would engage in
[25] conversations with staff, engage in

Page 149

**L. POWERS**

[1]
[2] conversations with other inmates. She still
[3] isolated herself to some extent, but when she
[4] was in contact with other people she was much
[5] more social than she was when she first
[6] arrived.
[7] Q: Now, when Ms. Siddiqui first
[8] arrived at FMC Carswell — let me back it up.
[9] Are there different units at
[10] Carswell for federal prisoners?
[11] A: Yes.
[12] Q: And are those units M1, M2, and
[13] M3?
[14] A: Yes, they are.
[15] Q: What's M1?
[16] What type of unit is that?
[17] A: M1 is an inpatient — it's a
[18] locked unit, but it is — you know, FMC
[19] Carswell is an Air Force hospital, it's an old
[20] Air Force hospital we built on to. And,
[21] basically, the entire unit she was on — the
[22] entire part of her unit was just what you'd
[23] see when you go into a hospital.
[24] Q: So, did she have a cell?
[25] A: No, she had a hospital room.

Page 150

**L. POWERS**

[1]
[2] Q: And was the room locked from the
[3] outside?
[4] A: No.
[5] Q: So, she could come and go —
[6] A: It was never locked. There was
[7] no locks on the outside of the door.
[8] Q: So, Ms. Siddiqui could come and
[9] go from her room?
[10] A: Yes.
[11] Q: Now, at FMC Carswell, are there
[12] strip searches?
[13] A: Yes.
[14] Q: Do you remember the first time
[15] Ms. Siddiqui was strip searched?
[16] A: Yes.
[17] Q: When was that?
[18] A: It was when she first arrived at
[19] R&D, receiving and discharge area, to be
[20] admitted.
[21] Q: And I think you talked a little
[22] bit about that on your cross-examination.
[23] During the course of that strip
[24] search, was an accommodation reached?
[25] A: Yes.

Page 151

**L. POWERS**

[1]
[2] Q: Tell us about that.
[3] A: It took about an hour to convince
[4] her that, you know, she needed to do this in
[5] order to be admitted, that this is a process
[6] she was going to have to go through one way or
[7] the other. But she was trying to negotiate
[8] how she would be strip searched and said that
[9] she would just remove a piece of clothing and
[10] then put that back on and remove another piece
[11] of clothing and then put that back on.
[12] The officers who were there to
[13] conduct the strip searches for all the inmates
[14] that come in said no, that she's going to have
[15] to do it like everyone else and do a regular
[16] strip search. Once it was determined that
[17] there was no way around it, she submitted to
[18] the strip search without — without any
[19] fanfare and went in the room.
[20] It has a half-wall, so I could
[21] see her head and the head of the officer, and
[22] didn't seem to be very much fanfare associated
[23] with it, and she came right out afterwards.
[24] Q: Now, during your time — during
[25] the period of time in which you observed Ms.

Page 152

**L. POWERS**

[1]
[2] Siddiqui, did you ever see her or hear her
[3] claim to hallucinate?
[4] A: Yes.
[5] Q: And what types of hallucinations
[6] was she claiming she had?
[7] A: Really, the only hallucination
[8] that she reported at FMC Carswell is the
[9] report of seeing her children.
[10] Q: And based on your evaluation in
[11] this case and your professional opinion, do
[12] you believe that she was, in fact,
[13] hallucinating?
[14] A: During the first report I did
[15] because I didn't have any kind of evidence to
[16] show otherwise; I only had her self-report.
[17] But over time, no, I don't
[18] believe that she was hallucinating. I think
[19] that she was saying that she was seeing her
[20] children at night, but, yet, the nursing staff
[21] was reporting to me during the day that she
[22] was sleeping fine.
[23] She didn't display this kind of
[24] behavior during the day, it was only when no
[25] one was watching her. And then her reports of

Page 153

[1] **L. POWERS**
[2] it were to only specific people.
[3]  Q: And the extent of the
[4] hallucinations that she's reported, have they
[5] varied at all in frequency from the time she
[6] came to Carswell to the time she left?
[7]  A: I don't believe that she's
[8] reporting them as frequently when she left.
[9]  The only person that she
[10] continued to speak to with any degree was Dr.
[11] Kemke, and I don't think she was reporting
[12] those any longer when she left.
[13]  Q: And when you were at — during
[14] your time at Carswell, do you ever recall an
[15] incident — I believe you testified about this
[16] on cross-examination — where at one point,
[17] Ms. Siddiqui claimed she could not read?
[18]  A: Yes, she claimed that from the
[19] time she got there.
[20]  And when they come in R&D, they
[21] have a packet of things that they must read,
[22] and it's, you know, confidentiality issues,
[23] some issues about the rules and things like
[24] that that they must read and sign saying that
[25] they understood them. She told me then and

Page 154

[1]  **L. POWERS**
[2] told the other officers there that she could
[3] not read them.
[4]  Q: After that incident, did you
[5] observe Ms. Siddiqui doing what appeared to be
[6] reading?
[7]  A: Yes.
[8]  Q: On how many different occasions?
[9]  A: Several times.
[10]  Q: What would you see her doing?
[11]  A: She was reading the Koran. I
[12] observed her to be reading the Koran to
[13] another inmate.
[14]  And those were my observations of
[15] her, but then Mr. McGee had reported that she
[16] had read a newspaper and kind of outlined some
[17] parts of the newspaper that were noteworthy so
[18] she could talk to him about it.
[19]  Q: I believe on cross-examination
[20] you were shown a handwritten letter that Ms.
[21] Siddiqui wrote to the warden.
[22]  A: Uh-huh.
[23]  Q: Were her claims of not being able
[24] to read, did those occur before Ms. Siddiqui
[25] wrote the letter?

Page 155

[1] **L. POWERS**
[2]  A: Yes.
[3]  Q: Now, you mentioned another inmate
[4] that Ms. Siddiqui — I believe you just
[5] referenced another inmate during the course of
[6] your answer.
[7]  A: I did.
[8]  Q: Tell us a little bit about Ms.
[9] Siddiqui's relationship with that other
[10] inmate.
[11]  MS. CARDI: I'm going to object.
[12] Outside the scope of my cross-
[13] examination.
[14]  MR. LAVIGNE: Your cross-
[15] examination dealt with Dr. Powers'
[16] evaluation and her reasons for finding
[17] that Ms. Siddiqui was competent.
[18]  This is one piece that is
[19] certainly relevant, so I believe it's
[20] within the scope.
[21]  MS. CARDI: Okay, I'm just —
[22]  MR. LAVIGNE: I understand.
[23]  MS. CARDI: I continue to have an
[24] objection.
[25]  Q: You can answer the question.

Page 156

[1] **L. POWERS**
[2]  A: Her relationship — what was the
[3] question?
[4]  Q: Okay.
[5]  Tell us about Ms. Siddiqui's
[6] relationship with this other inmate, to your
[7] knowledge.
[8]  A: Okay.
[9]  To my knowledge, she was asked by
[10] the religious staff to mentor this inmate.
[11] This other inmate has a diagnosis of mental
[12] retardation, very low functioning, and was
[13] asked to sort of mentor her because this
[14] inmate had expressed an interest in the Muslim
[15] religion.
[16]  This inmate has also expressed an
[17] interest in every religion — in many
[18] religions there over the time; she's been a
[19] Wicken, Pentecostal, whatever. But at this
[20] point, she expressed an interest in the Muslim
[21] religion, so Ms. Siddiqui was asked to mentor
[22] her.
[23]  Ms. Siddiqui was noted to — and
[24] I saw her — reading to this inmate. She was
[25] helping her tie her headpiece on in the

Page 157

**L. POWERS**

[2] correct way.

[3] I'm not sure what the name of the

[4] headpiece is, but...

[5] **MS. CARDI:** Hijab?

[6] **Q:** Yeah, when you say — the hijab?

[7] **A:** Yes.

[8] **Q:** Something that's worn by Muslim

[9] women?

[10] **A:** Yes.

[11] Ms. Siddiqui wore one the entire

[12] time that she was there. I've never seen her

[13] without it with the exception of the first

[14] strip search.

[15] **Q:** Uh-huh.

[16] And was Ms. Siddiqui — did you

[17] hear Ms. Siddiqui reading to this individual?

[18] **A:** Yes, I did.

[19] **Q:** When other staff members reported

[20] this to you, did they indicate they heard Ms.

[21] Siddiqui —

[22] **A:** Yes, they did.

[23] **Q:** — reading to this inmate?

[24] **A:** Yes.

[25] **Q:** And what was she reading?

Page 158

**L. POWERS**

[1]

[2] **A:** The Koran, the Koran.

[3] **Q:** Now, how long did that —

[4] approximately how long did that relationship

[5] last?

[6] **A:** About two to three weeks.

[7] And she was asked to stop

[8] mentoring this person.

[9] **Q:** How did Ms. Siddiqui — who asked

[10] — was Ms. Siddiqui asked by a specific

[11] person? By a group of people?

[12] **A:** I believe that initially she

[13] might have been asked by the religious

[14] services to stop because of concerns that had

[15] been expressed.

[16] But Dr. Kemke had went to discuss

[17] this with her — and this was in Dr. Kemke's

[18] notes — and had expressed to her that the

[19] team decided that she should not mentor this

[20] person because everyone was concerned because

[21] she might be a terrorist.

[22] **Q:** How did Ms. Siddiqui react to

[23] that?

[24] **A:** She was upset by that.

[25] **Q:** And what did she said?

Page 159

**L. POWERS**

[2] **A:** I don't recall specifically, but

[3] the content of what she said was that, you

[4] know, she wasn't going to harm this person and

[5] she wasn't a terrorist.

[6] **Q:** During your observations of Ms.

[7] Siddiqui, how has her grooming been?

[8] How has her physical appearance

[9] been?

[10] **A:** Excellent.

[11] She was noted from day one to —

[12] not from day one, but from the first week when

[13] she was first placed on the M1 unit, one of

[14] her major concerns that she was focussed on

[15] was getting a razor. And razors are not

[16] allowed on the M1 unit for obvious reasons;

[17] they're some very, generally, pretty mentally

[18] challenged individuals who are suicidal, could

[19] be suicidal. But she was very insistent of

[20] getting the razor, so this was a topic of

[21] conversation about how she could do this.

[22] She was also frequently observed

[23] to be cleaning her room, and she kept a very

[24] clean room.

[25] **Q:** Did you personally observe that?

Page 160

**L. POWERS**

[1]

[2] **A:** Yes.

[3] **Q:** That her room was clean?

[4] **A:** Yes, on many occasions.

[5] **Q:** What about body odor?

[6] **A:** Never.

[7] I never noticed her having a body

[8] order or any bad breath or anything that would

[9] be indicative of someone with severe hygienic

[10] problems.

[11] **Q:** Tell me how these factors,

[12] concentration, grooming, reading, writing, how

[13] do they factor into a determination of

[14] somebody's competence to stand trial?

[15] **A:** Well, you would assume that, you

[16] know, competency would require someone to be

[17] able to concentrate, so that's important.

[18] And her self-care, her ability to

[19] clean her room all indicate that she is kind

[20] of goal-oriented, future-oriented, and it

[21] could play a role in looking at — you could

[22] extrapolate to that behavior in hopes that she

[23] could be goal-oriented with her attorney.

[24] **Q:** Now, in terms of Ms. Siddiqui's

[25] writing, have you observed Ms. Siddiqui write

Page 161

**L. POWERS**

[1]
[2] anything?
[3]    A: No, I haven't personally observed
[4] her write anything.
[5]    Q: Have you ever spoken with her or
[6] heard her speak about her ability to write?
[7]    A: I've heard her say she can't
[8] write.
[9]    Q: When was that?
[10]    A: When she first arrived, she said
[11] she couldn't write. But then by the time of
[12] the first treatment team meeting, she said she
[13] couldn't write with her dominant hand, she had
[14] to write with her left hand.
[15]    Q: And approximately when was that?
[16]    A: It would have been within a
[17] couple weeks after she arrived, so sometime in
[18] October, the end of October.
[19]    Q: Was that before Ms. Siddiqui
[20] wrote that letter to the warden?
[21]    A: Yes.
[22]    Q: Now, generally speaking, in a
[23] forensic psychiatric — or I'll just say in
[24] the forensic psychological evaluation setting,
[25] in deciding whether individuals are competent

Page 162

**L. POWERS**

[1]
[2] or not competent to stand trial, are there
[3] specific tests that can be done?
[4]    A: Yes.
[5]    Q: What are some of those tests?
[6]    A: We generally, at our institution,
[7] and pretty standard across the forensic board,
[8] will give a intelligence test just to assess
[9] whether they're intelligent enough to assess
[10] — to assist their attorney.
[11]    We would also give personality
[12] tests that would give us some idea of how they
[13] view the world, and that might play a role in
[14] their inability or ability to assist their
[15] attorney. Those are usually the MMPI, the PAI
[16] or the MCMI.
[17]    And also give some kind of
[18] competency assessment. We often give the
[19] Georgia Court Competency Test or the Exner
[20] Competency Test. Those things are — just
[21] kind of give us an idea of what they
[22] understand as first rational and factual
[23] understanding.
[24]    Then, depending on the specific
[25] case, we may give more tests depending on what

Page 163

**L. POWERS**

[1]
[2] our working diagnosis is and ruling things out
[3] or kind of confirming a working diagnosis.
[4]    Q: Now, during the time Ms. Siddiqui
[5] was at Carswell, did she ever consent to
[6] psychological testing or to any of these
[7] tests?
[8]    A: No.
[9]    Q: How many times did you attempt to
[10] administer these types of tests?
[11]    A: I don't have a specific number,
[12] but I asked her about it on numerous
[13] occasions.
[14]    Q: Numerous occasions meaning?
[15]    A: Fifteen times, maybe.
[16]    Q: And how would Ms. Siddiqui
[17] respond to these attempts?
[18]    A: No, absolutely not.
[19]    Q: And when she responded in that
[20] way, what was her demeanor?
[21]    A: It wasn't really noteworthy in
[22] that she didn't seem to have major depression
[23] surrounding it or anything like that, but she
[24] was just very curt about it: I'm not
[25] participating.

Page 164

**L. POWERS**

[1]
[2]    Q: To your knowledge, has she
[3] consented to psychological testing by anyone?
[4]    A: I don't recall that she has.
[5] I've never read that or seen any evidence to
[6] that.
[7]    Q: Now, you were asked the various
[8] questions on cross-examination about Ms.
[9] Siddiqui's sleeping habits.
[10]    It's fair to say you're not at
[11] the institution in the evenings.
[12]    Is that right?
[13]    A: Right.
[14]    Q: But you indicated you asked
[15] certain staff members to observe Ms.
[16] Siddiqui.
[17]    A: Yes.
[18]    Q: What was the reason for that?
[19]    A: Because — a couple of reasons.
[20] Number one, as I stated in my
[21] prior testimony, sleep is important for a
[22] couple of different diagnoses and it's a
[23] criteria that should be looked at to rule in
[24] and rule out different diagnoses. But, also
[25] she was reporting seeing her children at night

Page 165

[1] **L. POWERS**
[2] and she's also reporting that she's having
[3] difficulty sleeping.
[4]     So, based on those things, I
[5] asked the nurses — the nurses always do
[6] rounds every thirty minutes, but I asked them
[7] to be especially vigilant about noticing her,
[8] what she's doing, if she's awake, and
[9] reporting it back to me the next morning.
[10]     Q: And this went on for about how
[11] long, about how many months?
[12]     A: It's hard to say because I was
[13] gone for that, but two months.
[14]     Q: What, did they — did the nurses
[15] start doing this before you went on medical
[16] leave?
[17]     A: Yes.
[18]     Q: So, before February of 2009?
[19]     A: Yes.
[20]     Q: Okay.
[21]     A: And then once I got back from
[22] medical leave, I again reminded them at team
[23] to please be extra vigilant about noticing
[24] that, and they did.
[25]     Q: The team meetings would be each

Page 166

[1] **L. POWERS**
[2] morning?
[3]     A: Uh-huh.
[4]     Q: And you would have a chance to
[5] confer with the nurses who were there the
[6] night before?
[7]     A: Yes — well, they give a passdown
[8] to the nurses that are that shift. The
[9] nurses' shifts are seven to seven.
[10]     Q: Over time, how did Ms. Siddiqui's
[11] relationship with you evolve?
[12]     A: Well, it started out that she
[13] talked to me a little bit. Never to any great
[14] extent, but she would talk to me a little.
[15]     After I submitted the first
[16] report, she — I went to talk to her about
[17] what the report findings were, she said she'd
[18] already heard from her brother and did not
[19] want to talk to me. After that, she started
[20] politely refusing to talk to me at all.
[21]     Once Dr. Johnson came —
[22]     Q: Are you referring to Dr. Sally
[23] Johnson?
[24]     A: Yes, I am.
[25]     — she refused to speak to me

Page 167

[1] **L. POWERS**
[2] rather strongly.
[3]     Q: And what were some of the things
[4] she said to you about that, about Dr.
[5] Johnson's visit?
[6]     A: She specifically, the day that
[7] Dr. Johnson came in — is that what you're
[8] referring to?
[9]     Q: Yes.
[10]     A: Dr. Johnson had interviewed her,
[11] I believe, the first day, and she wouldn't
[12] speak with her.
[13]     And then the second day, we were
[14] having treatment team meeting in the morning,
[15] and Ms. Siddiqui came in and sat down in the
[16] middle of the floor in the room that we were
[17] having treatment team meeting in and was
[18] refusing to talk to Dr. Johnson, had her
[19] fingers in her ears.
[20]     Then she looked at me and said:
[21] When I asked you to leave me alone, Dr.
[22] Powers, you walk away. Would you please tell
[23] her to walk away? She's not walking away.
[24]     And I said — that was the first
[25] time I had ever been very curt with her. I

Page 168

[1] **L. POWERS**
[2] said: Ms. Siddiqui, you are out of bounds
[3] right now. You need to go to your room.
[4]     And she ended up going to her
[5] room. But that was, in my mind, a turning
[6] point. After that point, she wasn't even
[7] polite in refusing to talk to me.
[8]     Q: And during the course of your
[9] observations of Ms. Siddiqui, your
[10] conversations with staff about their
[11] observations of Ms. Siddiqui, what about her
[12] appetite?
[13]     What have you learned about her
[14] appetite or her eating habits?
[15]     A: When she first arrived, there was
[16] some question about her appetite, I guess. It
[17] had been Ramadan here at MDC and her appetite
[18] wasn't — they were concerned about it.
[19]     When she arrived at Carswell,
[20] there were also some concerns because she was
[21] not wanting the common fare tray. But once
[22] all that was resolved and she was able to go
[23] downstairs on the unit, she was noted to be
[24] eating, but she also ordered commissary with a
[25] lot of food items.

Page 169

**L. POWERS**

[1]
[2] Q: Now, are there certain staff
[3] members that Ms. Siddiqui interacts with more
[4] than others?
[5] A: Yes.
[6] Q: Who are the staff workers that
[7] Ms. Siddiqui gravitates to?
[8] A: There are basically — I think
[9] over time it has ended up being two.
[10] Over time, she has attempted to
[11] talk to some people, requested some of the
[12] psychologists by name to come up to her unit,
[13] talk to her, but then wouldn't speak to them
[14] again after that.
[15] So, over time, it has been two
[16] individuals. Chris McGee, who is, as I said
[17] in my earlier testimony, he's a social worker
[18] there, but he is a PHS officer, I believe he's
[19] an 05, he could be an O4 — not in the
[20] military — and wears a military uniform.
[21] And then Dr. Kim Keith, a
[22] psychiatrist.
[23] Q: How is the relation — Mr. McGee
[24] walks around in a military uniform?
[25] A: Yes, he does.

Page 170

**L. POWERS**

[1]
[2] Q: How is her relationship, then,
[3] with — how has Ms. Siddiqui's relationship
[4] been with Mr. McGee, from your perspective?
[5] A: It's been very positive.
[6] She solicits him to help her with
[7] numerous things, beginning when she arrived
[8] with advance directives that she had asked him
[9] to help her with.
[10] And I've noted her to be laughing
[11] with him and joking with him. She's a totally
[12] different person around him than she is around
[13] other people.
[14] Q: Have you seen Ms. Siddiqui laugh?
[15] A: Yes.
[16] Q: How often, generally speaking?
[17] A: I've seen her laugh. I don't
[18] know. I don't have any idea.
[19] It's not an everyday occurrence,
[20] but there are certain people who she has a
[21] greater tendency to laugh around.
[22] Q: Are those other inmates?
[23] A: Generally, no, they're more
[24] likely to be staff.
[25] Q: Have you conferred with other

Page 171

**L. POWERS**

[1]
[2] staff members about Ms. Siddiqui's demeanor
[3] during her time at Carswell?
[4] A: Yes.
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13] Q: Have you spoke with any staff
[14] members who have observed Ms. Siddiqui to be
[15] laughing?
[16] A: Yes, I have.
[17] Q: Do you recall any of those staff
[18] members' names?
[19] A: Chris McGee.
[20] Q: Okay.
[21] Anybody else?
[22] A: One of the correctional officers,
[23] but I do not recall his name.
[24] Q: At some point, doctor, in your
[25] report, I believe you made reference — let me

Page 172

**L. POWERS**

[1]
[2] withdraw that.
[3] During your observation of Ms.
[4] Siddiqui during the time that Ms. Siddiqui has
[5] been at Carswell, has the issue of an insanity
[6] defense come up at all with regard to her?
[7] A: The only time that it's come up
[8] with her is when she was — she made reference
[9] to — and I just read it in Kicharski's
[10] report, I did not — I have not read any data
[11] about it, but I guess in Kicharski's report
[12] she had made reference to a staff member that
[13] was known to be on psychotropic medication and
[14] could, therefore, plead insane and get the
[15] insanity defense if he hurt her.
[16] Q: And that was in Dr. Kicharski's
[17] report?
[18] A: Yes.
[19] Q: You were asked on cross-
[20] examination a handful of questions about
[21] delusional disorder.
[22] Do you believe Ms. Siddiqui is
[23] suffering from a delusional disorder?
[24] A: No, I do not.
[25] Q: And why is that?

Page 173

**L. POWERS**

[1]

[2] A: She just doesn't exhibit the

[3] hallmarks of a delusional disorder.

[4] I think the things that she is

[5] exhibiting that are unusual compared to what I

[6] would normally see could be explained in light

[7] of her being from a different country, being

[8] held as a prisoner awaiting a very high

[9] profile case.

[10] I also believe that some of the

[11] things that she is expressing she expresses in

[12] an effort to further her political views.

[13] Q: And you were also asked about

[14] posttraumatic stress disorder.

[15] Do you believe she, Ms. Siddiqui,

[16] meets the criteria for posttraumatic stress

[17] disorder?

[18] A: The first essential component of

[19] posttraumatic stress disorder is that there

[20] must be a significant trauma that would cause

[21] this. I haven't seen a great deal of evidence

[22] that shows that she exhibits the symptoms or

[23] has exhibited — has experienced a trauma that

[24] would be to that magnitude.

[25] If it were to come to light that

Page 174

**L. POWERS**

[1]

[2] she was held captive for all of those years,

[3] some of her symptoms could be explained in

[4] light of that when she first arrived at the

[5] institution.

[6] Q: And based on your firsthand

[7] observations of Ms. Siddiqui, is her behavior

[8] consistent with that of someone who has

[9] endured trauma?

[10] A: No, not at all.

[11] Q: Why is that?

[12] A: Number one is I would expect

[13] someone who has experienced political captive

[14] trauma would have some leeriness of people who

[15] resembled those who held her captive. The

[16] fact that she gravitates to Chris McGee, who

[17] wears a uniform, is a high ranking officer,

[18] and makes me question why she picks him.

[19] One of the diagnostic criteria of

[20] PTSD is that you avoid things that may

[21] resemble the trauma that you experienced.

[22] Q: And you also testified about your

[23] viewing of the — what I'm going to call or

[24] refer to as the use of force video

[25]

Page 175

**L. POWERS**

[1]

[2]

[3]

[4] What did you take away from your

[5] viewing of that video?

[6] Based on your professional

[7] opinion, was Ms. Siddiqui in that video

[8] exhibiting symptoms of trauma or somebody

[9] who's reliving a traumatic experience?

[10] A: No, not at all.

[11] She was very angry in that video,

[12] she was yelling obscenities, she was demanding

[13] things from other people, demanding that there

[14] be cameras, demanding that they give her their

[15] names because she's going to sue them. Very

[16] much in control despite being restricted.

[17] Q: Based on your view of that video,

[18] you used the word control.

[19] Can you expand upon that a little

[20] bit?

[21] A: Yeah.

[22] I think that someone who — like

[23] I said in my earlier testimony, I've seen many

[24] use of force procedures. And, generally, the

[25] person who is undergoing the procedure is

Page 176

**L. POWERS**

[1]

[2] upset; they're being forced to do something

[3] they don't want to do. But it doesn't involve

[4] them making demands: You better give me your

[5] number. I'm going to sue you.

[6] And, also, using the camera as a

[7] tool to talk about political beliefs. She, I

[8] think at the end of the use of force, she

[9] really got into a, really, string of

[10] conversations about her belief about Americans

[11] and what they're doing here and mistreating

[12] her.

[13] Q: You were asked on cross-

[14] examination about tangential thinking.

[15] What evidence have you seen of

[16] tangential thinking within the last two or

[17] three months?

[18] A: I personally, I have not spoken

[19] with her. She will not speak with me. When

[20] she does refuse to speak with me, it's very

[21] direct.

[22] So, I personally have not seen

[23] any tangential thinking. The only tangential

[24] thinking that's been reported to me — and

[25] that's from the nurses and the other staff who

**L. POWERS**

[2] interact with her — are Dr. Kemke's report

[3] and Mr. McGee has reported some tangential

[4] thinking as well.

[5] **Q:** And you indicated that, you know,

[6] it is — tangential thinking is something

[7] that's possible to malinger.

[8] **A:** Yes.

[9] **Q:** Expand upon that a little bit.

[10] In your experience, have you seen

[11] individuals who are able to malinger that

[12] symptom?

[13] **A:** Yes, absolutely.

[14] Jumping from one topic to another

[15] is not that difficult to do. Usually when I

[16] see someone who's malingering that,

[17] malingering tests can flush it out.

[18] In this case, that wasn't an

[19] option.

[20] **Q:** Why was it not an option?

[21] **A:** Because she refused to submit to

[22] any tests.

[23] **Q:** You've listened to phone calls of

[24] Ms. Siddiqui.

[25] Correct?

**L. POWERS**

[2] **A:** Yes.

[3] **Q:** Up until recently?

[4] Do you know the most recent phone

[5] call you've listened to?

[6] **A:** No, it's been a while. I haven't

[7] listened to any since my report, I know.

[8] **Q:** So, since — you haven't listened

[9] to any since May 2009.

[10] Is that —

[11] **A:** Correct.

[12] **Q:** — fair to say?

[13] **A:** I'd say April.

[14] **Q:** Okay, April.

[15] What did you take away from

[16] hearing those phone calls?

[17] When you listen to Ms. Siddiqui

[18] communicate with her brother, for example, in

[19] your opinion, what did that show?

[20] **A:** She was able to communicate to

[21] her brother in a fairly logical way from the

[22] conversations that I reviewed toward the end.

[23] She did exhibit some thinking

[24] what was kind of jumping from topic — one

[25] topic to another, but she was also trying to

**L. POWERS**

[2] talk about political issues, and that really

[3] wasn't that unusual for her.

[4] **Q:** And you also indicated that Dr.

[5] Kemke's opinion has — well, you also indicate

[6] on cross-examination you've spoken with Dr.

[7] Kemke about this case.

[8] Is that right?

[9] **A:** Uh-huh.

[10] **Q:** Have you also read certain of her

[11] notes?

[12] **A:** Yes, I have read her notes.

[13] **Q:** Now, I believe you indicated on

[14] cross-examination that Dr. Kemke's opinion has

[15] not been the same throughout the time Ms.

[16] Siddiqui came to Carswell to the time that she

[17] left.

[18] **A:** Uh-huh.

[19] **Q:** Can you tell us about how Dr.

[20] Kemke has — how her opinion has changed?

[21] **A:** Yeah.

[22] Dr. Kemke in the beginning was,

[23] as I was, really focussed on the reports that

[24] I was getting and I was passing along to her

[25] that she may have been a victim of torture.

**L. POWERS**

[2] When Sally Johnson and Mr. Satoff

[3] — Dr. Satoff came to do the evaluation, they

[4] explained to Dr. Kemke that there was more

[5] collateral that she didn't know and I think

[6] went into detail on some of the collateral

[7] stuff.

[8] And Dr. Kemke said she wasn't

[9] aware of all that, and had she known that it

[10] would have changed her diagnosis — her

[11] working diagnosis. She never officially —

[12] she'd make notes in the file but never

[13] officially, I don't think, had any avenue with

[14] which to diagnose her.

[15] **Q:** Is Dr. Kemke a forensic

[16] psychologist or —

[17] **A:** No, she is not.

[18] **Q:** — forensic psychiatrist?

[19] **A:** No, she is not.

[20] **Q:** What's the difference between a

[21] — I'll withdraw that question.

[22] You were retained — you were

[23] tasked by the Court to opine on whether or not

[24] Ms. Siddiqui was competent to stand trial.

[25] **A:** Yes.

Page 181

**L. POWERS**

[1]

[2] Q: I just want to ask you a couple

[3] of kind of broad questions here.

[4] Can somebody be mentally ill or

[5] have a mental disorder and still be competent?

[6] A: Absolutely.

[7] Q: And your opinion is that Ms.

[8] Siddiqui is competent to stand trial.

[9] A: That is my opinion, yes.

[10] Q: And is that contingent upon

[11] whether or not she does suffer from a mental

[12] disorder?

[13] A: Based on the presentation that

[14] she showed to me in the window with which I

[15] had to evaluate her, I believe that she is

[16] competent to stand trial. Regardless of if we

[17] find out one way or the other what happened to

[18] her, where she's been the last few years,

[19] she's still competent to stand trial, in my

[20] opinion.

[21] Q: What is your opinion based on?

[22] A: It's based on the idea — I mean,

[23] opinions on competency are based upon the

[24] Dusky Standard, which is, you know, factual

[25] and rational understanding of the court

Page 182

**L. POWERS**

[1]

[2] process and the ability to assist their

[3] defense.

[4] Q: Is there any specific fact, in

[5] your view, that can change the calculus as to

[6] whether Ms. Siddiqui is competent or not

[7] competent?

[8] A: I'm not sure what you're asking.

[9] Q: Let me rephrase that.

[10] Is your opinion of Ms. Siddiqui's

[11] competence, is that based upon a variety of

[12] different factors or just one specific thing?

[13] A: Based on a variety of factors.

[14] Q: And can you just give us a

[15] general summary of why you believe Ms.

[16] Siddiqui is competent to stand trial?

[17] A: She certainly possesses the

[18] rational and factual understanding of her

[19] case. She possesses the intelligence; she

[20] doesn't suffer from a mental disease of defect

[21] that would inhibit her from having an

[22] understanding of — the rational and factual

[23] understanding of her case. And she's also

[24] demonstrated that she has a knowledge of her

[25] court proceedings.

Page 183

**L. POWERS**

[1]

[2] Her ability to assist her

[3] attorney has not been a concern as much as her

[4] willingness to assist her attorney. She has

[5] continued to refuse to do that based on — for

[6] a variety of reasons, from the religious

[7] affiliation of her attorney to the strip

[8] searches. But she certainly — my opinion is

[9] that she possesses the ability to assist her

[10] attorney.

[11] Q: So, is it fair to say that in

[12] your professional opinion, her refusal to

[13] assist or consult with her attorneys is due to

[14] a conscious choice?

[15] A: It's volitional, yes.

[16] MR. LAVIGNE: I have no further

[17] questions.

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 184

**L. POWERS**

[1]

[2]

[3] THE VIDEOGRAPHER: The time is

[4] now 4:18. This marks the ending of Tape

[5] No. 3.

[6] Off the record.

[7]

[8] (Time noted: 4:18 p.m.)

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 185

[1]
[2] **CAPTION**
[3]
[4] The Deposition of LESLIE POWERS, Ph.D., taken
[5] in the matter, on the date, and at the time
[6] and place set out on the title page hereof.
[7]
[8]
[9] It was requested that the deposition be taken
[10] by the reporter and that same be reduced to
[11] typewritten form.
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 186

[1]
[2] **CERTIFICATE**
[3]
[4] STATE OF                    :
[5] COUNTY/CITY OF              :
[6]
[7] Before me, this day, personally appeared
[8] LESLIE POWERS, Ph.D., who, being duly sworn,
[9] states that the foregoing transcript of her
[10] Deposition, taken in the matter, on the date,
[11] and at the time and place set out on the title
[12] page hereof, constitutes a true and accurate
[13] transcript of said deposition.
[14]
[15]
[16]
[17]          LESLIE POWERS, Ph.D.
[18]
[19] SUBSCRIBED and SWORN to before me this _____
[20] day of _____, 2009, in the jurisdiction
[21] aforesaid.
[22]
[23]
[24]
[25] My Commission Expires        Notary Public

Page 187

[1]
[2]          DEPOSITION ERRATA SHEET
[3] RE:
    FILE NO. 08CR826(RMB)
[4] CAPTION: USA v. SIDDIQUI
[5] DEPONENT: LESLIE POWERS, Ph.D.
    DEPOSITION DATE: JUNE 26, 2009
[6]
    To the Reporter:
[7] I have read the entire transcript of my
    Deposition taken in the captioned matter or
[8] the same has been read to me. I request for
    the following changes to be entered upon the
[9] record for the reasons indicated.
    I have signed my name to the Errata Sheet and
[10] the appropriate Certificate and authorize you
    to attach both to the original transcript.
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25] SIGNATURE: _____  DATE: _____
          LESLIE POWERS, Ph.D.

Page 188

[1]
[2]          **INDEX**
[3] WITNESS                    PAGE
[4] Leslie Powers                6
[5]
[6]
[7]          REQUEST FOR INFORMATION
[8]     PAGE      LINE
        14        13
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 189

[1]
[2]          CERTIFICATE
[3] STATE OF NEW YORK          )
[4]                                    )ss.:
[5] COUNTY OF NEW YORK          )
[6]          I, LINDA A. MARINO, a Registered
[7]    Professional Reporter, Certified Court
[8]    Reporter, and Notary Public within and
[9]    for the State of New York do hereby
[10]   certify:
[11]         I reported the proceedings in the
[12]   within-entitled matter to the best of my
[13]   ability, and that the within transcript
[14]   is a true record of such proceedings.
[15]         I further certify that I am not
[16]   related, by blood or marriage, to any of
[17]   the parties in this matter and that I am
[18]   in no way interested in the outcome of
[19]   this matter.
[20]         IN WITNESS WHEREOF, I have
[21]   hereunto set my hand this _____ day
[22]   of _____ 2009.
[23]
[24]
[25]          LINDA A. MARINO, RPR, CCR