UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA   :

    - v. -      :  08 Cr. 826 (RMB)

AAFIA SIDDIQUI,     :

     Defendant.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**GOVERNMENT'S
PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

   The Government respectfully submits the following proposed findings of fact and conclusions of law with respect to the competency hearing, held on July 6, 2009, to determine the competency of the defendant to stand trial.

**PROPOSED FINDINGS
OF FACT**

**I.  INTRODUCTION**

   1.  On August 4, 2008, Aafia Siddiqui, the defendant, was arrested in Bagram, Afghanistan. The defendant was charged in a two-count criminal complaint with: (1) attempting to kill United States officers and employees in Ghazni, Afghanistan; and (2) assaulting United States officers and employees in Ghazni, Afghanistan. The defendant was presented on this Complaint on August 5, 2008 in the United States District Court for the Southern District of New York, and was detained at the Metropolitan Detention Center ("MDC") in Brooklyn, New York. Thereafter, a grand jury sitting in the United States District Court for the Southern District of New York returned an indictment against the defendant in the following seven counts:

(1) attempted murder of United States nationals; (2) attempted murder of United States officers and employees; (3) use of a firearm during the commission of crimes of violence; and (4) four counts of assault of United States officers and employees.

2.      On August 21, 2008, after 17 days of pre-trial incarceration, the defendant began complaining of mental health symptoms.  As a result, on or about October 1, 2008, the Court ordered that the defendant be transferred to the Federal Medical Center in Carswell, Texas ("FMC Carswell") for purposes of a mental health evaluation, pursuant to Title 18, United States Code, Section 4241.  After an initial evaluation found the defendant to be incompetent, both parties retained mental health professionals to conduct independent mental health evaluations of the defendant.

3.      Subsequently, three separate mental health evaluations found the defendant competent to stand trial.  One of these three evaluations was from FMC Carswell, which reversed its prior finding that the defendant was not competent, and concluded that, in fact, she was competent.  In addition, one mental health evaluation, from the defense-retained expert, found the defendant incompetent to stand trial.  On July 6, 2009, the Court held a competency hearing pursuant to Title 18, United States Code, Section 4247(d), to determine whether the defendant is competent to stand trial.

4.      The Government submits, as set forth below, that the testimony and other evidence presented in this hearing establishes that the defendant is malingering and does not suffer from a mental disease or defect.  In addition, the evidence establishes that the defendant possesses a rational and factual understanding of the proceedings, and possesses the ability to consult with her attorney with a reasonable degree of rational understanding.  Accordingly, the

defense is unable to meet its burden of proving that the defendant is not competent to stand trial.

## II.    BACKGROUND

### A.    Personal Data

5.    As summarized in the various expert reports, the defendant was born on March 3, 1972 in Multan, Pakistan.  (GX A at 4; GX B at 5.)[1]  Following graduation from high school, the defendant traveled to the United States where she enrolled at the University of Houston.  (GX B at 5.)  Thereafter, the defendant transferred to the Massachusetts of Technology ("MIT"), where she obtained a degree in biology, graduating with a 4.4 Grade Point Average (out of a 5.0 scale). The defendant subsequently obtained a Master of Science degree and a Ph.D in Neuroscience from Brandeis University in 2001.  (GX B at 5.)

6.    The defendant married her first husband in 1995 and had three children with him. (GX B at 5.)  Two of the children were raised in the United States, and the third was raised in Pakistan.  (GX B at 5-6.)  The defendant and her husband lived in the United States until 2002, at which point they moved to Pakistan.  (GX A at 4; GX B at 6.)  The defendant subsequently returned to the United States in late December 2002 and returned to Pakistan in early 2003.  (GX B at 7.)

---

[1]    "GX [LETTER]" refers to Government Exhibits that previously were submitted to the Court on June 22, 2009 and July 1, 2009; "GX [NUMBER]" refers to certain witness 3500 material; "DX [NUMBER]" refers to Defense Exhibits that previously were submitted to the Court; "[DATE] Tr." refers to certain transcripts of proceedings before the Court; and "Compl." refers to the Criminal Complaint in this case.

The Government respectfully requests that the Government exhibits (marked by letter) previously submitted to the Court be admitted as evidence.  As discussed at the competency hearing, the Government also respectfully requests that Government Exhibits 3501-28, 3502-7, and 3503-4 (the curriculum vitae of Doctors Johnson, Saathoff, and Powers) be admitted as evidence.  The defense consents to these requests.

7.        The defendant has provided conflicting reports of her whereabouts from 2003 until her July 2008 apprehension, including that she was in hiding after learning that the Federal Bureau of Investigation ("FBI") was looking for her.  (GX B at 7.)  Similarly, the defendant has provided conflicting information about the whereabouts of her children.  One child was with the defendant upon her arrest.  The defendant did not disclose to authorities that the child was hers; rather, she claimed that he was an orphan who she was caring for.  (GX A at 8; GX D at 234, 411.)  As for the other children, the defendant has claimed on various occasions that they were left with her sister or that they are dead.  (GX A at 4.)

B.        <u>The Charges</u>

8.        As alleged in the Complaint and Indictment, on or about July 17, 2008, the defendant was in Ghazni, Afghanistan.  (Compl. ¶ 4(b).)  The defendant appeared to be acting suspicious and was approached by members of the Afghan National Police ("ANP").  (Compl. ¶ 4(c).)  The ANP recovered a number of documents from her relating to the construction of explosives, chemical weapons, and other weapons involving biological and radiological materials.  (Compl. ¶ 5(a).)  The defendant was then brought to an ANP facility where she remained until the following day.

9.        As alleged in the Complaint and Indictment, on July 18, 2008, a team of United States Army Officer and FBI agents (the "U.S. interview team") was directed by Afghan officials to a meeting room on the second floor of the ANP facility.  (Compl. ¶ 5(a).)  Unbeknownst to the U.S. Interview Team, the defendant was in the meeting room, unrestrained, behind a sheet that partitioned the room.  A U.S. Army Officer ("U.S. Army Officer One") sat in a chair next to the curtain and placed his M-4 rifle next to the curtain.  (Compl. ¶ 5(b).)  A short

time later, the defendant obtained the rifle and attempted to fire and fired it at members of the U.S. interview team, repeatedly stating her desire to kill Americans. (Compl. ¶ 5(c).) U.S. Army Officer One returned fire with a 9-millimeter service pistol, firing approximately two shots at the defendant's torso and hitting her at least once. (Compl. ¶¶ 5(d)-(g).) The defendant was then taken to a U.S. Army hospital for treatment of her injuries.

10. The defendant was subdued by law enforcement and military personnel. Shortly thereafter, she was transported to a United States military base where she received medical care for her gunshot wounds.

C.    <u>The Defendant's Hospitalization</u>

11. While hospitalized at the military base, the defendant began conversing with FBI agents about a wide range of issues. (GX D). The FBI agents documented these interviews in reports. (GX D.) As set forth in these reports, the defendant responded to questions about her past and demonstrated an ability to negotiate and an ability to contest (or dispute) certain allegations relating to the July 18 shooting and her affiliation with al Qaeda.

12. During the two-week period that the defendant was speaking with the FBI, she did not complain of hallucinations or other mental health symptoms. (GX B at 9.) Likewise, the defendant was not diagnosed with any mental health disease or defect. (GX A at 6; GX B at 9; GX C at 7.)

D.    <u>The Defendant's Transfer to the United States</u>

13. On August 4, 2008, the defendant was transported to the United States. The defendant was medically cleared for travel by a physician. (GX B at 8.) No signs of mental health symptoms were observed by law enforcement agents and no diagnosis of mental illness

was made by traveling physicians.  (GX B at 9; GX C at 7; GX G at H1-H2, H9-H10.)

E.    The Defendant's Incarceration at the MDC

14.    Upon arrival in the United States, the defendant was brought to the MDC in Brooklyn, New York.  At the "intake screening," the defendant denied a history of mental illness, and expressed reluctance discussing her criminal case until she had the opportunity to confer with an attorney.  (GX B at 10-11; GX F at 56.)  The defendant was cleared to be incarcerated, and was not observed exhibiting any signs of mental illness.  (GX B at 10-11; GX C at 7; GX F at 55.)

15.    The defendant appeared in Court on August 5, 2008 before United States Magistrate Judge Ronald L. Ellis.  (8/5/08 Tr.)  Judge Ellis explained to the defendant that the purpose of the proceeding was to inform her of certain rights she had, to inform her of the charges against her, to consider whether counsel should be appointed to represent her, and to consider the issue of bail.  (8/5/08 Tr. at 3:10-15.)  The defendant acknowledged that she understood the purposes of the proceeding.  (8/5/08 Tr. at 3:16-20.)  The defendant also stated that she understood (as read to her by Judge Ellis): (1) her right to remain silent; (2) her right to be released on bail, unless there were no conditions that reasonably could assure her presence or the safety of the community; and (3) her right to an attorney.  (8/5/08 Tr. at 4:3-19.)   The defendant then stated that she had completed a financial affidavit in the case, and affirmed that the statements contained therein were true and correct.  (8/5/08 Tr. at 4:21-5:3.)  Judge Ellis then appointed counsel to represent the defendant.  (8/5/08 Tr. at 5:4-5.)  Thereafter Judge Ellis read the charges and allegations in the Complaint to the defendant who acknowledged she understood them.  (8/5/08 Tr. at 6:25-12:16.)

16.     The defendant also appeared in Court on August 11, 2008 before Chief United States Magistrate Judge Henry B. Pitman. (8/11/08 Tr.) At this proceeding, the defense withdrew its bail application, consented to the defendant being detained, agreed to extend the preliminary hearing date, and obtained an Order pertaining to the defendant's medical treatment. (8/11/08 Tr. at 3-12.). The defense did not raise an issue with respect to the defendant's competency at either the August 5th or August 11th proceedings.

17.     While incarcerated, the MDC provided medical care for the defendant's gunshot wound. Staff members frequently visited the defendant and checked on her wound and medical status. (GX B at 10-11; GX I at MED 261-272, 274, 288.) For about the first two and half weeks, the defendant was cooperative with these visits and allowed her wound dressing to be changed. (*Id.*) Staff members did not record any overt signs of mental illness during these encounters. (*Id.*)

18.     On August 21, 2008, the defendant began expressing symptoms of depression, mostly related to the gravity of her legal situation. (GX B at 12; GX I at MED 291.) Although the defendant complained of these symptoms, she stated that she could not discuss them, at the advice of her lawyer. (*Id.*) During these encounters, the defendant was found to have normal thought content. (*Id.*)

19.     Shortly thereafter, the defendant claimed to experience hallucinations. (*See*, *e.g.*, GX B at 13; GX C at 8; GX E at LOG 86, 103-4.) The alleged hallucinations varied, but included visions of her children, her children's pets, and dark angels. (GX B at 13; GX E at LOG 86, 103; GX I at MED 313, 367.) Around this same time, the defendant became less cooperative with certain MDC staff members and began refusing medical care. (*See*, *e.g.*, GX A at 11; GX B

at 13; GX I at MED 302-305, 309-311, 313-22.)  Consistently, the defendant refused to expand upon her hallucinatory symptoms when asked about them.  (GX A at 17; B at 11-13.)  In addition, the defendant refused to attend court proceedings.  (GX B at 15; GX E at LOG 135.)

20.     At the request of the Court, MDC Psychology staff conducted an evaluation of the defendant.  Staff found – based on interviews with the defendant – that she suffered from major depressive disorder, with mood congruent psychotic features.  (GX B at 14; GX F at 39.)  This diagnosis was viewed as a "working one," given that many aspects of the defendant's presentation – such as sleeping, grooming, and reading – were inconsistent with symptoms of depression.  (GX B at 14; 7/6/09 Tr. at 121:5-13 (noting that MDC did not provide the "for-sure diagnosis" that would follow the defendant "forever"; rather they believed transfer to an inpatient facility for forensic assessment would be the best course).)

21.     As a result of the defendant's refusal of medical care, a forced medical examination of the defendant was conducted on September 9, 2008, which was videotaped.  (GX A at 32-33; GX B at 14; GX C at 8.)  During the course of the examination, the defendant was uncooperative, and repeatedly yelled at and taunted MDC staff who performed the examination. (*Id.*)  After this incident, the defendant continued to complain of mental health symptoms, including hallucinations.  (GX B at 14; GX I at MED 367.)

22.     On consent, the Court ordered a mental health evaluation of the defendant pursuant to Title 18, United States Code, Section 4241.  On or about October 2, 2008, the defendant was sent to FMC Carswell for purposes of the competency evaluation.

F.  The Defendant's Incarceration at FMC Carswell

23.  When the defendant arrived at FMC Carswell, she complained of an inability to remember certain aspects of her past and her own identifying information – including her name (GX H MED at 46, 47, 395).  The defendant also claimed that she suffered hallucinations, which included purported images of her babies flying.  (GX H at MED 46-51.)  In addition, the defendant claimed that staff at the MDC had killed her.  (GX B at 16; GX H at MED 1-3, 46-51, 415.)

24.  Dr. Kempke – a staff psychiatrist at FMC Carswell – saw the defendant on October 3, 2008.  (GX H at MED 46-51.)  After meeting the defendant, Dr. Kempke concluded: "my opinion is that there is a 99% certainty she is psychotic."  (GX H at MED 46, 47-51; DX 7 at 122:11-17.)  Dr. Kempke made this conclusion based on her observations of the defendant the day after she was brought to FMC Carswell.  (DX 7 at 122:18-22.)  This meeting lasted 45 minutes to an hour.  (DX 7 at 123:8-23.)  Prior to making this assessment, Dr. Kempke had not reviewed any of the defendant's medical records from the MDC, had not consulted with the defendant's physicians at MDC, had not spoken to staff members from the MDC, and had not consulted with law enforcement personnel who had been in contact with the defendant.  (DX 7 at 124:5-125:8.)

25.  At FMC Carswell, the defendant was housed on the M-1 Unit, which is not restrictive and is similar to a hospital ward.  (GX O at 148:9-23.)  The inmates reside in rooms that are similar to those found in hospitals and enjoy the freedom to move around.  (GX A at 10; GX O at 148:25-149:10.)

26.  The defendant continued to complain of a variety of mental health symptoms.

Quite often, for example, the defendant stated that she was "dead." (GX H at MED 59, 80, 84, 117, 423.) The defendant also repeatedly described graphic "hallucinations" of her children. (GX B at 17; GX C at 5-6; GX H at MED 129, 132, 151 (November 2008 note where defendant states "if my children come tonight, don't turn them away"), 161 (December 2008 note referencing defendant's request that her children be allowed to come during the day because they keep her up at night), 163.)) The defendant made these claims even though FMC Carswell did not observe the defendant to be suffering from any type of sleep disturbances. (GX C at 6; GX H at MED 109, 129, 132 (November 2008 showing that the defendant was sleeping about 6-8 hours per night), 192 (May 2009 note setting forth no difficulties with the defendant's sleeping), 196, 399-401, 406-09.))

27.     In a November 2008 evaluation, Dr. Powers – the forensic evaluator at FMC Carswell – concluded that the defendant was not competent to stand trial. (GX H at MED 153.) Dr. Powers diagnosed the defendant with Major Depressive Disorder, based in part on the hallucinations described by the defendant and various statements she had made to evaluators (including that she was dead and that she would be poisoned). (GX C at 12; GX H at MED 151-53.)

28.     After this evaluation was submitted, the defendant remained at FMC Carswell for seven months. During this period, Dr. Powers received additional information about the defendant (including records from the MDC) which placed the defendant's symptoms in better context. (GX B at 18; GX C at 6; GX O at 20:13-18, 146:5-12, 146:19-147:3.)

29.     In addition, the defendant's mental health symptoms improved. (GX C at 5-6; GX O at 28:24-25, 29:2-6 (noting the "vast difference" in the defendant's presentation); DX 7 at

22:7-8, 163:3-10, 202:20-203:2.)  By the time the defendant left FMC Carswell, the defendant no longer experienced crying episodes, was observed reading on the unit, and did not exhibit depressive symptoms.  (GX O at 29:2-6.)  Whereas the defendant initially presented as tearful, with negative affect, and possible depressive symptoms, she later presented as laughing, and often having conversations with various staff members.  (GX O at 148:22-149:2.)  Similarly, the defendant ceased complaining of hallucinations or other "visions" at night.  (GX O at 153:7-9.)

30.     This improved presentation was achieved without the use of anti-psychotic medication.  (GX A at 3, 14; GX O at 32: 4-21 ("[S]he was sleeping adequately, she didn't seem to be depressed most of the day; in fact, over time, she was observed to be laughing and joking . . . . was not observed to have, that I knew of, any eating problems after the initial thing where she was waiting to eat downstairs. . . .  And this is without – without medication.  She was not on antidepressant throughout that first stay there. . . .  It definitely seemed to have gotten better, so I attributed that to just her adjustment at prison in the situation that she was in."), 153:7-9; DX 7 at 196:23-25, 202:20-203:2.)

31.     At the direction of the Court, FMC Carswell submitted an updated evaluation on May 4, 2009.  (GX C.)  The updated evaluation found that the defendant was malingering and did not suffer from a mental disease or defect.  (GX C; GX O at 137:25-138:13 ("[N]ow that I've had a longer period of time to observe her, I do not believe she meets the criteria for major depressive disorder congruent with psychotic features.")  The report also concluded that the defendant was competent to stand trial, as she possessed a factual and rational understanding of the proceedings, and had the ability to assist in her defense.  (GX C at 12.)

32.     On or about June 17, 2009, in advance of the July 6, 2009 competency hearing,

the defendant was transferred from FMC Carswell to the MDC.

## III.    THE COMPETENCY HEARING

33.    The competency hearing was held before the Court on July 6, 2009.  Three

witnesses testified – Dr. L. Thomas Kucharski (for the defense), Dr. Sally C. Johnson (for the

Government), and Dr. Gregory B. Saathoff (for the Government).  In addition, two witnesses

were deposed prior to the hearing – Dr. Powers (the FMC Carswell evaluator, called by the

Government) and Dr. Kempke (an FMC Carswell staff psychiatrist, called by the defense).  With

the exception of Dr. Kempke, all four witnesses submitted written evaluations to the Court in

advance of their testimony.  The defendant was offered the opportunity to attend the depositions,

one of which (Dr. Powers) was held at the MDC to accommodate the defendant, but the

defendant refused to attend either deposition.  The Court required that the defendant attend the

hearing itself.  A brief summary and assessment of the witnesses is described below.

A.    <u>Dr. Powers</u>

34.    Dr. Powers is the BOP forensic psychologist and evaluator for this case.  Dr.

Powers was not retained by either party, but was assigned to this case in accordance with the

Court's October 2, 2008 Order.  (GX O at 145:3-4.)  Dr. Powers role is "to look at the evidence

and to evaluate the Defendant and to formulate an opinion for the Court."  (GX O at 145:4-7.)

35.    Dr. Powers is one of two forensic psychologists at FMC Carswell.  (GX O at.

12 at 20-21.)  She has conducted about 70 evaluations at FMC Carswell, and about 30 at her

prior institution in Fort Worth, Texas.  (GX O at 17:10-16.)  In advance of the hearing, Dr.

Powers reviewed various pieces of information relating to the defendant, including the

defendant's medical and institutional records from the MDC and FMC Carswell, various FBI

interview reports of the defendant, recorded phone calls of the defendant (and transcripts thereof) made while she was incarcerated, and the forced medical examination videotape of the defendant. (GX C at 2-4; GX H at MED 148.) Dr. Powers also spoke with various law enforcement agents and FMC Carswell staff members who observed and interacted with the defendant since the time of her arrest. (GX C at 7-11; GX H at MED 148; GX O at 148:9.)

36.     As noted above, Dr. Powers submitted two evaluations to the Court prior to testifying – one was a report dated November 6, 2008 and one was a report dated May 4, 2009. At the time Dr. Powers conducted her initial evaluation, Dr. Powers had limited collateral information upon which to rely. (GX A at 12; GX C at 6.) Dr. Powers did not, for example, have records from the MDC (including the video of the forced medical exam) or all of the FBI interview reports. (GX O at 146:5-12, 146:19-147:3.)

37.     After the initial evaluation, Dr. Powers continued to observe and evaluate the defendant. Dr. Powers observed the defendant two to three times per week. (GX O at 147:25.) In addition, Dr. Powers spoke with staff members about their observations of the defendant. (GX O at 148:9.) As noted above, additional information helped place the defendant's symptom presentation in better context. (GX C at 6; GX O at 20:13-18, 146:5-12, 146:19-147:3.) In addition, Dr. Powers viewed the defendant as having improved in her presentation. (GX C at 5-6; GX O at 28:24-25, 29:2-6.)

38.     Accordingly, Dr. Powers submitted a revised evaluation to the Court on or about May 4, 2009. The report found that the defendant "is not suffering from a mental disease or defect which would render her unable to understand the nature and consequences of the proceedings against her or to assist properly in her own defense." (GX C at 12.) Dr. Powers

added that the defendant's "refusal to participate in her legal defense or to communicate with her attorneys is not indicative of a mental disease or defect that results in her inability to be a competent defendant," but "is a volitional decision made by [the defendant.]" (GX C at 11.)

   B.    Dr. Sally Johnson

39.    Dr. Sally Johnson conducted an independent evaluation of the defendant on behalf of the Government.  (7/6/09 Tr. at 149:13-150:1.)  Dr. Johnson is a Professor of Psychiatry at the University of North Carolina, Chapel Hill.  (GX 3502-7 at 2.)  Previously, Dr. Johnson worked as a forensic psychiatrist at the Bureau Of Prisons ("BOP") for over 25 years (from 1979 to 2004).  (GX 3502-7 at 2; 7/9/09 Tr. at 132:21-133:5.)  Dr. Johnson was the BOP's lead forensics evaluator and expert witness, focusing on its most high-profile and complex cases. (GX 3502-7 at 2; 7/9/09 Tr. at 133:1-5.)

40.    Dr. Johnson held numerous positions at the BOP throughout her career. Dr. Johnson served as the Psychiatric Consultant to the Medical Director of the entire BOP (from 2001 to 2004); the Associate Warden and Chief Psychiatrist for the Federal Correctional Complex in Butner, North Carolina (from 1999 to 2001); the Associate Warden and Chief Psychiatrist for the Federal Correctional Institution in Butner, North Carolina ("FCI Butner") (from 1989 to 1999); the Director of Forensic Services and Clinical Research at FCI Butner (from 1983 to 1989); and as a Staff Psychiatrist at FCI Butner (from 1979 to 1983)  (GX 3502-7 at 2.)  Throughout her career, Dr. Johnson has conducted 100s of forensic psychiatric evaluations, and has focused on a wide range of issues relating to competency.  (GX 3502-7 at 1; 7/6/09 Tr. at 6-9.)

41.    In addition to being a Professor of Psychiatry at the University of North

14

Carolina, Dr. Johnson is also a Consulting Assistant Professor to the Department of Psychiatry at Duke University Medical Center; a Senior Lecturer at Duke University School of Law; and an Adjunct Professor at the University of North Carolina Law School. (GX 3502-7 at 4.) Dr. Johnson is also a member of various psychiatric boards and associations, and has served as a consultant to various correctional institutions and task forces on issues relating to mental health. (*Id.*)

42. In advance of testifying, Dr. Johnson spent well over 200 hours working on her ongoing evaluation of the defendant. (7/9/09 Tr. at 90:2-3.)[2] In connection with this evaluation, the defendant reviewed thousands pages of documents. These documents included all of the medical records that were generated on the defendant during her stay in Afghanistan, her incarceration at the MDC, and her time at FMC Carswell. (GX B at 2-5.) In addition to reviewing these materials, Dr. Johnson listened to and reviewed transcripts of over 30 recorded phone calls the defendant made while she was incarcerated, and watched the videotape of the defendant's forced medical examination. (GX B at 2-5, 14.) Dr. Johnson also reviewed hundreds of pages of materials relating to the charges against the defendant, including hundreds of pages of FBI Interview reports, court documents, and transcripts of court proceedings. (*Id.*) After submitting her report, Dr. Johnson continued to receive and review materials as they became available, including updated medical and prison records of the defendant. (7/9/09 Tr. at 114:16-115:15.)

43. As part of her evaluation, Dr. Johnson also interviewed over 40 people who had

---

[2] Dr. Johnson spent approximately 200 hours on the case as of March 2009, and has continued to work on this case. (*See* GX 3502-8.)

interacted with the defendant since the time of arrest. These interviews included: (1) 29 medical and correctional staff members at FMC Carswell; (2) 13 medical and correctional staff members at the MDC; (3) 5 FBI agents; (4) 3 defense attorneys; and (5) the in-flight physician with the defendant from Afghanistan to the United States. (GX B at 4-5.)

44.     With the possible exception of Dr. Powers, Dr. Johnson spent more time with the defendant than the other expert witnesses. Similarly, out of all the expert witnesses, Dr. Johnson had seen the defendant most recently. Dr. Johnson met with the defendant on five separate occasions – January 22 and 23, 2009 (at FMC Carswell); February 10 and 11, 2009 (at FMC Carswell); and July 5, 2009 (at the MDC). (7/6/09 Tr. at 133:17-24.) All told, Dr. Johnson spent between 10 and 12 hours with the defendant. (7/6/09 Tr. at 134:3-4.) According to Dr. Johnson, the defendant's presentation on July 5, 2009 was the same as it had been in February 2009. (7/6/09 Tr. at 135:24; 136:2-6; 8-18.) In addition to personally meeting with the defendant, Dr. Johnson also observed her interacting with other inmates and staff members at FMC Carswell. (7/6/09 Tr. at 134-21-23.)

45.     Dr. Johnson submitted a report to the Government on March 16, 2009. Dr. Johnson concluded, in part, that the defendant "is not presently suffering from a mental disease or defect rendering her mentally incompetent to the extent that she is unable to understand the nature and consequences of the proceedings or to assist properly with her defense. She has a rational and factual understanding of the proceedings against her and is able to assist her attorneys with a reasonable degree of rational understanding should she choose to do so. In summary, it is this evaluator's opinion that Ms. Siddiqui is competent to stand trial at this time." (GX B at 35.) In addition, Dr. Johnson referenced the defendant's lack of cooperation with the

psychiatric evaluation process, and determined that "the lack of cooperation by Ms. Siddiqui is volitional and not a symptom of mental illness."  (GX B at 2.)

C.    Dr. Saathoff

46.    Dr. Saathoff also conducted an independent evaluation of the defendant on behalf of the Government.  (7/6/09 Tr. at 191:1-7.)  Dr. Saathoff is an Associate Professor of Research in Psychiatric Medicine and an Associate Professor of Emergency Medicine at the University of Virginia Medical School.  (GX A 3; 3501-28 at 1.)  Prior to holding these positions, Dr. Saathoff's experiences includes: Psychiatric Consultant to the Virginia Department of Corrections (1991 to the present); Associate Professor of Clinical Psychiatry at the University of Virginia (1987 to 2002); Attending Psychiatrist at Western State Hospital (1987-2002); Psychiatric Forensic Consultant to the FBI (1993-96); Medical Director for the Kuwait PTSD Project (1994-96); and Psychiatric Consultant to the Virginia Bureau of Criminal Investigation (1984-87).  (GX 3501-28 at 2-3.)  Dr. Saathoff is also a member of a number of psychiatric organizations, including the American Psychiatric Association.  (GX 3501-28 at 6.)  Dr. Saathoff also worked overseas as a military psychiatrist tending to trauma victims during the Gulf War.  (GX A at 3.)  And, Dr. Saathoff has also provided prisoner psychiatric care since 1991.  (*Id.*)  Dr. Saathoff also provides teaching and training on these topics.

47.    In advance of testifying, Dr. Saathoff spent hundreds of hours evaluating the defendant, reviewing thousands of pages of materials, and conducting over 25 interviews.  (GX A at 40-47.)[3]  The documents reviewed by Dr. Saathoff included all of the medical records that

_____

[3]    As of February 2009, for example, Dr. Saathoff had spent close to 100 hours on the case.  (GX 3501-30; 7/6/09 Tr. at 154:13-15.)  Since that time, Dr. Saathoff has continued to work on this case, including preparing his March 2009 report and testifying.

were generated on the defendant during her stay in Afghanistan, her incarceration at the MDC, and her time at FMC Carswell. (*Id*.) In conducting his evaluation, Dr. Saathoff meticulously analyzed a several hundred page log (GX E) maintained by the MDC that pertained to the defendant's actions at the MDC. (GX 3501-5.) Dr. Saathoff also listened to (and reviewed transcripts of) over 30 recorded phone calls the defendant made while she was incarcerated at the MDC and FMC Carswell. Dr. Saathoff also watched the videotape of the defendant's forced medical examination while she was incarcerated at the MDC. (GX A at 40-47.) Dr. Saathoff also reviewed hundreds of pages of materials relating to the charges against the defendant, including FBI Interview reports, court documents, transcripts of court proceedings, and other materials. (*Id*.) After submitting his report, Dr. Saathoff continued to receive and review materials as they became available, including updated medical and prison records of the defendant. (*See*, *e.g.*, 7/9/09 Tr. at 164:7-8 (discussing latest information from MDC).)

48.    As part of his evaluation, Dr. Saathoff also interviewed over 25 people who interacted with the defendant since the time of arrest. These interviews included: (1) 9 medical and correctional staff members at FMC Carswell; (2) 14 medical and correctional staff members at the MDC; and (3) 4 FBI agents. (GX A 40-47.)

49.    Dr. Saathoff also traveled to FMC Carswell to interview and observe the defendant. Dr. Saathoff went there on February 12 and 13, 2009 and attempted to interview her on three separate occasions. (GX A at 6-7.) All told, Dr. Saathoff spent about three and a half hours with the defendant. (7/6/09 Tr. at 159:4-5.) In addition to personally meeting with the defendant, Dr. Saathoff also observed her interacting with other inmates and staff members. (*See*, *e.g.*, GX A at 7.)

50.     After reviewing all of these materials, Dr. Saathoff submitted an evaluation report to the Government on March 15, 2009.  Dr. Saathoff's report concluded that the defendant "is competent to stand trial and does not suffer from any mental illness that would preclude her from assisting her attorneys, should she desire to do so."  (GX A at 1.)  Dr. Saathoff further determined that the defendant "has most likely fabricated reported psychiatric symptoms to give credibility to her claims that she suffers from a mental disorder." (*Id.*)  As Dr. Saathoff found, the defendant's "malingered symptoms have provided a dual solution in that a finding of incompetency could serve to both prevent prosecution while at the same time facilitating rapid repatriation."  (GX A at 38.)

        D.      Dr. Kucharski

51.     Dr. Kucharski was retained by the defense to conduct an evaluation of the defendant, and testified as the defense forensic expert at the hearing.  (7/6/09 Tr. at 22:22-23.)  Dr. Kucharski worked as a staff psychiatrist at the BOP for about 10 years.  (7/6/09 Tr. at 23:7-8.)

52.     Dr. Kucharski submitted an expert report to defense counsel on June 20, 2009.  In completing his report, the defense expert relied on a number of documents, including medical records of the defendant and certain case-related materials.  (DX 1 at 2.)  On cross examination, however, Dr. Kucharski admitted that he did not speak with any mental health professionals or staff members at the MDC regarding their treatment or observations of the defendant.  (7/6/09 Tr. at 23:1-24:5)  Likewise, Dr. Kucharski did not confer with law enforcement agents who observed the defendant after her detention in Afghanistan, or who transported the defendant to the United States.  (DX 1 at 2.)  Dr. Kucharski did interview the defendant's brother and a

representative of the Pakistani Consulate who was in contact with the defendant. (*Id*.)

53. Dr. Kucharski met with the defendant at FMC Carswell on one occasion. The meeting was on May 1, 2009 and lasted an hour and a half. (7/6/09 Tr. at 24:15-17). During his time at FMC Carswell, Dr. Kucharski did not observe the defendant interact with staff members or other prisoners outside of her room. ((7/6/09 Tr. at 25:8-14.) Although the defendant has been at the MDC since June 17, Dr. Kucharski has not – as of the July 6, 2009 hearing date – made any follow-up visits to interview and assess her. (7/6/09 Tr. at 25:18-26:2.)

54. Dr. Kucharski found that the defendant suffered from a "delusional disorder paranoid type" and significant depression. (DX 1 at 17.) Although Dr. Kucharski concluded that the defendant most likely possessed a factual understanding of the proceedings again her, he went on to determine that the defendant's understanding of these proceedings was not rational and that the defendant could not rationally assist her attorney. (DX 1 at 16-17.) In justifying this position, Dr. Kucharski concluded that the defendant does not believe that the Court "is engaged in a process of adjudicating her innocence or guilt" and that the defendant's "tangentiality" "significantly impairs her ability to communicate with counsel." (DX at 17.)

E.    Dr. Kempke

55. Dr. Kempke is not a forensic psychiatrist or psychologist. She is not qualified to prepare a forensic evaluation of the defendant. Thus, she was the one witness who did not submit an evaluation to the Court in advance of testifying. Dr. Kempke was a staff psychiatrist for the unit on which the defendant was staying. (GX O at 125:18-19.) Dr. Kempke recently concluded that the defendant suffered from paranoid schizophrenia, though conceded that the defendant's mental health symptoms – as a whole – had improved since arriving at FMC

Carswell. (DX 1 at 22:7-8, 127:15-19, 128:12-15, 163:3-10, 202:20-203:2.) Dr. Kempke did not opine on whether the defendant was mentally competent to stand trial, as she was not qualified to make that assessment.

56. During the almost nine months that the defendant was at FMC Carswell, Dr. Kempke spent about 8 hours with the defendant. (DX 7 at 155:15-156:16, 225:17-25.) Dr. Kempke saw the defendant once a month, with each visit averaging between half hour to an hour. (DX 7 at 23:2-17.) Dr. Kempke has worked at FMC Carswell for a little over a year.

F. Dr. Kempke's Testimony Should Be Given Little to No Weight

57. First, although Dr. Kempke testified at her deposition that she believed the defendant suffered from paranoid schizophrenia, Dr. Kempke *did not* opine as to whether the defendant was competent to stand trial. In fact, Dr. Kempke acknowledged that she was not a forensic evaluator and was not even qualified to render an opinion on that issue. (DX 7 at 116:6; 120:23-121:6.) Dr. Kempke was unaware, for example, of the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM IV") criteria for determining or considering malingering. (DX 7 at 133:9-14, 133:22-134:4, 134:10-12.) Dr. Kempke also considered herself easily "conned" (DX 7 at 141:16-22), stating to Dr. Saathoff that she was "the most easily conned person on the unit." (GX A at 37.) Dr. Kempke's testimony is of limited relevance in determining whether the defendant is *competent* to stand trial.

58. Second, Dr. Kempke acknowledged that she had not reviewed the voluminous collateral evidence that was considered by the other four experts in this case. Dr. Kempke did not speak with any of the staff members at the MDC who observed or cared for the defendant, nor did she confer with agents who were present with the defendant in Afghanistan or who

transported the defendant to the United States. (DX 7 at 151:3-13; 152:2-9; 161:8-11.) Dr. Kempke only looked at certain FMC Carswell documents and did not even review Dr. Powers' forensic file. (DX 7 at 152:10-20.) Dr. Kempke did not listen to, or review transcripts of, the defendant's recorded phone while at FMC Carswell or the MDC. (DX 7 at 156:17-157:12.) Dr. Kempke did not read the FBI interview reports of the defendant. (DX 7 at 160:6-13; 161:12-24.) And, nowhere in her testimony did Dr. Kempke indicate that she spent any significant amount of time – as Doctors Johnson, Saathoff, and Powers did – observing the defendant interact with other staff members or inmates.

59.     Given her limited preparation, Dr. Kempke lacked an ability to understand various references made by the defendant. This was apparent during Dr. Kempke's deposition, where she recounted that the defendant – while discussing the offense – noted "[t]here were no glass bottles." (DX 7 at 240:5-7.) Dr. Kempke found this comment "strange," "out there," and "disconnected." (DX 7 at 240:5-24.) Dr. Kempke then conceded that she had not read the Criminal Complaint in this case, which summarized the items that the defendant had as including "numerous chemical substances in gel and liquid form that were sealed in bottles and glass jars." (DX 7 at 241: 20-23; Compl. ¶ 4(d).) This connection between the defendant's statements and the charges in the Complaint – which Dr. Kempke missed – actually tends to demonstrate the defendant's awareness of the allegations against her.

60.     Third, Dr. Kempke made several broad-based statements that undercut her credibility. After four separate experts have spent hours poring over thousands of pages of documents and interviewing scores of witnesses, and after two different opinions have emerged, Dr. Kempke expressed her belief that this was not a complicated case. (DX 7 at 190:9-12

(responding "no" when asked if this was a complicated case).)  Dr. Kempke made this statement even though she sent an email to defense counsel the week prior describing the case as "[c]losely akin to the five blind men describing an elephant after reading all those reports."  (DX 7 at 190:16-20.)  Similarly, Dr. Kempke indicated that she was "100% sure" that the defendant was a paranoid schizophrenic, notwithstanding the fact that *no other mental health professional* has diagnosed the defendant with this ailment.  (DX 7 at 189:17-21.)

61.     Fourth, Dr. Kempke was not the defendant's evaluating psychiatrist; she was a treating psychiatrist who came to view the defendant as a patient.  (DX 7 at 140:17-20.)  In this role, Dr. Kempke specifically avoided asking the defendant questions about her past.  (GX 7 at 140:21-25.)  This was because Dr, Kempke was afraid of losing the defendant's trust.  (GX 7 at 141:1-6.)  Dr. Kempke discussed, for example, that the defendant "has come under my patriarchal paternalistic particular medical umbrella."  (GX 7 at 217:5-12.)  Whatever Dr. Kempke's relationship with the defendant was, it left her ill suited to evaluate the defendant from a forensic standpoint and very much in the dark as to many of the background facts that support the conclusion that the defendant was malingering.

62.     Lastly, Dr. Kempke's opinion as to whether the defendant suffers from a mental disease or defect has wavered and evolved.  Although initially professing a 99 percent certainty regarding the defendant's psychological symptoms (GX H at MED 46-51), Dr. Kempke conceded that the defendant's mental health condition has improved and that she was no longer depressed.  (DX 7 at 104:23-105:3, 127:15-19, 128:12-15.)  Dr. Kempke still contends, however, that the defendant is a paranoid schizophrenic.

63.     Dr. Powers, Dr. Saathoff, and Dr. Johnson all reported having conversations with

Dr. Kempke that are at odds with her present diagnosis of paranoid schizophrenia. According to

Dr. Powers, Dr. Kempke's position has "changed over time." (GX O at 127:12-21, 128:19-

130:16.) In particular, Dr. Kempke "has wavered several times depending on who she's talking

to." (GX O at 131:16-18.) Dr. Powers recalled, for example, that when Dr. Johnson and Dr.

Saathoff visited Dr. Kempke, they provided her with additional information, and Dr. Kempke

indicated that had she been aware of that information, she "would have changed her diagnosis."

(GX O at 180:8-10.)

64. Dr. Johnson also testified that she had shared certain information with Dr.

Kempke, who later indicated that that information "puts things in a different light." (7/6/09 Tr.

at 143:1.) At different times, Dr. Kempke reported different findings and conclusions to Dr.

Johnson: she said the defendant was not feigning (7/6/09 Tr. at 105:5-9),[4] but later said that the

defendant was "doing much better now" (7/6/09 Tr. at 143:1-2); Dr. Kempke added that she did

not "feel a need to treat [the defendant] for psychotic symptoms now" and that she did "not think

[the defendant] is that depressed" (7/6/09 Tr. at 143:2-4); but still later, Dr. Kempke "found [the

defendant's] symptoms to be very unusual, and not consistent with any symptom picture."

(7/6/09 Tr. at 143:8-9.) At the time Dr. Johnson left FMC Carswell, Dr. Kempke continued to

be concerned for the defendant, but did not share with Dr. Johnson any firm diagnostic

impression. (7/6/09 Tr. at 143:12-13.) It also is undisputed that Dr. Kempke never prescribed

anti-psychotic medications to the defendant. (DX 7 at 196:23-25.)

65. Dr. Saathoff also referenced in his report various comments made by Dr.

---

[4] This testimony was elicited by showing Dr. Johnson her notes of conversations from her first visit to FMC Carswell on January 22, 2009. (*See* 3502-3 at 55.)

Kempke.  (*See*, *e.g.*, GX A at 1, 13, 15, 20-22, 27, 29, 31, 37-38.)  In brief, Dr. Saathoff summarized the fact that Dr. Kempke viewed the defendant's mental health symptoms as having improved, and that the defendant had most likely fabricated mental health symptoms.  In her deposition, Dr. Kempke either did not recall, or denied, making a few of the statements that Dr. Saathoff attributed to her.  (DX 7 at 87:8-17, 99:14-100:12, 110:21-111:20.)  Dr. Kempke stated that while she believed the defendant's depressive symptoms had improved (DX 7 at 104:23-105:3), she added that the defendant's "paranoia" had not.  (DX 7 at 105:2-3; *see also* DX 7 at 22:7-8, 91:1-18 (noting that the defendant's initial psychotic symptoms had improved but that her paranoia had not), 163:2-10, 202:20-203:2.)

66.     Dr. Saathoff did acknowledge that one statement in his report stemmed from a typographical error (7/6/09 Tr. at 184:1 - 185:17), but testified that other attributions in his report to Dr. Kempke were accurate.  (7/6/09 Tr. at 185:16-17.)  Indeed, Dr. Saathoff's version of conversations with Dr. Kempke is consistent with those of Dr. Johnson and Dr. Powers, both of whom recall the inconsistency of Dr. Kempke's various "diagnoses" and her acknowledgment that collateral information placed the defendant's symptoms in a different light.

67.     Dr. Kempke's position that the defendant is a paranoid schizophrenic does not alter Dr. Johnson's or Dr. Saathoff's opinion as to whether the defendant is competent to stand trial.  (7/6/09 Tr. at 105:20-24, 194:5-8; *see also* 174:18-175:1, 179:14-19, 180:11-181:2, 182:6-17, 182:20-183:17, 185:16-17, 185:18-25, 186:17-25, 186:17-25, 194:5-8.)  Likewise, Dr. Powers testified that the defendant was competent to stand trial notwithstanding her understanding that Dr. Kempke's present belief is that the defendant is a paranoid schizophrenic. (GX O at 127:16-21, 181:7-20.)

68.     Given her limited qualifications, limited preparation, limited knowledge, and the inconsistency of her conclusions, Dr. Kempke's testimony is less than credible and is deserving of little to no weight.

## IV.     EXPERT OPINIONS THAT THE DEFENDANT DOES NOT SUFFER FROM A MENTAL DISEASE OR DEFECT RENDERING HER INCOMPETENT TO STAND TRIAL

69.     Dr. Johnson, Dr. Saathoff, and Dr. Powers have concluded that the defendant is malingering and is not suffering from a mental disease or defect rendering her incompetent to stand trial.  The defense experts have opined that the defendant suffers from either delusional disorder, significant depression, or paranoid schizophrenia.

70.     The balance of evidence firmly establishes that the defendant is malingering and does not suffer from a mental disease or defect.

A.     <u>The Defendant Is Malingering</u>

71.     The essential feature of malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as evading prosecution.  (GX B at 26; GX C at 12.)  The DSM IV provides that malingering is strongly suspected if any combination of the following criteria are suspected: (1) whether the presentation is in the context of a legal proceeding; (2) whether the defendant refused to cooperate; (3) whether there are marked discrepancies between the person's claimed stress and the objective findings; and (4) the presence of antisocial personality disorder.  (GX B at 26; DSM IV at 739-40.)  Other factors are also relevant to determining whether a defendant is malingering, including the defendant's education and the manner in which certain symptoms are expressed.  (7/6/09 Tr. at 27:19-22, 38:15-24.)

72.    Regarding the first criteria, it is undisputed that the defendant's presentation

and evaluation arose in the context of her criminal case.  (7/6/09 Tr. at 29:9-15.)  Related to this

criteria is the "secondary gain" to a defendant from this presentation.  (7/6/09 Tr. at 26:18-27:2.)

73.    Here, the evidence demonstrates that the defendant began complaining of mental

health symptoms 17 days after she had been incarcerated in the United States and after she twice

had been to Court.  The manner and timing of this presentation indicates that the defendant was

feigning her symptoms to avoid prosecution and to be repatriated to Pakistan.  (GX A at 7, 38;

GX B at 27.)

74.    The defendant did not complain of mental health symptoms while under United

States medical care in Afghanistan.  (GX B at 9.)  Similarly, neither physicians nor FBI agents

who transported the defendant to the United States viewed the defendant as suffering from a

mental illness.  (GX B at 9; GX C at 7; GX G at H1-H2, H9-10.)  When the defendant was

interviewed by MDC psychology staff on August 4, 2008, she denied any history of mental

illness.  (GX B at 10-11; GX F at 57.)  Likewise, MDC staff conducting the interview did *not*

view the defendant as exhibiting mental health symptoms.  (GX B at 10-11; GX C at 7; GX F at

55.)  Similarly, the defendant was cooperative with MDC staff and did not display overt mental

health symptoms for her first 17 days at the MDC. (GX B at 10-11; GX I at MED 261-272, 274,

288.)

75.    The defendant abruptly began expressing serious mental health symptoms on or

about August 23, 2008.  (GX B at 12-13, 27.)  On that date – over one month after being taken

into custody and after two separate court proceedings – the defendant informed a prison guard

that she wanted to save meat from her lunch tray for her son. (GX E at LOG 86.) Three days later, on August 26, 2008, the defendant asked a prison guard if he took food off of her tray because her son's dog was in her cell. (GX E at LOG 103.) When questioned, however, the defendant refused to expand on these hallucinations. (GX E LOG at 104.) On September 2, 2008, the defendant claimed that her daughter was in her cell (GX I at MED 313.) On September 11, 2008, the defendant claimed that a man appeared at her cell the previous night and informed her that her son was in harm's way. (GX E at LOG 175.) On September 30, 2008, the defendant noted that she saw "good and bad angels" coming to her cell, and that she saw her baby in her cell. (GX I at MED 367.) During the course of expressing these symptoms, the defendant became less and less cooperative with MDC staff. (*See*, *e.g.*, GX A at 17; GX B at 27; GX I at MED 302-305, 309-311, 313-22; 7/6/09 Tr. at 121:5-7 (noting that when MDC tried to ask more questions about hallucinations "she wouldn't tell us anything").)

76. These expressions resulted in the defendant being diagnosed (at least preliminarily) as suffering from major depression. (GX B at 14; 7/6/09 Tr. at 120:22-24 ("[W]hat got the ball rolling about [the MDC] being concerned that she was seriously mentally ill was the hallucinatory reports."); 7/6/09 Tr. at 121:5-13.) As a result, the defendant ended up being transferred to FMC Carswell where she was managed in a less restrictive environment and had her legal proceedings delayed. (GX B at 32 (noting that the defendant's expressed symptoms resulted in a less restrictive setting and a delay in her criminal case; the defendant "perceives this as a positive state"); GX O at 148:9-23).) Similarly, the defendant's diagnosis helped her avoid responsibility for biting and kicking MDC staff members during the forced medical examinations. (GX A at 35-36; GX I at MED 353.)

77.     In addition to being transferred to FMC Carswell, the defendant was informed

that if she was found incompetent, she would be repatriated to Pakistan. (DX 1 at 9 (noting that

the Pakistani Embassy "were conveying to [the defendant] that if she were found incompetent

she would be repatriated to Pakistan"); 7/6/09 Tr. at 30:9-18, 33:12-15.)   This is one of the

defendant's main objectives.   During an October 23, 2008 phone call with the defendant, for

example, the Pakistani consulate repeatedly informed the defendant that it would attempt to

repatriate her.  (GX J (10/23/08 call (14:01:55 p.m.)); GX K1 at T 73 (noting that "we will take

you to Pakistan" after the competency evaluation), *id.* at T 79 ("we will come and get you

immediately").[5]  In a call with the defendant's brother the same day, the defendant expressed

frustration at the delay in repatriating her, noting "how would I want to stay in prison and

wouldn't want to go home?  That is just insane."  (GX J (10/23/08 call (18:34:28 p.m.)); GX K1

at T 85.)

78.     Although Dr. Kucharski has opined that there would be little secondary gain to

the defendant if she was found incompetent – given that the logical result would be restoration

and possible indefinite commitment (7/6/09 Tr. at 31:1-32:25) – this misses the point.  The

defendant's belief is what matters, and her behavior and recorded phone calls demonstrate that

she believes it is in her interests to be found incompetent.

79.     Accordingly, the timing and circumstances of the defendant's mental health

---

        [5]     GX J consists of a disc of recorded phone calls (organized by date) made by the
defendant from the date of her incarceration until May 19, 2009; GX J1 consists of a disc of
recorded phone calls (organized by date) made by the defendant from May 20, 2009 to June 17,
2009); and GX K1 consists of draft transcripts and translations of these phone calls, portions of
which are in Urdu.  In addition, GX H at MED 232-33 contains a list of the dates and times of
the defendant's telephone calls made from October 3, 2008 to May 19, 2009.

presentation support a finding of malingering.

ii.    Refusal to Cooperate

80.    Refusing to cooperate with a forensic evaluation is another indication of malingering. (GX B at 28 ("Consistent with the identification of Malingering, is Ms. Siddiqui's significant lack of cooperation.")) There are, for example, a number of psychological tests that can be utilized in determining whether an individual is competent to stand trial. These include: (1) an intelligence test to discern whether an individual has the potential to assist his/her attorney; (2) a personality test, which gives an analysis of how an individual views the world; and (3) specific competency assessments, which provide an idea of the factual and rational understandings of the proceedings (GX O at 162:6-23.)

81.    Dr. Johnson, Dr. Saathoff, and Dr. Powers believed that a lack of cooperation is indicative of malingering, which is consisted with the DSM IV's criteria. (GX A at 2-3; GX B at 28; GX O at 122:15-23; DSM IV at 739.) While Dr. Kucharski disagreed with this assessment (noting that the DSM IV was "wrong") (7/6/09 Tr. at 34:23-25), even he conceded that objective testing was useful in detecting malingering. (7/6/09 Tr. at 35:10-16.)

82.    As Dr. Powers noted: "the first clue that I get that somebody is malingering is they say: I don't know. I don't want to talk to you. I can't talk to you. Thinking their inability to talk to me is going to somehow play a role in my report so that I will say that she's not able to communicate to the Court." (GX O at 122:15-23.) Dr. Johnson added that better educated defendants – like the defendant here – who have had more exposure to mental health treatment "are more likely to be aware that too much information is not good." (7/6/09 Tr. at 144:10-13.) It is undisputed that the defendant is well educated, having received a Ph.D from Brandeis

30

University.  The defendant also took psychology and advanced science courses at both MIT and Brandeis.  (GX Q at 909-910, 924.)  Indeed, BOP staff members frequently commented on the defendant's high level of intelligence.  (GX A at 10.)  Here, the defendant's presentation of various symptoms, "but not wanting to get them further evaluated," is consistent with malingering.  (7/6/09 Tr. at 144:19-22; *see also* GX A at 2-3, 38; GX B at 27.)

83.    The record reveals, for example, that the defendant provided a limited degree of cooperation during her first couple of weeks at the MDC and during her initial evaluation at FMC Carswell.  (GX B at 10-11; GX E at LOG 87 (noting that after the defendant's first purported hallucination she refused to speak with MDC staff unless they helped her son); GX H at MED 150; GX I at MED 261-72, 274, 288.)  This changed after FMC Carswell's initial evaluation (finding the defendant incompetent) was submitted.  That is when the defendant informed Dr. Powers that, after discussing the findings with her brother, she did not want to speak with Dr. Powers.  (GX O at 166:15-19 ("I went to talk to [the defendant] about what the report findings were, she said she'd already heard from her brother and did not want to talk to me.").  Thereafter, the defendant "started politely refusing to talk to [Dr. Powers] at all."  (Gx O at 166:19-20.)  Similarly, the defendant refused to cooperate and "avoid[ed] any significant interaction with anyone who is at all related with her court evaluation or return to court." (GX B at 32.)  After Dr. Johnson's first visit to FMC Carswell, the defendant "wasn't even polite in refusing to talk to [Dr. Powers]."  (GX O at 168:6-7.)

84.    All five of the experts agreed that the defendant did not cooperate. (GX A at 2; GX B at 18-26; GX C at 5-6; DX 7 at 137:22-138:22; 7/6/09 Tr. at 35:17-35:25).  On Dr. Johnson's initial trip to FMC Carswell (January 22 and 23, 2009), the defendant indicated that

she had already participated in an evaluation and had no intention of complying with another one. (GX B at 18 (the defendant "indicated that she had already completed an evaluation in regard to her competency to stand trial and she no intent of complying with any further evaluation"); 7/6/09 Tr. at 135:3-7 (noting that the defendant "was intentionally uncooperative, verbalized that she would not cooperate, had no intention of cooperating with the evaluation. She had already had an evaluation, she was not going to cooperate with anyone else.").) On this and subsequent visits, the defendant refused to cooperate with Dr. Johnson. (GX B at 18-26.) The defendant declined, for example, to discuss her understanding of her legal situation, her relationship with her attorneys, or her familiarity with the legal process. (GX B at 19, 20.) The defendant also did not provide basic information regarding her age or even the day's date, and refused to participate in tests. (GX B at 20, 22.) At various point, the defendant feigned crying and put her fingers in her ears, claiming that she would not listen to Dr. Johnson. (GX B at 18-23.) In a January 26, 2009 phone call with the Pakistani Consulate, the defendant showed her awareness of the purpose of Dr. Johnson's visit and her perceived benefit in not cooperating. Specifically, the defendant told the Consulate that "the court sent a woman" (referencing Dr. Johnson), and added: "I did not say anything to her about my case. . . . If she goes and tells people that I understand what she said or that I said anything. . . . I didn't even hear what she said Okay?" (GX J (1/26/09 call); GX K1 at T 161.)

85.     On Dr. Saathoff's trip to FMC Carswell, the defendant initially refused to be interviewed, though eventually agreed to answer some questions. (GX A at 2, 13 (the defendant stating that she would not assist Dr. Saathoff or anyone else sent from the Court), 34 (noting that the defendant was "hostile" to the court ordered competency evaluation).) During these

interactions, the defendant also pretended to cry, and claimed that she was insane and that she was dead. (GX A at 7, 18, 28-29.) The defendant also called Dr. Powers a "liar," citing Dr. Powers' purported comment to her that the study was over. (GX A at 34.) Although the defendant did speak with Dr. Kempke, Dr. Kempke never gave the defendant a psychological test, as, according to Dr. Kempke, "that's not my job." (DX 7 at 138:23-139:5;186:7-10.)

86. Similarly, the defendant never consented to any psychological testing. (DX 7 at 163:4-8; GX H 113.) Dr. Powers attempted to impose tests on about 15 different occasions, all of which the defendant refused. (GX O at 163:9-18.) Given the defendant's persistent refusal to be tested, Dr. Kucharski did not even attempt to administer a test. In addition, the defendant informed Dr. Kucharski that she would not cooperate. (7/6/09 Tr. at 36:17, 23.) The defendant also refused to take tests administered by Dr. Johnson and Dr. Saathoff. (GX A at 12, 21; GX B at 23.)

87. The defendant's refusal to cooperate with evaluators is further evidence of malingering.

### iii. Manner of Presentation

88. Also relevant to the determination of malingering is the manner in which mental health symptoms are presented. (GX A at 14-17.) Although Dr. Kucharski stated that malingerers rarely deny being mentally ill (DX at 13), he acknowledged that they "go out of their way to call attention to their difficulties." (7/6/09 Tr. at 38:22-24.) Dr. Kucharski also acknowledged that "unusual hallucinatory experiences and uncommon symptoms appear to be strong indicators of malingering." (7/6/09 Tr. at 38:15-16.) Dr. Kucharski further conceded that succeful malingerers are often better educated than the average criminal defendant. (7/6/09 Tr.

at 27:19-22; *see also* 7/6/09 Tr. at 32:4 (acknowledging that the defendant "is a very intelligent woman.") The defendant meets all three of these criteria.

89. While the defendant generally has avoided calling herself mentally ill, the defendant has not "concealed" purported symptoms of mental illness, nor truly "denied" suffering from a mental illness, in a way that Dr. Kucharski would find uncommon in malingerers. (GX A at 14-17; 7/6/09 Tr. at 138:18-22; 171:11-13 (contrasting the *reporting* of symptoms with the *displaying* of symptoms).) To the contrary, the defendant repeatedly has broadcasted a number of detailed, graphic, and "over the top" mental health symptoms to various individuals throughout her incarceration. (GX A at 14-17; 7/6/09 Tr. at 138:18-22, 192:17 (concluding that the defendant employed "a very public expression of symptoms").) This public, unusual presentation is indicative of malingering.

90. Although the defendant never referenced any mental health history when brought to the MDC, and although the defendant exhibited no symptoms of hallucinations or serious mental health problems after her arrest, the defendant abruptly claimed experiencing hallucinations in late August 2008. The defendant's description of these hallucinations was graphic. Among other things, in an approximate four week period, the defendant claimed that her son's dog was in her cell; that her daughter was in her cell; that a man was in her cell who said the defendant's son was in harm's way; and that "good and bad" angels were in her cell. (GX E at LOG 103, 104, 175; GX I at MED 313, 367.)

91. At FMC Carswell, the defendant continued to broadcast these symptoms to FMC Carswell staff and inmates on frequent occasions. (GX C at 5-6; GX H at MED 129, 132, 151, 161, 163.) At one point, the defendant announced at an entire unit meeting of about 60 inmates

34

that her children came and visited her at night. (GX A at 16; 7/6/09 Tr. at 192:2-10.) The defendant stated that other inmates should be allowed to have their children come to the unit as well. (GX A at 16; GX C at 5; 7/6/09 Tr. at 192:1-10.) After these statements, Dr. Powers had to do "damage control" as many of the inmates were in uproar. (GX A at 16.) The defendant also requested nursing staff not to turn her children away at night, and also inquired as to whether they could come during the day since they kept the defendant up at night. (GX C at 6; GX H at MED 151, 161.)

92.     The defendant discussed these supposed hallucinations with Dr. Powers (GX H at MED 117.) The defendant also verbalized these hallucinatory experiences during Dr. Johnson's first visit. (GX B at 19.) When a nurse indicated during Dr. Johnson's evaluation that children were not permitted on the unit, the defendant responded "you're not going to stop them from coming are you?" (GX B at 19.) The defendant did not reiterate these claims during Dr. Johnson's second visit. (GX B at 21-22.) Indeed, after this visit, the defendant appears to have ceased reporting these hallucinations – without ever receiving anti-psychotic medication. (GX A at 3,14; GX B at 27; GX C at 6.)

93.     Similarly, the defendant recounted these experiences during phone calls with her brother and the Pakistani Consulate:

October 23, 2008:     The defendant stated to the Pakistani Consulate that "My youngest baby was here. . . . . He was walking and running around." (GX J (10/23/08 call (14:01:55 p.m.)); GX K1 at T 70);

October 23, 2008:     The defendant mentioned to her brother that she spoke with Dr. Powers and the "unit people" and told them that she saw her little baby at FMC Carswell. (GX J (10/23/08 call (18:34:28 p.m.)); GX K1 at T 86) The defendant added that this was at night and added "I don't know if that is helpful." (*Id.*);

October 31, 2008:     The defendant told her brother that she can speak with her youngest daughter. (GX J (10/31/08 call)); GX K1 at T 97); and

December 9, 2008:     The defendant discussed hallucinations of her daughter and indicated that she told the staff: "please don't scare them away. . . . They get scared seeing you people." (GX J (12/9/08 call)); GX K1 at T 134.)

94.     This dramatic presentation is strong evidence of malingering. The fact that the hallucinations are "unusual" and "uncommon" is inconsistent with mental illness. (7/6/09 Tr. at 38:15-16 (admitting that "unusual hallucinatory experiences and uncommon symptoms appear to be strong indicators of malingering"), 41:10-21 (conceding that the defendant's purported visions were unusual).) Moreover, the defendant has presented the hallucinations only on her own terms, failing to respond to follow-up questions about them. This is also inconsistent with mental illness because it is unusual for psychotic individuals to report having hallucinations yet provide little additional detail when asked by mental health professionals. (GX B at 27.) When questioned about these hallucinations, for example, the defendant was evasive. This was "[p]ossibly because she realized it would be difficult to accurately continue to report it." (7/6/09 Tr. at 138:24-139:9.) Rather, the defendant "openly volunteers" these symptoms "to a selected subset of individuals that . . . she perceives as sympathetic." (7/6/09 Tr. at 138:24-139:9.) Dr. Johnson determined that the defendant provides the same description of her history and symptoms to a select group of individuals, but "[i]f you ask her extra questions about it, she won't give you any of the details, she won't expand on it." (7/6/09 Tr. at 139:17-21.) Dr. Johnson opined that she was aware of no psychiatric barrier that would inhibit the defendant from providing additional details about her symptoms. (7/6/09 Tr. at 139:22-25.) And, there is no evidence that the defendant was not responding to any internal stimuli, which normally would

happen if she were in fact hallucinating.  (GX B at 27.)

95.     Similarly, Dr. Saathoff found that the defendant would not discuss her purported hallucinations with him or others.  (GX A at 13, 17.)  In addition, Dr. Saathoff concluded that the defendant has employed such "isolation" in order to impede her mental health assessment.  (GX A at 11.)

96.     Dr. Kucharski and Dr. Kempke testified that these were not true hallucinations but were "hynogogic" (DX 7 at 179:24-180:12.).  These opinions should be rejected, as the evidence shows that these "visions" were feigned.  (7/6/09 Tr. at 138:4-12 (Dr. Johnson noting that she does not "think [the hallucinations] w[ere] a truthful presentation [but] was just part of the presentation she gave that made her look like a very fragile, you know, frightened individual."))

97.     The evidence is also flatly inconsistent with the notion that the defendant's reported sightings are hypnogogic visions.  Hynogogic visions occur in the stage right before someone goes to sleep.  (7/6/09 Tr. at 193:2-4.)  Often, they can be frightening experiences.  (7/6/09 Tr. at 137:18-21.)  Dr. Kucharski noted that they are "very temporary" and "very fleeting."  (7/6/09 Tr. at 42:21-23.)  Here, although the defendant claimed to experience these visions at night, that claim is not supported by the record of her sleeping patterns and other evidence.  As Dr. Powers noted: "she was saying that she was seeing her children at night, but, yet, the nursing staff was reporting to me during the day that she was sleeping fine.  She didn't display this kind of behavior during the day, it was only when no one was watching her.  And then her reports of it were only to specific people."  (GX O at 152:18-153:1; *see also* GX A at 11, 15, 19, 31; 7/6/09 Tr. at 43:20-24 (noting that there has been no reporting that the defendant

suffers from narcolepsy or is falling asleep in public places),193:5-7.)   In fact, no BOP staff members reported observing the defendant actually experience any of these visions.  (7/6/09 at 43:16-19.)  Likewise, BOP staff members did not view the defendant as behaving consistent with hallucinations.  (GX A at 15.)  And, these hallucinations subsided by the time the defendant left FMC Carswell, without receiving anti-psychotic medication.  (GX O at 153:7-9.)  It is unusual for such visions to stop so abruptly and without medication.  (GX B at 27.)

98.      Moreover, these "visions" cannot be described as "fleeting," as they would be if they were truly hypnogogic  The defendant described these hallucinations to almost anyone who would listen – including MDC and FMC Carswell staff, evaluators, family members, and consular officials – from about August 2008 until well into her incarceration at FMC Carswell. Dr. Johnson also testified that these phenomena were not typical hypnogic experiences, given the detailed manner in which she recounted them to staff members.  (7/6/09 Tr. at 137:5-7, 15-17.) Dr. Johnson noted that "you don't get this kind of description of it, and maneuvering around it and trying to manipulate it with people."  (7/6/09 Tr. at 137:24-25.)  Similarly, it is unusual for hypnogogic experiences suddenly to cease, which happened with the defendant after Dr. Johnson's first visit.  (7/6/09 Tr. at 193:12-14 ("If someone is experiencing hypnogogic hallucinations, it would be unusual that just the arrival of an evaluator would cause those to dissipate."))

99.      Related to the above, Dr. Kucharski was convinced that the defendant's denial that she is crazy or ill suggests that she was not malingering.  (DX 1 at 13.)  This conclusion is inconsistent with other experts' experience and the facts of this case.  In Dr. Powers' experience, for example, individuals who are malingering do not always say that they suffer from mental

illness.  (GX O at 115:9-16.)  To the contrary, several patients "verbaliz[e] that they were not mentally ill, but, at the same time, through the testing and different assessments that we do, were really endorsing a lot of mentally ill symptoms."  (GX O at 115:18-25.)  In addition, folks who are more educated such as the defendant are more likely to be "aware of what malingering assessments are, and are going to do just the opposite, which is actually more convincing and more difficult to discern."  (GX O at 117:12-18.)

100.    In addition, with respect to the facts in this record, the defendant has repeatedly stated to her brother and to the Pakistani embassy that she was "crazy":

October 9, 2008:     The defendant informed her brother that "I am going crazy."  (GX J (10/9/08 call); GX K1 at T37.)  She later added "I am going crazy. . . .  I am still sane enough to talk, right?"  (*Id.* at T 42.)

January 26, 2009:    The defendant stated to the Pakistani Consulate that she was dead. The defendant also said that "I am insane so no one believes me." (GX J (1/26/09 call); GX K1 at 170.)  The defendant then added that she was "not," but said she would not argue about it.  (*Id.*)

The defendant made similar comments to Dr. Saathoff during his meeting with her.  At various times, the defendant claimed that she was "insane" and that she was already dead.  (GX A at 18, 28-29; 7/6/09 Tr. at 161:16-21.)

101.    Finally, the defendant's outbursts in court are consistent with the defendant's *modus operandi* of presentation: she denies being crazy, but acts as if she is.  During the entire cross examination of Dr. Kucharski, the defendant was sitting at counsel table and observing the proceedings.  (7/6/09 Tr. at 67:14-19.)  During this time, the defendant was observed communicating with counsel.  (7/6/09 Tr. at 67:20-23.)  Immediately after the Government highlighted the defendant's subdued behavior, the defendant interrupted the proceedings and continued to do so for the remainder of the hearing.  (7/6/09 Tr. at 68:2-3 (defendant asking to

"speak for myself" after the Government's examination of Dr. Kucharski).) Among other things, the defendant insisted she was not psychotic (7/6/09 Tr. at 68:24-25), but, just like her purported hallucinations, the defendant's statements in open Court were calculated, and aimed at influencing the outcome of the proceedings.

102.    Accordingly, the defendant has not "concealed" symptoms of mental illness. Rather, the defendant's dramatic presentation of her supposed symptoms supports a finding of malingering.

### iv.    Discrepancy Between Objective Findings and Expressed Symptoms

103.    All of the expert witnesses acknowledged that certain of the defendant's expressed symptoms were contradicted by underlying, objective evidence. There is ample evidence of these contradictions, which is a hallmark of malingering.

### Reading And Writing

104.    When initially transferred to FMC Carswell, the defendant claimed an inability (or difficulty) to read, write, and/or concentrate. (GX C at 9; GX H at MED 110; GX O at 100:7-9; 153:13-154:3 (noting that when the defendant arrived at FMC Carswell she informed officers that she could not read materials that had been provided to her).) It is undisputed, however, that the defendant signed and wrote numerous documents at the MDC. (*See, e.g.,* GX I at MED 242-43, 301.) And, it is undisputed that the defendant drafted a number of documents at FMC Carswell. (*See, e.g.*, GX H at MED 170-71.)

105.    The defendant was also observed reading on several occasions at FMC Carswell. (GX B at 31.) Dr. Powers saw the defendant reading the Koran. (GX O at 154:11-13.) At least one staff member saw the defendant reading newspapers. (GX O at 154:14-18.) The defendant

had been teaching another inmate about Islam, and had been observed reading portions of the Koran to the inmate.  (GX C at 10; GX O at 157:15-158:2.)

106.    When confronted by this varying presentation, the defendant lied.  Dr. Powers recounted the following event: "I walked into her room and said: Oh, I'm sorry to have disturbed your reading.  This is after I stood outside her door for a few seconds and saw that she was reading.  When I walked in, I said: I'm sorry to disturb your reading.  She said Oh, I wasn't reading.  I was just looking at the text.  I wasn't reading it, though.  I can't read.  I'm dead." (GX O at 103: 5-17.)  In response to Dr. Powers' follow up questions, the defendant was "very vague."  (GX O at 103:18-21.)

107.    Even Dr. Kempke conceded that the defendant has had inconsistent presentations throughout different period of her incarceration at FMC Carswell.  Initially, for example, the defendant professed a lack of recollection of her schooling and number of pregnancies, but later provided all of this information to Dr. Kempke.  (DX 7 at 164:8-165:6; 167:20-168:8.)  On several other occasions, the defendant reported to Dr. Kempke that the defendant could not read very well, but was observed to be reading on later dates. (DX 7 at 168:19-169:6.)  Dr. Kempke's interpretation of these facts reflects her lack of forensic training and further diminishes the relevance of her findings.  Rather than consider this a sign of malingering, Dr. Kempke saw this only as a sign of "the improvement she's had."  (DX 7 at 169:2-11.)

<u>Sleeping</u>

108.    The defendant also claimed – on certain occasions – to have difficulties sleeping.  (GX H MED 153, 197; DX 1; DX 7 at 58:12-15).)  As a result, Dr. Powers asked various staff nurses to report on the defendant's sleeping patterns.  They consistently reported

41

that the defendant did not have sleeping problems.  (GX O at 33:21-23, 165:4-9,166:7-9; *see also* GX A at 11, 15, 19, 31; GX B at 31;GX C at 6.)  This is consistent with other FMC Carswell documents – including the defendant's own reporting.  (GX H MED 109, 129, 132, 192, 196, 399-401, 406-09.)  As Dr. Powers noted: "some of the things that she was reporting were exaggerated or not true at all, like her lack of sleep – we were seeing her sleep adequately."  (GX O at 30:15-19; *see also* GX A (FMC Carswell staff member noting that defendant's claims of being kept up at night were "proven to be false when sleep monitoring was performed by Carswell nursing staff").)  Similar inconsistencies were reported by MDC staff.  (GX A at 10 (MDC staff member noting that the defendant was observed sleeping during the day but would later claim an inability to sleep).)

### Forced Medical Examination

109.    As noted above, on September 9, 2008, MDC staff members conducted a forced medical examination on the defendant given her refusal to accept medical care.  In accordance with BOP policies, this incident was videotaped.  Throughout her time at the MDC and FMC Carswell, the defendant made repeated references to this examination.  The defendant claimed, for example, that "dark angels" "killed" her by videotaping the incident, and also indicated that the Court sanctioned this.  (GX A at 30-31.)  Further, the defendant expressed fears that the videotape had been placed on the internet.  (GX A at 32.)

110.    A review of the videotape of this incident, however, undercuts the defendant's claims of trauma and purported delusions.  During the examination, the defendant repeatedly requests that the cameras stay on, and states that she wants the video to be displayed for "the world" to see how prisoners are treated.  (GX A at 31-33.)  In addition, at no point during this

examination did the defendant refer to the prison guards as "dark angels," but instead referred to them by name.  (GX A at 31; GX M (under seal).)

111.    Thus, the manner in which the defendant presented herself during the forced cell move (as seen in the video) was very different than how she summarized the events after the fact.  (GX A at 2; GX O at 25:20-23.)  The defendant "was very much in control of that situation with regard[] to verbally making statements and arguing and all that stuff, which is not at all what I would have expected to see given what she was reporting as delusional, dark angels, and those kind of things.  It just didn't go."  (GX O at 91: 4-10.)

112.    Similarly, the defendant's behavior after this forced examination is not consistent with her expressions of mental distress.  As Dr. Powers concluded, "when I looked at her behavior just after the forced cell move through the logs, it wasn't really indicative of someone . . . who had been traumatized to the level that she was saying."  (GX O at 90:18-23; *see also* GX B at 14; GX O at 25:10-14 (noting that after the forced cell move, the defendant "did not appear to be in very significant distress, [or at least not] one that would warrant such a huge amount of trauma presentation that I was seeing when she first arrived or that she was reporting."))  Indeed, on one of the subsequent strip searches that Dr. Powers observed, Dr. Powers noted that the defendant was not traumatized but submitted to the search "without any fanfare." (GX O at 95:2-4; 151:18-19; *see also* GX B at 14, 24 (discussing how FMC Carswell reached an agreement on strip searches), 30 (finding that the defendant "has not discontinued activities such as visits with her brother and the Consulate, despite these required strip searchs").)  Similarly, Dr. Saathoff noted that upon the defendant's return to the MDC in June 2009, the defendant apologized to the individuals who were involved in the forced medical exam.  (7/9/09 Tr. at 164:17-22 ("[The

defendant] has gone from seeing those individuals, to speaking of them as dark angels, and now has gone back to speaking to them as individuals and apologizing.")))

Claims of Being Dead

113.    On numerous occasions, the defendant has claimed to be "dead." (*See*, *e.g.*, GX H MED 59, 80, 84, 117, 423.) These statements are at odds with her presentation to others. (GX B at 27.) Similarly, these purported symptoms are "exceedingly uncommon." (GX A at 27.) Even Dr. Kucharski indicated that this statement of death has some type of "metaphorical" aspect. (DX at 5 (noting that "the belief that she will never leave prison or see her children, that she has been shamed and thus would be an outcast in the Muslim world and her community appears to be what she is referring to as being dead"); *see also* GX B at 27 (noting that this statement could refer to the defendant being "dead" in the eyes of her peer group).)

114.    Although claiming to be "dead," the defendant is well groomed and maintains the orderly appearance of her living space. (GX A at 7; GX B at 29; GX O at 159:10-160:6.) She carries out customary tasks and maintains relationships in a manner inconsistent with someone who perceives that life has ended. For example, the defendant speaks with her brother about a number of future events, including her criminal case (as described below); she continues to eat and order food (GX A at 9; GX B at 29); and she has asked relatives about the types of prison foods she could eat to avoid an iron deficiency (GX J (10/28/08 call (18:34:28 p.m.)); GX K1 at T 88.). While at FMC Carswell, the defendant claimed that her dominant hand and arm were "dead," and asked BOP officials if she could sign documents with her non-dominant hand. (GX A at 17; GX C at 9.) She signed documents with her non-dominant hand. (GX A at 17.) As yet another example of the defendant's malingering, the defendant was observed using her dominant

hand, later that day.  (GX A at 17.)

Inconsistent Presentations

115.　　The defendant has also presented herself in different ways to different people. Most notably, the defendant has been non-communicative and/or hysterical in meeting with treating/evaluating physicians and others (including the Pakistani consulate), but has behaved normally in interacting with other inmates and staff members.

116.　　As summarized above, the defendant was uncooperative with mental health experts.  (*See, e.g.*, GX A at 7; GX B at 18-26; GX C at 5-6.)  When the defendant did interact with them, she made statements that conveyed the appearance of being mentally ill.  (*See, e.g.*, GX A at 18, 28-29; GX B at 18-23.)  The defendant informed Dr. Johnson and Dr. Powers, for example, that her children came and talked to her at night.  (GX B at 18-23; GX C at 5-6.) Similarly, the defendant told Dr. Saathoff that she was already "dead" and was "insane."  (GX A at 18, 28-29.)

117.　　Similarly, the defendant has managed to report symptoms to "people that she's identified are the most sympathetic with her, who are really not doing an evaluation."  (GX O at 119:2-4; *see also* 7/6/09 Tr. at 99:15-18 (noting that the defendant was "selectively kind of pouring out what could be her heart and soul, or whatever she wants to say, to a few people in the system who are relatively sympathetic to listening to that"), 139:3-8.)

118.　　Dr. Kempke was such a person.  (*See* 7/6/09 Tr. at 139:5 ("[O]ne of those individuals at Carswell was Dr. Kempke."); GX O at 126:16 (noting that Dr. Kempke is "much more sympathetic").)  Dr. Kempke had concluded at the outset that the defendant was psychotic (GX H at MED 46); she had moved the defendant to a less restrictive unit (GX A at 10; GX B at

45

16; GX H MED 45, 46 ("DO NOT WANT HER HOUSED ON M-3!"); and although not a forensic evaluator, Dr. Kempke continued to make detailed notes of the defendant's reported symptoms. (GX H MED at 46-51, 85, 140-41, 163, 177, 182-84, 197.) As a result, the defendant ensured that she got "plenty of face time for Dr. Kempke to put all of that in the notes." (GX O at 120:5-7.) Given that Dr. Kempke was not trained in forensics, there was little risk that the defendant's malingering would be detected. (GX A at 37 (Dr. Kempke admitting to being the "most easily conned person in the unit"); DX 7 at 132:2-7 (Dr. Kempke explaining that her patients "filter their experiences through things which can't be described as truth or nontruth because [Kempke] deals with their emotions and behaviors").)

119.    Despite the defendant's reported hallucinations and statements of death to evaluators and certain treating physicians, "[w]hen [the defendant] is talking to people outside of the evaluation setting, her thinking does not show any evidence of a thought disorder. There is no tangential thinking, no looseness of association, there is no circumstantiality." (7/6/09 Tr. at 146:8-12; *see also* GX B at 22.) This is most obvious with BOP staff members and inmates. Dr. Johnson observed the defendant interact with FMC Carswell inmates and staff and did not observe the defendant to be in distress. Rather, the defendant was talking, laughing, and having goal directed thinking. (GX B at 20; 7/6/09 Tr. at 135:11-19 (noting that outside of the evaluation context the defendant "showed a full range of affect. I saw her laughing, joking, using abstract thinking. . . . When she was not directly dealing with me as a forensic evaluator, she looked pretty good").)

120.    Dr. Saathoff had a similar view of the defendant's interactions with other inmates and staff members. (GX A at 7 (noting that "[w]hen unaware of my presence, [the defendant]

appeared to be bored and yawned while sitting in the dining room at a table with another patient. . . . [and] laughed and conversed with other patients while waiting in line to enter the dining room").)

121.     In addition, various staff members at FMC Carswell and at the MDC indicated that the defendant did not exhibit overt signs of mental illness, notwithstanding her purported hallucinations and other claims of mental distress. (GX A at 15, 29-30; GX B at 26.)  These staff members recounted instances in which the defendant was able to negotiate or engage in complex tasks.  One social worker, for example, assisted the defendant in completing an "advance directive" relating to the continuation of life-saving health care.  (GX B at 24.)  Other staff members discussed how they had reached an accommodation with the defendant regarding strip searches, in which they would only remove one article of clothing at a time.  (GX B at 24.)

122.     MDC staff members did not view the defendant as behaving in a way consistent with hallucinations.  (GX A at 15, 30.)  Certain BOP staff members actually observed the defendant mis-represent certain events to psychology staff and others.  One MDC staff member, for example, recalled that the defendant informed psychology staff that she had been sitting by the window of her cell, waiting for a man who had information about her son.  (GX A at 30.) The MDC staff member had been observing the defendant that day, however, and saw no such behavior.  (GX A at 30.)  Likewise, the defendant frequently complained that she was not being fed or cared for, notwithstanding the fact that she had actually gained weight at the MDC, and had refused medical care.  (GX A at 8-10.)  These misrepresentations are consistent with the defendant's initial lies regarding her son.  (GX A at 8.)

123.     Similarly, even though the MDC psychology staff diagnosed the defendant as

suffering from Major Depressive Disorder, an MDC staff psychologist noted on September 10, 2008 that the defendant "is selective about whom she speaks with and is able to initiate communication and respond to staff in a coherent, rational, logical, and goal-directed manner." (GX F at 27.) The psychologist also wrote that the defendant "does not exhibit any of the major symptoms characteristic of psychotic illness, such as disorganized speech, grossly disorganized or catatonic behavior, or a delusional system. . . . Even when angry and emotionally upset, her speech has been focused and free of formal thought disorder characteristics such as derailment, loosening of associations, flight of ideas, or a tangential quality." (GX F at 29.) Similarly, after her first reported hallucination, Dr. Hess of the MDC noted that the defendant was able to communicate with staff in a rational manner. (GX F at 46.)

124. Dr. Kucharski's conclusion that the defendant presents herself in a consistent manner (DX at 14) is belied by the record. That record overwhelmingly demonstrates based on the observations of three other forensic psychiatrists (Dr. Johnson, Dr. Powers, and Dr. Saathoff) and various MDC and FMC Carswell staff members, that the defendant presented herself in different ways to different people to suit her own interests. Even Dr. Kucharski acknowledged that he had interviewed three different staff members who described the defendant as, among other things, showing no obvious signs of mental illness, "commanding" the room and getting what she wants, and being organized. (7/6/09 Tr. at 45:1 - 45:21.)

125. Accordingly, the defendant's inconsistent presentations supports a finding of malingering.

48

B.     The Defendant Does Not Suffer From a Mental Disease or Defect

126.     The record supports a finding that the defendant is malingering.  Likewise, the normal criteria for any identifiable mental disease or defect are absent from this record.

i.     The Defendant Does Not Suffer From Delusional Disorder

127.     Dr. Kucharski determined that the defendant suffers from "a delusional disorder of the paranoid type."  (DX 1 at 11.)  Dr. Kucharski went on to note that delusional disorders consist of the "presence of nonbizarre delusions; things that could happen but are very unlikely to happen." (7/6/09 Tr. at 86:24-87:1; *see also* DX 1 at 11.)  He also added that "there is the absence of this gross disorganization in a disorder like schizophrenia, or bipolar disorder." (7/6/09 Tr. at 87:1-3.)  Hallucinations are not a typical symptom of delusional disorder.  (7/6/09 Tr. at 42:3-5.)  In support of his diagnosis, Dr. Kucharski referenced a number of purported delusions, including the defendant's fears that she is being poisoned, that the video of her strip search was placed on the internet, and that the court is part of a conspiracy.  (DX 1 at 11, 16.) This conclusion is rejected for the following reasons.

128.     First, Dr. Saathoff, Dr. Johnson, and Dr. Powers all examined the defendant, reviewed available records, and did not find that the defendant suffered from delusional disorder. (GX B at 19; GX O at 173:2-3 (noting that the defendant "just doesn't exhibit the hallmarks of a delusional disorder."); 7/6/09 Tr. at 111:17-18 ("I do not think she is delusional, and I do think she is competent."), 7/6/09 Tr. at 155:4-6 (noting that the defendant's "constellation of symptoms that she claims, does not fit under any specific mental illness and is consistent with the diagnosis of malingering").)  Their bases for not finding delusional disorder are persuasive and referenced below.  In addition, as Dr. Saathoff testified, the DSM IV does not even

recognize a diagnosis of delusional disorder, "paranoid type."  (7/6/09 Tr. at 190:23-25 (noting that the DSM provides for "a number of different types of delusional disorders; there is jealous, erotomanic, persecutory, grandiose, somatic, but there is not a paranoid type".))

129.    Second, the delusional statements attributed to the defendant are consistent with the defendant's radical ideology, rather than a product of a mental illness. (7/6/09 Tr. at 90:21-23.)  Many of the defendant's supposed delusional beliefs are "well accepted within her peer group" (7/6/09 Tr. at 91:21-22), including that if she were in taken into custody, she very well may be poisoned.  (7/6/09 Tr. at 91:9-11, 106:8-9; *see also* GX O at 85:19-86:4 ("[S]ome of her beliefs are really not that incongruent with someone who is not familiar with our system here, doesn't know what the prison system is like, doesn't have an idea of who's on her side, who's not on her side.  And I felt like some of her paranoia is based on the fact that she is not from this country and maybe nervous about being incarcerated in this country."))

130.    A physician at FMC Carswell who conducted an initial evaluation of the defendant described the defendant as a "true believer," and felt that "she would be able to be influenced to do anything if it was couched in religious terms."  (GX B at 16.)  Likewise, Dr. Johnson – who visited the defendant on five separate occasions – referenced the defendant's "devotion to her belief system" and emphasized that the defendant very well "may perceive herself as a martyr for a cause."  (GX B at 35.)  Even Dr. Kucharski acknowledged that the defendant espouses "political ideology which is typical of Jihadi sort of thinking."  (7/6/09 Tr. at 48:10-11.)

131.    Indeed, this is apparent from many of the defendant's statements to the FBI.  (GX D.)  Among other things, the defendant expressed antipathy towards Jewish people and

discussed her belief that the Israelis orchestrated the September 11th attacks and made it appear that al Qaeda was responsible. (GX D at 232.) The defendant also discussed *jihad*, urged the United States to leave Afghanistan, and discussed various writings recovered from her on July 17. (*See* GX D at 321-26, 406, 415-18 (discussing the necessity of having to motivate people in *jihad*).) Similar sentiments are reflected in the letter the defendant wrote to the Warden (GX H at MED 170), and in the actual writings recovered from her on July 17 (GX L at 557-73 and 604 (stating that the defendant can "insha Allah help" to "rid our nation of the "superpower" bent on destroying us"); *see also* GX D1 (under seal) and N (under seal).)

132.    Third, many of the defendant's purported delusions are based in part upon actual experiences she has encountered since being incarcerated. After placing these statements in the appropriate context, they are not irrational or delusional. Regarding the defendant's fear of being poisoned, for example, in October 2008 the defendant suffered a bad gastrointestinal reaction from a meal she received at FMC Carswell. After this reaction, the defendant frequently verbalized fears of being poisoned. (7/6/09 Tr. at 91:6-11; GX H at MED 88 (October 10, 2008 noting that the defendant suffered cramps after eating fish), 141 ("She is convinced that the fish made her seriously ill and that it was intentional on someone's part.").) Shortly thereafter, the defendant requested a "regular tray" from which to select her food in order to avoid being poisoned. (*See, e.g.,* GX H at MED 101 (noting that the defendant wants a regular tray so no one knows which one is hers).)

133.    The defendant also referred to this on the phone with the Pakistani embassy on October 23, 2008: "[t]hey have for sure mixed some things in my food which are very dangerous. My health was affected by ingesting only one or two bites of food." (GX J

(10/23/08 call (14:01:55 p.m.)); GX K1 at T 67.)  The defendant added: "I went there and asked them to record my condition which was because of the kosher fish I ate" (*id.* at T 72) and added that she is not allergic to fish but that there is "something else going on."  (*Id*. at T 79.)  This gastrointestinal reaction is consistent with the defendant's view that someone did – in fact – try and poison her.  (7/6/09 Tr. at 145:9-13.)  Similarly, Dr. Powers noted that while the defendant on one occasion provided a list of staff members who wanted to harm her (GX I at MED 392-93), many of the staff members referenced on that list had previously had disagreements with the defendant.  (GX C at 6.)

134.    Indeed, this sentiment or fear is not surprising.  The defendant has publicly been wanted for questioning by the FBI since 2003.  While receiving medical care, the defendant told the FBI that she was aware that various law enforcement agencies had been looking for her, and that she therefore was in "hiding" for the last five years.  (GX D at 233, 236-37, 240, 243, 402, 540-41, 554.)  The defendant also admitted to the FBI that she was married to Ammar al-Baluchi – the nephew of Khalid Sheikh Muhammad and an alleged "fixer" for the September 11th attacks – and that she assisted Majid Khan – another alleged al Qaeda operative – in opening a post office box in Maryland.  (GX D at 197, 240, 243, 399, 540-41.)  Now that the defendant has been apprehended, her fear that her life is in danger may be very real to her, and must be viewed as reasonable given her perspective and ideological belief system.  .

135.    Similarly, many of the defendant's purported beliefs about the Court relate to her view that the Court was involved in the forced medical examination on September 9, 2008.  During phone conversations with the defendant's brother, for example, she indicates that BOP staff members informed her that the Court had ordered the forced medical examination. (GX J

(10/4/08 call); GX K1 at T 33 (discussing how BOP staff members stated that the Court ordered the forced medical examination); GX J (10/9/08 call); GX K1 at T 45; *see also* GX H at MED 104 (summarizing conversation with defendant where she discusses being "killed" on a judge's order relating to the forced medical exam), 140 (referring to the court that ordered the forced medical exam)). It also is not irrational for the defendant to believe (or fear) that the videotape of her forced medical exam has been placed on the internet.

136.    Fourth, many of the defendant's behaviors are inconsistent with her expressed delusions. Although the defendant claims a fear of being poisoned, for example, she has been eating her meals regularly and has gained weight. (7/6/09 Tr. at 145:14-18.) In Dr. Johnson's experience, "the people that I am familiar with who actually believe they are being poisoned, are very finicky about taking any food or anything in, because they do feel they are going to be harmed." (7/6/09 Tr. at 145:5-8.) Accordingly, while the defendant may harbor some fear that she could be poisoned, "there is no evidence that she's operating on a belief system that she is being poisoned." (7/6/09 Tr. at 91:16-17; *see also* GX O at 168:19-25; 7/6/09 Tr. at 145:14-18 (stating that the defendant "doesn't appear to be operating as if she thinks anybody is trying to poison her at this particular point in time"), 7/6/09 Tr. at 167:16 ("I don't believe [the fear of being poisoned] is a paranoid delusion.")) This is corroborated by the numerous commissary purchases the defendant made since her incarceration at FMC Carswell, which notably included fish, as well as candy, beans, cookies, beans, and fruit. (GX H MED 199-220.) And, there are no reports from FMC Carswell suggesting that the defendant was underweight, or needed forced feedings.

137.    Similarly, although the defendant stated that the Court already imposed a death

sentence on her, the defendant also stated in phone calls that she understands the charges against her and plans to defend against them. These discussions are not consistent with the defendant's purported belief that the Court has already imposed a death sentence on her or that the Court is part of a grand conspiracy. (DX 1 at 17.)

138. Dr. Kucharski emphasizes various statements of the defendant in support of his theory that the defendant is delusional in her thoughts that the outcome of the trial is predetermined and that she will get the death penalty. (DX 1 at 1, 5, 16.) On May 5, 2009 – four days after the defendant made these statements – the defendant made it abundantly to her brother in a phone call that she understood the court process, and that the court had not rendered a decision in her case. On the same call, the defendant expressed interest in conferring with her attorney. (GX J1 (5/5/09 call); GX K1 at T 211 (the defendant telling her brother that she informed Dr. Kucharski that she "might" think about "talking to [Cardi]").) On this same phone call, the defendant also stated "so far the judge has not done anything great or positive. We will see." (*Id.* at T 213.) The defendant went on to say "I am not like [losing] hope overall." (*Id.* at T 214.) The defendant has had similar phone calls since this date, and has indicated that she has elected – for now – not to participate in the court process. Contrary to Dr. Kucharski's assessment, the record demonstrates that the defendant's decision is volitional rather than the by-product of delusional disorder.

139. Fifth, many of the statements that Dr. Kucharski references as delusional are simply not prevalent enough to constitute "fixed, false beliefs," which are necessary for categorization of delusions. (7/6/09 Tr. at 91:24-95:1.) Certain of these statements – like a reference to the "eyes" technique and the fact that a staff member may try and kill her – are too

isolated to be considered delusional. (DX 1 at 11.) They are "simply . . . statement[s] made on once occasion, or a couple of occasions," such that they cannot be deemed evidence of delusional disorders. (7/6/09 Tr. at 92:1-2.)

140. The defendant does not suffer from a delusional disorder.

ii. The Defendant Does Not Suffer From Paranoid Schizophrenia

141. Only Dr. Kempke concluded that the defendant is a paranoid schizophrenic. As noted above, her opinion should be given little to no weight. None of the other experts – nor any other physician for that matter – have diagnosed the defendant as a paranoid schizophrenic. (*See*, *e.g.*, 7/6/09 Tr. at 41:25-42:2; 95:15; 148:13-14.) Even Dr. Kucharski reached a contrary conclusion, noting that the defendant would act less organized were she schizophrenic. (7/6/09 Tr. at 81:8.)

142. The general symptoms of paranoid schizophrenia include the presence of prominent delusions or auditory hallucinations in the context of a relative preservation of cognitive functioning and affect. (DSM IV at 313-14.) In distinguishing delusional disorder from paranoid schizophrenia, Dr. Kucharski noted that in delusional disorder "there is not this extensive disorganization in thinking and behavior in schizophrenia." (7/6/09 Tr. at 86:10-12; *see also* 7/6/09 Tr. at 86:24-87:3 (noting that in delusional disorder "there is the absence of this gross disorganization that you see in a disorder like schizophrenia, or bipolar disorder").)

143. Dr. Kempke did not submit a report outlining the reasons for this diagnosis. At her deposition, Dr. Kempke insisted that she was "a hundred percent sure" that the defendant was a paranoid schizophrenic, but noted that "there may be a subset of what [she has] treated as paranoid schizophrenia that someone else within the field would describe as delusional

disorder." (DX 7 at 189:17-21.)

144.    When asked to summarize the symptoms that permit this diagnosis, Dr. Kempke stated "[r]eading the old records, it looks like she underperformed when she was working at Karachi, Pakistan, at least according to one of the doctor's reports.  She also apparently had difficulties – again, paranoia, and almost didn't get her Ph.D. from Brandeis because of that." (DX 7 at 233:21-234:4.)  It is unclear what this refers to and how it could support a diagnosis of paranoid schizophrenia.  Nothing in the collateral materials indicates that the defendant "underperformed" in either Karachi or Brandeis.  To the contrary, the defendant has performed remarkably well in life, obtained a Bachelors of Science Degree from MIT and a PhD from Brandeis University.

145.    Dr. Kempke also cited the fact that the defendant began referencing the "Zionist conspiracy" and "the fear that she will be mistreated" on the flight over from Afghanistan.  (DX 7 at 234:5-10.)  Dr. Kempke also outlined the fact that the defendant had misgivings about her children, feared that her food may be poisoned, and also expressed thoughts that certain staff members may be seeking to harm her.  (DX 7 at 29-39). Dr. Kempke did not address whether these statements could be consistent with the defendant's belief symptoms or past experience, nor did she explain how these statements were "bizarre" for purposes of a diagnosis of schizophrenia.

146.    Moreover, Dr. Kempke simply did not question any of the defendant's symptom presentation.  When asked, for example, about the defendant's appetite, Dr. Kempke reponded "I don't care one way or the other."  (DX 7 at 194:16-23.)  One of the purported delusions suffered by the defendant (as noted by Dr. Kempke) was a fear of being poisoned.  Thus the defendant's

food intake was relevant to the extent the defendant had expressed fears of being poisoned. (7/6/09 Tr. at 84:9.)  Dr. Kempke's conclusion that matters relating to food intake are "irrelevant" to her diagnosis further undercuts her credibility.

147.    In addition, Dr. Kempke made this diagnosis even though she never prescribed anti-psychotic medications for the defendant.  (DX 7 at 196:23-25.)  Despite receiving no medication, the defendant's mental health condition has improved.  (DX 7 at 202:20-203:2.) Similarly, Dr. Kempke never formally diagnosed the defendant as suffering from paranoid schizophrenia in the various progress notes that are part of the record in this case.  In examining one of Dr. Kempke's notes from April 14 2009 (GX H at MED 183), for example, Dr. Saathoff observed that "no place in [this] note does [Dr. Kempke] mention paranoid schizophrenia." (7/6/09 Tr. at 189:7-8.)  Rather, Dr. Kempke gave the defendant an assessment of "adjustment disorder with depressed mood" (GX H at MED 184), which does not even call for medication and which is neither a psychotic disorder nor a mood disorder.  (7/6/09 Tr. at 189:8-10, 17-21.)

148.    Dr. Kempke's diagnosis of paranoid schizophrenia should be completely disregarded.

### iii.    The Defendant Does Not Suffer From Any Other Identified Mental Disease or Disorder

149.    With little elaboration, Dr. Kucharski indicates that the defendant also suffers from significant depression, and also notes that the defendant has symptoms of tangential thinking.  (DX 1 at 16-17.)  These suggestions are unpersuasive on a number of fronts.

150.    Tangential thinking can be indicative of a variety of diagnoses, but is *not* necessarily pathological.  (GX O at 79:23-25; 7/9/09 Tr. at 145:24-1 ("[A]nybody can have tangential thinking.  It doesn't have to be a pathological symptom.  And we probably all

demonstrate it at times."))   Tangential thinking may be a symptom of depression, but typically is not one of delusional disorder.  (GX O at 80:7-16; *see also* DX 1 at 12 (noting that in delusional disorder "the thought process is usually not impaired; however some circumstantiality and idiosyncrasy may be observed").)

151.    Moreover, "tangential thinking" refers to disconnect in one's thought processes. (7/6/09 Tr. at 125:10-12, 146:2-4 ("[I]t is one type of disordered thinking that we see in thought-disordered people." )) Typically, people who experience tangential thinking are hard to follow, and respond to questions in ways that are peripherally or tangentially related.  (7/6/09 Tr. at 146:4-7.)

152.    In support of his conclusion that the defendant experiences "tangential thinking," Dr. Kucharski references his own conversations with the defendant, and claims that staff members "uniform[ly]" share this view.  (7/6/09 Tr. at 44:16-18.)  Dr. Kucharski also writes that "tangential thinking" is difficult to malinger, and argues that the defendant's manner of thinking seriously impedes her ability to communicate with counsel.  (DX 1 at 13, 17.)

153.    Dr. Kucharski's opinion is inconsistent with that of Dr. Johnson, who did not view the defendant as suffering from tangential thinking.  (7/6/09 Tr. at 100:24-101:3.)  Dr. Johnson based her assessment on interviews of various staff members who interacted with her, as well as several hours she spent with the defendant herself. (7/6/09 Tr. at 101:11-102:3.)  In addition, when Dr. Johnson observed the defendant outside of the evaluation setting, the defendant did "not show evidence of a thought disorder" or "tangential thinking."  (7/6/09 Tr. at 146:8-12.)  In addition, tangential thinking is not established simply by the fact that the defendant's brother may have been confused by her.  (7/6/09 Tr. at 146:18-20.)  As Dr. Saathoff

noted, "tangential thinking" is not the same as "tangential speech," given that people can express symptoms that do not exist – that is, fake their symptoms. (7/6/09 Tr. at 175:14-20.)

154. Similarly, Dr. Powers did not view the defendant as suffering from tangential thinking within the last two to three months of her stay at FMC Carswell. (GX O at 176:22-23.) This is consistent with early MDC psychology reports, indicating that the defendant did not display any thought disorders, notwithstanding the fact that she was reporting purported hallucinations. (GX F at 29, 46.) Likewise, as summarized in Dr. Saathoff's report, MDC and FMC Carswell staff members did not view the defendant as suffering from a mental illness or exhibiting bizarre behavior. (GX A at 11, 15, 19, 23-24, 29-32.) Indeed, even Dr. Kucharski personally interviewed three different FMC Carswell staff members who described the defendant as, among other things, showing no obvious signs of mental illness, "commanding" the room and getting what she wants, and organized. (7/6/09 Tr. at 45:1-45:21.)

155. In addition, contrary to Dr. Kucharski's opinion, tangential thinking is not difficult to feign. (GX O at 123:6-13.) As Dr. Powers stated: "[j]umping from one topic to another is not that difficult to do. Usually when I see someone who's malingering that, malingering tests can flush it out." (GX O at 177:14-18.) Here, testing "wasn't an option" because the defendant refused to be tested. (GX O at 177:18-19.)

156. More fundamentally, Dr. Kucharski does not identify in his report – nor during his testimony – what mental or disease or defect results from the defendant's alleged tangential thinking. Likewise, Dr. Kucharski has not shown how the defendant's alleged tangential thinking affects the defendant's rational understanding of the proceedings or her ability to communicate with her attorney in a rational manner. An isolated symptom is not the same as a

mental illness, nor is it sufficient to render a defendant incompetent to stand trial. (*See* 7/6/09 Tr. at 44:7-9 ("I don't believe that someone with mild tangential thinking would be incompetent."), 147:8-13 ("[Y[ou do need the presence of a mental illness to have an individual not be competent to stand trial. . . . [I]f there is a mental illness, it's a matter of how severe that illness is, and how it is connected to the issues that are pertinent in resolving the legal situation.")) As set forth below, the record shows that the defendant has consistently shown the ability – and potential – to communicate about her criminal case to third parties.

157.   Dr. Kucharski's conclusion that the defendant suffers from significant depression is similarly unsupported. As an initial matter, Dr. Kucharski offers little to no support for this diagnosis, nor has he opined as to how this diagnosis affects competence. (DX 1 at 17.) Accordingly, this opinion should be rejected.

158.   In addition, a number of criteria are to be considered in assessing whether a defendant suffers from "major" depressive disorder, including five or more identified symptoms within a two-week time frame. (GX B at 29; DSM IV at 356.) There are nine of these possible symptoms, which include, in sum and substance, the following: depressed mood most of day nearly every day; markedly diminished interest or pleasure in almost all activities nearly every day; significant weight loss or weight gain or decrease or increase in appetite nearly every day; insomnia or hypersomnia nearly every day; psychomotor agitation or retardation nearly every day; fatigue or loss of energy nearly every day; feelings of worthlessness or inappropriate feeling of guilt nearly every day; diminished ability to think or concentrate (or indecisiveness) nearly every day; and recurrent thoughts of death. (GX B at 29; DSM IV at 356.)

159.   In finding that the defendant is significantly depressed, Dr. Kucharski did not

address these criteria or symptoms. Nor would any of them fit this defendant. (GX B at 29.)

Dr. Johnson, found, for example, that the defendant was not feeling sad or depressed; has been

performing daily activities; had been noted to be reading, praying, and taking care of hygiene;

and has been observed eating (GX B at 29; 7/6/09 Tr. at 90:16-20 ("I do not believe [the

defendant] meets the criteria to be diagnosed with a major depression."); *see also* GX A at 7

(noting that the defendant's "hygiene and grooming appeared to be excellent").) Similarly, Dr.

Powers did not believe that the defendant is suffering from major depressive disorder (GX O at

29:13-17), and alluded to the fact that the defendant recently has not experienced problems

sleeping, which is a criteria used in diagnosing depression. (GX O at 38:17-18, 41:18-21.) In

fact, Dr. Kucharski acknowledged that the presentation of depression "may have diminished"

given that during his interview the defendant "was able to smile, her energy level appeared

adequate and she engaged in the discussion with some vigor." (DX 1 at 6.) It is clear that the

defendant does not suffer from a major depressive disorder.

160.    Although Dr. Kucharski alludes to a possible diagnosis of Post-Traumatic Stress

Disorder ("PTSD"), none of the testifying experts have diagnosed her with such a mental illness.

(7/6/09 Tr. at 117:7-12 ("[N]o one is diagnosing her with a PTSD diagnosis at this time.").) In

fact, Dr. Johnson noted that the defendant's current symptoms are inconsistent with such a

diagnosis (GX B at 30-31; 7/6/09 Tr. at 132:3-6, ), and referenced Dr. Dromgoole's similar

conclusion at FMC Carswell. (GX B at 25; 7/6/09 Tr. at 149:2-9; *see also* (GX O at 173:13-

174:9 (noting that the defendant does not exhibit symptoms consistent with PTSD.) .) Dr.

Johnson noted in this regard that the defendant has continued to visit with her brother and the

Pakistani Consulate, notwithstanding that she is forced to undergo strip searches, one of the main

sources of her supposed trauma.  (GX B at 30.)

## V.   EXPERT OPINIONS THAT THE DEFENDANT HAS A FACTUAL AND RATIONAL UNDERSTANDING OF THE PROCEEDINGS AGAINST HER AND THE ABILITY TO CONSULT WITH COUNSEL WITH A RATIONAL DEGREE OF UNDERSTANDING

161.   The evidence supports a finding that the defendant is malingering and does not

suffer from a mental disease or defect.  The evidence also supports the conclusion that the

defendant possesses a factual and rational understanding of the charges against her, and has the

potential to consult with her attorney with a reasonable degree of rational understanding.

162.   All four experts – including Dr. Kucharski the defense expert – opined that the

defendant has a factual understanding of the charges against her.  (DX 1 at 16; 7/6/09 Tr. at 78:4-

5 ("I don't think there is any argument that she either has a factual understanding, or that she is

capable of acquiring one").)  Dr. Johnson, Dr. Saathoff, and Dr. Powers – but not Dr. Kucharski

– found that the defendant had a rational understanding of the proceedings against her, and the

ability to consult with an attorney with a rational degree of understanding.  (GX A at 39; GX B

at 35; GX C at 12; *but see* DX 1 at 16-17.)

163.   The record amply supports the conclusions of Dr. Johnson, Dr. Saathoff, and Dr.

Powers.  Since being detained on July 17, 2008, the defendant has demonstrated that she has a

factual and rational understanding of the proceedings, and that she has the ability to consult with

counsel in a rational manner.  During the two week period that the defendant received medical

care in Afghanistan, for example, the defendant discussed a wide range of topics with the FBI,

including details surrounding her arrest.  The defendant demonstrated an understanding of the

criminal process, inquiring about the potential charges and penalties she faced.  According to

FBI reports, for example, the defendant inquired as to what offenses carry the death penalty in

the United States and what sentence was associated with attempted murder.  (GX D at 200.)  On another occasion, the defendant inquired about potential charges that could be levied against her.  (GX D at 237.)  These questions demonstrate not only an awareness of the impending charges, but that the defendant had sufficient understanding of her circumstances and the legal process to correctly predict one of the charges – attempted murder – that would ultimately be brought against her.

164.    In speaking with the FBI, the defendant also framed potential defenses to anticipated charges, claiming that she never not shot or killed anyone, and noting that she only picked up the gun to look at it.  (GX D at 197, 201.)  On another occasion, the defendant claimed that she picked up the gun to "scare the men in the room" so she could get away, but added that she never fired it or functioned the safety device.  (GX D at 543.)  Similarly, although the defendant admitted to possessing many of the items that were recovered from her – including writings and sodium cyanide – the defendant claimed that she did not have these materials for nefarious purposes.  (GX D at 236, 243-44, 321-26, 399-400, 415-21, 451-52.)  The defendant also admitted to associating with various al Qaeda members – including her former husband Ammar al Baluchi – but astutely denied knowing their al Qaeda affiliations at the time she dealt with them.  (GX D at 232-33, 397, 539-40, 546.)  These comments demonstrate that the defendant was already considering and possible testing out, various defenses, long before she even had legal representation.

165.    During this period, the defendant demonstrated an ability to negotiate, repeatedly offering to cooperate with, or assist, the FBI, subject to certain conditions.  (GX D 237, 248-49, 413, 455; *see* GX B at 33 (noting that the defendant "has the capacity to understand the plea

bargaining process should she choose to do so").)  Similarly, during her transportation to the United States, the defendant was advised of her *Miranda* rights.  (GX D 202.)  The defendant acknowledged her understanding of these rights, and invoked her right to counsel.  (GX D 202-03.)  Similarly, while at MDC, the defendant on August 23, 2008 that she did not want to speak to anyone unless they could help her son.  (GX E at LOG 87.)

166.    Likewise, when the defendant was first brought to an "intake" interview at the MDC on August 4, 2008, the defendant was described by psychology staff as "appropriately guarded when discussing any subjects she considered sensitive to her current charges and legal situation."  (GX F 56.)  The defendant stated that she wanted to speak with an attorney before answering such questions, and "expressed concerns that the reality of the circumstances surrounding the incident leading to her arrest is being distorted and lies are being told about her."  (GX F 56.)

167.    The defendant's recorded phone conversations at FMC Carswell also support the conclusions of Dr. Powers, Dr. Saathoff, and Dr. Johnson that the defendant possesses a rational and factual understanding of the proceedings and the ability to assist in her defense.  Far from expressing delusional beliefs about the Court and the legal process, the defendant indicated that she is aware of the status of her criminal case, and that she has the right to defend herself and to retain counsel.  In certain phone calls, the defendant discussed retaining new attorneys to work on her case and expresses reservations that she will get a fair trial:

August 29, 2008:    The defendant discussed with her brother retaining new counsel. Referencing the Pakistani Legal Forum, the defendant noted that "they're setting up a legal fund," that "they can give me a lawyer," and that "the case is not that difficult."  (GX J (8/29/09 call); GX K-1 at T 8.);

October 3, 2008:     The defendant discussed the competency evaluation with her brother (GX J (10/3/08 call); GX K1 at T 15-16) and asked for new attorneys, noting that she did not shoot anyone (*id.* at T 21), and that she "need[s] a Muslim attorney" and the case is "not as difficult as it seems." (*Id.* at T 22.);

October 4, 2008:     The defendant stated to her brother: "[e]ven if you get the best attorney in the world and even if I could prove all of this is false . . . . It can be proven but it won't work. . . . I don't believe in their system anymore at all." (GX J (10/4/08 call): GX K1 at T 31.) The defendant added "I was shot by the soldiers. I didn't shoot them. They shot me. They should be in prison." (*Id.* at T 34.);

October 9, 2008:     The defendant discussed with her brother her dissatisfaction with her lawyer, inquiring as to whether he could inform "the media" that they were not her lawyers. (GX J (10/9/08 call); GX K1 at T 40.);

October 15, 2008:    The defendant informed her brother that if she is proven competent, then "they only thing I want to be proven competent" for is "to fire [my attorney.]" (GX J (10/15/08 call); GX K1 at T 52.); and

March 24, 2009:      The defendant informed her brother that she was told "the judge is going to appoint me a public defender." (GX J (3/24/09 call); GX K1 at T 176.) The defendant added "you can't hire anybody for me because I didn't give the right to anybody." (*Id.*)

168.     In other phone calls, the defendant discusses possible defenses to the charges, and her view of the status of the proceeding. (GX O at 24:2-8 (noting that the defendant "has demonstrated the knowledge of court proceedings through conversations that she's had with other people; she has had conversations with her brother in particular, where she talked about a legitimate defense."); GX O at 26: 6-11 (defendant "was able to talk about court proceedings in a logical manner to her brother and that she was able to communicate with people on the unit in a manner that would indicate that she had a logical method of doing so"):

October 9, 2008:     The defendant told her brother "we have very strong evidence to

win this case, but we will not win it through this system." (GX J (10/9/08 call); GX K1 at T 43.) The defendant added that "he has to make the point, internationally, that I was shot. . . . I was a prisoner in the third government country." (*Id.*) The defendant also provided an abbreviated version of the events leading up to her detention. (*Id.* at T 44) The defendant added that initially she believed she could defend the case, but "now I don't because they don't give me justice." (*Id.*) The defendant reiterated that "we have to prove that this whole thing, the whole drama of me coming here is against international law. . . . [I]t is the international agencies and the Human Rights agencies that need to take it up. This is an international crime." (*Id.* at T44 - 45.); and

June 10, 2009:      The defendant said to her brother "I just protest against this whole process and don't want to participate." (GX J1 (6/10/09 call); GX K1 at T 289.)

169.    In certain other phone calls, the defendant demonstrated an understanding of the

competency hearing and the court's schedule:

October 9, 2008:      The defendant told her brother that "they probably want me to determine I am able to stand trial." (GX J (10/9/08 call); GX K1 at T 40.) The defendant referenced the fact that at the MDC she had been diagnosed and that it was reported in the media. (*Id.*);

October 16, 2008:      The defendant inquired with her brother about when the 30 day evaluation is over and notes that she does not "get a bad feeling about the study." (GX J (10/16/08 call); GX K1 at T 58, 60.);

October 23, 2008:      The defendant repeatedly spoke to the Pakistani consulate about the status of the competency evaluation and when it would end. (GX J (10/23/08 call (14:01:55 p.m.)); GX K1 at T 71.);

November 4, 2008:      The defendant noted to her brother that she believes the evaluation is complete as "[i]t's been a month since I've been brought here." (GX J (11/4/08 call); GX K1 at T 101.);

November 17, 2008:      The defendant told her brother that she has "full right to get the [psychiatric] report" (GX J (11/17/08 call); GX K1 at T 120) and said that "[Dr. Powers] lied to me" because "she said I will be able to see it." (*Id.* at T 123.);

December 17, 2008:      The defendant said to her brother that she would not cooperate

66

with treatment, but noted that "the court will decide now."  (GX J (12/17/08 call); GX K1 at T 141.); and

January 26, 2009:   The defendant inquired with her brother about the status of her competency hearing: "what is the court doing? . . . They have been evaluating me for a long time.  What do they want to hear?  I don't think they will stop evaluating me until they get to hear what they want to hear."  (GX J (1/26/09 call); GX K1 at T 161.)

170.    In still other phone calls, the defendant discusses the possibility of having court

teleconferences, or of possibly arranging "non-contact" attorney visits, such that the defendant

can avoid strip searches:

May 5, 2009:        The defendant discussed with her brother the fact that she would be moved "either this week or next," and discussed the possibility of having a teleconference at FMC Carswell, in lieu of appearing in court in New York.  (GX J (5/5/09 call); GX K1 at T 209-210.);

May 11, 2009:       The defendant discussed with her brother the possibility of having teleconferencing for court proceedings: "if this Judge wants to, it's really not a problem.  There are many people who don't go to court."  (GX J (5/11/09 call); GX K1 at T 217.); and

May 19, 2009:       The defendant requested that the Pakistani embassy arrange for "non-contact" visits, such that there would be no strip searches. (GX J (5/19/09 call); GX K1 at T 251-52, 54-55.)  On the same call, the defendant discussed the possibility of retaining new attorneys, noting that she might "have some issues" with the ones proposed by the embassy.  (*Id.* at T 252-53.)  The defendant also reiterated that "I feel am not interested in going into this system period."  (*Id.* at T 256.)

171.    In addition, the defendant has been able to communicate about the offense with

staff at MDC and at FMC Carswell.  (GX H at MED 89 (summarizing her version of events to

FMC Carswell staff); 171 (writing to FMC Carswell warden that "she never shot any soldiers . . .

and no, she never said she wanted to do any of the lies they have drummed up against her"), 173

(discussing events underlying arrest to Dr. Kempke; claiming that she can prove "in one minute"

that she is innocent and will not reveal that until she goes to court); GX I at MED 301 (writing

on August 27, 2008 that she will not sign medical release form unless, among other things, "my

current attorneys are removed from my case and a team of Muslim – preferably Pakistani

attorneys talk to me and take over my case").)

172.     The defendant is highly intelligent and faces straightforward charges.  As Dr.

Johnson testified: competency is "a matter of how severe that illness is, and how it is connected

to the issues that are pertinent in resolving this legal situation."  (7/6/09 Tr. at 147:10-12.)  Dr.

Johnson provided the following example:

> [Y]ou could have someone who is mentally retarded.  And if the
> charges in the proceedings against them are relatively simple, that
> person may be viewed as competent to stand trial in that particular
> situation.  You might have a much more complex situation where
> they are overwhelmed, where they didn't have sufficient
> intelligence.

(7/6/09 Tr. at 147:14-19.)  Here, the charges are not complex.  The Indictment centers on a July

18, 2008 shooting, and alleges that the defendant attempted to kill United States officers and

employees in Ghazni, Afghanistan.  The defendant has repeatedly articulated her defense – that

she did not shoot anyone.  That, in a nutshell, is the case.

173.     The issues at trial will not be complicated or overwhelming, particularly for

someone of the defendant's educational background, intellectual functioning, and familiarity

with the United States.  (GX B at 32.)  As referenced above, the defendant resided in the United

States for approximately twelve years.  (GX B at 4-7.)  The defendant received advanced degrees

from MIT and Brandeis University, as recently as 2001.  (GX B at 5; GX Q.)  While attending

these schools, the defendant successfully raised two children, and was actively involved in

promoting Islam.  (GX B at 5-6.)  Thus, the defendant certainly has the capability to assist in her

defense to these charges.

174.    Although Dr. Kucharski reached a contrary view, his opinion is contrary to the weight of the evidence.  As a threshold matter, the underlying premise of Dr. Kucharski's opinion is that the defendant does not suffer from delusional disorder, significant depression, or from tangential thinking.  That premise is unsupported by the record.

175.    Even assuming the defendant suffers from some degree of delusional disorder or significant depression – which she does not – Dr. Kucharski did not demonstrate how these disorders render her incompetent to stand trial.[6]  Out of a 17-page report, Dr. Kucharski devoted only one paragraph to this issue.  (DX 1 at 17.)  He opined that the defendant does not believe that the Court is involved in adjudicating guilt or innocence, but views the Court process as an extension of her history of being persecuted and believes the outcome is predetermined.  (DX 1 at 17; *see also* 7/6/09 Tr. at 47:7-13 (stating that the defendant's delusional belief relating to her case is that it is the product of a conspiracy in which the Court is an active participant).)  Dr. Kucharski also opined that the defendant's tangentiality significantly affects her ability to communicate with counsel.  (DX 1 at 17; *see also* 7/6/09 Tr. at 57:9-10, 73:13-15 (alluding to

---

[6]        Dr. Kucharski recognized that someone can have mental health symptoms – including delusional disorder – and still be competent to stand trial.  (7/6/09 Tr. at 66:19-22, 86:10-23.)  Similarly, as alluded to above, Dr. Johnson indicated that a defendant's firm, irrational beliefs render a defendant incompetent to stand trial only if those beliefs seriously affect the defendant's participation in the legal process.  (7/6/09 Tr. at 107:6-11, 108:10-17, 147:11-13, 147:22-148:2)  ("[I]f there is a mental illness, the person may still be competent and, in fact, most of the people who are mentally ill, by at least a small majority, would still be competent to stand trial.");  *see also* GX O at 181:7-9 (noting that someone can be mentally ill and competent to proceed to trial); 7/6/09 Tr. at 180:1-2 ("[P]resence of a mental illness itself does not mean that someone is incompetent."))

the defendant's interruptions during the competency hearing as evidence of this).)

176.    These broad, generalized statements are not to be credited.  Most importantly, the defendant's behavior since being detained in July 2008 shows that she does *not* harbor any delusions about her criminal case and knows that she has the *option* of putting forth a defense. In recorded phone calls with her brother and the Pakistani consulate, for example, the defendant has discussed the status of her case, provided input regarding possible defenses, and considered retaining new attorneys.  Although the defendant has expressed reservations about getting a fair trial, that sentiment is consistent with her radical ideology and her perceived reality of her situation.  It is not delusional.  Of particular note is that since being arrested the defendant has not expressed any delusions relating to her actions at the time of the offense.  (GX B at 33 ("[t]here is no indication that she has any delusional ideas about her action at the time of the events.").)  Nowhere in Dr. Kucharski's report does he reference that fact.

177.    Far from evidencing conspiratorial beliefs relating to the Court or the U.S. legal system, the defendant demonstrated her ability to understand the consequences of the July 18 shooting and to frame defenses to the charged offense and to her association with various al Qaeda individuals.  The defendant has continued to verbalize these defenses to various BOP staff members since being incarcerated.  And, upon her arrival to the United States, the defendant showed reluctance to communicate with law enforcement without first consulting with her attorney.  These actions are inconsistent with the behavior of someone who truly believes her arrest was the product of a conspiracy involving the Court.

178.    Similarly, the defendant's ability to communicate and consult with her attorneys is not "significantly impaired."  (DX 1 at 17.)  As summarized above, since the

defendant was arrested, she has demonstrated the ability to communicate about her case to FBI agents, BOP staff members, and her brother and Pakistani consulate.  The defendant also has the intellectual capacity to assist in her defense, especially given her prior education and the nature of the charges.

179.    In sum, the record demonstrates the defendant's complete awareness of the issues she faces.  This is apparent in her courtroom utterances at the hearing, where she continued to emphasize her innocence, expressed a desire to replace her lawyers, voiced repeated displeasure with strip searches, and reiterated her frustration with the competency evaluation and desire not to be force medicated.  (7/6/09 Tr. at 68:21-23, 69:23-24 (noting that she "did not shoot anybody"), 7/6/09 Tr. at 70:5-6 ("Can I relieve my legal counsel of their services."), 7/6/09 Tr. at 142:8-11 (noting that "you want to . . . make me insane so you can force medicate me"), 7/6/09 Tr. at 150:23-25 (stating that she "could defend this and get it over with in like one year"), 7/6/09 Tr. at 151:10-11 ("I don't want to be here."), 7/6/09 Tr. at 157:5-6 ("My objection was to be forced, strip searched.")  The defendant also referenced Dr. Kempke by name, stating that she was "one of the few people who helped [her] *get better*," suggesting that even the defendant believes her mental health has improved. (7/6/09 Tr. at 94:6-8) (emphasis added).

180.    The defendant also made similar statements (7/6/09 Tr. at 68:10-19) in her January 2009 letter to the Warden at FMC Carswell (GX H MED at 171-72), which she requested be made public (7/6/09 Tr. at 150:4-6.)  Dr. Saathoff testified that the letter is "quite organized in terms of sentence structure, in terms of the way that she expressed her thoughts." (GX H MED at 177.)  Similarly, Dr. Johnson found that the letter was consistent with the defendant's radical belief system, rather than a symptom of delusional beliefs.  (GX B at 24-25.)

Likewise, the defendant's statements in court were not disorganized or illogical, but showed an awareness of the court process and an attempt to influence the proceedings.

181.    Taken as a whole, the record shows that the defendant has a rational understanding of the proceedings and that the defendant knows she can consult with her attorneys with a rational degree of understanding.  The defendant has, however, voiced concerns about the utility of doing so.  As referenced in a June 10, 2009 telephone call with her brother, the defendant decided that she does not "want to participate."  (GX J1 (6/10/09 call); GX K1 at T 289.)  This decision is volitional, however, and not the product of a delusion or mental illness. (*See* 7/6/09 Tr. at 51:24-52:2 (recognizing that an individual may be competent and elect not to participate in the process).)

# PROPOSED CONCLUSIONS OF LAW

## VI.     THE DEFENDANT IS COMPETENT TO STAND TRIAL

182.     The standard for determining whether a defendant is competent to stand trial is well settled. "The defendant must have (1) 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and (2) 'a rational as well as factual understanding of the proceedings against him.'" *United States* v. *Nichols*, 56 F.3d 403, 410 (2d Cir. 1995) (quoting *Dusky* v. *United States*, 362 U.S. 402 (1960) (*per curiam*)); *see also Godinez* v. *Moran*, 509 U.S. 389, 396 (1993); *United States* v. *Morrison*, 153 F.3d 34, 46 (2d Cir. 1998); *United States* v. *Hemsi*, 901 F.2d 293, 295 (2d Cir. 1990). A district court's determination of competency is made on the basis of a preponderance of the evidence. *See United States* v. *Morrison*, 153 F.3d at 46; *Nichols*, 56 F.3d at 410 (citing 18 U.S.C. § 4241(d)). In making this determination, the district court may properly rely on a number of factors, including medical opinions and the district court's observation of the defendant's comportment. *Nichols*, 56 F.3d at 411; *United States* v. *Hemsi*, 901 F.2d at 295-96; *United States* v. *Oliver*, 626 F.2d 254, 258-59 (2d Cir. 1980).

183.     The Second Circuit has not decided who bears the burden of proof in the competency context. *See Nichols*, 56 F.3d at 412. The Circuit has, however, recognized that "the allocation of the burden of proof to the defendant will affect competency determinations only in a narrow class of cases where the evidence is in equipoise; that is, where the evidence that a defendant is competent is just as strong as the evidence that he is incompetent." *Id.* at 410 (quoting *Medina* v. *California*, 505 U.S 437, 448 (1992)). Here, that is not the case, as the evidence of the defendant's competence far outweighs the evidence that she is not competent.

184.     The Supreme Court has indicated, however, that the defendant bears the burden of proving incompetence by a preponderance of the evidence. *See Cooper* v. *Oklahoma*, 517 U.S. 348, 362 (1996) ("Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence."); *see also United States* v. *Sandoval*, 365 F. Supp. 2d 319, 320 (E.D.N.Y. 2005) ("The burden after a hearing is on the defense to prove by a preponderance of the evidence that the defendant is not competent to proceed."); *United States* v. *Gigante*, 996 F. Supp. 194, 199 (E.D.N.Y. 1998) ("Placing the burden of proving incompetence at sentencing on the defendant is defensible as matter of policy.").  This conclusion is supported by the plain language of the statute. *See* 18 U.S.C. § 4241(d) (noting that if "after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his own defense, the court shall commit the defendant to the custody of the Attorney General.")

185.     Here, where the defense claims that their client is incompetent, the defendant bears the burden of proof.

186.     "It is well-established that some degree of mental illness cannot be equated with incompetence to stand trial." *United States* v. *Vamos*, 797 F.2d 1146, 1150 (2d Cir. 1986); *accord Nichols*, 56 F.3d at 412; *see also Vamos*, 797 F.2d at 1150 (holding that since expert report did not "link [defendant's] illness to her competency to stand trial, and the obervations of the court and [defense] counsel did not provide such a connection, the report did not give reasonable cause to doubt [the defendant's] competency"); *United States* v. *Newfield*, 565 F.2d 203 (2d Cir. 1977) (finding defendant who was diagnosed as paranoid schizophrenic competent

to stand trial); *United States* v. *Gluzman*, 124 F. Supp. 2d 171, 176 (S.D.N.Y. 2003) ("Neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial.") (quoting *Vogt* v. *United States*, 88 F.3d 587, 591 (8th Cir. 1996) (internal quotations omitted)); *United States* v. *Simmons*, 993 F. Supp. 168 (W.D.N.Y. 1998) (finding defendant diagnosed with paranoid schizophrenia competent to stand trial).

187.    Rather, to support a finding of incompetency, "[t]he mental illness must deprive the defendant of the ability to consult with his lawyer 'with a reasonable degree of rational understanding' and to understand the proceedings against him rationally as well as factually." *Nichols*, 56 F.3d at 412 (quoting *Dusky*, 362 U.S. at 402). In addition, while the district court may consider psychiatric history, "the question of competency to stand trial is limited to the defendant's abilities at the time of trial." *Vamos*, 797 F.2d at 1150.

190.    Here, the proof establishes by a preponderance of the evidence that the defendant does not suffer from a mental disease or defect rendering her mentally incompetent to stand trial. Rather, the evidence overwhelmingly shows that the defendant: (1) has the ability to consult with her attorney with a reasonable degree of rational understanding; and (2) a rational and factual understanding of the proceedings against her.

191.    Although the defendant has verbalized mental health symptoms, the evidence established that she is malingering. First, the defendant's symptoms came about abruptly, long after her arrest, and well into her incarceration at the MDC. Second, the defendant has an incentive to fabricate these symptoms, in order to avoid prosecution and bring about repatriation to Pakistan. Third, despite verbalizing mental health symptoms, the defendant did not cooperate with the evaluations or with mental health staff. Fourth, the defendant presented these symptoms

in a graphic and over-the-top manner, by, for example, claiming to see her children visiting her at night, which largely resolved without medication.  Fifth, many of the defendant's claimed symptoms were inconsistent with certain objective facts, including the defendant's actual behaviors (sleeping, reading, eating, and interactions with fellow inmates and certain staff members).

192.    In addition, the defendant's symptoms are not consistent with an identified mental disease or defect.  The defendant is not suffering from a delusional disorder.  Many of the defendant's purported delusional statements can be explained in the context of her radical belief system and in light of certain experiences (such as gastrointestinal infection) she has endured while incarcerated.  In addition, many of the defendant's behaviors are inconsistent with her alleged delusional statements.  Finally, the defendant is not suffering from paranoid schizophrenia or significant depression.  All but one of the experts agrees with the former proposition, and there is no support for the latter proposition.

193.    The conclusion that the defendant is competent to stand trial would still be supported by the record even if the defendant has some mild form of illness.  Since being detained on July 17, 2008, the defendant has demonstrated a factual and rational understanding of the potential and actual charges against her.  The defendant is highly educated and has demonstrated the ability to communicate in a rational manner about her case.  To date, the defendant has chosen not to assist her appointed attorneys in defendant against this case.  This decision is volitional and not the result of a mental disease or defect.  Should the defendant so

choose, she has the ability to consult with counsel in a rational manner about her case.

194.    Accordingly, the defendant is competent to stand trial.


Dated:        New York, New York
              July 20, 2009


                        Respectfully submitted,

                        LEV L. DASSIN
                        Acting United States Attorney for the
                        Southern District of New York
                        Attorney for the United States of America

           By:    _____/s_____
                        DAVID RASKIN
                        CHRISTOPHER L. LAVIGNE
                        Assistant United States Attorneys
                        Telephone: (212) 637-2635/2325