UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/29/09

**ORDER FINDING
DEFENDANT COMPETENT
TO STAND TRIAL**

-against-

08 **CR.** 826 (RMB)

AAFIA SIDDIQUI,

Defendant.
------------------------------------------------------------X

## I.    Background

On or about July 31, 2008, a criminal complaint (08 Mag 1697) was filed charging Aafia

Siddiqui, Ph.D. ("Defendant" or "Dr. Siddiqui") with the following: 1- assault, in that on or

about July 18, 2008 at an Afghan National Police compound in Ghazni, Afghanistan Dr. Siddiqui

allegedly obtained a United States Army officer's M-4 rifle and fired it at officers and employees

of the Federal Bureau of Investigation and United States armed services; and 2- on the same date,

Dr. Siddiqui allegedly attempted to murder officers and employees of the United States in that

she obtained a United States Army officer's M-4 rifle and fired it at officers and employees of the

Federal Bureau of Investigation and United States armed services.  Defendant is a 37 year old

woman and a citizen of Pakistan.  She received a Bachelor's degree in biology from

Massachusetts Institute of Technology ("MIT") in 1995 and a Doctorate in neuroscience from

Brandeis University in 2001.

On August 5, 2008, Defendant appeared before Magistrate Judge Ronald L. Ellis who

informed Dr. Siddiqui of the following: i) her right to remain silent; ii) that anything she said

-1-

could be used against her; iii) her right to be represented by counsel; iv) her right to have counsel appointed if she could not afford counsel. At the same court appearance, Dr. Siddiqui completed a financial affidavit which she signed indicating that she has no assets, she is not employed, she has no property and she has no income. See [Docket #3]. Elizabeth Fink was appointed as her CJA counsel.[1] Ms. Fink stated that she had read the Complaint to the Defendant. (See Transcript of proceedings held on August 5, 2008 ("8/5/08 Tr.") at 5:7-8 (Ms. Fink: "I have read it [the Complaint] to Ms. Siddiqui.") .) Magistrate Judge Ellis also read the Complaint in its entirety in open court. See 8/5/08 Tr. at 7-12. When Judge Ellis asked Dr. Siddiqui "Do you understand the allegations against you?", Dr. Siddiqui responded "I understand them." See 8/5/08 Tr. at 12:14-16.

On August 11, 2008, Dr. Siddiqui appeared before Magistrate Judge Henry B. Pitman. Ms. Fink had requested this hearing on the issue of Defendant's detention. At the hearing, Assistant United States Attorney Christopher LaVigne stated that he "spoke with defense counsel and at this time defense counsel consents to the continued detention of Ms. Siddiqui without prejudice to her later application." 8/11/08 Tr. at 3:2-5. Magistrate Judge Pitman was also advised, by Ms. Fink, that "a counselor from Washington, the Pakistani Embassy, came up to see [visit with] Ms. Siddiqui and along with a high-level person from the Pakistan Council of New York, and Gideon Oliver [an associate of Ms. Fink]." 8/11/08 Tr. at 5:8-11.

On or about September 2, 2008, an indictment was filed against Dr. Siddiqui charging her with seven counts, including:1- attempted murder of United States nationals in violation of 18

---

[1]Ms. Fink, at her request, was relieved as counsel on or about February 23, 2009 and replaced by Dawn Cardi, another member of the CJA Panel. See Order dated February 23, 2009.

U.S.C. §§ 2332(b)(1) and 3238 ; 2- attempted murder of United States officers and employees in violation of 18 U.S.C. §§ 114(3) and 3238; 3- armed assault against United States officers and employees in violation of 18 U.S.C. §§ 111(a)(1), 111(b), 3238 ; 4- discharge of a firearm during a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), 924(c)(1)(B)(ii) and 3238 ; 5- assault against United States officers and employees (Interpreter One) in violation of 18 U.S.C. §§ 111(a)(1) and 3238; 6- assault against United States officers and employees (FBI Special Agent One) in violation of 18 U.S.C. §§ 111(a)(1) and 3238 ; and 7- assault against United States officers and employees (U.S. Army Officer Two) in violation of 18 U.S.C. §§ 111(a)(1) and 3238. Each offense is alleged to have occurred on or about July 18, 2008 at an Afghan National Police compound in Ghazni, Afghanistan.[2]

By letter dated September 3, 2008 ("Defense Letter 9/3/08"), Ms. Fink informed the Court that she did "not believe that Dr. Siddiqui is competent to participate in her own defense or to stand trial in this case." (Defense Letter 9/3/08 at 5.) Ms. Fink also stated: "Based on multiple factors and investigation, I have a good faith basis to believe that [Dr. Siddiqui] is a victim of torture, and that the strip searches [during incarceration] exacerbate an existing acute psychological disorder;" (Defense Letter 9/3/08 at 4.) and that "Psychological reports [of MDC] . . . reveal that she has been crying in her cell, neglecting her food tray, and making bizarre requests, including a request that the turkey from her meal tray be placed in the refrigerator so that it could be sent to her son." (Defense Letter 9/3/08 at 4.)

On September 4, 2008 ("9/4/08 Tr."), this Court held a status conference (at which the

---

[2] Count Four carries a statutory mandatory minimum term of imprisonment of thirty years and a statutory maximum sentence of life imprisonment.

Defendant's appearance was not compelled). Ms. Fink indicated that the Defendant was suffering from medical and psychological issues. See, e.g., 9/4/08 Tr. at 17:3 ("She is unbelievably damaged."; at 18:8 ("She has total anxiety about her children."); and at 18:24-25 ("This is a really smart person, but she is a mess, and she has to be rehabilitated.") The Court stated: "I am told . . . that [Dr. Siddiqui] does not appear, doesn't want to appear, because she does not want to go through the strip search procedure, which, as I also understand it, is a uniform procedure that is followed at the MDC [Metropolitan Detention Center], perhaps at the MCC [Metropolitan Correction Center] as well." (9/4/08 Tr. at 13:24-25,14:1-4.)[3]

By letter dated September 5, 2008 ("Govt Letter 9/5/08"), Mr. LaVigne informed the Court that "a female doctor from the Federal Correctional Center in Otisville traveled to the MDC and attempted to examine the defendant. The Government has been advised that despite the female doctor's extensive efforts, the defendant refused to be examined by her." (Govt Letter 9/5/08.) By memo endorsement, dated September 8, 2008, the Court directed the United States Bureau of Prisons ("BOP") "to perform a psychological exam at MDC of Defendant forthwith." See Order dated September 8, 2008 [Docket #11]. And, by order dated September 9, 2008, the Court directed that "the 'psychological exam' ordered by the Court on September 8, 2008 shall include a forensic evaluation conducted at the Metropolitan Detention Center ("MDC")." [Docket #12]

---

[3] The Court also stated: "The best approach, I think, in our system is usually the defendants want to be here and to have them here. They get to assess the measure of the court, of the lawyers, of the process, of the procedure. They get the most information that way about the case and get to see for themselves and make an assessment, and we, too, get to make an assessment if you're raising the issue of competence . . . I am also able to make an assessment from someone's demeanor that might be helpful . . . on that issue as well. So I would encourage Ms. Siddiqui to be here." (9/4/08 Tr. at 13:13-23.)

By letter dated September 10, 2008 ("BOP Letter 9/10/08"), the Court was informed by BOP Warden Cameron Lindsay that "MDC Brooklyn Psychiatrist Diane McLean, M.D., performed a psychological examination of Ms. Siddiqui" on September 9, 2008 and that she "received an Axis I diagnosis of Depressive Type Psychosis." (BOP Letter 9/10/08 at 1 [Docket #13].) Among other things, Warden Lindsay's letter reflects that Defendant "reported that she did not wish to speak with a psychiatrist or take any psychotropic medication, stating, 'It wouldn't fix the problem. What I need is to talk with my son and for him to be released.'" (BOP Letter 9/10/08 at 2.)

By letter dated September 16, 2008 ("Defense Letter 9/16/08"), Ms.Fink advised: "I am writing this letter to apprise the Court of Ms. Siddiqui's current condition and the urgent need to treat her in a hospital setting. Since September 4, 2008, we have been researching the nature of Ms. Siddiqui's illness and treatment options in the New York City area. After speaking with a number of psychiatric professionals, unit managers, and hospital administrators, we believe that the Forensic Unit at Elmhurst Hospital administered by the New York City Department of Corrections [which is not part of the BOP] fulfills all the criteria for Ms. Siddiqui's treatment in a custodial setting." (Defense Letter 9/16/08 at 1.) Ms. Fink also noted in her correspondence, "I spoke to Ms. Siddiqui today for the first time since August 11, 2008. Before this call, Ms. Kunstler [Ms. Fink's associate] was informed by Adam Johnson that Ms. Siddiqui was no longer accepting legal mail. However, when she learned that my letter and materials concerned the release of her son to her family in Pakistan, she opened it up, saw the pictures of the reunion, and asked to speak to me. My fifteen minute telephone call more than reinforced the urgency of the situation and the need to help this woman." (Defense Letter 9/16/08 at 3.)

By letter dated September 22, 2008 ("Defense Letter 9/22/08"), defense counsel stated that the reports provided from MDC "establish beyond dispute that Dr. Siddiqui is suffering from severe mental illness which renders her incompetent under any definition of the word. Dr. Siddiqui needs immediate psychiatric treatment in a psychiatric hospital." (Defense Letter 9/22/08 at 1.)

By letter dated September 19, 2008 ("Govt Letter 9/19/08"), the Government reported that it "believes that a competency hearing and a complete psychiatric evaluation of the defendant is warranted." (Govt Letter 9/19/08 at 1.) "The record thus far is sparse - mainly because the defendant has refused to cooperate with medical and psychiatric professionals - but based on the initial Court-ordered psychological examination by a Bureau of Prisons' psychiatrist, which resulted in an 'Axis I diagnosis of Depressive Type Psychosis,' the Government submits, in an abundance of caution, that the best course is for the Court to find that there is reasonable cause to believe that the defendant may be suffering from a mental disease or defect rendering her incompetent to enter a plea or stand trial." (Govt Letter 9/19/08 at 1.) The Government added: "a complete examination of the defendant and competency hearing is warranted. Such an examination and hearing is the best method to establish an adequate record for a competency determination under the current circumstances . . . Law enforcement personnel who spent more than 20 hours with the defendant on the flight from Afghanistan to New York carried on relatively normal chit-chat with her and observed no sign of mental illness, in their lay opinions. [See pp 10 infra.] The diagnosis of the MDC psychiatrist, given the limited interaction with the defendant upon which it was based, is best described as a preliminary and best understood as a signal to conduct further psychiatric examination." (Govt Letter 9/22/08 at 4.)

On September 23, 2008 ("9/23/08 Tr."), the Court held a further status conference to discuss the submissions of counsel. (Dr. Siddiqui did not appear.) See 9/23/08 Tr. At the conference, Ms. Fink stated: "I think the situation here, she's not competent, Judge. She's sitting in a cell screaming. She won't come out. And it is not that she is not uncooperative because she is, she is thanking everybody all the time. Please, I'm so sorry. She's crazy. She can't make mental determinations. She's just not letting anybody touch her because she's in total psychic pain. And so, therefore, what she needs is not an evaluation but treatment." (9/23/08 Tr. at 5:17-24.) Ms. Fink continued: "[Siddiqui] has refused everything. She has refused to come out of her cell. She has refused to have anything to do with her lawyers. She has refused to open up her legal mail . . . And the reason why she has refused is because she has mental illness." (9/23/08 Tr. at 7:19-23.) Based upon the record and the submissions of counsel, the Court entered a plea of "not guilty" on Ms. Siddiqui's behalf, pursuant to Federal Rules of Criminal Procedure Rule 11(a)(4).[4] See 9/23/08 Tr. at 17:3-6.

By Order dated October 1, 2008 ("10/1/08 Order"), the Court stated: "Upon the record of these proceedings, including without limitation, prior conferences, submissions of counsel, Court orders, and counsels' request for a competency determination; and the Court having considered various options proposed by counsel; it is ORDERED that a hearing will be conducted to determine whether AAFIA SIDDIQUI, the defendant is medically fit and mentally competent to understand the nature and consequences of the proceedings against her or to assist properly in her defense, pursuant to 18 U.S.C. §§ 4241(a) and (c), on or before December 17, 2008 at 10:00

---

[4]Federal Rules of Criminal Procedure Rule 11(a)(4) provides: "If a defendant refuses to enter a plea or if a defendant organization fails to appear, the court must enter a plea of not guilty."

a.m.," (10/1/08 Order at 1.), and directed "that the facility at which defendant is treated and evaluated shall be one that has the resources to treat the medical and psychological needs of the defendant." (10/1/08 Order at 2.) Pursuant to the Court's 10/1/08 Order, Ms. Siddiqui was transferred to Federal Medical Center ("FMC") Carswell in Fort Worth, Texas on October 2, 2008. FMC Carswell provides specialized medical and mental health services to females.

In response to the 10/1/08 Order, the Court received a psychological evaluation, dated November 6, 2008, by Leslie Powers, Ph.D., Forensic Psychologist, United States Department of Justice, Federal Bureau of Prisons, Federal Medical Center, Carswell ("Powers 11/6/08 Report"). Dr. Powers concluded that "Ms. Siddiqui is not currently competent to proceed as a result of her mental disease, which renders her unable to understand the nature and consequences of the proceedings against her or to assist properly in her defense," (Powers 11/6/08 Report at 8.) and that "Ms. Siddiqui's current mental condition is such that transporting her for a court appearance is not recommended." (Powers 11/6/08 Report at 7; but see Powers Report, dated May 4, 2009 at pp 10 et seq infra (drawing a different conclusion).)[5]

Thereafter, the Government and defense counsel retained their own (respective) mental health professionals to conduct additional psychiatric analyses and evaluations of the Defendant. By Order dated December 23, 2008 ("12/23/08 Order"), the Court directed, among other things, that these mental health professionals "shall be permitted to interview AAFIA SIDDIQUI, the defendant, for purposes of the Evaluations; [t]he [m]ental [h]ealth [p]rofessionals shall be permitted to interview any other individuals at FMC Carswell and MDC Brooklyn relating to the

---

[5]The Court held a status conference on November 19, 2008 to discuss with counsel the Powers 11/6/08 Report. Defendant's appearance was not required by the Court for this conference.

competence and mental health treatment of AAFIA SIDDIQUI, the defendant, for purposes of the Evaluations; [t]he [m]ental [h]ealth [p]rofessionals shall be permitted to review, inspect, and/or copy and documentation or information at FMC Carswell and MDC Brooklyn relating to the competence of AAFIA SIDDIQUI, the defendant, for purposes of conducting the Evaluations" (12/23/08 Order at 2.)

Additional status conferences were held in this case on February 23, 2009, March 26, 2009 and April 28, 2009. Defendant, who was still at FMC Carswell for evaluation, was not required to be present at any of these conferences. At the March 26, 2009 conference, the Government advised the Court that its two (2) retained psychiatrists had completed their evaluations and had determined that the Defendant is competent to stand trial. See 3/26/09 Tr. at 3:2-7 ("Just to add, the reports not only find that Ms. Siddiqui is competent to stand trial, but both doctors independently concluded that the symptoms that we had seen here and the symptoms that they saw when they spoke to her were all attributed to malingering.") At the April 28, 2009 conference, Dr. Siddiqui's competency hearing was rescheduled for July 6, 2009 ("July 6, 2009 Competency Hearing"); pretrial submissions were due June 22, 2009; and post trial submissions were due July 20, 2009. See also Order dated April 28, 2009 ("4/28/09 Order"). The Court also directed that Ms. Siddiqui appear at the July 6, 2009 competency hearing, see 4/28/09 Order at 1, which she did.

**Mental Health Evaluations**

The following psychological evaluations were conducted while Dr. Siddiqui was at FMC Carswell:

**1- Reports dated November 6, 2008 and May 4, 2009 by Leslie Powers, Ph.D.**

**("Powers 11/6/08 Report" and "Powers 5/4/09 Report", respectively)**.  The Powers 11/6/08

Report concluded, as noted, that "[i]n summary, in my professional opinion, Ms. Siddiqui is

incompetent to proceed at this time as a result of her mental illness [Major Depressive Disorder,

Severe with Mood Congruent Psychotic Features and possible Posttraumatic Stress Disorder]."

(Powers 11/6/08 Report at 7.)  In the Powers 11/6/08 Report, Dr. Powers found that Dr. Siddiqui

"has been observed to display depressive symptoms, and has reported thoughts of hopelessness

and death.  She shows no interest in participating in activities on the unit, and frequently

complains of an inability to think or concentrate.  She also reports a decrease in appetite and

sleep.  Her hallucinations correlate with her depressive themes of worrying about her children

and being harmed by others."  (Powers 11/6/08 Report at 6.)  Dr. Powers also stated: "Ms.

Siddiqui consistently refused to participate in any formal testing for this evaluation."  (Powers

11/6/08 Report at 6.)

The Powers 5/4/09 Report reached a different conclusion, namely that in Dr. Powers

professional opinion, "Ms. Siddiqui is currently competent to stand trial.  Ms. Siddiqui is not

suffering from a mental disease or defect which would render her unable to understand the nature

and consequences of the proceedings against her or to assist properly in her own defense."

(Powers 5/4/09 Report at 12.)  In her May 4, 2009 Report, Dr. Powers stated: "Based upon a

review of this case, it is my opinion that Ms. Siddiqui currently meets the diagnostic criteria for

Malingering.  According to the Diagnostic and Statistical Manual of Mental Disorders, Fourth

Edition, Test Revision (DSM-IV-TR), Malingering is the intentional production of or grossly

exaggerated psychological symptoms motivated by external incentives such as evading criminal

-10-

prosecution. The DSM-IV-TR also adds that malingering can represent adaptive behavior - for example, feigning illness while a captive of the enemy during wartime." (Powers 5/4/09 Report at 12.);

2- **Report dated March 16, 2009 by Sally C. Johnson M.D. Professor, Department of Psychiatry, The University of North Carolina at Chapel Hill ("Johnson Report").** Dr. Johnson concluded "it is this evaluator's opinion that Ms. Siddiqui is competent to stand trial at this time," (Johnson Report at 35.), and she determined that Dr. Siddiqui was malingering. "Consistent with the identification of Malingering, is Ms. Siddiqui's significant lack of cooperation during the diagnostic evaluation and her refusal of treatment interventions despite her claimed symptoms. She also has adamantly refused to cooperate with any psychological testing that could further clarify the validity of her symptom presentation. During this evaluation she also was unable to expand upon her symptom description in a way consistent with usual report of visual hallucinations." (Johnson Report at 28.) Dr. Johnson also stated: "It should be noted that overall Ms. Siddiqui was extremely uncooperative with the evaluation process." (Johnson Report at 2.)

3- **Report dated March 15, 2009 by Gregory B. Saathoff M.D., Diplomate, American Board of Psychiatry and Neurology ("Saathoff Report").** Dr. Saathoff concluded "it is my opinion that Ms. Siddiqui has sufficient present ability to consult with her lawyer(s) with a reasonable degree of rational understanding and maintains a rational as well as factual understanding of the proceedings against her." (Saathoff Report at 39.) Dr. Saathoff also determined: "I do not see convincing evidence of major mental illness in Ms. Siddiqui. Her constellations of varied, dramatic evolving symptoms that she uses to 'crowd the canvass' are

-11-

much more consistent with malingered mental illness than true mental illness. Motivations to malinger generally involve either circumventing punishment or seeking pleasure. In Ms. Siddiqui's unique case, malingered symptoms have provided a dual solution in that a finding of incompetency could serve to both prevent prosecution while at the same time facilitating rapid repatriation [to Pakistan]." (Saathoff Report at 38.) Dr. Saathoff also stated: "Although a direct assessment of competency is thwarted by Ms. Siddiqui's refusal to cooperate, one can gain a deeper appreciation of her understanding of the legal process through interviews and review of documentation." (Saathoff Report at 34.);

4- **Report dated June 20, 2009 by L.Thomas Kucharski, Ph.D., Chair, Department of Psychology, John Jay College of Criminal Justice ("Kucharski Report")**. Dr. Kucharski concluded that "it is therefore my opinion that Dr. Siddiqui is currently not competent to stand trial." (Kucharski Report at 17.) Dr. Kucharski stated: "No direct formal assessment of Dr. Siddiqui's competency to stand trial was possible and no evaluator has been able to question her about her factual and rational understanding of the proceedings against her or to assess directly her ability to assist counsel. All of the opinions provided to the court have relied on collateral and observational information." (Kucharski Report at 15.) Dr. Kucharski determined: "It is . . . my opinion that Dr. Siddiqui currently presents with a mental illness best characterized as a delusional disorder. She is also depressed. Her delusional beliefs directly involve the Court and significantly impair her ability to assist counsel." (Kucharski Report at 17.)

Dr. Kucharski believes that the Defendant is not malingering because "[i]f Dr. Siddiqui [were] malingering she would readily admit to being mentally ill. She would go out of her way to engage mental health staff in an attempt to impress upon them the seriousness of her

-12-

psychiatric difficulties. She would report ongoing persistent auditory hallucinations and would attempt to present behavior that would support her claims of hearing voices. She would readily talk about her traumatic past. She would not present with symptoms that are difficult to feign such as tangentiality. She would not present the same consistent symptoms to family members and others outside of the evaluation context. Dr. Siddiqui's presentation is diametrically opposed to everything we know abou the clinical presentation of malingerers." (Kucharski Report at 15.)

## Competency Hearing

As noted, the Competency Hearing was held on July 6, 2009. Dr. Siddiqui was present along with her (new) counsel, Dawn Cardi. See fn 1 supra at 2.

The various forensic evaluations were submitted to the Court in lieu of direct testimony. The hearing included the cross examination and redirect examination of Sally C. Johnson, M.D., Gregory B. Saathoff, M.D., and L. Thomas Kucharski, Ph.D. With the consent of counsel, the Court also received into evidence the deposition testimony of Leslie Powers, Ph.D., dated June 26, 2009 ("Powers Deposition"), and the deposition testimony of Camille Kempke, M.D., dated July 1, 2009 ("Kempke Deposition"), and numerous exhibits (agreed to by counsel).

Post hearing findings of fact and conclusions of law were submitted by the parties on or about July 20, 2009 (hereinafter referred to as "Govt Submission 7/20/09" and "Defense Submission 7/20/09").

In summary, the Government argues "that the testimony and other evidence presented in this hearing establishes that the defendant is malingering and does not suffer from a mental disease or defect. In addition, the evidence establishes that the defendant possesses a rational and factual understanding of the proceedings, and possesses the ability to consult with her attorney

-13-

with a reasonable degree of rational understanding. Accordingly, the defense is unable to meet its burden of proving that the defendant is not competent to stand trial." (Govt Submission 7/20/09 at 2-3 ¶ 4.)

In summary, the Defense argues that Dr. Siddiqui is not presently competent to stand trial "[b]ecause of her delusional disorder and her tangential thinking." (Defense Submission 7/20/09 at 5.)[6] "Both her delusional disorder and tangential thinking render Dr. Siddiqui unable to understand the proceedings against her and prevent her from providing assistance to her attorneys. Dr. Siddiqui cannot be weaned from her belief that the Court and everyone associated with it - her attorneys, the Bureau of Prison, psychologists retained by both parties - are part and parcel of the anti-Muslim, Zionist conspiracy that she so fears. Because she cannot be weaned from this belief, she currently cannot obtain a rational understanding of the proceedings against her . . . As a criminal attorney's most fundamental tasks are to obtain from his or her client a clear account of the events surrounding the alleged offense conduct and to subject that account to inevitable questions and inevitably, challenges, the fact that Dr. Siddiqui's mental state precludes both of these fundamental tasks means that she cannot lend assistance to her attorneys." (Defense Submission 7/20/09 at 4-5.)

## II. Legal Standard

The test for competency is "whether [the defendant] has sufficient present ability to

---

[6]The Defense notes: "If Dr. Siddiqui was as clever as the government insists, she should be able to comprehend that her machinations risk either forced medication [to restore her to competence] . . . and eventual trial or a lifetime of civil commitment. (Defense Submission 7/20/09 at 31.) Dr. Kucharski testified that if someone is found incompetent "the only procedure that would be beneficial to treating a psychosis would be antipsychotic medication." See Transcript of July 6, 2009 Competency Hearing ("7/6/09 Hearing Tr.") at 31:13-15.

consult with [her] lawyer with a reasonable degree of rational understanding - and whether [s]he has a rational as well as factual understanding of the proceedings against h[er]." United States v. Dusky, 362 U.S. 402 (1960). "Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence." Cooper v. Oklahoma, 517 U.S. 348, 362 (1996). See also United States v. Reinhold, No. 97 cr 686, 1998 WL 88764, at *4 (S.D.N.Y. Feb. 27, 1998).

"The competency assessment requires the court to examine the defendant's ability to rationally understand, appreciate, and communicate about (1) the charges, including the range and nature of possible penalties and likely outcomes; (2) the roles of the judge, prosecutor, defense counsel, jury, and witnesses; and (3) the factual bases of the charges and possible defenses, including plea options, and the ability to make rational choices among them. Courts must also assess the defendant's ability to rationally assist [her] counsel in evaluating the testimony of witnesses and the significance of exhibits, whether the defendant can testify coherently, and whether the defendant can control motor and verbal behavior to avoid disrupting court proceedings." United States v. Nagy, No. 96 cr 601, 1998 WL 341940, *6 (S.D.N.Y. June 26, 1998) (internal citations and quotations omitted).

"The person shall be afforded an opportunity to testify, to present evidence, to subpoena witnesses on [her] behalf, and to confront and cross-examine witnesses who appear at the [competency] hearing." 18 U.S.C. § 4247(d).

**III. Analysis**

The Court had the opportunity to observe the demeanor and assess the credibility of each of the witnesses at the July 6, 2009 Competency Hearing. See Transcript of July 6, 2009

Competency Hearing ("7/6/09 Hearing Tr.").

The Court also had the opportunity to observe and assess the demeanor of Dr. Siddiqui in the courtroom. See United States v. Nagy, No. 96 cr 601, 1998 WL 341940, at *7 (S.D.N.Y. June 26, 1998) ("In determining the competency of a defendant to stand trial, the court may take into account a number of factors, including medical evidence, medical and psychological opinion, and observation of the defendant at the competency hearing.") She appeared to the Court to be appropriately groomed and in good physical condition. She entered and exited the courtroom at an appropriate pace and without assistance. At times during the proceeding, the Court observed the Defendant consulting (in a quiet and appropriate manner) with her attorneys. There were also times during the hearing when the Defendant spoke loud out and out of turn. See e.g., 7/6/09 Hearing Tr. at 70:7-8, 10, 12-13 (The Court: "Please, please, we speak one at a time here . . . Right now it's Ms. Cardi who is speaking . . . if you don't mind.") and at 157:7-8 (The Court: "Excuse me, excuse me." Defendant: "Sorry, sir.") See also pp36-37 infra.

The Court has also reviewed the comprehensive record, including post hearing proposed findings of fact and conclusions of law.

The Court finds that Dr. Siddiqui is competent to stand trial by a preponderance of the evidence.[7] Dr. Siddiqui has sufficient present ability to consult with her lawyers with a reasonable degree of rational understanding and she also has a rational as well as a factual

---

[7] The defense failed to prove incompetence by a preponderance of the evidence. See, e.g., United States v. Reinhold, 97 Cr 686 (AGS), 1998 WL 88764, *4 (S.D.N.Y. Feb. 27, 1998) ("[Defendant] has the burden of proving by a preponderance of the evidence that he is unable to understand the nature and consequences of these proceedings or to assist properly in his defense. The defendant, based upon the testimony, medical examinations, reported tests and the other exhibits in evidence, has failed to carry that burden.")

-16-

understanding of the proceedings against her. The Court concludes that she understands the

nature of the charges and can assist counsel with her defense.[8]  Additionally, upon the record

established at the July 6, 2009 Competency Hearing and upon the record and prior proceedings in

this matter, the Court finds as follows:

1- Leslie Powers, Ph.D. Dr. Powers - - of all the evaluators - - appears to have had the

most "one on one" contact with Dr. Siddiqui (at FMC Carswell).  Her initial assessment of

incompetence (Powers 11/6/08 Report) was made after a thirty day evaluation.  Dr. Powers final

report, i.e., Powers 5/4/09 Report, is more persuasive and was made after an evaluation that

extended over approximately six months, and a review of thousands of documents (see, e.g.,

---

[8]Witnesses for the Government and Defense agree that the presence of some mental illness is not the standard for determining competence to stand trial.  See e.g., Powers Deposition at 181 (Question: "Can somebody be mentally ill or have a mental disorder and still be competent?" Answer: "Absolutely.") and 7/6/09 Hearing Tr.at 147:147:22-25 (Dr. Johnson: "So, you have to - - if there is a mental illness, the person may still be competent and, in fact, most of the people who are mentally ill, by at least a small majority, would still be competent to stand trial."); and 7/6/09 Hearing Tr. at 179-180:23-25, 1-2 (Dr. Saathoff: "There are many people who are paranoid schizophrenic that I treat in prison currently who have been brought to trial and have been convicted, adjudicated.  So, presence of a mental illness itself does not mean that someone is incompetent.").  Dr. Kucharski also testified that someone with mental health issues can be competent.  See e.g., 7/6/09 Hearing Tr. at 66:19-22 (Question: "You would also agree with me, Doctor, that someone can, with mental health symptoms, still be competent to stand trial, isn't that right." Answer: "Yes.")

See also MDC Psychology Data System 9/10/08 notes (Govt Exhibit F at 27, 29-30) (Although diagnosed as having Major Depressive Disorder with Mood Congruent Psychotic Features, the psychologist noted that Ms. Siddiqui "is selective about whom she speaks with and is able to initiate communication and respond to staff in a coherent, rational, logical, and goal-directed manner" . . . "Ms. Siddiqui does not exhibit any of the major symptoms characteristic of psychotic illness, such as disorganized speech, grossly disorganized or catatonic behavior, or a delusional system.  On the contrary, Ms. Siddiqui's speech and thought processes are coherent, logical, rational, well organized, and goal-directed.  Even when angry and emotionally upset, her speech has been focused and free of formal thought disorder characteristics such as derailment, loosening of associations, flight of ideas, or a tangential quality.")  See also United States v. Vamos, 797 F. 2d 1146, 1150 (2d Cir. 1986)

Powers 5/4/09 Report at 2-4); her own observations of and conversations with Ms. Siddidqui approximately two to three times a week from October 2008 until May 2009; as well Dr. Powers's interviews of staff members who observed and interacted with Dr. Siddiqui during this time period.[9]  See Powers Deposition at 145-148.  Dr. Powers stated: "In the absence of any collateral documents concerning her mental health history, the diagnosis of Major Depressive Disorder in the November 2008 report was based on her depressive symptomology, her disinterest in participating in activities, and her self-report of appetite, sleep, and concentration difficulties.  After nearly six months of observation and review of the extensive collateral evidence that has since been available to me, it is my opinion that Ms. Siddiqui's response when she first arrived was due, in part, to a normal reaction to facing criminal prosecution and incarceration." (Powers 5/4/09 Report at 12.)  "The reason I think she's competent now is based on the fact that she has demonstrated the knowledge of court proceedings through conversations that she's had with other people; she has had conversations with her brother in particular, where she has talked about a legitimate defense." (Powers Deposition at 23:25, 24:2-8.)  "[H]er refusal to participate in her legal defense or to communicate with her attorneys is not indicative of a mental disease or defect that results in her inability to be a competent defendant.  Rather, it is a volitional decision made by Ms. Siddiqui." (Powers 5/4/09 Report at 11.);

2- Gregory B. Saathoff, M.D. Dr. Saathoff's evaluation "was attempted in three separate interview sessions and one period of extended observation for a total of four hours.  The timing and length of interview sessions was determined by Ms. Siddiqui's repeated refusal to be

---

[9] For approximately one and one half months (i.e. during February and March 2009), Dr. Powers was on medical leave.

evaluated and request for prayer time as well as the FMC's visiting scheduled for medical evaluations. [His] evaluation is based on examination interviews of Ms. Siddiqui, interviews of medical, nursing and security personnel at MDC Brooklyn, FMC Carswell, and review of documents cited [in Appendix 1].[10] (Saathoff Report at 1.) Dr. Saathoff's "attempted three interviews on 12 and 13 FEB [2009] were initially rebuffed by Ms. Siddiqui, who alternately pleaded with [him] and angrily directed [him] to leave her alone, as she would refuse to answer questions related to any assessment requested by the court. After persistent questioning, she did engage in some discussion, choosing to answer some questions while refusing others. She did not initiate conversation and seemed uncomfortable during the interview situation." (Saathoff Report at 7.)

Dr. Saathoff opined persuasively "that Ms. Siddiqui is competent to stand trial and does not suffer from any mental illness that would preclude her from assisting her attorneys, should she desire to do so." (Saathoff Report at 1.) Dr. Saathoff also stated: "Ms. Siddiqui's alarming statements about hallucinations and increasingly adamant refusal to cooperate with medical exams and assessments, complaints of decreased eating, sleeping, reading, etc. were not at all accompanied by evidence of deterioration in observable behaviors. Remarkably, she actually improved in those behaviors in September [2008] compared to August [2008], when she ate more, slept more, read more, wrote more, attended to hygiene more and cried less." (Saathoff Report at 34.) Dr. Saathoff also stated: "Because of her desire to be repatriated to Pakistan and her interest in avoiding criminal prosecution, Ms. Siddiqui has had a strong motivation to appear incompetent [as reflected in Dr. Powers November 6, 2008 report]. Ms. Siddiqui's use of

_____

[10]Appendix 1 includes 393 collateral sources.

deception, evasiveness, expressions of paranoia and isolation have served to thwart an accurate assessment. Her public expression of psychotic symptoms and claims of torture initially influenced mental health professionals to assume that these symptoms were real and required assessment. However, her occasional bizarre public statements have had the appearance of overacting. In addition, her inconsistencies during telephone conversations have at times been striking, when she changed the genders of her hallucinatory child in mid-sentence. Her dramatic, yet inconsistently expressed hallucinations and sudden onset delusions have evolved and decreased significantly despite the absence of antipsychotic or psychotherapeutic treatment." (Saathoff Report at 38.)

Dr. Saathoff also reported that: "Her claims of serious deterioration at MDC Brooklyn are belied by a thorough examination of the log book, which remarkably demonstrated improvement in her function over the course of her two months there [August to September 2008]. Her cognitive complaints have been myriad, short-lived and readily contradicted by observation of her high level of functioning. She has consistently demonstrated high level of interpersonal and intellectual skills as evidenced by her ability to effectively negotiate for privileges. She herself reports that she has improved significantly since her arrival at FMC Carswell, attributing it to her prayers to Allah." (Saathoff Report at 39.) Dr. Saathoff stated: "Although her comments to mental health professionals have suggested that she does not understand the basic elements of the judicial process, Ms. Siddiqui's comments to non mental health professionals have revealed understanding of the charges against her and the role of prosecution and defense attorneys as well as the role of prosecution expert witnesses who have been ordered by the court to perform an assessment." (Saathoff Report at 3.) Dr. Saathoff states: "I do not see convincing evidence of

-20-

major mental illness in Ms. Siddiqui. Her constellations of varied, dramatic and evolving symptoms that she uses to 'crowd the canvas' are much more consistent with malingered mental illness than true major mental illness. Motivations to malinger generally involve either circumventing punishment or seeking pleasure. In Ms. Siddidqui's unique case, malingered symptoms have provided a dual solution in that a finding of incompetency could serve to both prevent prosecution while at the same time facilitating rapid repatriation." (Saathoff Report at 38.)

3- <u>Sally C. Johnson, M.D.</u> Dr. Johnson visited Carswell on two separate occasions in January and February 2009 to evaluate Dr. Siddiqui. <u>See, e.g.</u>, 7/6/09 Hearing Tr. at 134:1-4 (Question: [A]pproximately how many hours have you spent with Ms. Siddidqui at a one-on-one setting? Dr. Johnson: [P]robably somewhere in the ballpark of 10 to 12 in contact with her.") and at 135:3-7 (Dr. Johnson: "When she was with me, not all of the time, but much of the time, she was intentionally uncooperative, verbalized that she would not cooperate, had no intention of cooperating with the evaluation. She had already had an evaluation, she was not going to cooperate with anyone else.") Dr. Johnson reviewed extensive written collateral materials including, but not limited to, other forensic evaluations, medical records, phone transcripts, FBI materials and she also conducted in person or telephone interviews with many doctors, nurses, BOP staff, FMC Carswell staff, FBI agents, defense attorneys, and Assistant United States Attorneys. Dr. Johnson continued to receive information about the Defendant after her report was submitted on or about March 17, 2009. This additional information did not cause her to change her conclusion. <u>See e.g.</u>, 7/6/09 Hearing Tr. at 115:8-10 (Dr. Johnson: "The information that I continued to receive between the time I submitted my report, up to today, so far, it's not

changed my opinion."); at 133:21-23 (Dr. Johnson: "And then, most recently, I spent about three hours with her yesterday morning.") and at 136:7-18 (Dr. Johnson stated further: "[Dr. Siddiqui] turned her back to me and bent down on her bed. And I proceeded to reintroduce myself and go through the limits of confidentiality and all of this. And then she said she is not going [to] listen to me, and she put her fingers in her ears. And, you know, she - - I stayed for about three hours and attempted in many ways to talk to her, do some structured interviewing, do a competency exam with her and various things. And during that time period, she basically was uncooperative, which is pretty much the way she presented most of the time through the - - the other periods of time of time I tried to assess her competency.").

Dr. Johnson concluded persuasively that "[I]t is this evaluator's opinion that at this time Ms. Siddiqui is medically fit to stand trial . . . It is also this evaluator's opinion that Ms. Siddiqui is not presently suffering from a mental disease or defect rendering her mentally incompetent to the extent that she is unable to understand the nature and consequences of the proceedings or assist properly in her defense. She has a rational and factual understanding of the proceedings against her and is able to assist her attorneys with a reasonable degree of rational understanding should she choose to do so." (Johnson Report at 34, 35.)

Dr. Johnson also reported: "It appears Ms. Siddiqui has discovered that the initial reaction to her expressed symptoms has been to label her as seriously mentally ill. This has resulted in her being managed in a less restrictive environment and delaying her legal proceedings. It appears that she perceives this as a positive state at the present time, and thus does not see a need for change in her degree of cooperation. She has, as Dr. Powers described, 'found a niche for herself at FMC Carswell.' She avoids any significant interaction with anyone who is at all

-22-

related with her court evaluation or return to court. She selectively interacts with individuals that she does not perceive to be directly involved in that process. She also makes an effort to align herself with staff that she perceives may be sympathetic to her situation. She has attempted to engage her family members and Consulate staff, in assisting her in locating alternative legal counsel, or being returned to Pakistan." (Johnson Report at 32.) "I don't think [Dr. Siddiqui] is delusional, and I do think she is competent." (7/6/09 Hearing Tr. at 111:17-18.)

4- <u>L.Thomas Kucharski, Ph.D.</u>, Dr. Kucharski interviewed Dr. Siddiqui at FMC Carswell for approximately one and a half hours on or about May 1, 2009. Dr. Kucharski also conducted interviews with the Defendant's brother, her sister, mental health staff at FMC Carswell, nursing staff at FMC Carswell, her attorneys, Asif Hussain, (a representative of the Pakistani Embassy who had met with Dr. Siddiqui), and he reviewed collateral documents including, but not limited to, medical records, transcripts, and log books. (Kucharski Report at 1-2.) Dr. Kucharski stated that Dr. Siddiqui was "extremely guarded, willing to provide only limited information, and often refused to answer certain questions . . . Dr. Siddiqui's thinking was very tangential moving from topic to topic in a disconnected manner. Her thoughts were replete with numerous conspiratorial ideas, some of which are consistent with her radical political beliefs others not. For example she spoke at length about conspiracies by the Jews, Israel, India and the United States. She also related a number of beliefs that appeared delusional . . . Throughout the records Dr. Siddiqui has denied being mentally ill and as having very poor insight into her mental illness." (Kucharski Report at 5.) "From time to time she questions whether she is 'going crazy' but this is related to the stress she is experiencing and not an acceptance of her current psychiatric difficulties. She admitted to brief fleeting visions of her children, of a man standing outside her cell and of a dog

-23-

eating off a plate. These visions appear to be hypnogogic experiences and not true visual hallucinations. They are not enduring experiences that typically characterize true visual hallucinations. There appears to be no auditory, tactile or olfactory hallucinations. Significant depression has been noted throughout her incarceration." (Kucharski Report at 6.)

Dr. Kucharski also reported that: "Dr. Siddiqui appears oriented to person, place and time although her understanding of her current circumstances appears to involve some delusional interpretation. Judgment appears limited particularly around her legal representation and cooperation. There are no significant intellectual deficits, no severe memory impairment, although some concentration and therefore short term memory deficits of minor proportion are likely . . . Her speech was tangential but of normal rate. Records of her interviews with the FBI are suggestive of some grandiose thinking as are some of her writings. No symptoms of mania were observed. Her demeanor was quite paranoid." (Kucharski Report at 6.)

Dr. Kucharski found: "that Dr. Siddiqui currently presents with a mental illness best characterized as a Delusional Disorder of the Paranoid Type." (Kucharski Report at 10.) Dr. Kucharski notes: "By definition delusional disorder is characterized by nonbizarre beliefs that could have a basis in reality but are highly unlikely. Many of these beliefs have their origin in some reality based experience." (Kucharski Report at 11.) Dr. Kucharski also notes that: "While some of her beliefs are consistent with radical political ideology, typical of Muslim militants dedicated to jihad, many others exceed political ideology." (Kucharski Report at 11.) Dr. Kucharski is of the opinion that "Dr. Siddiqui is not malingering." (Kucharski Report at 14.)

While the Court found Dr. Kucharski to be a thoughtful evaluator, it is concerned, as the Government observes, that Dr. Kucharski does not identify "what mental disease or defect results

from the [D]efendant's alleged tangential thinking" or how specifically it affects the Defendant's "rational understanding of the proceedings or her ability to communicate with her attorney in a rational manner. An isolated symptom is not the same as a mental illness, nor is it sufficient to render a defendant incompetent to stand trial." (Govt Submission 7/20/09 at 59-60 ¶ 156.) The Court also believes that this is an instance where a defendant may have some mental health issues but may nevertheless be competent to stand trial. See 7/6/09 Hearing Tr. at 66:19-22 (Question: "You would also agree with me, Doctor, that someone can, with mental health symptoms, still be competent to stand trial, isn't that right?" Dr. Kucharski: "Yes.") See also, United States v. Vamos, 797 F. 2d 1146, 1150 (2d Cir. 1986) (Some degree of mental illness cannot be equated with incompetence to stand trial.) And, this is most certainly a situation where the Defendant's political beliefs and perspectives blur the line between mental health issues and political advocacy. See, e.g., 7/6/09 Hearing Tr. at 47:16-25 (Question: "[B]ut is it possible that some part of her thinking has to do with politics, or religion, or nationality . . . ?" Dr. Kucharski: "It's difficult to kind of parse out where the delusions begin and where the political ideology stops." Question: "But could the political have any impact in her views about the court proceeding?" Dr. Kucharski: "Certainly.").

5- Camille Kempke, M.D., Staff Psychiatrist at FMC Carswell, testified that she spent approximately one half to one hour per month with Dr. Siddiqui (between October 2008 and May 2009) as her clinical psychiatrist. She also reviewed the reports of Drs. Johnson and Saathoff. (Kempke Deposition at 23, 121, 150.) Dr. Kempke diagnosed Dr. Siddiqui as suffering from "paranoid schizophrenia". See Kempke Deposition at 27:17-18.

The Court's concerns about Dr. Kempke's analysis are these: (i) she is not a forensic

-25-

psychiatrist and is not trained to evaluate a person's competence to stand trial, see, e.g., Kempke Deposition at 114:25, 115:2-5 (Question: "And it's fair to say that you don't consider yourself qualified to make a determination about somebody's competency to stand trial?" Dr. Kempke: "Yes, sir."); at 116:2-6 (Question: "but you're not here testifying as an expert about whether the Defendant is competent to stand trial. Correct?" Dr. Kempke: "Yes, sir."); at 182:5-9 (Question: "You agree with me, though, that determining whether a defendant is competent to stand trial, that falls outside of what you do?" Dr. Kempke: "Yes, sir."); (ii) her diagnosis is not the same as the assessment of any other competency evaluator in this matter; (iii) she reached the conclusion that Dr. Siddiqui is "psychotic" within 45 minutes of meeting Dr. Siddiqui in 2008; see, e.g., Kempke Deposition at 123:8-11 (Question: "So, after 45 minutes to an hour of meeting with Ms. Siddiqui, you were 99 percent certain that she was psychotic?" Dr. Kempke: "Yes, sir."); and (iv) she acknowledges "I am the most easily conned person on the unit, and I realized that [Dr. Siddiqui] was conning me when I received the collateral information from Dr. Johnson." (Kempke Deposition at 105:18-22.)

**Dr. Siddiqui's Understanding of the Proceedings**

The Court finds by a preponderance of the evidence that this prong of the United States v. Dusky, 362 U.S. 402 (1960) standard has been proven. The Defense acknowledges that Dr. Siddiqui has a factual understanding of the proceedings. See Def Submission 7/20/09 at 30 ¶ 5 ("As the forensic evaluators are in agreement that Dr. Siddiqui has a factual understanding of the proceedings, the Court's inquiry is limited to whether she has the present ability to consult with her attorneys 'with a reasonable degree of rational understanding' and whether she has a rational understanding of the proceedings against her."). And, as the Government points out, "the

charges are not complex. The Indictment centers on a July 18, 2008 shooting incident, and alleges that the defendant attempted to kill United States officers and employees in Ghazni, Afghanistan. The defendant has repeatedly articulated her defense - that she did not shoot anyone. That, in a nutshell, is the case." (Govt Submission 7/20/09 at 68.)

The following, in addition to the reasoned conclusions of Dr. Powers, Dr. Johnson and Dr. Saathoff, support the conclusion that Dr. Siddiqui has the ability rationally to understand, appreciate and communicate about the charges, including the range and nature of possible penalties and likely outcomes; about the roles of the judge, prosecutor, defense counsel, jury and witnesses; and about the factual bases of the charges and possible defenses, including plea options, and the ability to make rational choices among them. See United States v. Nagy, No. 96 Cr 601, 1998 WL 341940, *6 (S.D.N.Y. June 26, 1998) (internal citations and quotations omitted):

i) Dr. Siddiqui has an extensive educational background and her training at prominent American universities (Brandeis and MIT) has no doubt exposed her to American culture, very likely including its legal system. "Suffice it to say that Dr. Siddiqui is a very intelligent person with significant exposure to United States culture and institutions. It is highly unlikely that she does not possess a factual understanding of the operation of the court, the roles and functions of courtroom personnel, the available pleas, the meaning of important legal concepts, etc. It is therefore my opinion that Dr. Siddiqui most likely possesses a factual understanding of the proceedings against her or if she does not she is capable of being educated by counsel." (Kucharski Report at 16.)

ii) Dr. Siddiqui confirmed to Judge Ellis that she understood the charges against her. See

page 2 supra.

iii) FBI (302) Reports prepared shortly after the July 18, 2008 incident in Afghanistan alleged in the Indictment reflect:

a) On or about July 21, 2008, while at the Craig Joint Theater Hospital ("Craig Hospital") at the Bagram Air Field in Afghanistan, Dr. Siddiqui asked a Special Agent what sentence one would receive if they were accused of attempted murder. (Govt Exhibit D at 200.);

b) Dr. Siddiqui repeatedly stated to the Special Agent that she did not shoot anyone. Rather, she was the one who had been shot. (Govt Exhibit D at 201.);

c) On or about July 22, 2008, while at the Craig Hospital, Dr.. Siddiqui asked a Special Agent "hypothetically what one would be charged with if they were involved in an incident in which a gun went off and shot some people in the legs, but then the person wrongly accused of shooting the gun ended up being shot themselves." (Govt Exhibit D at 237.);

d) On or about August 1, 2008, at the Craig Hospital, Dr. Siddiqui "expressed gratitude that her belongings were now in the hands of the United States . . . and made the following statement: 'spewing bullets at soldiers is bad' but 'you' have still taken care of me and treated me well. [Dr. Siddiqui] continued that she was surprised that the United States would take such good care of her under the circumstances." (Govt Exhibit D at 420.);

iv) "An effort was made throughout [the Dr. Johnson] evaluation period to offer general information to Ms. Siddiqui about the courtroom process, principle courtroom personnel, available pleas, possible defenses, the plea bargaining process and the appeals process. It is this evaluator's impression that she listened to the questions and discussions about these issues, although she did not comment." (Johnson Report at 34.)

v) "Ms. Siddiqui has expressed an awareness to various individuals of the charges against her. . . Ms. Siddiqui has made several attempts to bargain with information in regard to her current situation. It appears that she has the capacity to understand the plea bargaining process should she choose to do so. Ms. Siddiqui is aware that she has been charged with serious crimes, is facing prosecution, and has knowledge of the specific charges and potential penalties if convicted. She understands that the prosecution's account of what occurred is different than the account which she would like to put forth." (Johnson Report at 33.);

vi) During an August 29, 2008 phone call between Dr. Siddiqui and her brother, Mohammad Siddiqui, who lives in Texas, Dr. Siddiqui states: "The case is not difficult. Honestly!" See Govt Exhibit K-1 at T8;

vii) During an October 9, 2008 phone call between Dr. Siddiqui and her brother, Siddiqui's brother states: "You need to trust me here with the lawyers that I bring. They may not all be Pakistanis . . ." To which Dr. Siddiqui responded: "I am sorry. I am not going to talk to the lawyer if they are non-Muslims. I just had it. I am sorry." See Govt Exhibit K-1 at T45.

**Dr. Siddiqui's Ability to Consult with Counsel**

Dr. Siddiqui has, as far as the Court is aware, so far refused to cooperate with court appointed counsel. See, e.g., 9/23/08 Tr. at 7:20-22 (Ms. Fink: "She has refused to have anything to do with her lawyers. She has refused to open up her legal mail."). As noted by Dr. Kucharski: "She believes that the court process is irrelevant given that her arrest and prosecution are the result of a conspiracy. . . Thus far, it is apparent that she has rejected court-appointed counsel, private counsel and even Pakistani counsel." (Kucharski Report at 17.) But, in the Court's view, this does not mean Dr. Siddiqui does not have the ability to consult with counsel rationally and

factually and to participate meaningfully in her defense of this case. The Court finds that this prong of the <u>Dusky</u> standard has been shown by a preponderance of the evidence based upon, among other things, the following evidence in the record:

i) Dr. Saathoff concluded credibly: "[I]t is my opinion that Ms. Siddiqui has sufficient present ability to consult with her lawyer(s) with a reasonable degree of rational understanding and maintains a rational as well as factual understanding of the proceedings against her." (Saathoff Report at 39.)

ii) According to Dr. Powers, Dr. Siddiqui's "ability to assist her attorney has not been a concern as much as her willingness to assist her attorney. She has continued to refuse to do that based on - for a variety of reasons, from the religious affiliation of her attorney to the strip searches. But she certainly - my opinion is that she possesses the ability to assist her attorney." (Powers Deposition at 183.) Dr. Powers also concluded: "In my opinion, her refusal to participate in her legal defense or to communicate with her attorneys is not indicative of a mental disease or defect that results in her inability to be a competent defendant. Rather, it is a volitional decision made by Ms. Siddiqui." (Powers 5/4/09 Report at 11.);

iii) According to Dr. Johnson: "Through conversations that she has had with various individuals, it is clear that she understands that she has had attorneys with significant experience appointed to represent her. She has identified her dissatisfaction with her attorneys because she perceives them to be Jewish and therefore not likely to act in her best interest. She has expressed her wishes to her family to obtain alternate counsel. Early on in the process, she also indicated that if she were found competent she would dismiss her current attorneys." (Johnson Report at 32.)

-30-

iv) Dr. Johnson also observed: "She appears to be interested in retaining an attorney to assist her in her situation, she simply does not wish to work with the initial attorneys who have been assigned to her. At the same time . . . she did verbalize an awareness that if viewed as competent she could ask to change her attorneys and also appears to understand that she can privately retain attorneys should she be able to financially do so. There is evidence in her conversations with her brother that she is motivated to have him continue to explore alternate legal representation and to raise funds for her legal defense." (Johnson Report at 34.)

v) Dr. Johnson was persuaded "that some of the thinking that Dr. Kucharski feels is delusion, is actually part of her personal belief system, her political views, and her religious ideology." (7/6/09 Hearing Tr. at 90:21-23.)

vi) Although Dr. Kucharski concludes that Siddiqui's "rational understanding and her ability to assist counsel are seriously adversely impacted by her mental illness" (Kucharski Report at 16), he notes, as indicated above, that "[t]he line between [her] delusions and radical ideology may be obscure" (Kucharski Report at 16 ). And, as noted, when asked by the Court "but could the political have any impact in her views [] about the court proceeding?" Dr. Kucharski answered, "Certainly." (7/6/09 Hearing Tr. at 47:23-25.)

Further support for the conclusion that Defendant has sufficient present ability to consult with her lawyers with a reasonable degree of rational understanding is found in the record, as follows:

i) MDC Psychology Data System notes, dated August 4, 2008, state that Dr. Siddiqui "was appropriately guarded when discussing any subjects she considered sensitive to her current charges and legal situation. Ms. Siddiqui answered these questions by indicating she would like

to wait until she is able to speak with her attorney. Ms. Siddiqui's primary concerns centered around being able to access legal representation. She expressed concerns that the reality of the circumstances surrounding the incident leading to her arrest is being distorted and lies are being told about her." (Govt Exhibit F at 56.);

    ii) MDC Medical exam notes, dated August 22, 2008, state: "She declines ant[i]-depressants, but states that she might consider them at some point if her lawyer gives her the go-ahead." See Govt Exhibit I MED 292;

    iii) Defendant's handwritten notes on Authorization of Medical Release Form, dated August 27, 2008, "I will only sign if the Pak[istan] Embassy is informed that my concerns are 1- My son Ahmad is immediately released from whoever custody he is in and sent back to family [which in fact occurred] - 2- the prison stops their policy of strip searching . . . 3- that my current attorneys are removed from case and a team of [words illegible] Pakistani attorneys talk to me and take over my case . . . Thank You." See Govt Exhibit I MED 301.

    iv) October 4, 2008 phone call between Dr. Siddiqui and her brother in which Dr. Siddiqui states: "Elaine [Sharp] is too expensive. I know she said that I should retain [Sharp] instead of Liz [Fink]."[11] See Govt Exhibit K-

---

[11]Elaine Sharp, Esq., appeared before Magistrate Judges Ellis and Pitman on August 5 and August 11, 2008, respectively. On August 5, 2008, Ms. Fink introduced Ms. Sharp as "an attorney in the District of Massachusetts, who has been retained by the family over the last period of time, but not by Ms. Siddiqui for the purposes of this proceeding." (8/5/08 Tr. at 2:15-18.) On August 11, 2008, Ms. Fink introduced Ms. Sharp as "an expert on medical issues" and asked the Court for permission for her (Ms. Sharp) to address the Court on what she had observed with regard to Dr. Siddiqui's injuries. (8/11/08 Tr. at 7:15-16.) At the Court conference held on September 4, 2008 , Ms. Fink introduced Ms. Sharp as "a member of the district of Massachusetts, [who] was admitted by Judge Pitman pro hac vice to represent the family here." (9/4/08 Tr. at 5:21-22.) When asked by the Court if she was "suggesting [] that [she] may become principal counsel in this case?", Ms. Sharp replied: "That hasn't been worked out yet so I

1 at T31;

v) October 15, 2008 phone conversation between Dr. Siddiqui and her brother in which Siddiqui states: "Let her [Elizabeth Fink] know that if I am proven competent, the only thing I want to be proven competent is to fire her." See Govt Exhibit K-1 at T52;

"In determining the competency of a defendant to stand trial, the court may take into account a number of factors, including medical evidence, medical and psychological opinion, and observation of the defendant at the competency hearing. Nagy at 7. See also United States v. Nichols, 56 F.3d 403, 410 (2d Cir. 1995) ("In making a determination of competency, the district court may rely on a number of factors, including medical opinion and the court's observation of the defendant's comportment."). In making its assessment of the Defendant's competency, this Court has relied upon the forensic evaluations conducted, the testimony and demeanor of witnesses at the Competency Hearing, the depositions, the medical records of the Defendant as well as the exhibits in evidence, and the Court's observations of Dr. Siddiqui in the courtroom.

Recognizing that competency assessments are (certainly) more art than science, the Court finds by a preponderance of the evidence that the Defendant is competent to stand trial under the standard of United States v. Dusky, 362 U.S. 402 (1960) and 18 U.S.C. § 4241.

**Malingering**

"As defined in DSM IV-TR, the essential feature of Malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by

---

would like to have an opportunity to work with Ms. Fink on that issue." (9/4/08 Tr. at 5:21-22.) When asked by the Court, "So you have no objection to us proceeding today with Ms. Fink as principal counsel?", Ms. Sharp replied: "No, I don't, I encourage that. Thank you." (9/4/08 Tr. at 8:22-25.)

external incentives such as evading criminal prosecution." (Johnson Report at 26.) "The DSM IV-TR outlines that Malingering is strongly suspected if any combination of the following is noted: (1) medico-legal context in the presentation; (2) marked discrepancy between the person's claimed stress or disability and the objective findings; (3) lack of cooperation during the diagnostic evaluation and in complying with prescribed treatment regime; or (4) the presence of Antisocial Personality Disorder." (Johnson Report at 26.) At least some of these factors are present in this case. The Government argues that "although the defendant has verbalized mental health symptoms, the evidence established that she is malingering. First, the defendant's symptoms came about abruptly, long after her arrest, and well into her incarceration at the MDC. Second, the defendant has an incentive to fabricate these symptoms, in order to avoid prosecution and bring about repatriation to Pakistan. Third, despite verbalizing mental health symptoms, defendant did not cooperate with the evaluations or with mental health staff. Fourth, the defendant presented these symptoms in a graphic and over-the-top manner, by, for example, claiming to see her children visiting her at night, which largely resolved without medication. Fifth, many of the defendant's claimed symptoms were inconsistent with certain objective facts, including the defendant's actual behaviors (sleeping, reading, eating, and interactions with fellow inmates and certain staff members)." (Govt Submission 7/20/09 at 75-76 ¶ 191.) The Defense disputes that Dr. Siddiqui is malingering. "Both her delusional disorder and tangential thinking render Dr. Siddiqui unable to understand the proceedings against her and prevent her from providing assistance to her attorneys." Defense Submission 7/20/09 at 4.

According to Dr. Johnson, "Ms. Siddiqui's symptom picture has only come to light in the midst of her evaluation in her regard to her ability to stand trial." (Johnson Report at 27.) "Her

report of visual hallucinations is suspect. It is not common for individuals to report seeing people who are reduced in size, and it is also unusual for psychotic individuals to be so forthcoming in volunteering the presence [of] their symptoms while refusing to provide any additional detail . . . After the first part of [Dr. Johnson's] evaluation, [Dr. Siddiqui] stopped claiming she was seeing her children. It would be unusual for true hallucinatory experiences to stop so abruptly." (Johnson Report at 27.) "Consistent with the identification of Malingering, is Ms. Siddiqui's significant lack of cooperation during the diagnostic evaluation and her refusal of treatment interventions despite her claimed symptoms." (Johnson Report at 28.) Dr. Powers also stated that the Defendant's "report of seeing alleged hallucinations of her children are contradicted by the evidence. When she reported these alleged hallucinations at MDC Brooklyn, the log book does not indicate she was attending to any external stimuli or exhibiting unusual behavior to support her claims. At FMC Carswell, she reports seeing her children at night and that her children are keeping her up all night but regular nightly rounds by nursing and correctional staff have shown her to be consistently sleeping through the night." (Powers 5/4/09 Report at 11.)

And, as observed by Dr. Saathoff, "Psychotic symptoms of the magnitude claimed by Ms. Siddiqui are characteristic of individuals with major mental illnesses requiring psychotherapy and medication treatment. Remarkably, these dramatic hallucinations and delusions involving flying infants, dark angels, a dog in her cell and children visiting her in her room have largely resolved after she was found to be incompetent to stand trial [in November 2008 by Dr. Powers]. Ultimately, these purported psychotic symptoms have disappeared without the use of any psychotherapy or antipsychotic medication." (Saathoff Report at 3.)

-35-

Finally, the Court observed during the Competency Hearing that Dr. Siddiqui's demeanor - - which initially had been polite and appropriate - - changed almost instantaneously after AUSA LaVigne stated at the conclusion of his cross examination of Dr. Kucharski: "You have been sitting here for two hours . . ."; "Ms. Siddiqui is right here, correct?"; "Have there been any outbursts? [There had not been.]"; "Have you seen Ms. Siddiqui speak to her attorney? [She had done so.]"  Immediately thereupon, Dr. Siddiqui became much more loquacious, outspoken and difficult in the courtroom.  See 7/6/09 Hearing Tr. at 67, 68, 69, 70, 142, 143, 150, 151, 157, 169, 170, 199, 200.

## IV. Conclusion and Order

For the foregoing reasons, the Court concludes that the Defendant is competent to stand trial pursuant to 18 U.S.C. § 4241.

The trial of this action will proceed in accordance with the timetable established in the Court's Order, dated April 28, 2009, attached hereto as Exhibit A.


Dated: New York, New York
       July 29, 2009


*RMB*
_____
**RICHARD M. BERMAN, U.S.D.J.**

-36-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

**SCHEDULING ORDER**

-against-                                              08 **CR.** 826 (RMB)

AAFIA SIDDIQUI,

Defendant.
------------------------------------------------------------X

      The following sets forth the schedule in this matter as established at today's conference.

See Transcript of proceedings held on April 28, 2009.

      i- any written FMC Carswell update to be filed by 5/11/09;

      ii- Defense report (forensic evaluation) to be filed by 6/22/09;

      iii- Direct testimony/affidavits to be filed by 6/22/09 (affidavits not to exceed 10 pages in

length); parties may submit expert's reports in lieu of affidavits;

      iv- Schedule indicating length of time (in minutes) of cross examination and redirect

examination to be submitted to the Court by 6/29/09;

      v- Competency hearing to be held on 7/6/09 at 9:00 a.m. (Ms. Siddiqui to be present);

      vi- Post hearing findings of fact and conclusions of law simultaneously to be served and

filed by 7/20/09;

      vii- Defense motion (suppression, etc. i.e., including all arguments) to be served and filed

by 8/21/09. See Court's rules re: page limits;

      viii- Government response to be served and filed by 9/4/09. See Court's rules re: page

limits;

      ix- Defense reply to be served and filed by 9/11/09. See Court's rules re: page limits;

x- Conference/ruling on Defense motion 9/17/09 at 2:00 pm;

xi- Joint jury charges, joint verdict sheet, and any motions in limine to be served and filed by 9/28/09;

xii- Responses to motions in limine to be served and filed by 10/5/09;

xiii- Trial, if one is needed, to begin10/19/09 at 9:00 a.m.

Dated: New York, New York
April 28, 2009

_____

**RICHARD M. BERMAN, U.S.D.J.**