UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA,

                                                    08 Cr. 826 (RMB)

      - against -                              **REDACTED**


AAFIA SIDDIQUI,

                          Defendant.

------------------------------------------------------------X




**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANT AAFIA SIDDIQUI'S
OMNIBUS PRETRIAL MOTIONS**

DAWN M. CARDI & ASSOCIATES           Linda Moreno, Esq.
  Dawn M. Cardi                      P.O. Box 10987
  Chad L. Edgar                      Tampa, FL 33697
Two Park Avenue, 19th Floor          Tel. (813) 247-4500
New York, New York 10025             Fax (813) 386-6211
Tel. (212) 481-7770                  *Attorney for Aafia Siddiqui*
Fax (212) 684-3008
Attorneys for Aafia Siddiqui




SWIFT & MCDONALD, P.S.               Elaine Whitfield Sharp, Esq.
  Charles Swift                      196 Atlantic Avenue
2003 Western Avenue, #330            Marblehead, MA 01945
Seattle, WA 98121                    Tel. (781) 639-1862
Tel. (206) 441-3377                  Fax (781) 639-1771
Fax (206) 448-2252                   *Attorney for Aafia Siddiqui*
*Attorney for Aafia Siddiqui*

# TABLE OF CONTENTS

**I.  COUNT ONE OF THE INDICTMENT SHOULD BE DISMISSED AS THE GOVERNMENT FAILED TO OBTAIN A PROPER CERTIFICATE FOR PROSECUTION REQUIRED UNDER 18 U.S.C. § 2332(D)** ................................................................................................ **2**

A.  Introduction: Facts .................................................................................................**2**

B.  Whereas 18 U.S.C. §2332 Explicitly Prohibits the Government from Undertaking any Prosecution under that Statute unless a Certification has First Been Duly Issued in Accordance with §2332(d), the Government Lacks Jurisdiction over the Defendant for the Acts Alleged in Count One of the Indictment because she was Arrested, Forcibly Taken to the United States, and Indicted Prior to the issuance of a §2332(d) Certification. ...................**3**

    1.  Written Certification of the Attorney General Under 18 U.S.C. §2332(d) is a Statutorily-Mandated Prerequisite to Assertion of Extra-territorial  Jurisdiction by the United States over Foreign Nationals for Acts Described in §2332(b) ........**3**

C.  Prosecution of the Defendant Under §2332(b) – Including Arrest, Indictment, and Rendition to the United States – was Improperly Undertaken by The United States Without the Written Certification of the Attorney General .................................................................**6**

D.  Whereas 18 U.S.C. §2332(d) Expressly Requires Issuance of Written Certification by the Attorney General as a Prerequisite to any Prosecution Under §2332(b), Subsequent Production of the Certificate        is Insufficient to Overcome Non-compliance ......................**7**

E.  Dismissal of Count One of the Indictment is Required where the Government has Failed to Meet its Burden of Establishing Extraterritorial Jurisdiction over the Defendant ....................**7**

F.  Failure to Obtain the Certification Required in § 2332(d) Prior to Initiation of Prosecution is an Abuse of Statutorily Limited Prosecutorial Discretion, the Appropriate Remedy for Which is Dismissal of Count One of the Indictment .................................................................**8**

**II.  COUNTS TWO THROUGH SEVEN OF THE INDICTMENT SHOULD BE DISMISSED AS THE RELEVANT CRIMINAL STATUTES DO NOT CONTEMPLATE EXTRATERRITORIAL APPLICATION.** ..................................................................................**10**

A.  Federal Courts Have Found That 18 U.S.C. § 1114 is Extraterritorial in Scope Where Law Enforcement Agents and Other Government Civilian Personnel are Concerned. .....................**13**

B.  The Government Interests in Punishing Attacks on Law Enforcement Officers and other U.S. Civilian Government Employees Articulated in Benitez, Bin Laden, And Al Kassar, do not Extend to Members of the Uniformed Services Deployed in a War Zone ...........................**14**

    1.  Ghazni, Afghanistan was in a State of War on July 18, 2008 ........................................**14**

    2.  Congress did not Intend to Make an Attack of Uniformed Services Members an Extraterritorial Crime. .......................................................................................................**15**

**III.  THE UNCHARGED CONDUCT ALLEGED IN PARAGRAPHS ONE THROUGH FOUR OF THE INDICTMENT MUST BE STRICKEN AS SURPLUSAGE** ..............................................**17**

A.  The Uncharged Criminal Activity Alleged in Paragraphs One Through Four may only be Presented to the Jury, if at all, under Federal Rules of Evidence 404(b) ....................................**19**

B.   The Allegations Relating To Other Criminal Activities Contained In Paragraphs One Through Four Do Not Arise Out Of The Same Transactions Or Series Of Transactions As The Alleged Defenses .............................................................................................................**19**

C.   The Evidence is not Inextricably Intertwined with the Evidence Regarding the Charged Offenses...................................................................................................................................**20**

D.   The Evidence is not Necessary as Background ................................................................**20**

## IV.  ALL STATEMENTS THAT DEFENDANT AAFIA SIDDIQUI MADE TO AFGHANISTAN AND UNITED STATES AUTHORITIES WHILE IN THEIR CUSTODY SHOULD BE SUPPRESSED .......................................................................................................................**21**

A.   Introduction: Facts.............................................................................................................**21**

B.   Defendant Aafia Siddiqui's Statements To Afghanistan Authorities Should Be Suppressed Because They Were Not Voluntary.................................................................................**30**

C.   Defendant Aafia Siddiqui's Pre-<u>Miranda</u> Statements To FBI Agents While She Was In Their Custody And Being Interrogated By Them Are Inadmissible...........................................**31**

D.   Neither the so-called Public Safety nor Spontaneous Statements Exceptions to the <u>Miranda</u> Rule Are Applicable To The Interrogations of Defendant-Aafia Siddiqui ...................**34**

     1.   The Government Cannot Satisfy The Stringent Standard For The Public Safety Exception to the *Miranda* Rule.....................................................................**35**

     2.   The Government Cannot Satisfy the Standard for the "Spontaneous Statement" Exception to the *Miranda* Rule...................................................................**36**

## V.  THE STRIP SEARCHES TO WHICH DEFENDANT SIDDIQUI IS SUBJECTED BY THE BUREAU OF PRISON WHENEVER SHE MEETS HER ATTORNEYS INFRINGES ON HER CONSTITUATIONAL RIGHT TO THE ASSISTANCE OF COUNSEL.........................**39**

A.   Introduction: Facts.............................................................................................................**39**

B.   Strip Searching Is Offensive To Muslims And Violates Islamic Law. ............................**41**

C.   Dr. Siddiqui is Being Forced to Sacrifice her Sixth Amendment Right to Counsel to Prepare her Defense Because her First Amendment, Free-Exercise Rights are Being Violated without Legitimate Penological Purpose......................................................................**42**

D.   BOP's Insistence in Forcing Dr. Siddiqui to Strip Naked and Expose her Private Parts to Other Women Violates her Right to Bodily Privacy.......................................................**48**

E.   The Strip Searches Violate Ms. Siddiqui's Fourth Amendment Rights not to be Subject to Unreasonable Search and Seizure. ..................................................................................**51**

F.   The Appearance of Justice and Integrity of the Court is at Risk Where the Due-Process Right to a Fair Trial is Damaged Because Dr. Siddiqui is Inhibited and Intimidated not to Communicate with Counsel by the Application of the Strip-Search Regulation. .....................**53**

## CONCLUSION ........................................................................................................................**56**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

UNITED STATES OF AMERICA,

                                                    08 Cr. 826 (RMB)

        - against -                                 **REDACTED**


AAFIA SIDDIQUI,

                            Defendant.

-----------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANT AAFIA SIDDIQUI'S
OMNIBUS PRETRIAL MOTIONS**

This Memorandum of Law is respectfully submitted on behalf of Aafia Siddiqui ("Dr.

Siddiqui") in support of her motion for an order by this Court granting the following relief:

- Point One – Dismiss Count One of the Indictment where the Prosecution Abused
  its Discretion by failing to obtain the required Certification under Section
  2332(d);

- Point Two – Dismiss Counts Two through Seven of the Indictment where the
  relevant criminal statutes do not contemplate extra-territorial application;

- Point Three – Strike the Uncharged Conduct in paragraphs One through Four of
  the Indictment because they are prejudicial and confusing surplusage.

- Point Four – Suppress all statements for the purposes of the trial that Dr. Siddiqui
  allegedly made while in the custody of the police in Afghanistan in or around July
  17, 2008 to July 18, 2008 and while in custody of the Federal Bureau of
  Investigation from July 18, 2008 to August 4, 2008; and;

- Point Five – Request that MDC/BOP cease and desist strip-searching Dr. Siddiqui
  for non-contact attorney visits.

**POINT ONE**

I.  **COUNT ONE OF THE INDICTMENT SHOULD BE DISMISSED AS THE
    GOVERNMENT FAILED TO OBTAIN A PROPER CERTIFICATE FOR
    <u>PROSECUTION REQUIRED UNDER 18 U.S.C. § 2332(D)</u>**

   A.    **Introduction: Facts**

Count One of the indictment charges the defendant with attempted murder of a United

States national, "in an offense begun and committed out of the jurisdiction of any particular State

or District of the United States," in violation of 18 U.S.C. §2332(b)(1).[1]  Title 18 U.S.C.

§2332(b)(1) provides, in pertinent part:

> (b) Whoever outside the United States attempts to kill . . . a national of the United
> States shall—
>
>> (1) in the case of an attempt to commit a killing that is a murder as defined in
>> this chapter, be fined under this title or imprisoned not more than 20 years, or
>> both . . . .

18 U.S.C. §2332(b)(1).

However, there is an expressed limitation on the application of §2332(b) contained in

§2332(d), which states that:

> [n]o prosecution for any offense described in this section shall be undertaken by the
> United States except on written certification of the Attorney General or the highest

---

[1] Count One of the indictment alleges as follows:

<u>Attempted Murder of United States Nationals</u>

6.  On or about July 18, 2008, in an offense begun and committed outside of the
jurisdiction of any particular State or District of the United States, AAFIA SADDIQUI,
the defendant, who was first brought to and arrested in the Southern District of New
York, unlawfully, willfully, and knowingly attempted to commit a killing that is
murder, as that term is defined in Title 18, United States Code, Section 1111(a), of a
national of the United States, to wit: SIDDIQUI obtained U.S. Army Officer One's M-4
(<u>sic</u>) rifle,  attempted to fire and fired it at U.S. Army Officer Two and other members
of the U.S. Interview Team, and repeatedly stated her intent and desire to kill
Americans.

2

ranking subordinate of the Attorney General with responsibility for criminal prosecutions that, in the judgment of the certifying official, such offense was intended to coerce, intimidate, or retaliate against a government or a civilian population.

18 U.S.C. §2332(d). No such written certification was issued in this case until September 2, 2008, more than a month after the complaint had been filed and the defendant had been arrested and brought to the United States against her will. A copy of the certification is annexed to the Declaration of Chad L. Edgar dated August 21, 2009 as Exhibit "G." The §2332(d) certification is a condition precedent to federal jurisdiction to prosecute offenses under §2332(b). A prosecution initiated without the statutorily-mandated §2332(d) certification is jurisdictionally defective and an abuse of prosecutorial discretion. Accordingly, the defendant moves to Dismiss Count I of the Indictment.

**B. Whereas 18 U.S.C. §2332 Explicitly Prohibits the Government from Undertaking any Prosecution under that Statute unless a Certification has First Been Duly Issued in Accordance with §2332(d), the Government Lacks Jurisdiction over the Defendant for the Acts Alleged in Count One of the Indictment because she was Arrested, Forcibly Taken to the United States, and Indicted Prior to the issuance of a §2332(d) Certification.**

**1. Written Certification of the Attorney General Under 18 U.S.C. §2332(d) is a Statutorily-Mandated Prerequisite to Assertion of Extra-territorial Jurisdiction by the United States over Foreign Nationals for Acts Described in §2332(b)**

It is beyond dispute that this offense, which allegedly began and was committed entirely outside of the jurisdiction of any State or District of this country, requires a jurisdictional nexus to the United States. United States v. Gatlin, 216 F.3d 207 (2nd Cir. 2000. "[T]he party invoking federal jurisdiction bears the burden of establishing its existence." Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 103 (1998)(citation omitted). As the government is the party invoking the court's jurisdiction in a criminal case, it bears the burden of proof on the issue. United States v. Tinoco, 304 F.3d 1088, 1114 (11th Cir. 2002), cert. denied, 538 U.S. 909 (2003)

("[T]he government bears the burden of establishing that the statutory requirements of subject matter jurisdiction . . . have been met.")[2]; United States v. King, 781 F.Supp. 315, 316 (D. N.J. 1991) ("The United States has the burden of proving that federal jurisdiction exists.")

The threshold question in cases in which federal authorities seek extraterritorial criminal jurisdiction is whether Congress intended the extraterritorial application of the statute that proscribes the conduct alleged. 1 A.L.R. Fed. 2d 415 (2005). There is a presumption that Congress does not intend a statute to apply to conduct outside the territorial jurisdiction of the United States. Foley Bros. v. Filardo, 336 U.S. 281, 285 (1993); United States v. Gatlin, 216 F.3d 207, 211 (2nd Cir. 2000) ("We assume that Congress legislates against the backdrop of the presumption against extraterritoriality.") (internal quotations omitted)(citations omitted).[3] That presumption can be overcome only when Congress clearly expresses its intent to do so. See Sale v. Haitain Ctrs. Council, Inc., 509 U.S. at 188. The Second Circuit has indicated that the presumption should apply to all types of statutes. United States v. Gatlin, supra; See Kollias v. D. & G. Marine Maintenance, 29 F.3d 67, 71 (2nd Cir. 1994), cert. denied, 513 U.S. 1146 (1995)(stating that "[t]he Supreme Court's recent discussions of the presumption against extraterritoriality ... seem to require that all statutes, without exception, be construed to apply within the United States only, unless a contrary intent appears."). Whether a statute has such

---

[2] See also Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp., 549 U.S. 422, 423 (2007)("[ A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the cause (subject-matter jurisdiction) and the parties (personal jurisdiction (citations omitted).

[3] "In determining whether a statute applies extraterritorially, we are guided by a general presumption that Acts of Congress do not ordinarily apply outside our borders." U.S. v. Gatlin, 216 F.3d. at 211, citing Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 155, 173 (1993)(internal quotations omitted) and EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248(1991)("Aramco")("It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." (Internal quotation marks omitted.)

extraterritorial application is solely a question of legislative intent. <u>United States v. Bowman</u>, 260 U.S. 94, 97-98 (1922).[4]  "If punishment [of crimes like assault and murder] is to be extended to include those [acts] committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard.  <u>Id</u>.

Jurisdiction under Count One of the indictment is asserted via 18 U.S.C. §2332(b)(1).[5] The starting point for interpreting a statute:

> is the language of the statute itself.  Thus, the first canon of statutory construction is that a legislature says in a statute what it means and means in a statute what it says there. Indeed, when the words of a statute are unambiguous, ... this first canon is also the last: judicial inquiry is complete. Finally, unless otherwise defined, [statutory] words will be interpreted as taking their ordinary, contemporary, common meaning.

<u>U.S. v. Piervinanzi</u>, 23 F.3d 670, 677 (2d. Cir. 1994) (citations and internal quotations omitted), <u>cert</u>. <u>denied</u>, 513 U.S. 900 (1994).

Against the backdrop of the presumption against extraterritorial jurisdiction is the clear and unambiguous language of §2332(d), which expressly prohibits "prosecution for *any* offense" listed under §2332, "*except* on written certification" by the appropriate government official that the underlying acts were motivated by the defendant's intention to coerce, intimidate or retaliate against a government or civilian population of the United States.  18 U.S.C §2332(d) (emphasis supplied); <u>United States v. Yousef</u>, 327 F.3d 56, 116 (2nd Cir. 2003).  It is a basic interpretive

---

[4] This rule of statutory construction is inapplicable only to those criminal statutes which are, as a class, "not logically dependent upon their locality" for the government's jurisdiction, such as those which punish fraud or obstruction against the government.  <u>United States v. Bowman, supra, at 98</u>; <u>United States v. Yousef</u>, 327 F.3d 56, 86 (2d Cir. 2003). However, this principle is to be read narrowly.  <u>Kollias v. D & G Marine Maintenance</u>, 29 F.3d 67, 71 (1994)

[5] Count One of the indictment also refers to 18 U.S.C. §3238.  However, in order for this statute to be applicable, the crime charged must be one within the jurisdiction of the United States. 22 C.J.S. Criminal Law §234 (2009), <u>citing</u> <u>United States v. Cordova</u>, 89 F.Supp. 298 (E.D.N.Y. 1950).

canon that "'[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'"[6] <u>Corley v. U.S.,</u> 129 S.Ct. 1558, 1566 (2009) (<u>quoting</u> <u>Hibbs v. Winn</u>, 542 U.S. 88, (2004) <u>and</u> <u>quoting</u> 2A N. <u>Singer, Statutes and Statutory Construction</u> § 46.06, pp.181-186 (rev. 6th ed. 2000)).

The language of 18 U.S.C. §2332 leads to the logical and inescapable conclusion that when Congress included subsection (d) in the statute, it intended it to operate as a condition precedent to the extension of extraterritorial jurisdiction for the acts proscribed in §2332(b). Any other interpretation would be contrary to the express language of the statute and the intent of Congress.[7]

### C. Prosecution of the Defendant Under §2332(b) – Including Arrest, Indictment, and Rendition to the United States – was Improperly Undertaken by The United States Without the Written Certification of the Attorney General.

It is well established that the prosecution of an individual is initiated by arrest or by the filing of formal charges, whichever comes first. <u>See</u> <u>U.S. v. Marion</u>, 404 U. S. 307, 313 (1971) (<u>*Held*</u>: right to speedy trial attaches at arrest or charge); <u>see also</u>, Wayne LaFave, et. al., 5 Crim. Proc. §18.1(c), (3rd ed. 2008). In this case, the complaint charging the defendant with violation of §2332(b) was filed on July 31, 2008. The defendant was arrested and arraigned on the complaint on August 4th and 5th, 2008, respectively. Therefore, prosecution of the defendant under §2332(b) was undertaken on July 31, 2008, the day of the filing of formal charges.[8]

---

[6] It is a "cardinal rule that a statute is to be read as a whole." <u>*Corley v. U.S.*</u>, <u>supra</u>, at 1567 (quotations omitted).
[7] <u>See</u> H.R. Conf. Rep. 99-783, 87-88 (Aug 12, 1986) ("The committee of conference does not intend that [this chapter] reach non-terrorist violence inflicted upon American victims.")
[8] The defendant was already in custody on July 31, 2008, although the precise circumstances surrounding her initial detention are not yet clear. Thus, it is arguable that prosecution of the defendant under §2332(b) began even before the filing of the complaint.

However, contrary to the express requirements of §2332(d), the Attorney General did not issue a written certification until September 2, 2008, the day of the defendant's indictment, and more than a month after initiation of a prosecution under §2332(b).

**D.** **Whereas 18 U.S.C. §2332(d) Expressly Requires Issuance of Written Certification by the Attorney General as a Prerequisite to any Prosecution Under §2332(b), Subsequent Production of the Certificate is Insufficient to Overcome Non-compliance.**

The fact that the Attorney General eventually issued a written certification does not fix the problem of the government's failure to comply with an express statutory procedure. Section 2332(d) mandates issuance of the Attorney General' certification **prior** to the initiation of any prosecution under that section. 18 U.S.C. §2332(d). Although this is a stringent requirement, it was included by Congress "to ensure that this statute is used only for its intended purpose." H.R. Conf. Rep. 99-783, 87-88, supra, n. 8. If the court were to allow prosecution under §2332(b) without production of the required written certification <u>as</u> <u>mandated</u> it would, in effect, excise the words contained in §2332(d) from the statute by rendering them meaningless. "There is a presumption against construing a statute as containing superfluous or meaningless words or giving it a construction that would render it ineffective." <u>Kuzma</u> <u>v. I.R.S</u>. 821 F.2d 930 (2nd Cir. 1987).

**E.** **Dismissal of Count One of the Indictment is Required where the Government has Failed to Meet its Burden of Establishing Extraterritorial Jurisdiction over the Defendant**

As discussed in section I (A)(1), of this memorandum, a prosecution brought in violation of 18 U.S.C. §2332(d) is jurisdictionally defective. Where the government has failed to meet its burden of establishing federal jurisdiction, the appropriate remedy is dismissal of the indictment. <u>United States v. Gatlin</u>, 216 F.3d at 201(dismissing indictment and reversing for lack of jurisdiction defendant's conviction for sexual abuse of a minor on U.S. military property in

Germany); see also United States v. Paredes, 950 F.Supp.584, 585-86 (S.D.N.Y. 1996)

(dismissing indictment charging federal "murder for hire" where government failed to prove the

use of a "facility in interstate commerce," as the statute requires. See United States v. Paredes,

supra, at 585-86, *overruled on other grounds.* In dismissing the indictment, the Paredes Court

recognized that the government bore the burden of proof, because "[o]nce the existence of

subject matter jurisdiction is challenged, the burden of establishing it is always on the party

asserting jurisdiction." United States v. Paredes, supra, at 586. See also, 1 A.L.R. Fed. 2d 415

§24, citing United States v. Baker, 136 F.Supp. 546 (S.D.N.Y. 1955); United States v. Assia, 118

F.915 (C.C.E.D. N.Y. 1902).

    **F.   Failure to Obtain the Certification Required in § 2332(d) Prior to Initiation of Prosecution is an Abuse of Statutorily Limited Prosecutorial Discretion, the Appropriate Remedy for Which is Dismissal of Count One of the Indictment.**

In general, the executive branch has exclusive authority and discretion to decide whether

to prosecute a case. U.S. v. Nixon, 418 U.S. 683, 695 (1974). However, although there is a

presumption that prosecutors are properly discharging their official duties,[9] see United States v.

Armstrong, 517 U.S. at 464, 116 S.Ct. 1480, there are undoubtedly limits upon the exercise of

prosecutorial discretion. Bordenkircher v. Hayes, 434 U.S. 357, 365 (1978).[10]

---

[9] The reluctance of courts to look behind a prosecutor's charging decision rests in part on separation of powers principles and in part on an assumption that the public prosecutor is constrained by the ethics of the legal profession and the oath to uphold the Constitution and laws of the United States, will act properly and exercise reasoned discretion. In the case of a Justice Department prosecutor, the courts' reluctance to intervene is also based on a level of judicial confidence in the systems of checks and balances and review at various levels of the Department of Justice . . . up to and including the Attorney General. United States v. Hsia, 24 F.Supp. 2d 33, 47 (D.D.C. 1998), *rev'd in part on other grounds*, U.S. v. Hsia, 176 F.3d 517, 336 (D.C. Cir. 1999).

[10] For example, a prosecution initiated without probable cause or conducted for an improper purpose may deprive the victim of procedural due process. Jennings v. Schuman, 567 F.2d 1213, 1220 (3d Cir. 1977).

In this case, prosecutorial discretion to charge the defendant with violation of §2332(b) was explicitly and unequivocally limited by Congress, to wit:

> **d) Limitation on prosecution**. – No prosecution for any offenses in this section shall be undertaken by the United States except on written certification of the Attorney General.

See, 8 U.S.C.§2332(d). (Emphasis in original.)

The express limitation on prosecutorial discretion is repeated in the government's own Department of Justice ("DOJ") Criminal Division regulations. For example, according to the DOJ Criminal Resources Manual, offenses under 18 U.S.C. §2332 are applicable only to "terrorist[s]," and any prosecution thereunder "requires the written certification of the Attorney General, or the highest ranking subordinate of the Attorney General with responsibility for criminal prosecutions, that, in the judgment of that official, the offense was intended to coerce, intimidate, or retaliate against a government or a civilian population." DOJ, Criminal Resource Manual Sec. 12, "Terrorist Acts Abroad Against U.S. Nationals,"

http://www.usdoj.gov/usao/eousa/foia_reading_room /usam/title9/ crm00012.htm (last visited August 16, 2009). Prosecutorial compliance with the certification requirements of §2332(d) is repeated in the U.S. Attorney's Manual, which provides, in pertinent part:

> Pursuant to statute, the written certification of the Attorney General is required to allege a violation of 18 U.S.C. §2332. This certificate represents a finding that the offense was intended to coerce, intimidate or retaliate against a government or civilian population. . .

DOJ, U.S. Attorney's Manual ("USAM"), Title 9, sec. 9-2.136," Notification, Consultation, & Approval Requirements for International Terrorism Matters," Part J, http:// www.usdoj.gov/ usao/eousa/ foia_reading_room/ usam/title9/ 2mcrm.htm#9-2.131 (last visited August 16, 2009).

The DOJ regulations and procedures limiting prosecutorial discretion under 18 U.S.C. §2332 are based on a clear statutory mandate, and compliance with those procedures is essential

to protection of the rights of the accused and implementation of the clear intent of Congress.  A court has a duty to enforce an agency regulation when compliance with the regulation is mandated by the Constitution or federal law. United States v. Caceres, 440 U.S. 741, 749 (1979). Indeed, "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required." Id. at n. 14. (Internal quotations and citations omitted); see also, Bergamo v. Commodity Futures Trading Commission, 192 F.3d 78, 79 (2d. Cir. 1999) (An agency is bound to follow procedures required by its own regulations, even if these regulations were not statutorily or constitutionally mandated.) (Citations omitted.)  Although the Second Circuit has also ruled that the U.S. Attorney's Manual does not create substantive rights, the holding was based upon an express finding by the court that the guidelines invoked by the defendant in that case were "not mandated by statute." United States v. Piervinzani, 23 F.3d 670, 684 (1994)(citations omitted).

The prosecutors in this case adhered to neither the statutory mandate of 2332(d) nor formal DOJ procedures, and therefore exceeded their authority by charging the defendant with attempted murder under 18 U.S.C. §2332(b)(1).  In such a situation, "[i]t is, of course, quintessentially the responsibility of the judiciary to deal – and to deal firmly – with prosecutorial overreaching . . ." United States v. Hsia, supra, 24 F.Supp. at 47.  In this situation, the only appropriate remedy is dismissal of the charge that resulted from the abuse of prosecutorial discretion.

**POINT TWO**

**II.     COUNTS TWO THROUGH SEVEN OF THE INDICTMENT SHOULD BE
         DISMISSED AS THE RELEVANT CRIMINAL STATUTES DO NOT
         CONTEMPLATE EXTRATERRITORIAL APPLICATION.**

Unlike Count One of the indictment, where the definition section clearly contemplates "extraterritorial jurisdiction," providing that the conditions precedent had been complied with, the statutes underlying Counts Two through Seven are conspicuously silent on the issue of extraterritorial jurisdiction. [11]

All of the violations alleged occurred in their entirety in Afghanistan and outside of the Special Maritime and Territorial Jurisdiction of the United States set out 18 U.S.C. § 7. Accordingly, in order for the offenses to be within the jurisdiction of this court, statutes, 18 U.S.C. § 1114, must be extraterritorial in scope.

Title 18 U.S.C. § 1114 falls within "Chapter 51-Homicide" of U.S. Code Title 18. Section 1114 was enacted in 1948, along with a host of general homicide provisions, including 18 U.S.C. § 1111, "Murder"; 18 U.S.C. § 1112 "Manslaughter"; and 18 U.S.C. § 1113, "Attempt to Commit Murder or Manslaughter." The relevant language of Section 1114, reads as follows:

> "Whoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such

---

[11] Count Two alleges the same conduct by the defendant as Count One in violation of 18 U.S.C. § 1114(3), (Attempted Murder of United States Officers and Employees) for the underlying offense. Count Three again alleges the same conduct by the defendant, this time in violation of 18 U.S.C. § 111(a)(1) and 111(b) (Armed Assault of United States Officers and Employees). Count Four alleges that the defendant carried and brandished and discharged a firearm in conjunction with Counts One, Two and Three in violation of 18 U.S.C. § 942(c)(1)(A)(iii) and 18 U.S.C. § 942(c)(1)(B)(iii) and (Discharge of a Firearm During a Crime of Violence). Count Five alleges that the defendant physically resisted and struggled with interpreter One as he attempted to obtain US Army Officer One's M4 rifle from the defendant, in violation of 18 U.S.C. § 111(a) (1) (Assault of United States Officers and Employees). Count Six alleges that the defendant for the underlying offense in Count Three alleges that the defendant struck Special Agent One as he was attempting to subdue her in violation of 18 U.S.C. § 111(a)(1) (Assault of United States Officers and Employees). And, finally, Count Seven alleges that the defendant physically resisted Army Officer Two as he attempted to carry her out of the ANP facility by kicking him and attempting to kick him in violation of 18 U.S.C. § 111(a)(1) (Assault of United States Officers and Employees).

an officer or employee in the performance of such duties or on account of that assistance, shall be punished. . ."

Section 1114 serves as the jurisdictional basis not only for Attempted Murder of United States Officers and Employees, (18 U.S.C. § 1114(3), but also for Armed Assault of United States Officers and Employees (18 U.S.C. § 111(a)(1) and (b), Assault of United States Officers and Employees  (18 U.S.C. § 111(a)(1). Notably absent, however, from § 1114 is any language indication that Congress intended the statute to be extra-territorial in its reach.

In <u>Bowman,</u> supra, the Supreme Court articulated the basis for extending for extending construing a statute as extraterritorial scope where the text of the statute is silent:

> "The necessary locus, when not specifically defined, depends upon the purpose of Congress as evinced by the description and nature of the crime and upon the territorial limitations upon the power and jurisdiction of a government to punish crime under the law of nations.  Crimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement, and frauds of all kinds, which affect the peace and good order of the community must, of course, be committed within the territorial jurisdiction of the government where it may properly exercise it.  If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard."
>
>                  * * * * * **
>
> "But the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents." <u>Bowman</u>, 260 U.S. 94, 97-98 (1922).

Subsequent to <u>Bowman</u>, the Supreme Court made clear that there is nevertheless a "*presumption*" against extraterritorial jurisdiction.  <u>See Sale v. Haitian Ctrs. Council, Inc.,</u> 509 U.S. 155, 173 (1993); <u>Foley Brothers</u>, 336 U.S. at 285, <u>see also Yousef,</u> 327 F.3d at 86; <u>Kim,</u> 246 F.3d at 188-89; Gatlin, 216 F.3d at 211.

**A.      Federal Courts Have Found That 18 U.S.C. § 1114 is Extraterritorial in Scope Where Law Enforcement Agents and Other Government Civilian Personnel are Concerned.**

Applying the presumption extraterritorial jurisdiction with the Supreme Court's use of "murder" Bowman,  as an example of the type  of crime which is *not* given the extraterritorial, Bowman, 260 U.S. at 98, § 1114 would on its face appear to restrict the application to the territorial jurisdiction of the United States.

In spite of the presumption against extraterritorial jurisdiction, the Federal Court's that have consider the question of § 1114 scope have to date found it to be extraterritorial.  United States v. Benitez, 74 F.2d 1312 (11th Cir. 1984), cert denied 471 U.S. 1137 (1985) (finding that § 1114 permitted the prosecution of the defendant for the murder and attempted Murder of DEA agents in Columbia); United States v. Bin Laden, 92 F.Supp.2d 189 (S.D.N.Y. 2000); and United States v. Al Kassar, 582 F. Supp. 2d 488, 497 (S.D.N.Y. 2008).

Each of the above cases found that § 1114 was extraterritorial by focusing, not on the nature of the crime, but on the second part of the Bowman test, namely the "right of the government to defend itself."  Bowman at 98. (See e.g. Al Kassar at 497 the "Government has a strong and legitimate interest in protecting its officers and employees performing official duties abroad.")   In the leading case United States v. Benitez, the 11th Circuit recognized that a government interest in protecting its officer's employees alone, however, would not justify extension of extraterritorial jurisdiction if such jurisdiction violated principals of international law.  See, Benitez at 1312 (holding that question of whether their conduct without the United States had such a deleterious effect within the United States to justify this country in prohibiting the conduct was answered by turning to the five general principals of criminal jurisdiction).

The five general principals, referred to by the Benitez Court, are the territorial, national, protective, universality, and passive personality principles and are drawn from  Rocha v. United

<u>States</u>, 288 F.2d 545 (9 Cir., 1961); <u>cert. den.</u> 366 U.S. 948. The <u>Benitez</u> found that jurisdiction under § 1114 did not run counter to any of the principals and was supported by two of them namely "the protective principle and the passive personality principle. Holding that "(U)nder the former, jurisdiction is based on whether the national interest is injured; under the latter, jurisdiction is based on the nationality or national character of the victim." <u>Benitez</u> at 1316.

**B.**    **The Government Interests in Punishing Attacks on Law Enforcement Officers and other U.S. Civilian Government Employees Articulated in <u>Benitez</u>, <u>Bin Laden</u>, And <u>Al Kassar</u>, do not Extend to Members of the Uniformed Services Deployed in a War Zone**

The Defendant has not found any case considering whether § 1114 revision in 1996 includes "any member of the uniformed services" should be likewise construed to extend extraterritorial jurisdiction to "Members of the Uniformed Services" that have been deployed extraterritorially into an area where there exists a "state of war."

**1.**    **Ghazni, Afghanistan was in a State of War on July 18, 2008**

"War" may be defined as "that state in which a nation prosecutes its right by force." <u>Arce v. State</u>, 83 Tex. Crim. 292, 296 (Tex. Crim. App. 1918). The U.S. Supreme Court in <u>Bas v. Tingy</u>, dealing with the quasi-war with the French in 1799, held that war may either be "general" when declared by Congress, or "limited" as to place, objects, and time. 1 L. Ed. 731, 734 (U.S. 1800). A time of war may exist if there is either a *de jure* war, formally declared by Congress, or if the conflict is a *de facto* war. <u>See, United States v. Castillo</u>, 34 M.J. 1160, 1163 (C.M.R. 1992). A *de facto* war is "determined by the realities of the situation," with the "existence of armed hostilities against an organized enemy" being of "crucial importance." *Id.* at 1163, quoting <u>United States v. Shell</u>, 7 U.S.C.M.A. 646 (1957). Additionally, military actions may fall short of *de facto* war if they are classified as military actions such as reprisal, defensive action, humanitarian intervention or other measures which are "confined in nature and extent, being

14

limited as to places, persons, and things." See Bas, supra, at 40. Most importantly in 2004, a plurality of the Supreme Court, citing reports of ongoing conflict in Afghanistan held that "Active combat operations against Taliban fighters apparently are ongoing in Afghanistan." Hamdi v. Rumsfeld, 542 U.S. 507, 521 (U.S. 2004). The Hamdi plurality found that the state of war would at a minimum continue as long as "the record establishes that United States troops are still involved in active combat in Afghanistan." Id. It cannot be seriously argued that the state of affairs in Afghanistan has changed since Hamdi and that we are no longer in combat operations. Accordingly, Ghazni, Afghanistan was within a war zone.

### 2. Congress did not Intend to Make an Attack of Uniformed Services Members an Extraterritorial Crime.

While uniformed service members routinely assist the government in quasi-law enforcement efforts (e.g., the aftermath of Hurricane Katrina) and there was ample reason for Congress to extend territorial protection to uniformed service members under § 1114; uniformed service members deployed are another matter, altogether. Soldiers in combat are ordinarily protected not by criminal statutes, but by the force of arms. The law of war does not criminalize armed resistance against state forces, nor does it criminalize any attempt to escape from those forces. Section 1114's national interest in the protection of law enforcement officers by force of law found by Benitez does not logically extend to the protection of members of the Armed Forces deployed to a "war zone". In a war zone, the interest is not law enforcement, it is combat.

While the United States certainly has an interest in protecting its soldiers from harm on the battlefield, it does so by force arms, not force of law. To the extent that Congress can protect

soldiers on the battlefield by the force of law, it has done so by passing the War Crimes Act 18 U.S.C. § 2441.[12]

Extraterritorial jurisdiction outside of the battlefield is not without problems, either. The deployment of the large majority of military units deployed outside of United States territory is pursuant to treaties referred to as "Status of Forces Agreements." The oldest of these is the "Status of Forces Agreement for the North Atlantic Treaty Organization," signed in 1949 and ratified by the Senate in 1951. Paragraph 11 of Article VI of this agreement provides that

> [E]ach Contracting Party shall seek such legislation as it deems necessary to ensure the adequate security and protection within its territory of installations, equipment, property, records and official information of other Contracting Parties, and the punishment of persons who may contravene laws enacted for that purpose.
> http://www.nato.int/docu/basictxt/b510619a.htm.

The plain language of the treaty gives the host nation exclusive criminal jurisdiction for attacks on military facilities. Host nation retention of exclusive jurisdiction over its citizens and third party naturals is understandable, given the fears that every nation has regarding the loss of sovereignty injunction with a foreign military presence.

It does not follow that Congress' silence in amending §1114 to include uniformed service persons intended to upset this long-standing treaty arrangement. Had the attacks of U.S.

---

[12] Section (c) of the Act defines "war crime" as: (1) defined as a grave breach in any of the international conventions signed at Geneva 12 August 1949, or any protocol to such convention to which the United States is a party; (2) prohibited by Article 23, 25, 27, or 28 of the Annex to the Hague Convention IV, Respecting the Laws and Customs of War on Land, signed 18 October 1907; (3) which constitutes a grave breach of common Article 3 (as defined in subsection (d)) when committed in the context of and in association with an armed conflict not of an international character; or (4) of a person who, in relation to an armed conflict and contrary to the provisions of the Protocol on Prohibitions or Restrictions on the Use of Mines, Booby-Traps and Other Devices as amended at Geneva on 3 May 1996 (Protocol II as amended on 3 May 1996), when the United States is a party to such Protocol, willfully kills or causes serious injury to civilians.

facilities considered in <u>Bin Laden</u> been on US military facilities, the principles under which the court extend territorial jurisdiction under §1114 would have led to an opposite conclusion. [13]

In the final analysis, the extension of §1114 extra-territorially to uniformed service members offends two of the five principals relied on by the Court of Appeals in <u>Benitez</u>. The universality principal of the Law of Wars application to the battlefield is offended by the substitution of domestic law of the foreign state and the territorial principal is offended by the alternation of long standing treaty. There is no reason to believe that Congress intended a crazy-quilt application of §1114 outside of US territory, e.g. nations where forces are deployed not pursuant to a treaty and not engaged in hostilities. Accordingly, Counts Two through Seven of the Indictment should be dismissed. Supra Part I, Paragraph 3.

POINT THREE

III. **THE UNCHARGED CONDUCT ALLEGED IN PARAGRAPHS ONE THROUGH FOUR OF THE INDICTMENT MUST BE STRICKEN AS SURPLUSAGE**

The background section of the indictment against defendant Dr. Siddiqui alleges the following:

1. AAFIA SIDDIQUI, the defendant, resided in the United States from on or about 1991 until in or about June 2002, when she moved to Pakistan. During this period, SIDDIQUI obtained degrees from the Massachusetts Institute of Technology and Brandeis University in biology and neuroscience. SIDDIQUI returned to the United States on December 25, 2002 and departed the United States on January 2, 2003.

2. On or about July 17, 2008, AAFIA SIDDIQUI, the defendant, was detained by the Afghan National Police ("ANP") in Ghazni, Afghanistan. At that time, a number of items were in SIDDIQUI'S possession, including various documents, various chemicals, and a computer thumb drive, among other things.

---

[13] This not to say that such an attack could not be prosecuted in the US Federal Courts. It could pursuant to §2332. Such a prosecution, however, would require the Attorney General's certification, thereby insuring that long standing treaty arrangements are not violated and or differences resolved. <u>Supra</u> part I of this memorandum.

3. Among the documents in the possession of AAFIA SIDDIQUI, the defendant, were handwritten notes that referred to a "mass casualty attack" and that listed various locations in the United States, including Plum Island, the Empire State Building, the Statue of Liberty, Wall Street and the Brooklyn Bridge.  In addition, certain notes referred to the construction of "dirty bombs," chemical and biological weapons, and other explosives.  These notes also discussed mortality rates associated with certain of these weapons and explosives.   Other notes referred to various ways to attack "enemies," including by destroying reconnaissance drones, using underwater bombs, and using gliders.

4. The computer thumb drive in the possession of AAFIA SIDDIQUI, the defendant, contained various electronic documents.   A number of these documents consisted of correspondence that referred to specific "cells" and "attacks" by certain "cells."  Other documents referred to "enemies," including the United States, and discussed recruitment and training.

All of facts related in Paragraphs One through Four are superfluous to the

elements underlying counts of the indictment that must be proven at trial.[14] Rather the

background information contained in these paragraphs allege facts that related to a

laundry list of other violations of Title 18 including: § 32 (relating to destruction of

aircraft or aircraft facilities), § 175 (relating to biological weapons); § 229 (relating to

chemical weapons), § 831 (relating to nuclear materials), paragraph (2) or (3) of §844(f)

(f) (relating to arson and bombing of government property risking or causing injury or

---

[14] The defendant notes that subsection (d) of 18 USCS § 2332 (Charge 1) does require that,  "No prosecution for any offense described in this section shall be undertaken by the United States except on written certification of the Attorney General or the highest ranking subordinate of the Attorney General with responsibility for criminal prosecutions that, in the judgment of the certifying official, such offense was intended to coerce, intimidate, or retaliate against a government or a civilian population." Subparagraph (d), however, is a "limit on prosecution rather than as an element of the offenses set forth in § 2332. *United States v. Yousef*, 327 F.3d 56, 118 (2d Cir. N.Y. 2003) (Internal punctuation omitted.) Accordingly, the allegations do not support an element that must be proved at trial.

death); § 1366(a) (relating to weapons of mass destruction), § 2332b (relating to acts of terrorism transcending national boundaries); and § 2339b (relating to providing material support or resources to designated foreign terrorist organizations).

**A.** **The Uncharged Criminal Activity Alleged in Paragraphs One Through Four may only be Presented to the Jury, if at all, under Federal Rules of Evidence 404(b).**

It is well established in the 2nd Circuit, that the uncharged criminal activity may be independently proved outside of the constraints and requirements of Fed. R. Evid 404(b), if the evidence meets one of the three following criteria:

1) The evidence arises out of the same transaction or series of transactions as the charged offense;

2) is inextricably intertwined with the evidence regarding the charged offense; and

3) is necessary to complete the story of the crime on trial it.

United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (holding that "evidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." (Internal citations omitted.)

Accordingly allegations may only be generally charged and proved if they meet one of the above exceptions to the application of Fed. R. Evid. 404(b).

**B.** **The Allegations Relating To Other Criminal Activities Contained In Paragraphs One Through Four Do Not Arise Out Of The Same Transactions Or Series Of Transactions As The Alleged Defenses**

Counts under which defendant-Dr. Siddiqui stands accused all stem out of the U.S. military, contract interpreters, and agents of the FBI (U.S. interviewer team) visit to the ANP compound in an effort to question defendant Dr. Siddiqui on July 18. There is no allegation that the defendant was engaged in a continuing course of criminal conduct implicated by the documents in her possession at the time of the alleged crimes. At most, the documents set out in paragraphs 3 and 4 are suggestive that at one time, the defendant may have researched potential terror targets in the United States. There is now evidence, however, that such research was part of the same transaction that led the defendant to Ghazni, Afghanistan.

### C.     The Evidence is not Inextricably Intertwined with the Evidence Regarding the Charged Offenses.

Quite the opposite – the documents alleged in paragraphs one through four have no direct relationship to the evidence related to the counts against the defendant.

### D.     The Evidence is not Necessary as Background

Reading the indictment absent the objectionable language demonstrates that it is not necessary as background. Absent the superfluous language, the indictment would read as follows:

1) On or about July 17, 2008, AAFIA SIDDIQUI, the defendant, was detained by the Afghan National Police (ANP) in Ghazni, Afghanistan.

2) On or about July 18, 2008, in Ghazni, Afghanistan, a team of officers and employees of the United States, and others assisting them, attempted to interview AAFIA SIDDIQUI, the defendant, at an ANP compound. The team included, among others: three offices and employees of the United States Army ("U.S. Army Officer One," U.S. Army Officer Two," and U.S. Army Officer Three"); two officers and employees of the Federal Bureau of Investigation ("FBI Special Agent One" and "FBI Special Agent Two"); and two U.S. Army contract interpreters ("Interpreter One" and "Interpreter Two") (collectively, "the U.S. Interview Team"). The U.S. Interview Team was shown to a meeting room at the ANP compound, which was partitioned by a curtain. Unbeknownst to the U.S. Interview Team, SIDDIQUI was behind the curtain.

Rather than confusing the jury, the removal of the surplus language actually ensures that the charged course of conduct is not confused. Indeed, the only way the jury would be confused is if the evidence is permitted to be introduced absent 404(b). Were that to be the case, a limiting instruction on the jury use of the evidence is not required. See United States v. Towne, 870 F.2d 880, 886 (2d Cir. Vt. 1989)(holding that a limiting instruction not required when evidence of other crimes is admissible outside of Fed R. Evid. 404(b)). Admission of the allegations of uncharged criminal activity and the supporting evidence in Paragraphs One through Four, absent a limiting instruction, would almost undoubtedly be reversible error. The jury would quite likely convict the defendant out of fear of the crimes she might be predisposed to commit rather than on the evidence of the crimes before them.

**POINT FOUR**

**IV.     ALL STATEMENTS THAT DEFENDANT AAFIA SIDDIQUI MADE TO AFGHANISTAN AND UNITED STATES AUTHORITIES WHILE IN THEIR CUSTODY SHOULD BE SUPPRESSED**

**POINT FIVE**

**V.  THE STRIP SEARCHES TO WHICH DEFENDANT SIDDIQUI IS SUBJECTED BY THE BUREAU OF PRISON WHENEVER SHE MEETS HER ATTORNEYS INFRINGES ON HER CONSTITUATIONAL RIGHT TO THE ASSISTANCE OF COUNSEL.**

**A.  Introduction: Facts**

---

Aafia Siddiqui is a pretrial detainee at Metropolitan Detention Center (MDC), Brooklyn, New York, where she is being held as an administrative detention inmate in one of the medical cells in the East unit[23]; this is the equivalent of being housed in the Special Housing Unit (SHU).

Dr. Siddiqui is charged with assault and attempted murder crimes, but not with crimes of terrorism.[24] Dr. Siddiqui has no prior criminal record.

In order for Dr. Siddiqui to consult with her attorneys about her legal defense, she is forced to strip naked and expose her genitalia for visual examination by female guards. Relevant excerpts of the MDC Program Statement is annexed hereto as Exhibit "H" to the Edgar Declaration, (PS) 5521.05 6. b (defining a "visual search as "[a] **visual inspection of all body surfaces and body cavities**." Id., at Page 2, Section 6 b.) (Emphasis added.) Dr. Siddiqui is a devout Muslim.

The practice of strip searching Dr. Siddiqui violates her following fundamental constitutional rights: the Free Exercise clause of the first amendment, the sixth amendment right

---

[23] <u>Administrative Detention Status is defined as.</u> "A form of separation from the general population used when the continued presence of the inmate within the general population would pose a serious threat to life, property, self, staff or other inmates, or to the security or orderly running of the institution. This housing status may also include inmates who require protective custody, those who cannot be placed in local population because they are en route to another institution (holdovers), and those who are awaiting a hearing before the Unit Discipline Committee or Discipline Hearing Officer. Administrative detention status is a non-punitive status in which restricted conditions of confinement are required only to ensure the safety of inmates or others, the protection of property, or the security or orderly running of the institution." (See, Exhibits B, Program Statement P5270, Chapter 9, Page 1.)

[24] Specifically, a seven-count indictment accuses Ms. Siddiqui, as follows: Count 1 - armed assault of United States Officers and Employees, 18 USC, §§ 2332(b)(1) and 3238; Count 2 - attempted murder of U.S. officers and employees, 18 USC, §§ 1114(3) and 3238; Count 3 – armed assault of United States Officers and employees, 18 USC §§ 111(a)(1), 111(b) and 3238; Count 4 – discharge of a firearm during a crime of violence, 18 USC §§ 924(c)(1)(A)(iii), 924(c)(1)(B)(ii) and 3238; Count 5 – Assault of US officers and employees, 18 USC §§ 111(a)(1) and 3238; Count 6 – assault of US officers and employees, 18 USC §§ 111(a) (1) and 3238; Count 7 – 18 USC §§ 111(a)(1) and 3238. (*See*, Indictment, ECF Doc. 8.)

to counsel, her right to bodily privacy and the fourth amendment not to be subject to unreasonable searches and seizures; and offends the Court's stake in preserving the public perception that justice is being done.

This motion is not about an inmate seeking more palatable conditions of confinement; Rather, it is about the exercise of, and the inhibition of the exercise of, fundamental rights, as well as their violation, as this affects the integrity of the criminal justice process, and the public perception of fundamental fairness in the case at bar. "Not only must Justice be done; it must also seen to be done." <u>Regina v Sussex Justices, Ex Parte McCarthy</u>, ([1924] 1 KB 256, [1923] All ER 233).

### B.    Strip Searching Is Offensive To Muslims And Violates Islamic Law.

Dr. Siddiqui is a Muslim woman and the strip search is offensive to her principles of modesty. A traditional Islamic woman understands and obeys Islamic law regarding the sanctity of her body. A Muslim woman's nude exposure is tantamount to indecency. Islamic law requires that women should be properly covered in public or before others. Even during funeral ceremonies, a woman's body is required to be covered and no man is allowed to lay his eyes on the shape of the body. An Islamic woman should never be strip searched as this is categorically violation of her religion and of her culture. Further, the Holy Qu'ran specifically addresses nudity viewed by third parties.

> "Tell the believing men to lower their gaze, and protect their private parts. That is purer for them. Verily, Allah is All-Aware of what they do."[25]

The custom and traditions of Islam, as expressed in the *Hadith* also forbids the viewing of one's *awrah*, that is genitalia, by a third party:

> The Prophet (peace and blessings of Allah be upon him) expressly forbade one man to look at the 'awrah of another, ***or one woman to look at the 'awrah of another***. It was narrated from Abu Sa'eed al-Khudri (may Allah be pleased with him) that the Messenger

---

[25] Translated meaning of the Qu'ran, Chapter 24, Verses 30.

of Allah (peace and blessings of Allah be upon him) said: "No man should look at the 'awrah of another man, ***and no woman should look at the 'awrah of another woman.***"[26]

Ali (may Allah be pleased with him) said: "The Messenger of Allah (peace and blessings of Allah be upon him) said: "***Do not show your thigh, and do not look at the thigh of anyone, living or dead***."[27]

Muhammad ibn Jahsh (may Allah be pleased with him) said: "The Prophet (peace and blessings of Allah be upon him) passed by Ma'mar when I was with him, and his thighs were uncovered. He said: '***O Ma'mar, cover your thighs, for the thigh is awrah***'."[28]

The Prophet (peace and blessings of Allah be upon him) passed by him when his thigh was uncovered and he said: "***Do you not know that the thigh is 'awrah***?"
Ibn 'Abbaas (may Allah be pleased with him) said that the Prophet (peace and blessings of Allah be upon him) said: "***The thigh is 'awrah***."[29]

**C.    Dr. Siddiqui is Being Forced to Sacrifice her Sixth Amendment Right to Counsel to Prepare her Defense Because her First Amendment, Free-Exercise Rights are Being Violated without Legitimate Penological Purpose.**

Aafia Siddiqui has a fundamental right to counsel under US CONST., amend VI.  Dr. Siddiqui also has the fundamental right to be let alone by Government in the practice of her religion under the Free Exercise clause of US CONST., amend I.  The Bureau of Prisons' insistence that Dr. Siddiqui submit to a strip search and expose her genitalia before she may engage in a ***non-contact*** consultation with her attorneys, creates a sharp conflict between the exercise by these two fundamental rights with the result that, rather than violate the law of the Holy Qu'ran which, in her free exercise of her Islamic beliefs, she must obey, she is not only inhibited, but actually <u>deterred</u> from exercising her sixth amendment right of access to counsel.

The first amendment to the United States Constitution states:

Congress shall make no law respecting an establishment of religion, ***or prohibiting the free exercise thereof***; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. U.S.CONST., amend. I. (Emphasis added.)

---

[26] Muslim (name of person).
[27] Abu Daud, Ibn Majah.
[28] Ahmad.
[29] Ahmad, Abu Dawood, Tirmidhi.

The sixth amendment to the U.S. Constitution states:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, ***and to have the Assistance of Counsel for his defence***.  U.S.CONST., amend VI. (Emphasis added.)

In both the criminal-procedural and civil-rights contexts, it is well-established constitutional jurisprudence that a defendant need not sacrifice one constitutional right in order to exercise another.  Yet this is what Dr. Siddiqui, who is not even a convicted felon, is forced to do.

In <u>Simmons, et al  v United States</u>, 390 U.S. 377 (1968) the Supreme Court reversed one defendant's armed-robbery conviction where the defendant had to give up his fifth amendment right not to incriminate himself in order to assert his fourth amendment right not to be subject to unreasonable search and seizure.  The <u>Simmons</u> Court held "that when a defendant testifies in support of a motion to suppress evidence on fourth amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt. . . ." One of the <u>Simmons</u> defendants, Garrett, challenged the reasonableness of a search under US CONST., amend IV. The search was conducted in the home of a third party and revealed a suitcase containing evidence incriminating Garrett in the armed robbery at issue in the case. In order to establish standing to challenge the reasonableness of the search, Simmons testified at a suppression hearing that he owned the suitcase, thus satisfying the possessory-interest under <u>Jones v United States</u>, 362 U.S. 257 (1960).  The trial court denied Garrett's motion to suppress and at trial admitted his suppression-hearing testimony that he owned the suitcase.

Under the facts of <u>Simmons</u>, had Garrett known he was sacrificing his right under US

CONST, amend. V, not to incriminate himself by asserting his right not to be the subject of

unreasonable search and seizure under US CONST., amend IV, he might not have testified, thus

weakening the exclusionary rule of deterrence. In Garrett's case, the Supreme Court stated "that

a defendant who knows that his testimony may be admissible at trial will sometimes be deterred

from presenting the testimonial proof of standing necessary to assert a fourth amendment claim."

Id. 393.

The same concerns that animated the decision in <u>Simmons</u> should animate this Court's

decision in the case at bar.  The relief this Court is being asked to bring to the situation is to issue

an order requesting that the Bureau of Prisons (BOP) cease and desist the practice of strip-

searching Dr. Siddiqui.  Such an order – where the violation of one fundamental right is

impacting the Defendant's exercise of another right that is central to the integrity of due-process

guarantee of a fair criminal trial – is consistent with the oft quoted aphorism: "Not only must

Justice be done; it must also seen to be done."

In Dr. Siddiqui's case where attorney visits are non-contact and where she is alone in her

cell, <u>the strip search is nothing more than an exaggerated response to a security concern</u>.  As

recently as 2006, the United States Supreme Court was a moderating voice on this very issue in

<u>Beard v. Banks</u>, 548 U.S. 521, 528 (U.S. 2006):

> <u>Turner v. Safley</u>, 482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987), and <u>Overton v.</u>
> <u>Bazzetta</u>, 539 U.S. 126, 123 S. Ct. 2162, 156 L. Ed. 2d 162 (2003), contain the basic
> substantive legal standards governing this case. This Court recognized in <u>Turner</u> that
> imprisonment does not automatically deprive a prisoner of certain important
> constitutional protections, including those of the First Amendment. 482 U.S. at 93, 107 S.
> Ct. 2254, 96 L. Ed. 2d 64; <u>see also O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 348, 107
> S. Ct. 2400, 96 L. Ed. 2d 282 (1987). But at the same time the Constitution sometimes
> permits greater restriction of such rights in a prison than it would allow elsewhere. <u>See,</u>
> <u>e.g.</u>, <u>Turner</u>, <u>supra</u>, at 84-85, 107 S. Ct. 2254, 96 L. Ed. 2d 64. As <u>Overton</u> [summarizing
> pre-<u>Turner</u> case law] pointed out, courts owe "substantial deference to the professional

judgment of prison administrators." 539 U.S., at 132, 123 S. Ct. 2162, 156 L. Ed. 2d 162. And <u>Turner</u> reconciled these principles by holding that restrictive prison regulations are permissible if they are "'reasonably related' to legitimate penological interests," 482 U.S., at 87, 107 S. Ct. 2254, 96 L. Ed. 2d 64, ***and are not an "'exaggerated response'" to such objectives***. . . .(Emphasis added.) *Id.*

While Dr. Siddiqui does not challenge the BOP "visual search" regulation on its face, she does challenge its application to her.  Dr. Siddiqui was classified as an "Administrative Detention," detainee when she was first admitted to the MDC-Brooklyn in August 2008.  As recently as May 18, 2009, the United States Supreme Court in a fundamental rights case brought by a Pakistani-Muslim against MDC-Brooklyn characterized Administrative Detention as "restrictive conditions *designed to prevent [detainees] from communicating with the general prison population*." <u>See</u>, <u>Ashcroft v Iqbal</u>, 129 S.Ct. 1937, 173 L.Ed. 2d 868; 2009 U.S.LEXIS 3472; 73 Fed.R.Serv.3d (Callaghan) 837.

Precedent establishes that to meet a challenge to regulations governing prisoner-to-prisoner communications that also impact on a prisoner's fundamental rights, all the prison administration need show is that the regulation burdening the fundamental right is "reasonably related to the legitimate penological objective." <u>Turner</u>, <u>supra</u>, 83-84.  But, because the United States Supreme Court recognizes that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," and courts are charged with upholding those rights, courts – charged with upholding the Constitution – will evaluate the reasonableness of the regulation.  <u>Id.</u>, at 84.

In <u>Beard</u>, the Court wrote:

Turner also sets forth four factors "relevant in determining the reasonableness of the regulation at issue." Id., at 89, 107 S. Ct. 2254, 96 L. Ed. 2d 64. First, is there a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"? *Ibid*. Second, are there "alternative means of exercising the right that remain open to prison inmates"? *Id*., at 90, 107 S. Ct. 2254, 96 L. Ed. 2d 64. Third, what "impact" will "accommodation of the asserted constitutional right . . . have

on guards and other inmates, and on the allocation of prison resources generally"? *Ibid*. And, fourth, are "ready alternatives" for furthering the governmental interest available? Ibid.

Prison regulations interfering with an inmate's free exercise of religion must be "reasonably related to legitimate penological interests." (See, O'Lone v. Estate of Shabazz, 482 U.S. 342, 351-53 (1987); see also Cutter v. Wilkinson, 544 U.S. 709, 722-23 (2005) (holding that Religious Land Use and Institutionalized Persons Act *prohibits government from placing substantial burden on prisoners' religious exercise except to further compelling governmental interests such as order* and are analyzed using the *Turner* factors). Turner, supra. [30]

---

[30] Several cases have been held to state valid free-exercise claims: See, e.g., McEachin v. McGuinnis, 357 F.3d 197, 203 (2d Cir. 2004) [free exercise claim stated because prison officials placed Muslim inmate on punitive diet during Ramadan and denied *inmate properly blessed food]);* Sutton v. Rasheed*, 323 F.3d 236, 254* [3d Cir. 2003] *(per curiam*) [free exercise claim stated because inmates in special unit denied access to Nation of Islam texts]; Ali v. Dixon, 912 F.2d 86, 90-91 (4th Cir. 1990) [free exercise right of Muslim prisoner violated by prison officials' failure to add legal name change resulting from religious conversion to official record and failure to correspond with inmate under new name]; Eason v. Thaler, 14 F.3d 8, 10 (5th Cir. 1994) [free exercise claim stated because during 25-day prison lockdown Muslim inmate received only 3 nonpork hot meals and subsisted on peanut butter biscuits]; Flagner v. Wilkinson, 241 F.3d 475, 486 (6th Cir. 2001) [free exercise claim stated because prison officials presented only generalized concerns about impact of exempting Orthodox Hasidic Jew prisoner with beard and sidelocks from grooming regulation]; Sasnett v. Litscher, 197 F.3d 290, 292-93 (7th Cir. 1999) [free exercise rights of Protestant inmates violated by prison regulation that allowed inmates to wear cross only when attached to rosary]; Love v. Reed, 216 F.3d 682, 689 (8th Cir. 2000) [free exercise right of self-proclaimed adherent of "Hebrew religion" who derived beliefs from fundamentalist interpretation of Old Testament violated when prison officials refused to provide food on Saturday for consumption on Sunday]; Wares v. Simmons, 392 F.3d 1141, 1144-45 (10th Cir. 2004) [free exercise claim stated when inmate denied access to religious texts]; Hakim v. Hicks, 223 F.3d 1244, 1249 (11th Cir. 2000) [free exercise rights of inmate who legally changed his name to Muslim name violated by prison policy refusing to follow dual-name policy for identification card and related services]; Levitan v. Ashcroft, 281 F.3d 1313, 1322-23 (D.C. Cir. 2002) [free exercise rights violated if rule preventing prisoners from consuming small amounts of wine as part of Catholic sacrament was not reasonably related to penological interest].

A prisoner claiming a violation of his or her right to religious freedom must establish that his or her beliefs are sincere[31] and religious in nature[32]. Based upon the Court's review of the psychiatric reports in the case at bar, and recent letter to the Court (ECF Doc. 83, Letters and

[31] See, e.g., Farid v. Smith, 850 F.2d 917, 926 (2d Cir. 1988) [free exercise rights not violated by confiscation of tarot cards because prisoner did not allege or submit proof that his sincerely held religious beliefs mandated their use]; Sourbeer v. Robinson, 791 F.2d 1094, 1102 (3d Cir. 1986) [free exercise rights not violated by prohibiting inmate in administrative custody from attending worship services because court inferred belief was insincere based on prisoner not attending religious services while in general prison population and not designating a spiritual adviser while in administrative custody]; Dunn v. White, 880 F.2d 1188, 1197-98 (10th Cir. 1989) (per curiam) [free exercise rights not violated by threatening disciplinary segregation for refusal to submit to AIDS test when prisoner objected to test on unspecified religious grounds]. But see, e.g., Ford v. McGinnis, 352 F.3d 582, 590-91 (2d Cir. 2003) [objective evidence in form of testimony of prison religious authorities that prisoner's belief did not comport with requirements of Islam not dispositive if prisoner found to have a sincerely held religious belief]; Reed v. Faulkner, 842 F.2d 960, 963 (7th Cir. 1988) [fact that Rastafarian inmate ate meat and shaved beard, both prohibited by his religion, not conclusive evidence of religious insincerity]; Love v. Reed, 216 F.3d 682, 688 (8th Cir. 2000) [free exercise rights not forfeited due to insincerity merely because inmate still struggling to understand tenets of religious belief system]; Searles v. Dechant, 393 ' F.3d 1126, 1131 (10th Cir. 2004) [free exercise rights implicated by preventing inmate from practice of sincere religious belief though belief was not a core tenet of religion].
[32] See, e.g., Africa v. Pa., 662 F.2d 1025, 1026 (3d Cir. 1981) [though prisoner's beliefs sincerely held, M.O.V.E., described as "revolutionary" organization "absolutely opposed to all that is wrong," not a religion]; Goff v. Graves, 362 F.3d 543, 548 (8th Cir. 2004) ["celebration of life" feast not rooted in Church of the New Song religion because inmates gave conflicting accounts of meaning of the feast and no clear evidence ritual was prescribed by their religion]; Kalka v. Hawk, 215 F.3d 90, 99 (D.C. Cir. 2000) [no constitutional violation when inmate prohibited from forming groups within prison chapels to promote humanism because beliefs found to be rooted in philosophy, not religion]. But see, e.g., Sutton v. Rasheed, 323 F.3d 236, 252-53 (3d Cir. 2003) (per curiam) [because Nation of Islam's central tenets meet "definition of religion," Nation of Islam inmates' sincerely held views are entitled to 1st Amendment protection]; Dettmer v. Landon, 799 F.2d 929, 931-32 (4th Cir. 1986) [church based on witchcraft entitled to same free exercise protection as more conventional religions]; Kaufman v. McCaughtry, 419 F.3d 678, 682 (7th Cir. 2005) [practice of atheism entitled to free exercise protection because it takes position on religion, existence and importance of supreme being, and prisoner's belief was "deeply and sincerely held"]. Although the prisoner must be sincere in his religious beliefs, there is no requirement that the beliefs be held by a majority of the members of the particular religion in order to have free exercise protection. See, e.g., Searles v. Dechant, 393 F.3d 1126, 1131 n.6 (10th Cir. 2004) [prisoner's practice of his sincere religious belief protected though practice not central to religion]; Martinelli v. Dugger, 817 F.2d 1499, 1503-05 (11th Cir. 1987) [prisoner's practice of his sincere religious belief protected though the practice was optional].

Endorsed Memo) there can be no doubt that Dr. Siddiqui meets the requirement of one whose beliefs are both religious and sincere.

The practice of strip-searching as applied to Dr. Siddiqui violates her First Amendment free-exercise rights, and deters her from exercising her Sixth Amendment right to counsel. Respectfully, this Court should put a stop to this practice in the interests of justice and in the interest of the appearance of justice.

### D. BOP's Insistence in Forcing Dr. Siddiqui to Strip Naked and Expose her Private Parts to Other Women Violates her Right to Bodily Privacy

Dr. Siddiqui is a pretrial detainee and not a convicted felon; even convicted felons – which she is not – have a right to bodily privacy. In Fortner v Thomas, 983 F.2d 1024 (1993, 11th Cir), the Eleventh Circuit held that prisoners have a clearly-established right to bodily privacy. (Fortner continues to be cited for this proposition, even in the post "9-11" environment, including recently by the United States Supreme Court in the 2006 case of Beard v Banks, supra.

The Fortner Court wrote:

> As a matter of general principle, it is well established that prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." Bell v. Wolfish, 441 U.S. 520, 545, 99 S. Ct. 1861, 1877, 60 L. Ed. 2d 447 (1979); see also, Turner v. Safley, 482 U.S. 78, 84, 107 S. Ct. 2254, 2259, 96 L. Ed. 2d 64 (1987) [recognizing that prison walls do not separate inmates from their constitutional rights]; Harris v. Thigpen, 941 F.2d at 1512 [same].

While it is also settled that a prisoner's constitutional rights must be exercised with due regard for the "inordinately difficult undertaking" of modern prison administration, Turner, supra, at 85, 107 S. Ct. at 2259; and, Bell v Wolfish, 441 U.S. 520, at 547 (1979) [recognizing that courts must give great deference to the decisions of prison officials relating to the administration of the facility], and that it is settled United States Supreme Court jurisprudence that "this court engages in a deferential review of the administrative decisions of prison

authorities*, the traditional deference does not mean that courts have abdicated their duty to protect those constitutional rights that a prisoner retains*." (Fortner, supra, citing, Sheley v. Dugger, 833 F.2d 1420, 1423 (11th Cir.1987); see also, Procunier, supra, at 405-06, [recognizing that federal courts will discharge their duty to protect constitutional rights when prison regulations or practices offend fundamental constitutional guarantees], overruled on other grounds, Thornburgh v. Abbott, 490 U.S. 401, 413-14, 109 S. Ct. 1874, 1881-82, 104 L. Ed. 2d 459 (1989). (Emphasis added.)

With a concern that justice be done and be seen to be done, this Court can review the facts of this case at bar and make its own determination about the strip-searching policy as applied to Dr. Siddiqui. The Fortner Court provides ample authority for this Court to review the matter and issue an order to BOP requesting that it cease and desist forcing Dr. Siddiqui to strip naked and expose her private parts before she may meet with her attorneys:

> *It is clear that prison inmates "'retain certain fundamental rights of privacy.'"* Harris, 941 F.2d at 1513 (quoting Houchins v. KQED, Inc., 438 U.S. 1, 5 n. 2, 98 S. Ct. [*1030] 2588, 2592 n. 2, 57 L. Ed. 2d 553 (1978) and recognizing that "seropositive prisoners enjoy some significant constitutionally protected privacy interests in preventing the non-consensual disclosure of their HIV-positive diagnosis"]. As stated previously, this court has declined to define the precise parameters of a prisoner's constitutional right to privacy. See generally Harris, 941 F.2d at 1513 n. 26. *Although we continue to approach the scope of the privacy right on a case-by-case basis, we now recognize that prisoners retain a constitutional right to bodily privacy.* (Emphasis added.)

> * * * * *

> [W]e are persuaded to join other circuits in recognizing a prisoner's constitutional right to bodily privacy because most people have '*a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating.*" Lee v. Downs, 641 F.2d 1117, 1119 (4th Cir.1981); see also Covino v. Patrissi, 967 F.2d 73, 78 (2d Cir.1992) [**concluding that "we have little doubt that society is prepared to recognize as reasonable the retention of a limited right of bodily privacy even in the prison context**"]; Sepulveda v. Ramirez, 967 F.2d 1413, 1415 (9th Cir.1992) (recognizing that prison inmates retain the right to bodily privacy); Michenfelder v. Sumner, 860 F.2d 328, 333-34 (9th Cir.1988) [same]. Fortner, supra, 1029-1030. (Emphasis added.)

In Dr. Siddiqui's case she is a Muslim woman who has a not only a special interest, but a *religious <u>mandate</u>* not to expose her genitalia to third parties, as she is forced to do by the strip search required by MDC in order for her to have a non-contact visit with her lawyers before returning to her cell which she, alone, occupies.

Although Dr. Siddiqui is classified as an "Administrative Detention," pretrial detainee, the harsh operation of MDC Program Statement 5521.05 (June 30, 1997) does not serve a legitimate penological purposes in her case. The brief history of Dr. Siddiqui's visits with attorneys at MDC in 2008 were classified as non-contact. Therefore, the stated purpose and scope of Program Statement 552.10 to locate and deter the introduction of contraband into the prison population (<u>see</u>, Edgar Decl., Ex. H), is obviated. Further, Dr. Siddiqui has no contact with other inmates at MDC. She is in a medical cell in the east block (the functional equivalent of "SHU"). She is alone in that cell. In her case, there is no legitimate penological purpose. Administrative detention is not intended to be a punitive classification but here, that is precisely how it is operating against Ms. Siddiqui. <u>See</u> Edgar Decl., Exhibit I, page 1.

The <u>Fortner</u> Court's analysis of similarly-sensitive cases is a voice of moderation against the harsh application of a rule over substance, especially in a case such as the one at bar where (unlike the <u>Fortner</u> plaintiffs) the defendant is not even a convicted felon, has no-contact visits and is alone in her cell:

> In determining the merits of the appellants' claim for injunctive relief against prison officials for alleged violations of their constitutional right to bodily privacy, the district court must apply the standard of review for evaluating prisoners' constitutional claims which the Supreme Court articulated in *Turner*. When a prison regulation or policy 'impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.' *Turner*, 482 U.S. at 89, 107 S. Ct. at 2261. Based on the ruling in *Turner*, this court in *Harris* identified the following four factors governing the reasonableness review of prison regulations:

> (a) whether there is a 'valid, rational connection' between the regulation and a legitimate government interest put forward to justify it; (b) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (c) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates and the allocation of prison resources generally; and (d) *whether the regulation represents an 'exaggerated response' to prison concerns*. *Harris*, 941 F.2d at 1516 (quoting *Turner*, 482 U.S. at 89-91, 107 S. Ct. at 2261-63). We emphasize that the fourth *Turner* factor is not a "least restrictive alternative" test, but rather it allows an inmate to "point to an alternative that fully accommodates the prisoners' rights at *de minimis* cost to valid penological interests" as evidence that a restriction is not reasonable. *Turner*, 482 U.S. at 90-91, 107 S. Ct. at 2262-63.

The strip searches should end because there is no legitimate penological basis for them in these circumstances, they invade Dr. Siddiqui's right to bodily privacy, and they are nothing more than an exaggerated response in the situation.

### E. The Strip Searches Violate Ms. Siddiqui's Fourth Amendment Rights not to be Subject to Unreasonable Search and Seizure.

The strip searches required prior to non-contact visits with her attorneys violate Ms. Siddiqui's fourth amendment right where there is no reasonable suspicion that Ms. Siddiqui is introducing contraband into the prison population where: (1) the history of attorney visits at MDC is one of non-contact visits; and (2) Ms. Siddiqui has never shared a cell with another inmate or had contact with other inmates at MDC. Quite apart from Ms. Siddiqui's religious beliefs forbidding her use of contraband drugs, simply put there is no risk of Ms. Siddiqui actually achieving the goal of smuggling of drugs.

There is ample precedent for finding that the strip searches conducted of Ms. Siddiqui by MDC violate her fourth amendment not to be subject to unreasonable search and seizure.

In Bell v. Wolfish, supra, at 559-60, the Supreme Court was sensitive to the degree to which such searches invade personal privacy of inmates and may prove abusive, stating: "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, **the**

**justification for initiating it**, and the place in which it is conducted." (<u>See</u>, <u>e.g.</u>, <u>Shain v. Ellison</u>, 273 F.3d 56, 65-66 (2d Cir. 2001) [4th Amendment claim stated because inmate has right to be free from strip search absent reasonable suspicion prisoner is carrying contraband or weapons]; <u>Moore v. Carwell</u>, 168 F.3d 234, 237 (5th Cir. 1999) [4th Amendment claim stated because absence of exigent circumstances and availability of alternative searches may have rendered multiple strip and body-cavity searches of prisoner unreasonable]; <u>Cornwell v. Dahlberg</u>, 963 F.2d 912, 916-17 (6th Cir. 1992) [4th Amendment claim stated when male inmate strip searched outdoors in presence of several female correctional officers after prison uprising because not justified by security interest]; <u>Canedy v. Boardman</u>, 16 F.3d 183, 184-86 (7th Cir. 1994) [4th Amendment claim stated when female prison guards routinely allowed to conduct strip searches and observe male inmates in various stages of undress because interest in providing equal employment opportunity for women as prison guards should be weighed against invasion of inmate's privacy interest]; <u>Way v. County of Ventura</u>, 445 F.3d 1157, 1160-62 (9th Cir. 2006) [4th Amendment rights violated by suspicionless strip search with visual body cavity inspection of person arrested on charges of being under influence of controlled substance because intrusiveness was extreme and no link existed between search policy and legitimate security concerns]; <u>Farmer v. Perrill</u>, 288 F.3d 1254, 1259 (10th Cir. 2002) [inmate had an established right not to be subjected to a humiliating strip search in full view of several others unless procedure was reasonably related to a legitimate penological interest]; <u>Evans v. Stephens</u>, 407 F.3d 1272, 1281-82 (11th Cir. 2005) [4th Amendment rights violated when officer, in absence of exigent circumstances, employed unnecessary force and threatening language and per formed unsanitary body cavity search of prisoner in broom closet in front of other prisoner].

Where the strip searches are not based in any realistic suspicion that Dr. Siddiqui will introduce contraband into the MDC population respectfully, this Court should order MDC to cease and desist in enforcing the requirement that Ms. Siddiqui submit to these.

      **F.**     **The Appearance of Justice and Integrity of the Court is at Risk Where the Due-Process Right to a Fair Trial is Damaged Because Dr. Siddiqui is Inhibited and Intimidated not to Communicate with Counsel by the Application of the Strip-Search Regulation.**

Courts have the highest stake in the public perception of how 'justice' is dispensed. Many prisoner cases, starting with Turner, supra, hold that prison regulations burdening the exercise of fundamental rights, such as the First and Fourteenth Amendments, may be analyzed under the "reasonableness" test in which the inquiry may be styled as: Is the burdening regulation one that is designed not for an improper purpose, but to satisfy a legitimate penological interest?  Turner, supra, at 84-85.[33]  But these cases deal with prisoner-to-prisoner,

---

[33] In Turner, the Supreme Court summarized four landmark prisoner-rights cases: "[In] Jones v. North Carolina Prisoners' Union, *433 U.S. 119 (1977)*. . . .the Court considered prison regulations that prohibited meetings of a "prisoners' labor union," inmate solicitation of other inmates to join the union, and bulk mailings concerning the union from outside sources.  Noting that the lower court in *Jones* had "got[ten] off on the wrong foot . . . by not giving appropriate deference to the decisions of prison administrators and appropriate recognition to the peculiar and restrictive circumstances of penal confinement," id*., at 125*, the Court determined that the *First* and *Fourteenth Amendment* rights of prisoners were "barely implicated" by the prohibition on bulk mailings, see id., at 130, and that the regulation was "reasonable" under the circumstances.  The prisoners' constitutional challenge to the union meeting and solicitation restrictions was also rejected, because "the ban on inmate solicitation and group meetings . . . was rationally related to the reasonable, indeed to the central, objectives of prison administration. Id., at 129." The Turner Court continued:

"Bell v. Wolfish, 441 U.S. 520 (1979), concerned a *First Amendment* challenge to a Bureau of Prisons rule restricting inmates' receipt of hardback books unless mailed directly from publishers, book clubs, or bookstores.  The rule was upheld as a "rational response" to a clear security problem.  Id., at 550. Because there was "no evidence" that officials had exaggerated their response to the security problem, the Court held that "the considered judgment of these experts must control in the absence of prohibitions far more sweeping t*han those involved here."* Id., at 551. And in Block v. Rutherford, 468 U.S. 576 (1984), a ban on contact visits was upheld on the ground that "responsible, experienced administrators have determined, in their sound

and/or in-prison or 'in-house' issues, only. The case at bar has a reach far beyond prison walls to both a national and international audience and constituency.

Most prisoner-rights cases today apply to fundamental rights that only impact prisoners within the confines of prison walls. This case is different. This case impacts the Sixth Amendment but, in doing so, in the context of a Muslim woman who refuses to be strip searched, it impacts the stake the Courts have in the public perception of the integrity of the American justice system.

Where a prison regulation burdens an interest that is shared by a third party who is not confined, the evaluation of whether Constitutional interests are burdened should be nothing less than strict scrutiny. The Court, in its role as the administrator and dispenser of justice, and in its role as the defender of the Constitution and fundamental rights under it, is such a third party in this case.

In Procunier v Martinez, 416 U.S. 396 (1973), a Missouri state prison regulation burdened in-person interviews between prisoners *and outside, third parties*, namely paralegals and law students. Id., at 398. In that setting, the United States Supreme Court held that the correspondence regulation could be justified "only if it furthers an important or substantial governmental interest unrelated to the suppression of expression, and the limitation is no greater than necessary or essential to protect that interest." Id., at 413. The Procunier Court strictly scrutinized the burdening regulation. To burden communications with third-party, non-inmates, prison officials must show that the regulation furthers security, order and/or rehabilitation. But, even if it is designed to do so, it may not be acceptable if its sweep is unnecessarily broad. Id.

---

discretion, that such visits will jeopardize the security of the facility," and the regulation was "reasonably related" to these security concerns." Turner, at 86-87

In the case at bar, the scope and the application of the strip-search regulation is unnecessarily broad where the trigger is Ms. Siddiqui's "Administrative Detention" classification which, like a skittle effect, causes her to choose between her First-Amendment rights to freely exercise her faith and her Sixth Amendment right to counsel and, in turn, affects the public perception of the integrity of how justice is being dispensed in this case. The due-process right to a fair trial under US CONST, amend XIV, is nothing more than a farce where the defendant will not meet with counsel due to her First Amendment concerns. As the Supreme Court has noted: Administrative Detention is a "restrictive condition[] *designed to prevent [detainees] from communicating with the general prison population*." Ashcroft, supra.

Cleary the application of the strip-search regulation is a burdening regulation that is an exaggerated response to the situation where Dr. Siddiqui has had only non-contact visits with her attorney at MDC. Beard, supra. There is no legitimate penological purpose here. There are less restrictive ways to handle attorney-client visits – the non-contact requirement takes care of any security concerns. But, even if these visits were contact visits, does the BOP and MDC really believe that Ms. Siddiqui's attorneys who, themselves officers of the Court, will slip her a prison shank or crack cocaine? In addition, as in *Iqbal*, *supra,* it would appear under these *particular* facts that Dr. Siddiqui is being discriminated against because of her race and religion in violation of 42 USC §§ 1983 and 1985 which, properly pleaded, (avoiding the pleading pitfalls of *Iqbal*) could withstand a challenge under F.R.Civ.P 12(b)(6). There is simply no reason to enforce this regulation which burdens so many fundamental rights of Dr. Siddiqui *and* offends societal interests in the legitimacy of the justice system as it is being viewed through the public lens of this case.

For the above reasons stated above, we respectfully request that this Court

issue an order to the Metropolitan Detention Center-Brooklyn, operating under the auspices of the Bureau of Prisons, requesting that it cease and desist the practice of forcing Ms. Siddiqui to submit to a strip search in order to meet with her attorneys to prepare her defense.

## CONCLUSION

Thus, for all the reasons cited above, we respectfully request that the relief sought in the Notice of Motion and any other relief deemed just and appropriate by this Court be in all respects granted.

Yours, etc.<br>
DAWN M. CARDI & ASSOCIATES

/s/
By: _____
    Dawn M. Cardi
    Chad L. Edgar

*Attorneys for Aafia Siddiqui*
Two Park Avenue, 19th Floor
New York, New York 10016
212.481.7770 (tel.)
212.684.3008 (fax)

_____/s/_____
Linda Moreno, Esq.
P.O. Box 10987
Tampa, FL 33697
813.247.4500 (tel.)
813.386.6211 (fax)
*Attorney for Aafia Siddiqui*

_____/s/_____
Charles Swift, Esq.
SWIFT & MCDONALD, P.S.
2003 Western Avenue, #330
Seattle, WA 98121
206.441.3377 (tel.)
206.448.2252 (fax)
*Attorney for Aafia Siddiqui*

_____/s/_____
Elaine Whitfield Sharp, Esq.
196 Atlantic Avenue
Marblehead, MA 01945
781.639.1862 (tel.)
781.639.1771 (fax)
*Attorney for Aafia Siddiqui*