UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA     :

      - v. -       :     08 Cr. 826 (RMB)

AAFIA SIDDIQUI,     :

        Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S *OMNIBUS* PRETRIAL MOTIONS

### REDACTED


**PREET BHARARA**
**United States Attorney for the**
**Southern District of New York,**
**Attorney for the United States of**
**America**


**CHRISTOPHER L. LAVIGNE**
**ERIC B. BRUCE**
**Assistant United States Attorneys**

- Of Counsel -

# TABLE OF CONTENTS

I.     BACKGROUND ........................................................ 1

II.    THE DEFENDANT'S MOTIONS SHOULD BE DENIED
      IN THEIR ENTIRETY ............................................... 7

      A.    The Government Properly Obtained the Attorney General's Certification
           Before Initiating A Prosecution For A Violation of Title 18, United States
           Code, Section 2332(b) In The Indictment ......................... 7

      B.    There Is Extraterritorial Jurisdiction Over Counts Two Through Seven Of
           The Indictment ................................................... 9

      C.    None of The Paragraphs in the Indictment Are Surplusage ............. 14

      D.    None of the Defendant's Statements The Government Intends to Introduce
           Should Be Suppressed ........................................... 16

           1.    The Defendant's Motion to Suppress Statements the Defendant
                Made to Afghan Law Enforcement Should Be Denied .......... 16

           2.    Statements the Defendant Made Immediately Before, During, and
                 After the Shooting Should Not Be Suppressed ................. 22

           3.    The Remaining Grounds For The Suppression Motion Should
                 Be Denied As Moot ....................................... 25

      E.    MDC's Accommodation for No Visual Searches In Connection with
           Attorney, Non-Contact Visits Renders Point V of Defense Counsel's
           Motion Moot .................................................. 26

III.    CONCLUSION ................................................... 30

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

      - v. -          :          08 Cr. 826 (RMB)

AAFIA SIDDIQUI,          :

          Defendant.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S
## RESPONSE TO THE DEFENDANT'S
## *OMNIBUS* PRETRIAL MOTIONS

The Government respectfully submits this response to the defendant's *omnibus*

pretrial motions seeking: (1) dismissal of Count One of the Indictment; (2) dismissal of Counts

Two through Seven of the Indictment; (3) to strike paragraphs One through Four of the

Indictment; (4) the suppression of certain statements the defendant made to Afghan and United

States law enforcement; and (5) an order to the Metropolitan Detention Center ("MDC") to cease

and desist its policy of strip searching the defendant before and after attorney non-contact visits.

For the reasons that follow, this motion should be denied in its entirety.

## I.   BACKGROUND

On the evening of July 17, 2008, Aafia Siddiqui, the defendant, was with a young

boy in the bazaar district of Ghazni, Afghanistan, in the vicinity of the Ghazni Governor's

residence. (Compl. ¶ 4 (b).)[1]  A member of the Afghan National Police ("ANP") began to

---

[1]      Throughout this response, "Compl." refers to the criminal complaint filed in this
case; "Competency Hearing GX [ ]" refers to exhibits submitted in connection with the Court's
competency hearing, held on July 6, 2009; "Competency Order" refers to the Court's July 29,
2009 Order finding the defendant competent to stand trial; "[DATE] Tr." refers to transcripts of

question the defendant in local dialects, and realized that she was a foreigner, who spoke Urdu. (Compl. ¶ 4(b).)

The defendant declined to accept the officers' assistance and indicated, among other things, that she was a foreigner and was looking for her husband. Thereafter, the defendant was searched and numerous items were recovered from her. (Compl. ¶ 4(c).)

These items – which subsequently were provided to United States personnel – were alarming. Among other things, these items included: (1) a computer thumb drive that contained various documents referencing "enemies," including the United States, and discussed recruitment and training; (2) chemicals in gel and liquid form; (3) handwritten notes referencing a "mass casualty attack" and listing various locations in the United States, including Plum Island, the Empire State Building, the Statue of Liberty, Wall Street, and the Brooklyn Bridge; (4) handwritten notes referencing the construction of "dirty bombs," chemical and biological weapons, and other explosives; (5) handwritten notes discussing mortality rates associated with certain of these weapons and explosives; and (6) handwritten notes discussing ways to attack "enemies," including by destroying reconnaissance drones, using underwater bombs, and using gliders. (*See* Comp. Hearing GX D-1 and N (under seal); Compl. ¶ 4(c), (d); Indictment ¶¶ 2-4.)

The Government expects the evidence at trial will show that after retrieving the items, ANP officers attempted to arrest the defendant,

---

proceedings before the court; "Def. Br." refers to the brief filed by defense counsel; "Edgar Decl. Ex. [ ]" refers to exhibits attached to the Edgar Declaration; and "Indictment" refers to the Indictment filed in this case.

The Government also expects the evidence will show that the defendant was taken to an ANP police compound (the "ANP Compound") where she was held until the following afternoon (of July 18, 2008.)

On July 18, 2008, a team of United States personnel traveled to the ANP Compound at which the defendant was being held in order to interview and identify her. (Indictment ¶ 5.) The team of personnel consisted of, among others: (1) a Chief Warrant Officer of the United States Army (the "Warrant Officer"); (2) a Captain of the United States Army (the "Captain"); (3) a Medic with the United States Army; (4) two military interpreters ("Interpreter 1" and "Interpreter 2"); and (5) two FBI Special Agents ("Special Agent 1" and "Special Agent 2") (collectively the "Interview Team"). (Indictment ¶ 5.)

After arriving at the ANP Compound, the Interview Team eventually was directed to a second floor room. The room was partitioned by a yellow curtain, that stretched the length of the room. (Compl. ¶ 5(b).) Unbeknownst to the Interview Team, the defendant was behind the curtain, and was left unsecured. (Compl. ¶5(b); Indictment ¶ 5.) After entering the second floor room and briefly looking behind the curtain, the Warrant Officer placed down a United States Army M-4 rifle next to the curtain. (Compl. ¶5(c).)

Subsequently, the defendant grabbed the M-4 rifle and pointed it directly at the Captain. (Compl. ¶ 5(d).) The defendant stated in English words to the effect of "May the blood

3

of [unintelligble] be directly on your [unintelligible, possible head or hands]" and "get the fuck out of here." (Compl. ¶¶ 5(e), (f).) The Government expects the evidence will show that the defendant then attempted to fire, and fired, the M-4 at the Interview Team, causing Interpreter 1 to lunge at the defendant in order to wrestle the gun from her. (Compl. ¶ 5(f); Indictment ¶¶ 6-14.) During the course of this struggle, the Warrant Officer shot the defendant with his .9 millimeter pistol. (Compl. ¶ 5(f).)

Thereafter, the defendant ferociously struggled with members of the Interview Team, including Special Agent 1 and the Captain who were attempting to subdue her. During these struggles, the defendant repeatedly yelled that she wanted to kill Americans and screamed various epithets, including "Allah Akbar." (Compl. ¶¶ 5(f), (g); Indictment ¶¶ 13-18.)

The Government expects the evidence at trial will show that the Interview Team then removed the defendant from the ANP Compound and brought her to the Forward Operating Base in Ghazni, Afghanistan ("FOB Ghazni") where she immediately was provided medical care. The Government expects that the evidence also will show that the defendant thereafter was transported for surgery to another operating base, and then to Bagram Airbase where she continued to receive medical treatment. The defendant remained at Bagram Airbase from July 19, 2008 until August 4, 2008.

During this two week period, the defendant received medical care and recovered from her gunshot wounds.

On or about July 31, 2008, the Government obtained a criminal complaint sworn out of the United States District Court for the Southern District of New York. The Complaint charged the defendant with two counts: (1) attempting to kill United States officers and employees in violation of Title 18, United States Code, Section 1114; and (2) armed assault of United States officers and employees in violation of Title 18, United States Code, Section 111. On August 4, 2008, the FBI arrested the defendant pursuant to this Complaint, and transported her to the United States District Court for the Southern District of New York. En route to New York, the defendant was advised of her *Miranda* rights and declined to waive them, electing instead to confer with an attorney before conversing with agents about the case. (*See* Competency Hearing GX D at 202.)

------------------------------------------------

Upon arrival in this District on August 5, 2008, the defendant was arraigned on the Complaint and entered a plea of not guilty. On September 2, 2008, a Grand Jury sitting in the Southern District of New York indicted the defendant on the following seven counts relating to the events of July 18, 2008: (1) attempting to kill United States nationals in violation of Title 18, United States Code, Section 2332(b) (Count One); (2) attempting to kill United States officers and employees in violation of Title 18, United States Code, Section 1114 (Count Two); (3) armed assault of United States officers and employees in violation of Title 18, United States Code, Section 111(b) (Count Three); (4) discharging a firearm during a crime of violence in violation of Title 18, United States Code, Section 924(c) (Count Four); and (5) assaulting United States officers and employees in violation of Title 18, United States Code, Section 111(a) (Counts Five through Seven).

On or about October 1, 2008, the Court ordered that the defendant be transferred to the Federal Medical Center in Carswell, Texas for purposes of a mental health evaluation, pursuant to Title 18, United States Code, Section 4241. After extended proceedings in July 6, 2009, the Court held a competency hearing pursuant to Title 18, United States Code, Section 4247(d), to determine whether the defendant is competent to stand trial. In a July 29, 2008 Order, the Court found by a preponderance of the evidence that the defendant is competent to stand trial. (Competency Order at 36.)

On September 8, 2009, defense counsel filed an *omnibus* pretrial motion seeking the relief summarized above.

## II.  THE DEFENDANT'S MOTIONS SHOULD BE DENIED IN THEIR ENTIRETY

As summarized in greater detail below, in its first two requests, the defense seeks dismissal of all Counts in the Indictment on jurisdictional grounds. Inexplicably, however, in each of these two arguments the defense either (1) incorrectly states a fact that is central to their argument, or (2) overlooks a fact that undermines their argument.

The defense's third request – to strike certain paragraphs from the Indictment as surplusage – is both premature and unwarranted; the Court has not yet even ruled on motions *in limine*. The defense also seeks suppression of various statements the defendant made to Afghan law enforcement and to the FBI. The former request can swiftly be denied as the defendant has not even come close to the necessary showing for a hearing – let alone suppression; the latter request is moot as the Government does not intend to offer the challenged statements in its case-in-chief. Likewise, the defendant's final request for an order from the Court directing the Bureau of Prisons ("BOP") to cease and desist from strip searching the defendant before attorney "non-contact" visits is moot. BOP has agreed to stop this practice, subject to various conditions.

### A.  The Government Properly Obtained the Attorney General's Certification Before Initiating A Prosecution For A Violation of Title 18, United States Code, Section 2332(b) In The Indictment.

The defense's first request seeks dismissal of Count One of the Indictment. Count One charges the defendant with violating Title 18, United States Code, Section 2332(b), which makes it a crime for a defendant (outside the United States) to attempt to kill United States nationals. In seeking to dismiss Count One, the defendant argues that the Government failed to comply with Title 18, United States Code, Section 2332(d), which provides that "no prosecution for any offense described in this section shall be undertaken by the United States except on

written certification of the Attorney General . . . that in the judgment of the certifying official, such offense was intended to coerce, intimidate, or retaliate against a government or civilian population." Indeed, over the course of nine pages in their brief, the defense argues that "[t]he prosecutors in this case adhered to neither the statutory mandate of 2332(d) nor formal DOJ procedures, and therefore exceeded their authority." (Def. Br. at 10). There is, however, a fatal flaw in defense counsel's argument. They have their facts completely wrong.

As an initial matter, at defense counsel's request, the Government provided to the defense a copy of then Attorney General Michael B. Mukasey's signed, September 2, 2009 certification that "the attempt by Aafia Siddiqui to murder United States nationals outside the United States, namely in Afghanistan, was intended to coerce, intimidate, or retaliate against a government or civilian population." (Edgar Decl. Ex. G.) This certification was obtained before the Grand Jury returned its Indictment. Despite this fact, the defense nonetheless contends that Count One should be dismissed because "prosecution of the defendant under § 2332(b) was undertaken on July 31, 2008 the day of the filing of [the complaint]" and *the complaint charg[ed] the defendant with [a] violation of § 2332(b)."* (Def. Br. at 6) (emphasis added.)

The facts presented by the defense to the Court are clearly and demonstrably incorrect. While the defendant initially was charged in a criminal complaint, contrary to defense counsel's representations, the Complaint did *not* charge the defendant with violating § 2332(b). Rather, as summarized above (and as even a cursory review of the Complaint attached at Edgar Decl. Ex. D would reveal), the Complaint charged the defendant in two counts: (1) violating Title 18, United States Code, Section 1114; and (2) violating Title 18, United States Code, Section 111. (Compl. ¶¶ 1, 2.) The necessary Attorney General certification was obtained before the defendant was charged – in the *indictment* – with a violation of Title 18, United States Code,

Section 2332(b).

Because Point I of the defense motion is premised on incorrect facts – *i.e.* that the Government charged Title 18, United States Code, Section 2332(b) in the Complaint without obtaining the necessary authorization – it should be summarily denied.

## B.  There Is Extraterritorial Jurisdiction Over Counts Two Through Seven Of The Indictment.

In Point II of their motion, the defense argues that Counts Two through Seven of the Indictment should be dismissed because the statutes charged in those Counts (18 U.S.C. §§ 111, 924(c), and 1114) should not apply extraterritorially in this case. Yet, as a threshold matter, the defense is forced to concede that "the Federal Court's [*sic*] that have consider [*sic*] the question of § 1114 scope have to date found it to be extraterritorial." (Def. Br. at 13.)

Indeed, the power of Congress to penalize extraterritorial conduct is clear. *See EEOC* v. *Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991); *United States* v. *Evans*, 667 F. Supp. 974, 980 (S.D.N.Y. 1987) (citations omitted ). Whether a particular statute has extraterritorial application is a question of congressional intent. And, as even the defense is forced to concede, all three courts that have directly considered this question with respect to Section 1114 – the Eleventh Circuit and two judges of this Court – have held that Congress intended Section 1114 to have extraterritorial application. *See United States* v. *Benitez*, 741 F.2d 1312, 1317 (11th Cir. 1984) ("[W]e hold that assault and attempted murder of DEA agents [by foreign nationals in Colombia, in violation of 18 U.S.C. §§ 111 and 1114] is exactly the type of crime that Congress must have intended to apply extraterritorially."); *United States* v. *Bin Laden*, 92 F. Supp. 2d 189, 202-203 (S.D.N.Y. 2000) (same as to Section 1114); *United States* v. *Al Kassar*, 582 F. Supp.2d

488, 497 (S.D.N.Y. 2008) (same as to Section 1114).[3]

In *Bin Laden*, where the defendants were charged with violations of Section 1114, *inter alia*, in connection with their roles in the 1998 bombings of the U.S. embassies in Kenya and Tanzania, Judge Sand concluded that "the offense described by Section 1114 is 'exactly the type of crime that Congress must have intended to apply extraterritorially' – irrespective of the nationality of the offender." *United States* v. *Bin Laden*, 92 F. Supp. 2d at 202 (quoting *United States* v. *Benitez*, 741 F.2d at 1317). Judge Sand reasoned that three factors supported the extraterritorial application of Section 1114: (1) the statute "is explicitly intended to protect vital United States interests;" (2) a "significant number" of U.S. officers and employees perform their official duties in foreign countries, and (3) foreign nationals therefore have at least the same level of opportunity as U.S. nationals to kill or attempt to kill U.S. officers and employees. *Id.* Thus, Judge Sand clearly held that "Congress intended [18 U.S.C. § 1114] . . . to reach conduct by foreign nationals on foreign soil." *Id.* at 198.

Similarly, in *Al Kassar*, the United States prosecuted three defendants for, *inter alia*, conspiring to violate Section 1114 by selling surface-to-air missiles to DEA confidential sources that the defendants believed were members of the FARC, an international terrorist organization based in Colombia. Specifically, Al Kassar told one of the confidential sources that "certain of the weapons he agreed to sell to the FARC would be good for attacking United States military helicopters in Colombia." *See United States* v. *Al Kassar*, S3 07 Cr. 354 (JSR),

_____

[3]     *See also United States* v. *Felix-Gutierrez*, 940 F.2d 1200, 1204-06 (9th Cir. 1991) (where defendant was charged with being an accessory after the fact to the murder of a DEA Agent in Colombia, the Court held that "[w]e think it clear that Congress intended to apply statutes proscribing the kidnaping and murder of DEA agents [by foreign nationals] extraterritorially.").

10

indictment at ¶ 11.t, available at www.usdoj.gov/dea/pubs/pressrel/pr061308_attach.pdf. In response to Al Kassar's challenge that Section 1114 should not apply extraterritorially, Judge Rakoff held that the presumption against extraterritorial application of U.S. statutes "does not apply 'to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself.'" *United States* v. *Al Kassar*, 582 F. Supp.2d at 497 (*quoting United States* v. *Bowman*, 260 U.S. 94, 98-99 (1922)). Judge Rakoff further held that "'[s]tatutes prohibiting crimes against the United States government may be applied extraterritorially even in the absence of "clear evidence" that Congress so intended.'" *Id.* (*quoting United States* v. *Gatlin*, 216 F.3d 207, 211 (2d Cir. 2000)).

Defense counsel attempt to distinguish the relevant holdings on two grounds. First, the defense argues that these holdings "do not extend to members of the uniformed services deployed in a war zone." (Def. Br. at 14.) The defense, however, cites no direct authority for this novel proposition. Moreover, in advancing this argument over seven pages of their brief, the defense overlooks a critical fact that eviscerates their argument – specifically, that two FBI employees were among Ms. Siddiqui's intended victims and one of them was directly assaulted by Ms. Siddiqui.[4] Contrary to the defense argument, this important fact puts this case squarely within the holdings in *Benitez*, *Bin Laden*, and *Al Kassar*.[5]

---

[4]     The defense are clearly aware that two FBI employees were a part of the U.S. interview team on July 18, 2008, as evidenced by references to this fact in later portions of their brief. (*See, e.g.,* Def.'s Br. at 20) (referring to the U.S. interview team as including "U.S. military, contract interpreters, and agents of the FBI."). Yet this critical fact is mentioned *nowhere* within Point II of their brief.

[5]     Defense counsel also overlooks the fact that the defendant did not assault and attack uniformed services members of the Interview Team on the battlefield; she attempted to kill

Second, the defense also tries to distinguish the relevant holdings by pointing to the 1996 Amendment to Section 1114, in which the words "(including any member of the uniformed services)" were added to the statute. Of course, it makes no sense why the inclusion of these words by Congress would be seen to make the statute less expansive than it previously was. Our soldiers primarily face danger when they are deployed overseas, and the plain language of this statute would protect them from murderous ambushes on those missions. Moreover, the extraterritorial application of Section 1114 to soldiers in a war zone is in accord with at least two recognized bases for the exercise of extraterritorial jurisdiction. Specifically, exercising extraterritorial jurisdiction in this case is warranted under "the 'protective principle,' which provides for jurisdiction over acts committed outside the State that harm the State's interests [and] the 'passive personality principle,' which provides for jurisdiction over acts that harm a State's citizens abroad." *United States* v. *Yousef*, 327 F.3d 56, 91 n. 24 (2d Cir. 2003); *see also United States* v. *Benitez*, 741 F.2d 1312, 1316 (11th Cir. 1984) (exercising extraterritorial jurisdiction over the attempted murder of two DEA agents under both the protective principle and the passive personality principle). Applying these principles here, there can be little debate that armed ambushes of U.S. soldiers "harm the State's interests," and no question that the United States is entitled to protect its citizens from attempted murder.

In addition, the defense theory – that the 1996 Amendments to Section 1114 somehow restricted the extraterritorial reach of that statute – is belied by the reasoning of Judge Rakoff's decision in *Al Kassar* and Judge Sand's decision in *Bin Laden*, both of which post-date the 1996 Amendments. In *Bin Laden*, for example, Judge Sand noted that in the 1996

---

them in the confines of the ANP Compound, moments before they were about to interview her.

Amendments Congress "replaced the 'lengthy list of federal employees' with the following broad, inclusive language: 'any officer or employee of the United States' and 'any person assisting such an officer or employee.'" *United States* v. *Bin Laden*, 92 F. Supp. 2d at 203. Similarly, in *Al Kassar*, where the Government alleged that the defendants knew that their weapons would be used to shoot down U.S. military helicopters, Judge Rakoff also reviewed the current version of the statute and held that "[i]t is beyond question that the United States Government has a strong and legitimate interest in protecting its officers and employees performing official duties abroad." *United States* v. *Al Kassar*, 582 F. Supp.2d at 497. Judge Sand and Judge Rakoff therefore correctly viewed the revised statute as Congress' attempt to *expand* the reach of the statute, not contract it.

And, finally, it is black-letter law that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U.S. 353, 382 n. 66 (1982). Thus, in this case, Congress is deemed to have been aware of the 1984 *Benitez* decision (holding that Section 1114 applies extraterritorially) at the time it passed the 1996 Amendments to Section 1114. Accordingly, if Congress had actually wanted to restrict the extraterritorial reach of the newly-added language – *i.e.*, the statute's application to "any member of the uniformed services" – it could have and would have done so. Because Congress knew that the courts had applied Section 1114 extraterritorially and added language regarding members of the armed services without any territorial qualification, it is presumed that this language also applies extraterritorially. *United States* v. *Felix-Gutierrez*, 940 F.2d 1200, 1204 (9th Cir. 1991) ("Courts look to congressional intent, express or implied, to determine whether a given statute should have extraterritorial application.").

For all of the foregoing reasons, the Court should deny the defense motion and find that Sections 1114 and 111 apply extraterritorially to the offense conduct in this case. In addition, the offense charged in Count Four (a § 924(c) violation) also applies extraterritorially where the base offense applies extraterritorially. *See United States* v. *Yousef*, 327 F.3d at 87-88; *United States* v. *Lindh*, 212 F. Supp. 2d 541, 580 (E.D.Va. 2002)(an extraterritorial violation of 18 U.S.C. § 2339B is a crime of violence to which a Section 924(c) use of a firearms count can attach); *United States* v. *Khan*, 309 F. Supp. 2d 789, 823 (E.D.V.A., 2004).

### C.  None of The Paragraphs in the Indictment Are Surplusage

In point III of its motion, defense counsel seeks to strike paragraphs One through Four of the Indictment as surplusage. Although Federal Rule of Criminal Procedure 7(d) allows a court to strike "surplusage" from an indictment, such motions "will be granted only where the challenged allegations are not relevant to the crime charged *and* are inflammatory and prejudicial." *United States* v. *Mulder*, 273 F.3d 91, 99-100 (2d Cir. 2001) (quoting *United States* v. *Scarpa*, 913 F.2d 993, 1013 (2d Cir.1990) (emphasis added)). "'If evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken.'" *Scarpa*, 913 F.2d at 1013 (quoting *United States* v. *DePalma*, 461 F. Supp. 778, 797 (S.D.N.Y.1978)).

Moreover, as Judge Sand has observed: "[a]lthough the Federal Rules of Criminal Procedure grant the Court authority to strike surplusage from an indictment . . . , [i]t has long been the policy of courts within the Southern District to refrain from tampering with indictments." *Bin Laden*, 91 F. Supp. 2d at 621 (citations omitted); *see also United States* v. *Chen*, No. 05 Cr. 938 (DAB), 2007 WL 2244213, at *7 (S.D.N.Y. Aug. 1, 2007); *United States* v. *Stein*, 429 F. Supp. 2d 633, 646 (S.D.N.Y. 2006); *United States* v. *Sattar*, 314 F. Supp. 2d 279,

320 (S.D.N.Y. 2004); *United States* v. *Jimenez*, 824 F. Supp. 351, 369 (S.D.N.Y. 1993). Given that standards for striking surplusage are "exacting," *Scarpa*, 913 F.2d at 1013 (internal quotation marks omitted), "only rarely is alleged surplusage stricken from an indictment." *United States* v. *Gotti*, 42 F. Supp.2d 252, 292 (S.D.N.Y. 1999) (internal quotation marks omitted).

The defendant has not met this exacting standard. As an initial matter, it is premature to address this motion, before the Court has even seen the Government's evidence. "The defendant may renew [the] motion after the presentation of the government's case if it fails to offer proof of [the indictment's allegations.]" *See United States* v. *Scarpa*, 913 F.2d at 1011 (quoting district court's adoption of this procedural approach to surplusage motion). There is no risk of unfair prejudice to the defendant by such an approach because the challenged portions of the Indictment will not be read to the jury until after the evidentiary portion of the trial has ended. In addition, the Government intends to move *in limine* regarding the admissibility of certain of the information referenced in paragraphs One through Four of the Indictment. The Government submits that this information is: (1) admissible as direct evidence of certain elements of the crimes with which the defendant is charged; and (2) (in the alternative) admissible under Federal Rule of Evidence 404(b), or as permissible background evidence. Accordingly, prior to a ruling on whether the evidence supporting this information is admissible, the Court need not consider whether paragraphs of the indictment should be stricken as surplusage. *Cf. United States* v. *Scarpa*, 913 F.2d at 1013. In fact, in the event the Court finds this information and evidence admissible or not admissible, it will obviate the need to address Point III of the defendant's motion.[6]

---

[6]     As noted above, the Government intends to move *in limine* on September 28, 2009 regarding the admissibility of much of the evidence and information underlying paragraphs

**D.** **None of the Defendant's Statements The Government Intends to Introduce Should Be Suppressed**

---

One through Four of the Indictment. In the event the Court wishes to address Point III of defense counsel's motion on the merits, however, the Government requests the opportunity to submit briefing regarding the relevance and admissibility of this information.

### 2. Statements the Defendant Made Immediately Before, During, and After the Shooting Should Not Be Suppressed

As reflected in the Complaint, the defendant made a number of statements in the presence of United States personnel immediately before and after the July 18, 2008 shooting. Upon obtaining the Warrant Officer's rifle, for example, the defendant made a number of comments, including "May the blood of [unintelligible] be on your [unintelligible, possibly head or hands]," and various other epithets, including "Allah Akbar," and "Get the fuck out of here." After the defendant was shot, she struggled with United States authorities who subdued her, and repeatedly made anti-American statements, including her desire to kill Americans, as well as requests to let her die.

The defendant's motion purports to seek suppression of "all statements that defendant Aafia Siddiqui made to Afghanistan and United States authorities while in their custody." (Def. Br. at ii.) The accompanying memorandum of law offers no argument as to why the statements referenced above should be suppressed. Given the lack of argument relating to these points, the Government submits the defendant has failed to make the necessary showing for suppression. *See Indiviglio* v. *United States*, 612 F.2d 624, 630 (2d Cir. 1979); *United States* v. *Caiello*, 420 F.2d 471, 474 (2d Cir. 1969) (holding that the defendant's statements were not suppressed as "the defendant had not discharged his burden" of showing that suppression was warranted); *cf. Frank* v. *United States*, 78 F.3d 815, 833 (2d Cir. 1996) ("Issues not sufficiently argued are in general deemed waived and will not be considered on appeal.").

22

In addition, as with the grounds for suppression discussed above, there is no accompanying affidavit from the defendant to create a factual dispute regarding these statements. *See United States* v. *Gillette*, 383 F.2d 843, 848-49 (2d Cir. 1967); *United States* v. *Hemingway*, No. 05-Cr-6108, 2007 WL 499470, at * 9 (W.D.N.Y. February 13, 2007); *United States* v. *Malizia*, No. 99 Cr. 207, 2000 WL 193129 at *3 (S.D.N.Y. Feb. 16, 2000); *United States* v. *Amparo*, No. 87 Cr. 753, 1988 WL, 25186,(S.D.N.Y. Mar. 3, 1988); *United States* v. *Kornblau*, 586 F. Supp. 614, 621 (S.D.N.Y. 1984).

Regardless, any suggestion that these statements should be suppressed is meritless. Defense counsel does not suggest that these statements – made in the presence of the Interview Team – were elicited through torture. Nor does counsel argue that these statements were made in violation of *Miranda*. Any such argument would be frivolous, however, as the *Miranda* protections apply only where the suspect is both in custody and "subjected to questioning" by persons the suspect knows are acting on behalf of the state. *Miranda* v. *Arizona*, 384 U.S. 436, 478 (1966); *see also id.* ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.") *United States* v. *Compton*, 428 F.2d 18, 22 (2d Cir. 1970) ("spontaneous utterance" made by defendant when taken into custody, prior to administration of *Miranda* warnings, admissible because not the result of police interrogation).

Indeed, where there has been no interrogation, the suspect's statements are admissible, even if the suspect was in custody when he made the statements. *See Miranda*, 446 U.S. 291, 300, 302-03 (1980) ("Interrogation, as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.") (internal quotation omitted); *Pennsylvania* v. *Muniz*, 496 U.S. 582, 603-04 (1990) (*Miranda* does not

require suppression of spontaneous incriminating utterances); *United States* v. *Colon*, 835 F.2d 27, 30 (2d Cir. 1987) (no interrogation where defendant was "not questioned, confronted with evidence, or even encouraged to be honest and tell the facts"); *Wolfrath* v. *LaVallee*, 576 F.2d 965, 973 n.6 (2d Cir. 1978) ("[S]ince the statement which was litigated below was a gratuitously volunteered statement, *Miranda* itself is inapplicable, for spontaneous statements which are not the result of 'official interrogation' have never been subject to its strictures."); *United States* v. *Vigo*, 487 F.2d 295, 299 (2d Cir. 1973) (holding that defendant's statements were admissible notwithstanding failure fully to apprise of *Miranda* where "the statements were made immediately after [the defendant]'s arrest, at the scene of the arrest and before any systematic inquiry was begun by the arresting agents. None of the inherently compelling factors of station-house interrogation were present.").[8]

Here, it is beyond dispute that statements made by the defendant immediately before and after the shooting at the ANP Compound were spontaneous. The defendant picked up a gun, stated her intentions, and tried to shoot her way out of the ANP Compound. Unfazed after being disarmed, the defendant struggled with members of the Interview Team, repeatedly

---

[8]    In other contexts, the Second Circuit has taken a broad interpretation of this exception to *Miranda,* finding statements to have been spontaneously made even during the course of conversations between law enforcement agents and defendants. *See, e.g., United States* v. *Rommy,* 506 F.3d 108, 133 (2d Cir. 2007) ("[W]here a person in custody volunteers incriminating information to the police, simple clarifying questions do not necessarily constitute interrogation."); *United States* v. *Gelzer,* 50 F.3d 1133, 1138 (2d Cir. 1995) (police officer's quip that arrest likely disrupted robbery defendant's New Year's Eve plans was not the functional equivalent of interrogation, and thus defendant's response, "[w]e're amateurs, not professionals," was admissible as a volunteered statement); *United States* v. *Montana,* 958 F.2d 516, 519 (2d Cir. 1992) (agent's response to defendant's unsolicited comment did not constitute interrogation, although it led to subsequent inculpatory statements by defendant); *United States* v. *Guido,* 704 F.2d 675, 677 (2d Cir. 1983) (holding that defendant's statements made after law enforcement agents responded to his questions about the charges were admissible; agents did not engage in interrogation notwithstanding their suggestion that he cooperate).

24

expressing her hatred of the United States.  Accordingly, none of these statements should be suppressed.

     **3.**       **The Remaining Grounds For The Suppression Motion Should Be Denied As Moot**

**E.** **MDC's Accommodation for No Visual Searches In Connection with Attorney, Non-Contact Visits Renders Point V of Defense Counsel's Motion Moot**

Point V of the defendant's motion seeks an Order from this Court declaring MDC's policies of conducting visual searches of the defendant before and after attorney "non-contact" visits to be unconstitutional. Defense counsel argues that these visual searches violate the defendant's First, Fourth, and Sixth Amendment rights, as well as the defendant's privacy rights. In deciding whether a particular condition of pretrial detention is unconstitutional, the court must determine whether the condition is imposed to punish or, rather, whether it is imposed to serve and is reasonably related to a legitimate governmental objective. *See United States v. McTier*, No. 05 Cr. 401 (ILG), 2006 WL 2707622, at *2 (E.D.N.Y. July 20, 2006) (citing *Bell* v. *Wolfish*, 441 U.S. 520, 538 (1979)). In addition, the court must determine whether the government's legitimate interest in maintaining order and security justifies the condition and thereby negates any inference that it is intended as punishment. *See McTier*, 2006 WL 2707622, at *2 (citing *Bell*, 441 U.S. at 540).

---

In making these determinations, prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *See McTier*, 2006 WL 2707622, at *2 (citing *Bell*, 441 U.S. at 521); *see also Sandin* v. *Conner*, 515 U.S. 472, 482 (1995) (federal courts should "afford appropriate deference and flexibility to state officials trying to manage a volatile [prison] environment"); *United States* v. *Cohen*, 796 F.2d 20, 22 (2d Cir. 1986) ("Security is the main objective of prison administration; prison officials must have broad latitude to adopt rules that protect the safety of inmates and corrections personnel and prevent escape or unlawful entry."). Such considerations are peculiarly within the province and professional expertise of corrections officials. In the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment. *See McTier*, 2006 WL 2707622, at *2 (citing *Bell*, 441 U.S. at 547-48).

As the Government informed the Court in its September 14, 2009 letter, it has diligently worked with the MDC to obviate the need for Court intervention on this issue. By way of background, the defendant resides in the segregated housing unit ("SHU") which, according to Bureau of Prisons policy, requires that she be visually searched upon admission (or movement) into the SHU. (*See* Bureau of Prisons Program Statement P5270.07.) As a result, after engaging in "non-contact" visits with her attorneys outside the SHU, the defendant is subject to visual searches.

Counsel's motion challenges this visual search policy in connection with attorney, non-contact visits, and the Court directed the parties and the MDC to discuss possible alternatives. (9/2/09 Tr. at 27.) After extensive discussions, on September 11, 2009, the MDC

27

agreed to accommodate defense counsel's general concerns regarding visual searches in connection with attorney, "non-contact" visits. The MDC agreed that attorney "non-contact" visits could occur without visually searching the defendant, subject to the following general conditions: (1) the attorney non-contact meetings (the "meetings") will take place with the attorneys outside the defendant's cell and the defendant inside her cell; (2) the meetings will be visually monitored, though MDC staff will not listen to any communications between the defendant and counsel; (3) no materials may be passed to the defendant during these meetings, though items may be shown to the defendant through the window of her cell; and (4) any inmates housed in the vicinity of the defendant's cell will be removed from their cells during the meetings to ensure attorney-client privacy. This accommodation took into account the unique facts and circumstances of the defendant's case, including the defendant's religious practices and the fact that she is one of the few female inmates on the SHU.[10]

The Government communicated this accommodation to defense counsel by letter (sent via email) on September 11, 2009 (attached as Exhibit A to the Government's September 14, 2009 letter to the Court). The Government informed counsel that it viewed this accommodation as rendering the issues raised in Point V of their *omnibus* pretrial motions moot. The Government's letter also informed counsel that they should contact the Government by noon (EST) on Monday if they disagreed or had other concerns. Otherwise, the Government stated that it would advise the Court that issues raised in Point V of counsel's *omnibus* pretrial motions

---

[10] It also should be noted that while the defendant was incarcerated at the Federal Medical Center in Carswell, Texas, she had visits with her brother and the Pakistani consulate without incident, notwithstanding the fact that she was subject to visual searches in connection with those visits. (*See* Competency Hearing GX B at 33.) Thus, in her evaluation of the defendant, Dr. Johnson concluded that the defendant was not refusing to see her lawyers because of the visual search requirement; rather, it was a volitional decision on the defendant's part. (*Id.*)

are moot. After informing the Court of MDC's accommodation and the Government's view that this issue was moot, defense counsel sent the Government a letter stating that it would not withdraw its motion. Defense counsel had a number of follow-up questions regarding MDC's proposal. The Government has relayed these questions to the MDC and is in the processing trying to resolve any outstanding issues that have been raised.

Although defense counsel indicated that it is proceeding with its motion, the Government still views the issues raised in Point V of their motion as moot. A case becomes moot when it no longer satisfies the "case-or-controversy" requirement of Article III, Section 2 of the Constitution. *See Spencer* v. *Kemna*, 523 U.S. 1, 7, 118 S. Ct. 978 (1998). In order to satisfy the case-or-controversy requirement, a party must, at all stages of the litigation, have an actual injury that is likely to be redressed by a favorable judicial decision. *Id.*

Where intervening events preclude the Court's ability to redress the original injury, there is no case or controversy. *See United States* v. *Quattrone*, 402 F.3d 304, 308 (2d Cir. 2005) ("Ordinarily, if an event occurs during the course of the proceedings or on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, we must dismiss the case.") (internal quotation omitted); *Irish Gay and Lesbian Organization* v. *Giuliani*, 143 F.3d 638, 647 (2d Cir. 1998) ("A case becomes moot when interim relief or events have eradicated the effects of the defendant's act or omission, and there is no reasonable expectation that the alleged violation will recur."); *Tawwab* v. *Metz*, 554 F.2d 22, 24 (2d Cir. 1977) (claim for injunctive relief against prison was moot where prison changed its challenged policy after the institution of the lawsuit).

Given MDC's accommodation, the defendant's "actual injury" alleged in her motion – requiring her to submit to visual searches before and after attorney "non-contact" visits

-- is no more. The MDC has removed this requirement. The Government is unaware of whether defense counsel has conducted any attorney non-contact visit since the MDC made this accommodation and encountered any difficulties therewith. Regardless, in the event MDC's accommodation implicates other constitutional concerns from counsel, those concerns can be addressed in a subsequent motion to which the Government will respond. The MDC and the Government also will work with defense counsel to try and cure any problems regarding this accommodation that arise during attorney-client meetings. Right now, however, MDC has changed its practice for the defendant and her lawyers, such that the factual predicate for defense counsel's motion no longer exists. Accordingly, Point V of the defendant's motion is moot.

## III.   CONCLUSION

For all of the foregoing reasons, the defendant's *omnibus* pretrial motions should be denied in their entirety.

Dated:  New York, New York

September 15, 2009

Respectfully submitted,

PREET BHARARA
United States Attorney

By:  _____/s/_____
CHRISTOPHER L. LAVIGNE
ERIC B. BRUCE
Assistant United States Attorneys
(212) 637-2325/2219