**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
UNITED STATES OF AMERICA,

                              Government,                    **ORDER**

          -against-                                         08 **CR.** 826 (RMB)

AAFIA SIDDIQUI,

                              Defendant.
----------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/08/09

          The attached documents are being filed on the public docket as they are referenced

in the Court's Order dated July 29, 2009 ("Competency Order").  The forensic evaluations relied

upon by the Court in its Competency Order were previously placed on the public docket.


Dated: New York, New York
          December 8, 2009




                                        RMB
                              RICHARD M. BERMAN, U.S.D.J.

*Govt Exhibit F*
*08 cr 826*

Siddiqui Aafia #90279-054.txt
SIDDIQUI is selective about whom she speaks with and is able
to initiate communication and respond to staff in a coherent,
rational, logical, and goal-directed manner.

Gov+ Exhibit F
08cr826

Ms. SIDDIQUI does not exhibit any of the major symptoms characteristic of psychotic illness, such as disorganized speech, grossly disorganized or catatonic behavior, or a delusional system. On the contrary, Ms. SIDDIQUI's speech and thought processes are coherent, logical, rational, well organized, and goal-directed. Even when angry and emotionally upset, her speech has been focused and free of formal thought disorder characteristics such as derailment, loosening of associations, flight of ideas, or a tangential quality.

Gov't Exhibit F
08cr826

~~_____ and practices.~~
DIAGNOSIS:
AXIS I: Major Depressive Disorder with Mood Congruent
Psychotic Features

Govt Exhibit D
08 cr 826

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of _____Aafia Siddiqui_____ , On _07/21/2008_ , Page _2_


      SIDDIQUI asked                             what sentence
would one receive if they were accused of attempted murder.

Govt Exhibit D
08cr826

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of _____ Aafia Siddiqui _____ , On 07/21/2008 , Page ___3___

        SIDDIQUI repeated that she did not shoot anyone, and that she was the one who had been shot.

Govt Exhibit D
08 cr 826

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___AAFIA SIDDIQUI_____ , On _07/22/2008_ , Page __7__

᛫ SIDDIQUI asked
hypothetically what one would be charged with if they were involved
in an incident in which a gun went off and shot some people in the
legs, but then the person <u>wrongly</u> accused of shooting the gun ended
up being shot themselves.

Gov't Exhibit D
08cr 826

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of     AAFIA SIDDIQUI _____ , On 08/01/2008 __ , Page ___ 6

        SIDDIQUI expressed gratitude that her belongings were now
in the hands of the United States because she does not consider the
U.S. corrupt.  As she was expressing gratitude for how she has been
treated while in custody, she made the following voluntary
statement:

        "Spewing bullets at soldiers is bad", but "you" have
still taken care of me and treated me well.  SIDDIQUI continued
that she was surprised that the United States would take such good
care of her under the circumstances.



Gov+ Exhibit K-1
08cr926

16    SIDDIQUI:        The case is not difficult.  Honestly!

T000000008

Gov't Exhibit K-1

08cr826

 **TORRES**

You need to trust me here with the lawyers that I bring. They may not all be Pakistanis but …

122.   **Afia:** I am sorry. I am not going to talk to the lawyer if they are non-Muslims. I just had it. I am sorry.

T000000045

Gov't Exhibit F
08 cr 826

_____ , she was appropriately guarded when discussing any subjects she considered sensitive to her current charges and legal situation. Ms. SIDDIQUI answered these questions by indicating she would like to wait until she is able to speak with her attorney.

Ms. SIDDIQUI's primary concerns centered around being able to access legal representation. She expressed concerns that the reality of the circumstances surrounding the incident leading to her arrest is being distorted and lies are being told about her.

Gov't Exhibit I
08cr826

**Other:**

that she might consider them at some point if her lawyer gives her the go-ahead. She declines ant-depressants, but states

MED000000292

Govt Exhibit I
08 cr 826

### AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

I will only sign if the Pak.
Embassy is informed that
my concerns are ①. My son Ahmad is
immediately released from where is
custody he is in and set back to
I strip searching in order to call my family to meet with anyone of our family ② The prison stops their plying
a neutral outside female Muslim doctor in ③ have my current attorneys are removed from my

| Signature of Patient | Date | Staff Witness |
|---|---|---|
| ④ my family provided security from the Pak. they are receiving from various agencies | | case and the or team of muslim - possibly other Pakistani attorneys talk to me and take over my care - They should call somehow |

**FAX SIGNATURE VALID ORIGINAL**

**SPECIFIC AUTHORIZATION FOR RELEASE OF INFORMATION PROTECTED BY STATE OR FEDERAL LAW**
Must sign below, to release protected information.

and if they come to meet, they should make sure I am not strip searched in I cannot go thru the rejourney dehumani process through

I specifically authorize the release of data and information relating to:

___ 1. Substance Abuse          ___ 2. Mental Health          ___ 3. HIV

_____          _____
Signature                                              Date

I may be health comes after all this.

Deliver Records To: (Institution Address & Fax Number)

Thank you.
P.S. I am thus being denied access to the outside world except all through my current attorneys, who I want removed immediately PLEASE.

She refused to sign
Atto AttSA
8/27/08  1430 Hrs

Govt Exhibit K-1
08cr 826



**TORRES**
*Advanced Enterprise Solutions*

99.   **Afia:**                                                                    ▸Elaine is too expensive. I know she said that I should retain instead of Liz.

*Linguist Certification: Linguist certifies that the above summary accurately represents the issues discussed in the referenced phone conversation as identified by the above file name.*

T000000031

Gov't Exhibit 14

08cr826

| Aasia: | Let her know that if I am proven competent, the only thing I want to be proven competent is to fire her. |

T000000052

08cr826

## In The Matter Of:

*USA   v.*
*SIDDIQUI*

---

*CAMIELLE KEMPKE*
*July 1, 2009*

---

*FINK & CARNEY REPORTING AND VIDEO SERVICES*
*39 WEST 37TH STREET*
*NEW YORK, NY  USA  10018*
*(212) 869-1500   or   (800) 692-3465*

Original File LAM07019.TXT, 247 Pages
Min-U-Script® File ID: 0034586280

## Word Index included with this Min-U-Script®

Defendant
Exhibit
DX 7

Page 1

[1]
[2] UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
[3]
[4] UNITED STATES OF AMERICA,
[5]        Plaintiff,
                              Index No.
[6]    -against-          08CR.826(RMB)
[7] AAFIA SIDDIQUI,
[8]        Defendant.
[9]
[10]
           July 1, 2009
[11]       2:17 p.m.
[12]
[13] Deposition of CAMIELLE KEMPKE, Ph.D., taken by
[14] Defendant, at 1 St. Andrew's Plaza, New York,
[15] New York, before Linda A. Marino, Registered
[16] Professional Reporter, Certified Court
[17] Reporter, and Notary Public within and for the
[18] State of New York.
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 2

[1]
[2] Appearances:
[3]
[4]    U.S. ATTORNEY'S OFFICE
       SOUTHERN DISTRICT OF NEW YORK
[5]       Attorneys for Plaintiff
          1 St. Andrew's Plaza
[6]       New York, New York 10007
[7]    BY:  CHRISTOPHER LAVIGNE,
             ASSISTANT U.S. ATTORNEY
[8]
[9]
[10]
       DAWN M. CARDI & ASSOCIATES
[11]      Attorneys for Defendant
          2 Park Avenue - 19th Floor
[12]      New York, New York 10016
[13]   BY:  DAWN M. CARDI, ESQ.
            CHAD EDGAR, ESQ.
[14]
[15]
[16]
     Also Present:
[17]
[18]   JOSE SANTOS, Videographer
[19]   CARLY WEINREB, Paralegal to Mr. Lavigne
[20]
[21]
[22]
[23]
[24]
[25]

Page 3

[1]              **C. KEMPKE**
[2]    THE VIDEOGRAPHER: We're now
[3] going on the record. The time is 2:18
[4] p.m. on July 1, 2009. This is the
[5] videotape deposition of Camille Kempke,
[6] M.D., in the matter of the United States
[7] versus Aafia Siddiqui, under the
[8] jurisdiction of the United States
[9] District Court, Southern District of New
[10] York.
[11]    This deposition is being held at
[12] 1 St. Andrew's, New York New, York. My
[13] name is Jose Santos and I'm the video
[14] specialist, the court reporter is Linda
[15] Marino, and we both represent Fink &
[16] Carney Reporting.
[17]    May I have an introduction from
[18] counsel?
[19]    **MS. CARDI:** My name is Dawn
[20] Cardi, and I represent Dr. Siddiqui.
[21] Beside me is my colleague Chad Edgar,
[22] another attorney.
[23]    This is the deposition of Dr.
[24] Camielle Kempke. We have waived our
[25] client's appearance today because she

Page 4

[1]              **C. KEMPKE**
[2] does not want to attend the deposition
[3] and because she has had extremely
[4] upsetting reactions to her having to be
[5] strip searched in order to come. So, we
[6] decided that, given that it's a
[7] competence hearing, that we would waive
[8] her presence for today.
[9]    And...
[10]    **MR. LAVIGNE:** Chris Lavigne on
[11] behalf of the Government, Assistant
[12] United States Attorney. With me at
[13] counsel table is Carli Weinreb.
[14]    And we're here per the Court's
[15] Order to take the deposition of Dr.
[16] Kempke. This was done at the Court's
[17] suggestion.
[18]    And my understanding is Ms.
[19] Siddiqui was unwilling to attend the
[20] deposition, as counsel indicated, and
[21] waived her appearance.
[22]    THE VIDEOGRAPHER: Will the court
[23] reporter please swear in the witness?
[24]
[25] CAMIELLE KEMPKE, having been

Page 5

[1]                          C. KEMPKE
[2] first duly sworn by a Notary Public of
[3] the State of New York (Linda A. Marino),
[4] was examined and testified as follows:
[5]                      EXAMINATION
[6]                    BY MS. CARDI:
[7]     Q: Good afternoon, Dr. Kempke.
[8] What is your educational
[9] background?
[10]     A: I have a bachelor's in biological
[11] sciences from Michigan Technological
[12] University, 1975; M.D. from University of
[13] Michigan in 1978; I completed an internship at
[14] Reading Hospital and Medical Center in 1979;
[15] and then went to Johns Hopkins psychiatry
[16] residency from 1993 through 1996.
[17]     Q: Okay.
[18] And are you board certified in
[19] psychiatry?
[20]     A: I've been board certified in
[21] psychiatry since 1998.
[22]     I just recently renewed my board
[23] certification, in the spring of 2008.
[24]     Q: Okay.
[25] Also, your CV says you're board

Page 6

[1]                          C. KEMPKE
[2] certified in neurology.
[3]     Is that a different subsection or
[4] is that part of psychiatry?
[5]     A: Yes, the Board is actually listed
[6] as the Board of Psychiatry and Neurology.
[7]     We set — the psychiatrists
[8] certify under one section of that and the
[9] neurologists under a separate. So, I'm not —
[10] while we do test on 25 percent of neurology on
[11] our boarding exam, we do not — I do not
[12] practice neurology.
[13]     Q: And, Dr. Kempke, tell me what
[14] your employment history has been since...
[15]     A: Since retaining my psychiatry
[16] residency will probably be the easiest to
[17] discuss.
[18]     I first returned to my children's
[19] hometown in Michigan's upper peninsula, where
[20] I worked with a community and mental health
[21] center there seeing chronically and mentally
[22] ill patients. Added more outpatient general
[23] practice of psychiatry to that in 1999 — no,
[24] excuse me, 1998, when I went to work for
[25] Marquette General Hospital so that I could get

Page 7

[1]                          C. KEMPKE
[2] extra hours. I continued my work
[3] subcontracting to the community mental health
[4] system because I covered some fire areas.
[5]     Left that job to get a — with
[6] Marquette General to work in a private
[7] practice of my own, doing — again, continuing
[8] the subcontracting work with the community and
[9] mental health. That became financially
[10] unfeasible.
[11]     And I worked first locum tenens
[12] and then employed for the Community Mental
[13] Health Center, three hours' drive away on the
[14] southern portion of Michigan's upper peninsula
[15] in Manoname, Michigan. Left that employment
[16] when I developed the breast cancer.
[17]     Went to Texas to be with a
[18] different man, and began working there for
[19] first locum tenens intermittently for the
[20] Dallas County Jail as a psychiatrist for the
[21] jail system. I worked for several months up
[22] at North Texas State Hospital, which is the
[23] forensic hospital for the State of Texas. I
[24] worked on them — dually diagnosed mentally
[25] ill and mentally retarded unit.

Page 8

[1]                          C. KEMPKE
[2]     Returned back to the Dallas
[3] County Jail as a full-time employee of
[4] Parkland. They had changed providers for the
[5] — from the UMTB — UTMB, University of Texas
[6] Medical Branch had been providing it when I
[7] was working locums at Dallas County, and when
[8] I returned it was under Parkland.
[9]     Then found the job available at
[10] FMC Carswell and began at FMC Carswell with
[11] the Bureau of Prisons in February 2008, and I
[12] have been working there since that time.
[13]     Q: All right.
[14] What's your experience in
[15] diagnosing individuals with psychosis and/or
[16] delusional disorders?
[17]     A: That's basically my bread and
[18] butter since 1993.
[19]     At Hopkins, we spent our first
[20] eight — our first twelve months on the
[21] inpatient unit covering all chronically and
[22] severely mentally ill patients.
[23]     I spent an additional six units
[24] on the inpatient child unit, three months on
[25] — six months on the inpatient child unit,

USA v.
SIDDIQUI

CAMILLE KEMPKE
July 1, 2009

Page 9

**C. KEMPKE**

[1]
[2] three months on the day hospital for that
[3] program, and had to do three months of
[4] neurology for that training as well.
[5]     Since that time, then, I've
[6] continued in the practice of chronically
[7] mentally ill treatment.
[8]     I had some experience working in
[9] the emergency rooms prior to that, of course,
[10] with contact with mentally ill people in
[11] difficult situations because of — from having
[12] worked ER from 1970 — no, 1980 until 1991 or
[13] '93, when I went back to residency.
[14]     **Q:** Okay.
[15] So, can you estimate how many
[16] patients you've diagnosed with psychosis
[17] and/or delusional disorders over the course of
[18] that time?
[19]     **A:** Psychotic disorders probably
[20] number in about two thousand range.
[21]     **Q:** Okay.
[22] Do you know if your experience in
[23] diagnosing individuals with psychotic disorder
[24] differs at all from Dr. Powers' experience?
[25]     **A:** My understanding is that her

Page 10

**C. KEMPKE**

[1]
[2] graduation from her program was in 2005. And
[3] since that time and during that time, given
[4] what I see of her work load, I don't think
[5] it's possible for her to have achieved that
[6] number of patients, but I don't know her
[7] specific totals.
[8]     **Q:** Okay.
[9] Now, there came a time when you
[10] first met with Dr. Siddiqui.
[11]     Correct?
[12]     **A:** Yes, ma'am.
[13]     **Q:** Can you tell me, what was your
[14] experience and describe for us how you
[15] diagnosed her, the basis of your diagnosis,
[16] and your treatment of Dr. Siddiqui during the
[17] course of her stay at Carswell?
[18]     **A:** When Ms. Siddiqui first arrived
[19] at the facility, she was described to us as
[20] being quite medically ill and quite upset and
[21] distressed. She had — we had very little
[22] information from MDC Brooklyn, which is not
[23] uncommon. That's very difficult until we
[24] developed our electronic medical record for us
[25] to be able to have that rapidly.

Page 11

**C. KEMPKE**

[1]
[2]     When she arrived, she was placed
[3] in the medical seclusion unit. And the next
[4] day, Friday, I saw her in that unit. I was —
[5] actually happened to be present with her while
[6] Dr. Lorenzi did the evaluation physically to
[7] be sure that she was healthy enough to stay
[8] there, and particularly remember Ms. Siddiqui
[9] asking me to turn my back while Dr. Lorenzi
[10] examined her abdominal wound, for privacy and
[11] modesty's sake.
[12]     Then when Dr. Lorenzi was done
[13] with the examination, she left the room, and I
[14] sat with Ms. Siddiqui for some approximately
[15] hour to talk to her and try to understand what
[16] was going on with her status. She at that
[17] time was quite tangential, confused,
[18] disorganized in her thinking processes.
[19]     And the specifics, I would have
[20] to defer to my evaluation.
[21]     **Q:** Is there something that might
[22] refresh your recollection, Dr. Kempke?
[23]     **A:** There should be a note dated for
[24] 10/3 of '08.
[25]     **Q:** Okay.

Page 12

**C. KEMPKE**

[1]
[2]     **A:** It's a six-page note.
[3]     **Q:** I'm going to refer to —
[4]     **MS. CARDI:** What exhibit is
[5] this?
[6]     **MR. EDGAR:** E, Government Exhibit
[7] E.
[8]     **Q:** — Government Exhibit E, and it's
[9] Bates Stamp No. MED 46, 47, 48, 49, 50, — I
[10] just want to make sure — 51.
[11]     I'm going to show you this.
[12] Do you recognize that?
[13]     **A:** Yes.
[14] This is my psych eval put in
[15] backwards order, so, just a moment, let me —
[16]     **Q:** Sorry.
[17]     **A:** That's okay. I can manage to get
[18] it in the right order. All right.
[19]     **Q:** So, that refreshes your
[20] recollection?
[21]     **A:** This is my — these are the notes
[22] that I took during that time.
[23]     And I quoted from the patient —
[24]
[25]

Page 13

**C. KEMPKE**

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 14

**C. KEMPKE**

[1]
[2]
[3]   **Q:** The question will be: What is
[4]  the basis of your initial diagnosis of Dr.
[5]  Siddiqui?
[6]   **A:** Dr. Siddiqui was obviously very
[7]  distressed, very concerned about her children
[8]  and an event which had happened at MDC
[9]  Brooklyn, which we eventually came to
[10]  understand was the use of force team.
[11]   She also felt that she had
[12]  difficulties with her memory, with
[13]  understanding where she was, and that she was
[14]  experiencing — hearing or seeing her babies
[15]  in extremis, particularly her baby boy, and
[16]  having difficulties.
[17]   We discussed some of her medical
[18]  history, very briefly touched on the fact that
[19]  she did have an abdominal wound. Dr. Lorenzi
[20]  had indicated to me that had been well healed
[21]  and was no longer a particular concern.
[22]   Ms. Siddiqui did ask me at that
[23]  time about my religion, and I did reply to her
[24]  that I was Christian in an attempt to build
[25]  rapport with the patient by being open and

Page 15

**C. KEMPKE**

[2]  honest about my traits so that she would know
[3]  whether or not she could choose to decide if
[4]  she wanted to trust me, but that I was not
[5]  going to hide my religion from her.
[6]   At that time, because of the
[7]  distress, disorganization of her thought
[8]  processes, tangential speaking, my working
[9]  diagnosis for the medical side, because she
[10]  was at this time in a medical bed, was that
[11]  she was having difficulties with psychosis.
[12]   Though I did not know the
[13]  etiology of the psychosis, it could have been
[14]  as a result of a mental illness, delirium,
[15]  trauma, just plain disorganization which
[16]  occurs when any patient arrives at our
[17]  facility, which is a pretty confusing process.
[18]   **Q:** So, Dr. Kempke, the notes that
[19]  you made on that day in this exhibit were your
[20]  observations in regard to Dr. Siddiqui when
[21]  you met her.
[22]   Correct?
[23]   **A:** Yes, ma'am.
[24]   **Q:** And you have written on the side
[25]  of M-E — MED note 51 some notes there which I

Page 16

**C. KEMPKE**

[2]  cannot read.
[3]   Can you tell me what you wrote
[4]  there?
[5]   **A:** I have the advantage of having a
[6]  better copy that I've already — of my own
[7]  that I've already looked at.
[8]   So, what I can tell you: Only
[9]  two people were mean. The people who killed
[10]  me with the videos, I can't ever — means I
[11]  can't ever go back home. I'm having poor
[12]  concentration. My baby can fly but he doesn't
[13]  grow. Maybe it's because I am not nursing
[14]  him.
[15]   **Q:** The symptoms that you describe in
[16]  this note — I believe there's a page where —
[17]  let me see. Here it is.
[18]   When you talk about tangential
[19]  thinking, what do you mean by that?
[20]   **A:** One of the reasons that that is
[21]  an unusual note for me is that I had written
[22]  it in all quotes because it was so difficult
[23]  to make a coherent story of what she was
[24]  telling me.
[25]   In ordinary people, I would be

**C. KEMPKE**

[1]
[2] able to start with: When did these symptoms
[3] start? What happened? When did they get
[4] better?
[5]      But with her, it was a series of
[6] non — apparently to me nonrelated concerns,
[7] questions, statements, that she spontaneously
[8] brought out with or without prompting of any
[9] questions. Some of them were clearly in
[10] response about her questions when I asked her,
[11] because I did not understand at that time any
[12] of the issues surrounding her children, so I
[13] was pretty confused about her baby flying.
[14] And then she described that people didn't
[15] believe her, so that she — nobody believed
[16] her about what had happened to her children.
[17]      So, clearly, I had asked her
[18] something to clarify the issues about her
[19] children when she described that for me.
[20]      So, that's what I mean by
[21] tangentiality; apparently random mix of
[22] statements which don't flow into a coherent
[23] story.
[24]      **Q:** How long do you think you spent
[25] with her that initial — for that initial

**C. KEMPKE**

[1]
[2] examination?
[3]      **A:** 45 minutes to an hour, given the
[4] times that I was writing that.
[5]      My workday is over at 1600, and I
[6] have times of 1833, I believe, on that note.
[7]      **Q:** So, that meant that you spent
[8] additional time with her.
[9]      Is that what —
[10]      **A:** No.
[11] I spent extra time writing. It
[12] probably takes me as much time to write it as
[13] it does to talk to her, although the quotes
[14] would have been as I was speaking to her
[15] because of the difficulty with that tangential
[16] thinking and not being able to get it. And I
[17] tend to not trust my memory over a period of
[18] time, so I tend to write that history of
[19] present illness portion of that as I'm talking
[20] to the patient.
[21]      **Q:** So, when you say here: In my
[22] opinion is that there's a 99 percent certainty
[23] she's psychotic. It's not clear what the
[24] etiology is, so the differential diagnosis
[25] includes all of the causes of psychosis with

**C. KEMPKE**

[1]
[2] the possible exception of substance abuse.
[3]      What did you mean?
[4] What did you base that on? I'm
[5] sorry.
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]      **A:** The psychosis is a symptom. It's
[17] like having a fever; you could have a fever
[18] because you've got appendicitis, you could
[19] have a fever because you've got strep throat.
[20]      In this situation, psychosis is a
[21] psychiatric symptom. And, so, when people are
[22] psychotic, it's crucial — and one of the
[23] first things learned in psychiatry is that you
[24] determine that the patient is not having a
[25] delirium, a problem with metabolic,

**C. KEMPKE**

[1]
[2] infectious, central nervous system disorders
[3] that may be causing a psychosis. That means
[4] it's a more important person to be taking care
[5] of.
[6]      In this particular instance,
[7] there's a big importance upon the fact that it
[8] was Friday. Friday at 2:30 in the afternoon
[9] is the last time I can get any laboratory work
[10] done at FMC Carswell until the following
[11] Monday at 7 a.m.
[12]      In a person that is potentially
[13] delirious, I didn't want them in a place where
[14] they could not be evaluated rapidly. It was
[15] not an option, due to her security status, to
[16] have her seen at the local emergency room.
[17] Nor did it seem justified; she was not
[18] appearing febrile, she didn't appear to have
[19] urinary tract infection. So, it was not
[20] necessary to go through a serious manpower
[21] problem of transporting her there.
[22]      But if something were to happen
[23] to her as a result of, for example, a head
[24] injury and becoming unconscious, the M3 unit
[25] would have been a very inappropriate place for

Page 21

**C. KEMPKE**

[1]
[2] her. That unit requires at least fifteen
[3] minutes to get to an inmate who, quote, goes
[4] down, meaning would become unconscious and
[5] come to the attention of somebody.
[6]    That requires — that unit
[7] requires three keys and three separate people
[8] plus a lieutenant to be able to be there. You
[9] need an outside door key to get into the
[10] sallyport; that key is carried by the M2 unit
[11] officer. Once you're in the sallyport, you
[12] need the M3 officer to open that second door.
[13] And then a third person needs to go open
[14] the inpatient — inmate's door.
[15]    So, when I put down that I
[16] thought the patient was having psychosis, this
[17] was my medical attempt to make it clear to the
[18] treating staff on medicine that over the
[19] weekend it would be inappropriate to put the
[20] patient on the M3 seclusion unit.
[21]    **Q:** Okay.
[22] Did you — in retrospect, now
[23] looking at it, do you think she was suffering
[24] from psychosis at the time that you saw her?
[25]    **A:** At that time, very probably.

Page 22

**C. KEMPKE**

[1]
[2] It may — at this point, I
[3] probably would have said that was an
[4] adjustment psychosis at that time, making the
[5] diagnosis of major depression with psychotic
[6] features and adjustment disorder.
[7]    The major depression resolved
[8] over time.
[9]    **Q:** Can you describe for us your
[10] relationship, your professional relationship,
[11] with Dr. Siddiqui thereafter her initial
[12] admission?
[13]    **A:** At the time that Ms. Siddiqui was
[14] admitted to our facility, I was required to
[15] see that — each patient admitted to the unit
[16] once every month; that provided — she was
[17] admitted to an inpatient psychiatric unit, as
[18] all study cases are, coming to the Female
[19] Medical Center at Carswell. And in order to
[20] fulfill the policies and procedures of FMC
[21] Carswell, I needed to see her and write a note
[22] once a month.
[23]    **Q:** Okay.
[24] How often did you see Dr.
[25] Siddiqui then?

Page 23

**C. KEMPKE**

[1]
[2]    **A:** It averaged at once a month.
[3] I'm afraid that one time when I
[4] saw her on the — twice in April, I waited
[5] until the beginning of June to see her. So, I
[6] actually didn't see her in the month of May
[7] itself.
[8]    **Q:** And can you describe for us how
[9] long you spent with Dr. Siddiqui when you did
[10] see her?
[11]    **A:** One month — one time, in
[12] reviewing my notes, it looks like there was
[13] one time when I spent about five minutes at
[14] the door. But other than that, each time that
[15] I spoke to her was a minimum of half an hour
[16] to more often an hour and I think there was
[17] once when it was even an hour and a half.
[18]    **Q:** So, did you have any difficulty
[19] in terms of Dr. Siddiqui — withdrawn.
[20]
[21]
[22]
[23]
[24]
[25]

Page 24

**C. KEMPKE**

[1]
[2]
[3]
[4]    **Q:** When you entered the room, when
[5] you met with Dr. Siddiqui, did she speak with
[6] you?
[7]    **A:** Ms. Siddiqui usually came to my
[8] room because of our policies at the facility
[9] that we usually prefer not to enter inmates'
[10] rooms.
[11]    **Q:** Okay.
[12]    **A:** So, she would come to — we have
[13] a little — we call it my office, but it's
[14] actually an office supply room, so, I get to
[15] play with the papers. And it has the chart
[16] thinnings, which is important for some
[17] inmates.
[18]    But I have all my notes — to
[19] take paper notes in that little office.
[20] And, so, she would come and talk to me there,
[21] except on one occasion when she requested to
[22] see me in my — my real office on the second
[23] floor, where my computer is.
[24]    And, so, that note also on the —
[25] put on the BEMR so that — again, I've talked

Page 25

**C. KEMPKE**

[1]
[2] a little bit about this BEMR, which is our
[3] Bureau Electronic Medical Record. And if I
[4] could put it on there, other facilities will
[5] be able to have access to that note. So, that
[6] made an advantage there.
[7]     Right now, we do not have a
[8] computer in my office supply office, although
[9] I saw when I was there Tuesday that it's in
[10] the box; I'll get it eventually.
[11]     **Q:** That's great.
[12] Tell us about how you treated Dr.
[13] Siddiqui, what your continued diagnosis was
[14] over the course of her time at Carswell, and
[15] the basis for that diagnosis.
[16]     **A:** Originally, we continued the
[17] citalopram, antidepressant, which Dr. McLean
[18] had ordered at MDC Carswell, as well as — I
[19] believe she had been prescribed a medication
[20] by Dr. Lorenzi to try to stop the menorrhagia
[21] that she had.
[22]     She arrived on our unit. I
[23] believe Dr. Powers or Dr. Cherry's note was
[24] that she arrived at our unit on the eighth.
[25] It took a while, apparently, for everybody to

Page 26

**C. KEMPKE**

[1]
[2] agree that she was stable to come. And
[3] usually there's some issues with the officer
[4] or with Corrections.
[5]     But as I recall, there was also a
[6] concern about whether we needed to have her on
[7] a secluded unit or not. And because of my
[8] concern that she had the major depression with
[9] psychosis, as well as a background concern
[10] about the absence of her children and the
[11] possibility that post traumatic stress
[12] disorder would play a part in any diagnosis
[13] that she had, I requested that she be placed
[14] on the usual — well, it's not unlocked.
[15]     M1 is our usual inpatient unit
[16] that all of the 41B — 4241B studies are
[17] admitted to. That's a lot more freedom and
[18] allows people to move around, take their own
[19] showers, when they wish to have significantly
[20] larger amount of personal property, such as
[21] towels, sheets, pillow cases, a pillow that
[22] would not have been available if she was in
[23] the more restricted unit, the M3 unit.
[24]
[25]

Page 27

**C. KEMPKE**

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]     **Q:** What is your most recent
[15] diagnosis of Dr. Siddiqui?
[16]     **A:** She has a psychotic disorder of
[17] the paranoid type. I would call it paranoid
[18] schizophrenia.
[19]     The differential diagnosis
[20] between that and Dr. Kucharski's diagnosis of
[21] delusional disorder is lost on me. The
[22] difference between those two are pretty big.
[23]     **Q:** And what's the basis of your
[24] diagnosis, your present diagnosis?
[25]     **A:** In re — I'm going to go back

Page 28

**C. KEMPKE**

[1]
[2] here to review a little bit of prior history
[3] which came out later from the reports that Dr.
[4] Johnson and Dr. Kucharski had, because these
[5] are portions of that that I consider to be
[6] prodromal of a paranoid schizophrenia.
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]     **Q:** Give us the basis for your
[23] diagnosis of — as you just described your
[24] diagnosis of Dr. Siddiqui.
[25]     What was the basis of that

Page 29

**C. KEMPKE**

[1]
[2] diagnosis?
[3]    What were her symptoms? What
[4] were your clinical impressions?
[5]    **A:** The symptoms that I had when she
[6] was there was that she had ongoing concerns
[7] about being killed, about the results of the
[8] trial, about the potential for damage to her
[9] children, and the risk to others who were kind
[10] to her.
[11]    **Q:** When?
[12]    **A:** This was — it's progressed
[13] during the time that she was in FMC Carswell.
[14]    At the beginning, she did
[15] describe difficulties with worrying about what
[16] was going to happen to her children.
[17]    These progressed to asking me if
[18] I knew what was happening — what had happened
[19] to her children. Because if she knew
[20] specifically that her daughter was dead or
[21] that her daughter was alive, she would be able
[22] to talk more freely because she would no
[23] longer worry that her statements would be
[24] returned to whoever was holding them and make
[25] it impossible for her daughter and the other

Page 30

**C. KEMPKE**

[1]
[2] son to be released to her.
[3]    Her food started off with an
[4] incident, with feeling that her fish had been
[5] poisoned. She, in my opinion, exaggerated
[6] some of her symptoms about that. She had some
[7] kind of a stomachache; may have been
[8] significant or not, but did not appear to me,
[9] as former — working former ER that I would
[10] have worried that she had appendicitis. She
[11] wasn't having any of those kind of acute
[12] symptoms.
[13]    From the fish being poisoned,
[14] there was a lot of difficulties with the
[15] religious fare, the common fare diet, the
[16] religious authorities, and who could arrange
[17] for that diet. It took a period of time to
[18] come to a compromise — and a period of time,
[19] I mean about three to five days — to come to
[20] the compromise that she would go down to the
[21] cafeteria with the officer of the unit only
[22] and there be allowed to choose her common fare
[23] tray. And I'm not even sure — I believe that
[24] the tray actually comes in a box.
[25]    From that point, she began to

Page 31

**C. KEMPKE**

[1]
[2] feel — fear that she did not — was at risk
[3] for being poisoned in the cafeteria and began
[4] to refuse to go to the cafeteria on several
[5] occasions.
[6]    She then described that she was
[7] getting her calories from commissary food, and
[8] most recently had described that she was
[9] having — well, the next to the last one that
[10] I — time that I saw her, I believe, she
[11] described that she was having difficulties
[12] with any food from the commissary that would
[13] be opened and left opened in her locker
[14] because somebody could contaminate it while
[15] the food was open.
[16]    The last visit, she indicated
[17] that in addition to all of that she could no
[18] longer trust that the fish was not
[19] contaminated since that was the first thing
[20] that had been contaminated when she arrived.
[21] So, there was a progression of paranoia about
[22] her food to restricting more and more.
[23]    Originally, she took medication.
[24] She took a few of the tablets for the vaginal
[25] bleeding because Dr. Lorenzi had said she

Page 32

**C. KEMPKE**

[1]
[2] should. She then began to refuse the
[3] medication, stating that it could be switched
[4] by a malevolent person for another drug, could
[5] be contaminated, and eventually got to the
[6] point where she told me that even if I were
[7] personally to open a sealed vial and use a
[8] syringe that there was no way I could
[9] guarantee her to the point of me being able to
[10] give her medication that it had not been
[11] contaminated with the intent of killing her.
[12]    That was particularly important
[13] at the last visit when I was asking her about
[14] whether she would take any medication because
[15] of my fear that if she was found incompetent
[16] she might be set back for competency
[17] restoration. And she made it very clear that
[18] she would not voluntarily take any medication
[19] at that time.
[20]    **Q:** Were there other examples of
[21] paranoia that you observed in Dr. Siddiqui
[22] over the time period she was at Carswell?
[23]    **A:** When Dr. Siddiqui originally
[24] arrived, she did not seem to have any
[25] complaints about any of the officers at our

Page 33

**C. KEMPKE**

[1]
[2] facility. It had been about the officers
[3] involved in the use of force, whom she
[4] referred to as the dark angels.
[5]    At that time, when she arrived
[6] and described them as the dark angels, she
[7] seemed very confused about whether God
[8] actually was sending angels to take her to
[9] some version — Islamic version of hell or if
[10] it might have been something else. So, at
[11] first — it wasn't until our Lieutenant Jones,
[12] a female lieutenant, was able to describe them
[13] as being the use of force team that we
[14] suddenly realized that blue people — people
[15] in blue and black clothes with the big black
[16] mask was the use of force team because we have
[17] the same uniforms for our use of force team.
[18]    From that point, at some later
[19] point she began to describe that she did not
[20] want to be involved with anybody from the
[21] court. Particularly, this became important
[22] around her attorney and rapidly involved her
[23] quitting talking to Dr. Powers because Dr.
[24] Powers was part of the Court.
[25]    I had assured her that I would

Page 34

**C. KEMPKE**

[1]
[2] not be writing a report for the Court. So, to
[3] some extent, my being here today is against
[4] Dr. Siddiqui's specific wishes that anybody —
[5] that she did not want to talk to anybody who
[6] would report to the Court any — because she
[7] felt not only was it dangerous for her but she
[8] began later — again, another step further,
[9] the progression of paranoia, that it would be
[10] dangerous for me; that not only my job, but my
[11] life and my reputation, which seemed to be
[12] more important to her, would be at stake, that
[13] the international community would be so
[14] offended by my talking and treating her.
[15]    She began also, then, later after
[16] that —
[17] **Q:** Let me just interrupt you.
[18] So, you found this as more of her
[19] paranoia?
[20] **A:** An expansion of the paranoid
[21] ideation.
[22]    Originally, it was just around
[23] her, it expanded to include me, and then it
[24] began to include other members of the — both
[25] inmate and staff at Carswell.

Page 35

**C. KEMPKE**

[1]
[2]    She clearly trusted Black people
[3] and Hispanics specifically, and she told me
[4] that was because they had physiognomy that was
[5] much different from Jewish people but that
[6] Caucasians could be Jewish and not look at it
[7] — look like it, but that God had given her a
[8] special ability to determine the physiognomy
[9] of a Jewish person without having to —
[10] without having them actually declare
[11] themselves as Jewish. So, she would speak to
[12] the Hispanic inmates and the Black inmates.
[13]    An unfortunate incident occurred
[14] in which a Spanish language article about her
[15] appeared on the unit. We tried to keep any of
[16] those off of the unit. It just seemed sort of
[17] funny to me because about a third of our
[18] inmates are Hispanic and if not — amongst
[19] that group, most of them will speak English as
[20] well, but there's a third of the people, it
[21] seems, a quarter to a third of the people at
[22] any given time. And at the time that this
[23] happened, both of our INAs, Inmate Nurse
[24] Assistants, were Hispanic.
[25]    So, this article had appeared on

Page 36

**C. KEMPKE**

[1]
[2] the unit, and she felt that it was a ploy of
[3] the powers that — she usually refers to the
[4] Zionist powers, and I'm — that's my word.
[5] I'm not using it as her word because she
[6] tended to use they, and that is difficult for
[7] me to keep using that term — but the Zionist
[8] powers had planted that on the unit in order
[9] to make the Hispanic people also her enemies.
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]    **Q:** The question is describe for us
[19] other examples that you saw of her paranoia.
[20]    **A:** So, Susie is a very
[21] impressionable young lady and also disliked by
[22] the other inmates because she's — she's just
[23] a very sad sack and she does some very stupid
[24] things and she gets herself in trouble.
[25]    Susie sat at a lunch counter —

Page 37

**C. KEMPKE**

[1]
[2] table with Ms. Siddiqui against Ms. Siddiqui's
[3] request, according to Ms. Siddiqui; became
[4] friends with her.
[5]     Susie eventually decided she
[6] wanted to become Muslim. Susie cannot read
[7] well. She reads at about a third grade
[8] level. And when I asked Chaplain Ford about
[9] the incident, it appeared — Chaplain Ford
[10] agreed that they had requested that Susie talk
[11] to Ms. Siddiqui about the Muslim prayers and
[12] how to say them, how to properly be a Muslim.
[13]     Ms. Siddiqui felt that in order
[14] to practice being a good Muslim, she needed to
[15] teach her the prayers in a private area or at
[16] least an area not frequented by other
[17] inmates. And since they cannot visit room to
[18] room, they went to the laundry room to pray.
[19] And that was —
[20]     **Q:** How is this an example of her
[21] paranoia?
[22]     **A:** Well, eventually, she was
[23] requested to stop doing that. And she was
[24] afraid that Susie was going to be harmed by
[25] being Muslim.

Page 38

**C. KEMPKE**

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]     **A:** Ms. Siddiqui told me that she was
[10] afraid that Susie's association with her —
[11] because Susie quite rapidly got herself in
[12] trouble and went over to the seclusion unit.
[13] And she was afraid that Susie was going to be
[14] poisoned over there because of her association
[15] with Ms. Siddiqui.
[16]     Ms. Siddiqui then began to
[17] describe to me that inmates who went to the
[18] seclusion unit had been sent — she believed
[19] had been sent to the seclusion unit because
[20] they had become friendly with Ms. Siddiqui.
[21]     She then also described that one
[22] of the inmates who left — and we have a hard
[23] time getting the marshals to pick up our
[24] inmates on time, so they will leave at rather
[25] abrupt times. Plus, we're not allowed to tell

Page 39

**C. KEMPKE**

[1]
[2] anybody when they're leaving or —
[3] theoretically.
[4]     So, an inmate left. Ms. Siddiqui
[5] said she was sent away because: Her only
[6] purpose in being here was to get close to me
[7] and she made me laugh the day before she
[8] left.
[9]     So, I have an ongoing progression
[10] of her paranoia to involve not only her own
[11] safety and — but those of others. And it
[12] includes not only the Government, but people,
[13] inmates, being sent to spy on her.
[14]     She was afraid that if she left
[15] her cell — which is actually an old hospital
[16] room, so it's not quite a cell — she told me
[17] that she was afraid that she would be one of
[18] these paid people or one of these spies — and
[19] she never said that they were paid — one of
[20] these other inmates might intentionally get
[21] her into an altercation which would involve
[22] her being disciplined by being sent to the
[23] seclusion unit where she would be poisoned
[24] because she would have access only to the food
[25] that was given to her through the SHU slot.

Page 40

**C. KEMPKE**

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]     **Q:** Did you see this behavior, these
[12] symptoms that you just described, as examples
[13] of Ms. Siddiqui malingering?
[14]     **A:** No.
[15]     **Q:** Why not?
[16]     **A:** First of all, the stories were
[17] consistent and progressed in a direction that
[18] I have seen happen with multiple other people
[19] who had paranoid schizophrenia; particularly,
[20] the issues of medication and food.
[21]     The concern for others is less
[22] common, but Ms. Siddiqui made it clear that
[23] her concern for her children extended to all
[24] people of the — that she was connected with.
[25]     My experience with those people

Page 41

**C. KEMPKE**

[1]
[2] is that I get the way — the story would be
[3] consistent from time to time, that I could
[4] write down, but while I was talking to her
[5] remained — there remained parts I couldn't
[6] write down because they didn't make sense.
[7]      So, each time I would talk to
[8] her, there was enough disorganization that I
[9] couldn't follow the track that she was asking
[10] about and would leave parts of it out of
[11] repeat questioning because it was not going to
[12] be beneficial in developing rapport with the
[13] potential restoration of competency patient.
[14]     **Q:** Did you have any difficulties
[15] redirecting Ms. Siddiqui when she would go off
[16] track in her conversations with you?
[17]     **A:** I didn't have so much trouble
[18] getting her to answer questions to clarify as
[19] I had problems getting her to answer certain
[20] questions at all.
[21]     **Q:** Can you explain?
[22]     **A:** If I would ask about the concerns
[23] about her children, she would say: I can't
[24] tell you because that may kill them.
[25]      So, the paranoia for — obviously

Page 42

**C. KEMPKE**

[1]
[2] extended to her children or started off with
[3] her children. And, so, from that standpoint,
[4] could I redirect her? I couldn't get her to
[5] give me an answer, so, yeah, that was really
[6] difficult.
[7]      If I said what was the problem
[8] with the professor at Brandeiss, she —
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 43

**C. KEMPKE**

[1]
[2]     **A:** She describes that she had
[3] troubles at Brandeiss getting her Ph.D.
[4] awarded to her, and that there was a
[5] professor. And I never could get a direct
[6] answer as to what the problem was with that
[7] professor.
[8]     **Q:** So, that's an example?
[9]     **A:** That's an example of where I
[10] couldn't figure out — there was some problem
[11] with the professor that could have interfered
[12] with her getting her Ph.D., but it was
[13] resolved with somebody else.
[14]      And that was all I could ever
[15] figure out from it.
[16]     **Q:** Can you give me any more examples
[17] that you recall of her tangential thinking?
[18]     **A:** Well, the last day that I spoke
[19] to her, and we went around a whole series that
[20] was the 6/2 of '09 note.
[21]     **Q:** June 2 of '09?
[22]     **A:** Yeah. I believe your copy of it
[23] doesn't have the date visible on it.
[24]     **Q:** Okay. Let me just get that.
[25]     **A:** It would be after the typewritten

Page 44

**C. KEMPKE**

[1]
[2] note. Look after that one. I think the next
[3] one is the one I'm looking for.
[4]     **Q:** This one?
[5]     **A:** Yeah.
[6]     **Q:** Okay.
[7] Dr. Kempke, I'm going to show you
[8] what is marked — Bates marked M-E-D, MED 197.
[9]      Is this a note that you prepared?
[10]     **A:** Yes.
[11]     **Q:** And does that refresh your
[12] recollection about some of Dr. Siddiqui's
[13] tangential thinking?
[14]     **A:** Yes.
[15]     **Q:** What does it — can you explain?
[16]     **A:** First of all, the way I'm
[17] writing, it is clear that I've had to add and
[18] adjust because there are notes on the side,
[19] each side, of the — of that record. So, as
[20] things that came up.
[21]      She talked anywhere from
[22] answering my question about seeing doctor —
[23] her sister Aanifka to talking about the foods
[24] — and this is where the — she couldn't eat
[25] fish anymore off of the commissary, so that my

Page 45

**C. KEMPKE**

[1]
[2] understanding was that tuna came in those bags
[3] at that point, and I'm not sure.
[4]     There's discussion about money
[5] laundering and her conversation with an inmate
[6] in the kitchen who wanted to send her a
[7] letter. There's a discussion of — I believe
[8] there's one, another one, about her children
[9] on that one.
[10]     I'm sorry, it's just I can't
[11] remember everything that's on that note.
[12] Again, this is where I had troubles because it
[13] doesn't make sense, it doesn't follow.
[14]     Q: Here, you can...
[15]     A: Oh, and we again had talked about
[16] the medications, what she could and couldn't
[17] take.
[18]     Q: So, describe for us how it
[19] appeared tangential to you.
[20]     What was it that made it
[21] tangential as opposed to someone going from
[22] topic to topic to topic in an intelligent
[23] fashion?
[24]     Why do you interpret this as
[25] tangential?

Page 46

**C. KEMPKE**

[1]
[2]     A: I would have wanted to discuss
[3] with her symptoms of depression or specific
[4] psychosis. I would have asked her: How are
[5] you doing? How are you sleeping? How are you
[6] eating? Any worries or concerns on the unit?
[7]     Medicated patients who are ill
[8] and normal people will allow me to sort of
[9] lead the conversation. But to start with
[10] asking her about sister Aanifka and ending up
[11] somehow talking about the money laundering
[12] lady downstairs, I would never have gotten
[13] there 'cause I wouldn't even have known to ask
[14] about somebody from the money laundering.
[15]     And with the incomplete sentences
[16] that I'm using in that is another indication
[17] of my inability to keep up with the flow of
[18] ideas and the rapidity at which we moved from
[19] one idea to another. My ordinary notes are
[20] much more lucid than that.
[21]     Q: Was this example that you just
[22] told us symptomatic of Dr. Siddiqui's
[23] communication with you every time you met
[24] while she was at Carswell?
[25]     A: Yes, ma'am.

Page 47

**C. KEMPKE**

[1]
[2]     Q: And did you see this description,
[3] this — her manner of describing things to you
[4] as symptoms of malingering?
[5]     A: No.
[6]     Q: Why not?
[7]     A: In — okay.
[8] First of all, she asked me very
[9] clearly not to diagnose her as mentally ill.
[10] She did not want me to release any of this
[11] information to the Court.
[12]     She progressed down paths of
[13] paranoid ideations that I would find it very
[14] difficult for someone not a psychiatrist to
[15] know as a routine progression of paranoid
[16] delusions. She seemed at times herself to be
[17] confused about why she would get to where she
[18] had started.
[19]     I did not see any gain from me to
[20] be had by refusing treatment and wanting me
[21] not to keep records.
[22]     Q: So, correct me if I'm wrong,
[23] you're saying a person malingering would want
[24] the opposite of that?
[25]     Is that what you're suggesting?

Page 48

**C. KEMPKE**

[1]
[2]     A: In — yes.
[3]     Q: What's been your experience in
[4] diagnosing people with malingering?
[5]     A: We do that a lot in the emergency
[6] room. Probably the most important part. But
[7] I've also worked at Dallas County Jail.
[8]     I am not likely to diagnose
[9] malingering because in most situations people
[10] don't come to a psychiatrist without a plan of
[11] why they need to do that or why they need to
[12] come to me.
[13]     I have seen people — the more
[14] common problem is borderline personality
[15] disorder patients trying to present as
[16] mentally ill.
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 49

**C. KEMPKE**

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]    THE WITNESS: Yes, sir, we
[9] certainly have had a number of inmates
[10] that Dr. Powers, Dr. Yanez, and I have
[11] all agreed were malingering mental
[12] retardation and psychosis.
[13]    Q: You did not — it was not your
[14] opinion that that was Dr. Siddiqui's
[15] situation?
[16]    A: Never.
[17]    Q: There came a time when there was
[18] some — I think there were some notes about
[19] memory loss. I'm going to be referring to MED
[20] 77.
[21]    A: Oh, this is actually not my note.
[22]    Q: But in there, they refer to PTSD
[23] and memory loss.
[24]    A: That particular piece of paper
[25] was completed by the — what we call an IHP,

Page 50

**C. KEMPKE**

[1]
[2] an in-house physician.
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 51

**C. KEMPKE**

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]    THE WITNESS: I co-sign those —
[12] usually it's a co-sign — because an
[13] in-house physician does the physicals
[14] for us. This is a standard procedure.
[15]    But the individual who did that
[16] paper, who did that history and
[17] physical, did not sign his name to it.
[18]    Q: What was — and when you look at
[19] this form —
[20]    A: It looks like Dr. Baldwin's.
[21]    Q: — what do you understand as the
[22] designation of PTSD and/or memory loss?
[23]    A: The in-house physician is a
[24] contracted person who comes in and takes
[25] information, putting it together on to that

Page 52

**C. KEMPKE**

[1]
[2] form because of JCHAO guidelines to have a
[3] history and physical done on admission to an
[4] inpatient unit.
[5]    Q: Did you ever experience Dr.
[6] Siddiqui having what you would call memory
[7] loss?
[8]    A: Yes, ma'am.
[9]    Q: When?
[10]    A: When she was first there and
[11] ongoing throughout it, throughout my talks
[12] with her, we remained with difficulties of her
[13] remembering where she had been.
[14]    Q: Now, there were times, correct me
[15] if I'm wrong, when Dr. Siddiqui had memory for
[16] certain information.
[17]    Correct?
[18]    A: Yes.
[19]    Q: And there were other times where
[20] Dr. Siddiqui couldn't remember certain things.
[21]    Correct?
[22]    A: Yes, ma'am.
[23]    Q: Does the juxtaposition of those
[24] two examples impact on your diagnosis of
[25] psychotic?

Page 53

**C. KEMPKE**

[1]
[2] **A:** It can be a factor, yes.
[3] **Q:** Explain what you mean.
[4] **A:** Usually people who are psychotic
[5] don't have much memory for that time period or
[6] have altered memories.
[7]     The particular — best example of
[8] that is in bipolar mania, when an individual
[9] is psychotic and does some pretty embarrassing
[10] things. It's essentially like having a movie
[11] of you when you're drunk. If they are called
[12] to task on that, they have no idea remembering
[13] that they did it.
[14] **Q:** Did you ever consider Dr.
[15] Siddiqui's memory loss as symptomatic of any
[16] mental illness?
[17] **A:** The PTSD diagnosis remained as a
[18] concern for as long — until this date, as we
[19] do not know what officially has happened to
[20] her children.
[21]     PTSD is associated with memory
[22] loss for traumatic events. But in order to
[23] diagnose it, you have to have had a life
[24] threatening or life threatening to your family
[25] member type of experience.

Page 54

**C. KEMPKE**

[1]
[2] **Q:** So, what did you mean when you
[3] said that to this day, PTSD remains a possible
[4] diagnosis for Dr. Siddiqui?
[5] **A:** Throughout reviewing all of the
[6] records that I have had access to, Dr.
[7] Johnson's report, Dr. Saathoff's report, two
[8] reports from Dr. Powers, I have not seen that
[9] anyone has retrieved her children.
[10]     With either loss of children or
[11] un — having no idea where they are as a
[12] custodial parent, that's the most stressful
[13] possible event for a human being.
[14] **Q:** If you were to learn that Dr.
[15] Siddiqui's children were, in fact, murdered or
[16] tortured or have disappeared, would that
[17] impact on your diagnosis of Dr. Siddiqui
[18] today?
[19] **A:** Yes, ma'am.
[20] **Q:** In what way?
[21] **A:** Then I'd be very comfortable
[22] giving her a PTSD diagnosis.
[23] **Q:** And what would that mean in terms
[24] of Dr. Siddiqui's mental health?
[25]     What would be the symptomology,

Page 55

**C. KEMPKE**

[1]
[2] then, that would lead you to PTSD?
[3] **A:** Ms. Siddiqui's symptomatology
[4] that I would be concerned about would be
[5] decompensation in the setting of a SHU.
[6] Particularly having reviewed the video of the
[7] MDC SHU in Brooklyn, the background noise of
[8] other inmates' separated from her could very
[9] easily mimic what she described to me as
[10] hearing children being tortured when she was
[11] in custody of the bad people.
[12]     It would give serious explanation
[13] for memory loss for time periods when she was
[14] in — missing, I guess, that missing time
[15] period, if we could refer to it that way.
[16]     It would increase an
[17] understanding of the hypnogogic experience of
[18] seeing her children.
[19]     It also would increase an
[20] understanding of her fear of not wanting to
[21] offend the people who were her bad custodians
[22] for fear of further damage to her children.
[23] **Q:** Dr. Siddiqui reported to you,
[24] correct, that her children had been tortured?
[25]     Correct?

Page 56

**C. KEMPKE**

[1]
[2] **A:** Yes, ma'am, she — well, I need
[3] to clarify that a little bit. She thought
[4] they were her children. She was told they
[5] were her children.
[6]     When she first came, she was very
[7] clear to try to tell me those things she could
[8] not prove by her own sight because she felt
[9] that ran a risk of her lying, which was
[10] against her religion. So, she said: I cannot
[11] prove they were my own children. I thought
[12] they were and they showed me pictures, but I
[13] do not know that they were my own children.
[14] **Q:** Did Dr. Siddiqui speak to you
[15] about her oldest child, her son?
[16] **A:** I believe that is the person you
[17] referred to as the young boy that she was
[18] picked up with.
[19] **Q:** Yes.
[20] **A:** She spoke to me at first and told
[21] me that they told her he was her son. But
[22] when she asked him, he didn't think she was
[23] his mother and she at that time didn't think
[24] he was her son, but that there had been enough
[25] time that had gone by that it could have been.

Page 57

**C. KEMPKE**

[1]
[2]      Later on, she described to me
[3] that he was the same young man or boy, I
[4] guess, was in therapy in Pakistan, I believe
[5] living with family and I believe it was her
[6] sister, although I'm not sure, and that they
[7] were sure it was her son but that he didn't
[8] remember her.
[9]      **Q:** What did you — did you use that
[10] information in any way?
[11]      Did that impact on your diagnosis
[12] of Dr. Siddiqui?
[13]      **A:** While I believed early on that we
[14] knew that this had been her son — no.
[15]      There was a period early on when
[16] we didn't know that was her son. When we
[17] later believed — she expressed to me that she
[18] was — he was her son after the evaluations by
[19] Dr. Johnson and Saathoff, who had raised the
[20] question that we didn't know if she had
[21] abandoned the child. That, I don't believe
[22] shows up in their written reports but was one
[23] of the things that they described to me, that
[24] she had abandoned her children.
[25]      Then it — since I had that

Page 58

**C. KEMPKE**

[1]
[2] information, it didn't make an impact on me.
[3] If I take into a diagnosis that she did —
[4] that she had not abandoned the children, that
[5] they had been forcibly taken from her, then
[6] that would lead me to a PTSD-type diagnosis.
[7]      **Q:** Okay.
[8] Did Dr. Siddiqui complain or have
[9] any sleep issues that you were aware of?
[10]      **A:** She complained to me or —
[11] complained.
[12]      She told me that she did not like
[13] to sleep at night because she was afraid of
[14] being killed and that she had trouble
[15] sleeping.
[16]      **Q:** If a person sleeps less than an
[17] average of five hours each night over the
[18] course of two months, would you consider that
[19] as exhibiting a sleep problem?
[20]      **A:** Yes, ma'am.
[21]      **Q:** If a person in a 24-hour period
[22] had as little as one or two hours of sleep,
[23] would you consider that exhibiting a sleep
[24] problem?
[25]      **A:** It's a problem for that

Page 59

**C. KEMPKE**

[1]
[2] particular night for a one-time occurrence.
[3]      I'm sure we've all done that
[4] before an exam. So, it can be normal.
[5]      **Q:** And if it continued episodically?
[6]      **A:** Again, it would have to determine
[7] the frequency of that.
[8]
[9]
[10]
[11]
[12]
[13]
[14]      **Q:** If you were to learn that in 60
[15] days, 39 out of 60 days Dr. Siddiqui's sleep
[16] was discontinuous, meaning she slept — within
[17] a 24-hour period, she slept, she got up, she
[18] slept again, would you consider that
[19] exhibiting a sleep program?
[20]      **A:** I need to know more about why she
[21] got up.
[22]      If she just got up, went to the
[23] bathroom, went back to sleep, that's very
[24] normal. So, it may or may not, but it would
[25] not...

Page 60

**C. KEMPKE**

[1]
[2]      **Q:** So, if she got up and sat in her
[3] cell and read her Koran or prayed or just
[4] walked around her cell, how would that impact
[5] on your determination?
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]      **Q:** If you learned that Dr. Siddiqui
[15] got up and either stayed up, prayed, moved
[16] around her cell, didn't go back to sleep,
[17] couldn't go back to sleep, would you consider
[18] that a sleep problem?
[19]      **A:** After a short period of time?
[20]      **Q:** Yes.
[21]      **A:** So, you're saying — the
[22] clarification.
[23]
[24]
[25]

Page 61

**C. KEMPKE**

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]    **Q:** If there are — if you can show
[19] that the person does not have continuous sleep
[20] when they go to sleep 39 out of 60 days, would
[21] that be an example of a sleep problem?
[22]    **A:** My understanding of sleep
[23] disorders involves that you need to have a
[24] period of at least three to four hours to
[25] achieve stage four sleep in sufficient

Page 62

**C. KEMPKE**

[1]
[2] quantity to get restorative sleep.
[3]    So, if you sleep in one- to
[4] two-hour increments, even if you attain eight
[5] hours of sleep over a 24-hour period, that, in
[6] my understanding of sleep disorders, is sleep
[7] disturbance.
[8]    **Q:** At Carswell, how does anyone
[9] monitor sleep?
[10]    **A:** The officers make rounds to count
[11] I believe at midnight and eight. It may be —
[12] not eight, four o'clock in the morning. It
[13] may be somewhat different hours.
[14]    And then the nurses make rounds
[15] irregularly. I believe they're supposed to
[16] make rounds every half an hour or something,
[17] but I'm not clear, on M1. M3, we have more
[18] specific rules about how often they have to
[19] make rounds.
[20]    **Q:** So, did there come a time when
[21] anyone observed Dr. Siddiqui's sleep patterns
[22] at Carswell, to the best of your knowledge?
[23]    **A:** I guess I need to you to clarify
[24] that.
[25]    **Q:** Was there any log kept of the

Page 63

**C. KEMPKE**

[1]
[2] amount of time Dr. Siddiqui slept in a 24-hour
[3] period each day?
[4]    **A:** There was none on the medical log
[5] that I saw.
[6]    **Q:** And did you have any
[7] conversations with anyone at Carswell about —
[8] other than Dr. Siddiqui about whether or not
[9] Dr. Siddiqui was sleeping a sufficient amount
[10] of time in any given 24-hour period?
[11]    **A:** Yes.
[12] At treatment team, Dr. Powers
[13] would ask about her sleep.
[14]    **Q:** And what did you learn at
[15] treatment team?
[16]    **A:** The report would be from the
[17] second unit nurse, meaning the day shift
[18] nurses. The night shift nurses were not
[19] there.
[20]    So, secondhand report from those
[21] nurses was that she was not having trouble
[22] sleeping.
[23]    **Q:** And that report, that was not a
[24] report that they actually observed.
[25]    Correct?

Page 64

**C. KEMPKE**

[1]
[2]
[3]    **Q:** When you say second shift, just
[4] to clarify it, they were not the nurses who
[5] were actually observing Dr. Siddiqui at night?
[6]    **A:** Correct.
[7]    **MR. LAVIGNE:** How do you know
[8] that?
[9]    **THE WITNESS:** How do I know
[10] that? Because we have our nursing —
[11] our staff rounds are at 9 — 8:30 to 9
[12] a.m., and our shifts are from 7 —
[13] they're 12-hour shifts and they change
[14] at 7, on the sevens, so that we never
[15] have night shift nurses give us report.
[16]    **Q:** When the nurse gives a report—
[17] gave a report that Dr. Siddiqui was not having
[18] problems sleeping, do you have any idea what
[19] they based it on?
[20]    **A:** It's my understanding that they
[21] would go in and look.
[22]    **Q:** But how frequently would they go
[23] in and look.
[24]    Do you know?
[25]

Page 65

**C. KEMPKE**

[1]
[2] objection.
[3]    **Q:** If you know.
[4] Do you know?
[5]    **A:** I don't know.
[6]    **Q:** Did Dr. Powers at meeting ask
[7] them how frequently they went in to look at
[8] Dr. Siddiqui and her sleeping patterns?
[9]    **A:** I don't remember if she asked,
[10] but — I don't recall that she asked ···
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 66

**C. KEMPKE**

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]    **Q:** And if they had been told,
[15] there's no log or medical record that
[16] indicates anywhere how often any nurse went to
[17] check on Dr. Siddiqui's sleeping.
[18]    Correct?
[19]    **A:** No.
[20]
[21]
[22]
[23]
[24]
[25]

Page 67

**C. KEMPKE**

[1]
[2]
[3]
[4]
[5]    **MS. CARDI:** At the meeting, I'm
[6] sorry.
[7]
[8]
[9]    **Q:** You had a meeting.
[10] Right?
[11] You always had a meeting
[12] regarding — you met regarding Dr. Siddiqui.
[13]    Correct?
[14]    **A:** We meet every morning —
[15]    **Q:** Okay.
[16]    **A:** — Monday through Friday except
[17] holidays. There is a morning team meeting at
[18] which we get morning nursing report and
[19] discuss those patients that we need to for the
[20] day selectively. We do not get a full report
[21] on each of our 55 patients that morning.
[22]    Dr. Powers could have spoken to
[23] them at another time of the day.
[24]    **Q:** Okay.
[25] So, you only remember Dr. Powers

Page 68

**C. KEMPKE**

[1]
[2] raising it in what, how many meetings?
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12] (
[13]
[14]
[15]
[16]
[17]
[18]    **A:** Dr. Powers twice in my
[19] recollection at morning meeting asked how much
[20] Dr. Siddiqui was sleeping.
[21]    **Q:** Okay.
[22] In your professional opinion,
[23] your diagnosis of Dr. Siddiqui, would it have
[24] any impact on her ability to communicate with
[25] me preparing her defense?

Page 69

**C. KEMPKE**

[2] **A:** Yes, ma'am.

Page 71

**C. KEMPKE**

Page 70

**C. KEMPKE**

[4] **Q:** In your professional opinion, do
[5] psychotics, people who are psychotic, does
[6] that — if Dr. Siddiqui is psychotic, can that
[7] have an impact on how she can communicate with
[8] me?
[9] **A:** Any psychosis can affect your —
[10] her ability to communicate with you, yes.
[11] If you want me to specify that
[12] for paranoid psychosis in this particular
[13] patient, this paranoid psychosis is going to
[14] make it very difficult for her to communicate
[15] with an attorney because she has made it clear
[16] to me that she believes that the Court has
[17] made a decision and that talking to an
[18] attorney is going to harm her, basically, by
[19] joining — she'd be cooperating with the
[20] process.

Page 72

**C. KEMPKE**

[11] **Q:** What impact does Dr. Siddiqui's
[12] diagnosis have on her ability to describe for
[13] me clearly the events that transcribed
[14] surrounding her arrest?
[15] **A:** I don't think she can.
[16] **Q:** Why not?
[17] **A:** Because she couldn't do it for
[18] me.

Page 73

**C. KEMPKE**

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24] . . . . . . . . . .
[25]    **Q:** Did you have an opportunity to

Page 74

**C. KEMPKE**

[1]
[2] read Dr. Siddiqui's letter to the warden?
[3]    **A:** Yes, ma'am.
[4]    **Q:** And do you — what did you — did
[5] that letter have any impact on your diagnosis
[6] of Dr. Siddiqui?
[7]    **A:** It reiterated the same thing she
[8] had been telling me; that she felt she could
[9] help out peace and there were people
[10] persecuting other people.
[11]    So, it just confirmed what I had
[12] heard already.
[13]
[14]    **Q:** Did you notice anything about the
[15]
[16]
[17]
[18]    Did you notice anything about the
[19] style of the letter?
[20]    Did anything stick out in your —
[21] based on the style of the letter?
[22]    **A:** It was pretty — it was my
[23] classic difficulty reading psychosis of a
[24] person; lots and lots of words smooshed into
[25] lots of small space.

Page 75

**C. KEMPKE**

[1]
[2]    **Q:** Dr. Siddiqui said that she
[3] couldn't read to you.
[4]    Right?
[5] She told you she was having —
[6] she couldn't read?
[7]    **A:** When I tried to clarify that with
[8] her, she expressed to me that she capable
[9] of reading very slowly but couldn't retain
[10] what she read, so she would stare at a page.
[11]    **Q:** Do you know how much time Dr.
[12] Powers actually spent with Dr. Siddiqui over
[13] the course of her stay at Carswell?
[14]    **A:** I do not know that.
[15]    **Q:** How much time did you actually
[16] spend with Dr. Siddiqui over the course of her
[17] stay at Carswell?
[18]    **A:** My estimation would be about
[19] eight hours.
[20]
[21]
[22]
[23]
[24]
[25]

Page 76

**C. KEMPKE**

[1]
[2]
[3]    **Q:** Did there come a time when Dr.
[4] Johnson came to examine Dr. Siddiqui?
[5]    **A:** Yes.
[6]    **Q:** What happened when Dr. Johnson
[7] came to examine Dr. Siddiqui?
[8]    **A:** Dr. Siddiqui again made it clear
[9] that she didn't want to talk to Dr. Johnson.
[10]    Dr. Johnson moved through the
[11] facility talking to multiple different people
[12] between —
[13]    **MR. LAVIGNE:** Objection.
[14] What time are we talking about?
[15]    **THE WITNESS:** Both times, as far
[16] as I know. I mean, she would come on to
[17] the unit.
[18]    **MR. LAVIGNE:** Did you observe
[19] this?
[20]    **THE WITNESS:** Yeah.
[21]    **MR. LAVIGNE:** Okay. Let's talk
[22] about what you observed.
[23]    When Dr. Johnson —
[24] I'm not trying to interrupt you,
[25] Dawn, I just want to get the sequence.

Page 77

**C. KEMPKE**

[1]
[2] MS. CARDI: Sure, sure, no
[3] problem.
[4] MR. LAVIGNE: So, if we just
[5] focus on...
[6] Q: What did you observe?
[7] A: Dr. Johnson came on to the unit —
[8] MR. LAVIGNE: The first time.
[9] MS. CARDI: Well, I don't know
[10] when she first walked on to the unit,
[11] I'm sorry.
[12] Those two episodes, Dr. Johnson,
[13] you'll have to ask to tell about that.
[14] Q: What did you observe during the
[15] two occasions when Dr. Johnson came to the
[16] unit to interview Dr. Siddiqui?
[17] A: Dr. Johnson, first that I noticed
[18] — some of the things that I noticed, and I
[19] don't remember which order they occurred in,
[20] there's a period of time when Dr. Johnson was
[21] standing outside Ms. Siddiqui's door and was
[22] talking to her from the doorway.
[23] The most dramatic was when she
[24] chased her up and down the hallway.
[25]

Page 78

**C. KEMPKE**

[1]
[2]
[3] MR. LAVIGNE: Who chased who?
[4] THE WITNESS: Dr. Johnson
[5] followed Dr. Siddiqui while Dr. Siddiqui
[6] said she didn't want to talk to her.
[7] A: Dr. Johnson spoke to her while
[8] she was seated in the officers' — there's a
[9] chair in the — in one officers' station, and
[10] she spoke to her there while Dr. Siddiqui had
[11] her ears — her fingers in her ears.
[12] Dr. Johnson also did the same
[13] thing while she was in the nurse manger's
[14] office. Dr. Siddiqui — Dr. Johnson talked to
[15] Ms. Siddiqui in the nurses' station in the
[16] same fashion.
[17] Eventually, they requested that I
[18] stay with Dr. Johnson in an attempt to get Ms.
[19] Siddiqui to talk with her. And I tried the
[20] first time just to assist Dr. Johnson in
[21] asking questions in ways that I thought might
[22] make more sense to Ms. Siddiqui.
[23] I believe it was the second time
[24] she came back that Dr. Johnson and I met in my
[25] office so that I could — oh, no.

Page 79

**C. KEMPKE**

[1]
[2] I had asked Dr. Johnson to write
[3] a list of the questions that she wanted me to
[4] see if I could answer or get — if I could ask
[5] them of Ms. Siddiqui so that I would be the
[6] one asking the questions and not Dr. Johnson
[7] but Dr. Johnson would be there listening —
[8] well, it ended up that Dr. Johnson was
[9] listening in the room.
[10] And, so, I think that was the
[11] second time, because the first time had been
[12] so difficult. And, so, that time I tried to
[13] ask some of the questions.
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22] MS. CARDI: We'll strike the last
[23] sentence.
[24] Q: Can you explain to me what you
[25] mean about she didn't answer certain

Page 80

**C. KEMPKE**

[1]
[2] questions?
[3] I'm a little confused.
[4] She answered some questions but
[5] not others?
[6] A: Questions that sounded more like
[7] specific questions about what she — how do I
[8] explain that? I don't know.
[9] The questions that she would
[10] answer were more social questions.
[11] Q: Okay.
[12]
[13]
[14]
[15] Q: What was the tone of voice Dr.
[16] Johnson used when she spoke with Dr. Siddiqui?
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 81

C. KEMPKE

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18] A: I felt it was disrespectful.
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 82

C. KEMPKE

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21] Q: Did Dr. Saathoff act differently
[22] with Dr. Siddiqui?
[23] A: Yes, ma'am.
[24] Q: And explain what you observed.
[25] A: He was — first, he sat down with

Page 83

C. KEMPKE

[1]
[2] her
[3]
[4]
[5]
[6]
[7]
[8] Q: Do you mean speak to her in front
[9] of the inmates as opposed to evaluate?
[10] Is that what you're saying?
[11] A: Yes, ma'am.
[12] Q: We'll exchange that word.
[13] In what other ways did Dr.
[14] Saathoff treat Dr. Siddiqui differently?
[15] A: He gave her choices.
[16] He had come with a personality
[17] inventory paper-and-pencil test and suggested
[18] that he could help her fill it out if she was
[19] having trouble reading it, I could help her
[20] fill it out, or he could leave it there so if
[21] she chose to fill it out later she could do
[22] that.
[23] Q: Did Dr. Siddiqui respond better
[24] to Dr. Saathoff than to Dr. Johnson in your
[25] observation, what you observed?

Page 84

C. KEMPKE

[1]
[2] A: It was a much shorter period of
[3] time, but during that period of time I was
[4] more comfortable, which I interpolated is
[5] because she was not as uncomfortable.
[6] She seemed to answer more
[7] questions, but, again, only, I think, because
[8] he did more rapport-building questions first.
[9] Q: Did Dr. Johnson express a
[10] diagnostic opinion about Dr. Siddiqui before
[11] she started speaking with her?
[12] A: I don't know.
[13] Q: Did she express anything to you
[14] about her thoughts about Dr. Siddiqui before
[15] she interviewed her?
[16] A: I did not talk to Dr. Johnson
[17] before she interviewed Dr. Siddiqui.
[18] Q: Did you have any conversations
[19] with Dr. Johnson about Dr. Johnson's diagnosis
[20] of Dr. Siddiqui?
[21] A: Dr. Johnson told me that Dr.
[22] Siddiqui was malingering.
[23] Q: And when did she tell you that?
[24] A: The first visit, I — yes, the
[25] first visit she told us — told me in my

Page 85

**C. KEMPKE**

[1]
[2] office.
[3] **Q:** Was that before or after she had
[4] attempted to speak with Dr. Siddiqui?
[5] **A:** After.
[6] **Q:** And Dr. Saathoff, did he express
[7] any opinion about Dr. Siddiqui's diagnosis to
[8] you?
[9] **A:** I don't recall that he did, no.
[10] **Q:** Did Dr. Johnson ask you any
[11] questions about your opinion about a diagnosis
[12] for Dr. Siddiqui?
[13] **A:** She asked what I thought when she
[14] first came in, and then explained to me why I
[15] was wrong.
[16] **Q:** Was this before or after she saw
[17] Dr. Siddiqui?
[18] **A:** After.
[19] **Q:** And that was the first visit?
[20] **A:** I believe so.
[21] **Q:** Do you know about how much time
[22] she had spent with Dr. Siddiqui when she had
[23] this conversation with you?
[24] **A:** No, I don't know how much time
[25] she had spent with her.

Page 86

**C. KEMPKE**

[1]
[2]
[3]
[4]
[5] **Q:** You have reviewed Dr. Saathoff's
[6] report.
[7] Correct?
[8] **A:** Yes, ma'am.
[9] **Q:** And that is in evidence as
[10] exhibit —
[11] **MS. CARDI:** It's not marked on
[12] here.
[13] **MR. EDGAR:** Hang on.
[14] **MS. CARDI:** Can we leave a place
[15] in the space and I'll add it when we get
[16] it?
[17] **MR. LAVIGNE:** I think it's
[18] Exhibit A.
[19] Is that Dr. Saathoff?
[20] **MS. CARDI:** Yeah, Dr. Saathoff.
[21]
[22]
[23]
[24] **Q:** On the first page of Dr.
[25] Saathoff's report, he says on the last

Page 87

**C. KEMPKE**

[1]
[2] paragraph: I am in agreement with her
[3] treating psychiatrist and evaluating
[4] psychologist that she has most likely
[5] fabricated reported psychiatric symptoms to
[6] give credibility to her claims that she
[7] suffers from a mental disorder.
[8] Did Dr. Saathoff accurately
[9] represent what you told him in regard to your
[10] opinion of her mental condition as her
[11] treating psychiatrist?
[12] **A:** No.
[13] **Q:** So, is it your testimony that you
[14] never said to Dr. Saathoff that you thought
[15] that Dr. Siddiqui was fabricating her reported
[16] psychiatric symptoms?
[17] **A:** That is correct.
[18] **Q:** Did Dr. Saathoff show you this
[19] report before he submitted it to the Court?
[20] **A:** No, he did not.
[21] **Q:** On Page 3 of Dr. Saathoff's
[22] report, Dr. Saathoff reports in Paragraph 4:
[23] Psychotic symptoms of the magnitude claimed by
[24] Ms. Siddiqui are characteristic of individuals
[25] with major mental illnesses requiring

Page 88

**C. KEMPKE**

[1]
[2] psychotherapy and medication treatment.
[3] Remarkably, these dramatic hallucinations and
[4] delusions involving flying infants, dark
[5] angels, a dog in her cell, and children
[6] visiting in her room have largely resolved
[7] after she was found to be incompetent to stand
[8] trial.
[9] Do you agree with Dr. Saathoff's
[10] representation in that paragraph?
[11] **A:** The problem I have is that that's
[12] a long paragraph, and the very beginning of it
[13] is where I disagree.
[14] **Q:** So, can you show me on Page 3
[15] what you disagree with in regard to that
[16] paragraph about Dr. Siddiqui?
[17] **A:** Dramatic hallucinations and
[18] delusions involving flying infants, dark
[19] angels, a dog in her cell, and children
[20] visiting in her room.
[21] **Q:** Have they largely resolved?
[22] **A:** Those have resolved, but I don't
[23] think they were hallucinations in the first
[24] place.
[25] **Q:** What do you think they were?

Page 89

C. KEMPKE

[1]

[2]    A: Hypnogogic phenomenon, which are

[3] normal.

[4]    Q: Did those hypnogogic phenomenon

[5] resolve or — let me just see the correct

[6] words — resolve, become resolved after she

[7] was found to be incompetent to stand trial?

[8]    A: They went away after she saw Dr.

[9] Johnson, so that was before — it was after

[10] she had been found incompetent to stand trial

[11] but before — but, like, six weeks or two

[12] months, I'm not sure, after the report had

[13] been put in.

[14]    Q: Okay.

[15]    A: You were on that set of papers.

[16]    Q: Where was I in my notes? This

[17] was here.

[18]    Okay. All right. Let's turn to

[19] Page 10 of Dr. Saathoff's.

[20]    On Page 10, paragraph number one,

[21] it says: Ms. Siddiqui's uses of deception,

[22] evasiveness, expressions of paranoia and

[23] isolation, as well as her public expression of

[24] psychotic symptoms and claims of torture have

[25] had a significant impact on the assessment

Page 90

C. KEMPKE

[1]

[2] process. Her dramatic yet inconsistently

[3] expressed hallucinations and delusions,

[4] symptoms referable to mood disorder and

[5] cognitive dysfunction, have further

[6] complicated the picture for those responsible

[7] for evaluating her. Her high levels of

[8] interpersonal and intellectual skills and

[9] ability to negotiate the terms of her

[10] assessment have paradoxically served to impede

[11] assessment.

[12]    THE WITNESS: Are you trying to

[13] follow her?

[14]    I'm just — because you're not on

[15] the same page.

[16]    Q: And that it is remarkably —

[17]    MR. LAVIGNE: It's Page 10.

[18] Right?

[19]    MS. CARDI: I'm sorry, it's Page

[20] 8. I apologize.

[21]    Q: He says here: Remarkably, she

[22] has improved significantly subsequent to the

[23] determination that she was incompetent to

[24] stand trial, even though she continues to

[25] receive no formal form of treatment.

Page 91

C. KEMPKE

[1]

[2]    Is it your opinion that Dr.

[3] Siddiqui's expressions of paranoia have

[4] improved dramatically?

[5]    A: No.

[6]    Q: How about her isolation?

[7]    A: No.

[8]    Q: How about her psychotic

[9] symptoms?

[10]    A: The original ones have improved.

[11]    Q: And is that the ones — which

[12] ones do you refer to?

[13]    A: That was the dysfunctional

[14] behaviors when she arrived and was on

[15] med-surge and was...

[16]    Q: Have her paranoid delusions

[17] remarkably improved?

[18]    A: No.

[19]    (Discussion off the stenographic

[20] record)

[21]    THE VIDEOGRAPHER: The time is

[22] now 4:06 p.m.

[23]    Off the record.

[24]    THE VIDEOGRAPHER: Time is now

[25] 4:10 p.m.

Page 92

C. KEMPKE

[1]

[2]    On the record.

[3]    Q: On Page 10 of Dr. Saathoff's

[4] report, he stays, the fourth paragraph down:

[5] Over time and following receipt of information

[6] relating actual events, Dr. Kempke was stuck

[7] — struck by the fact that Ms. Siddiqui had

[8] not been truthful.

[9]    And he quotes you: I realized

[10] that she was conning me when I received the

[11] collateral information... close quote.

[12]    Did you make that statement to

[13] Dr. Saathoff?

[14]    A: I might have.

[15]    Q: Do you know what you were

[16] referring to?

[17]    A: I do not remember specifically.

[18] Dr. Saathoff, however, did give me the

[19] information about the use of force that Dr.

[20] Siddiqui had been requesting that the cameras

[21] take her picture, and that may have been what

[22] I — that would be my guess.

[23]    Q: Okay.

[24] And does that impact at all on

[25] your diagnosis of Dr. Siddiqui today, that

Page 93

**C. KEMPKE**

[2] she —

[20] **A:** What I saw in today's review of
[21] the video was that she asked to be videoed
[22] until that point at which they began to take
[23] her clothes off of her lower body, and at that
[24] point she requested that the video be turned
[25] off.

Page 94

**C. KEMPKE**

[2]     In this situation, the —
[3]     **Q:** Just so we get — keep on — so,
[4] how is this quote I realized that she was
[5] conning me when I received the collateral
[6] information impact on what you saw today?
[7]     **A:** Sorry, I've got too many body
[8] languages going on here.
[9]     **MR. LAVIGNE:** Could you —
[10]    **MS. CARDI:** Maybe it's better if
[11] I rephrase it.
[12]    **Q:** I realized she was conning me
[13] when I received the collateral information...
[14] close quote.
[15]    **A:** When I —
[25]    **THE WITNESS:** That's a phrase I

Page 95

**C. KEMPKE**

[2] would use.
[3]     **MR. LAVIGNE:** Okay.
[4]     **Q:** And explain what you mean in this
[5] — when you said it to Dr. Saathoff, what you
[6] meant, if you can?
[7]     **A:** What I took out of Dr. Saathoff's
[8] description was that she had requested
[9] videotaping of the entire thing, and including
[10] the exam of the lower half of her body. I did
[11] not make a distinction that she — when Dr.
[12] Saathoff spoke to me that she — I did not
[13] understand that there was a distinction, that
[14] there was a point at which she asked the
[15] cameras to be turned off.
[16]     **Q:** Okay.
[17] Does the fact that she asked to
[18] be videoed and then asked for the video
[19] cameras to be turned off impact on your
[20] diagnosis of Dr. Siddiqui?
[21]     **A:** No.
[22]     **Q:** All right.
[23] The next line, Dr. Saathoff
[24] says: Dr. Kempke repeatedly used the term,
[25] open quotation marks, calculating when

Page 96

**C. KEMPKE**

[2] describing Ms. Siddiqui's approach to her
[3] interactions with other inmates and staff.
[4]     Did you use that word?
[5]     **A:** That is not a word I use.
[6] That particular word means very
[7] different things to me in math — as math
[8] calculations.
[9]     **Q:** So, you did not use the word
[10] calculating many times, repeatedly?
[11] You didn't tell Dr. Saathoff
[12] that?
[13]     **A:** I can't believe I'd say it once.
[14]     **Q:** Now, how about the substance of
[15] this sentence?
[16] Forget the word calculating: Dr.
[17] Kempke repeatedly used the term — some term
[18] when describing Ms. Siddiqui's approach to her
[19] interactions with other inmates and staff.
[20] Was there any other term that you
[21] can recall or can you — in regard to this
[22] sentence?
[23]     **A:** I don't recall discussing her as
[24] manipulating other people in any form.

Page 97

**C. KEMPKE**

[1]
[2]    **Q:** Okay.
[3]  Page 11 in Dr. Saathoff's report,
[4]  I'm going to skip over. I'm going to go to
[5]  Page 12.
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]    **Q:** Page 13 of Dr. Saathoff's report
[15]  — okay. That's fine.
[16]    Okay. Page 15, Paragraph 2, Dr.
[17]  **Saathoff reports:** For that matter, in the
[18]  opinion of Dr. Powers, Dr. Kempke, and the
[19]  nursing staff at FMC Carswell, they do not
[20]  believe that she suffers from a major mental
[21]  illness.
[22]    Did you say that to Dr. Saathoff?
[23]    **A:** No.
[24]    **Q:** And is that your opinion?
[25]    **A:** No.

Page 98

**C. KEMPKE**

[1]
[2]    **Q:** You were present for the
[3]  interviews with Dr. Saathoff, correct, and Dr.
[4]  Siddiqui?
[5]    **A:** At least one.
[6]  I don't know if there were others
[7]  that I was not present for.
[8]    **Q:** On Page 18, he says: In my
[9]  interviews with her on the 12th and the 13th
[10]  of 2009, she spoke to me — meaning Dr.
[11]  Siddiqui — in a clear and coherent way.
[12]    When you were listening to the
[13]  interview between Dr. Saathoff and Dr.
[14]  Siddiqui, did you think she was speaking in a
[15]  clear and coherent fashion?
[16]    **A:** Yes.
[17]    **Q:** And can you explain what you
[18]  mean?
[19]    **A:** She answered questions politely,
[20]  in good English, when she did answer.
[21]    **Q:** Did she talk — it says here —
[22]  he quotes Dr. Siddiqui: I don't make sense to
[23]  anyone here. No one listens to me. Now when
[24]  I make sense, people want to hurt me.
[25]    Do you recall Dr. Siddiqui saying

Page 99

**C. KEMPKE**

[1]
[2]  that to him?
[3]    **A:** No.
[4]    **MR. LAVIGNE:** I'm going to object
[5]  to this.
[6]    **Q:** So, you might not have been
[7]  present when Dr. Siddiqui made these comments,
[8]  it might have been at a different interview?
[9]    **A:** Yes.
[10]
[11]
[12]
[13]
[14]    **Q:** Okay. I'm going to show you on
[15]  Page 20 of Dr. Saathoff's report — I'm going
[16]  to refer you to the second paragraph under
[17]  claims of torture. I want you to look at that
[18]  paragraph, which begins: As a consequence.
[19]    And ask you whether or not you
[20]  reported that to Dr. Saathoff.
[21]    **A:** I would have said all but the
[22]  last two sentences.
[23]    I might have said that sentence,
[24]  but I would agree with the rest of them.
[25]    **Q:** Which ones do you have a question

Page 100

**C. KEMPKE**

[1]
[2]  about?
[3]    **A:** It surprised me that after her
[4]  claims about men and prior abuse she's as
[5]  comfortable as she is around men. I don't
[6]  remember discussing that.
[7]    Initially, she was clear she
[8]  wouldn't with men. If I said that, it would
[9]  have been on the basis of my understanding of
[10]  Islam treatment of — separation of medical
[11]  treatment of men and women. So, I don't
[12]  remember that at all.
[13]    **Q:** On Page 21, first paragraph —
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 101

**C. KEMPKE**

[23]    **Q:** On Page 21, Dr. Saathoff says
[24] when talking about post traumatic stress
[25] disorder: In my February 13, 2009 interview

Page 102

**C. KEMPKE**

[2] of Dr. Kempke, I learned that although this
[3] was a diagnostic consideration — referring to
[4] the post traumatic stress disorder — for FMC
[5] Carswell initially. Due to Ms. Siddiqui's
[6] initial statements, this is no longer a strong
[7] diagnostic consideration.
[8]      Did you say that to Dr.
[9] Saathoff?
[10]    **A:** I may have said that, yes.
[11]    **Q:** Okay.
[12] And what did you mean?
[13]    **A:** I was told that she was not held
[14] hostage.
[15]    **Q:** So, you were basing that on whose
[16] — what — whose report that she was not held
[17] hostage?
[18]    **A:** Dr. Johnson's.
[19]    **Q:** Okay.
[20]
[21] Dr. Johnson's written report?
[22] Dr. Johnson's statement?
[23]    **THE WITNESS:** No, statement to
[24] me.
[25]

Page 103

**C. KEMPKE**

[3]    **THE WITNESS:** Right.
[4]
[5]
[6]    **Q:** Just if she was held hostage,
[7] would post traumatic stress disorder continue
[8] to be a consideration in her diagnosis?
[9]    **A:** Yes.
[10]    **Q:** Okay.
[11] There's a note in here, in Dr.
[12] Saathoff's report, on Page 22 by Cassidy
[13] Brown, R.N., a nurse at Carswell. And she's
[14] quoted as saying: Someone who is psychotic —
[15] referring to the commissary — someone who is
[16] psychotic orders things irrationally.
[17]      Has that been your experience
[18] with psychotic patients and their use of
[19] ordering from the commissary?
[20]    **A:** Not for all psychotic patients.
[21]    **Q:** Okay.
[22] Page 31 — no.
[23] I'm going to show you Pages 37
[24] and 38 of Dr. Saathoff's report, and I'm going
[25] to direct you to look at the second — well,

Page 104

**C. KEMPKE**

[2] first of all, let's do it this way: I want
[3] you to read the section that says: Dr. Kempke
[4] echoed the assessment of Dr. Powers.
[5]      And I want you to tell me there
[6] the places where you do not agree with Dr.
[7] Saathoff's representation of your opinion.
[8]    **MR. LAVIGNE:** If you don't agree
[9] with it.
[10]    **Q:** If you don't agree with it.
[11]    **A:** In December, I was under the
[12] impression that she was depressed and
[13] psychotic.
[14]      By December, she was not
[15] depressed and psychotic. She was no longer
[16] depressed, she remained psychotic.
[17]      Again, the second sentence: Now
[18] she gives the appearance of being more
[19] calculating in what she says.
[20]      Sounds more like Dr. Powers than
[21] me, but I don't remember ever using the word
[22] calculating.
[23]      Second paragraph I believe that I
[24] would agree with: Even though she hasn't been
[25] given anti-psychotics, she has improved.

Page 105

**C. KEMPKE**

[2] Depression has improved. The
[3] paranoia had not.
[4]    I had thought that her brother
[5] would become helpful in the resolution of her
[6] symptoms. I was surprised she emphasized an
[7] interest in returning back to Pakistan.
[8]    Quite honestly, I'm actually a
[9] little — I'm not sure that I said that, but I
[10] had thought her brother would become helpful
[11] in the resolution of her symptoms would have
[12] reflected that I had hoped she would be able
[13] to spend on some time with him and he would do
[14] that, so it could be that I would say that.
[15]    The next paragraph I agree with:
[16] I am a clinical psychiatrist. I am not a
[17] forensic psychiatrist. I am not going to
[18] claim to diagnose someone as incompetent. I
[19] am the most easily conned person on the unit,
[20] and I realized that she was conning me when I
[21] received the collateral information from Dr.
[22] Johnson.
[23]    Again, we go back to the issues
[24] of her not having been held hostage.
[25]    Q: Let me just ask you a question

Page 106

**C. KEMPKE**

[2] right there.
[3]    What you're saying — the issue
[4] about her not being held hostage —
[5]    A: That was what Dr. Johnson told
[6] me. That was the collateral information from
[7] Dr. Johnson.
[8]    Q: So, if that information was true,
[9] then this statement that you made —
[10]    A: Up here.
[11]    Q: Is that right?
[12]
[13]
[14]
[15]    Q: If the statement that Dr. Johnson
[16] made to you is accurate —
[17]    A: The collateral information from
[18] Dr. Johnson?
[19]    Q: Right.
[20]    A: If that — and that being that
[21] she had not been held hostage, that statement.
[22]    Q: Okay.
[23]    A: If that was true, then I realize
[24] she was conning me.
[25]    Q: But if that statement is untrue

Page 107

**C. KEMPKE**

[2] or there's no — we don't know whether or not
[3] it was true, then —
[4]    A: Then that sentence becomes up for
[5] debate, the whole sentence.
[6]    Q: Okay.
[7]    A: The problem I've got, we get down
[8] to the last paragraph: By week three, no
[9] longer worried she was refusing the
[10] antidepressant, I initially believed her to be
[11] naive, but after Dr. Johnson's visit I noticed
[12] a difference in her.
[13]    I don't use naive about Dr.
[14] Siddiqui ever.
[15]    The refusal to speak with someone
[16] training and also her capability of making
[17] decision is not something I would have
[18] discussed.
[19]    Clearly, she demonstrates she was
[20] calculating.
[21]    I would not have used the word
[22] calculating.
[23]    This woman is very smart.
[24] Yes, she is very smart.
[25]    Q: On the next page, he continues

Page 108

**C. KEMPKE**

[2] with his interview with you.
[3]    A: After Dr. Johnson's first visit,
[4] I was concerned. She clearly demonstrated how
[5] calculating she was after Dr. Johnson's second
[6] visit.
[7]    Again, calculating is not
[8] something I would have used.
[9]    Dr. Johnson's visit really
[10] revealed her lack of cooperation.
[11]    I agree.
[12] If she's been psychotic in the
[13] last three months, I have not seen it.
[14]    I do not agree.
[15] At no time have I seen her
[16] homicidal, suicidal with evidence of thought
[17] disorder.
[18]    Here, we break this down. At no
[19] evidence have I seen her homicidal or suicidal
[20] I agree.
[21]    Evidence of thought disorder, I
[22] would — I don't know that I ever put down
[23] tangentiality, but I don't remember that I
[24] didn't.
[25]    Negative symptoms, she did not

CAMIELLE KEMPKE
July 1, 2009

Page 109

### C. KEMPKE

[2] have.

[3]     Response to internal stimuli, she

[4] did not have.

[5]     Poor grooming, I agree with that.

[6] Vegetative — the only one

[7] worrisome there is evidence of thought

[8] disorder.

[9]     **Q:** Do you think she has a thought

[10] disorder?

[11]     **A:** Yes.

[12] And then the problem is the very

[13] last paragraph is the one that is the repeat

[14] of the prior.

[15]     **Q:** Okay.

[16] I'm going to show you Pages 37

[17] and 38.

[18]     And what is the problem with the

[19] last — your last paragraph on 38, which is

[20] the third paragraph down from the top?

[21]

[22]

[23]

[24]

[25]

Page 110

### C. KEMPKE

[2]

[3]

[4]

[5]

[6]

[7]

[8]     **Q:** Explain what you mean when you

[9] read — read the statement and explain what

[10] you mean.

[11]     **A:** The statement, which seems to be

[12] attributed to Dr. Powers, is: Based on what I

[13] know now — what I now know from collateral

[14] sources, malingering is high on my

[15] differential diagnosis. I think she was upset

[16] at first getting here. I think that she is

[17] reactive in her emotions.

[18]     First sentence, I'll give you the

[19] first phrase.

[20]     Okay, let me read the second one.

[21]     **Q:** Just so we're clear, you were

[22] reading from Page 37 and were reading from the

[23] paragraph that occurs under Dr. Powers, the

[24] following statement to me.

[25]     Now you're going to Page 38,

Page 111

### C. KEMPKE

[2] which is under the paragraph of Dr. Kempke

[3] echoed the assessment of Dr. Powers and you're

[4] going to one, two, three paragraphs down.

[5]     Go ahead. Continue.

[6]     **A:** Based on what I know from

[7] collateral sources malingering is now high on

[8] my differential diagnosis, period. I think

[9] she was upset at first getting here, period.

[10] I think she was reactive in her emotions with

[11] response to stress, period.

[12]     And I can read phrase by phrase.

[13] They are the same: Based on what I now know

[14] from collateral sources, comma.

[15]     Based on what I now know from

[16] collateral sources, comma.

[17]     **Q:** I understand they're the same.

[18] Did you make that statement to

[19] Dr. Saathoff?

[20]     **A:** No.

[21]     **Q:** And it is written as if you and

[22] Dr. Johnson — Dr. Powers made the exact same

[23] statement to Dr. Saathoff.

[24]     Is that correct?

[25]     **A:** Yes, sir — yes, ma'am.

Page 112

### C. KEMPKE

[2]     **Q:** Have there been any repercussions

[3] for you in regard to your continuing to

[4] maintain your diagnosis of Dr. Siddiqui as

[5] psychotic?

[6]     **MR. LAVIGNE:** Objection.

[7] Repercussions?

[8]     **Q:** At your job.

[9]     **A:** No.

[10]     **Q:** Has there been any — have you

[11] been — had any interaction with anyone, any

[12] conversations with anyone, in regard to your

[13] continuing to have a diagnosis of psychotic

[14] for Dr. Siddiqui?

[15]     **A:** Yes.

[16]     **Q:** Explain?

[17]     **A:** I have been instructed how I

[18] could be wrong.

[19]     **Q:** And who has instructed you?

[20]     **A:** Dr. Cherry.

[21]     **Q:** And Dr. Cherry is who?

[22]     **A:** My supervisor.

[23]     **Q:** And what's been the sum and

[24] substance of those conversations?

[25]     **A:** That it's okay to disagree.

Page 113

**C. KEMPKE**

[1]
[2]    **Q:** And who said that to — Dr.
[3] Cherry said that to you?
[4]    **A:** Yes, ma'am.
[5]    **Q:** Okay.
[6] Have you had any conversations
[7] with Dr. Powers about your continuing to have
[8] a diagnosis of psychosis and delusions for —
[9] paranoid delusions for Dr. Siddiqui?
[10]    **A:** Yes.
[11]    **Q:** And what have been the sum and
[12] substance of those conversations?
[13]    **A:** Originally, she described —
[14] described me as being naive for believing it.
[15] Later, she has come to the state that we're
[16] able to disagree.
[17]    **MR. LAVIGNE:** When you have she,
[18] are you referring to Dr. Powers or Ms.
[19] Siddiqui?
[20]    **THE WITNESS:** Dr. Powers.
[21]    **MS. CARDI:** Dr. Powers.
[22]    **MR. LAVIGNE:** Okay.
[23]    **MS. CARDI:** I have no further
[24] questions.
[25]    **THE VIDEOGRAPHER:** Time is now

Page 114

**C. KEMPKE**

[1]
[2] 4:35.
[3]    We are now off the record.
[4]    (Recess taken)
[5]    **THE VIDEOGRAPHER:** Time is now
[6] 4:44 p.m.
[7]    On the record.
[8]                **EXAMINATION**
[9]            **BY MR. LAVIGNE:**
[10]    **Q:** Good afternoon, Dr. Kempke.
[11]    **A:** Hello, Mr. Lavigne.
[12]    **Q:** As you know, my name is Chris
[13] Lavigne. I'm going to be asking you some
[14] questions. If at any time you don't
[15] understand one of my questions, please let me
[16] know.
[17]    Okay?
[18]    **A:** Okay.
[19]    **Q:** Dr. Kempke, you were not
[20] appointed by the Court in this case to make a
[21] determination about the Defendant's
[22] competency.
[23]    Is that right?
[24]    **A:** Correct.
[25]    **Q:** And it's fair to say that you

Page 115

**C. KEMPKE**

[1]
[2] don't consider yourself qualified to make a
[3] determination about somebody's competency to
[4] stand trial?
[5]    **A:** Yes, sir.
[6]    **Q:** You've told these lawyers here,
[7] for example, this past week that the only
[8] thing you can opine upon is a mental disorder.
[9]    Is that right?
[10] Well, let me rephrase it. It's a
[11] poor question.
[12]    **A:** Okay.
[13]    **Q:** You've told the attorneys here
[14] that the only thing you can opine on in this
[15] case is whether the Defendant suffers from a
[16] mental disorder.
[17]    **A:** I think that's what I eventually
[18] said.
[19]    My — when I reviewed it with Mr.
[20] Frazier, Mike Frazier of the regional office,
[21] he gave me a statute — I don't know what it
[22] is, but it's from your equivalent to the DSM
[23] that says that I can be a fact witness,
[24] whatever that means.
[25]    **Q:** Okay.

Page 116

**C. KEMPKE**

[1]
[2] But you're not here testifying as
[3] an expert about whether the Defendant is
[4] competent to stand trial.
[5]    Correct?
[6]    **A:** Yes, sir.
[7]    **Q:** You were not — and you are here
[8] testifying on behalf of the Defendant in this
[9] case.
[10]    Correct?
[11]    **A:** I was requested to come by the
[12] Defendant.
[13]    **Q:** By the Defendant's lawyers.
[14] Right?
[15]    **A:** Right.
[16]    **Q:** How many times have you spoken
[17] with the Defendant's lawyers before today?
[18]    **A:** One, two — well, three if you
[19] count this morning.
[20]    **Q:** And did you meet with them in
[21] person this morning?
[22]    **A:** Yeah.
[23]    **Q:** About how long did you sit down
[24] and talk with them for?
[25]    **A:** An hour?

---

**Page 117**

**C. KEMPKE**

[1]
[2] I don't know. I watched the
[3] videotape for an hour, I was late by 45
[4] minutes, and then we had to take a taxi, and
[5] we got there — it may have been an hour or
[6] two.
[7]    **Q:** You have also spoke with them on
[8] the phone.
[9]    Correct?
[10]   **A:** Yes.
[11]   **Q:** And the attorneys have provided
[12] you with various pieces of information.
[13]   Correct?
[14]   **A:** Yes.
[15]   **Q:** They provided you with Dr.
[16] Saathoff's report?
[17]   **A:** Yes.
[18]   **Q:** Dr. Johnson's report?
[19]   **A:** Yes.
[20]   **Q:** And Dr. Kucharski's report?
[21]   **A:** Yes.
[22]   **Q:** And Dr. Powers' report?
[23]   **A:** I have access to both of those.
[24]   **Q:** Both of those.
[25] But you were given all these

---

**Page 118**

**C. KEMPKE**

[1]
[2] documents when?
[3]    Within the last two or three
[4] weeks?
[5]    **A:** In the last week, yeah.
[6]    **Q:** Did you request them or did the
[7] defense lawyers provide them to you?
[8]    **A:** They provided them to me.
[9] I did go into Dr. Powers' notes,
[10] partly because I needed during the same week
[11] to do the discharge summary for Dr. Powers —
[12] Dr. Siddiqui's chart, medical chart.
[13]   **Q:** Now, it's fair to say you are not
[14] or you were not Ms. Siddiqui's treating
[15] psychiatrist.
[16]   Correct?
[17]   **A:** I can't answer that question.
[18]   **Q:** You can't answer that?
[19]   **A:** Because I had to see the patient
[20] as part of my duties. In psychiatry,
[21] supportive psychotherapy is a treatment, but I
[22] didn't prescribe her any medications.
[23]   **Q:** We'll get to that.
[24] But Ms. Siddiqui was sent to
[25] Carswell on a 4241 referral.

---

**Page 119**

**C. KEMPKE**

[1]
[2]    Correct?
[3]    **A:** A 4241 B referral.
[4]    **Q:** 4241 B referral.
[5] And that's because the judge
[6] determined there was a reasonable cause to
[7] believe she may not be competent to stand
[8] trial.
[9]    Correct?
[10]   **A:** Correct.
[11]   **Q:** So, Ms. Siddiqui went to Carswell
[12] for evaluation.
[13]   Correct?
[14]   **A:** I'm a little — there's another
[15] problem in here.
[16]    It says that Dr. McLean, another
[17] psychiatrist, who I actually happen to know,
[18] at MDC Brooklyn felt that she needed different
[19] treatment than they could provide there.
[20]    I'm not clear, since we didn't
[21] get any of that information and I'm not—
[22] whether there was an emergency transfer at the
[23] same time. So, that's why under — what
[24] eventually came out at the end of it, or at,
[25] you know, partway into it anyway, it became

---

**Page 120**

**C. KEMPKE**

[1]
[2] clear she was a 4241 B. But when she first
[3] arrived, I'm not sure that we were clear she
[4] was not an emergency transfer.
[5]    **Q:** But the answer to my question is
[6] that Ms. Siddiqui was sent to Carswell for
[7] evaluation.
[8]    Correct?
[9]    **A:** If she was a transfer, it would
[10] have been for treatment.
[11]   **Q:** Yes or no?
[12] You done know?
[13]   **A:** I don't know what you're asking.
[14] You'll have to —
[15]   **Q:** Ms. Siddiqui was sent to
[16] Carswell, ordered by the judge in this case to
[17] be evaluated for her competence to stand
[18] trial.
[19]   Correct?
[20]   **A:** I'm sure she was sent there for
[21] that.
[22]   **Q:** Okay.
[23] Now, you were not the forensic
[24] evaluator in this case.
[25]   Correct?

---

**Min-U-Script®**

Page 121

**C. KEMPKE**

[1]
[2] A: Correct.
[3] Q: You are not a forensic evaluator
[4] at all.
[5]     Correct?
[6] A: Correct.
[7] Q: You're a clinical psychiatrist.
[8] Is that right?
[9] A: Yes.
[10] Q: And Ms. Siddiqui saw you because
[11] she had been prescribed drugs while she was at
[12] MDC.
[13]     Correct?
[14] A: Incorrect.
[15] Q: Incorrect.
[16] After Ms. Siddiqui came to
[17] Carswell, you spoke with her.
[18]     Correct?
[19] A: Correct.
[20] Q: And you spoke with her even
[21] though you were not the evaluator.
[22]     Correct?
[23] A: Correct.
[24] Q: Now, you testified on direct that
[25] it's your belief that Ms. Siddiqui is a

Page 122

**C. KEMPKE**

[1]
[2] paranoid schizophrenic.
[3]     Is that right?
[4] A: Yes, sir.
[5] Q: I want to talk about that
[6] diagnosis a little bit.
[7]     You made that diagnosis after
[8] seeing Ms. Siddiqui on October 3, 2008.
[9]     Correct?
[10] A: Incorrect.
[11] Q: Okay.
[12] Well, on October 3, 2008, you
[13] wrote, and I'm quoting: My opinion is that
[14] there's a 99 percent certainty that the
[15] Defendant is psychotic.
[16]     Is that right?
[17] A: Yes, sir.
[18] Q: You made that assessment, 99
[19] percent certainty, based on your observations
[20] of the Defendant that day.
[21]     Correct?
[22] A: Yes, sir.
[23] Q: And that was less than an hour.
[24] Correct?
[25] A: I doubt it.

Page 123

**C. KEMPKE**

[1]
[2] I suspect it was closer to an
[3] hour. Close to an hour, if not that.
[4] Q: I thought you said on direct
[5] examination it was maybe 45 minutes to an
[6] hour.
[7] A: Okay, 45 minutes to an hour.
[8] Q: So, after 45 minutes to an hour
[9] of meeting with Ms. Siddiqui, you were 99
[10] percent certain that she was psychotic?
[11] A: Yes, sir.
[12] Q: You made that assessment based
[13] purely on your observations and conversations
[14] with Ms. Siddiqui.
[15]     Is that right?
[16] A: That's not an assessment, that's
[17] a description of a symptom.
[18] Q: Okay.
[19] You made that based on your
[20] conversations and your observations with Ms.
[21] Siddiqui.
[22]     Is that right?
[23] A: Yes.
[24] Q: Now, you were aware at that time
[25] you made that entry that Ms. Siddiqui came

Page 124

**C. KEMPKE**

[1]
[2] from the MDC.
[3]     Correct?
[4] A: Yes, sir.
[5] Q: When you made that entry in your
[6] report or in the progress notes, you had not
[7] spoken with staff members of the MDC about Ms.
[8] Siddiqui.
[9]     Is that right?
[10] A: That is correct.
[11] Q: When you made that statement, you
[12] had not reviewed all the personal data system
[13] notes on Ms. Siddiqui.
[14]     Correct?
[15] A: Correct.
[16] Q: When you made that statement, you
[17] had not reviewed the MDC logbook.
[18]     Correct?
[19] A: Correct.
[20] Q: You had not reviewed all her
[21] medical records.
[22]     Correct?
[23] A: Correct.
[24] Q: You had not spoken with law
[25] enforcement who had been in contact with Ms.

Page 125

**C. KEMPKE**

[1]
[2] Siddiqui.
[3]     Correct?
[4]     **A:** Correct.
[5]     **Q:** According to this note, you were
[6] 99 percent certain she was psychotic.
[7]     Is that right?
[8]     **A:** Yes, sir.
[9]     **Q:** Now, even though you were 99
[10] percent certain Ms. Siddiqui was psychotic on
[11] October 3, 2008, your view of Ms. Siddiqui's
[12] condition has changed.
[13]     Isn't that right?
[14]     **A:** She continues to carry
[15] psychosis. She no longer carries depression.
[16]     **Q:** So, your view of her has changed,
[17] it's evolved.
[18]     Correct?
[19]     **A:** Yes, sir.
[20]
[21]
[22]
[23]
[24]
[25]

Page 126

**C. KEMPKE**

[1]
[2]     **Q:** During the — over the last ten
[3] months, you've made different statements
[4] regarding your view of Ms. Siddiqui's
[5] condition.
[6]     Correct?
[7]     **MS. CARDI:** Objection.
[8]     **Q:** You can answer it.
[9]     **A:** I have no clue what you're
[10] talking about. I'm sorry, sir.
[11]     **Q:** You have no clue what I'm talking
[12] about.
[13]     Over the last — from October
[14] 2008 'til now, have you had discussions with
[15] different people about Ms. Siddiqui's mental
[16] health condition?
[17]     **A:** Basically, no.
[18]     **Q:** So, from October 2008 until now,
[19] you have had no conversations with anybody
[20] about Ms. Siddiqui's mental health condition?
[21]     **A:** I have not been asked for a
[22] diagnosis.
[23]     **Q:** I'm not asking about a diagnosis.
[24] Have you made statements to
[25] different people about Ms. Siddiqui's mental

Page 127

**C. KEMPKE**

[1]
[2] health condition?
[3]     **A:** I have spoken about my
[4] observations of her.
[5]     **Q:** You've spoken about your
[6] observations to different people.
[7]     Correct?
[8]     **A:** Yes, sir.
[9]     **Q:** Since October 2008.
[10] Is that right?
[11]     **A:** Yes, sir.
[12]     **Q:** And in making those statements,
[13] you have not always said she's psychotic.
[14]     Isn't that right?
[15]     **A:** I have not been asked that
[16] specific question, sir, so, yes, I may have
[17] said that she was improved, she wasn't
[18] depressed, but I think my notes are fairly
[19] clear.
[20]     **Q:** I'm not asking about your notes,
[21] I'm asking about what you said.
[22]     Is it fair to say you told
[23] different people —
[24]
[25]

Page 128

**C. KEMPKE**

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]     **Q:** Since October 2008, have you made
[9] statements regarding Ms. Siddiqui's mental
[10] health, yes or no?
[11]     **A:** Yes.
[12]     **Q:** And in those statements, you have
[13] indicated that Ms. Siddiqui's condition has
[14] improved.
[15]     Correct?
[16]     **A:** Yes, sir.
[17]     **Q:** Now, you testified on direct
[18] examination about certain of your observations
[19] of Ms. Siddiqui.
[20]     Correct?
[21]     **A:** Yes, sir.
[22]     **Q:** You testified about certain
[23] statements Ms. Siddiqui has made to you.
[24]     Isn't that right?
[25]     **A:** Yes, sir.

Page 129

**C. KEMPKE**

[1]
[2]    **Q:** Certain hallucinations Ms.
[3] Siddiqui has claimed to have had.
[4]    Correct?
[5]    **A:** Incorrect.
[6]    **Q:** Incorrect?
[7]    **A:** Yes, sir.
[8]    **Q:** So, Ms. Siddiqui has never made
[9] statements to you about hallucinations she's
[10] had?
[11]   **A:** Ms. Siddiqui has described
[12] symptoms. I do not consider what she has
[13] described to be hallucinations.
[14]   **Q:** Ms. Siddiqui has described — you
[15] don't consider them to be hallucinations.
[16]   Is that what you're testifying?
[17]   **A:** Exactly.
[18]   **Q:** Okay.
[19] On your October 3, 2008 note,
[20] which is MED 46, isn't it true that you
[21] write: PTS symptoms — PTSD symptoms with
[22] lost and vagueness of memory for certain
[23] incidents while she clings to what could be
[24] visual hallucinations of her children as a
[25] comfort.

Page 130

**C. KEMPKE**

[1]
[2]    Did you make that entry?
[3]    **A:** Yes, sir.
[4]    **Q:** And today you don't consider
[5] those to be hallucinations?
[6]    **A:** Correct.
[7]    **Q:** And when did you determine that
[8] those were not hallucinations?
[9]    **A:** After she had been on the unit
[10] and I found out that they were occurring at
[11] night only, very briefly, as in moments of
[12] time, and they appeared to be occurring at a
[13] hypnogogic time.
[14]   **Q:** Now, in some of the statements
[15] you report on Ms. Siddiqui, she has claimed to
[16] you that she's been dead.
[17]   Correct?
[18]   **A:** She has made statements that she
[19] is dead.
[20]   **Q:** Ms. Siddiqui has also made
[21] statements, you testified on direct, that she
[22] fears being poisoned.
[23]   Isn't that right?
[24]   **A:** Yes, sir.
[25]   **Q:** Now, Dr. Kempke, in treating

Page 131

**C. KEMPKE**

[1]
[2] patients, you would agree with me that it is
[3] important to get as much information as
[4] possible.
[5]    Correct?
[6]    **A:** Including cultural context, yes.
[7]    **Q:** I'm sorry, including what?
[8]    **A:** Cultural context, yes.
[9]    **Q:** So, the answer to my question is
[10] yes, in treating patients it's important to
[11] get as much information as possible.
[12]   Correct?
[13]   **A:** Of course.
[14]   **Q:** That helps insure that you can
[15] make an appropriate diagnosis.
[16]   Right?
[17]   **THE WITNESS:** I'm supposed to
[18] answer that?
[19]   **MS. CARDI:** Yes.
[20]   **Q:** Yes, you are.
[21]   **A:** Okay, yes.
[22]   **Q:** Part of your job as a
[23] psychiatrist depends on patients telling you
[24] accurate symptoms.
[25]   Correct?

Page 132

**C. KEMPKE**

[1]
[2]    **A:** No.
[3] Part of it may, but most of my
[4] patients, including sane ones, filter their
[5] experiences through things which can't be
[6] described as truth or nontruth because I deal
[7] with their emotions and behaviors.
[8]    **Q:** But it's true that sometimes
[9] patients don't accurately tell you what their
[10] emotions motions and feelings are.
[11]   Isn't that right?
[12]   **A:** Yes.
[13]   **Q:** And that's what's — sometimes
[14] patients lie to mental health professionals.
[15]   Is that right?
[16]   **A:** Yes, sir.
[17]   **Q:** Sometimes that happens in the
[18] mental health context.
[19]   Correct?
[20]   **A:** All the time.
[21]   **Q:** That's known as malingering.
[22] Right?
[23]   **A:** No.
[24]   **Q:** No?
[25]   **A:** No.

CAMIELLE KEMPKE
July 1, 2009

USA v.
SIDDIQUI

---

Page 133

**C. KEMPKE**

[1]
[2]  **Q:** Well, let's talk about
[3]  malingering. Malingering basically means when
[4]  patients present false symptoms.
[5]      Correct?
[6]   **A:** No.
[7]  You have to have an additional
[8]  reason and secondary gain.
[9]   **Q:** We'll talk about that. Let's
[10] talk about malingering.
[11]     DSM lists four different criteria
[12] for malingering.
[13]     Isn't that right?
[14]  **A:** I don't know, sir.
[15]  **Q:** You don't know. Okay.
[16] One of the factors for
[17] malingering in the DSM is to consider whether
[18] a person's mental health presentation occurs
[19] in a legal context.
[20]     Are you aware of that?
[21]  **A:** Yes, sir.
[22]  **Q:** Okay.
[23] Another criteria is if the
[24] patient is cooperative with treatment and
[25] testing.

---

Page 134

**C. KEMPKE**

[1]
[2]      Correct?
[3]   **A:** I don't know, sir.
[4]   **Q:** You don't know that.
[5]  Another criteria is if there's a
[6]  discrepancy between objective findings and
[7]  symptoms.
[8]      Isn't that right?
[9]   **A:** Yes sir.
[10]  **Q:** And another criteria is if a
[11] person has anti-social disorder?
[12]  **A:** Could be.
[13]  **Q:** Could be.
[14] Well, I want to talk about the
[15] context of Ms. Siddiqui's presentation.
[16] Ms. Siddiqui came to Carswell
[17] because of — in the context of a criminal
[18] proceedings.
[19]     Correct?
[20]  **A:** Yes.
[21]  **Q:** You're aware that Ms. Siddiqui
[22] was charged with attempting to kill United
[23] States Officers and FBI agents.
[24]  **A:** Yes, sir.
[25]  **Q:** You're aware that Ms. Siddiqui

---

Page 135

**C. KEMPKE**

[1]
[2]  was indicted for that offense.
[3]   **A:** I don't — I'm afraid, sir, I'm
[4]  not privy to that.
[5]   **Q:** You're not privy to that?
[6]   **A:** I do not get the difference
[7]  between indicting and charging, and I don't
[8]  get the court documents. So, I can't tell
[9]  you.
[10]  **Q:** So you don't know?
[11]  **A:** Right.
[12]  **Q:** I'm asking, you don't know?
[13]  **A:** I don't know.
[14]  **Q:** Okay.
[15] Are you aware that Ms. Siddiqui's
[16] facing a life sentence for these offenses?
[17]  **A:** No.
[18]  **Q:** Are you aware that Ms. Siddiqui,
[19] if convicted is facing a mandatory minimum of
[20] thirty years incarceration?
[21]  **A:** I don't know those mandatories,
[22] no, sir.
[23]  **Q:** Are you also aware that Ms.
[24] Siddiqui has expressed a desire to return to
[25] Pakistan?

---

Page 136

**C. KEMPKE**

[1]
[2]   **A:** I understand that when — yes.
[3]   **Q:** Are you also aware that Pakistan
[4]  authorities publicly have requested that she
[5]  be repatriated?
[6]   **A:** No, sir.
[7]   **Q:** Are you aware that a finding of
[8]  incompetence in this case may increase the
[9]  chances —
[10]
[11]  **Q:** — of repatriation?
[12]
[13]
[14]  **Q:** You can answer.
[15] Are you aware of that?
[16]  **A:** No, sir.
[17]  **Q:** You're not aware. Okay.
[18] And I believe, turning to Exhibit
[19] MED 141, which is your note from November 17,
[20] 2008, do you recall writing — and these are
[21] your —
[22]  **A:** I can see basically what you're
[23] reading. So, if you read it I'll...
[24]  **Q:** Okay.
[25] These are your notes.

---

Page 137

**C. KEMPKE**

[1]
[2] Correct?
[3]   **A:** I have a copy of mine —
[4]   **MS. CARDI:** Want me to give it to
[5] her?
[6]   **MR. LAVIGNE:** Sure.
[7]   **MS. CARDI:** Here.
[8]   **Q:** These are your notes.
[9] Correct?
[10]   **A:** Yes, sir.
[11]   **Q:** And you take these notes after
[12] you meet with Ms. Siddiqui.
[13]   Right?
[14]   **A:** Some during, as we talked about
[15] on the other page, yeah.
[16]   **Q:** And in this note, you write: If
[17] she were released, she would either go home to
[18] Pakistan or Houston with her brother to never
[19] leave the house.
[20]   Isn't that right?
[21]   **A:** Yes.
[22]   **Q:** Now, you also know, Dr. Kempke,
[23] from your experience and time at Carswell that
[24] Ms. Siddiqui has not been cooperative with
[25] this evaluation.

Page 138

**C. KEMPKE**

[1]
[2]   Correct?
[3]   **A:** Correct.
[4]   **Q:** You're aware that Dr. Powers has
[5] attempted to have psychological testing done
[6] on Ms. Siddiqui?
[7]   **A:** Yes, sir.
[8]   **Q:** You're aware that Dr. Saathoff
[9] had attempted to administer a psychological
[10] test?
[11]   **A:** Yes, sir.
[12]   **Q:** And Ms. Siddiqui has not
[13] cooperated with those efforts.
[14]   Isn't that right?
[15]   **A:** Yes, sir.
[16]   **Q:** And you were present when Dr.
[17] Saathoff attempted to administer that test.
[18]   Correct?
[19]   **A:** Yes sir.
[20]   **Q:** I believe that was the PAI.
[21] Isn't that right?
[22]   **A:** Some personality inventory.
[23]   **Q:** You've never attempted to give
[24] Ms. Siddiqui a psychological test.
[25]   Correct?

Page 139

**C. KEMPKE**

[1]
[2]   **A:** No, sir.
[3]   **Q:** Because that's not part of what
[4] you do?
[5]   **A:** That's not my job.
[6]   **Q:** Your job is treating.
[7] Correct?
[8]   **A:** Correct.
[9]   **Q:** Not evaluating.
[10]   **A:** Correct.
[11]   **Q:** Now —
[12]   **A:** I — well — wait a minute, I'm
[13] sorry.
[14]   Evaluating a psychiatric intake
[15] is called a psychiatric evaluation. So,
[16] evaluating for competency —
[17]   **Q:** That's what I meant.
[18]   **A:** Okay.
[19]   **Q:** Now, Dr. Kempke, in deciding
[20] whether — or making a determination about
[21] whether Ms. Siddiqui's mentally ill, in part
[22] you need to decide whether Ms. Siddiqui is
[23] accurately portraying her symptoms.
[24]   Isn't that right?
[25]   **A:** That's part of it, yes.

Page 140

**C. KEMPKE**

[1]
[2]   **Q:** Okay.
[3] But making that decision is
[4] something that's difficult to do.
[5]   Correct?
[6]   **A:** Yes, sir.
[7]   **Q:** Because you're a treating
[8] psychiatrist.
[9]   Right?
[10]   **A:** Yes, sir.
[11]   **Q:** So, I think, as you indicated on
[12] direct, when patients come to you, you assume
[13] they're telling you, providing you, accurate
[14] symptoms.
[15]   Right?
[16]   **A:** No.
[17]   **Q:** Well, during Ms. Siddiqui's time
[18] at Carswell you came to view her as your
[19] patient?
[20]   **A:** Yes, sir.
[21]   **Q:** And isn't it true that because
[22] you viewed her as your patient, you did not
[23] ask her or you avoided specifically asking her
[24] about her past?
[25]   **A:** Yes, sir.

---

Page 141

**C. KEMPKE**

[1]

[2]   **Q:** And you told the attorneys here,

[3] Ms. Cardi and Mr. Edgar, either of them, that

[4] you refrained asking direct questions because

[5] you were afraid of losing her trust.

[6]   **A:** Yes, sir.

[7]   **Q:** And it's also true that you

[8] consider yourself the most easily conned

[9] person on the M1 unit.

[10]   **A:** That may be a little bit of a

[11] euphemism or exaggeration for emphasis' sake.

[12]   **Q:** Yes or no?

[13]   **A:** No.

[14]   **Q:** You don't consider yourself?

[15]   **A:** No.

[16]   **Q:** But you consider yourself easily

[17] conned?

[18]   **A:** Yes.

[19]   **Q:** Easily duped?

[20]   **A:** Sir, that implies a level of

[21] stupidity that I don't really want to agree

[22] to.

[23]   **Q:** Okay. I'm not suggesting you're

[24] stupid, Dr. Kempke.

[25]   And isn't it true that you also

---

Page 142

**C. KEMPKE**

[1]

[2] — well, I'll withdraw that.

[3]   But in deciding whether someone,

[4] even a patient, is being truthful in

[5] summarizing their symptoms, you need to decide

[6] — you need to make a credibility assessment.

[7]   Right?

[8]   **A:** Can you explain credibility

[9] assessment?

[10]   **Q:** Sure.

[11] You need to decide if they're

[12] being truthful or if they're making it up?

[13]   **A:** Okay.

[14]   **Q:** Right?

[15]   **A:** Yea.

[16]   **Q:** You have to judge somebody's

[17] character, basically.

[18]   **A:** Okay.

[19]   **Q:** Right?

[20] Now, in speaking with defense

[21] counsel this week, isn't it true that you said

[22] Ms. Siddiqui does not strike you as someone

[23] who cold-bloodedly left her children and

[24] became a terrorist?

[25]   **A:** Yes.

---

Page 143

**C. KEMPKE**

[1]

[2]   **Q:** Now, are you aware that the day

[3] before shooting in this case Ms. Siddiqui was

[4] arrested by the Afghan National Police?

[5]   **A:** Yes, sir.

[6]   **Q:** Are you aware that when Ms.

[7] Siddiqui was arrested by the Afghans she was

[8] in possession of various handwritten

[9] documents?

[10]   **A:** Yes, sir.

[11]   **Q:** Are you aware that certain of

[12] those handwritten documents contained

[13] instructions on explosives?

[14]

[15]

[16]   **A:** I have heard of that, yes.

[17]   **Q:** Okay.

[18] Have you also heard that certain

[19] of those handwritten documents contained

[20] instructions on chemical and biological

[21] weapons?

[22]

[23]   **A:** I don't know about that one.

[24]   **Q:** Have you also heard that Ms.

[25] Siddiqui was in possession of a computer

---

Page 144

**C. KEMPKE**

[1]

[2] drive?

[3]   **A:** Yes.

[4]   **Q:** And have you also heard that that

[5] computer drive contained documents that

[6] contained instructions on explosives?

[7]

[8]   **A:** I don't know that. I did not

[9] know the contents of the computer drive, I'm

[10] sorry.

[11]   **Q:** Are you aware that when Ms.

[12] Siddiqui was detained by the Afghan National

[13] Police, she was in possession of sodium

[14] cyanide?

[15]   **A:** I was not aware of that.

[16]   **Q:** Are you aware that sodium cyanide

[17] can be used to poison people?

[18]

[19]

[20]

[21]

[22]   **Q:** You can answer.

[23]

[24]

[25]   **A:** I don't know, sir.

---

**Page 145**

**C. KEMPKE**

[1]
[2]     **Q:** Are you aware that Ms. Siddiqui
[3] possessed all of these items — I withdraw
[4] that.
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]     **Q:** Dr. Kempke, are you aware that
[14] when Ms. Siddiqui was detained by the Afghans
[15] on July 17, 2008, she was with her son?
[16]     **A:** Okay, that's a very complicated
[17] answer. It's not a yes-or-no answer.
[18]     **Q:** That's not a yes-or-no answer.
[19] Okay.
[20]     Are you aware that when Ms.
[21] Siddiqui was arrested in Afghanistan on July
[22] 17, 2008, she was with an eleven year old boy?
[23]     **A:** I didn't know his age, but I knew
[24] she was with a young boy.
[25]     **Q:** Okay.

**Page 146**

**C. KEMPKE**

[1]
[2] Are you aware that Ms. Siddiqui
[3] brought that boy with her from Pakistan to
[4] Gazni, Afghanistan?
[5]
[6]
[7]     **A:** I don't — did not know any of
[8] that.
[9]     **Q:** Are you aware that while in
[10] United States custody, Ms. Siddiqui lied about
[11] the identify of that boy?
[12]
[13]
[14]
[15]
[16]
[17]     **A:** I know that she told me that at
[18] first she didn't know that he was her son and
[19] that he and she didn't recognize her, and that
[20] she later told me he was her son, that they
[21] had found she was her — he was her son.
[22]     **Q:** So, Ms. Siddiqui told you that
[23] the boy she was with was, in fact, her son?
[24]     **A:** Several months after arriving at
[25] Carswell, yes.

**Page 147**

**C. KEMPKE**

[1]
[2]     **Q:** Ms. Siddiqui told you that
[3] several months after arriving at Carswell.
[4]     **A:** Yes, sir.
[5]     **Q:** And initially she did not tell
[6] you that?
[7]     **A:** Initially, she didn't know.
[8]     **Q:** Initially she told you she didn't
[9] know.
[10]     **A:** Correct.
[11]     **THE WITNESS:** May I give you this
[12] back?
[13]     **MS. CARDI:** Oh, sure.
[14]     **Q:** Dr. Kempke, in deciding whether
[15] Ms. Siddiqui is being truthful in provided —
[16] in telling you her symptoms, one important
[17] piece is to compare what Ms. Siddiqui is
[18] recording with what objective facts are.
[19] Correct?
[20]     **A:** Correct.
[21]     **Q:** I want to talk about some of
[22] those facts.
[23]     You're aware that Ms. Siddiqui
[24] lived in the United States for twelve years.
[25] Correct?

**Page 148**

**C. KEMPKE**

[1]
[2]     **A:** She told me that, yes.
[3]     **Q:** You're aware Ms. Siddiqui
[4] exhibited a high level of functioning during
[5] those twelve years.
[6]     **A:** Yes, I am aware of what.
[7]     **Q:** You're aware that Ms. Siddiqui
[8] attended MIT.
[9]     Correct?
[10]     **A:** Yes, sir.
[11]     **Q:** You're aware that Ms. Siddiqui
[12] obtained a graduate degree from Brandeiss
[13] University?
[14]     **A:** Yes, she told me that.
[15]     **Q:** You're also aware that Ms.
[16] Siddiqui wrote a dissertation?
[17]     **A:** Yes, sir.
[18]     **Q:** You're also aware that Ms.
[19] Siddiqui took — are you aware that Ms.
[20] Siddiqui took psychology courses at both
[21] universities?
[22]     **A:** I believe she said that, yes.
[23]     **Q:** You're also aware that during
[24] this — you're also aware that Ms. Siddiqui
[25] has three children.

**CAMIELLE KEMPKE**
July 1, 2009

---

Page 149

**C. KEMPKE**

[1]
[2]    Correct?
[3]    **A:** Yes sir.
[4]    **Q:** Are you aware that Ms. Siddiqui
[5] raised two of those children in the United
[6] States?
[7]    **A:** I don't know which — I mean, I
[8] know that some of the children — son was a
[9] baby. I don't know the years or the dates.
[10]    **Q:** You're aware that Ms. Siddiqui
[11] lived in the United States —
[12]    **A:** With her children.
[13]    **Q:** With her children?
[14]    **A:** Yes.
[15]    **Q:** And with her husband?
[16]    **A:** Yes.
[17]    **Q:** And obtained these advanced
[18] degrees?
[19]    **A:** Yes.
[20]    **Q:** And, as far as you're aware, does
[21] not have a prior history of mental health
[22] treatment?
[23]    **A:** Correct.
[24]    **Q:** But sitting here today, you're
[25] testifying your view that Ms. Siddiqui is

---

Page 150

**C. KEMPKE**

[1]
[2] psychotic.
[3]    **A:** Yes, sir.
[4]    **Q:** And your opinion today is based
[5] upon events that have occurred since Ms.
[6] Siddiqui — let me withdraw that.
[7]    Your testimony today is based on
[8] your observations and interactions with Ms.
[9] Siddiqui since she came to Carswell?
[10]    **A:** And review of the records that
[11] we've gotten since — I mean, from MDC
[12] Brooklyn and the reports of Drs. Johnson and
[13] Saathoff.
[14]    **Q:** Okay.
[15] Before you testified today, did
[16] you speak with anybody at the MDC regarding
[17] Ms. Siddiqui?
[18]    **A:** I e-mailed to Dr. McLean.
[19]    **Q:** Did you speak to her?
[20]    **A:** No.
[21]    **Q:** Did she respond to your e-mail?
[22]    **A:** Yes.
[23]    **Q:** Did you speak with any of the
[24] staff members at the MDC who observed Ms.
[25] Siddiqui?

---

Page 151

**C. KEMPKE**

[1]
[2]    **A:** No, sir.
[3]    **Q:** And you didn't communicate with
[4] any of those staff members at all?
[5]    **A:** No, sir.
[6]    **Q:** And you communicated with Dr.
[7] McLean by e-mail, but that's it?
[8]    **A:** And we did not discuss name or
[9] symptom, she just wished me luck.
[10]    **Q:** So, you haven't had any contact
[11] with anybody at MDC about Ms. Siddiqui's stay
[12] there or her health?
[13]    **A:** Right, yeah, okay.
[14]    **Q:** Have you spoke with anybody at
[15] the Department of Justice about Ms. Siddiqui?
[16]    **A:** BOP is Department of Justice.
[17]    **Q:** Okay.
[18] Other than BOP.
[19] Fair point.
[20]    **A:** Sorry.
[21]    **Q:** Fair point.
[22]    **A:** We take it very seriously.
[23]    **Q:** I understand.
[24]    **A:** Anyway, no, nobody outside the
[25] BOP.

---

Page 152

**C. KEMPKE**

[1]
[2]    **Q:** You didn't speak with any law
[3] enforcement agents who were present with Ms.
[4] Siddiqui in Afghanistan?
[5]    **A:** No, sir.
[6]    **Q:** You didn't speak with any law
[7] enforcement agents who took Ms. Siddiqui from
[8] Afghanistan to the United States?
[9]    **A:** No, sir.
[10]    **Q:** And other than the medical
[11] documents you obtained from Carswell, you
[12] didn't look at any of her medical — you
[13] didn't look at any other documents.
[14]    Is that right?
[15]    **A:** No.
[16] And as a matter of fact Dr.
[17] Powers didn't give me her documents either.
[18]    **Q:** So you also didn't look at the
[19] forensic file?
[20]    **A:** Correct.
[21]    **Q:** And the medical documents you
[22] reviewed were the medical documents from
[23] Carswell.
[24]    **A:** Yes, sir.
[25]    **Q:** Now, I want to talk about — I

---

**Min-U-Script®**

---

Page 153

**C. KEMPKE**

[1]
[2] want to talk a little more about some of these
[3] notes that you created.
[4]     In your October 3, 2008 note, you
[5] indicated that: Ms. Siddiqui is delusional
[6] and unsure about what the Court told Carswell
[7] to do.
[8]     Is that right?
[9]     **A:** Is that the admission note, the
[10] long, six-page note.
[11]     **Q:** It's MED 49.
[12]     **THE VIDEOGRAPHER:** Counsel, about
[13] five minutes of tape left.
[14]     **MR. LAVIGNE:** Okay.
[15]     **Q:** And I'm looking at about the —
[16]     **A:** Oh, you're on the mental status
[17] pages.
[18]     **Q:** Yeah, Page 3, MED 49.
[19]     **MS. CARDI:** Sorry, 49?
[20]     **MR. LAVIGNE:** Yes.
[21]     **A:** Okay.
[22] There's the — I need the next —
[23] you guys have these numbers so screwy, I have
[24] no clue.
[25]     The mental status exam from

---

Page 154

**C. KEMPKE**

[1]
[2] admission. Okay. All righty.
[3]     Well, where's the first one?
[4] Here we go. Okay. All righty.
[5] What am I asking — answering?
[6]     **Q:** You wrote down: Ms. Siddiqui is
[7] very delusional and unsure about what the
[8] Court has told us to do.
[9]     **A:** Right.
[10] And that's the psychosis.
[11]     **Q:** That is a psychosis, you're
[12] saying?
[13]     **A:** Yes.
[14]     **Q:** Okay. Well, that's a separate —
[15]     **MS. CARDI:** What page is that
[16] just —
[17]     **THE WITNESS:** MED 49.
[18]     **MS. CARDI:** Psychosis is a symptom itself.
[19]     **A:** Psychosis is a symptom itself.
[20]     **Q:** No, I understand that.
[21] But what you're saying is this —
[22]     **A:** This is one of the psychoses.
[23] There are multiple psychoses.
[24]     **Q:** You've also told the attorneys in
[25] this case that the Defendant will not help

---

Page 155

**C. KEMPKE**

[1]
[2] them with her case.
[3]     **A:** I do — it's my belief she will
[4] not.
[5]     And my experience with her at
[6] Carswell was to go down and talk to Ms. Cardi
[7] and then go back up to talk to Ms. Siddiqui to
[8] try to convince her to go down to talk to Ms.
[9] Cardi.
[10]     **Q:** But you're making this statement,
[11] again, on your interactions with Ms. Siddiqui.
[12]     Correct?
[13]     **A:** Well, that's my — I mean, it's
[14] based upon what I have seen with her, yes.
[15]     **Q:** And all told, from October 3,
[16] 2008 until now you've estimated you've spent
[17] about eight hours with Ms. Siddiqui.
[18]     Right?
[19]     **A:** I think so. There's — October,
[20] November, December, January, February, March,
[21] April, May, and she wasn't there for June, so
[22] that's why I'm thinking and averaging about
[23] eight hours.
[24]     **Q:** I thought on your direct you said
[25] one of those months you didn't meet with her.

---

Page 156

**C. KEMPKE**

[1]
[2]     **A:** Well, I met twice in —
[3]     **Q:** Twice in one month and not the
[4] next?
[5]     **A:** Not in the next, right.
[6]     **Q:** So about eight meetings total.
[7] Right?
[8]     **A:** Plus, then, the time, if you want
[9] to count it or not, with Dr. Saathoff and Dr.
[10] Jim — Johnson.
[11]     **Q:** So, about 45 minutes to an hour
[12] for each meeting.
[13]     Is that right?
[14]     **A:** Yes, sir, although my guess is
[15] the January one must have been a lot longer,
[16] given the pages of typing I did.
[17]     **Q:** Dr. Kempke, during the course of
[18] preparing to testify today, have you listened
[19] to Ms. Siddiqui's recorded prison calls?
[20]     **A:** No, sir.
[21]     **Q:** Have you reviewed transcripts of
[22] those recorded prison calls?
[23]     **A:** No.
[24]     **Q:** Ms. Siddiqui's attorneys, they
[25] didn't provide those to you?

---

CAMIELLE KEMPKE
July 1, 2009

USA v.
SIDDIQUI

Page 157

[1]            C. KEMPKE
[2]    A: No, sir.
[3]    Q: Did you ask for them?
[4]    A: No, sir.
[5]    Q: You are aware that prisoners'
[6] phone calls are recorded, though.
[7]    Correct?
[8]    A: Oh, yes, sir.
[9]    Q: You are aware that in certain
[10] instances those phone calls are transcribed.
[11]    Correct?
[12]    A: Oh, yes, sir.
[13]    Q: Now, are you aware that in
[14] certain of the phone calls, Ms. Siddiqui has
[15] discussed her legal case with her brother?
[16]    A: I read that report, but I don't
[17] have firsthand knowledge of it.
[18]    Q: But you read that.
[19] Correct?
[20]    A: Yeah.
[21]    Q: Are you also aware that Ms.
[22] Siddiqui has discussed legal strategy with her
[23] brother.
[24]    A: I've read that.
[25]    MS. CARDI: Objection to legal

Page 158

[1]            C. KEMPKE
[2] strategy.
[3]    (Discussion off the stenographic
[4] record)
[5]    THE VIDEOGRAPHER: Time is now
[6] 5:18 p.m. This marks the ending of Tape
[7] No. 2.
[8]    Off the record.
[9]    (Recess taken)
[10]    THE VIDEOGRAPHER: Time is now
[11] 5:21 p.m. This marks the beginning of
[12] Tape No. 3.
[13]    On the record.
[14]    Q: Dr. Kempke, we left off, I was
[15] asking you whether you knew certain items.
[16] You indicated you had not —
[17]    A: Reviewed some things.
[18]    Q: Right.
[19] Are you aware that Ms. Siddiqui
[20] has discussed retaining new counsel with her
[21] brother?
[22]    A: She told me that she had
[23] discussed retaining a female lawyer, but that
[24] person was on some sort of medical leave and
[25] couldn't. And that when she — I talked to

Page 159

[1]            C. KEMPKE
[2] her the next time, which may have been the
[3] last time I spoke to her, she said that she
[4] was now no longer going to have any counsel.
[5]    Q: Were you aware what Ms. Siddiqui
[6] has discussed the status of the competency
[7] evaluation with her brother?
[8]    A: I know that she told her brother
[9] that he was on somebody's side so she wasn't
[10] going to talk to him. But what the content of
[11] what the conversation was other than that, I
[12] don't know.
[13]    Q: Are you also aware that Ms.
[14] Siddiqui has discussed possibly having
[15] teleconferences with the Court?
[16]    A: No.
[17]    Q: Are you also aware Ms. Siddiqui
[18] has discussed having noncontact visits with
[19] her attorneys?
[20]    A: I read that someplace.
[21]    Q: Now, putting aside the phone
[22] calls for a moment, are you aware that Ms.
[23] Siddiqui, after she was shot in Afghanistan,
[24] was interviewed by the FBI for an approximate
[25] two-week period?

Page 160

[1]            C. KEMPKE
[2]    A: She intimated that she had FBI
[3] agents assigned to her, but I didn't know the
[4] length or what the content of the
[5] conversations were.
[6]    Q: So, during the course of your
[7] preparation for this appearance for this
[8] deposition, have you reviewed the statements
[9] Ms. Siddiqui gave to the FBI —
[10]    A: No, sir.
[11]    Q: — from July 19 to approximately
[12] August 4, 2008?
[13]    A: No, sir.
[14]    Q: Are you aware that upon being
[15] arrested Ms. Siddiqui was advised of her
[16] Miranda rights?
[17]    A: No, sir.
[18]    Q: Are you aware that when Ms.
[19] Siddiqui was advised of those rights, she
[20] invoked her right to counsel?
[21]
[22]
[23]
[24]
[25]

USA   v.                                                    CAMIELLE KEMPKE
SIDDIQUI                                                    July 1, 2009

---

Page 161

**C. KEMPKE**

[1]
[2]
[3]    A: I don't — I'm not aware of
[4] anything that happened there, no.
[5]    Q: You're not aware of that because
[6] you haven't read those reports.
[7]    A: Right.
[8]    Q: And you haven't spoken with those
[9] agents who were with Ms. Siddiqui.
[10]    Correct?
[11]    A: Correct.
[12]    Q: Are you aware that Ms. Siddiqui
[13] has made statements in the past regarding this
[14] case and the circumstances leading up to her
[15] arrest?
[16]    A: I'm not clear what I'm supposed
[17] to be — to whom or when?
[18]    Q: When Ms. Siddiqui has discussed
[19] the details of the shooting with the FBI?
[20]    A: I would hope so, but I was not
[21] aware of that.
[22]    Q: You're not aware of that and you
[23] haven't read those statements.
[24]    A: I didn't read those statements.
[25]    Q: Are you aware that Ms. Siddiqui

---

Page 162

**C. KEMPKE**

[1]
[2] has had two different court appearances in
[3] this case?
[4]    A: I read in the records, yes.
[5]    Q: What records did you read?
[6]    A: Either Dr. Saathoff or — I think
[7] it was probably Dr. Saathoff, but it could
[8] have been Dr. Johnson's reports.
[9]    Q: So, you're basing that on Dr.
[10] Saathoff and Dr. Johnson's reports?
[11]    A: Right.
[12]    Q: When you read that in those
[13] reports, did you learn that Ms. Siddiqui was
[14] read the charges against her?
[15]    A: I don't recall reading that, no.
[16]    Q: Do you recall reading that Ms.
[17] Siddiqui pled not guilty?
[18]    A: No.
[19]    Q: Now, you agreed earlier on direct
[20] examination, I believe, when I was questioning
[21] you that you believe Ms. Siddiqui's
[22] presentation has gotten better.
[23]    Correct?
[24]    A: No.
[25]    Q: No?

---

Page 163

**C. KEMPKE**

[1]
[2] You don't agree with that?
[3] You don't agree that Ms.
[4] Siddiqui's mental health has improved since
[5] she was at Carswell in October 2008?
[6]    A: That has improved, her mental
[7] health condition has improved.
[8]    Q: Her mental health condition has
[9] improved.
[10]    A: Yes.
[11]    Q: Let's talk about on October 3 —
[12] and it's turned out that a lot of what Ms.
[13] Siddiqui has reported to you has not turned
[14] out to be true.
[15]    Correct?
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]    Q: Is it fair to say that a lot of

---

Page 164

**C. KEMPKE**

[1]
[2] what Ms. Siddiqui reported to you early on has
[3] turned out not to be true?
[4]    A: I don't know.
[5]    Q: Okay. Let's go through it.
[6] Turning to MED 47...
[7]    A: Okay.
[8]    Q: On the second paragraph of your
[9] handwriting, starting off where it says: She
[10] was unable to tell me the title of her thesis,
[11] what level degree. And when asked if she went
[12] to MIT, she turned aside and said something
[13] that made me think she could no longer
[14] remember.
[15]    Is that right?
[16]    A: That's in there, yes.
[17]    Q: But eventually, Ms. Siddiqui did
[18] say — did recall that she went to MIT.
[19]    Correct?
[20]    A: Correct.
[21]    Q: And there's comments in here
[22] about how Ms. Siddiqui was very confused about
[23] her pregnancies.
[24]    Correct?
[25]    A: Correct.

---

CAMIELLE KEMPKE
July 1, 2009

USA v.
SIDDIQUI

Page 165

**C. KEMPKE**

[1]
[2]  **Q:** And during the course of your
[3]  treatment with Ms. Siddiqui, she eventually
[4]  talked with you about her children.
[5]    Correct?
[6]  **A:** Yes, sir.
[7]  **Q:** And you also in February of 2009,
[8]  you spoke with Dr. Saathoff about Dr.
[9]  Siddiqui.
[10]    Correct?
[11]  **A:** Yes, sir.
[12]  **Q:** And when you spoke with Dr.
[13]  Saathoff, you indicated to him that there was
[14]  no evidence of short- or long-term memory
[15]  loss.
[16]    Isn't that right?
[17]  **MS. CARDI:** What page are you on?
[18]  **A:** I am not clear.
[19]  That's a quote from him, but I
[20]  don't remember.
[21]  **Q:** You don't remember if you said
[22]  that or not?
[23]  **A:** No.
[24]  **Q:** Do you also remember — do you
[25]  remember saying to Dr. Saathoff that Ms.

Page 166

**C. KEMPKE**

[1]
[2]  Siddiqui had an excellent memory?
[3]  **A:** I don't remember that, sir, no.
[4]  **Q:** Were you aware when interviewed
[5]  by the FBI, Ms. Siddiqui was able to recall
[6]  aspects of her past?
[7]  **A:** No.
[8]  **Q:** Are you aware that Ms. Siddiqui
[9]  was able to remember phone numbers and
[10]  addresses?
[11]  **A:** No.
[12]  **Q:** Are you aware that Ms. Siddiqui
[13]  was able to discuss what happened —
[14]  **A:** I guess, excuse me, in order to
[15]  be clear, I know from other reports that she
[16]  was able to read, from some of these other
[17]  reports I've read, that they reported that she
[18]  had been able to remember those things.
[19]  **Q:** Okay.
[20]  And you you're aware that Ms.
[21]  Siddiqui was able to discuss different
[22]  locations she had lived at during the last
[23]  five years?
[24]  **A:** I don't know when that occurred.
[25]  **MS. CARDI:** I'm going to object

Page 167

**C. KEMPKE**

[1]
[2]  because you're assuming that A, number
[3]  one, what she said that; and, number
[4]  two, that those are addresses she lived
[5]  at or that they're accurate phone
[6]  numbers.
[7]    You're assuming an accuracy in
[8]  the question that we have no
[9]  corroboration for. We just have words
[10]  like: Dr. Siddiqui said this is the
[11]  phone number.
[12]    We don't know if the phone number
[13]  exists.
[14]  **Q:** Are you aware that Ms. Siddiqui
[15]  was able to list the names and ages of her
[16]  children when speaking with the FBI?
[17]  **A:** No, sir.
[18]  **Q:** You're not aware of that.
[19]  **A:** No, sir.
[20]  **Q:** When she met with you on October
[21]  3, 2008, she indicated was unsure about the
[22]  number of pregnancies she had.
[23]    Correct?
[24]  **A:** Correct.
[25]  **Q:** She indicated she was not clear

Page 168

**C. KEMPKE**

[1]
[2]  about whether she attended MIT.
[3]    Correct?
[4]  **A:** Correct.
[5]  **Q:** And she indicated she was not
[6]  clear about the title of her dissertation.
[7]    Correct?
[8]  **A:** Correct.
[9]  **Q:** Now, turning to MED 41 — I'm
[10]  sorry, 51 on your October 3, 2008 date, you
[11]  indicated that Ms. Siddiqui can't read very
[12]  well.
[13]  **A:** Just for my benefit, where are
[14]  you, sir?
[15]  **Q:** I'm on the bottom right-hand
[16]  corner.
[17]  **A:** Point on your paper for me. You
[18]  can sit it right there and just — okay, yeah.
[19]  **Q:** Can't read very well, can't
[20]  remember parts of the Koran she used to have
[21]  memorized.
[22]    That's what Ms. Siddiqui reported
[23]  to you.
[24]    Is that right?
[25]  **A:** Yes, sir.

Page 169

**C. KEMPKE**

[1]

[2]    **Q:** After that date, after October 3,

[3] 2008, are you aware that Ms. Siddiqui has been

[4] observed reading?

[5]    **A:** Oh, yeah.

[6] That's the improvement she's had.

[7]    **Q:** So, the improvement is that Ms.

[8] Siddiqui said she couldn't read or couldn't

[9] read well and now she can read. That's one of

[10] the aspects of her improvement.

[11]    **A:** Right.

[12]    **Q:** In the letter you referred to —

[13] the letter you referred to that Ms. Siddiqui

[14] wrote to the warden, that was dated

[15] approximately January 30, 2009.

[16]    Correct?

[17]    **A:** I don't remember, sir, I'm

[18] sorry. I just saw it this weekend.

[19]    **Q:** You just saw it this weekend?

[20]    **A:** Yeah, I didn't see it at the time

[21] she was at Carswell.

[22]    **MS. CARDI:** Can I give it to

[23] her?

[24]    **MR. LAVIGNE:** Yeah, absolutely,

[25] if you have it.

Page 170

**C. KEMPKE**

[1]

[2]    **THE WITNESS:** Want me to give you

[3] this back?

[4]    **MS. CARDI:** 172 through 175.

[5]    **MR. LAVIGNE:** That's actually not

[6] it.

[7]    170 to 171.

[8]    **THE WITNESS:** It was the

[9] handwritten one, I think is what he's

[10] talking about

[11]    **MR. LAVIGNE:** I can show it to

[12] you, doctor.

[13]    **MS. CARDI:** Oh, you mean Dr.

[14] Siddiqui's letter. I'm sorry, I was

[15] getting Dr. Kempke's.

[16]    **Q:** This is a two-page handwritten

[17] letter.

[18]    Correct?

[19]    **A:** Looks like it.

[20]    **Q:** And that's the letter that you've

[21] seen that Ms. Siddiqui wrote to the warden?

[22]    **A:** That's what I have been told.

[23]    **Q:** Okay.

[24]    **A:** I did not see it, at Carswell, so

[25] I can't...

Page 171

**C. KEMPKE**

[1]

[2]    **Q:** Do you know when this letter was

[3] send to the warden?

[4]    **A:** I — it seems January would be

[5] okay, but I don't know, really.

[6]    I just ignored the letter

[7] entirely.

[8]    **Q:** You ignored the letter?

[9]    **A:** Well, I didn't read it then. I

[10] ignored the process of it because I was not

[11] given the letter, any copy of that letter.

[12]    **Q:** When was the first time you read

[13] this letter?

[14]    **A:** This week, Wednesday a week ago,

[15] maybe.

[16]    **Q:** This is the one —

[17]    **A:** No, maybe even more recent than

[18] that.

[19]    **Q:** So, it could have even been

[20] yesterday?

[21]    **A:** Could have been.

[22]    **Q:** This morning, possibly?

[23]    **A:** Oh, no, because I got this at

[24] home.

[25]    **Q:** This is the one document that

Page 172

**C. KEMPKE**

[1]

[2] you've seen that was actually written by Ms.

[3] Siddiqui.

[4]    Is that right?

[5]    **A:** As I recall, yeah.

[6]    **Q:** Okay.

[7] And you were made aware of this

[8] document around January 2009?

[9]    **A:** Probably.

[10]    **Q:** Probably.

[11] And the first time you actually

[12] sat down and read it was a couple days ago?

[13]    **A:** Right.

[14]    **Q:** Okay.

[15]    **A:** I did not have access to it prior

[16] to a couple days ago. I don't know where it

[17] went.

[18]    **THE WITNESS:** Did you guys get it

[19] with her medical records?

[20]    **MS. CARDI:** I don't remember. I

[21] think we did. I don't remember.

[22]    **Q:** Dr. Kempke, now directing your

[23] attention to what's been labeled MED 140,

[24] these are your notes from November 17, 2008.

[25] And, again, these are the monthly notes you

CAMIELLE KEMPKE
July 1, 2009

USA v.
SIDDIQUI

Page 173

**C. KEMPKE**

[1]
[2] made when you meet with Ms. Siddiqui.
[3]    Correct?
[4]    **A:** Yes.
[5]    **MS. CARDI:** Is this just 140 or
[6] you want me to give her 141 also?
[7]    **MR. LAVIGNE:** 140 is — no, 140
[8] is great.
[9]    **MS. CARDI:** Okay.
[10]    **Q:** Now, in the subjective heading,
[11] that summarizes the conversation you had with
[12] Ms. Siddiqui.
[13]    Right?
[14]    **A:** Uh-huh.
[15]    **Q:** Indicates you spoke with Ms.
[16] Siddiqui regarding her questions about court
[17] status.
[18]    Correct?
[19]    **A:** Uh-huh.
[20]    **Q:** And you also indicated you spoke
[21] with her that the video cameras killed her.
[22]    Is that right?
[23]    **A:** Uh-huh.
[24]    **Q:** And you then list in Danbury.
[25] Correct?

Page 174

**C. KEMPKE**

[1]
[2]    **A:** Yeah.
[3]    **Q:** I assume that's a reference to
[4] the MDC.
[5]    **A:** Right.
[6]    **Q:** You described Ms. Siddiqui as
[7] pleasant and polite.
[8]    Correct?
[9]    **A:** Yes, sir.
[10]    **Q:** And you then spoke with Dr.
[11] Powers over Ms. Siddiqui's concern over the
[12] status of the study.
[13]    Correct?
[14]    **A:** If you see just above that, it
[15] says: Discuss the potential of upcoming court
[16] procedure.
[17]    I think at that point, they
[18] thought they were going to switch her to 4142
[19] D.
[20]    **Q:** Okay.
[21] And at that point, you also
[22] informed Ms. Siddiqui that you were going to
[23] continue as her psychiatrist of record.
[24]    Correct?
[25]    **A:** There had been —

Page 175

**C. KEMPKE**

[1]
[2]    **Q:** Just yes or no.
[3]    **A:** Yes, that's correct.
[4]    **Q:** Turning to the reference to the
[5] video cameras, you've reviewed the video of
[6] Ms. Siddiqui?
[7]    **A:** Uh-huh.
[8]    **Q:** And isn't it true that at some
[9] point points throughout the video Ms. Siddiqui
[10] asked the guards to leave the cameras on.
[11]    Correct?
[12]    **A:** Uh-huh.
[13]    **Q:** Ms. Siddiqui says that she wants
[14] it on video so the world can see how you treat
[15] people in this prison.
[16]    Isn't that right?
[17]    **A:** Yes, sir.
[18]    **Q:** Ms. Siddiqui also adds: Put this
[19] on video. I want this to go out.
[20]    Isn't that correct?
[21]    **A:** Yes, sir.
[22]    **Q:** And Ms. Siddiqui has told you in
[23] sum and substance at some points that she
[24] believes she's dead.
[25]    Correct?

Page 176

**C. KEMPKE**

[1]
[2]    **A:** Yes.
[3]    **Q:** Isn't it true that on this video
[4] Ms. Siddiqui also said: You are not going to
[5] take my blood. I don't consent to it.
[6]    Isn't that right?
[7]    **A:** Uh-huh.
[8]    **Q:** Isn't it fair to say that Ms.
[9] Siddiqui is combative during that incident?
[10]    **A:** There are moments when she is
[11] combative, but not during the whole incident.
[12]    **Q:** And there are moments when Ms.
[13] Siddiqui was angry.
[14]    **A:** Yes, sir.
[15]    **Q:** Are you aware there was cameras
[16] present when Ms. Siddiqui was being treated in
[17] Afghanistan?
[18]    **A:** No, sir.
[19]    **Q:** Now, you indicated that — if I
[20] could just have a moment.
[21]    And, Dr. Kempke, you now do not
[22] believe that Ms. Siddiqui suffers from
[23] hallucinations.
[24]    Is that right?
[25]    **A:** Correct.

Page 177

**C. KEMPKE**

[1]
[2]   **Q:** You believe that they are instead
[3] hypnogogic experiences?
[4]   **A:** Yes.
[5]   **Q:** And you've seen Dr. Kucharski's
[6] report.
[7]   Correct?
[8]   **A:** Yes, sir.
[9]   **Q:** So, you concur with Dr.
[10] Kucharski's assessment.
[11]   Isn't that right?
[12]   **A:** That's a pretty broad brush to
[13] paint me with.
[14]   **Q:** I'm sorry. I understand.
[15] Do you agree — when Dr.
[16] Kucharski attributes these statements to
[17] hypnogogy, you agree with that?
[18]   **A:** Yes, sir.
[19]   **Q:** Is that right?
[20]   **A:** Yes, sir.
[21]   **Q:** But before you testified today,
[22] you've read Dr. Kucharski's report.
[23]   Correct?
[24]   **A:** Yes, sir.
[25]   **Q:** And isn't it true that hypnogogy

Page 178

**C. KEMPKE**

[1]
[2] — hypnogogic hallucinations occur when
[3] somebody is on the verge of falling asleep?
[4]   **A:** Well, there's also questions
[5] about whether they occur over longer periods
[6] of time. Hypnogogic means at sleep time, as
[7] opposed to awake time, which is hypnopompic.
[8]   But my experience with that, it's
[9] very difficult for patients to determine the
[10] difference between sleep and wake states at
[11] times. So, that's — that adds difficulty to
[12] it. So, I tend to expect — when somebody
[13] should be tired and they have a hallucination
[14] and it's dark, I tend to expect that as
[15] hypnogogic, because otherwise I get a lot of
[16] my inmates having visual hallucinations who
[17] are otherwise normal, as well as friends and
[18] family.
[19]   So, if I'm lying in bed and I
[20] have a bad dream and that carries over into
[21] the moments of awakening, or I start thinking
[22] about something and I start dreaming about
[23] that and dream it in a bad way, is it
[24] different when you're first going to bed or if
[25] you wake up in the middle of the night and

Page 179

**C. KEMPKE**

[1]
[2] then go to bed and is it different, I don't
[3] know, but they are normal experiences.
[4]   **Q:** Hypnogogic — hypnogogy is a
[5] normal experience?
[6]   **A:** Yes, sir.
[7]   **Q:** So, Ms. Siddiqui claims that her
[8] nursing age baby can fly. You attribute that
[9] to a normal reaction to hypnogogy.
[10]   Is that right?
[11]   **A:** That's not very really well
[12] explained in medical terms. I would say
[13] that's a hypnogogic experience.
[14]   **Q:** Okay.
[15] And when Ms. Siddiqui repeatedly
[16] says that — well, let me withdraw that.
[17]   You're aware that Ms. Siddiqui
[18] made similar comments at the MDC.
[19]   Correct?
[20]   **A:** I am now aware of that, yes.
[21]   **Q:** And how did you become aware of
[22] that?
[23]   **A:** From the reports of Dr. Saathoff.
[24]   **Q:** Are you aware that Ms. Siddiqui's
[25] expressions of those symptoms start at

Page 180

**C. KEMPKE**

[1]
[2] approximately three weeks into her stay at the
[3] MDC?
[4]   **A:** I didn't know — I don't know
[5] when they start or stop.
[6]   **Q:** And you've never read the log
[7] book at the MDC?
[8]   **A:** Correct.
[9]   **Q:** So, based on that, you're unaware
[10] where these symptoms actually started.
[11]   Correct?
[12]   **A:** Correct.
[13]   **Q:** Now, you testified about Dr.
[14] Johnson's visit on your direct examination.
[15] Ms. Siddiqui, it's fair to say, did not react
[16] favorably to this visit.
[17]   Correct?
[18]   **A:** Correct.
[19]   **Q:** Ms. Siddiqui did not want to
[20] speak with Dr. Johnson.
[21]   Correct?
[22]   **A:** Correct.
[23]   **Q:** Ms. Siddiqui was aware that Dr.
[24] Johnson was sent by the court?
[25]   **A:** Correct.

**CAMILLE KEMPKE**
**July 1, 2009**

USA   v.
**SIDDIQUI**

---

Page 181

### C. KEMPKE

[1]

[2]  **Q:** Or Ms. Siddiqui believed that Dr.

[3] Johnson was sent by the Court?

[4]  **A:** Correct.

[5]  **Q:** Ms. Siddiqui became agitated.

[6] Is that fair to say?

[7]  **A:** Yes.

[8]  **Q:** Isn't it true that after — after

[9] that first visit, you viewed Ms. Siddiqui as

[10] more calculating?

[11]  **A:** That's the word I don't find

[12] myself ever using. I don't describe patients

[13] as calculating.

[14]  **Q:** So, you don't remember using that

[15] term?

[16]  **A:** I sincerely doubt that I would

[17] use that word because of my orientation in

[18] psychiatry?

[19]  **Q:** Okay.

[20] But after Dr. Johnson's visit,

[21] you began to consider a diagnosis of

[22] malingering.

[23]  Correct?

[24]  **A:** Correct.

[25]  **Q:** And you described — you took

---

Page 182

### C. KEMPKE

[1]

[2] issue with the manner in which Dr. Johnson

[3] conducted her evaluation.

[4]  **A:** Yes, sir.

[5]  **Q:** You agree with me, though, that

[6] determining whether a defendant is competent

[7] to stand trial, that falls outside of what you

[8] do.

[9]  **A:** Yes, sir.

[10]  **Q:** Correct?

[11] And you agree that that's a very

[12] important issue to decide.

[13]  Correct?

[14]  **A:** What's the important issue?

[15]  **Q:** Whether a defendant is competent

[16] to stand trial.

[17]  **A:** Oh, yeah.

[18]  **Q:** In any criminal case.

[19] Correct?

[20]  **A:** I would assume so.

[21]  **Q:** Because it's possible that an

[22] individual could be feigning a mental illness

[23] and trying to get out or avoid responsibility.

[24]  Correct?

[25]  **A:** Correct.

---

Page 183

### C. KEMPKE

[1]

[2]  **Q:** It's also possible that somebody

[3] truly could be mentally ill, and, therefore —

[4] or truly could be incompetent, and, therefore,

[5] should not be tried.

[6]  Correct?

[7]  **A:** Correct.

[8]  **Q:** There's a lot at stake.

[9] Right?

[10]  **A:** Correct.

[11]  **Q:** Somebody's liberty is at stake.

[12] Right?

[13]  **A:** I assume so.

[14]  **Q:** Okay.

[15]  **A:** In most cases. There may be

[16] fines and parole, but...

[17]  **Q:** And forensic evaluations which

[18] decide whether somebody is competent to stand

[19] trial, part of that is sifting fact from

[20] fiction.

[21]  Correct?

[22]  **A:** Correct.

[23]  **Q:** And that is what Dr. Johnson was

[24] retained to do.

[25]  Correct?

---

Page 184

### C. KEMPKE

[1]

[2]  **MS. CARDI:** Objection.

[3] How could Dr. Johnson determine

[4] fact from fiction?

[5]  **Q:** Dr. Johnson was retained to

[6] determine the Defendant's competence.

[7]  Correct?

[8]  **A:** Quite honestly, sir, I can't say

[9] that. I assume that, but I have not seen

[10] anything printed that would confirm that.

[11]  **Q:** Okay.

[12] And Dr. Powers, that's what she

[13] was appointed to do.

[14]  **A:** That's her job, yeah.

[15]  **Q:** Correct?

[16]  **A:** Yes.

[17]  **Q:** And part of — part of deciding

[18] whether somebody is being truthful or

[19] something is malingering is testing.

[20]  Correct?

[21]  **A:** It can be. It is a possible way

[22] to do that, yes.

[23]  **Q:** And Ms. Siddiqui refused

[24] psychological testing.

[25]  Isn't that right?

---

USA  v.
SIDDIQUI

CAMIELLE KEMPKE
July 1, 2009

---

Page 185

**C. KEMPKE**

[1]
[2] **A:** Correct.
[3] **Q:** And Dr. Johnson repeatedly tried
[4] to test Ms. Siddiqui.
[5]     Correct?
[6] **A:** I would not describe Dr. Johnson
[7] as trying to test her.
[8] **Q:** Tried to interact with her?
[9] **A:** Yes, sir.
[10] **Q:** Tried to converse with her?
[11] **A:** Yes.
[12] **Q:** But Dr. Johnson was persistent.
[13] Correct?
[14] **A:** Nothing if not persistent.
[15] **Q:** And Dr. Saathoff also tried to
[16] test, doctor, Ms. Siddiqui?
[17] **A:** Yes.
[18] And I would agree that he tried
[19] to actually administer a specific test.
[20] **Q:** And Ms. Siddiqui refused —
[21] **A:** Yes.
[22] **Q:** — isn't that right?
[23] **A:** Yes.
[24] **Q:** And it's fair to say that Ms.
[25] Siddiqui also refused being tested by Dr.

---

Page 186

**C. KEMPKE**

[1]
[2] Powers.
[3]     Correct?
[4] **A:** Yes, sir.
[5] And I think by a second
[6] psychologist.
[7] **Q:** And you never tried —
[8] **A:** No, sir.
[9] **Q:** — to test Ms. Siddiqui?
[10] **A:** No, sir.
[11] **Q:** And Ms. Siddiqui talked to you.
[12] Right?
[13] **A:** Yes, ma'am — sir, excuse me.
[14] **Q:** Now, regarding the morning
[15] meetings you had on the unit that you
[16] testified about on direct examination, Dr.
[17] Powers what at certain of the those meetings.
[18] Correct?
[19] **A:** Some of them.
[20] **Q:** Some of the them.
[21] And you did not follow Dr. Powers
[22] around —
[23] **A:** No, sir.
[24] **Q:** — during her time at Carswell?
[25] **A:** No, sir.

---

Page 187

**C. KEMPKE**

[1]
[2] She and I have plenty of
[3] different jobs to do.
[4] **Q:** So, you don't know what — how
[5] many times Dr. Powers saw Ms. Siddiqui.
[6]     Correct?
[7] **A:** Correct.
[8] **Q:** You don't know what conversations
[9] Dr. Powers had with staff members at Carswell.
[10]     Correct?
[11] **A:** Correct.
[12] **Q:** You don't know what conversations
[13] Dr. Powers had with staff members at the MDC.
[14]     Correct?
[15] **A:** Correct.
[16] **Q:** You don't know what conversations
[17] Dr. Powers had with law enforcement agents.
[18]     Correct?
[19] **A:** Correct.
[20] **Q:** You don't know what documents Dr.
[21] Powers looked at in making her assessment.
[22]     Correct?
[23] **A:** Correct.
[24] **Q:** And you disagree with Dr. Powers
[25] in terms of whether — actually, I withdraw

---

Page 188

**C. KEMPKE**

[1]
[2] that.
[3]     Now, your diagnosis is that Ms.
[4] Siddiqui is a paranoid schizophrenic.
[5]     Is that right?
[6] **A:** Sir, I've been recently informed
[7] by the psychology sections that delusional
[8] disorder are other options, but in my opinion
[9] this is paranoid schizophrenia.
[10] **Q:** Sorry, could you repeat that?
[11] **A:** There's a delusional disorder
[12] paranoid type differentiates from paranoid
[13] schizophrenia on the basis of whether
[14] delusions are bizarre or nonbizarre.
[15]     I have in psychiatry never used
[16] delusional disorder. It is not studied in
[17] psychiatry because it's hard to find a drug
[18] company to pay for studies on people who won't
[19] want to come in and represent only point zero
[20] three percent of the population.
[21]     So, I am probably including
[22] delusional disorder as part of my diagnosis of
[23] paranoid schizophrenia.
[24] **Q:** So, you're saying Ms. Siddiqui
[25] suffers from a delusional disorder and from

---

CAMIELLE KEMPKE
July 1, 2009

USA v.
SIDDIQUI

Page 189

[1]                    **C. KEMPKE**
[2] paranoid schizophrenia?
[3]    A: I'm saying she suffers from
[4] paranoid psychosis. Those two paranoid
[5] psychoses are either paranoid schizophrenia or
[6] delusional disorder paranoid type. And they
[7] are — they are distinguished only on the
[8] basis of the term bizarre.
[9]    Q: But you don't know sitting here
[10] today under oath whether or not Ms. Siddiqui
[11] is a paranoid schizophrenic or suffers from
[12] delusional disorder.
[13]    A: I'd diagnose her as paranoid
[14] schizophrenia, but —
[15]    Q: You're not a hundred percent sure
[16] on that.
[17]    A: I'm a hundred percent sure, but
[18] there may be a subset of what I have treated
[19] as paranoid schizophrenia that someone else
[20] within the field would describe as delusional
[21] disorder.
[22]    Q: Such as Kucharski?
[23]    A: Yes, and Dr. Powers and Dr.
[24] Yanez.
[25]    And, so, there's difficulties

Page 190

[1]                    **C. KEMPKE**
[2] with that. And going back through the history
[3] of those, I don't think that that's a valid
[4] distinction, quite honestly.
[5]    Q: Going through the history of
[6] what?
[7]    A: The etiology and development of
[8] the diagnosis of delusional disorder.
[9]    Q: You view this as a complicated
[10] case.
[11]    Correct?
[12]    A: No.
[13]    Q: Didn't you send an e-mail to Chad
[14] Edgar on Wednesday, June 24, 2009?
[15]    A: I probably did.
[16]    Q: Didn't you describe this process
[17] as, quote: Closely akin to the five blind men
[18] describing an elephant after reading all those
[19] reports?
[20]    A: Yeah, that's what I felt.
[21]    Q: Let's talk about paranoid
[22] schizophrenia.
[23]    One symptom of paranoid
[24] schizophrenia is disorganized speech.
[25]    Correct?

Page 191

[1]                    **C. KEMPKE**
[2]    A: It doesn't have to be.
[3] That's the difficulty with
[4] paranoid schizophrenia.
[5]    Q: That's one symptom, that's one
[6] possible symptom.
[7]    Right?
[8]    A: Yes, a possible symptom.
[9]    Q: Another possible symptom is
[10] grossly disorganized behavior.
[11]    Isn't that right?
[12]    A: Yes, sir.
[13]    Q: And another criterion is that for
[14] a significant amount of time, one or more
[15] major areas of occupational functioning are
[16] inhibited.
[17]    Isn't that right?
[18]    A: Yes, sir.
[19]    Q: Occupational functioning, that
[20] includes work.
[21]    Correct?
[22]    A: Yes.
[23]    Q: That includes interpersonal
[24] relations.
[25]    Correct?

Page 192

[1]                    **C. KEMPKE**
[2]    A: Yes.
[3]    Q: And that includes self-care.
[4] Isn't that right?
[5]    A: Yes, sir.
[6]    Q: Isn't it true that Ms. Siddiqui
[7] is well groomed?
[8]    A: She's well groomed.
[9]    Q: She also does not have body
[10] order.
[11]    Correct?
[12]    A: Correct.
[13]    Q: Have you been to her room on the
[14] unit?
[15]    A: Yes, sir.
[16]    Q: And it's fair to say her room is
[17] very neat?
[18]    A: Oh, yes, sir.
[19]    Q: Ti's also true that Ms. Siddiqui
[20] continues to study the Koran.
[21]    Correct?
[22]    A: I do not watch that and reserve
[23] it, but — I mean I don't see it, i don't go
[24] and watch her read.
[25]    Q: Have you ever seen Ms. Siddiqui

Page 193

**C. KEMPKE**

[1]
[2] read the Koran?
[3]    **A:** No.
[4]    **Q:** Okay.
[5] Have you spoken to other staff
[6] members as to whether they have seen Ms.
[7] Siddiqui —
[8]    **A:** Yes, they have.
[9]    **Q:** They have.
[10]    **A:** Yes.
[11]    **Q:** Correct?
[12] It's also true at some point Ms.
[13] Siddiqui began teaching that inmate Susie how
[14] to read the Koran.
[15]    Correct?
[16]    **A:** She couldn't teach her how to
[17] read. She was teaching her prayers, is my
[18] understand.
[19]    **Q:** She was teaching her how to be a
[20] devout or a good Muslim woman.
[21]    Correct?
[22]    **A:** Yes.
[23]    **Q:** It's also true that Ms. Siddiqui
[24] has kept a good appetite.
[25]    Correct?

Page 194

**C. KEMPKE**

[1]
[2]    **A:** She has maintained what looks
[3] like a healthy body habitus.
[4]    **Q:** Have you reviewed Ms. Siddiqui's
[5] purchases from the commissary?
[6]    **A:** No, sir.
[7]    **Q:** You haven't?
[8]    **A:** No, sir.
[9]    **Q:** So, are you aware of how much
[10] food she's purchased?
[11]    **A:** No, sir.
[12]    **Q:** Are you aware of what type of
[13] food she's purchased?
[14]    **A:** No, sir, other than her report to
[15] me.
[16]    **Q:** So, you're relying on what Ms.
[17] Siddiqui reports to you in deciding — in
[18] terms of assessing her appetite.
[19]    Is that right?
[20]    **A:** That's fine by me.
[21]    **Q:** That's fine by you?
[22]    **A:** I don't care one way or the
[23] other.
[24]    **Q:** That's sufficient for your
[25] purposes of conducting an evaluation?

Page 195

**C. KEMPKE**

[1]
[2]    **A:** Yes, sir.
[3]    **Q:** You haven't looked at the
[4] commissary purchases to corroborate it?
[5]    **A:** I doesn't make any difference.
[6]    **Q:** It doesn't make any difference to
[7] you?
[8]    **A:** It doesn't make any difference to
[9] the diagnosis.
[10]    **Q:** It doesn't make any difference at
[11] all to the diagnosis, yes or no?
[12]    **A:** Yes or no — yes or no, sorry.
[13] No, it does not.
[14]    **Q:** Okay.
[15] But you're accepting what Ms.
[16] Siddiqui is telling you at face value?
[17]    **A:** That's fine.
[18]    **Q:** That's fine in your experience?
[19]    **A:** Do you want to wear a blue shirt
[20] or a red shirt; blue tie, red tie, I don't
[21] care. That's irrelevant to the diagnosis of
[22] paranoid schizophrenia.
[23]    **Q:** Whether somebody has a sufficient
[24] appetite?
[25]    **A:** Correct.

Page 196

**C. KEMPKE**

[1]
[2]    **Q:** Okay.
[3] It's fair to say that symptoms of
[4] psychoses improve with medication.
[5]    Correct?
[6]    **A:** Unfortunately, only in sixty to
[7] eighty percent of people.
[8]    **Q:** Okay.
[9] So, more than half the people who
[10] suffer from a psychosis, their condition
[11] improves with medication.
[12]    Is that right?
[13]    **A:** We hope so.
[14]    **Q:** We hope so. Right.
[15] And if somebody's a paranoid
[16] schizophrenic, medication can help them get
[17] better.
[18]    Correct?
[19]    **A:** If they take it, yes.
[20]    **Q:** You have never prescribed Ms.
[21] Siddiqui medication.
[22]    **A:** She's a 41B.
[23]    **Q:** Yes or no, have you prescribed
[24] Ms. Siddiqui medication?
[25]    **A:** No, no, sir.

CAMIELLE KEMPKE
July 1, 2009

USA v.
SIDDIQUI

Page 197

**C. KEMPKE**

[1]
[2] **Q:** The answer is no?
[3] **A:** No, sir.
[4] I mean the answer is no.
[5] **Q:** As a matter of fact...
[6] **A:** That's not m writing. It is a
[7] treatment team meeting, so there is an input
[8] from psychiatry.
[9] **Q:** Just give me one second.
[10] In your evaluation and opinion,
[11] you've concluded that at certain points
[12] throughout Ms. Siddiqui's stay at Carswell,
[13] she had no need for medication.
[14]    Isn't that right?
[15] **A:** She is not dangerous to herself
[16] or others, so I could not force medications,
[17] correct.
[18] **Q:** Okay, but that's not what I'm
[19] asking. I'm not asking about whether you
[20] forced medication.
[21]    I'm asking in your opinion as Ms.
[22] Siddiqui's treating psychiatrist, during your
[23] time at Carswell —
[24] **A:** If I had my way —
[25] **Q:** Let me finish m question. I may

Page 198

**C. KEMPKE**

[1]
[2] not be asking clearly.
[3]    Isn't it true that in January —
[4] on January 30, 2009, you determined that there
[5] was not an immediate need to medicate Ms.
[6] Siddiqui?
[7] **A:** Indeed, there was not an
[8] immediate need.
[9] **Q:** Okay.
[10] Isn't it true that on April 9,
[11] 2009, you concluded that Ms. Siddiqui was
[12] alert and cooperative.
[13]    Correct?
[14] **A:** This a little different.
[15] I would have describe that as
[16] reporting rather than concluding.
[17] **Q:** Okay.
[18] **A:** Yes.
[19] **Q:** Didn't you write down in a
[20] progress note —
[21] **A:** Yes, I wrote it.
[22] **Q:** Ms. Siddiqui awake, I believe it
[23] says alert, I could be wrong, and then
[24] cooperative.
[25]    Correct?

Page 199

**C. KEMPKE**

[1]
[2] **A:** Yes, sir.
[3] **Q:** You then say: Move, full range
[4] of affect.
[5]    Correct?
[6] **A:** Uh-huh.
[7] **MS. CARDI:** What's the MED
[8] number, Chris?
[9] **MR. LAVIGNE:** 182.
[10] **Q:** You never recommended in that
[11] progress note prescribing medications for Ms.
[12] Siddiqui.
[13]    Correct?
[14] **A:** No.
[15] **Q:** Turning to MED 192, this is
[16] dated, I believe, May 19, 2009. And while I
[17] don't believe this is your writing, Dr.
[18] Kempke, it is your signature right there.
[19]    Correct?
[20] **A:** Right, 'cause there's this line
[21] that's in there from the patient.
[22] **Q:** Right.
[23] And it then says: Team input.
[24] Right?
[25] **A:** Correct.

Page 200

**C. KEMPKE**

[1]
[2] **Q:** And psychiatry, that refers to
[3] you.
[4]    Correct?
[5] **A:** Yes.
[6] **Q:** And the response there is:
[7] Taking no medications.
[8]    Correct?
[9] **A:** Correct.
[10] **Q:** Turning to MED 197, this is June
[11] 19, 2009, this is another progress note.
[12]    Correct?
[13] **A:** Looks like it from her.
[14] **Q:** And under the objective —
[15] **A:** Sorry, I cannot get that at all.
[16] **MS. CARDI:** Sure.
[17] **Q:** Under objective, that has your
[18] handwriting.
[19]    Correct?
[20] **A:** Right. This is the one that's
[21] all screwed up.
[22] **Q:** This was —
[23] **A:** It would have been 6/2, I
[24] believe, is what we finally decided.
[25] **Q:** June 2, I think that's right.

USA v.
SIDDIQUI

CAMIELLE KEMPKE
July 1, 2009

Page 201

**C. KEMPKE**

[1]
[2]    **A:** I have the better original if you
[3] need that, but...
[4]    **Q:** That's fine.
[5] Among other things, though, you
[6] write down: No formal thought DO?
[7]    **A:** Disorder yeah.
[8]    **Q:** That refers to disorder.
[9] Right?
[10]    **A:** Right.
[11]    **Q:** And you also conclude: No signs
[12] of dangerousness to self or others that would
[13] warrant civil commitment or forced meds.
[14]    Correct?
[15]    **A:** Right.
[16]    **Q:** So, Ms. Siddiqui has never taken
[17] antipsychotic medications.
[18]    Correct?
[19]    **A:** Within my understanding of it,
[20] no.
[21]    **Q:** Okay.
[22]    **A:** In the time frame that I know,
[23] no.
[24]    **Q:** I'll rephrase the question.
[25] From the time Ms. Siddiqui was

Page 202

**C. KEMPKE**

[1]
[2] admitted at FMC Carswell in October 2008, to
[3] your knowledge she has never been on
[4] antipsychotic medications.
[5]    Correct?
[6]    **A:** Yes.
[7]    **Q:** You have never prescribed any
[8] type of psychiatric medication.
[9]    Correct?
[10]    **A:** I believe she originally had
[11] citalopram —
[12]    **Q:** Right.
[13] But you didn't prescribe that.
[14]    **A:** — for a few days.
[15]    **Q:** Right?
[16]    **A:** Well, it gets really confusing in
[17] the transfer someplace. Whether I wrote it or
[18] the not, I don't have the orders written
[19] here. If I did, it was for two or three days.
[20]    **Q:** Okay.
[21] And despite having no medication,
[22] you indicated earlier in your testimony that
[23] Ms. Siddiqui's mental health condition has
[24] improved.
[25]    Correct?

Page 203

**C. KEMPKE**

[1]
[2]    **A:** Correct.
[3]    **Q:** And it's your opinion now that
[4] Ms. Siddiqui is not suffering from
[5] hallucinations?
[6]    **A:** Correct.
[7]    **Q:** Correct?
[8]    **A:** Correct.
[9]    **Q:** I want to talk about just a few
[10] others parts of your direct examination.
[11]    You were testifying about an
[12] incident where there was a lot of back and
[13] forth about Ms. Siddiqui and the cafeteria.
[14]    I'm paraphrasing, but do you
[15] remember what I'm referring to?
[16]    **A:** I know the incident.
[17]    **Q:** Apparently, Ms. Siddiqui did not
[18] want to eat with the —
[19]    **A:** With Susie.
[20]    **Q:** With Susie or regular people in
[21] the institution.
[22]    **A:** No, she didn't want to eat with
[23] Susie, I know.
[24]    **MS. CARDI:** I don't — I'm going
[25] to object. I don't remember talking

Page 204

**C. KEMPKE**

[1]
[2] about that on direct.
[3]    Then again...
[4]    **THE WITNESS:** There were a bunch
[5] of objections around in the middle of
[6] that, so that's what the whole scoop
[7] was. It certainly didn't come out very
[8] cogently.
[9]    **MR. LAVIGNE:** Just bear with me.
[10]    **Q:** I believe you testified on direct
[11] that Ms. Siddiqui had a hard time with
[12] religious fare, the food?
[13]    **A:** Yeah.
[14]    **Q:** And Ms. Siddiqui had a fear of
[15] being poisoned.
[16]    Correct?
[17]    **A:** Yes, sir.
[18]    **Q:** In response to that, Ms. Siddiqui
[19] basically negotiated with the prison staff.
[20]    Correct?
[21]    **A:** I got the — I don't know how
[22] much this is — usually, a physician orders a
[23] diet. I tried to order a diet. The dietician
[24] said I couldn't order that diet because it's
[25] $7 a day instead of $1.75 or whatever that the

CAMIELLE KEMPKE
July 1, 2009

USA v.
SIDDIQUI

Page 205

**C. KEMPKE**

[1]
[2] other diet is.
[3]   I said: Well, who orders that
[4] diet?
[5]   She said it was the religious
[6] people.
[7]   But she came down to our place on
[8] the eighth, the third had been a Friday, so
[9] the tenth would have been a Friday. So, it
[10] was probably either the ninth or the tenth
[11] that we began there troubling thing of trying
[12] to figure out the diet.
[13]   Ms. Siddiqui offered to just take
[14] any regular tray and just not eat the
[15] inappropriate things on it, saying: I'd
[16] rather have asked God's forgiveness for eating
[17] something that touched pork — or whatever the
[18] prohibitions are — then to risk being
[19] poisoned because somebody knows which tray is
[20] mine.
[21]   So, over the weekend, she got
[22] just a regular tray. They bring up ten,
[23] fifteen trays, and she'd be the first one,
[24] pick out her tray, and eat, whatever.
[25]   Then, when the religious people

Page 206

**C. KEMPKE**

[1]
[2] came back, it just — it all went very ugly,
[3] and the religious people eventually said she
[4] had to go downstairs and take a common fare
[5] diet downstairs and she was going to have to
[6] have to go downstairs with the officers
[7] because we had thought she had to stay up on
[8] the unit.
[9]   So, the correctional people had
[10] to make the accommodation for religious
[11] purpose because the religious people said she
[12] had to go downstairs to eat the common fare —
[13] yeah, eat the common fare downstairs where she
[14] could have a choice.
[15]   So, it was a lot not in her
[16] control, other than for saying: Look, I'd be
[17] happy to eat the noncommon fare, just let me
[18] choose my own diet.
[19]   And the imam or whoever I don't
[20] know who got into it, but they had — the
[21] religious people had to wait for the imam and
[22] the imam — I stayed out of it. I don't
[23] really know who said what, but it took two or
[24] three days.
[25]   Q: But eventually, it got resolved?

Page 207

**C. KEMPKE**

[1]
[2]   A: Right.
[3]   Q: You also indicated that you did
[4] not believe Ms. Siddiqui would be cooperative.
[5]   Is that right?
[6]   A: Cooperative with?
[7]   Q: With the legal process.
[8]   A: She made it clear. She told me
[9] frequently that she was just — the Court
[10] could do whatever they wanted and tell the
[11] Court to do that and not take her to trial
[12] because she — various sundry; either she was
[13] already dead, or they had already made up
[14] their mind what they were going to do.
[15]   There may have been other
[16] things. Those are the two I remembered.
[17]   Q: Hasn't Ms. Siddiqui also talked
[18] about her case with you and other staff
[19] members?
[20]   A: I'm sure she has.
[21]   Q: Didn't she have a long, extended
[22] conversation with you about how she was going
[23] to proceed in court?
[24]   A: I don't know, sir.
[25]   Q: Well, I'm referring — on January

Page 208

**C. KEMPKE**

[1]
[2] 30, 2009 —
[3]   MS. CARDI: Just give me the
[4] number.
[5]   MR. LAVIGNE: MED 173.
[6]   Q: Doctor, if you could just listen
[7] to my question before looking at anything.
[8]   A: I'm sorry.
[9]   Q: I understand. There's just
[10] certain formalities we have to keep here.
[11]   Isn't it true that Ms. Siddiqui
[12] dismissed the two charges against her?
[13]   Correct, when she was speaking
[14] with you?
[15]   A: I don't remember.
[16]   Q: You don't remember?
[17] Do you remember Ms. Siddiqui
[18] telling you that she can prove in one minute
[19] that she did not do that?
[20]   A: Oh, yeah.
[21] I thought that was pretty weird.
[22]   Q: You thought that pretty weird
[23] that Ms. Siddiqui said she could prove in one
[24] minute that she did not do it?
[25]   A: Yeah.

Page 209

**C. KEMPKE**

[1]
[2] **Q:** Did Ms. Siddiqui also inform you
[3] she will not reveal that until she is in
[4] court.
[5]     Correct?
[6]     **A:** Pretty grandiose.
[7]     **Q:** It's pretty grandiose for a
[8] defendant to say they're not going to reveal
[9] their defense until they get to court?
[10]    **A:** No, the other part, and that she
[11] couldn't tell us because the setting of that
[12] conversation was —
[13]    **Q:** Just please answer my question.
[14]    **A:** I don't know what the question
[15] is, I'm sorry.
[16]    **MS. CARDI:** Let letter finish
[17] it. Maybe repeat the question.
[18]    **MR. LAVIGNE:** Can you read back
[19] the question?
[20]    (Record read)
[21]    **A:** No, that wouldn't be grandiose.
[22]    **Q:** That's not grandiose?
[23]    **A:** No.
[24]    **MS. CARDI:** Are you on 173?
[25]    **MR. LAVIGNE:** Yeah.

Page 210

**C. KEMPKE**

[1]
[2]    **MS. CARDI:** Okay.
[3]    **Q:** It's fair to say, though, doctor,
[4] that certain statements Ms. Siddiqui made to
[5] you, you may not have been able to place in
[6] their proper context.
[7]     Correct?
[8]     **A:** Yes, sir.
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]    **Q:** The only documents you reviewed
[17] in this case are the documents from FMC
[18] Carswell, the medical documents.
[19]    Correct?
[20]    **A:** Correct, and the Saathoff —
[21]    **MS. CARDI:** She also — right.
[22]    **A:** — Saathoff and Johnson reports.
[23] I think that was — and Kucharski's report.
[24]
[25]

Page 211

**C. KEMPKE**

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]    **Q:** Given the fact that you haven't
[23] reviewed all of the materials relating to Ms.
[24] Siddiqui's criminal case, it's possible that
[25] something she could say, you would not be able

Page 212

**C. KEMPKE**

[1]
[2] to place in proper context.
[3]     **A:** I can't — I don't know how to
[4] answer that question.
[5]     **Q:** Ms. Siddiqui has made statements
[6] to you relating to a lot of different matters.
[7]     Correct?
[8]     **A:** Yes, sir.
[9]     **Q:** Some are related to her children.
[10] Correct?
[11]    **A:** Yes, sir.
[12]    **Q:** Some have related to her beliefs
[13] about her own existence; in other words,
[14] whether she's dead or alive.
[15]    Correct?
[16]    **A:** Yes.
[17]    **Q:** And in hearing those statements,
[18] you've taken them at face value.
[19]    Correct?
[20]
[21]
[22]    **A:** No psychiatrist takes anything at
[23] face value, sir.
[24]    **Q:** Okay.
[25] But you — isn't it true that you

CAMIELLE KEMPKE
July 1, 2009

USA v.
SIDDIQUI

---

Page 213

**C. KEMPKE**

[1]
[2] told Ms. Siddiqui's lawyers that you refrained
[3] asking direct questions of Ms. Siddiqui
[4] because you were afraid of losing her trust.
[5]     Correct?
[6]     **A:** About things in the past.
[7]     **Q:** Okay.
[8]     **A:** If you want to add that, I'll say
[9] yes.
[10]     **Q:** So, when it came to issues in Ms.
[11] Siddiqui's past, you refrained from asking her
[12] direct questions about that.
[13]     Correct?
[14]     **A:** Yes — no.
[15] Obviously, at the beginning I
[16] asked her about MIT, so I don't want to be
[17] caught lying. And how old she was, those
[18] kinds of things.
[19]     **Q:** You also testified about your
[20] opinion on certain — about the effect of how
[21] sleep can have on the psyche.
[22]     Correct?
[23]     **A:** Yes, sir.
[24]     **Q:** It's fair some say you're not an
[25] expert in sleep disorders.

---

Page 214

**C. KEMPKE**

[1]
[2]     Is that right?
[3]     **A:** It's one of the fields that we
[4] have to learn about in psychiatry, but it is
[5] not an area I have chosen to do research or
[6] practice in.
[7]     **Q:** And you haven't consulted with
[8] staff members regarding Ms. Siddiqui's
[9] sleeping patterns.
[10]     Correct?
[11]     **A:** We heard the report at morning
[12] report.
[13]     **Q:** Right.
[14] But you have not tasked staff
[15] members with monitoring Ms. Siddiqui's sleep.
[16]     Is that right?
[17]     **A:** Correct.
[18]     **Q:** Dr. Kempke, I'm just going to ask
[19] you a few more questions.
[20]     When Dr. Saathoff visited in
[21] February 2009, you sat in on his interview and
[22] evaluation of Ms. Siddiqui.
[23]     Correct?
[24]     **A:** I sat in once. If he did it more
[25] than once, I didn't see any other ones.

---

Page 215

**C. KEMPKE**

[1]
[2]     **Q:** Isn't it true that you told Dr.
[3] Saathoff in February, at that meeting,
[4] February 2009, if Ms. Siddiqui had been
[5] psychotic in the last three months, you were
[6] unaware of it?
[7]     **A:** No, sir, that's not true.
[8]     **Q:** That's not true.
[9] Didn't you also say to Dr.
[10] Saathoff that hallucinations were not evident
[11] in Ms. Siddiqui?
[12]     **A:** Yes, sir.
[13]     **Q:** And that's an opinion that you
[14] stand by today.
[15]     Correct?
[16]     **A:** Yes, sir.
[17]     **Q:** That Ms. Siddiqui is not
[18] hallucinating.
[19]     Right?
[20]     **A:** Correct.
[21]     **Q:** Now, regarding — you indicated
[22] that Ms. Siddiqui could be suffering from
[23] paranoid schizophrenia or from delusional
[24] disorder.
[25]     Correct?

---

Page 216

**C. KEMPKE**

[1]
[2]     **A:** Correct.
[3]     **Q:** Isn't it true that people who
[4] suffer from delusional disorder can hold jobs?
[5]     **A:** So can people with paranoid
[6] schizophrenia.
[7]     **Q:** Right.
[8] So, both people who suffer from
[9] those mental diseases can still function at
[10] work.
[11]     Correct?
[12]     **A:** Just like the issue of hygiene
[13] yes.
[14]     **Q:** Right, at home.
[15] Correct?
[16]     **A:** Yes.
[17]     **Q:** Is it fair to say, Dr. Kempke,
[18] that you feel sympathy towards Ms. Siddiqui?
[19]     **A:** I feel sympathy towards all of my
[20] patients or I should not be seeing them, which
[21] is exactly what has happened at Carswell.
[22] When one psychiatrist feels no longer capable
[23] of empathy with that inmate, we have had to
[24] change.
[25]     **Q:** So, you have felt sympathetic

---

Page 217

**C. KEMPKE**

[1]
[2] towards Ms. Siddiqui.
[3]     Correct?
[4]     **A:** Yes, sir.
[5]     **Q:** And that's come about in the
[6] course of your treating her.
[7]     Correct?
[8]     **A:** It starts off from meeting
[9] somebody. She has come under my patriarchal
[10] paternalistic particular medical umbrella.
[11]     I hope most physicians care about
[12] their patients.
[13]     **Q:** And your job, just so we're
[14] clear, was to treat this woman?
[15]     **A:** Sir, that is a problem we're
[16] having.
[17]     My job was to be her attending
[18] psychiatrist on an inpatient psychiatric unit.
[19]     **Q:** That was your job, correct?
[20]     **A:** Yes, sir.
[21]     **Q:** Your job was not to evaluate
[22] whether Ms. Siddiqui was competent to stand
[23] trial.
[24]     Correct?
[25]     **A:** Correct.

Page 218

**C. KEMPKE**

[1]
[2] The problem that I'm having —
[3]     **Q:** No, that's my question. You can
[4] answer other questions on redirect.
[5]     And Dr. Kempke, in reviewing Dr.
[6] Saathoff's and Dr. Johnson's report, you would
[7] agree with me — when you reviewed those
[8] reports, you saw the amount of materials that
[9] they reviewed in connection with this case.
[10]     Correct?
[11]     **A:** Correct.
[12]     **Q:** Also with Dr. Kucharski.
[13] Correct?
[14]     **A:** Yes, sir.
[15]     **Q:** You would agree there are a lot
[16] of materials in those reports you haven't
[17] looked at.
[18]     Correct?
[19]     **A:** Yes, sir.
[20]     **Q:** There are a lot of people that
[21] Dr. Kucharski, Dr. Saathoff, and Dr. Johnson
[22] interviewed that you haven't spoke with.
[23]     Correct?
[24]     **A:** Yes, sir.
[25]     **Q:** People from different aspects of

Page 219

**C. KEMPKE**

[1]
[2] Ms. Siddiqui's case.
[3]     Correct?
[4]     **A:** Yes, sir.
[5]     **Q:** People who were with Ms. Siddiqui
[6] in Afghanistan.
[7]     Correct?
[8]     **A:** Yes, sir.
[9]     **Q:** People who were with Ms. Siddiqui
[10] at the MDC in Brooklyn.
[11]     Correct?
[12]     **A:** Yes, sir.
[13]     **Q:** And some people who were with Ms.
[14] Siddiqui at Carswell.
[15]     Correct?
[16]     **A:** Yes, sir.
[17]     **Q:** And your opinion — I withdraw
[18] that.
[19]     **MR. LAVIGNE:** Let me just have
[20] one minute.
[21]     **THE VIDEOGRAPHER:** Would you like
[22] to go off the record?
[23]     **MR. LAVIGNE:** Yeah, why don't we
[24] go off the record for a second?
[25]     **THE VIDEOGRAPHER:** Time is 6:16.

Page 220

**C. KEMPKE**

[1]
[2] Off the record.
[3]     (Recess taken)
[4]     **THE VIDEOGRAPHER:** Time is now
[5] 6:23.
[6]     On the record.
[7]     **Q:** Dr. Kempke, I just have a few
[8] more questions.
[9]     **A:** Yes, sir.
[10]     **Q:** Have you testified before?
[11]     **A:** Yes, sir.
[12]     **Q:** Approximately how many times?
[13]     **A:** It depends upon — if you want
[14] just psychiatrically testifying in forensic
[15] cases through the BOP, it's three or four.
[16]     **Q:** In court?
[17]     **A:** In court, once — well, there's
[18] those video testimonies.
[19]     Do those count as court, when
[20] you've got the judge on the other side?
[21]     **MS. CARDI:** Yes.
[22]     **A:** Then that's three, maybe four
[23] again. It would be the same number.
[24]     I've done others as ER doctor and
[25] as a community health psychiatrist, but those

CAMIELLE KEMPKE
July 1, 2009

USA v.
SIDDIQUI

---

Page 221

C. KEMPKE

[1]
[2] are very different than the BOP.
[3]    Q: And you've been at the BOP for
[4] less than — you've been at Carswell for the
[5] last two years?
[6]    A: Yes.
[7]    Q: And approximately how many
[8] patients do you treat?
[9]    A: About a hundred.
[10]   Q: About a hundred patients at once?
[11]   A: Yes.
[12]   Q: And what are your hours each day?
[13]   A: 7:30 to 4; but on the days that I
[14] have to do the intake bus, I work from 9 'til
[15] 5:30.
[16]   Q: So, you work about eight hours a
[17] day.
[18]   Correct?
[19]   A: Yeah.
[20]   Q: About five days a week.
[21] Correct?
[22]   A: Yea.
[23]   Q: And you see — you have about a
[24] hundred patients.
[25]   Correct?

---

Page 222

C. KEMPKE

[1]
[2]    A: Yeah.
[3] I think it's about 75, and then
[4] what I'm counting in there, there's another
[5] eight or ten over the admin unit, and then the
[6] intakes on those bus days. So that's sort of
[7] a different kind of a thing, but...
[8]    Q: When you do intake, you're the
[9] psychiatrist who goes to see an inmate who's
[10] first coming in on a referral.
[11]   A: It's a screening in the RD.
[12]   Q: Is that right?
[13] And how many screenings would you
[14] say you do a week?
[15]   A: Well, we do — we have busses
[16] coming every other week, so on those I tend to
[17] do about five or six. And then we have
[18] screens every so often someplace else.
[19]   Q: It's fair to say that each of
[20] your hundred patients, is it fair to say, you
[21] try to see about once a month?
[22]   A: Those — yeah, let's see, some of
[23] the ones — I have to see once a week the ones
[24] who are on M3, I have to see the ones on M1
[25] once a month, and I have to see the once on

---

Page 223

C. KEMPKE

[1]
[2] admin every one to three months depending upon
[3] their clinical status.
[4]    Q: M1 was the unit Ms. Siddiqui was
[5] on.
[6]    Correct?
[7]    A: Yes, sir.
[8]    Q: And how many of your other
[9] patients are on M1?
[10]   A: This has just changed, okay, so
[11] I'm having a little hard time because about
[12] two weeks ago we changed it so that I don't —
[13] I'm not the psychiatrist of record for any of
[14] the 41Bs.
[15]   Q: Uh-huh.
[16]   A: So, I have — I'm having a hard
[17] time because I have to figure out — those
[18] out.
[19]   MS. CARDI: Do you want to leave
[20] it for the period of time when Dr.
[21] Siddiqui was there?
[22]   MR. LAVIGNE: Yeah.
[23]   A: Okay, she was there before we
[24] changed this stuff.
[25]   Q: Okay.

---

Page 224

C. KEMPKE

[1]
[2]    A: Because this started about June
[3] 15.
[4]    I'm sorry, now I've lost
[5] question. Something about numbers of
[6] patients.
[7]    Q: No problem.
[8] When Ms. Siddiqui was on M1, how
[9] many other patients did you have who were on
[10] M1?
[11]   A: Usually 50 to 55, and ten of
[12] those were — about ten.
[13]   Q: Okay.
[14]   A: So, I saw about 45 people on M1.
[15]   Q: About 45 people on M1?
[16]   A: Maybe an easier way, I keep a
[17] list of who my patients are on the two units,
[18] M1 and M3, the ones that are inpatient
[19] assigned, and there's another small category.
[20]   At any rate, I usually have 20 to
[21] 22 people to see a week.
[22]   Q: Okay.
[23]   A: Does that make more sense?
[24]   Q: For the patients on M1, you see
[25] them once a month.

---

USA v.
SIDDIQUI

CAMIELLE KEMPKE
July 1, 2009

Page 225

**C. KEMPKE**

[1]
[2] Is that right?
[3] **A:** Yes.
[4] **Q:** Ms. Siddiqui was one of those
[5] patients on MI.
[6] **A:** Yes, sir.
[7] **Q:** Correct?
[8] You saw Ms. Siddiqui once a
[9] month.
[10] **A:** Yes, sir.
[11] **Q:** Is that right?
[12] So, from October 2008 until Ms.
[13] Siddiqui's transfer, we estimate you saw Ms.
[14] Siddiqui about eight hours total.
[15] Correct?
[16] **A:** Yeah.
[17] **Q:** And based on those eight hours,
[18] your interactions with her, today your opinion
[19] is shes a paranoid schizophrenic.
[20] Is that right?
[21] **A:** Yes, sir.
[22] **Q:** But you're not expressing opinion
[23] as to whether she's competent to stand trial.
[24] Correct?
[25] **A:** Yes, sir.

Page 226

**C. KEMPKE**

[1]
[2] **MR. LAVIGNE:** No more questions.
[3] **EXAMINATION**
[4] **BY MS. CARDI:**
[5] **Q:** Mr. Lavigne asked you if you were
[6] sympathetic to Dr. Siddiqui.
[7] Correct?
[8] **A:** Yes, ma'am.
[9] **Q:** Would the fact that you're
[10] sympathetic to your patient mean that you
[11] would change a diagnosis?
[12] **A:** No, ma'am.
[13] **Q:** Is your — does your sympathy for
[14] Dr. Siddiqui mean that you would give her a
[15] diagnosis of paranoid schizophrenic if you
[16] thought it would help her?
[17] **A:** No, ma'am.
[18] **Q:** Mr. Lavigne asked you about a
[19] series of documents which you admitted that
[20] you had not seen.
[21] Correct?
[22] **A:** Yes, ma'am.
[23] **Q:** And there was a whole list of
[24] them, and I won't enumerate them again.
[25] Okay?

Page 227

**C. KEMPKE**

[1]
[2] **A:** Thank you.
[3] **Q:** But isn't it true that you did
[4] read Dr. Saathoff's report and Dr. Johnson's
[5] report?
[6] Correct?
[7] **A:** Yes, ma'am.
[8] **Q:** And in that report, both Dr.
[9] Saathoff and Dr. Johnson refer fairly
[10] regularly to various interviews and documents
[11] that they have reviewed.
[12] Correct?
[13] **A:** Yes, ma'am.
[14] **Q:** And those are the same interviews
[15] and documents that Mr. Lavigne was referring
[16] to when he asked you if you had actually
[17] reviewed them.
[18] Correct?
[19] **A:** Yes, ma'am.
[20] **Q:** Okay.
[21] When you read Dr. Saathoff's
[22] report and Dr. Johnson's report, did you know,
[23] first of all, whether or not their reporting
[24] of what they read in the documents was
[25] accurate?

Page 228

**C. KEMPKE**

[1]
[2] **A:** I have no idea.
[3] **Q:** Okay.
[4] When you read Dr. Johnson and Dr.
[5] Saathoff's report, did you know whether or
[6] not, other than when they refer to you,
[7] whether or not their reports of conversations
[8] they claim to have had with a myriad of
[9] individuals were actually accurate reports of
[10] what those individuals said?
[11] **A:** No, ma'am.
[12] **Q:** Would it be — when you review
[13] Dr. Saathoff and Dr. Johnson's report and you
[14] reviewed the list of all of the documents that
[15] they reviewed, did you find anywhere in either
[16] of their reports any documentary proof that
[17] Dr. Siddiqui had not been tortured?
[18] **A:** No, ma'am.
[19] **Q:** Did you find anywhere in their
[20] reports in the documents reviewed that Dr.
[21] Siddiqui's children had not been tortured?
[22] **A:** No, ma'am.
[23] **Q:** Did you find anywhere in these
[24] reports any documentary evidence that those —
[25] two of those children are still missing?

**CAMIELLE KEMPKE**
July 1, 2009

USA  v.
SIDDIQUI

---

Page 229

**C. KEMPKE**

[1]
[2]   **A:** I don't have any documents that
[3]   — I mean, as far as I can tell, they have
[4]   never been found from the reading of that.
[5]   I've never seen that they've been found in any
[6]   way or that their whereabouts are known.
[7]   **Q:** Was there anything reported in
[8]   either of these two reports which led you to
[9]   change your diagnosis of paranoid
[10]  schizophrenia?
[11]  **A:** No, ma'am.
[12]  **Q:** I'm going to show you MED 173.
[13]  Can you tell me what on this,
[14]  which is a part of a report that you prepared
[15]  and Mr. Lavigne referred to, what on that page
[16]  did you think was weird about Dr. Siddiqui?
[17]  **A:** Okay. This is the first
[18]  paragraph, approximately the eighth or so
[19]  line.
[20]      She dismisses derisively the two
[21]  charges that she shot a man.
[22]      And I cannot remember if she was
[23]  able to remember the second charge.
[24]  She reports that she can prove in
[25]  one minute that she did not do that.

---

Page 230

**C. KEMPKE**

[1]
[2]      And that's pretty weird.
[3]  I have figured out something they
[4]  have not. She would not reveal then until
[5]  she's at court. I have figured out something
[6]  they have not.
[7]      And she's quite proud that God —
[8]  again, not using the term Allah — has given
[9]  her this understanding and frequently reports
[10] that God is with me.
[11]     I think getting that special
[12] ability from God is grandiose.
[13]  **Q:** You told Mr. Lavigne that you
[14] told Dr. Saathoff in his February 9 interview
[15] that, in your opinion, Dr. Siddiqui was not —
[16] was no longer or had not experienced
[17] hallucinations.
[18]     Correct?
[19]  **A:** I don't remember that we had
[20] described — discussed with Dr. Saathoff
[21] whether those were hypnogogic hallucinations
[22] or hallucinations of any sort. I don't
[23] remember asking — him asking that question.
[24]  **Q:** That's my question to you: Did
[25] Dr. Saathoff ask you anything about whether

---

Page 231

**C. KEMPKE**

[1]
[2]  you thought they were hypnogogic?
[3]   **A:** No.
[4]   **Q:** Did you volunteer that they were
[5]  hypnogogic?
[6]   **A:** No, ma'am.
[7]   **Q:** Why not?
[8]   **A:** Because it was taking too much
[9]  time out of my day as it was.
[10]  **Q:** And he didn't ask?
[11]  **A:** Correct.
[12]  **Q:** You say people who are suffering
[13] from delusional disorder and paranoid
[14] schizophrenia can hold jobs.
[15]     Is that correct?
[16]  **A:** Yes, ma'am.
[17]  **Q:** Would it also be equally true
[18] that many of them can't hold jobs?
[19]  **A:** Yes, ma'am.
[20]  **Q:** And would it be — withdrawn.
[21] You saw Dr. Siddiqui for
[22] approximately eight hours — withdrawn.
[23]     When Mr. Lavigne asked you about
[24] the report in MED 197 that her mental health
[25] condition had improved, was that referring to

---

Page 232

**C. KEMPKE**

[1]
[2]  the depression or the diagnosis of paranoid
[3]  schizophrenia?
[4]   **A:** The depression.
[5]   **Q:** Okay.
[6]  Now, there was a lot discussed
[7]  about medication and why — that you didn't
[8]  give her medication.
[9]      Explain why you didn't give her
[10] medication.
[11]  **A:** That's the importance of the 4241
[12] B designation. As I found out over the course
[13] of the last six months, I am not to be
[14] medicating 4241 B patients unless requested by
[15] the psychologists.
[16]  **Q:** All right.
[17] So, were you ever requested by
[18] the psychologists working with Dr. Siddiqui,
[19] specifically Dr. Powers, to medicate her?
[20]  **A:** No.
[21]  **Q:** When you said that Dr. Siddiqui
[22] improved in her ability to read, did that
[23] refer to — what did that refer to?
[24]  **A:** She quit complaining about not
[25] being able to read. She quit telling me that

---

Page 233

**C. KEMPKE**

[1]
[2] she couldn't read the Koran.
[3]    **Q:** Do you have any — did she tell
[4] you whether or not she was having any
[5] improvement in her — in her being able to
[6] focus while reading or to remember?
[7]    **A:** She didn't describe that. I
[8] didn't ask her, really.
[9]    **Q:** Mr. Lavigne asked you about
[10] certain — certain symptoms that some paranoid
[11] schizophrenics suffer from, and that one of
[12] them was disorganized speech, which Dr.
[13] Siddiqui does not have, and grossly
[14] disorganized behavior, which you said Dr.
[15] Siddiqui does not have.
[16]    Correct?
[17]    **A:** Yes, ma'am.
[18]    **Q:** What are the symptoms that Dr.
[19] Siddiqui does have which permit you to
[20] diagnose her as a paranoid schizophrenic?
[21]    **A:** Reading the old records, it looks
[22] like she underperformed when she was working
[23] at Karachi, Pakistan, at least according to
[24] one of the doctor's reports.
[25]    She also apparently had

Page 234

**C. KEMPKE**

[1]
[2] difficulties — again, paranoia — and almost
[3] didn't get her Ph.D. from Brandeiss because of
[4] that.
[5]    She is described to have had the
[6] feeling that — sorry, what I refer to in my
[7] mind as the Zionist conspiracy and the fear
[8] that she will be maltreated began on the
[9] flight over. She proceeded to have more and
[10] more paranoia that her life was in danger.
[11]    And I'm not clear about the
[12] discussions about her children, whether that
[13] represents paranoia or reality-based PTSD type
[14] of traumas because I don't know the validity
[15] or the actual events, I guess I should put, of
[16] what went on while she was quote/unquote
[17] missing.
[18]    **Q:** Were you aware that Dr. Johnson
[19] and Dr. Saathoff were being paid by the
[20] Federal Government to perform this competency
[21] evaluation on their behalf?
[22]
[23]
[24]
[25]

Page 235

**C. KEMPKE**

[1]
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]    **MR. LAVIGNE:** We'll stipulate
[11] that they were retained by the
[12] Government.
[13]    **MS. CARDI:** Okay.
[14]    **Q:** Mr. Lavigne asked you about — a
[15] lot about your diagnosis on the first day that
[16] you met Dr. Siddiqui.
[17]    **A:** Yes, ma'am.
[18]    **Q:** And the fact that she didn't
[19] answer certain questions for you on that day.
[20]    **A:** Yes, ma'am.
[21]    **Q:** Things like her age and whether
[22] or not she — where she had gone to school, et
[23] cetera.
[24]    Was there anything about the
[25] actual conduct of this examination that

Page 236

**C. KEMPKE**

[1]
[2] suggested to you that there was something
[3] wrong or — withdrawn. Let me start again.
[4]    Mr. Lavigne made a number of
[5] points that Dr. Siddiqui did not report these
[6] kinds of information to you on the day — the
[7] first day you met with her.
[8]    Is there anything about that fact
[9] that impacts on your diagnosis of her today?
[10]    **A:** No, ma'am.
[11]    **Q:** Is there anything about that fact
[12] that she — was there anything that was going
[13] on that day during this initial intake that
[14] would have — might have impacted on Dr.
[15] Siddiqui's ability to report to you?
[16]    **A:** Yes, ma'am.
[17] That was a fairly traumatic
[18] transfer, and she had undergone another
[19] physical examination, which she had to
[20] reluctantly agree to because the woman was a
[21] Muslim physician.
[22]    **Q:** What was her condition when you
[23] observed her?
[24]    **A:** She was fairly distraught, upset,
[25] worried, and confused.

Page 237

**C. KEMPKE**

[1]

[2] **Q:** You didn't see the letter from

[3] the warden that she wrote — that Dr. Siddiqui

[4] wrote to the warden.

[5]      Do you know why?

[6] **A:** Those documents were given to the

[7] evaluating psychologist.

[8] **Q:** Okay.

[9] Didn't Dr. Siddiqui report to Mr.

[10] McGee some of the facts she describes of what

[11] happened on the day of her arrest in

[12] Afghanistan?

[13] **A:** She may have.

[14] **Q:** But you don't recall reading

[15] that.

[16]      Can people who have advanced

[17] degrees and have gone to schools like MIT and

[18] Brandeiss be psychotic?

[19] **A:** Yes, ma'am.

[20] **Q:** When you say that you avoided

[21] asking her about her past, did that — in your

[22] mind, did that ever prevent Dr. Siddiqui from

[23] talking about her past?

[24] **A:** No, ma'am.

[25] **Q:** You've reviewed all of these

Page 238

**C. KEMPKE**

[1]

[2] documents and you've read the reports, you've

[3] met for hours with Dr. Siddiqui, you've looked

[4] at the video.

[5]      Do you think that Dr. Siddiqui is

[6] conning you?

[7] **A:** No, ma'am.

[8] **MS. CARDI:** I have no further

[9] questions.

[10] **MR. LAVIGNE:** Brief recross?

[11] **MS. CARDI:** Whatever.

[12] **THE VIDEOGRAPHER:** Counselor,

[13] before you begin, you have five minutes.

[14] **MR. LAVIGNE:** Yeah, I'll be two

[15] minutes.

[16]      **EXAMINATION**

[17]      **BY MR. LAVIGNE:**

[18] **Q:** Dr. Kempke, you indicated that

[19] you a reviewed the reports of Dr. Saathoff and

[20] Dr. Johnson which summarize a lot of the

[21] information that they saw.

[22]      Correct?

[23] **A:** Yes.

[24] **Q:** Or that they reviewed.

[25] Correct?

Page 239

**C. KEMPKE**

[1]

[2] **A:** Yes, sir.

[3] **Q:** Okay.

[4] **A:** I'm sorry, your repetitive

[5] correct is reminding me of a professor I once

[6] had, so...

[7] **Q:** Well, I'm flattered, I think.

[8] That underlying information,

[9] though, a lot of it you haven't seen.

[10]      Correct?

[11] **A:** I didn't see the originals.

[12] **Q:** Right.

[13] **A:** Correct.

[14] **Q:** You didn't see all the

[15] information that Dr. Saathoff and Dr. Johnson

[16] relied upon.

[17] **A:** Correct.

[18] **Q:** Going back to the January 30,

[19] 2009 note —

[20] **MR. LAVIGNE:** I'm referring to

[21] MED 173.

[22] **Q:** — you talk about Ms. Siddiqui's

[23] reporting to you. You indicate that: Ms.

[24] Siddiqui reported that the day the Afghanistan

[25] personnel picked her up, she was participating

Page 240

**C. KEMPKE**

[1]

[2] in one of the experiments.

[3]      Correct?

[4] **A:** Yes, sir.

[5] **Q:** You also reported that Ms.

[6] Siddiqui said, quote: There were no glass

[7] bottles, dismissive laugh.

[8]      Correct?

[9] **A:** Correct.

[10] **Q:** And that comment to you seemed

[11] strange.

[12]      Correct?

[13] **A:** Yeah.

[14] **Q:** Seemed out there.

[15] Correct?

[16] **A:** Yes.

[17] **Q:** You weren't able to put that in

[18] context.

[19]      Right?

[20] Well, that — it seems

[21] disconnected with what else Ms. Siddiqui is

[22] saying.

[23]      Correct?

[24] **A:** Yes.

[25] **Q:** Okay.

**Page 241**

C. KEMPKE

[1]
[2]    **A:** Okay.
[3]    **Q:** Have you seen the criminal
[4] Complaint in this case?
[5]    **A:** I don't get access to any of
[6] those, sir.
[7]    **Q:** All right. I'll show you it.
[8]    **MR. LAVIGNE:** For the record, I'm
[9] showing O8MAG1697.
[10]    **Q:** Have you seen that document
[11] before?
[12]    **A:** No, sir.
[13]    **Q:** Okay.
[14] I'll represent this is the
[15] criminal Complaint against Ms. Siddiqui, and
[16] I'm directing your attention to Paragraph 5 —
[17] sorry, Paragraph 4, Subsection D on Page 3.
[18]    Could you just read what that
[19] sentence says?
[20]    **A:** Siddiqui was also in possession
[21] of numerous chemical substances in gel and
[22] liquid form that were sealed in bottles and
[23] glass jars.
[24]    **MR. LAVIGNE:** Thank you.
[25] No further questions.

**Page 242**

C. KEMPKE
EXAMINATION
BY MS. CARDI:

[1]
[2]
[3]
[4]    **Q:** So, if Dr. Siddiqui thought there
[5] were no glass bottles and there was, that
[6] would be what?
[7]    What kind of a symptom?
[8]    **A:** Sounds like some troubles with
[9] her memory.
[10]    **MS. CARDI:** I have no further
[11] questions.
[12]    **MR. LAVIGNE:** Done.
[13]    **THE VIDEOGRAPHER:** The time is
[14] now 6:46 p.m. This marks the ending of
[15] Tape No. 3.
[16]    Off the record.
[17]
[18]    (Time noted: 6:46 p.m.)
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 243**

[1]
[2]    **CAPTION**
[3]
[4] The Deposition of CAMIELLE KEMPKE, Ph.D.,
[5] taken in the matter, on the date, and at the
[6] time and place set out on the title page
[7] hereof.
[8]
[9]
[10] It was requested that the deposition be taken
[11] by the reporter and that same be reduced to
[12] typewritten form.
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 244**

[1]
[2]    CERTIFICATE
[3]
[4] STATE OF                              :
[5] COUNTY/CITY OF                        :
[6]
[7] Before me, this day, personally appeared
[8] CAMIELLE KEMPKE, Ph.D., who, being duly sworn,
[9] states that the foregoing transcript of her
[10] Deposition, taken in the matter, on the date,
[11] and at the time and place set out on the title
[12] page hereof, constitutes a true and accurate
[13] transcript of said deposition.
[14]
[15]
[16]
[17]    CAMIELLE KEMPKE, Ph.D.
[18]
[19] SUBSCRIBED and SWORN to before me this _____
[20] day of _____, 2009, in the jurisdiction
[21] aforesaid.
[22]
[23]
[24]
[25] My Commission Expires        Notary Public

**CAMIELLE KEMPKE**
**July 1, 2009**

USA   v.
SIDDIQUI

Page 245

[1]

[2]        DEPOSITION ERRATA SHEET

[3] RE:

FILE NO. 08CR826(RMB)

[4] CAPTION: USA v. SIDDIQUI

[5] DEPONENT: CAMIELLE KEMPKE, Ph.D.

DEPOSITION DATE: JULY 1, 2009

[6]

To the Reporter:

[7] I have read the entire transcript of my

Deposition taken in the captioned matter or

[8] the same has been read to me. I request for

the following changes to be entered upon the

[9] record for the reasons indicated.

I have signed my name to the Errata Sheet and

[10] the appropriate Certificate and authorize you

to attach both to the original transcript.

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

SIGNATURE: _____ DATE: _____

[25]      CAMIELLE KEMPKE, Ph.D.

Page 246

[1]

[2]        INDEX

[3] WITNESS              PAGE

[4] Camielle Kempke            5

[5]

[6]

[7]    SPACE PROVIDED FOR INFORMATION

[8]      PAGE     LINE

86       22

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 247

[1]

[2]        CERTIFICATE

[3] STATE OF NEW YORK             )

[4]                               )ss.:

[5] COUNTY OF NEW YORK            )

[6]      I, LINDA A. MARINO, a Registered

[7] Professional Reporter, Certified Court

[8] Reporter, and Notary Public within and

[9] for the State of New York do hereby

[10] certify:

[11]      I reported the proceedings in the

[12] within-entitled matter to the best of my

[13] ability, and that the within transcript

[14] is a true record of such proceedings.

[15]      I further certify that I am not

[16] related, by blood or marriage, to any of

[17] the parties in this matter and that I am

[18] in no way interested in the outcome of

[19] this matter.

[20]      IN WITNESS WHEREOF, I have

[21] hereunto set my hand this _____ day

[22] of _____ 2009.

[23]

[24]

[25]      LINDA A. MARINO, RPR, CCR