UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

        - v. -          :          **08 Cr. 826 (RMB)**

AAFIA SIDDIQUI,          :

        Defendant.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S RESPONSE TO THE DEFENDANT'S MOTIONS IN LIMINE

 

 

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
    of America

Christopher L. LaVigne
David M. Rody
Jenna M. Dabbs
Assistant United States Attorneys

    -Of Counsel-

# TABLE OF CONTENTS

I.     **<u>Background</u>**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     **<u>Discussion</u>** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

         A.     **<u>None of the Evidence the Government Seeks to Introduce Should Be Suppressed</u>** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

                 1.     **<u>Certain of the Proffered Evidence is Admissible as Direct Evidence of the Crimes Charged</u>**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

                 2.     **<u>Certain of the Proffered Evidence Is Admissible As Background Evidence to the Crimes Charged</u>**. . . . . . . . . . . . . . . . . . . . . . . . . . 11

                 3.     **<u>The Proffered Evidence is Admissible Pursuant to Federal Rule of Evidence 404(b)</u>**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                 4.     **<u>The Proffered Evidence Should Not Be Excluded Under Rule 403</u>**. . 17

         B.     **<u>The Defendant's Motion Regarding Authentication Should Be Denied In Its Entirety</u>**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

         C.     **<u>The Defendant's Motions Regarding the Exclusion of Expert Testimony Should Be Denied in Their Entirety</u>**. . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

                 1.     **<u>Legal Standard</u>**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

                 2.     **<u>Carlo Rosati</u>**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

                 3.     **<u>D.J. Fife</u>** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

         D.     **<u>The Defendant's Motion To Limit the Use of Certain Terms At Trial Should Be Denied</u>** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

III.    **<u>Conclusion</u>** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

       - v. -          :          **08 Cr. 826 (RMB)**

AAFIA SIDDIQUI,          :

           **Defendant.**          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S RESPONSE TO THE DEFENDANT'S MOTIONS IN LIMINE

       The Government respectfully submits this response to the defendant's motions *in limine.*  As set forth in these motions, the defendant seeks the followings rulings in advance of trial: (1) the exclusion of a laundry list of evidence pursuant to Federal Rule of Evidence ("Rule") 404(b) and/or Rule 403; (2) the exclusion of evidence that was recovered from the defendant by the Afghan National Police ("ANP") unless the Government "establishes the required foundation" (Def. Mem. 138 at 1); (3) the exclusion of portions of testimony of two of the Government's experts; and (4) the exclusion of evidence and opinions regarding the defendant's alleged affiliation with al Qaeda or other terrorist organizations.[1]

       For the reasons detailed below, the Court should deny the defendant's motions in their entirety.

---

[1]    Throughout this brief, "Def. Mem. [NUMBER]" refers to the motions *in limine* filed by the defendant, labeled by the docket entry associated with each individual motion; "Ex. [LETTER]" refers to the exhibits attached to the Government's motion *in limine*, filed on December 14, 2009; and Competency Hearing GX [LETTER] refers to exhibits introduced at the competency hearing in this matter.

## I.    Background

The background to this offense was set forth in the Government's motion *in limine*, filed on December 14, 2009.  In brief, on September 2, 2008, a grand jury sitting in this District returned an indictment (the "Indictment") that charges the defendant in the following seven counts, based on events that occurred at an Afghan National Police Compound (the "ANP Compound") in Ghazni, Afghanistan on July 17 and 18, 2008: (1) attempting to kill United States nationals in violation of Title 18, United States Code, Section 2332(b) (Count One); (2) attempting to kill United States officers and employees in violation of Title 18, United States Code, Section 1114 (Count Two); (3) armed assault of United States officers and employees in violation of Title 18, United States Code, Section 111(b) (Count Three); (4) discharging a firearm during a crime of violence in violation of Title 18, United States Code, Section 924(c) (Count Four); and (5) assaulting United States officers and employees in violation of Title 18, United States Code, Section 111(a) (Counts Five through Seven).

The charges stem from the defendant's apprehension on July 17, 2008 by the ANP in Ghazni, Afghanistan.  Upon being arrested, the ANP recovered a number of items from the defendant, certain of which were provided to the United States military.  These items included a number of handwritten and pre-printed documents, women's personal effects, various chemicals (certain of which tested positive for sodium cyanide), and a computer thumb drive which contained various electronic documents.  Based in part on its review of these items, the United States military contacted the Federal Bureau of Investigation ("FBI") to assist in interviewing and identifying the individual whom the ANP had detained (later determined to be the defendant).

The following day, a team of United States military personnel and FBI agents (the "Interview Team") traveled to the ANP Compound at which the defendant was held, in order to interview and identify her. Eventually the Interview Team was directed to a second floor room at the ANP Compound. Unbeknownst to the Interview Team, the defendant was left unsecured in the room, behind a curtain that partitioned it. After the Interview Team entered the room, the defendant grabbed one of the Team member's (the "Warrant Officer") M-4 rifle, and attempted to fire, and fired, it at members of the Interview Team. In response, the Warrant Officer shot the defendant, and she was subsequently subdued. During and immediately after this shooting, the defendant repeatedly screamed anti-American statements, including her desire to kill Americans.

The Interview Team then brought the defendant to a military base, where her wounds were treated. The same day, two members of the Interview Team brought the defendant to another military base for medical treatment, and then to Bagram Airbase, where she remained until August 4, when she was transferred to this District.

## II.    Discussion

As summarized below, the defendant's motions *in limine* should be denied in their entirety, without an evidentiary hearing. The defendant's various motions are addressed in turn.

### A.    None of the Evidence the Government Seeks To Introduce Should Be Suppressed

The defendant's self-styled "404(b) Motion" recites a laundry list of evidence (the "Proffered Evidence") that she claims should be excluded. The Proffered Evidence consists of: evidence of the defendant's actions immediately before, during, and after the July 18, 2008 shooting; materials recovered from the defendant on July 17, 2008 by the ANP (the "Defendant's Materials"); testimony regarding the circumstances surrounding the defendant's arrest (the

"Arrest Evidence"); various statements and escape attempts made by the defendant while in Afghan custody (the "Defendant's Statements and Escape Attempts"); facts relating to the defendant's educational background (the "Education Evidence"); and recorded phone calls made and letters written by the defendant (the "Defendant's Phone Calls and Letters") (collectively the "Proffered Evidence") (Def. Mem. 136 at 1-2.).

The defendant's motion does not address the Proffered Evidence with particularity. Rather, with broad strokes and hyperbole, the defendant cursorily claims that all of the Proffered Evidence is inadmissible, going so far as to argue that all of the Proffered Evidence "has no relevance" to the charges. (*See, e.g.*, Def. Mem. 136 at 3, 16.)

This characterization is inaccurate; it grossly overstates the facts and the law. To be relevant, evidence simply must have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Specifically, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency. Relevant evidence is not confined to that which directly establishes an element of the crime." *United States* v. *Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997).

The Proffered Evidence easily meets the threshold determination of relevance, to take just one obvious example, because it includes direct evidence of the defendant's actions and statements *while in the course of committing the charged crimes*. As summarized below, the Proffered Evidence is also direct evidence of the defendant's intent on July 18, 2008, is necessary background evidence to the charges as it will help the jury place the defendant's, the

United States military's, and the FBI's actions in their proper context, and, in the alternative, is admissible under Rule 404(b).  Moreover, the probative value of the Proffered Evidence is not substantially outweighed by the danger of unfair prejudice.

Accordingly, the defendant's motion should be denied in its entirety.

1. **Certain of the Proffered Evidence is Admissible as Direct Evidence of the Crimes Charged**

Much of the Proffered Evidence is admissible as direct evidence of the crimes with which the defendant is charged.  As summarized below, this evidence establishes the defendant's actions and intent on July 18, 2008, including that she attempted to fire a gun at United States personnel.

The Defendant's Actions Immediately Before, During, and After the Shooting

One portion of the Proffered Evidence the defendant seeks to exclude is the "defendant's actions immediately before, during, and after the" July 18, 2008 shooting.  (Def. Mem. 136 at 1.)  This evidence consists of the defendant taking the Warrant Officer's M-4 rifle; pointing it at members of the Interview Team; attempting to fire and then firing the rifle at U.S. personnel; and making statements expressing, among other things, her hatred for Americans, her desire and intent to kill Americans, her desire to die, and numerous obscenities.

This aspect of the defendant's motion is frivolous.  Read literally, it seeks to exclude any evidence that the defendant took an M-4 rifle and attempted to kill members of the Interview Team, while proclaiming her intent to do so.  This would effectively preclude the Government from introducing any eyewitness testimony about what the defendant did and said during the course of the charged crimes.  It is hard to imagine evidence more probative of a shooter's intent than what she did and said right before, during, and after she pulled the trigger.

Indeed, the defendant has not even attempted to demonstrate how this evidence is inadmissible.

Accordingly, the defendant's efforts to preclude the Government from introducing evidence of the "defendant's actions immediately before, during, and after the" July 18, 2008 shooting should summarily be denied.

<u>The Defendant's Materials</u>

The defendant also seeks to preclude the Government from offering at trial the Defendant's Materials. The Government previously moved *in limine* for a ruling that certain of these items are admissible, given that the Government intends to introduce in its case-in-chief: (1) chemicals recovered from the defendant (including almost two pounds of sodium cyanide); (2) hard copy documents recovered from the defendant (certain of which were in the defendant's handwriting and certain of which consist of excerpts from published materials); and (3) photographs of the evidence recovered from the defendant.[2]

As summarized in the Government's motion *in limine*, the Defendant's Materials are direct evidence of the crimes with which the defendant is charged. The hard copy documents include over 100 pages of handwritten and pre-printed materials. These documents are written in both the defendant's native Urdu language and in English. The handwritten documents unmistakably are in the defendant's handwriting, and three of the documents contain the defendant's fingerprints (*see* Government Motion *in Limine*, Ex. B at 1353, 1380; Ex. D at 2.).

The documents contain references to planned attacks and to specific United States landmarks, including locations in New York City and Plum Island. The documents also contain

---

[2]     The Government attached the hard copy documents to its motion *in limine*, including translations of portions of those documents that were written in Urdu. *See* Government Motion *In Limine*, Exs. B-D.

numerous anti-American sentiments and discuss various ways to construct and use weapons. Included among the items recovered from the defendant are, for example, diagrams for a "match gun," with specific instructions on how to construct and fire it.[3]  Interspersed throughout these documents are references to the United States as "enemies" and "infidels," and discussions of the *mujahadeen.*

The chemicals recovered from the defendant included some that tested positive for sodium cyanide, which is lethal even in small doses.  And, the computer thumb drive contained over 500 electronic documents.  The content of these documents was similar to those of the hard copy documents; they both contain anti-American sentiments and references to the creation and use of various weapons.[4]

Collectively, these materials demonstrate that on July 18, 2008 the defendant intended to kill United States nationals and United States officers and employees — elements that the Government must prove beyond a reasonable doubt at trial.  The Defendant's Materials show that when the defendant saw the opportunity to kill Americans on July 18, 2008, she acted consistently with the sentiments expressed in her writings recovered from her *the very night*

---

[3]    The Government's motion *in limine* inadvertently cited (on pages 7 and 17) the defendant's diagram of a match gun as appearing behind Exhibit C, when it actually appears behind Exhibit B.  *See* Government Motion *in Limine* Ex. B at 1618-21.  The Government's motion also cited (on page 6) one document bearing the defendant's fingerprint as appearing behind Exhibit C, when it actually appears behind Exhibit D.  *See* Government Motion *in Limine* Ex. D at 2.

[4]    While the Government does not presently intend to introduce electronic documents recovered from the thumb drive, it has reserved its right to do so and will promptly advise the Court and defense counsel if it chooses to do so.  As discussed in section B below, certain documents contained on the thumb drive help to authenticate all of the Defendant's Materials, and accordingly the Government may seek to offer some of them at trial for that limited purpose.

*before*, and attempted to do so.

Without citation to a single case or relevant authority, the defendant challenges the admission of the Defendant's Materials on the grounds that the crimes with which the defendant is charged are "*not* a continuing offense"; that "[the defendant's] intent cannot be determined from non-contemporaneous events, documents, and materials"; and that the defendant's "intent is not some continuing state of mind, but rather must be fixed at the time of the event itself." (Def. Mem. 136 at 9.)

This is misleading. To prove attempted murder, the Government must establish that the defendant intended to kill her victims. *See* 18 U.S.C. § 1114 (making it a crime to "attempt[] to kill an officer or employee of the United States"); § 2332(a) (making it a crime to "attempt[] to kill" a national of the United States). Neither statute (nor any caselaw of which the Government is aware) contains any requirement that the defendant's intent be "fixed at the time of the event itself" or proven solely by "contemporaneous events." The Defendant's Materials are thus directly probative of her intent to commit the charged crimes. They demonstrate that the night before the shooting, the defendant was in possession of her own writings which discussed attacking and killing Americans. As cited in the Government's motion *in limine*, courts routinely have held (even in the 404(b) context) that a defendant's prior relationships or interactions with their victims may be admissible as evidence of the defendant's intent or motive to commit a particular crime against the victim. *See*, *e.g.*, *See United States* v. *Lehder-Rivas*, 955 F.2d 1510, 1518 (11th Cir. 1992); *United States* v. *Fazal-ur-Raheman-Fazal*, 355 F.3d 40, 51 (1st Cir. 2004); *United States* v. *Russell*, 971 F.2d 1098, 1107 (4th Cir. 1992); *United States* v. *McKinney*, 954 F.2d 471, 480 (7th Cir. 1992). It is disingenuous to argue that this evidence is

"irrelevant under Rules 401 and 402." (Def. Mem. 136 at 12.)

Moreover, the Defendant's Materials directly bear on how the United States military responded to the arrest of this woman. After the defendant was detained, the United States military reviewed the Defendant's Materials and determined — based on their content — that the FBI should be contacted and that the defendant should be interviewed and identified. Accordingly, all of these materials relate to the purpose for which the United States military and the FBI traveled to the ANP Compound. This is probative of the fact that these individuals acted in accordance with their official duties — another element that the Government must prove beyond a reasonable doubt at trial.

<u>The Arrest Evidence and the Defendant's Statements and Escape Attempts</u>

The defendant also seeks to preclude the admission of the Arrest Evidence (consisting of the circumstances surrounding the defendant's arrest) and of the Defendant's Statements and Escape Attempts. The Government views this portion of the defendant's motion largely to be moot in light of recent developments. During the course of depositions of Afghan defense witnesses that were conducted in Afghanistan on December 22, 2009 (the "Depositions"), defense counsel elicited testimony from its witnesses regarding the above subjects, including the circumstances surrounding the defendant's arrest, statements she made while in Afghan custody, and her attempts to escape from Afghan custody.

In the event that these depositions are admitted into evidence, all portions thereof should be admitted — including testimony relating to the subjects outlined above — other than portions to which objections were raised by the parties and which are sustained by the Court. Should the defendant seek to excise portions of the Depositions, or choose not to offer the

Depositions, the Government will make an appropriate application with the Court.[5]

In any event, the Government submits that testimony related to the above topics is admissible as direct evidence of the crimes charged. During and after the defendant's arrest, for example, she repeatedly made anti-American statements and asked the Afghans not to hand her over to the Americans. While she was held in Afghan custody, the defendant attempted to escape from her captors on two separate occasions, threatened bodily harm to those guarding her, and fought vigorously with (and actually injured) several of her captors. Moreover, during the Depositions the Afghan defense witnesses made clear that the defendant engaged in at least some of these activities on July 18, 2008, only a few hours before she committed the acts that are the subject of the instant charges.

Like the Defendant's Materials, the Arrest Evidence and the Defendant's Statements and Escape Attempts are therefore direct evidence of the defendant's commission of the crimes charged in the Indictment. This evidence helps demonstrate that when the ANP allowed United States personnel to interview and identify her, the defendant did everything possible to prevent that from happening.

Accordingly, the defendant's motion to exclude the above evidence on the grounds that it is not direct evidence of the defendant's crimes should be denied.

---

[5]      Defense counsel indicated during the Depositions that he had reserved a prior motion to suppress statements the defendant made while in Afghan custody on the grounds of alleged abuse. In the event an additional motion is filed (or renewed) on this basis, the Government will respond accordingly. Of note, however, much of the witnesses' testimony regarding both statements made by the defendant and her actions are admissible not only to show the defendant's intent and background to the offense, but also to impeach the credibility of the Afghan witnesses' version of events.

## 2. Certain of the Proffered Evidence Is Admissible As Background Evidence to the Crimes Charged

In addition, much of Proffered Evidence is admissible as background to the crimes with which the defendant is charged. As explained in the Government's motion *in limine*, evidence may be admissible "to provide background for the events alleged in the indictment." *United States* v. *Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) (citation omitted); *see also United States* v. *Williams*, 585 F.3d 703, 707 (2d Cir. 2009) ("[E]vidence is often admissible 'to provide background for the events alleged in the indictment' or 'to enable the jury to understand the complete story of the crimes charged.'") (quoting *United States* v. *Reifler*, 446 F.3d 65, 91-92 (2d Cir. 2006)); *United States* v. *Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) (holding that evidence is admissible "to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense"). In short, "[a] jury is entitled to know the circumstances and background of a criminal charge." *United States* v. *Moore*, 735 F.2d 289, 292 (8th Cir. 1984).

Courts have recognized that events (not specifically charged) which precede a defendant's arrest may be admissible for background purposes. In *United States* v. *Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997), for example, the Second Circuit affirmed the district court's admission of evidence related to the defendants' burglary attempt in a felon-in-possession case. At trial, a police officer testified that he observed the defendants acting suspiciously and apparently "casing" a street in the Bronx. When the officer approached them, both defendants ran towards him with guns drawn, firing at least one shot. The circuit court ruled that the district court properly admitted evidence of a burglary that occurred in the vicinity of the area where the defendants were arrested, and that took place around the same time as when they were arrested.

The circuit court reasoned that admission of this evidence was necessary "to provide crucial background evidence that gave coherence to the basic sequence of events that occurred [on the night of the arrest]." Even though the defendants were not charged with the burglary, the circuit court concluded that the burglary helped "add meaning" to the defendants' actions because it "tended to show that [the defendants] were acting as armed look-outs" and "explained the defendants' patrolling activities and other behavior." *Gonzalez*, 110 F.3d at 942. In addition, the evidence "offered an explanation as to why [the defendants] would have been running down the street toward [the officer.]" *Id.*

As with the burglary in *Gonzalez*, much of the Proffered Evidence — including the Arrest Evidence, the Defendant's Statements and Escape Attempts, and the Defendant's Materials — are admissible to help explain the actions of the defendant and the United States military and FBI on July 18, 2008. The Proffered Evidence, for example, explains how the defendant ended up in Afghan custody, and why the United States traveled there to interview her. The evidence also puts the defendant's actions on July 18, 2008 in better context, in light of her previous escape attempts and the various anti-American sentiments contained in documents that she authored and that were in her possession at the time of her arrest.

Ignoring *Gonzalez,* the defendant relies on *Williams,* 585 F.3d 703 (cited above), which is distinguishable. In *Williams*, a felon-in-possession case, police officers responded to a 911 call and observed the defendant flee, in possession of a gun. The officers chased the defendant and eventually detained him. Shortly thereafter, the officers recovered a gun that the defendant dropped during the chase. *A day later*, the officers executed a search warrant at an apartment from which shots had been fired on the previous day, which precipitated the 911 call.

12

The search yielded a number of firearms, which the district court permitted the government to introduce at trial.

In reversing the decision to admit this evidence, the Second Circuit stated that the evidence recovered from the search was "not particularly helpful to explain the crime." *Williams*, 585 F.3d at 707. Characterizing the Government's proof without the search evidence as "simple and complete," the circuit court emphasized that the contraband was not needed "to explain why the police were at the building, why Officer Jordan pursued Jackson, why Jackson was arrested, or why Jackson was charged with possessing a firearm." *Id.* The court further stated that "[f]ailing to detail the contents of the apartment would not have left any gaps in the Government's case, nor have left the jury wondering about missing pieces of the story." *Id.* at 707-08.

Here, by contrast, the Proffered Evidence is needed to explain why the United States military, the FBI, and other specialized U.S. personnel traveled to the ANP Compound to interview and identify the defendant. This evidence shows how the defendant ended up at the ANP Compound in the first place, and what the United States military and law enforcement officers were doing there. If this evidence is excluded, it will create "gaps" in the Government's case and — as the *Williams* Court cautioned — will leave "the jury wondering about missing pieces of the story." 585 F.3d at 708.[6]

---

[6]     The *Williams* court also determined that the evidence recovered from the search was not admissible under Rule 404(b) to show that the defendant possessed the "opportunity and motive" to possess the gun. In so holding, the court stated that opportunity and motive were not put at issue during the trial, as "the Government did not argue or even assert that Jackson had the opportunity or motive to possess the gun." *Williams*, 585 F.3d at 709. Here, the Government will be making the argument that the defendant had both the motive, intent, and knowledge to possess and fire an M-4 rifle at United States personnel.

In short, the Proffered Evidence — unlike in *Williams* — is "inextricably intertwined" with the charges against the defendant. *United States* v. *Towne*, 870 F.2d 880, 886 (2d Cir. 1989). Having Government witnesses begin their testimony at the moment United States personnel entered the ANP Compound prevents the jury from hearing about the day's preceding events, including the defendant's repeated entreaties not to be turned over to the Americans, her two escape attempts from the ANP Compound, and the various materials that were recovered from her, all of which should be considered by the jury in its deliberations.

Accordingly, the defendant's motion to preclude necessary background evidence should be denied.

3.     **The Proffered Evidence is Admissible Pursuant to Federal Rule of Evidence 404(b)**

The Proffered Evidence also may be admitted under Rule 404(b), which permits evidence of prior acts of the defendant to be admitted as evidence of the defendant's "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." As the Government argued in its motion *in limine*, the Second Circuit employs an "inclusionary approach" to other crimes evidence, such that admission of prior crimes, wrongs or acts is admissible for any purpose other than to show a defendant's criminal propensity. *See United States* v. *Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996); *United States* v. *Lasanta*, 978 F.2d 1300, 1307 (2d Cir. 1992), *abrogated on other grounds*, 526 U.S. 559 (1999); *United States* v. *Pipola*, 83 F.3d 556, 565 (2d Cir. 1996); *United States* v. *Paulino*, 445 F.3d 211, 221 (2d Cir. 2006); *United States* v. *Pitre*, 960 F.2d 1112, 1118-19 (2d Cir. 1992). In short, as long as the other crimes evidence is "relevant to some disputed issue in the trial," and satisfies the probative balancing test of Fed. R. Evid. 403, it is admissible. *United States* v. *Brennan*, 798 F.2d 581,

589 (2d Cir. 1986) (citation omitted); *see also Pitre*, 960 F.2d at 1118.

The Defendant's Materials, the Arrest Evidence, and the Defendant's Statements and Escape Attempts fulfill this test. They are probative of the defendant's motive and intent on July 18, 2008. And, they establish the defendant's knowledge of weaponry, including guns, which makes it more likely than not that she grabbed the Warrant Officer's M-4 rifle and was able to fire it. The defendant has not removed these issues from the jury's consideration, and the suggestion that the Government is precluded from offering this evidence "unless, and until, the defense raises the specific ground as an issue" is incorrect. *See*, *e.g.*, *Pitre*, 960 F.2d at 1120 (holding that where it is apparent that knowledge or intent will be in dispute "evidence of prior or similar acts may be introduced during the government's case-in-chief") (quoting *United States* v. *Caputo*, 808 F.2d 963, 968 (2d Cir. 1987)).

In challenging the admission of this evidence under Rule 404(b), the defendant cites the Second Circuit's recent decision in *United States* v. *Farmer*, 583 F.3d 131 (2d Cir. 2009), which is distinguishable. There, the Second Circuit found the district court erred in permitting the Government to refer to the defendant by his nickname "Murder" throughout trial, without a limiting instruction. *Id.* at 146. In so holding, the court concluded that this nickname had limited probative value, inasmuch as identity was not at issue and there was no evidence that the nickname was related to the offenses with which the defendant was charged.

Here, by contrast, the Government is seeking to introduce evidence that underpins the July 18, 2008 shooting, and that directly bears on critical issues the Government is bound and entitled to prove at trial — specifically, her motive, knowledge, and intent to commit the charged crimes. The Proffered Evidence consists of the defendant's actions between the time of her

arrest until shortly after the shooting, along with items that were recovered from her at the time of her arrest. This evidence is directly related to, and intertwined with, the shooting with which she is charged.

The defendant also repeatedly claims that admission of such evidence will result in several "mini trials." (Def. Mem. 136 at 16.) This is incorrect. The Government has carefully limited and circumscribed the 404(b) evidence it seeks to offer at trial (regarding the defendant's knowledge, intent, and motive) to the hard copy documents recovered from her and the chemicals that tested positive for sodium cyanide. These documents speak for themselves, and the Government anticipates calling one expert to testify about the sodium cyanide that was recovered from the defendant.

If necessary, and as referenced below in Section B, the Government is prepared to introduce the "Education Evidence" and the "Defendant's Phone Calls and Letters" solely for the limited purpose of showing "identity" under Rule 404(b). Specifically, the Government would offer this evidence for the limited purpose of establishing that the defendant in fact possessed and/or authored certain of the Defendant's Materials. *Cf. United States* v. *Khorrami*, 895 F.2d 1186, 1194-96 (7th Cir. 1990) (holding that prior threatening phone calls made by the defendant were admissible for proving identity); *United States* v. *Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (holding that "the evidence of the 1992 Atlanta robbery was admitted in order to establish the ownership of a defaced firearm recovered during the crime presently charged").

The Government would seek to introduce evidence of the defendant's educational background via documents, or through records custodians from Brandeis University and the Massachusetts Institute of Technology who could verify that the defendant attended these

institutions and completed course work dealing with the sciences.  In addition, the Government

would introduce certain of the defendant's recorded phone calls and writings while in prison to

show to the jury her ability to understand English and Urdu and her style of handwriting.  All of

these materials would be introduced for the sole purpose of establishing that the Defendant's

Materials were authored and/or possessed by her, and the Government will consent to any

limiting instruction for this purpose.[7]

Accordingly, the defendant's motion to preclude Rule 404(b) evidence should be

denied.

### 4.      The Proffered Evidence Should Not Be Excluded Under Rule 403

None of the Proffered Evidence should be excluded under Rule 403, which

permits the exclusion of evidence only where "its probative value is substantially outweighed by

the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by

considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Under this rule, evidence is not properly excluded where it "involve[s] conduct [no] more

sensational or disturbing than the crimes with which [the defendant] was charged."  *United

States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990), *cert. denied*, 499 U.S. 940 (1991).

Such is the case here.  The defendant is accused of taking a United States Army

M-4 rifle and attempting to kill United States nationals.  Testimony at trial will show that the

---

[7]      The suggestion that the Government "opposed a limiting instruction" regarding the admissibility of certain of the Proffered Evidence (Def. Mem. 136 at 3) is incorrect.  The Government believes that certain of the Proffered Evidence is admissible as direct and background evidence of the crimes charged, which does not require a limiting instruction.  *See United States* v. *Brand*, No. 04 Cr. 194 (PKL) 2005 WL 77055, at * 3 (S.D.N.Y. Jan. 12, 2005). In the event that the Proffered Evidence is admitted only pursuant to Rule 404(b), then a limiting instruction would be appropriate.  *Pitre*, 960 F.2d at 1119.

defendant pointed this gun directly at certain United States officers and law enforcement agents and tried to kill them at point blank range. During and immediately after this incident, the defendant screamed anti-American sentiments. The materials recovered from the defendant certainly are no more sensational or inflammatory than the above evidence. Indeed, aside from the actual murder of United States officers in the line of duty, it is difficult to imagine more disturbing or sensational evidence.

Although nothing of the kind is true, the defendant suggests that the Government is seeking to introduce this evidence to prejudice the defendant unduly by linking her with terrorism-related activities unrelated to the charged offense. (Def. Mem. 136 at 9, 13.) In making this point, the defendant relies on *United States* v. *Al-Moayad*, 545 F.3d 139 (2d Cir. 2008). This case is readily distinguishable. The defendants in *Al-Moayad* were charged with, *inter alia*, providing material support to Hamas and al Qaeda. At trial, the Government introduced eyewitness testimony regarding a Hamas suicide bombing — with which the defendants were not involved — in order to demonstrate the defendants' knowledge that Hamas was a terrorist organization. *Id.* at 160-61. In holding that this evidence should have been excluded under Rule 403, the Second Circuit emphasized the limited probative value of the eyewitness testimony, given that the defendants were not involved in the particular bombing and that the defendants offered to stipulate that they were aware Hamas was a terrorist organization. *Id.* at 161. The Circuit Court also focused on the fact that "the eyewitness account of a violent, destructive, and fatal suicide bombing seems quite clearly to involve conduct more inflammatory than the charged crimes." *Id.* at 161. Notably, the crimes with which the defendants were charged did not include specific, violent terrorist attacks. *Id.* at 162, 166 (internal quotation

omitted).

Unlike the evidence at issue in *Al-Moayad*, the Proffered Evidence concerns the defendant's *own* writings and actions immediately prior to the charged crimes. This evidence is not attenuated in time or character from the charged offense; it includes material recovered from the defendant the night before the shooting at issue, and her actions mere hours earlier. Indeed, the circumstances in which the Government will offer the Proffered Evidence is no different than in any murder case where a defendant has made threatening statements concerning his victim in the hours or days leading up to the crime. Unlike in *Al-Moayad*, moreover, the Proffered Evidence is not more egregious or sensational than the offense for which she is charged — attempted murder of United States nationals.

Likewise, and contrary to the defendant's exaggerations, admission of this evidence will not result in "mini-trials," make the case more "complex," or "open the floodgates" to collateral evidence. (Def. Mem. 136 at 17-18.) Rather, the Proffered Evidence will assist the jury by allowing them to place the shooting in its proper context. The evidence will help explain why the United States military and the FBI went to the ANP Compound and will provide crucial evidence of the defendant's motive and intent on July 18, 2008. The Proffered Evidence will not "complicate" this trial because it consists of evidence intertwined with that of the shooting, which is not particularly complex or difficult to understand. *Cf. United States* v. *DiNome*, 954 F.2d 839, 842 (2d Cir. 1992) (holding that there was no danger of jury confusion where criminal acts were "rather ordinary in nature, except in their viciousness"). In addition, the Proffered Evidence will largely be introduced by witnesses who are already scheduled to testify and its admission will add negligible time to the trial.

19

Accordingly, the defendant's motion to preclude the admission of the Proffered Evidence on Rule 403 grounds should be denied.

**B.**      <u>The Defendant's Motion Regarding Authentication Should Be Denied In Its Entirety</u>

The defendant also moves for an order from the Court precluding the admission of the Defendant's Materials "unless the government establishes the required foundation for their admission by having a witness who seized these alleged documents testify." (Def. Mem. 137 at 1.) As an initial matter, the defendant's motion is premature. Whether an adequate foundation has been made for evidence to be admitted at trial is a decision that can only be made in the context of the trial itself. Moreover, it is simply not the case, as the defendant asserts, that Defendant's Materials may only be admitted at trial if a witness who seized them from the defendant directly testifies. The Government is aware of the evidentiary requirements relating to admissibility of documents and other items and expects to provide a more than adequate foundation for the introduction of these documents and items at trial.

Authentication of proffered evidence requires only "evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a); *see United States* v. *Hon*, 904 F.2d 803, 809-10 (2d Cir. 1990); *United States* v. *Mendel*, 746 F.2d 155, 167 (2d Cir. 1984). Rule 901 "does not erect a particularly high hurdle." *Al-Moayad*, 545 F.3d at 172 (quoting *United States* v. *Gagliardi,* 506 F.3d 140, 151 (2d Cir. 2007)); *United States* v. *Dhinsa*, 243 F. 3d 635, 658-59 (2d Cir. 2001). The proponent of the evidence is not required to "rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *Gagliardi*, 506 F.3d at 151 (quoting *United States* v. *Pluta*, 176 F.3d 43, 49 (2d Cir. 1999)); *see also Dhinsa*, 243 F.3d at 659. Typically, the rule is satisfied

"if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." *United States* v. *Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004) (citation and internal quotations omitted). "[T]he standard for authentication, and thus for admissibility, is one of reasonable likelihood. If in the court's judgment it seems reasonably probable that the evidence is what it purports to be, the command of Rule 901(a) is satisfied, and the evidence's persuasive force is left to the jury." *Dhinsa*, 243 F.3d at 659 (citations and internal quotations omitted); *see also Pluta*, 176 F.3d at 49.

"[T]he principal function of authentication testimony is to convince the court that it is improbable that the original item has been exchanged with another or otherwise tampered with." *Gelzer*, 50 F.3d at 1141 (internal quotations omitted). Even if the district court does not believe the evidence to be authentic, the court must still let the evidence go to the jury, as long as there is sufficient reason on which the jury could conclude that it is authentic. *See Ricketts* v. *City of Hartford*, 74 F.3d 1397, 1411 (2d Cir. 1996) (district court erred in excluding evidence on authentication grounds where rational juror could have concluded that defendant made statement at issue).

"The chain of custody is ordinarily a method of authentication for physical evidence." *Gelzer*, 50 F.3d at 1140. But by its express terms, Rule 901 itself is clear that such testimony is not the only way to authenticate physical evidence. Fed. R. Evid. 901(b). Accordingly, "[a] break in the chain of custody does not necessarily result in the exclusion of physical evidence." *Id*. at 1141. Rather, it is axiomatic that the chain of custody "need not be perfect," *United States* v. *Johnson*, 977 F.2d 1360, 1367 (10th Cir. 1992), and that any flaw in a chain of custody informs only the *weight* to be afforded the evidence, not its *admissibility*. *See*

*United States* v. *Morrison*, 153 F.3d 34, 56 (2d Cir. 1998). Ultimately, the authentication inquiry

focuses on whether "it is improbable that the original item ha[s] been exchanged with another or

otherwise tampered with," *Gelzer*, 50 F.3d at 1141, and with respect to the chain of custody and

authentication as a general matter, the Government's case may "ultimately rest[] on inferences."

*United States* v. *Grant*, 967 F.2d 81, 83 (2d Cir. 1992).

Rule 901(b) provides an illustrative list of ways in which evidence may be

authenticated, which does not purport to be exhaustive. Among other things, documents may be

authenticated by a comparison of known handwriting with other specimens that are undisputed

or otherwise authenticated, either by an expert or the trier of fact. Fed. R. Evid. 901(b)(3).

Documents may also be authenticated by their "[a]ppearance, contents, substance, internal

patterns, or other distinctive characteristics [of the evidence], taken in conjunction with

circumstances." Fed. R. Evid. 901(b)(4). Indeed, the finding of authentication "may be based

entirely on circumstantial evidence." *United States* v. *Bagaric*, 706 F.2d 42, 67 (2d Cir. 1983)

(contents of letter found in defendants' home sufficient to authenticate); *see also Al Moayad,* 545

F.3d at 171; *United States* v. *Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990); *United States*

v. *Calbas*, 821 F.2d 887, 893 (2d Cir. 1987) (notebook sufficiently authenticated as belonging to

the defendant based on the location where it was found and its contents); *United States* v.

*Drougas*, 748 F.2d 8, 26 (1st Cir. 1984) (handwritten notes sufficiently authenticated as having

been prepared by a co-conspirator based on the location where they were found and their

content. A court of appeals reviews decisions of a district court relating to evidentiary issues

for abuse of discretion, *United States* v. *Anglin*, 169 F.3d 154, 162 (2d Cir. 1999), and will only

overturn such decisions if the trial judge acted "in an arbitrary and irrational fashion." *Dhinsa*,

243 F.3d at 649; *United States* v. *Salameh*, 152 F.3d 88, 110 (2d Cir. 1998) (*per curiam*).

    To authenticate the Defendant's Materials, the Government expects to introduce testimony from United States military personnel who received all of the seized evidence from Afghan law enforcement personnel during the evening of July 17, 2008, at which time they were advised that the documents and other items were recovered from a woman who had been arrested.  A number of United States military personnel reviewed the documents and other items that were provided to them and processed them as evidence.  They recall and recognize the types of documents and other items that they reviewed.  The Government further expects to introduce testimony that the seized documents and other items were then transferred to the custody of the FBI on the day of the shooting, and ultimately were transported to the United States.  In this way, the Government will establish at trial that the evidence we seek to offer – consisting of a subset of the Defendant's Materials – is in fact the same evidence that the ANP provided to the United States military on July 17, 2008.  Indeed, as discussed in section A above, it was the review of these documents and other materials by the United States military that resulted in the involvement of the FBI in the first instance, and that ultimately led to the Interview Team traveling to the ANP Compound in Ghazni in order to interview and identify the defendant.

    In addition to this testimony, the Government can authenticate the seized documents and other items — establishing that they are what the Government claims them to be, namely, items that were seized from the defendant at the time of her arrest by the ANP — in at least seven ways.  First, the evidence at trial will show that the defendant's fingerprints were found on a number of the hard copy documents that were provided to the United States military by the Afghan authorities on the evening of July 17, 2008 (*see* Government Motion *in Limine* at

6).  Second, the hard copy documents were written in a combination of English and Urdu, both languages that the defendant speaks fluently because of her Pakistani heritage and her education in the United States.  Notably, Urdu is not a language that is commonly spoken in Afghanistan.  Urdu is the national language of Pakistan and is primarily spoken in Pakistan and India.  Third, the handwriting on several of the hard copy documents is identifiable as the defendant's handwriting when compared to known samples, namely, materials written by the defendant during the time that she has been incarcerated in the United States.  Fourth, the subject matter of several of the handwritten documents, as well as the documents contained on the thumb drive, concerns chemical compounds and the construction of chemical and biological weapons.  The defendant is a scientist by education and training and received advanced degrees in related disciplines.  Fifth, the personal effects – which included cosmetics, feminine hygiene products and female undergarments – that were provided to the United States military along with the hard copy documents, thumb drive and other items tend to show that the collection of items altogether was seized from a female.  Sixth, many of the documents contained on the thumb drive that was provided to United States military personnel contain content that is uniquely known to the defendant and that essentially self-identifies the thumb drive and other materials as belonging to her.  For instance, the thumb drive contained one autobiographical document entitled "I am Not a Terrorist" that was written by the defendant and that contains a brief summary of her life, including her time spent in the United States.  (*See* Competency Hearing GX L.)  Seventh, during the Depositions, the defendant's own witnesses, who are both affiliated with the ANP, referred to the fact that a collection of hard copy documents, chemicals, and various personal effects were seized from the defendant upon her arrest on July 17, 2008.  In addition, the

defendant herself, when she was shown a number of these seized items (documents and otherwise) identified them as her own.

Apart from the numerous indicia of authenticity and identification recounted above, the circumstances of when and how the United States military was alerted to the defendant's arrest also tend to authenticate these documents and other items as being those that were seized from the defendant. United States military personnel will testify at trial that they were first alerted that the defendant had been arrested by the Afghan authorities during the late evening hours of July 17, 2008. This arrest was well-publicized, with Afghan law enforcement and government personnel holding a press conference early the next day. Around the same time that the United States military was advised of the defendant's arrest, they were also provided with the Defendant's Materials. Shortly thereafter, the United States military was in contact with the Afghan authorities in order to obtain access to the defendant — who was a person of interest given the content of the materials recovered from her — in order to interview and identify her. To that end, the United States military assigned specific personnel to coordinate these efforts with the Afghan authorities. Given this chronology and surrounding circumstances, the fact that the United States military was informed of the defendant's arrest at the same time that it was also provided with the documents and other seized items supports the conclusion that these documents and items in fact came from the defendant.

All of these indicia taken together — the defendant's fingerprints on the documents, the fact that the documents were written in a combination of English and Urdu, the fact that the writing on the handwritten documents is identifiable as the defendant's, the fact that the writings relate to chemical and biological science, the fact that the personal effects by their

nature clearly indicate that they belonged to a woman, the fact that documents contained on the thumb drive contain information that is unique to the defendant, the fact that the defendant's own Afghan witnesses acknowledge that these items were seized from the defendant upon her arrest, and the timing and circumstances of the United States military's receipt of these items from Afghan authorities — constitute more than sufficient proof that a reasonable juror could find in favor of authenticity. *Chin*, 371 F.3d at 38; *Gagliardi*, 506 F.3d at 151. In short, these circumstances taken together are powerful and sufficient proof that the documents and other items the Government will seek to offer into evidence at trial are in fact the same documents and other items that were seized from the defendant upon her arrest on July 17, 2008. The jury should be presented with this evidence and permitted to draw that conclusion. *See United States* v. *Tropeano*, 252 F.3d 653, 661 (2d Cir. 2001) ("Authentication of course merely renders [evidence] admissible, leaving the issue of [its] ultimate reliability to the jury."); *Bazak Int'l Corp.* v. *Tarrant Apparel Group*, 378 F. Supp.2d 377, 391-92 (S.D.N.Y. 2005) (once proponent has offered "sufficient proof ... that a reasonable juror could find in favor of authenticity ... the evidence may be admitted and any outstanding issues regarding its authenticity are to be resolved by the fact-finder") . These facts and circumstances are more than sufficient to satisfy the requirements of Rule 901.

        In short, in arguing that the Defendant's Materials cannot be admitted at trial without the testimony of the ANP officer who actually seized them, the defendant confuses "authentication" with "chain of custody." While the Government could seek to introduce these items through the testimony of the ANP officer who effected the defendant's arrest and directly made the seizure, such a means of introduction is by no means required under the law. Rule 901

is clear that there are many means by which the authenticity or identification of an item of physical evidence may be established. To the extent the Government's inability to call the ANP officer who directly made the seizure as a witness at trial renders the chain of custody imperfect with respect to these items, such an imperfection informs only the weight to be afforded the evidence, not its admissibility. *Morrison*, 153 F.3d at 56.

C.  **The Defendant's Motions Regarding the Exclusion of Expert Testimony Should Be Denied in Their Entirety**

The defendant seeks to preclude certain testimony and evidence from Government expert witnesses Carlo Rosati, regarding firearms and ballistics evidence at the crime scene, and D.J. Fife, regarding the recovery of latent fingerprints from items related to the crime scene. (Def. Mem. 135; Def. Mem. 134.) Neither motion has any merit. Both experts should be allowed to testify in full about their analysis of, and conclusions regarding, the evidence in this case within their areas of expertise. Specifically, the testimony of both witnesses is properly admissible under Federal Rule of Evidence 702 and *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137 (1999), as technical or specialized knowledge derived from training and experiences not common to the general public, which will assist the jury to understand the evidence and determine facts in issue in areas outside their common knowledge.

1.  **Legal Standard**

A district court has broad discretion to admit expert testimony, *see Hamling* v. *United States*, 418 U.S. 87, 108 (1974); *United States* v. *DiDomenico*, 985 F.2d 1159, 1163 (2d Cir. 1993), and its determination will not be set aside unless it was "manifestly erroneous," *United States* v. *Duncan*, 42 F.3d 97, 100 (2d Cir. 1994).

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Before admitting expert testimony under Rule 702, a trial court must make a threshold determination that the proffered expert testimony is relevant, in that the testimony is sufficiently tied to the facts that it will assist the trier of fact in understanding the evidence or determining a fact in issue. *See Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 591-93 (1993); *see also Kumho Tire*, 526 U.S. at 152. The trial court must also determine that the expert's testimony is reliable and can be properly applied to the facts at issue. *See Daubert*, 509 U.S. at 89, 92-93; *Kumho Tire*, 526 U.S. at 147. The Court in *Daubert* suggested for this purpose a non-exclusive list of factors that might "bear on" a district judge's gate-keeping function, including: (1) whether the expert's technique or theory has been tested; (2) whether it has been subjected to peer review; (3) its potential rate of error; (4) the existence or maintenance of standards and controls; and (5) whether it has gained general acceptance in the relevant scientific community. *See Daubert*, 509 U.S. at 92-94; *Kumho Tire*, 526 U.S. at 149-50.

The Supreme Court made clear in *Kumho Tire*, however, that although a trial court "*may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability," the test is "flexible," and *Daubert's* list of specific factors "neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141. "Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability

determination."  *Id.* (emphasis in original); *see also id.* at 150 ("*Daubert* makes clear that the factors it mentions do *not* constitute a definitive checklist or test.  And *Daubert* adds that the gatekeeping inquiry must be tied to the facts of a particular case.") (emphasis in original; citations and internal quotations omitted).  Whether the *Daubert* factors are, or are not, reasonable measures of reliability in a particular case "is a matter that the law grants the trial judge broad latitude to determine."  *Id.* at 153.

"[T]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience."  Fed. R. Evid. 702, Advisory Committee Notes to 2000 Amendments, ¶ 12.  *See Kumho Tire*, 526 U.S. at 147 (language of Rule 702 "makes no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge," but "makes clear that any such knowledge might become the subject of expert testimony").  Indeed, experience "is the predominant, if not sole, basis for a great deal of reliable expert testimony" in certain fields.  Fed. R. Evid. 702, Notes ¶ 12; *Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").  "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid. 702, Notes ¶ 13.

## 2.  <u>Carlo Rosati</u>

The defendant seeks to preclude Government firearms expert Carlo Rosati from offering testimony at trial "speculating" or "suggesting" that (1) "the possible fragmentation of bullets allegedly fired by [the defendant] from an M-4 rifle," and (2) "the inability to secure the

crime scene" after the shooting, were "explanations for the [G]overnment's failure to recover

physical evidence substantiating the firing of the M-4." (Def. Mem. 135 at 1-2.) In short, the

defendant moves to preclude Rosati's testimony on the ground that it amounts to "speculation"

and lacks a sufficient "scientific" basis. (Def. Mem. 135 at 4-7.) The defendant further claims

that she is entitled to a hearing pursuant to *Daubert*, *Kumho Tire*, and Rule 702, at which the

Government would be required to prove that Rosati's testimony satisfies the criteria of these

authorities. (Def. Mem. 135 at 1-3.)

No hearing is necessary for this Court to conclude that Rosati should be permitted

to testify in full regarding his analyses of, and conclusions regarding, the firearms and crime

scene evidence in this case. As explained below, Rosati's testimony is unquestionably relevant

in that it will entail, at the very least, "technical or other specialized knowledge" that will "assist

the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

Specifically, Rosati's testimony will include descriptions of his observations and other facts and

information regarding firearms, bullet trajectories, and crime scene analyses, which simply are

not within the ken of the average juror.[8]

Moreover, while the primary thrust of the defendant's motion appears to be that

Rosati's testimony lacks a sufficient *scientific basis* (Def. Mem. 135 at 4-6), the Government is

proffering Rosati as an expert based on his vast personal experience in his fields, particularly the

---

[8] Along these lines, it is notable that the defense has in no way challenged Rosati's
qualifications to testify as an expert within his areas of expertise, nor could they given his 30
years of experience with the FBI and ATF in the fields of firearms and toolmark examination,
gunshot residue testing, and bullet trajectory reconstruction at shooting crime scenes, to name a
few. Rosati has testified in excess of 60 times as an expert witness relating to firearms
examinations.

behavior of bullets when fired in various circumstances and the need to preserve crime scenes for proper analysis and testing. *See, e.g., Kumho Tire*, 526 U.S. at 147, 156; Fed. R. Evid. 702, Notes ¶ 12. Applying the principles of *Kumho Tire* and *Daubert*, this Court should find Rosati's testimony reliable and admissible. *Kumho Tire*, 526 U.S. at 141, 153.

The Government further notes that the defendant's motion is based on an affidavit — by the defendant's presumed opposing expert, William Tobin — which curiously opines that expert testimony is unnecessary to describe the possible behavior of bullets striking surfaces of various compositions, or to describe the possible loss or destruction of evidence when a crime scene is not preserved. (Def. Mem. 135, Ex. A, at 9, 11.) The Government disagrees that expert testimony is "unnecessary" to explain these matters to jurors who almost assuredly have no experience in examining the behavior of military rifle bullets when fired in various circumstances and the tests that can be performed to determine their presence in different locations. Nevertheless, whether characterized as the testimony of an expert or not, the Government submits that Rosati should be permitted to testify in full about his analyses of, and conclusions regarding, the firearms and crime scene evidence in this case, as it will unquestionably be helpful to the jury in deciding an issue that is simply outside of their ordinary base of knowledge and experience. No hearing is necessary for this Court to make that determination.

<u>Rosati's Proffered Testimony</u>

As the Government notified the defendant in its expert disclosure pursuant to Rule 702, including underlying reports, Rosati will testify that the firearms he examined in this case — the 9-mm pistol that the Chief Warrant Officer used to shoot the defendant and the M-4

rifle that the defendant used to attempt to kill U.S. officers — were operable and functioning at the time of testing. Rosati will also testify that the M-4 rifle was capable of delivering fully automatic fire and therefore qualified as a "machine gun." Rosati will further testify that, based on his examination, one 9-mm bullet and two 9-mm cartridge cases recovered at the crime scene (at different times) were fired from the Chief Warrant Officer's 9-mm pistol. In addition, Rosati will testify that he examined a curtain obtained from the crime scene for the presence of gunshot residue, but none was found. The defendant has not challenged Rosati's testimony regarding any of the foregoing findings and conclusions within his area of expertise in firearms, all of which are based on his training and experience.

The Government also notified the defendant that Rosati's testimony would include two additional subjects, each of which the defendant seeks to preclude.[9] The notice stated in relevant part:

> [1] Rosati will testify regarding various scenarios that can occur when a bullet fired from an M-4 rifle strikes a solid surface. It is expected that Mr. Rosati will testify, for example, that bullets from an M-4 rifle travel at a very high rate of speed, and can explode or fragment upon impacting hard surfaces, or can penetrate other surfaces. Based on the texture and content of the debris that Mr. Rosati examined in this case, it is expected that he will testify that a bullet fired from an M-4 rifle into a wall comprised of this material might shatter or fragment.
>
> [2] Rosati has also performed a number of crime scene

_____

[9] As the Government's notice further disclosed, Rosati also analyzed debris collected from a wall of the crime scene for possible bullets and/or bullet fragments, visually and with a metal detector, but found none. Despite the lengthy protestations from the defendant's presumed expert, Mr. Tobin (Def. Mem. 135, Ex. A, at 6-8), the Government's disclosure notice did not "insinuat[e] the presence of metal in the debris," (Def. Mem. 135, Ex. A, at 6). To the contrary, as Rosati's report and the notice made clear, no metal was found in the debris, and that is what Rosati will say at trial.

investigations during his career.  It is expected that Mr. Rosati will testify about his experience in conducting crime scene investigations, and how various factors can affect the results of such investigations.  These factors include the amount of time that has elapsed between an incident and a crime scene investigation, and how securely a crime scene was maintained before the crime scene investigation occurred.  Mr. Rosati also is expected to testify about the possible results that may occur when a crime scene is not preserved or maintained for analysis, including the loss or destruction of evidence.

The Government submits that, based on his training and 30 years of experience in the fields of firearms examination and crime scene analysis, Rosati is eminently qualified to testify as an expert on the foregoing subjects, and should be permitted to offer his expert opinions to the jury as proffered.  The defendant argues, however, that Rosati's testimony on these two subjects should be precluded as lacking a sufficient "scientific" basis, notwithstanding that the basis for the testimony is the same training and extensive experience that underlies the testimony of Rosati that the defendant embraces.

<u>Bullet Fragmentation</u>

The defendant claims that Rosati's testimony regarding possible bullet fragmentation at the crime scene cannot be squared with "rigor[ous]" scientific fields like metallurgy, because, for example, the proffered testimony does not specify the particular ammunition used or the composition of the wall that was struck.  (Def. Mem. 135 at 4-5.)  Thus, the defendant — and Tobin — repeatedly complain that Rosati's proposed testimony is lacking information, such as "bench notes," "field notes," and "data," to substantiate its conclusions. (*See, e.g.,* Def. Mem. 135 at 5.)  The defendant, accordingly, concludes that Rosati's testimony fails to satisfy the criteria of Rule 702 regarding sufficient factual basis and reliable principles and methods.  (Def. Mem. 135 at 5-7.)

Of course, the Government's expert disclosure notice included only a summary of Rosati's expected testimony, pursuant to Fed. R. Crim. P. 16(a)(1)(G), and not all of the details of his testimony, his notes, or his 3500 material. In fact, Rosati did consider the factors that the defendant claims are missing, and based his conclusions on that information in light of his 30 years of experience in this area of firearms examination. As a result, Rosati can more than satisfy the requirements for admissibility under Rule 702, by explaining how his experience leads to his conclusions, why his experience is a sufficient basis for his opinion, and how his experience was reliably applied to the facts. *See* Fed. R. Evid. 702, Notes ¶ 13. In any event, as set forth below, Rosati's testimony is admissible under Rule 702 because it is based on sufficient facts and data, is the product of reliable principles and methods, and reflects the application of reliable principles and methods to the facts of the case.

First, contrary to the defendant's claim, Rosati's opinion does take into account the composition of the bullet, the composition of the surface being struck, and the velocity of the bullet. (Def. Mem. 135 at 5-7.) Rosati will testify that he considered that the bullet fired by the Warrant Officer's M-4 was a military version of the .223 caliber rifle round, a 5.56-mm bullet known as the M855 (or, by its NATO designation, the SS-109). Rosati is aware that the military version of the .223 bullet is designed to, and does, hold its shape better and penetrate deeper than the commercial .223 round. As stated in the summary of his testimony, Rosati took into account that such a round fired from an M-4 travels at a very high speed, in fact in excess of 3,000 feet per second. (By comparison, the much larger 9-mm round fired by the Warrant Officer's pistol travels at roughly 1,300 feet per second.) Over the many years of his work for the FBI and ATF examining firearms — including teaching bullet trajectory reconstruction courses multiple times

per year from approximately 1995 through 2007 — Rosati has personally fired (or assisted in firing) .223/5.56-mm rounds countless times, easily numbering into the hundreds. Rosati has fired these rounds in the laboratory — including into a water tank and a "cotton box" — and in outdoor settings where the trajectory, impact, and other aspects of each shot were documented. He has fired both the commercial .223 round and the military M855/SS-109 round many, many times.

In the course of firing all of these .223/5.56-mm rounds, Rosati has observed — repeatedly and consistently over many years — that the bullets very often deform, fragment, and break apart upon impact with a surface. This deformation and fragmentation does not occur every time, but it occurs many times, including with the more penetrating military 5.56-mm rounds. For example, Rosati has personally fired (or assisted in firing) .223/5.56-mm bullets countless times into the FBI laboratory water tank, and has repeatedly observed that the bullets — *including the military version* — deform and fragment upon impact with the "soft" surface of the water, which is considered by the FBI to be the best medium for preserving the integrity of the rounds for microscopic analysis. Through exercises such as his bullet trajectory reconstruction courses, Rosati has observed that .223/5.56-mm rounds are even more likely to deform or fragment upon striking surfaces harder than water, such as cars, walls, or other objects. Rosati's observations lead him to conclude that the primary reason .223 rounds deform or fragment upon impact is their very high velocity, but that other important contributing factors include the angle of fire and the composition of the struck surface.

With respect to the latter point, Rosati was aware of the composition of the wall that was struck by the M-4 round in the instant case, and concluded that it was "hard." Rosati

did not personally view the wall at issue, but he examined several pounds of debris taken from the wall in the area of the bullet impacts, and reviewed photographs of the wall indicating its surface, thickness, and makeup. Rosati observed that the wall debris was comprised of dirt, straw, and rock, including individual rocks up to approximately two inches in width. Rosati deemed a wall of this construction to be "hard," especially in comparison to other surfaces such as water or cotton (considered ideal media to preserve test fires), or even other wall surfaces such as drywall.

Based on his observations and examinations in this case, and in light of his vast experience in the field, Rosati is expected to opine that a military-type .223 caliber bullet (the 5.56-mm M855/SS-109) fired from the Warrant Officer's M-4 might very well fragment upon impact with the wall in the crime scene. This opinion is necessarily conditional, depending in particular on the angle of fire and the precise portion of the wall struck — *i.e.*, whether it was directly upon rock. For all the reasons set forth above, Rosati is unquestionably qualified by his experience to deliver that expert opinion. Given that it considers all the appropriate variables, including the makeup of the bullet, its velocity, and the composition of the struck surface, Rosati's opinion is the product of reliable principles and methods, and reflects the application of such reliable principles and methods to the facts of the case. (*See* Def. Mem. 135 at 6.)

Contrary to the defendant's claim, the circumstances in which a high-speed military rifle round will fragment upon striking a wall of variable composition is simply not a topic of "common knowledge." (Def. Mem. 135 at 6.) Moreover, that Rosati's opinion includes "qualifiers such as might or could," and "fails to apply the principles and methods of metallurgy to quantify or substantiate the possibility" (Def. Mem. 135 at 6), in no way precludes Rosati's

opinion as an appropriate subject of expert testimony.  As the drafters of Rule 702 itself made

clear, "[s]ome types of expert testimony will not rely on anything like a scientific method, and so

will have to be evaluated by reference to other standard principles attendant to the particular area

of expertise."  Fed. R. Evid. 702, Notes ¶ 10.  In Rosati's case, his expertise is based on years of

experience firing .223/5.56-mm rounds and observing their behavior in myriad circumstances

and against multiple surfaces.  As such, Rosati's opinion is the opposite of a "subjective

assessment of general projectile behavior, or speculation" (*see* Def. Mem. 135 at 7), it is the

well-founded opinion of a highly qualified expert, carefully tailored to the facts of this case.

For many years, courts within this Circuit and elsewhere have routinely admitted

expert testimony under Rule 702 regarding firearms and ballistics, such as Rosati's unchallenged

testimony in this case matching the cartridge cases and bullet from the crime scene to the

Warrant Officer's 9-mm pistol.  *See, e.g., United States* v. *Williams*, 506 F.3d 151, 161 (2d Cir.

2007) (separate *Daubert* hearing not required to determine reliability of firearms examiner's

methodology before admitting expert firearms identification testimony); *United States* v.

*Santiago*, 199 F. Supp. 2d 101, 111-12 (S.D.N.Y. 2002) (Marrero, J.) (rejecting *Daubert* hearing

and admitting firearms identification testimony in part on the ground that the "decisions in

*Daubert* and *Kumho Tire*, did not call this entire field of expert analysis into question.  It is

extremely unlikely that a juror would have the same experience and ability to match two or more

microscopic images of bullets."); *United States* v. *Monteiro*, 407 F. Supp. 2d 351, 364 (D. Mass.

2006) (noting that "[f]or decades, both before and after" *Daubert* and *Kumho Tire,* "admission of

the type of firearm identification testimony challenged by the defendants has been semi-

automatic; indeed, no federal court has yet deemed it inadmissible," and concluding that the

"methodology of firearms identification is sufficiently reliable" for admission of firearms expert evidence at trial); *United States* v. *Hicks*, 389 F.3d 514, 526 (5th Cir. 2004) ("[w]e have not been pointed to a single case in this or any other circuit suggesting that the methodology . . . is unreliable"); *United States* v. *Foster,* 300 F. Supp.2d 375, 377 n.1 (D. Md. 2004) ("[b]allistics evidence has been accepted in criminal cases for many years"); *cf. United States* v. *Glynn*, 578 F. Supp.2d 567, 574-75 (S.D.N.Y. 2008) (noting that methodology of firearms identification "has garnered sufficient empirical support as to warrant its admissibility," but limiting particular expert's conclusion to state that match between firearm and casing was "more likely than not").

The defendant has cited no case excluding the type of expert firearms testimony that the Government intends to offer from Rosati. While the Government has thus far been unable to locate a case expressly admitting the specific expert testimony at issue — regarding whether a particular type of bullet would likely deform or fragment upon striking a particular surface — that testimony rests upon the same reliable foundation as the expert firearms testimony admitted in the cases above: the experience of a trained expert, practicing a reliable methodology. As such, Rosati's proffered expert testimony regarding bullet fragmentation should be admitted at trial, without a hearing.

<u>Crime Scene Preservation</u>

As noted above, the Government intends to offer expert testimony from Rosati concerning his experience conducting crime scene investigations in firearms related cases. These include more than two dozen bullet trajectory reconstruction investigations that Rosati has conducted between roughly 1990 and the present involving law enforcement and other shootings. Through his experiences in these investigations, during which Rosati and his team

were in virtually every case *not* the first responders to the scene, he learned first-hand the importance of having *first* responders properly document and preserve the crime scene for further investigation. In this connection, the Government intends to elicit testimony from Rosati concerning the factors that, in his experience, most affect the ability of later responders to conduct a meaningful investigation — including the length of time between an incident and the investigation, and the security of the crime scene in the interim — as well as the possible results that may occur when a crime scene is not preserved or maintained for analysis.

The defendant opposes admission of the testimony on the ground that the Government has failed to "proffer any relationship to scientific knowledge or particularized knowledge or experience" on which Rosati's opinions rest; and the defendant again complains about the lack of specificity in the Government's disclosure of Rosati's proffered expert testimony. (Def. Mem. 135 at 7.) Once again, the Government's expert notice did not include all of the details of his testimony, his notes, or his 3500 material. As in the case of his testimony regarding bullet fragmentation, Rosati has many years of experience in the area of crime scene investigation and preservation, which afford him a more than sufficient base of specialized knowledge to offer an expert opinion on the subject. Rosati can explain how his experience in firearms crime scene investigations leads to his conclusions, why his experience is a sufficient basis for his opinion, and how his experience was reliably applied to the facts of this case. *See* Fed. R. Evid. 702, Notes ¶ 13. Accordingly, Rosati's testimony is admissible under Rule 702 because it is based on sufficient facts and data, is the product of reliable principles and methods, and reflects the application of reliable principles and methods to the facts of the case.

On more than two dozen occasions from roughly 1990 through 2009, Rosati was

part of a team that responded to crime scenes throughout the country involving shootings by FBI and other federal, state, and local law enforcement officers, as well as to crime scenes in other high-profile shooting cases, such as that of Amadou Diallo in the Bronx in 1999. In most cases, Rosati's team arrived after the crime scene had already been processed by (typically) local law enforcement agencies, sometimes as much as a day beforehand. Rosati's primary role at these scenes was to conduct a bullet trajectory reconstruction investigation; but in so doing, he necessarily performed what amounted to a painstaking and detailed re-examination of the crime scenes, focusing on the search for additional firearms evidence. In many cases, Rosati and/or members of his team recovered additional pieces of firearms evidence — such as bullets, bullet fragments, and cartridge cases — that had been missed by the initial responders. This phenomenon occurred regardless of the size or sophistication of the law enforcement entity that first processed the crime scene, or how long an investigation they had conducted at the scene.

Through his experience responding to shooting scenes, Rosati learned that his ability to conduct his later investigation was greatly affected by whether and to what degree the first responders had preserved and documented the crime scenes. For example, without complete and accurate documentation about where firearms evidence (bullets, fragments, cases, etc.) were originally situated at the scene, Rosati and his team would be hampered (or stymied) in their efforts to, among other things, locate other firearms evidence, look for possible bullet impacts, or determine the number and position of the shooters. With respect to bullet impacts, for example, failures to document and preserve the crime scene by first responders could lead to the loss of valuable evidence in a given case because there are a number of tests Rosati could perform to determine whether a particular mark was in fact a bullet impact. These tests not only include

careful visual inspection and measurement, but also chemical tests to determine the presence of lead or copper in the suspected mark.[10]

Through his experience responding to crime scenes, Rosati also observed that firearms evidence was often absent in circumstances when it seemingly ought to have been present — for example, where a shooter in a confined space fired all the rounds of a magazine holding twelve cartridges, but only ten bullets or bullet fragments were found at the scene. In this respect, Rosati's more general knowledge of, and experience with, firearms comes into play. Rosati knows that a typical "bullet" is in fact comprised of multiple smaller parts, including a lead core, copper or steel jacketing, brass cartridge case, and gunpowder.

Likewise, Rosati knows that, for example, military assault rifles and semi-automatic pistols eject "spent" or empty cartridge cases along a presumed arc and path, which can vary greatly depending on the angle at which the weapon is held, the type of round fired, and environmental factors such as wind. In this regard, Rosati has conducted testing in which the ejection path, initial landing site, and final resting spot of ejected cartridge cases were documented for multiple different firearms in multiple different crime scene environments, such as pavement and grass. Rosati also knows from his experiences responding to crime scenes and firing countless weapons that cartridge cases are often found a distance away from the location at which the firearm was discharged, which Rosati attributes — based on his experience — to the cases being blown by the wind, bouncing on the ground and off of objects, rolling on the ground,

---

[10] Based on these experiences at already-processed crime scenes, in 2009 Rosati co-authored an article directed to law enforcement first responders and crime scene investigators in the Journal of the Association for Crime Scene Reconstruction, entitled A Practical Guide to Shooting Scene Preservation for Crime Scene Investigators, which discusses many of the principles described above.

being kicked, and getting picked up in the tread of car tires, shoes, or boots.  Rosati has observed (and in many cases documented) each of these scenarios occur over his years of experience with firearms and shooting crime scenes.

        Based on his experience, Rosati would testify at trial as to the factors that can affect the ability of later-responding authorities to recover firearms evidence at a crime scene, especially where the authorities did not respond until some six days after the incident.  Rosati will explain why it might be difficult to document whether and how a shooting had occurred where a crime scene was not preserved; and he can provide possible explanations, based on his experience, for the inability to locate certain firearms evidence in the instant case.  As with his testimony regarding bullet fragmentation, Rosati is fully qualified to offer expert testimony regarding the recovery of firearms evidence at crime scenes, based on his extensive experience in that field.  Rosati's opinion is the product of reliable principles and methods, reflects the application of such reliable principles and methods to the facts of the case, and is therefore admissible under Rule 702.

        The need for Rosati's testimony is all the more evident in this case in light of the Depositions.  During the Depositions, both Afghan law enforcement officers testified that they saw multiple spent cartridge cases at the crime scene in the immediate aftermath of the charged shooting.  One defense witness — a long-time officer with the ANP — recalled seeing at least two cartridge cases, each approximately an inch-and-a-half in length, in the possession of another ANP officer.  The witness described the cases as "rifle" rounds, that he believed came from an American rifle, and which had subsequently been "bagged" by the other ANP officer.  This is significant in that the only bullet fragments and cartridge cases that were recovered at the

crime scene by the FBI or given to the FBI by the ANP were 9-mm pistol rounds, matching the U.S. military M-9 sidearm that was used to shoot the defendant. The other defense witness described seeing bullet holes in the wall of the room after the shooting, on a portion of the wall where the Government was unable locate any additional evidence that bullets had struck. Thus, the possible loss or destruction of valuable evidence at the crime scene in this case, as suggested by the Depositions, highlights the need to preserve and document crime scene evidence and the need for expert testimony to explain to the jury the concepts and processes related to this field.

    **3.**    <u>**D.J. Fife**</u>

The defendant also moves to exclude a portion of the testimony of D.J. Fife, a major case coordinator in the Latent Print Operations Unit at the FBI Laboratory in Quantico, Virginia. Specifically, the defendant seeks to preclude Fife from testifying – based on his experience and generally accepted principles in his forensic field – that latent fingerprints are recovered from firearms only about ten percent of the time. The defendant grounds this motion on her contention that Fife's opinion is not scientifically reliable, and, in the alternative, that his opinion is more unfairly prejudicial than probative "in that it is offered in an attempt to sway the jurors in favor of the Government's case." (Def. Mem. 134, at 5.) The defendant also requests a *Daubert* hearing to fully explore these issues. For the reasons that follow, the defendant's motion *in limine* with respect to this limited portion of Fife's anticipated testimony should be denied in its entirety. The defendant offers absolutely no scientific or other basis for calling this opinion into question, and precisely this sort of expert opinion testimony – specifically relating to the difficulties inherent in obtaining fingerprints from firearms — is routinely admitted at trials in this district.

Fife was, among other things, the examiner who examined and analyzed the M-4 rifle in this case for fingerprints. Fife will testify that he conducted a series of tests on the M-4 rifle, and that after each step he inspected the rifle for identifiable latent fingerprints. Based on that examination, Fife concluded (and the defendant does not challenge) that no latent prints of value – belonging to the defendant or anyone else — could be identified on the M-4 rifle. As previously disclosed to the defendant, the Government also expects that Fife will testify about the general difficulties inherent in obtaining fingerprints from non-porous surfaces, such as firearms, and specifically that fingerprints are recovered from firearms approximately less than ten percent of the time. In this regard, he is expected to testify that various factors affect the ability to obtain fingerprints from firearms and other non-porous surfaces, including atmospheric conditions, environmental conditions, perspiration and the nature of the surface itself. Fife is also expected to testify that the physical features of individuals — in this case, the small size of the defendant's hands and fingers — can negatively affect the ability to obtain fingerprints of value from items with which those individuals have been in contact. It is to this contextual proffered testimony relating to possible explanations for the absence of latent fingerprints on a surface, and specifically on the M-4 rifle in this case, that the defendant now objects.

As an initial matter, Fife has been a forensic examiner in the Latent Print Operations Unit of the FBI Laboratory since May 2004. Since May 2008, he has worked as a major case coordinator in that same unit. In that role, Fife coordinates and oversees the efforts of multiple forensic examiners in large, complex cases. During his career, he has participated in extensive training sponsored by the FBI, forensic trade organizations and private entities. As a certified forensic examiner in the FBI Laboratory, Fife has examined evidence in numerous

cases and has conducted more than 300,000 fingerprint comparisons. During his tenure at the FBI Laboratory, he has processed at least 100,000 separate non-porous items (including firearms) for the identification of latent fingerprints. He has qualified as an expert witness in the discipline of friction ridge analysis and has testified in federal court as an expert witness in this field.

Fife's opinion that a number of factors affect the ability to visualize latent fingerprints on firearms, and that fingerprints are obtained from firearms approximately ten percent of the time, is based on both his own experience and that of the FBI Laboratory's Latent Print Operations Unit where he works.[11] His opinion is also based on the shared view in the field of latent print identification, based on years of collective experience, that it is relatively rare to develop latent fingerprints on firearms. *See* C.A. Barnum & D.R. Klasey, "Factors Affecting the Recovery of Latent Prints of Firearms," *Journal of Forensic Identification*, Mar/Apr 1997 ("Latent fingerprint examiners generally know that even when cutting edge technology such as cyanoacrylate fuming and laser/forensic light source examination are utilized, successful development of latent prints on firearms is difficult to achieve. In reality, very few identifiable latent prints are found on firearms, a fact that has been discussed in both the literature and the judicial system.").

Indeed, the opinion that fingerprints are obtained from firearms very rarely, in the

---

[11] Fife has examined approximately 10 to 20 firearms for latent fingerprints, and has only recovered an identifiable print from the magazine of one of those weapons. His experience of only rarely identifying fingerprints on firearms is consistent with that of his fellow forensic examiners in the FBI Laboratory's Latent Print Operations Unit. The FBI Laboratory does not keep track, for purposes of generating statistics, of the number of firearms they have analyzed over time nor their success rate at obtaining latent fingerprints from those weapons.

vicinity of ten percent of the time, is so widely accepted in the field that courts in this District have admitted expert testimony on this subject on numerous occasions. *See, e.g., United States* v. *Gotti*, No. 08 Cr. 1220 (PKC) (S.D.N.Y. Oct. 2009) (expert testimony of latent print examiner regarding difficulties inherent in obtaining fingerprints from firearms, and specifically that the expert witness succeeded in obtaining prints on only two occasions out of approximately 24 examinations); *United States* v. *Wilkins,* No. 09 Cr. 37 (JGK) (S.D.N.Y. June 2009) (expert testimony from two latent print examiners from the NYPD lab about the difficulties inherent in obtaining fingerprints from firearms); *United States* v. *Smith*, No. 08 Cr. 84 (DC) (S.D.N.Y. Aug. 2008) (expert testimony from latent print examiner that fingerprints are rarely recovered from firearms and regarding the difficulties inherent in obtaining fingerprints from firearms); *United States* v. *Ballard*, No. 08 Cr. 62 (JSR) (S.D.N.Y. July 2008) (expert testimony from latent print examiner regarding difficulties inherent in obtaining fingerprints from various surfaces); *United States* v. *Peterkin*, No. 05 Cr. 538 (JSR) (S.D.N.Y. June 2008) (expert testimony from latent print examiner that fingerprints are rarely recovered from firearms and regarding the difficulties inherent in obtaining fingerprints from firearms); *United States* v. *Williams*, No. 06 Cr. 316 (LBS) (S.D.N.Y. Oct. 2006) (expert testimony from latent print examiner that fingerprints are obtained from firearms approximately 14 percent of the time); *United States* v. *Minaya*, No. 01 Cr. 619 (RLC) (S.D.N.Y. Sept. 2006) (expert testimony from NYPD latent print examiner that the likelihood of recovering fingerprints from firearms is very small and regarding the difficulties inherent in obtaining fingerprints from firearms); *United States* v. *Ramire*, No. 05 Cr. 752 (SHS) (S.D.N.Y. Dec. 2005) (expert testimony from latent print examiner that fingerprints are recovered from firearms approximately five percent of the time and regarding the

difficulties inherent in obtaining fingerprints from firearms); *United States* v. *Whitley*, No. S1 04 Cr. 1381 (RCC), 2005 WL 3181321, at * 2 (S.D.N.Y. Nov. 29, 2005) (expert evidence introduced at trial that fingerprints are recovered from firearms less than 15 percent of the time); *United States* v. *Johnson*, No. 05 Cr. 306 (DC) (S.D.N.Y.  May 2005) (expert testimony from NYPD latent print examiner about the difficulties inherent in obtaining fingerprints from firearms and also about an empirical study done by the NYPD laboratory which concluded that fingerprints are only recovered from firearms approximately 14 percent of the time); *United States* v. *Freeman*, No. 02 Cr. 150 (LAP) (S.D.N.Y. Feb./Mar. 2005) (expert testimony from NYPD latent print examiner that the likelihood of recovering fingerprints from firearms is "very small" and regarding the difficulties inherent in obtaining fingerprints from firearms); *United States* v. *Chavez*, No. 02 Cr. 1301 (GEL) (S.D.N.Y. Jan. 2005) (expert testimony from latent print examiner that fingerprints are rarely recovered from firearms and regarding the difficulties inherent in obtaining fingerprints from firearms); *United States* v. *Griggs*, No. 04 Cr. 425 (RWS/PKL) (S.D.N.Y. Dec. 2004) (expert testimony from latent print examiner that fingerprints are rarely recovered from firearms and regarding the difficulties inherent in obtaining fingerprints from firearms); *United States* v. *Castillo*, No. 03 Cr. 979 (KMW) (S.D.N.Y. May 2004) (expert testimony from latent print examiner that fingerprints are rarely recovered from firearms and regarding the difficulties inherent in obtaining fingerprints from firearms); *United States* v. *Smith*, No. 03 Cr. 184 (RPP) (S.D.N.Y. Mar/Apr. 2004) (expert testimony from latent print examiner that fingerprints are rarely recovered from firearms and regarding the difficulties inherent in obtaining fingerprints from firearms); *United States* v. *Stukes*, No. 03 Cr. 601 (RWS) (S.D.N.Y. Nov. 2003) (expert testimony from latent print examiner that fingerprints are rarely

recovered from firearms and regarding the difficulties inherent in obtaining fingerprints from firearms); *United States* v. *Slaughter*, No. 02 Cr. 1587 (CLB) (S.D.N.Y. June 2003) (expert testimony from ATF latent print examiner that fingerprints are recovered from firearms approximately 3-5% of the time and regarding the difficulties inherent in obtaining fingerprints from firearms); *Acevedo* v.*United States*, No. 95 Civ. 9984 (PKL), 1996 WL 223937, at * 5 (S.D.N.Y. May 2, 1996) (expert testimony introduced at trial that fingerprints are recovered from a "very small" percentage of firearms and explaining why); *see also United States* v. *Patterson*, Nos. 04-4324, 04-4325, 135 Fed. Appx. 469, 2005 WL 1403292, at *5  (2d Cir. June 15, 2005) (holding that defendant's felon-in-possession conviction was supported by sufficient evidence, which included "the expert witness's testimony that it is rare to recover usable fingerprints from firearms"); *United States* v. *Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) (denying sufficiency challenge to felon-in-possession conviction where the Government explained lack of physical corroboration of shooting with "testimony that the chances of finding fingerprints on the found weapons was remote").

The above authority notwithstanding, the defendant argues that Fife should not be permitted to inform the jury of his  "ten percent opinion" because it is "scientifically unreliable." (Def. Mem. 134 at 5.)  In support of that proposition, the defendant points to a number of alleged flaws in the methodology of the Barnum study cited above.  Specifically, the defendant asserts that the Barnum study did not include any controls, did not distinguish between rifles and handguns, was not a prospective study, and did not include raw data (such as "a chart to inform us of how each variable existed in the case of each particular weapon" (Def. Mem. 134 at 9)) so that its conclusion could be replicated and thus validated.  The defendant also argues that the

Barnum study is old, and hypothesizes – without any support – that surely techniques in the field of latent print examination must have "moved forward considerably" within the last 12 years, such that "the ability to visualize and recover latent prints [from firearms] would be greater than ten percent" (Def. Mem. 134 at 11).

Tellingly, the defendant does not cite to any contravening studies or contrary articles since the publication of the Barnum study. In addition, the defendant does not proffer any contrary opinion from another latent print examiner. In other words, the defendant claims that the testimony of the Government's expert — which is directly supported by a study and the general consensus of the scientific community — should be excluded, notwithstanding the fact that the defendant offers no study or opinion evidence that challenges or even undercuts Fife's testimony. No doubt the defendant's inability to cite to contrary published authority, or to proffer to the court an expert with a contrary view, is owing to the commonly accepted fact in the field of latent print examination that fingerprints are recovered from firearms very rarely. Indeed, as the above citations indicate, courts in this District routinely admit expert testimony on this issue. And, the defendant has not cited any case, for example, where such testimony was excluded for lack of scientific reliability or for any other reason.

The defendant also argues that Fife's opinion should be excluded because he is not sufficiently experienced. The defendant does not suggest how many years of experience she feels is necessary or appropriate for such expert testimony, but cursorily claims that Fife's is inadequate. Having examined more than 100,000 non-porous surfaces for fingerprints during his career with the FBI Laboratory, and having conducted more than 300,000 fingerprint comparisons in total – a number of which he has testified about in federal court – Fife certainly

possesses the appropriate qualifications and experience in this field to testify about the generally accepted view that fingerprints are recovered from firearms only very rarely. Conveniently, the defendant appears to view Fife as sufficiently experienced to testify that upon examining the M-4 rifle in this case he did not observe any fingerprints that were identifiable as the defendant's, but not sufficiently experienced to testify to the arguably less controversial opinion in his field that fingerprints are only rarely recovered from firearms.[12]

Given the frequent reliance on precisely this sort of testimony in numerous prior cases, as described at length above, and the inability of the defendant to cite to the Court any contrary study or opinion, there is absolutely no reason to preclude Fife's testimony relating to his opinion that latent fingerprints are identified on firearms only approximately ten percent of the time. Moreover, there is no need to even hold a hearing on this issue. So long as the Court has sufficient information to determine that an expert's opinion has "a reliable basis in the knowledge and experience" of the particular discipline underlying his expertise, a hearing is not required. *United States* v. *Roberts*, No. 01 Cr. 410 (RWS), 2001 WL 1646732, at *11 (S.D.N.Y. Dec. 17, 2001); *Bank Brussels Lambert* v. *Credit Lyonnais (Suisse) S.A.*, No. 93 Civ. 6876 (LMM), 2000 WL 1694321, at *1 (S.D.N.Y. Nov. 13, 2000); *see also United States* v. *Stevens*, No. 03 Cr. 699 (RCC), 2004 WL 1516793, at *3 (S.D.N.Y. July 7, 2004) (noting that *Daubert* hearing not required for fingerprint expert where "many courts have already found fingerprint evidence admissible under *Daubert*'s criteria," and collecting cases); *United States* v. *Frias*, No.

---

[12] The defendant's motion *in limine* refers to the defendant's lack of fingerprints on the M-4 as a "powerful exculpatory forensic fact," (Def. Mem. 134, at 1, 4, 14, 16), and thus presumably the defendant intends to emphasize it at trial. The Government further presumes that the defendant will seek to do this through Fife's testimony, since the Government has not received any notice of a latent print expert who will testify for the defendant at trial.

01 Cr. 307 (AGS), 2003 WL 352502, at *1 (S.D.N.Y. Feb. 13, 2003) (hearing not required "if the expert testimony to be presented is based on well-established principles"); *cf. United States* v. *Williams*, No. S100 Cr. 1008 (NRB), 2004 WL 2980027, at *24 (S.D.N.Y. Dec. 22, 2004) (denying request for *Daubert* hearing related to proffered ballistics and tire tread evidence because of weight of authority that these are proper subjects for expert testimony and defendant offered no reason to depart from the prior reasoning). The Government submits that the Court has more than sufficient information on the current record — given the publication on which Fife relies, his personal experience and the clear, overwhelming weight of authority in this District — to deny the defendant's motion without a hearing.

Alternatively, the defendant argues that Fife's "ten percent opinion" should be precluded under Rule 403 because it is more unfairly prejudicial than probative. This claim is baseless. There is absolutely no possible ground upon which Fife's opinion — accepted in the scientific community and by numerous courts in this District — could be deemed "unfairly prejudicial," let alone that its probative value could be substantially outweighed by the danger of unfair prejudice. In this age of crime shows, such as "CSI," on network television, all of which can tend to leave a layperson with the impression that fingerprint evidence will unequivocally be found anytime an individual brushes up against a surface, it is crucial to contextualize forensic evidence and to advise the jury of its limitations. In this case in particular, the context is particularly probative. As the defendant is aware from the Government's disclosures in this case, not only did Fife not observe any fingerprints identifiable on the M-4 rifle as the defendant's, he did not observe any fingerprints of value belonging to any person. This was the case even though, after being used by the defendant on July 18, 2008, the M-4 rifle in this case

was returned to the Warrant Officer who continued to carry and use it for a period of five days prior to transferring it to the FBI. Despite this fact, Fife was unable to recover any fingerprints from even the Warrant Officer on the M-4 rifle. Indeed, the analysis in this case, and the circumstances surrounding it, provide further support for the opinion that fingerprints are only rarely recovered from firearms. Accordingly, the fact that it is difficult as a general matter to identify fingerprints on firearms is important background that should be available to the jury in assessing the more specific evidence — the M-4 rifle — that was examined in this case.

In addition, the defendant's interpretation of what constitutes evidence that is "unfairly prejudicial" for Rule 403 purposes — namely, evidence that "is offered in an attempt to sway the jurors in favor of the Government's case" — is so broad as to render Rule 403 meaningless. All of the evidence presented by the Government at this trial will be offered in an attempt to sway the jurors in favor of the Government's case — not because the Government will misrepresent or misconstrue that evidence, but because that evidence itself objectively supports the Government's view of the case. By that token, any evidence that is useful to, or tends to prove, the Government's case would be potentially excluded under Rule 403 as unfairly prejudicial. This is, quite simply, an overly broad and illogical reading of the rule.

**D.**      **The Defendant's Motion To Limit The Use Of Certain Terms At Trial Should Be Denied**

Lastly, the defendant's motion to exclude "from every aspect of the trial" references to various terms — including any suggestion that the defendant is a terrorist; any mention of her alleged affiliation with al Qaeda or any other specific terrorist organization; any mention of her alleged affiliation with a "radical Islamic fundamentalist movement"; any mention of the defendant's alleged affiliation with "jihad," "violent jihad," mujahideen," and

"mujahideen warriors"; any mention of the defendant's alleged affiliation with the Taliban; and any mention of the name Usama bin Laden (Def. Mem. 138 at 1-2) — should be denied. The defendant grounds this motion on Rules 402 and 403, essentially arguing that evidence regarding any of these terms is "not relevant." This request is simplistic and unnecessary.

The Government notes that it does not intend to present evidence in its case-in-chief regarding the defendant's alleged affiliation with al Qaeda, the Taliban, other foreign terrorist organizations, or Usama Bin Laden. As explained above at length, however, the Government does intend to introduce certain of the Defendant's Materials in its case-in-chief. Portions of these materials contain references — in the defendant's own words and handwriting — to certain of the terms referenced above (*i.e. jihad* and *mujahideen*). These materials are all relevant and admissible as direct evidence of the crimes with which the defendant was charged, necessary background evidence to the crimes with which the defendant was charged, and, in the alternative, admissible pursuant to Rule 404(b). And, as outlined above, it cannot be said that these materials should be excluded under Rule 403 as they are probative of the defendant's intent and the events surrounding the July 18 shooting, and are no more sensational or disturbing than the crimes with which the defendant is charged.

In addition, and as the Government noted in section A above, a large part of the defendant's request is moot. During the course of the Depositions, for example, defense counsel elicited testimony from its witnesses regarding their interactions with the defendant from the moment she was arrested. In doing so, defense witnesses indicated their belief that — at the time of her arrest — the defendant may have been "a suicide bomber." This testimony is relevant to those witnesses' version of events, as it impacted their subsequent actions. Thus, if

53

the Depositions are admitted, testimony introduced by the defendant will encompass certain of the terms and themes that the defendant now seeks to preclude.

In the event the Court admits evidence that encompasses the above terms purely for limited purposes (such as pursuant to Rule 404(b)), then the Court may provide a limiting instruction to the jury which would cure any potential prejudice. Indeed, the notion that "New Yorkers" "especially" cannot handle the admission of such evidence (Def. Mem. 138 at 4) is a gross overstatement; our jury pool encompasses people from vast backgrounds who we believe can and will remain impartial from the outset of this case until its conclusion, regardless of specific terms or phrases used during trial.

As framed, the scope of the defendant's motion is overbroad as it encompasses certain relevant proof that the jury should be permitted to hear and that has already been elicited during the Depositions. Moreover, the Government is unaware of whether the defendant will present a case at trial. In the event additional witnesses are called by the defendant, the Government may — depending on the scope of direct examination — seek to cross examine those witnesses on certain of the defendant's prior activities for purposes of impeachment. Granting the defendant's blanket request would preclude the Government from pursuing potential lines of cross examination, which, at this stage of the case, is premature and unnecessary. *Cf. United States* v. *Rodriguez*, 734 F.Supp. 116, 128 (S.D.N.Y. 1990) (denying defense request to preclude Government from using certain terms at trial as it "raises a matter that is best determined at trial").

Accordingly, for these reasons, the defendant's motion should be denied.

**III.    Conclusion**

For all of the foregoing reasons, the defendant's motions *in limine* should be

denied in their entirety.

Dated:  New York, New York
        December 30, 2009


                    Respectfully submitted,

                    PREET BHARARA
                    United States Attorney
                    Southern District of New York


              By:   _____/s/_____
                    Christopher L. LaVigne
                    David M. Rody
                    Jenna Dabbs
                    Assistant United States Attorney
                    (212) 637-2325/2304/2212