## 2. History And Characteristics Of Dr. Siddiqui

### Dr. Siddiqui's Childhood, Education and Arranged Marriage

Dr. Siddiqui was born in either Multan or Karachi, Pakistan on March 2, 1972. See Ex. B at 404 & 536. Shortly after she was born, her family moved to Zambia. See id. at 404. Eventually, her family moved back to Karachi where she spent the majority of her childhood. See id. at 404 & 536-37. Her father Mohammad Salay Siddiqui was a physician (now deceased) and her mother Ismaat Siddiqui (retired and unwell) was a social worker. See id. at 536. Dr. Siddiqui has two siblings: (1) Muhammad Siddiqui who lives in the vicinity of Houston where he is employed as an architect; and (2) Fowzia Siddiqui who is a neurologist practicing in Karachi, Pakistan. See id. at 536-37. Ms. Ismaat Siddiqui and Dr. Fowzia Siddiqui and her family live in the home where Dr. Siddiqui was raised in Karachi, Pakistan. Mohammad Ahmed Siddiqui, Dr. Siddiqui's oldest child who was born on November 29, 1996, lives with his aunt and grandmother in Karachi, Pakistan. Dr. Siddiqui's other two children, Mariam Bint Khan and Suleman Siddiqui, were born on September 5, 1998 and September 3, 2003 respectively. Mariam suddenly appeared on the doorstep of the Siddiqui family home in Karachi, Pakistan in March of this year; Suleman remains missing.

In 1989, Dr. Siddiqui was issued a students visa to study in the United States. At first, she enrolled in the University of Houston in the spring of 1990 and studied there for three semesters. Then she transferred to the Massachusetts Institute of Technology where she graduated with a Bachelors Degree in Biology in February of 1995. See id. at 924 & GX 400. In the latter part of 1995 or early part of 1996, Dr. Siddiqui applied to the Neuroscience Ph.D. program at Brandeis University; she was admitted into the program at or around March 21, 1996 and she accepted the offer at or around April 1, 1996.

In or around November of 1995, Dr. Siddiqui married Mohammad Amjad Khan by telephone. See id. at 794. It was an arranged marriage. See id. at 794 & 538. In or around December of 1995, Dr. Siddiqui and her husband lived together in the Boston area. See id. at 794. It appears that the marriage between Dr. Siddiqui and her husband, which lasted approximately seven years, was full of conflict and according to accounts of Dr. Siddiqui, faculty with whom she was close at Brandeis University, and a social worker in the Boston area, the ex-husband physically abused Dr. Siddiqui and her children. See id. at 197, 231, 397 & 552, 784-86, 795, 1267, 1276.

When Dr. Siddiqui received her Ph.D. in neuroscience from Brandeis University in or around February of 2001 (GX 401), she allegedly started and supervised for a few months a pre-school program that she ran out of her apartment attended by her own children, the children of her sister and other neighbors' children. See id. at 538. Shortly after September 11, 2001, Dr. Siddiqui apparently returned home to Pakistan with her children to attend to her ailing father. See id. In or around January of 2002, Dr. Siddiqui returned to Boston with her children to live with her ex-husband for about four or five months before returning to Karachi, Pakistan. See id. at 538-39.

### Dr. Siddiqui's Divorce From Her Ex-Husband And Subsequent Disappearance

In or around June of 2002, Dr. Siddiqui and her ex-husband returned to Pakistan and ultimately divorced by the fall of that year. See id. at 1284. According to Dr. Siddiqui's account in an interview with an FBI agent (an account that coincides with that of other members of her family), this divorce precipitated her father's heart attack that led to his death in August of 2002. See id. at 398 & 1284.

According to her mother, Dr. Siddiqui was very upset in the wake of her divorce. See id. at 1276. While living with her mother, Dr. Siddiqui was very isolated – she neither socialized with friends nor did she go to the mosque. See id. at 1278 & 1285. In or around March of 2003, Ms. Ismaat Siddiqui encouraged her daughter to go live with her uncle in Islamabad for a change of scenery. See id. Again, according to her mother, Dr. Siddiqui left with her three children for Islamabad on the spur of the moment to stay with her uncle. See id. at 1277. After Dr. Siddiqui telephoned her the day that she departed from what her mother assumed was the railroad station, Ismaat Siddiqui never saw or heard from her daughter again until she called her mother in the spring of 2009 from FMC Carswell. See id.

In the aftermath of Dr. Siddiqui's disappearance, her mother was visited by two strangers at her home whose threats directed at her appeared connected to Dr. Siddiqui's disappearance. Two days after Dr. Siddiqui left her house, a stranger broke into the family house and told Ismaat Siddiqui not to make a noise. See id. at 1277. Shortly after this incident a man drove up to her house on a motorcycle and told her in a threatening manner that if she remained quiet about her daughter she would get her back. See id. at 1283.

In an interview with ████████, ████████████████ recounted a story that indicated that Dr. Siddiqui had a basis to be concerned about her welfare during the years that she went missing. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. See id. As



Whether we account for Dr. Siddiqui's missing years as having been caused by her abduction by a governmental or non-governmental entity (as some accounts would have it), by going "into hiding" to avoid questioning by American intelligence agencies (as the government would have it), or because she was forced to lend assistance to jihadist organizations (as other accounts would have it), Dr. Siddiqui's experience of those years must have involved trauma because she reappeared in Afghanistan in 2008 accompanied by only one of her three children.

### Evidence Of Dr. Siddiqui's Mental Illness

There is much in the record to suggest that Dr. Siddiqui had and currently suffers from serious mental illness so we will not belabor the point. As the record currently stands, two forensic evaluators hired by the government diagnosed Dr. Siddiqui as malingering. Two forensic evaluators hired by defense counsel diagnosed Dr. Siddiqui as presenting serious mental illness, one of whom viewed her as incompetent to stand trial. See Forensic Psychological Evaluation of Dr. Kucharski dated June 20, 2009 at 17 ("It is therefore my opinion that Dr. Siddiqui is currently not competent to stand trial ... [c]urrently [she] presents with a delusional disorder paranoid type and significant depression"); see also Ex. A (Confidential Psychological Evaluation by Dr. Barry Rosenfeld dated July 12, 2010) at 11 ("In sum, considerable evidence appears to support the conclusion that Dr. Siddiqui suffers from a genuine and severe mental disorder that emerged prior to her arrest"). One forensic evaluator of the Bureau of Prison, Dr. Leslie Powers, diagnosed Dr. Siddiqui as presenting serious mental illness to the point of incompetence and then changed her mind after conferring with the government evaluators. As Dr. Barry Rosenfeld indicates in his report, Dr. Powers's evaluation, the one upon which the

24

Court placed considerable reliance, appears the most unstable as she conceded that she would change her mind again if she were presented with evidence that Dr. Siddiqui suffered a traumatic incident to explain her "florid" presentation. See Ex. A at 10. In any event, the evidence is compelling that Dr. Siddiqui has and is currently presenting with serious mental illness and that evidence becomes only more compelling the longer she continues her odd behavior with dissipating rewards for presenting them.

Dr. Rosenfeld offers a compelling account that Dr. Siddiqui's current mental illness has either been present for awhile or at least was in a "prodromal" period since her days in Boston. See id. at 6. Of particular note to Dr. Rosenfeld is the account of Dr. Yousef Abou Aballan who knew Dr. Siddiqui when she was still an undergraduate at MIT. At that point in time, Dr. Aballan viewed her as a compelling speaker and public figure whose future appeared promising. See id. A few years later, he noted that she had become odd and was "always by herself." Id. More significantly, at this point in time, Dr. Siddiqui was unable to find a community of like-minded persons in any Muslim organization in the Boston area, including extremist groups. See id.

In finding further basis for believing that Dr. Siddiqui's mental illness had an onset during her Boston years, Dr. Rosenfeld notes that she never pursued a professional position in her area of expertise. See id. at 3. Rather, she chose to spend her time teaching young children in an informal "nursery school" in her home and to hand out Korans to interested persons through the aegis of the Institute of Islamic Research. See id.

Dr. Rosenfeld's and Dr. Aballan's diagnosis of mental illness appearing during the Boston years is further substantiated by some of the discovery received in the proceeding. For example, ▮▮▮▮▮▮ interviewed the managing agents of apartments where Dr. Siddiqui stayed

while living in Boston and two noted that she complained of innocent incidents occurring in the building and affecting her family – like a water leak in her apartment or an alarm triggered accidentally by her children – as the product of anti-Muslim animus. See Ex. B at 1302-03. This conduct appears to have a continuation in the account of Dr. Siddiqui's conduct after her divorce and before she left the family home in Karachi in or around March of 2003. Her own mother described her conduct as withdrawn and sullen, reminiscent of Dr. Aballan's account of her always being alone, which prompted Ms. Siddiqui to suggest to her daughter that she go visit her uncle. See Ex. B at 1278 & 1285.

At this moment, it appears that Dr. Siddiqui's mental illness reached such an acute point that she withdrew from her own family into an isolation from which she has not returned. Her brother speaks painfully of his sister's metaphorical disappearance since she was brought to the United States for this criminal proceeding. Throughout the process he has tried to help her in every way that he can – visit her when she was in Carswell; hire her the best lawyers he could find; attend every day of trial. Yet, for all of his efforts, his sister will still at moments become suspicious of his motives and withdraw from his attempts to communicate with her.

Dr. Siddiqui is clearly a troubled woman whose withdrawal from the world renders her isolated not only from her family but from everyone else, including extremist groups who would want to make use of her. Even if extremist groups wanted to make use of her and Dr. Siddiqui allowed herself to be made use of, a low likelihood indeed, Dr. Rosenfeld convincingly argues that her mental illness has sealed her off from the sophisticated thinking she was once capable of at MIT and Brandeis University because the notes that she had in her possession, which are characterized so ominously by the government as a "roadmap for destruction," are actually an indication of her current low intellectual functioning. See Ex. A at 6 ("The materials found in

26

Dr. Siddiqui's possession after her arrest also support the contention that her mental state had markedly deteriorated during the months or years preceding her arrest, as they include numerous seemingly implausible ideas and beliefs ... These implausible ideas and beliefs are particularly striking given her obvious pre-morbid intelligence (having completed degrees [at] MIT and Brandeis) and her limited background in the biological and physical sciences").

### B. The Need for the Sentence Imposed

#### 1. To Reflect The Seriousness Of The Offense, To Promote Respect For The Law, And To Provide Just Punishment For The Offense

The sentence that we seek of twelve years reflects the seriousness of the offense, promotes respect for the law and provides just punishment because it is only a slight variance from the advisory Sentencing Guidelines range applicable for attempted murder accompanied by the brandishing of a firearm. As discussed more fully below, Dr. Siddiqui's advisory Sentencing Guidelines range is arrived at by applying the offense level associated with attempted murder, finding that her Criminal History Category is I, and then adding seven years to the Guidelines range of 70-87 months as required by 924(c) for a grand total of 154 months. The sentence that we seek, 144 months, is only 10 months less than the range advised by the Guidelines framework.

The slight variance downward that we seek is justified by the peculiar circumstances of this case. Dr. Siddiqui is not the typical defendant who attempts to murder another human being. She has no history to suggest that she has a violent past. There is no plausible evidence to support the government's theory that she is a terrorist. The centerpiece of the government's theory in this regard is the documents that were found in her possession at the time of her arrest in Ghazni. While the government has expended tremendous resources investigating what Dr.

Siddiqui was doing on the day that she was arrested and the days and months and years before her arrest, they never filed an indictment alleging that she was or supported terrorists. Thus, Dr. Siddiqui remains an atypical defendant in an attempted murder case.

What further justifies the slight variance downwards that we seek is Dr. Siddiqui's mental illness that certainly played a role in her conduct. For someone who suffers paranoid ideations such as Dr. Siddiqui, the circumstance of a team of American soldiers coming into a room where she is held captive where her biggest fear is being transferred into the custody of Americans and brought to Gitmo must have been terrifying. To Dr. Siddiqui, what she confronted, assuming as fact her paranoid frame of mind, was either an escape or certain torture in the hands of the Americans. Accepting this framework, what Dr. Siddiqui did is understandable, if not excusable, and it makes her conduct atypical and justifies a slight variance downwards from the advisory Sentencing Guidelines range.

### 2. To Protect the Public from Further Crimes of Dr. Siddiqui

Section 3553(a)(2)(C) requires the Court to consider the need to protect the public from future crimes of a particular defendant, in this case Dr. Siddiqui. We understand that the Court, in light of our continued emphasis upon Dr. Siddiqui's serious mental illness and the role it played in her offense conduct, has to speculate as to Dr. Siddiqui's future dangerousness when addressing the issue as to what sentence will protect the public from her. First, we must assume that Dr. Siddiqui will be deported to Pakistan after she serves the sentenced imposed by this Court. Second, Dr. Siddiqui's notoriety after this criminal proceeding renders it highly unlikely that she will be able to blend back into any general population abroad and from the vantage point of anonymity engage in further offense conduct. Her notoriety will ensure that all of her movements upon release will be carefully observed by intelligence communities all over the

world. Third, we would emphasize a point that Dr. Kucharski, a forensic psychologist retained by defense counsel for the purposes of the competency hearing, made recently to the defense team. He observed that Dr. Siddiqui's act of violence on July 18, 2008 has to be viewed as highly context-specific. If a normal person were in a strange land and arrested and brought to a precinct where very few spoke their language and they could not predict their fate, they would be acutely anxious. If they lived in a land where rumors were widespread that Americans committed atrocities to detainees and they had a reasonable fear that they were going to be transferred as a detainee to the Americans, their anxiety level would be ratcheted up. If then they heard unannounced those very Americans stomping into the room where they were detained and shouting, "Where's the detainee?" as certain accounts would have it, most persons, even those in their right mind, would be terrified. As Dr. Kucharski noted, under such circumstances, a normal person would be subject to instinctual activity in response to a flight/fight situation. From this perspective, what Dr. Siddiqui did was not so far removed from what a person would do who lacked mental illness. If Dr. Siddiqui had acted in a violent manner in response to an innocent gesture like a smile from a person standing alongside of her on a platform waiting for a train, then future dangerousness would be a real concern. But that is not the situation here. Dr. Siddiqui's conduct was close enough within the range of a normal person in her circumstances (in a strange land torn by war and taken captive by local authorities who do not speak her language and are sure to hand her over to the Americans) that fears of future dangerousness are not warranted. Of note here is the fact that Dr. Siddiqui has no criminal history in a life in which, according to Dr. Rosenfeld, she has probably been suffering from psychotic symptoms since at least the early to mid-1990s. That clean track record gives us confidence that the Court

need not fear that Dr. Siddiqui poses a threat to the public should she be released after a substantial amount of time in prison.

### 3. To Afford Adequate Deterrence To Criminal Conduct

18 U.S.C. §3553(a)(2)(B) instructs the Court to consider whether the sentence requested by the parties provides adequate deterrence to criminal conduct. Reason dictates that a term of imprisonment can, in certain circumstances, provide general deterrence; but 18 U.S.C. §3553(a) also instructs that a sentence should not be "greater than necessary." (stating that a sentence may not be greater than necessary to comply with the purposes of punishment.)

With respect to this factor of general deterrence, we respectfully submit that the analysis here dovetails the discussion of the factors regarding the imposition of a sentence that reflects the seriousness of the offense conduct, promotes respect for the law and represents just punishment. Here, where the sentence requested is but a minor variance from the advisory Sentencing Guidelines range and the variance is based on quite extraordinary circumstances, the sentence sought is bound to promote general deterrence because it involves a substantial amount of time and hews closely to the recommendation of the United States Sentencing Commission. This would not be a case of a dramatically lenient sentence imposed against a backdrop of a much more serious advisory Sentencing Guidelines range. In such circumstances, the factor of general deterrence recedes into the background.

### C. The Sentencing Guidelines Considered

United States v. Crosby and now Gall v. United States, both require sentencing courts to consider the advisory Sentencing Guidelines as one of many factors when sentencing a defendant. In the PSR, the Probation Office provides analysis of Dr. Siddiqui's advisory Sentencing Guidelines range as outlined below.

The Probation Office sets Dr. Siddiqui's base offense level at 33 as they view her attempted murder counts as constituting an attempt at first-degree member. See PSR, ¶ 38. The Probation Office arrives at offense level 33 by noting that the advisory Sentencing Guidelines for violations of 18 U.S.C. § 2332, § 1114 and § 111 are found in §§ 2A2.1 and 2A2.2. See id. The Probation Office uses § 2A2.1 apparently because it incorporates the more serious offense – attempted murder. See id. Without explanation or any reference to the fact that the jury found that Dr. Siddiqui did not commit attempted murder with premeditation, the Probation Office views Dr. Siddiqui's "actions" as "constitut[ing] first degree murder" and thus warranting a base offense level of 33. See id.

The Probation Office notes the possibility that three victim-related adjustments may be applicable to Dr. Siddiqui's conduct. First, there is the suggestion that because some witnesses allegedly heard Dr. Siddiqui say that she wanted to "kill Americans" a three-level "hate crime" enhancement might be warranted. See PSR, ¶¶ 40-41. Second, there is the suggestion that her conduct may be characterized as motivated by the victims' status as United States employees or officers. See PSR, ¶ 42. The Probation Office actually applied this enhancement and increased Dr. Siddiqui's offense level by 6 levels. See id. Finally, the Probation Office applied the terrorism enhancement to Dr. Siddiqui's offense level based on her alleged statement that she wanted to "kill Americans" and her possession of paper and electronic documents "that detailed her intent to hurt U.S. citizens and destroy U.S. landmarks." PSR, ¶ 43. Application of the terrorism enhancement added 12 levels to her offense level and raised her criminal history category from I to VI. See PSR, ¶¶ 43 & 53. According to the Probation Office, Dr. Siddiqui's adjusted offense level of 51 and Criminal History Category of VI framed an advisory Sentencing Guidelines range of life. See PSR, ¶ 90. Further, the Probation Office noted that Count 4

required imposition of a mandatory 360-month term of imprisonment to run consecutively to the term of prison imposed for the other counts. See id. We would note that the Probation Office prepared the PSR before the Supreme Court held that the factual issue as to whether a firearm was a machine gun for the purposes of a violation of 18 U.S.C. § 924(c)(1)(A)(iii) must be presented to the jury. See United States v. O'Brien, 130 S. Ct. 2169 (2010). In light of O'Brien, the maximum consecutive sentence that the Court may impose for a 18 U.S.C. § 924(c) violation without the jury finding that the firearm was a machine gun is 10 years. See Harris v. United States, 556 U.S. 545 (2002) (holding that the factual questions of "brandishing" and "discharging" a firearm with respect to a violation 18 U.S.C. § 924(c) may be found by a sentencing court and are sentencing factors).

Finally, the Probation Office notes that the government views Dr. Siddiqui as having obstructed justice by malingering mental illness and offering perjured testimony at the trial. See PSR, ¶¶ 32-33. The Probation Office defers to the Court as to whether an obstruction of justice enhancement is warranted. See PSR, ¶ 45.

### 1. The Probation Office Errs In Finding A Base Offense Level Of 33 As Dr. Siddiqui's Conduct Is Not Analogous To First-Degree Murder

Recognizing the critical role of the jury in determining the degree of guilt in homicide related crimes, the Court, at the Government's urging, submitted the question of whether Dr. Siddiqui acted with premeditation to the jury. That submission was in accordance with the long standing principle of jurisprudence—incorporated into the "Due Process Clause" of the Constitution—wherein the jury determines the degree of guilt where homicide is concerned. See Ring v. Arizona, 536 U.S. 584, 599 (2002), ("[t]he English jury's role in determining critical facts in homicide cases was entrenched. As fact-finder, the jury has the power to determine not

only whether the defendant was guilty of homicide but also the degree of the offense. [...] By the time the Bill of Rights was adopted, the jury's right to make these determinations was unquestioned." (internal cites omitted)). The jury in this case returned a finding that Dr. Siddiqui did not act with premeditation.

Under Section 2A2.1(a)(2)) of the Federal Sentencing Guidelines, conviction of unpremeditated attempted murder corresponds to a base level of 27 for the offense. Apparently, unaware of the jury's findings, the Probation Office determined that the attempted homicide had been committed with malice aforethought and pursuant to 2A2.1(a)(1), recommended a base level of 33 corresponding to a finding of premeditation for the attempted murder counts on which Dr. Siddiqui was convicted.[9] See PSR, ¶ 38. Whether the Probation Office's finding was out of ignorance, or indifference to the jury's findings and their fundamental role of determining the degree of guilt, the Court should give it no weight.

The Supreme Court has repeatedly upheld that due process requires the court to respect the findings of a jury when it comes to sentencing. See Apprendi v. New Jersey, 530 U.S. 466, 483 (2000) (holding that the Sixth Amendment does not permit a defendant to be "exposed . . . to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone."); Ring v. Arizona, 536 U.S. 584, 599 (U.S. 2002) (holding that the court's adoption of sentencing factors necessary to impose the death penalty, in contradiction to the jury's findings, violated the Due Process Clause); Blakely v. Washington, 542 U.S. 296, 303-04 (2004), (finding that, for Apprendi purposes, the "standard range" was the statutory

---

[9] Section 2A2.1(a)(1) of the Sentencing Guidelines, a base offense level of 33 is warranted where the "object of the offense would have constituted first degree murder' as defined by 18 U.S.C. § 1111. Section 1111, in turn, defines first degree murder in pertinent part is as "the unlawful killing of a human being with malice aforethought."

33

maximum, despite being below the maximum sentence, and thus any facts found justifying a sentence above the standard range must be found by a jury).

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court applied the teachings of Apprendi, Ring, and Blakely to the federal sentencing regime. The Court held that the upper end of the then-mandatory federal sentencing guidelines was the statutory maximum, even though it was below the maximum sentence established by Congress. Thus, judicial fact-finding used to justify a sentence above the range contemplated by the guidelines violated the Sixth Amendment. Id. at 233-35. While the Court, in effect, reinstated judicial fact finding to divert from the standard range by finding the mandatory nature of the guideline unconstitutional, see id. at 245-246, any fact necessary to support a sentence exceeding the maximum authorized by the facts (as established by a plea of guilty or a jury verdict) had to be admitted by a defendant or proved to a jury beyond a reasonable doubt. See id., at 232 ("the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.") Nothing in the decision suggests that it permits judicial findings to directly override the findings of the jury, imposing an enhancement based on a degree of criminality explicitly rejected by the jury—particularly where such an enhancement would have the effect of doubling the defendant's base sentence, as is the case here.[10] Accordingly, counsel respectfully suggests that the Court should reject the Probation Office's determination and, in accordance with the jury's verdict, find that Dr. Siddiqui's base offense level for attempted murder is 27.

---

[10] Attempted murder has a base offense level of 27, which advises, in conjunction with a Criminal History Category of I, a sentence of 70-87 months. Attempted murder that would have constituted first degree murder has an offense level of 33, which advises, again in conjunction with a Criminal History Category of I, a sentence of 135- 168 months. The difference amounts to a doubling in sentencing exposure.

### 2. The Probation Office Errs In Applying The Terrorism Enhancement

The terrorism enhancement of the advisory Sentencing Guidelines reads in pertinent part as follows:

§ 3A1.4 Terrorism

(a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

(b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

An application note to this enhancement provides a definition of "federal crime of terrorism," which is as follows: "For purposes of this guideline, 'federal crime of terrorism' has the meaning given that term in 18 U.S.C. 2332b(g)(5)." The definition of "federal crime of terrorism" as defined by 18 U.S.C. § 2332b(g)(5) is as follows: " an offense that – (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of [various enumerated offense conduct including attempted murder of United States officers and/or employees and United States nationals]."

The Second Circuit has recently interpreted the terrorism enhancement to consist of two different theories upon which it can be based: (1) where the defendant's offense or relevant conduct "involved" a federal crime of terrorism, which is interpreted to mean that the defendant "committed, attempted, or conspired to commit a federal crime of terrorism;" and (2) where the defendant's offense or relevant conduct "intended to promote" a federal crime of terrorism, which is interpreted to mean that the defendant "encourage[d], further[ed], or [brought] about a federal crime of terrorism." United States v. Awan, 07-4315, 2010 WL 2347081 (2d Cir. June 14, 2010). In distinguishing these two theories upon which the terrorism enhancement can be

35

based, the Second Circuit noted that while the first theory required the government to demonstrate that the offense conduct of the defendant was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," the second theory had a different requirement. See id. at *6. Instead of requiring the government to show that the defendant engaged in conduct "calculated to influence or affect the conduct of government," the second theory required the government to show that the defendant's conduct "encourage[d], further[ed], or [brought about]" the federal crime of terrorism of another. See id.

With respect to the question as to whether Dr. Siddiqui's offense conduct for which she was convicted constituted an offense for which the terrorism enhancement is applicable under the first theory, the answer is a simple no. In Awan, the Second Circuit clarified that "calculated" presumes that the defendant **planned** the act that constituted the federal crime of terrorism. See id. at *7. Here, the jury's verdict precludes the government from seeking a terrorism enhancement based on the first theory because they found that Dr. Siddiqui did not attempt to murder the United States officials and/or employees or United States nationals with premeditation.

On the verdict sheet, with respect to both Count One and Two, the attempted murder of United States nationals and the attempted murder of United States officials and employees respectively, the jury was asked in the event of finding guilty on either or both Counts whether the defendant committed either act with premeditation. See copy of the verdict sheet annexed hereto as Exhibit "K." With respect to both Counts, the jury found the defendant guilty but found that she committed the alleged acts without premeditation. See Tr. at 2129-30.

36

With respect to the first theory upon which the government can base the terrorism enhancement, the so-called "involved" theory, the only Counts applicable are Counts One and Two as they both are one of the enumerated offenses in subsection (B) of 18 U.S.C. § 2332b(g)(5). As the jury found that with respect to both of these Counts, Dr. Siddiqui engaged in the conduct without premeditation, she necessarily did so without planning, which amounts to engaging in conduct that was without calculation, a requirement for the terrorism enhancement under the first theory.[11] Thus, with respect to Counts One and Two, the jury's finding of no

---

[11] There can be no question that the government directly presented to the jury the theory that Dr. Siddiqui intended (read alternatively "planned") to kill members of the United States interview team that came to question her and the jury rejected this theory. During the closing, the government presented a host of background facts that they believed indicated Dr. Siddiqui's animus towards Americans. Her alleged rants about wanting to kill Americans and her possession of documents that were alleged to be roadmaps for terrorist attacks on the United States were but a few examples that the government presented to the jury as evidence that Dr. Siddiqui was on a mission in Afghanistan to kill Americans and she found an opportunity to do so in the context of the room in the Afghanistan National Police headquarters where she was detained on July 18, 2008. The government's theory of Dr. Siddiqui's attempted murder as a calculated and premeditated act warranting a terrorism enhancement is clearly encapsulated in the following argument to the jury:

> And if you find the defendant guilty of that crime, of that first count, you are going to be asked a second question and that's whether the defendant acted with premeditation. Premeditation means after deliberation, after thinking it over. And here we know the defendant acted with premeditation. You know that because throughout the trial you have heard time and time again from all different types of witnesses that this woman, the defendant, hated Americans. You heard that from the Afghans who had her in custody from July 17 to July 18, you see that in the documents that she had on her the night before, and you know that when the Americans walked in the defendant hid, she waited. She waited before she acted, and that is premeditation.

Tr. at 1969.

Here, the government carefully marshaled all of the Rule 404(b) evidence and clearly packaged it in a manner to suggest that Dr. Siddiqui was a terrorist who turned her captivity into a terrorist mission. Let there be no mistake – the government presented this theory and the jury flatly rejected it.

37

premeditation precludes the Court from basing the terrorism enhancement on the offense conduct alleged therein under the "involved federal crime of terrorism" theory.[12]

Should the government base the terrorism enhancement on the second theory outlined in Awan, then they would clearly have the burden to prove that Dr. Siddiqui's conduct for which she was convicted (or relevant conduct) somehow "encourage[d], further[ed], or [brought] about" a federal crime of terrorism of another. Under this theory, the government appears to have three insurmountable hurdles – first, the government would have to identify a federal crime of terrorism separate and apart from Dr. Siddiqui's offense conduct; second, the government would have to identify how that federal crime of terrorism was "encouraged" or "furthered" or "brought about" by Dr. Siddiqui's offense conduct; and third, the government would have to identify the offenders who committed this separate federal crime of terrorism.[13] We respectfully

---

[12] We respectfully request the right to reply to any allegations by the government that Dr. Siddiqui was "involved" in a "federal crime of terrorism" through a theory of relevant conduct. We have made discovery requests of the government in anticipation of litigating the terrorism enhancement and the response that we have received to those requests sheds very little light on the theory upon which the government intends to base a terrorism enhancement. See letter of defense counsel to the government dated March 27, 2010 and the letter of government counsel to Dawn M. Cardi, Esq. dated April 30, 2010 annexed hereto as Exhibit "L." The Presentence Investigation Report also does not articulate the theory upon which the Probation Office seeks the terrorism enhancement. See Presentence Investigation Report dated April 7, 2010, ¶ 43. Should the government seek the terrorism enhancement for uncharged conduct – for example, providing material support to terrorists – the effort should be rejected as a transparent attempt to move beyond the limits of conduct related to the offense of conviction in order to get a terrorist conviction "based on bench trial rather than jury trial." United States v. Allen, 488 F.3d 1244, 1255 (10th Cir. 2007). As the Allen court recognized, "the relatedness principle [constraining the ambit of relevant conduct] keeps the system from straying too far beyond the Sixth Amendment line." Id. As this Court has repeatedly observed, this proceeding was a relatively simple case of attempted murder. The government should not be allowed to turn it into a terrorism case at sentencing.

[13] We respectfully submit that the government will be especially hard pressed to demonstrate that Dr. Siddiqui's conduct "encouraged," "furthered," or "brought about" the federal crime of terrorism of another since her actions were viewed by the jury as unplanned, spontaneous and an instinctual response. It seems beyond dispute that in order for an act to be viewed as done with an intent to encourage, further, or bring about the actions of another, it has to be foreseen and

38

submit that there is nothing in the record, as defined by the government in its letter to defense counsel dated April 30, 2010, to support this second theory upon which to base the terrorism enhancement.[14]

### 3. There Is No Basis For Imposing A "Hate Crime" Enhancement

In the PSR, the Probation Office provides a possible basis for the application of the so-called "hate crime" enhancement pursuant to § 3A1.1 of the Sentencing Guidelines. For the very same reason that the terrorism enhancement is inapplicable to Dr. Siddiqui's offense conduct – the fact that the jury found that her actions were without premeditation – we respectfully submit that the "hate crime" enhancement should not be applied. It would defy logic to apply the "hate crime" enhancement, which implies that the defendant consciously chose to target in advance certain victims, where a jury finds that the conduct at issue was instinctual and spur of the moment.

§ 3A1.1 of the Sentencing Guidelines provides in relevant part as follows:

**Hate Crime Motivation or Vulnerable Victim**

(a) If the finder of fact at trial or, in the case of a plea of guilty or nolo contendere, the court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, disability, or sexual orientation of any person, increase by 3 levels.

---

planned in advance. There is nothing in the record to suggest that Dr. Siddiqui foresaw or planned to be captured by Afghan police authorities and then interviewed by U.S. military personnel, never mind foreseeing one of said U.S. military personnel leaving his rifle unattended where she could grab it and attempt her escape from Afghan authorities. Just stating this theory is enough to dismiss it as absurd.

[14] Again, we respectfully request the right to reply to the government's sentencing submission should they argue that under a theory of relevant conduct Dr. Siddiqui "encourage[d]" or "further[ed]" or "brought about" a federal crime of terrorism of another party.

In one of the application notes to this enhancement, special attention is drawn to the fact that "special evidentiary requirements govern the application of this subsection." § 3A1.1, Appl. Note 1. The "special evidentiary requirements" referred to include the requirement that where there is a trial the finder of fact must find "beyond a reasonable doubt" that the defendant "intentionally selected any victim ... because of the actual or perceived ... national origin ... of any person." Here, where the jury expressly found that Dr. Siddiqui's attempted murder was not planned in any manner, it is a matter of logic that she could not be characterized as having "intentionally selected" any of her victims based on their perceived national origin.[15]

Even if the Probation Office and government were to ignore the "special evidentiary requirements" of the "hate crime" enhancement, they would still fail to present evidence beyond a reasonable doubt that Dr. Siddiqui intentionally selected her victims based on their perceived national origin. Whatever Dr. Siddiqui may have shouted while in Afghan custody or right before she was shot or after she was shot (and there is certainly very little consensus between the various witnesses, both American and Afghan, as to what she said with respect to alleged anti-American sentiment), it is beyond dispute that her primary concern was not to be taken to an American prison where she believed she would be tortured or raped. See Tr. at 1820 (███ noting that Dr. Siddiqui frequently begged her Afghan captors not to turn her over to the Americans). The record as it currently stands makes perfectly clear that Dr. Siddiqui behaved like a desperate and feral captive who tried multiple times to escape from her Afghan captors. According to Afghan witnesses she struggled and bit her Afghan captors when they prevented

---

[15] Since the jury did not render a finding about premeditation with respect to the assault charges, the enhancement cannot be applied because the threshold requirement for its application is a jury finding of intentional selection. Arguably, the enhancement cannot be applied to the attempted murder charges for the same reason in that the jury was not charged directly with answering the question as to whether Dr. Siddiqui intentionally selected her victims based on perceived national origin.

40