her from escaping twice. See id. at 1821. She did not assault and bite her Afghan captors because they were Afghan; she assaulted and bit her Afghan captors because she viewed them as persons who would facilitate her transport to American officials who would, in turn, bring her to sites where she would be tortured or raped. What the record supports by implication is the proposition that Dr. Siddiqui would have struggled and bit anyone, whatever their race, ethnicity or national origin, if she perceived that they would hand her over to any authorities that would bring her to an American prison. Under such a scenario, the "hate crime" enhancement is simply not applicable.

### 4. There Is No Basis For An Enhancement For Targeting An Official Victim

Amongst the victim enhancements in the Sentencing Guidelines is one entitled "Official Victim" triggered where the victim was: "(A) a government officer or employee ... and [] the offense of conviction was motivated by such status." See U.S.S.G., § 3A1.2(a). The enhancement increases the offense level by 3 and where the conduct involves offenses against the person, such as attempted murder, the offense level is increased by 6. See U.S.S.G., § 3A1.2(a) & (b). As noted above, the Probation Office seeks to enhance Dr. Siddiqui's offense level by 6 as per subsection § 3A1.2(a) & (b). See PSR, ¶ 42.

We acknowledge that the Second Circuit has recently opined that a jury finding that a defendant who without provocation conspired to murder officers or employees of the United States is sufficient to trigger the "Official Victim" enhancement. See In re Terrorist Bombings, 552 F.3d 93, 155 (2d Cir. 2008). Here, however, it cannot be said that Dr. Siddiqui's offense conduct tracked that of El Hage. She did not carefully and deliberately plan an unprovoked attack of United States officers and employees in order to contribute to the ongoing terrorist efforts of an organization at war with the United States. As the jury found, Dr. Siddiqui's

conduct was spontaneous and unpremeditated and directed at everyone who attempted to take her captive. She struggled with her Afghan captors. She struggled with her American captors. She would have struggled with any captor. Such indiscriminate struggling as a factual matter does not satisfy the implied mens rea of the "Official Victim" enhancement, which assumes an animus that distinguishes and targets certain victims – specifically, government officers and employees. Such distinguishing and targeting posits a frame of mind that was not exhibited by Dr. Siddiqui from the moment that she was arrested in the evening of July 17th to the moment that was tried to escape twice from her Afghan captors to the moment that she tried her final escape when the U.S. Military and accompanying interview team arrived in the room where she was held.

### 5. There Is No Basis For An Enhancement For Obstruction of Justice

The Probation Office notes the government's position that Dr. Siddiqui's offense conduct may warrant an enhancement for obstruction of justice under two theories: (1) that by malingering symptoms of serious mental illness she somehow obstructed justice; and (2) that she perjured herself while testifying at trial. See PSR, ¶¶ 32-33. As the Court has conceded that at the base of Dr. Siddiqui's exaggerated symptoms lurks the possibility of serious mental illness, an obstruction of justice enhancement based on malingering is unwarranted. As for perjury, the Court should also reject this basis for the enhancement because the contradictions in statements upon which the government alleges perjury arise from interviews taken after Dr. Siddiqui was shot and on medication that spanned over many hours across two weeks. Further, Dr. Siddiqui was not prepared for her testimony. Under such conditions where Dr. Siddiqui's testimony was minutely compared and found to differ from statements made in across a hundred pages of FBI reports without the assistance of counsel to identify the government's likely questions under

cross and remind her of earlier statements, an obstruction of justice enhancement is patently unfair.

### Dr. Siddiqui's Mental Health Issues Should Not Serve As A Basis For An Obstruction Of Justice Enhancement

While the Probation Office's suggestion that Dr. Siddiqui's malingering mental illness warrants an obstruction of justice enhancement is not novel, there is certainly limited case law on the issue. It appears that the Second Circuit has yet to render an opinion that provides guidance to defense attorneys as to those circumstances where there is a bona fide basis for requesting a competence evaluation and where such a request risks providing the basis for an enhancement.

The Eleventh Circuit has provided limited guidance on the issue. See United States v. Patti, 337 F.3d 1317 (11th Cir. 2003); United States v. Diaz, No. 09-11848, 2010 WL 1767248 (11th Cir. May 4, 2010).

In Patti, the court found two bases for an obstruction of justice enhancement: (1) the defendant falsely claimed amnesia after a car accident; and (2) he engaged in arson in order to destroy incriminating documents in his accounting office. See Patti, 337 F.3d at 1325. The defendant in Patti engaged in a series of tactics to delay proceedings. He filed multiple motions for the judge's recusal. Shortly after losing these motions, he was allegedly involved in a car accident that triggered amnesia about the tax evasion for which he stood accused and after a hearing he was found to be malingering the amnesia symptoms. And then the court found believable the testimony of coconspirators who stated that they were instructed to destroy the defendant's office in order to get rid of certain documents material to the criminal proceeding. Under this set of circumstances, where feigning mental illness could be easily seen as one of many efforts to interrupt the course of the criminal proceedings, an obstruction of justice enhancement was warranted.

In Diaz, the defendant's obstructive behavior was similarly obvious. At the commencement of his criminal proceeding, the defendant claimed to be having difficulties understanding his attorney because he was under medical treatment for a brain injury suffered from a past accident. See Diaz, 2010 WL 1767248, at *9. A mental examination performed by the Bureau of Prison resulted in a finding that the defendant was malingering. See id. The defendant next decided to enter a plea of guilty. See id. He did so and then prior to sentencing he decided once again to claim that he was mentally ill, had been coerced into pleading guilty, and wished to go to trial. See id. The defendant then asserted a defense of guilty by reason of insanity, which triggered another round of evaluations resulting in another finding of malingering. See id. In fact, the defendant's own expert retained for trial could not support a finding that he was insane at the time of the offense conduct. Under these circumstances, similar to Patti in that the defendant's course of conduct was clearly intended to interrupt and delay the course of the criminal proceeding to an extent that his own expert could not provide cover by an opinion or a diagnosis of any mental illness, an obstruction of justice enhancement was warranted.

Here, the government cannot frame Dr. Siddiqui's malingering as one episode in a course of conduct meant to derail the criminal proceedings against her. In order to participate in the derailing of her own criminal proceedings, Dr. Siddiqui would have to confer with her counsel or seek the assistance of psychological staff at the prison where she is housed or write directly to the Court with applications that would slow or stop the progress towards trial or sentencing. There simply is no history of such conduct. Unlike the majority of defendants who are deemed malingerers, including the defendants in Patti and Diaz, Dr. Siddiqui never insisted that she was mentally ill nor did she seek a defense based on a mental state. Throughout the course of her

44

incarceration, she has repeatedly avoided encounters with psychological staff, encounters that might otherwise trigger concerns about her competence. As the Court knows, Dr. Siddiqui has refused to assist her counsel so we have been unable to do anything on her behalf that might place procedural hurdles in the way of trial or sentencing. Finally, in all of her correspondence to the Court, Dr. Siddiqui has done nothing that could be construed as an application that sought a hearing or procedure that proved to be a waste of time.

Most importantly, the Court has itself conceded that Dr. Siddiqui may very well have "some mental health issues" that warranted closer evaluation by experts and the Court. See Order Finding Defendant Competent to Stand Trial dated at 25. Unlike the defendants in Patti and Diaz, the assessment of Dr. Siddiqui's mental health was not unanimous amongst the experts who evaluated her. The Bureau of Prison psychologist who evaluated her changed her assessment over time, a striking indication of Dr. Siddiqui's complex presentation of symptoms. While two government experts diagnosed Dr. Siddiqui as malingering, defense counsel's expert, a psychologist who specialized in malingering, opined that she was doing no such thing. If ever there were a close call in terms of an assessment of mental illness – not perhaps the assessment of incompetence, which is a difficult standard to meet – it would be here.

Where the issue of mental illness is as present as it appears to be with Dr. Siddiqui and its relation to her ability to assist in her own defense is clear, counsel and the Court are right to proceed to a competency hearing and to clarify such an important issue. For the Court now to impose an obstruction of justice enhancement for the exploration of this issue which was at the instigation of all counsel and not Dr. Siddiqui – for she has always insisted that she is competent – would defy all common and legal sense. Thus, we respectfully request that the Court reject the

Probation Office's suggestion that the diagnosis of malingering by the government's experts is a basis for imposing a two-level enhancement on Dr. Siddiqui's offense level.

### The Government's Allegations Of Perjury Should Be Rejected And An Enhancement Based On Same Should Be Denied

According to the Probation Office, the government will seek an obstruction of justice enhancement based on Dr. Siddiqui's testimony at trial. The statements that the government views as perjurious are as follows: (1) Dr. Siddiqui's statement that she did not know how to use a gun; (2) her statement that she never took a firearm course while at MIT; (3) her statements denying writing certain documents and possessing them on the day of her arrest on July 17, 2008; and (4) her statements where she denied having made previous statements to FBI agents while they interrogated her before reading her Miranda rights and while she was heavily sedated. See PSR, ¶ 33.

### Statements About Familiarity With Firearms

It is true that the government posed questions to Dr. Siddiqui about her familiarity with firearms and the questions and answers with respect to this issue were typical of the difficulties anyone who attempts to question Dr. Siddiqui and get her to answer responsively. We respectfully submit that Dr. Siddiqui's difficulties in remaining on script is due to mental illness; the government argues that it is an indication of her cunning and manipulativeness. In any event, under conditions where answers to questions are frequently an inextricable mix of responsive and no-responsive answers such as Dr. Siddiqui provided, finding a basis for perjury is impossible. The pattern of questioning went something like the following: the government posed a question, Dr. Siddiqui provided a non-responsive answer; the government posed a series of follow-up questions, Dr. Siddiqui continued with her non-responsive answers; finally, the government bluntly posed a simple question that required a yes or no answer and Dr. Siddiqui,

46

out of frustration and untutored by her counsel not to answer a question that she could not answer as a simple yes or no, provided the yes or no answer that the government now finds perjurious and a basis for obstruction. Take, for example, the following line of questioning:

> Q. Ma'am, you have if [sic] a some familiarity with firearms, don't you?
> A. No, I don't.
> Q. Is it your testimony that you have no familiarity at all with firearms?
> A. Familiarity? I look at a gun and I know it is a gun. But I couldn't tell the different brands of them, how to use them, operate them, those kinds of things, no.
> ...
> Q. Ma'am, when you were a student at MIT –
> A. I am not that good an artist. I can tell you that. I cannot draw a hand and there are these hands.
> Q. Ma'am when you were a student at MIT, isn't it true that you took a gun course?
> A. A what course?
> Q. A gun course.
> A. Gun course?
> Q. Correct.
> A. A gun course?
> Q. Pistol safety course?
> A. Oh, you mean the physical education they had? That was a course probably. I – probably so. I may have. Everybody used to take it. I remember now. It is a possibility.
> Q. I will ask you a different question. Isn't it true in the early 1990s when you a [sic] student at MIT you took a pistol course at the Braintree Rifle & Pistol Club just outside of Boston, isn't that true.
> A. I have no recollection of that. Absolutely not.
> Q. Isn't it true as part of that course you fired hundreds of rounds on a firing range?
> A. I have no recollection of that. There is no way I can –
> Q. Well –
> A. Actually you can take that as a no.

Tr. 1731-33. Dr. Siddiqui's responses to this line of questioning pivot back and forth between yes and no. Her immediate response is to deny unqualifiedly familiarity with firearms. In the next breath, she remembers that there was a firearm course taught at MIT through physical education and she appears to remember taking the course. In the next breath, she qualifies her memory to say that "[i]t is a possibility" that she may have taken the course. When the

47

government narrows the line of questioning to a specific course that she may have taken at a rifle club in Braintree, Dr. Siddiqui then becomes confused and stated that she had no recollection of taking such a course. Note that this is not a denial of taking the course but a statement indicating her lack of memory as to taking such a course. When the government pursues this line of questioning, Dr. Siddiqui, out of frustration, characterizes her own response as no.

In reviewing this line of questioning, it is clear that Dr. Siddiqui has no sensitivity as to the importance of her thoughtful responses to the questions and she utterly lacked the kind of preparation by counsel that would have identified likely cross-examination questions and how to answer in a manner that was both careful, thoughtful, truthful without overstating what she knew or remembered. On the important question as to whether she has any familiarity with firearms, Dr. Siddiqui changed her answer dramatically from an absolute no to an absolute yes in the course of brief questioning when she suddenly remembered that course at MIT. On the issue of the Braintree course, it is likely that if the government had proceeded along this line of questioning, Dr. Siddiqui might have remembered taking this course too a few questions later. Dr. Siddiqui's dramatically changing responses to questions was due to her mental-health issues. Her refusal to confer with counsel before being examined was also due to her mental-health issues. All in all, the inconsistencies that the government wants to characterize as perjurious are, in fact, the byproduct of a mentally ill person testifying on her own behalf. It seems to defy fundamental fairness that a mentally ill person who counsel attempted to prevent from testifying for the very reason that she was bound to trip herself up in inconsistent testimony but whom the Court allowed to testify in order to protect her right to testify, should, in the end, be penalized for doing so. We respectfully request that the Court reject the

government's view that the answers to this line of questioning should serve as the basis for an obstruction of justice enhancement.

### Dr. Siddiqui's Statements About Writing And Possessing Certain Documents Do Not Warrant An Obstruction of Justice Enhancement

The statements that Dr. Siddiqui made at trial regarding documents that were in her possession at the time of her arrest follow the same pattern as the line of questioning about her familiarity with firearms: the government posed questions and Dr. Siddiqui provided partially responsive and partially non-responsive answers. The difference between this line of questioning and the line of questioning about familiarity with firearms is that here Dr. Siddiqui does not become impatient and provide an unambiguous "yes" or "no." The line of questioning was as follows:

> Q. Ma'am, you had a number of documents in your possession that day, correct?
> A. I can't testify to that either if it is correct or not. Because as I said I was in a daze. I mean, I didn't check my bags really. I didn't prepare them exactly.
> Q. Is it your testimony that you don't know whether you had documents with you that day?
> A. Did I have documents with me? What was in my bag was not – it wasn't stuff that – it was given to me, that bag.
> Q. Isn't it true that you had a number of documents that were handwritten?
> A. That I had a document – a number of documents that were handwritten.
> Q. Isn't that true?
> A. You mean in my life? ...
> A. I don't know. I mean, the bag was not mine. It was given to me. So I don't necessarily go through each and every thing in it at that day or whatever. I don't know what was put in it.
> ...
> Q. This is one of the documents that you had with you on July 17th, right?
> A. I can't testify to that as I said.
> Q. This document is in your handwriting, correct?
> A. It is a possibility.
> Q. Is it your testimony that you can't tell whether this is your handwriting or not, ma'am?
> A. No. Well, just by looking at this, I would not – I would not be able to tell but I don't want to lie. It is stuff that has been copied from a magazine and I

> remember – I can't testify to this because I don't remember the words. In the secret prison –
>
> ...
>
> The Court. She is just asking if this is your handwriting. That was her question.
> A. Just by looking at this page, I cannot say.
>
> ...
>
> Q. Now, this is another document that you had in your possession on July 17th, right?
>
> ...
>
> A. I am not claiming anything was in my possession that I know of because I don't know that that purse was given to me. I do not know what was put in it, what was added later, what was done. I don't know that.
>
> ...
>
> The Court. Is any of this your handwriting?
> A. Looking at this, I don't know.

Tr. 1728-32. In this line of questioning, it is important to note that Dr. Siddiqui refused to be pinned down on the two questions that the government appears to believe resulted in perjury: did you possess these documents on July 17th and are some of them in your handwriting. To both of these questions, Dr. Siddiqui repeatedly states in sum and substance, "I don't know." As the government fails to pin her down on either of these questions, we respectfully submit that her answers cannot be perjurious and thus a basis for an obstruction of justice enhancement.

### Dr. Siddiqui's Failure To Remember Hundreds Of Pages Of Her Prior Statements Cannot Be The Basis For An Obstruction Of Justice Enhancement

The government appears to argue that Dr. Siddiqui's statements at trial where she denied making previous statements while being interviewed for two weeks after she was shot on July 18, 2008 constitute perjury and triggers the obstruction of justice enhancement. As mentioned above, in light of Dr. Siddiqui's mental-health issues and the fact that counsel did not have the opportunity to review with her statements that she allegedly made and were memorialized in so-called 302 reports, the Court should not impose an obstruction of justice enhancement for any alleged inconsistencies between her post-arrest statements and her trial testimony.

At trial, the government confronted Dr. Siddiqui with the following post-arrest statements that she made while heavily medicated and recovering from a gunshot wound over the course of approximately two weeks of interviews that spanned whole days without being read her Miranda rights or offered the assistance of counsel to protect her rights by providing advice and taking copious notes of what was being said. First, the government noted that Dr. Siddiqui had stated to Agent "Bruce" that she picked up the gun to look at it. See Tr. at 1746. In response to which, she emphatically denied every speaking to "Bruce," but a few seconds later she observed, "I don't remember at all which day I spoke to what and who." Tr. at 1747. Second, the government confronted Dr. Siddiqui with having asked "Angela" what sentence a person would receive in the United States for attempted murder. See Tr. at 1748. To which Dr. Siddiqui responded, "I don't remember that at all. I don't remember, but she used to talk a lot about a lot of things. I don't remember asking that." Id. A few moments later, the government confronted Dr. Siddiqui with having observed to "Angela" that "spewing bullets at soldiers is bad but everyone there was still taking care of you." Id. In response to being confronted with this statement, Dr. Siddiqui remembered during the course of her interviews that an agent joked in her presence that there were numerous versions as to what occurred in the room where Dr. Siddiqui was shot and her statement may have arisen in the context where the versions were being humorously recounted. See Tr. at 1749. The government next confronted Dr. Siddiqui with having asked "Angela" what a person would be charged with if they shot a gun but ended up being shot themselves. See id. Dr. Siddiqui responded, "I don't remember those words. Those are not my words. I don't talk like that at all." Id. The government asked Dr. Siddiqui if she had stated that she was surprised that the United States was "taking such good care of you under the circumstances." Tr. at 1750. Dr. Siddiqui responded, "I don't know about that, but it

51

is not a surprise for me that the U.S. took care – took care." Tr. at 1750. When the government tried to return to the question as to whether Dr. Siddiqui had admitted to possessing certain documents allegedly found in her possession while being interviewed by "Angela," she stated, "I can't – well, I didn't -- I don't remember telling her that I had them ever in my possession." Tr. at 1751. In a final effort to get Dr. Siddiqui to admit that she had stated to "Angela" that she had prepared certain documents allegedly found on her person on the night of her arrest on July 17, 2008, she replied as follows:

> I did not prepare anything. I did mention translating something from an English book that was some kind of an Army manual that was given to me, lied to me, saying that whatever, but it was under torture of children. That's why I ask everybody repeatedly, how much can you bear it? If anybody can, I would like to see, and then I didn't see it doing any harm to anybody. But I'm not claiming that picture you show. I don't draw. I could never have drawn those pictures, so I don't know what that's all about.

Tr. at 1753. Upon close examination, Dr. Siddiqui's response to the government's question hinges on her understanding of "prepare," by which she means the creator of the content rather than the scribe. As the government does not clarify its understanding of "prepare" as being synonymous with either "creator" or "scribe" or both, Dr. Siddiqui's answer remains ambiguous and impervious to a claim of perjury.

In reviewing this line of questioning in which the government confronted Dr. Siddiqui with statements that she allegedly made to agents, it must be emphasized that all but one of her responses is to the effect of "I don't know." The only statement that she emphatically denies making is the one she allegedly made to "Bruce" (i.e., picking up the gun) and even with respect to this statement she qualified her emphatic denial by noting that she did not remember who she spoke to or what she said during the course of these interviews. See Tr. at 1747. Thus, her emphatic denial of the statement to Bruce was only transitory.

52

In light of the fact that Dr. Siddiqui does not affirmatively deny making any of the statements with which the government confronts her at trial, she cannot be said to have engaged in perjury. Even if she could be accused of inconsistent statements, which we do not believe she can, the circumstances of these ongoing interviews would make it fundamentally unfair to penalize her for perjury. She was recovering from a gunshot wound and heavily medicated at the time. She had no idea how she was going to be treated by officials of a country that she believed was going to bring her to Gitmo and torture her so she was probably anxious to please her captors. She did not have the assistance of counsel to advise her as to the care with which to present her statements, to help her clarify her statements and to copiously write down her statements as they were said in order to compare them with the 302s that the government eventually generated after the fact. Finally, Dr. Siddiqui was without the assistance of counsel at the time of trial when she took the stand on her own behalf. In a case where there is at least a hundred pages of post-arrest statements, counsel ordinarily requires weeks to prepare a defendant in anticipation of cross-examination where the prosecutor will certainly monitor testimony for the slightest deviation from prior statements. It is a challenging task for attorney and client to keep these statements in mind and recount the narrative of the offense conduct in line with the previous statements. Here, Dr. Siddiqui, due to her mental illness, effectively had no access to counsel to prepare for her examination and for all we know never reviewed the 302s that summarized her previous statements. Quite frankly, it would be startling under such circumstances if Dr. Siddiqui remembered everything she had previously said. Being human, and a highly troubled human at that, Dr. Siddiqui failed to remember statements that she had made to agents, hardly a basis for characterizing her testimony as perjurious and a basis for an obstruction of justice enhancement.

### 6. Dr. Siddiqui Is Not Subject To A Mandatory Minimum Of Thirty Years Because The Fact That She Allegedly Used A Machine Gun Was Not Decided By The Jury

Count 4 charged a violation of section 924(c)(1)(B), alleging in the relevant section that "during and in relation to a crime of violence for which she may be prosecuted in a court of the United States, *used, brandished and discharged* U.S. Army Officer One's M-4 rifle *(a machinegun)* in connection with the crimes described in Counts One, Two and Three." Indictment, ¶ 12 (emphasis added).

According to 18 U.S.C. § 924(c)(1)(A), the use, carrying or possession of a firearm, in conjunction with a crime of violence, triggers the following penalties:

(i) [] a term of imprisonment of not less than 5 years;
(ii) if the firearm is brandished, [] a term of imprisonment of not less than 7 years; and
(iii) if the firearm is discharged, [] a term of imprisonment of not less than 10 years.

18 U.S.C. § 924(c)(1)(A).

According to 18 U.S.C. § 924(c)(1)(A), if the firearm possessed by a person convicted of a violation of the same subsection is a "machine gun" that "person shall be sentenced to a term of imprisonment of not less than 30 years." 18 U.S.C. § 924(c)(1)(B).

The allegation that U.S. Army Officer One's M-4 rifle was a machinegun situated the alleged conduct in subsection (B)(ii) and, consequently, mandated a term of imprisonment of not less than 30 years. Alternatively, if the weapon were not found to be a machinegun, as alleged, then the allegation that Dr. Siddiqui used, brandished, and discharged the weapon situated the conduct in subsection (A)(i), requiring a mandatory minimum term of imprisonment of not less than 10 years consecutive to any other sentence but only if it were determined that she discharged the weapon. In short, Count 4 alleged a violation of subsection 924(c)(1)(B), along with all of the lesser crimes included in subsection 924(c)(1)(A).

In contrast to Count 4's allegation that Dr. Siddiqui had discharged a machine gun during the commission of a violent felony, the Court, at the government's request, and over defense counsel's objection, confined its instructions to the jury to the least serious course of conduct contemplated by section 924(c)(1)(A) – that of simple use of a firearm during the commission of an offense.[16] To wit, the Court instructed the jury as follows:

> To satisfy the second element of Count Four, the government must prove beyond a reasonable doubt that the defendant knowingly *used or carried a firearm* during and in relation to the commission of the underlying crime of violence. Count Four alleges that the defendant did *"use and carry" a firearm*. Where, as here, both using and carrying are charged, the government need only prove one or the other, not both.

Tr. at 2077 lines 11-16.

The Court further defined a firearm for the jury as "any weapon which will or is designed to, or may be readily converted to, expel a projectile by the action of an explosive." Tr. at 2077 lines 11-16. Pursuant to the Court's instruction, the jury was therefore not required to find, as an element of the crime, that the firearm used by Dr. Siddiqui was a "machinegun." Instead, the jury could, and necessarily did, find only that Dr. Siddiqui used a "firearm," placing her conduct within subsection (A) rather than subsection (B) as had been alleged.

Despite the fact that jury was not instructed on whether or not the firearm allegedly used by Dr. Siddiqui was a machinegun, the PSR recommended that the minimum sentence for Count 4 was 30 years, based on her use of a machinegun. Because the jury was not required to address the issue of whether the firearm used by Dr. Siddiqui was a machine gun, this recommendation is premised on the erroneous belief that application of the mandatory minimum for use of a machine gun contained in subsection (B) was a sentencing factor that could be applied by the Court, rather than an element of the crime.

---

[16] The defense objected to the instruction requested by the government for failing to allege that the weapon in question was the M-4 rifle.

55

The proper role of the jury in the application of the "machinegun" mandatory minimum has been the subject of extended debate and contrary findings within the Federal courts. Compare United States v. Branch, 91 F.3d 699 (5th Cir. Tex. 1996) and United States v. Alborola-Rodriguez, 153 F.3d 1269 (11th Cir. Fla. 1998) (sentencing factor for court) with United States v. Alerta, 96 F.3d 1230 (9th Cir. Guam 1996) (element for jury). The Supreme Court initially ended the circuit split in Castillo v. United States, 530 U.S. 120 (U.S. 2000) by finding that pursuant to the then existing language of section 924(c)(1), the use of a machinegun was an element of the offense that had to be found by the jury. Thereafter, Congress amended the language of section 924(c)(1) setting off the debate anew, resulting once again in a split within the Circuits as to whether the use of a machinegun was an element. Compare United States v. O'Brien, 542 F.3d 921 (1st Cir. Mass. 2008) (holding that whether the weapon was a machinegun is a factual element to be determined to the jury) with United States v. Cassell, 530 F.3d 1009 (D.C. Cir. 2008) (holding that machinegun is a sentencing factor).

Whatever debate that existed concerning the role of the jury at the time that the PSR was prepared, however, has been quashed in the interim by the Supreme Court's decision in United States v. O'Brien, 130 S. Ct. 2169 (U.S. 2010). In O'Brien the defendants carried firearms during an attempted robbery of an armored car. Count 3 of their indictment charged them with a violation of subsection 924(c)(1)(A)(i). Count 4 further alleged that one of the weapons carried by the defendants was machinegun, in violation of subsection 924(c)(1)(B)(ii). Prior to trial the Government moved to dismiss Count 4, maintaining that subsection 924(c)(1)(B)(ii)'s machinegun provision remained as a sentencing enhancement to be determined by the District Court upon a conviction of Count 3. See id. A unanimous Court rejected the Government's assertion, holding that "(t)he fact that a firearm was a machinegun is an element to be proved to

the jury beyond a reasonable doubt, not a sentencing factor to be proved to the judge at sentencing." Id.

The same necessarily holds true in this case. Although the Government did not move for the Court to dismiss the allegation that the weapon used was a machinegun, as was the case in O'Brien, they accomplished the equivalent by requesting that the Court instruct the jury only on the use of a firearm, rather than adding an element for the machinegun. Because the additional element of whether the weapon used was a machinegun was out of the jury's consideration, the conduct considered by the jury with regards to Count 4 was necessarily limited to a violation of subsection 924(c)(1)(A).

Subsection 924(c)(1)(A) contains three potential mandatory minimum sentences for use of a firearm—five years for simple use, seven years for brandishing, and ten years for discharging of a firearm. Pursuant to Harris v. United States, 536 U.S. 545 (U.S. 2002) the question of which of the mandatory minimum applies in the defendant's case is sentencing factor that may be determined by the Court.

Counsel concedes that the jury's finding of attempted murder requires the Court to find that the defendant took a substantial step by brandishing or discharging a firearm.[17] Because the PSR did not address the question of whether Dr. Siddiqui brandished or discharged the firearm, the Court would be within its rights to return the report for reconsideration of the issue. Counsel,

---

[17] The jury instruction left all possibilities open. See Transcript at 2077, line 25 and 2078 lines 1-5 ("This does not mean that the defendant must actually fire or attempt to fire the weapon, although those obviously would constitute use of the weapon. Brandishing, displaying, or even referring to the weapon so that others present knew that the defendant had the firearm available if needed all constitute use of the firearm.") Despite this fact, counsel acknowledges that because Dr. Siddiqui was convicted of attempted murder, she necessarily must have taken a substantial step toward the commission of a crime. While substantial step would not have required her to actually discharge a firearm, the jury necessarily found that she brandished it with the intent to fire in order to satisfy a guilty verdict on attempted murder.

however, does not believe that this is necessary, given the Court's familiarity with the facts in this case.

However, counsel submits that the evidence proffered in this case does not show that Dr. Siddiqui necessarily discharged a firearm. While the Government's witnesses uniformly reported that Dr. Siddiqui discharged a weapon, there is substantial reason to believe that she did not. The forensic evidence simply failed to confirm that she discharged a weapon. There was no gun shot residue, bullet fragments or shells recovered at the scene of the crime that could have been traced to an M4 rifle. This stands in sharp contrast to the ample forensic evidence left by the bullets from the pistol that was used to shoot Dr. Siddiqui. Moreover, the photographs of the scene taken *before the incident* clearly establish error in the Government's theory that she fired two shots into the wall behind the soldiers.

In light of the forensic evidence and the divergent accounts of U.S. military witnesses as to the specific issue as to how many shots Dr. Siddiqui allegedly fired and where she was aiming, we respectfully submit that the Court can find only that she brandished the M-4 on the day that she was shot. Thus, she is subject only to a mandatory minimum sentence of 7 years consecutive to any other sentence that the Court may impose.

### 7. Conclusion

It is the position of defense counsel that Dr. Siddiqui's adjusted offense level is 27 and her Criminal History Category is I. Her base offense level is 27 as per § 2A2.1(a)(2). As none of the enhancements suggested by the government and the Probation Office are applicable, Dr. Siddiqui's adjusted offense level is also 27. With a Criminal History Category of I and an offense level of 27, Dr. Siddiqui's advisory Sentencing Guidelines is 70-87 months. As Count Four requires a mandatory consecutive sentence of 7 years, any term of prison that the Court

imposes for the other Counts must be followed by a mandatory minimum sentence of 7 years. If the Court were to impose the lowest possible sentence within the advisory Sentencing Guidelines range and the mandatory minimum of 7 years required by Count Four, Dr. Siddiqui would receive a sentence of 154 months or between 12 and 13 years. For the reasons outlined below, we respectfully request that the Court impose a sentence of 12 years.

## CONCLUSION

For all the reasons outlined above, we respectfully request on behalf of Dr. Siddiqui that the Court impose a sentence of 12 years.

Dated: July 15, 2010
      New York, New York

DAWN M. CARDI & ASSOCIATES

/s/

Dawn M. Cardi
Chad L. Edgar
Two Park Place, 19th Floor
New York, New York 10016
212.481.7770 (tel.)
212.684.3008 (fax)
cardiesq@aol.com
*Attorneys for defendant Aafia Siddiqui*

/s/
Linda Moreno, Esq.
P.O. Box 10987
Tampa, FL 33697
813.247.4500 (tel.)
813.386.6211 (fax)
*Attorney for Aafia Siddiqui*

_/s/_
Charles Swift, Esq.
SWIFT & MCDONALD, P.S.
2003 Western Avenue, #330
Seatlle, WA 98121
206.441.3377 (tel.)
206.448.2252 (fax)
*Attorney for Aafia Siddiqui*

_/s/_
Elaine Whitfield Sharp, Esq.
196 Atlantic Avenue
Marblehead, MA 01945
781.639.1862 (tel.)
781.639.1771 (fax)
*Attorney for Aafia Siddiqui*