UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA,

                                         08 Cr. 826 (RMB)

   - against -                                   ~~Redacted~~

AAFIA SIDDIQUI,

                        Defendant.

-------------------------------------------------------X

## EXHIBITS FOR THE SENTENCING MEMORANDUM
## OF DEFENDANT AAFIA SIDDIQUI

DAWN M. CARDI & ASSOCIATES
 Dawn M. Cardi, Esq.
 Chad L. Edgar, Esq.
Two Park Avenue, 19th Floor
New York, New York 10025
Tel.: 212.481.7770
Fax: 212.684.3008
*Attorneys for Aafia Siddiqui*

Linda Moreno, Esq.
P.O. Box 10987
Tampa, FL 33697
Tel. (813) 247-4500
Fax (813) 386-6211
*Attorney for Aafia Siddiqui*

SWIFT & MCDONALD, P.S.
 Charles Swift
2003 Western Avenue, #330
Seattle, WA 98121
Tel. (206) 441-3377
Fax (206) 448-2252
*Attorney for Aafia Siddiqui*

Elaine Whitfield Sharp, Esq.
196 Atlantic Avenue
Marblehead, MA 01945
Tel. (781) 639-1862
Fax (781) 639-1771
*Attorney for Aafia Siddiqui*

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- X

UNITED STATES OF AMERICA,

      -  against -

AAFIA SIDDIQUI,

                       Defendants.

--------------------------------------------------------------- X

08 CR 826 (RMB)

**Redacted**

## SENTENCING MEMORANDUM OF DEFENDANT AAFIA SIDDIQUI

Defendant Aafia Siddiqui (hereafter, "Dr. Siddiqui" or "Siddiqui"), through her undersigned counsel, respectfully submits this Sentencing Memorandum, along with the annexed exhibits, for the Court's consideration in connection with her sentencing scheduled for August 16, 2010 at 9:30 a.m. Under all of the factors enumerated in 18 U.S.C. § 3553(a), Dr. Siddiqui respectfully requests that the Court impose a sentence of twelve years or 144 months, a sentence that is only slightly below the advisory Sentencing Guidelines range urged by defense counsel.

## INTRODUCTION

Dr. Siddiqui now stands before this Court, driven to the conduct for which she has been convicted, by mental illness. Still suffering from mental illness, she faces the possibility of life imprisonment in a United States prison. While the degree and extent of Dr. Siddiqui's mental illness has been the subject of much discussion in this case, one thing stands perfectly clear: the victim of Dr. Siddiqui's irrational behavior is—first and foremost—none other than herself.

It was her bizarre behavior that first aroused suspicion in Ghazni, Afghanistan, a land where all suspicious activity is presumed a possible threat. Once seized, and confirmed not to pose a threat by the Afghani law enforcement, her mental illness nonetheless prevented her from extricating herself from arrest. Cut off from any form of rational thought and fueled by the United States's shameful history of extraordinary rendition and torture at black sites such as Abu Ghraib, Bagram and the Dark Prison, she believed the worst when the United States interrogation team suddenly appeared. Cornered in the Afghan National Police compound, and left to her own devices, Dr. Siddiqui tried, by any means available, to escape what she viewed as a horrific fate. This is clearly what the jury determined when it found no premeditation for her actions. She was shot in the process, charged with attempted murder, and subsequently convicted of the same.

Most telling of her mental state was Dr. Siddiqui's self-destructive behavior before this court. During the proceedings, she declared a boycott of the trial, rejecting experienced defense counsel, subjecting the court to frequent, nonsensical outbursts, and refusing to meet with her counsel and ultimately, in the wake of her conviction, the Probation Officer. None of these acts was to her advantage. Contrary to Dr. Siddiqui's declaration of a boycott, she later took the stand, though counsel, who never got the opportunity substantively to confer with her, tried to prevent her from doing so convinced as they were of her serious mental illness. Her testimony, however, was not that of a terrorist with a political agenda. Instead, like everything else that Dr. Siddiqui has done, it was self-destructive. This pattern of behavior, exhibited by Dr. Siddiqui from her moment of seizure, through trial, is consistent with Dr. Rosenfeld's finding that she may be a "victim of some significant trauma," and has a "psychotic mental disorder," See Ex. A at 7 & 11.

2

Still, the Probation Office has arrived at an advisory Sentencing Guidelines range of life imprisonment, basing its analysis, in large part, on enhancements for a premeditated attempted murder and terrorism in relation to that attempted murder and a 30-year mandatory minimum for the use of an automatic weapon in the course of that conduct. None of these bases is legally justified, as set forth in what follows. The enhancement for premeditated murder necessarily collides with the jury's finding of no premeditation and is thus inappropriate under the facts of this case. The machine gun enhancement was clearly rejected by the Supreme Court's recent unanimous decision in United States v. O'Brien, 130 S. Ct. 2169 (2010), under facts analogous to those here, and thus cannot legally be applied. Finally, and perhaps most importantly, the terrorism enhancement passes neither the factual nor legal tests set out by the Second Circuit for applicability.

There was nothing found on Dr. Siddiqui the day that she was arrested that suggests that she was planning, supporting, or encouraging a terrorist operation, or had knowledge about the same. Though this was certainly not from a lack of an effort to find such evidence on the part of the Afghan and United States governments. Fearing that she might be wearing an explosive vest, the Afghans who stopped and searched her came to realize that she had nothing on her person that enabled her to blow up herself or anyone else. Convinced that Dr. Siddiqui was sent to deliver documents or messages to an individual in Afghanistan, United States investigators came away with nothing after an interview of the suspected recipient. Certain Afghan witnesses also alleged that Dr. Siddiqui was drawing a map of the Ghazni governor's compound or a nearby mosque on the day that she was arrested but that map was never located. The government even went so far as to evaluate Dr. Siddiqui's blood for evidence of "liquid clear" that is sometimes

used by suicide bombers to give them drug-induced courage to complete a suicide mission. The results were negative.

As for the evidence that was *found* on Dr. Siddiqui, none suggests a link to terrorism. United States investigators combed the thumb drive found in her possession for encrypted messages to jihadist cells, concluding that suspected messages in files were actually the product of random keystrokes. Moreover, while the government makes much of the documents that Dr. Siddiqui had on her person—containing notes on various so-called "mass-casualty attacks" on United States cities and landmarks—at least two experts retained by defense counsel have noted that these notes are mostly nonsensical and, in fact, probably indicative of serious mental illness.

In the end, the government could not come up with anything persuasive to ground Dr. Siddiqui's activities on July 17, 2008 with terrorist activity, and consequently, never superseded the indictment with a terrorism charge. The government's tacit recognition of the fact that Dr. Siddiqui is not involved in terrorist activity is supported by Mr. Abdul Qadeer, Head of the Terrorism Unit at the Afghan National Police headquarters, who concluded the same. As to the government's theory that Dr. Siddiqui was being used – or, worse yet, offered her expertise – to produce biological or chemical weapons for terrorist organizations, we offer the Court the opinion shared by both of the forensic evaluators retained by defense counsel. Both Dr. Kucharski and Dr. Rosenfeld examined the documents that the government characterized in its closing as a "roadmap for destruction, documents that talk about attacking the United States and lay out in painstaking detail how to do that," Tr. at 1933, and both came to the conclusion that these documents present "implausible ideas and beliefs."[1] See Ex. A at 6; see also Forensic

---

[1] All references to the trial transcript are denoted "Tr."

Psychological Evaluation of Dr. Kucharski dated June 20, 2009 at 11 (assessing the writings found in her possession and that troubles the government as "grandiose" and "psychotic").

What we are left with is a defendant who is clearly her own worst enemy. Mentally ill and caught in the crossfire of a war that is no longer fought on conventional battlegrounds, Dr. Siddiqui's self destructive behavior got her shot once in the abdomen, charged with attempted murder, and—undermining any form of defense convicted of the same. Notably, while the government cannot point to a single person who was harmed by Dr. Siddiqui's behavior, they seek enhancements to her advisory Sentencing Guidelines range that will result in a life of imprisonment. We believe that such a sentence would be a miscarriage of justice and a disinterested review of the record will result in the view that a sentence in the range of 12 years is reasonable.

## ARGUMENT

Section 3553 of Title 18 of the United States Code controls what factors a court is to consider when sentencing a defendant who has been convicted of a crime. In United States v. Booker, the Supreme Court held in the second of two different majority opinions that two provisions must be severed and excised from the federal sentencing statute: 18 U.S.C. § 3553(b)(1), which mandated the use of the United States Sentencing Guidelines; and 18 U.S.C. § 3742(e), which set forth the standards of review on appeal. 125 S. Ct. 738, 764 (2005). After Booker and now Gall v. United States, the Supreme Court has made clear that the advisory United States Sentencing Guidelines have become only one of the many factors that a sentencing court must consider when imposing a sentence. See Gall v. United States, 552 U.S. 38 (2007) ("The Guidelines are not the only consideration … the district judge should [] consider all of the §3553(a) factors to determine whether they support the sentence requested by a party"). Another

5

factor that a sentencing court must consider is any relevant policy statements issued by the

United States Sentencing Commission within the United States Sentencing Guidelines. See 18

U.S.C. § 3553(a)(5); United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).

**I.      18 U.S.C. § 3553(a) Considered**

The factors a court is to consider when sentencing a criminal defendant are enumerated in

18 U.S.C. § 3553(a). The statute states in pertinent part: "The court shall impose a sentence

sufficient, but not greater than necessary to comply with the purposes set forth in paragraph (2)

of this subsection." The purposes of sentencing set forth in paragraph (2) of the subsection and

introduced by the phrase "need for the sentence imposed" are as follows:

      A.    to reflect the seriousness of the offense, to promote respect for the law, and to
             provide just punishment for the offense;

      B.    to afford adequate deterrence to criminal conduct;

      C.    to protect the public from further crimes of the defendant; and

      D.    to provide the defendant with needed educational or vocational training, medical
             care, or other correctional treatment in the most effective manner.

Other considerations the Court is to consider as enumerated under § 3553 are "the nature and

circumstances of the offense and the history and characteristics of the defendant"; "the kinds of

sentences available"; "any pertinent policy statement issued by the Sentencing Commission ...";

"the need to avoid unwarranted sentence disparities among defendants with similar records who

have been found guilty of similar conduct"; and finally, "the need to provide restitution to any

victim of the offense."

As a result of Booker and Gall, a sentencing court has greater discretion to consider all of

the sentencing factors listed in 18 U.S.C. § 3553 rather than relying strictly on the United States

Sentencing Guidelines.  United States v. Crosby, 397 F.3d 103 (2d Cir. 2005); see also Gall, 552

U.S. 38 (2007).

    A.    **The Nature And Circumstances Of The Offense**
           **And The History And Characteristics Of Dr. Siddiqui**

        1.    **The Nature And Circumstances Of The Offense**
               **To Which Dr. Siddiqui Pled**

**Dr. Siddiqui's Arrest, Detainment and Subsequent Shooting**

On July 17, 2008, Dr. Siddiqui came to Ghazni City in Afghanistan and behaved in a way

that warranted investigation by the local police.  From a second-hand source, it is alleged that Dr.

Siddiqui loitered outside a store in the market area of the city all day and into the early evening

when the store was actually closed.  See document bearing Bates numbers 1714, a copy of which

is annexed hereto as Exhibit "B."[2]  Unfortunately for Dr. Siddiqui, her loitering coincided with a

warning allegedly given to the local ████████ who was warned that a woman and small child

might be coming to Ghazni City to "make trouble."[3]  See id.  As discussed later, the accounts

that the local ████████ gives of Dr. Siddiqui's arrival and detention have troubling credibility

issues.  When the local police received a call from a local merchant who alerted them that Dr.

Siddiqui was hanging out in the market with her son, the local authorities, including ████████

████████ of the Afghan National Police, drove to the market to confront Dr. Siddiqui.

---

[2] For the Court's convenience, we annex in Exhibit B documents that defense counsel received
from the government in the course of discovery bearing Bates numbers.

[3] We assume that the government does not credit the theory that the "trouble" that Dr. Siddiqui
came to "make" in Afghanistan when she was arrested in Ghazni was to distribute documents
instructing the Taliban how to make explosives to "destroy the foreigners and government army"
as suggested by her son in an interview with and written up by Afghan authorities.  See Ex. B at
1296 ("Two days later we headed to Ghazni to distribute the materials").  The absurdity of this
allegation is obvious – the documents seized from Dr. Siddiqui were written in English and
Urdu, neither of which is a language spoken in Afghanistan (such as Dari or Pashto).  This
interview of Dr. Siddiqui's son – containing as it does a patent absurdity – casts grave doubt on
the account he gives of his and Dr. Siddiqui's movements and purpose in coming to Afghanistan.

The encounter between ████████ and Dr. Siddiqui was complicated by the fact that they did not speak a common language and taking her into custody would require the assistance of a woman because local custom prohibited any physical contact between a man and a woman who were strangers to each other. In order to speak with her, ████████ secured the assistance of a local shopkeeper who spoke Urdu, Dr. Siddiqui's language. See Ex. B at 1386-87. He also sent his driver ████ to a local organization to obtain the assistance of a woman should there be a need to detain Dr. Siddiqui.

At some point in the questioning of Dr. Siddiqui, while ████ was seeking the assistance of a woman, she dropped documents that she was holding. Accounts vary as to the nature of these documents and why they provoked the authorities immediately to arrest her before they were able to procure the assistance of a woman. The witnesses to the arrest who remembered specific documents that caused their alarm remembered different items – ████████ remembered a drawing of an IED and the shopkeeper remembered a map indicating landmarks in Ghazni City like the governor's mansion and another office. See Ex B at 1714 and 1721-22. Significantly, neither of these documents that allegedly caught the attention of witnesses to Dr. Siddiqui's detainment   and caused them to think that she might be "trouble" and therefore should be immediately arrested – have ever been produced to defense counsel. While we understand that the night of Dr. Siddiqui's arrest was windy and some of the documents that she dropped may have blown away, we do not see how these memorable documents could have been carefully reviewed by those arresting her on a dark night and then subsequently lost to the wind.

While there have been many accounts as to what Dr. Siddiqui was shouting at the time that she was arrested (and subsequently while she was in Afghan custody), the only agreement is that she repeatedly shouted "Allah Akbar." See Ex. B at 1721-22 (the shopkeeper heard Aafia

8

shouting "Allah Akbar" and something to the effect of "you are not Muslims … you are all like the Americans"); 1717 (██████ ████████████████ heard her shout "Allah Akbar" and something to the effect of "you guys are Americans and not Afghans" (even though it is never explained explicitly how what he heard could differ from the translating shopkeeper because ███████ did not understand either English or Urdu)); 1715 (████████ heard her say only "Allah Akbar"); 1723-24 (████████, the bodyguard for ████████, heard her say only "Allah Akbar"). During his deposition, Mr. Abdul Qadeer, the head of the Terrorism Section of Ghazni Province, noted that people believed that Dr. Siddiqui was a suicide bomber because she kept shouting "Allah Akbar," an exhortation that suicide bombers have been known to invoke to steel themselves to the task at hand. See Deposition of Mr. Abdul Qadeer, a copy of which is annexed hereto as Exhibit "C," at 3-4. Notably, Mr. Qadeer came to believe that Dr. Siddiqui was not a suicide bomber since she had nothing on her person that could be construed as or were the actual ingredients for an explosive. See Ex. C at 4 & 33 ("This letter was written in the beginning, when she was said to be a suicide bomber. At the end when it was clear that she wasn't, I regret why I signed it").

Dr. Siddiqui possessed sodium cyanide when she was arrested. As is well known, sodium cyanide is "weaponized" by either mixing it with an acid, such as sulfuric acid, to produce the highly toxic gas hydrogen cyanide or by placing it into water supplies in salt form (the form in which it was found on Dr. Siddiqui's person). Notably, technicians working on behalf of the Federal Bureau of Investigation did not find any acid amongst Dr. Siddiqui's possessions at the time of her arrest. See Ex. B at 1653-65. Further, the government has not suggested that Dr. Siddiqui's conduct at the time of her arrest suggested that she was intending to contaminate any water supplies with sodium cyanide.

In fact, it is indisputable that the government committed tremendous resources to investigating whether Dr. Siddiqui was in fact on a terrorist mission the day that she was arrested. As the government never superseded her indictment to include a count that related to possible participation in terrorist activity, the government's effort to link Dr. Siddiqui with terrorism has proven to be wholly unsuccessful.

First, the government examined Dr. Siddiqui's blood obtained at the time of her arrest and found no traces of any discernible chemicals associated with chemical warfare. See id. at 1630-32. Second, the government engaged cryptologists to interpret possible coded messages found on the thumb drive that Dr. Siddiqui possessed at the time of her arrest and the analysis of the coded messages was that they were the product of random keystrokes. See id. 1711-13. Third, the government had chemists examine Dr. Siddiqui's blood to see if there were any traces of a chemical nicknamed "liquid courage" used by some terrorists to give them strength and courage while on a suicide mission and again the results were negative. See id. at 688-89. Fourth, the government interviewed someone in Afghanistan, presumably in the Ghazni City area, that they believed was the intended recipient of alleged messages on the thumb drive but the result of that interview apparently did not support the government's theory that she was a terrorist. See id. at 770-72 and letter to defense counsel from the government dated April 23, 2009 at 2 (5th bullet point) annexed hereto as Ex. "D."

When Dr. Siddiqui was transported back to the Afghan National Police headquarters, what occurred during the course of her interrogation becomes murky, not least because the discovery that we have regarding this time period is heavily redacted, including the redaction of the names of Afghan witnesses who were interviewed by the government with respect to her detainment. The salient events of her Afghan custody appear to be the following. She made two

10

attempts to escape her captors by trying to jump through windows in a room on the first floor of the Afghan National Police headquarters ("ANP headquarters") and then again in the room on the second floor where the shooting took place. See Ex. C at 5 & 19. Apparently, Dr. Siddiqui was terrified of being turned over to American authorities and thus frequently begged her Afghan captors not to do so. See Tr. at 1820 (███████ deposition testimony); Ex. C at 18. She was interviewed or observed by a number of Afghan authorities while she was held at the ANP headquarters: the ███████ (see Ex. B at 1726 & 1730), the ███████ driver named ███████ (see id. at 1719-20), and the two Afghan officials deposed by the parties – ███████ and Qadeer. She was also observed by Captain Caleb Threadcraft on the evening of July 17th when he attempted to take custody of Dr. Siddiqui pursuant to orders from his command. See Tr. at 251.

We know from Qadeer's deposition that the interviews that the government took of Afghan witnesses have troubling credibility problems. For example, the government interviewed Qadeer in August and again in October of 2008 and in questioning him they either elicited responses or mistranslated his responses in a manner that was in conformity with what the American witnesses testified in court (that Dr. Siddiqui came out from behind the yellow curtain and grabbed a rifle placed at rest next to an American soldier) but ran counter to what Qadeer saw with his own eyes and to which he testified at his deposition – that a U.S. soldier went behind the curtain and then shots were fired. See Ex. C at 12-13, 20-21. The disjunct between Qadeer's interviews by government authorities and his deposition suggests among other possibilities that the Afghan witnesses interviewed in the aftermath of the shooting did not recognize the solemnity of the interview process; or there were translation or interpretation problems during the course of the interviews; or they were under pressure from whatever source to present a narrative that conformed with those of the American witnesses. Whatever the reason

11

may be for Qadeer's initial misrepresentations in interviews by the government, any and all interviews of Afghan witnesses must be viewed with a skeptical eye, unless the persons being interviewed were subjected to the kind of cross examination that occurred at the depositions of both ▒▒▒ and Qadeer.[4]

If we take as true the accounts of witnesses who saw Dr. Siddiqui while in Afghan custody and were subject to cross examination – here, that would mean ▒▒▒, Qadeer and Colonel Threadcraft – the following conduct and statements may be attributed to her. She frequently shouted "Allah Akbar." See Tr. at 251 (Threadcraft); Tr. at 1822 (▒▒▒▒); Ex. C at 3. She pleaded with her captors not to hand her over to the Americans. See Tr. at 1820 (▒▒▒▒'s deposition testimony). She misidentified herself by giving the name of Saleha. See Ex C at 18. She lied about her educational background by stating that she had only a twelfth-grade education. See id. She told Ahmed to follow her lead in terms of disclosing information. See Tr. at 1801. And she attempted to escape her captors twice and when she was prevented from

---

[4] We would note that the government's initial interview of ▒▒▒ proved sorely inadequate. During the government's cross examination of ▒▒▒ at his deposition, it became clear that the government failed to establish at his initial interview that he was in the room when the shooting occurred. Somehow the government, through faulty questioning or mistranslation during the interview or mis-transcription after the fact, came to believe that at the time of the shooting ▒▒▒▒ was in a room interviewing Ahmed down the hall from the room where the shooting occurred. See Tr. at 1827-30. By way of another example, in the course of one of his early interviews, at a time when he would have recent events fresh in his mind, the ▒▒▒▒ stated that Dr. Siddiqui and her son were brought to the governor's mansion to be interviewed immediately after their arrest. See Ex. B at 1726-27. Notably, during this interview of the ▒▒▒▒▒, the person who arrested Dr. Siddiqui, ▒▒▒▒▒▒▒, was present and could have corrected the ▒▒▒▒▒ as to this detail but did not. See id. at 1727. During his subsequent interview, on August 21, 2008, a month after the arrest of Dr. Siddiqui, the ▒▒▒▒▒ corrected his earlier account and stated that he traveled to the ANP headquarters to speak with Dr. Siddiqui. See id. at 1730. Conveniently for the purposes of the government's theory that Dr. Siddiqui is a terrorist, while the ▒▒▒▒▒▒ could not remember the sequence as to where and when he interviewed Dr. Siddiqui, he remembered her screaming something to the effect that he was a dog of the Americans and that he and his colleagues would die like the Americans. See id. 1726 & 1730. Notably, no other Afghan witnesses to Dr. Siddiqui's arrest or subsequent detainment heard these rather remarkable invectives.

12

doing so both times she reacted like a cornered animal by struggling and biting the hands of those who would subdue her. See Tr. at 1821. During the second escape attempt, she picked up one of the canisters in her possession and pretended as if it contained an explosive. See Ex. C at 5; Tr. at 1801. Having already discerned that she had no such explosive substances in her possession, Qadeer ignored her threat. See Ex. C at 5-6.

After Dr. Siddiqui's second escape attempt on July 18, 2008, she was tied to the bed and Qadeer and his colleagues, including █████, left the Afghan National Police headquarters in order to meet representatives from the Ministry of the Interior who sought to interview Dr. Siddiqui and who were near Ghazni but were lost and needed help in finding their way. See Ex. C at 5-6; Tr. at 1803.

When the delegates from the Ministry of the Interior ("MOI") confronted Dr. Siddiqui in the room where she was restrained (and where she was eventually shot), they told Qadeer and his colleagues to untie her hands. See Ex. C at 6; Tr. at 1806. Pursuant to the instructions of the MOI delegation, Qadeer and his colleagues untied Dr. Siddiqui's hands from the bed so she was no longer immobile. Minutes after this untying of her hands, the interview team sent by the Federal Bureau of Investigation and the U.S. military personnel accompanying them entered the room where Dr. Siddiqui and her Afghan captors were. See Ex. C at 9-10; Tr. at 1806. During the time that the United States contingent and the Afghanistan contingent were introducing themselves, shots were fired and Dr. Siddiqui was found bleeding from a gunshot wound in the abdomen. The government's witnesses claimed  and the jury believed  that Dr. Siddiqui grabbed a rifle that an American soldier had placed next to him while he shook hands with his Afghan counterparts and discharged one, a few or many rounds (depending on the witness).

According to the government, some but not all of the witnesses present at the shooting recalled Dr. Siddiqui shouting anti-American sentiments in English at the moment that she shot the rifle. In order of their appearance at trial, their recollections are as follows: (1) Captain Snyder had no recollection of Dr. Siddiqui saying any anti-American sentiments (see Tr. at 165, 178 & 180); John Jefferson recalled Dr. Siddiqui shouting that she hated all Americans at the time that she shot the rifle and that she wanted to kill them both before and after she was shot (see Tr. at 294 & 361); Ahmad Gul recollected hearing only "blood" and "Americans" when Dr. Siddiqui was shouting (see Tr. at 445); Dawn Card had no recollection of Dr. Siddiqui shouting anything as she fired the rifle or thereafter (see Tr. at 975); the Chief Warrant Officer heard Dr. Siddiqui shout "Allah Akbar" at the moment that she shot the rifle and then "Death to America" and "I will kill all you mother fuckers" while she was being subdued after she was shot (see Tr. at 1077 & 1084); Erik Negron recalled Dr. Siddiqui shouting "I want to kill Americans" after she was shot and being subdued (see Tr. at 1182-85); Ahmad Amin recalled Dr. Siddiqui shouting, "Get the fuck out of here" right before she shot the rifle (see Tr. at 1270); Lamont Williams heard a female shouting at the time that he heard shots in the room and remembered that Dr. Siddiqui was yelling when she was being subdued but he had no recollection as to what she said (see Tr. at 1341); and finally, Kenneth Cook was in Dr. Siddiqui's presence only when she was being carried on the litter from the room where she was shot to the transport vehicles outside the ANP compound and his only memory of her shouting was a scream to cover her feet in which she used the phrase "mother fuckers." See Tr. at 1395.

As can be seen from a comparison of the various recollections of the government's witnesses at trial, there is hardly a consensus as to what exactly Dr. Siddiqui said at the moment that she allegedly shot at the U.S. military and then when she was shot and subdued. It is

14

probably no surprise that the recollections of Jefferson and Negron dovetail because they were in each other's company in escorting Dr. Siddiqui to the first-aid station at F.O.B. Ghazni, then to the surgery site at another F.O.B. and, finally, to recovery at Bagram hospital. Thus, on the day of Dr. Siddiqui's shooting, they spent at least twelve hours together directly after a dramatic incident the details of which they must have discussed at some length. What is telling is that their joint recollections do not conform with the recollection of the Chief Warrant Officer who was right next to Dr. Siddiqui when she grabbed his rifle and when she was subdued. He claimed that she only shouted "Allah Akbar" at the time of the shooting and instead of hearing her yell that she hated Americans like Jefferson and Negron, he heard her yell "Death to America." Clearly, the recollections of these witnesses as to what Dr. Siddiqui shouted at the time she grabbed the rifle and when she was eventually subdued is not to be trusted as the events in such a short time span, dramatic as they must have been, have turned into a blur.

### The Contents Of The Documents And Thumb Drive In Dr. Siddiqui's Possession At The Time Of Her Arrest

While Dr. Siddiqui was detained by Afghan authorities and then had the nearly fatal encounter with the interview team comprised of FBI agents and U.S. military personnel, the documents and thumb drive that were in her possession at the time of her arrest were being examined by intelligence analysts in the U.S. military, the FBI and presumably the CIA.

Amongst the documents that Dr. Siddiqui possessed were the following:

• handwritten notes in English about various bacteria like the plague and strep: while these notes generally describe how the bacteria is transmitted and its symptoms, there is no

hint that they are recipes for weaponizing these bacteria (see GX 123B-1, B-2 , 126A-1, 128B-1, 128B-2[5]);

- documents bearing telephone numbers that we assume the government investigated and could not link with any members of terrorist organizations (see GX 124A-1, 125A-1 & 125A-2);

- handwritten notes in English involving eccentric or delusional ideas for military attacks, including using gliders to attack enemies, harnessing hydrogen for plane take-offs, attacking enemies using laser beams and ultra-violet radiation, and, finally, connecting airplanes to fly-by-wire systems so they can do acrobatics to escape missile attack (GX 127A-1);

- handwritten notes in English involving ideas as to how to generate energy (GX 126A-2);

- Urdu notes regarding the construction of bomb shelters in the most general of terms (GX 129A-1T, 129A-2T, GX 140A-1T)

- Urdu notes providing recipes of explosives (or ingredients of explosives) similar to recipes that exist widely over the internet (see GX 132A-1T);[6]

- Urdu notes annotating diagrams of fuses, timers and rifles (see GX 141, -A, -B & -T);

- Additional handwritten notes in English involving eccentric or delusional ideas for military defenses (e.g., spewing out magnetic radiation to mess up the navigation of drones or using remote-control submarines to attack the U.S. Navy), capturing energy

---

[5] All references to "GX __" indicate government exhibits sought to be admitted or admitted at trial.

[6] For example, the recipes for nitric acid, an urea nitrate bomb, HMTD, a plastic explosive, and a carbon tetrachoforide bomb that the government introduced at trial as GX 131A-1T, GX 133A-1T, GX 133A-2T, GX 134A-1T, GX 135A-1T respectively, are all nearly in verbatim reproductions of recipes that are easily accessible on the internet and which we annex hereto as Exhibits "E," "F," "G," "H," and "I."

(by placing cables in thunderclouds), or possible terrorist attacks (stealing the garbage off of Plum Island or taking the cobalt 60 from food-irradiation facilities or disseminating the Ebola virus or sarin gas) (GX 142B-1);

Amongst the documents and/or files that were on the thumb drive that Dr. Siddiqui possessed were the following:

- An essay written in English and presumably authored by Dr. Siddiqui that is entitled "I am not a Terrorist" and which critiques the "women's liberation ideology" of feminist American women and describes the author's own struggles in pursuing a religious life as a Muslim in America while obtaining degrees in higher education (Competency Hearing, GX L);

- A list of chemical and plant poisons written in English;

- An allegorical play about the unification of all Muslim countries written in English entitled "Shaitan and the Muslim Countries" (Ex. B at 595-98);

- An admonition written in English to live as a practicing and true Muslim (Ex. B at 599);

- A document written in English and entitled "Meat Medley Recipe" that appears to be a description of the possible genetic manipulation of proteins that can invade cells[7] (Ex. B at 600-603);

- A document written in English and addressed to some public figure whose assessment of current crises confronting Pakistan had captured the attention of the writer who wishes to volunteer his or her knowledge to help save fellow-Pakistanis (Ex B at 604).

---

[7] Notably, Dr. Rosenfeld views Dr. Siddiqui's expertise in the "hard sciences" like biology as thin or comprised by her mental illness in light of her belief that viruses can be altered so that they attack adults and not humans. See Ex. A at 6. Even someone with a thin background in biology and chemistry knows that viruses attack cells whether they be in adults or children and attempting to alter a virus to distinguish the two is folly. Thus, we must view skeptically the "research" presented in a document like the "Meat Medley Recipe."

17

**Dr. Siddiqui's Interrogation While Recovering**
**From The Gunshot Wound**

From July 19, 2010 until her departure from Bagram Hospital on August 4, 2008, Dr.

Siddiqui was interrogated without being read her Miranda rights. See Tr. at 1619. The

interrogations spanned the course of each day and occurred without the assistance of counsel and

while she was heavily medicated and immobilized by the use of four-point restraints. See Tr. at

1619 (Agent Sercer testifying that the daily interviews were on average about 8 hours); 1625

(Agent Sercer testifying that Dr. Siddiqui received pain medication during the time in which she

interviewed her).

During the course of these interviews, Dr. Siddiqui at first concealed her name by

identifying herself as Bint Saleh (she was, after all, terrified of what might happen to her or her

children if she fell into the hands of American captors who might abuse her as rumor had it). See

Ex. B at 227 (July 19, 2008 interview). Two days later, Dr. Siddiqui disclosed her real identity

and her entire background history, including where she was born, the identity of her family

members, where she was educated, and the fact that she was divorced. See id. at 197-201.

Significantly, in the very first full conversation that Dr. Siddiqui had with an interrogator, she

disclosed the name "Majid Khan," the criminal defendant in whose proceedings she figured as a

possible jihadist operative because she allegedly assisted him in obtaining a United States travel

visa so he could plan and implement a possible terrorist attack in the Baltimore area

unbeknownst to her. See id. at 197.[8] Also, she mentioned that before her arrest she was

approached by possible bad men who wished to exploit her knowledge of biology to obtain

substances to scare people. See id. at 197-98. Dr. Siddiqui's immediate disclosure of

---

[8] In a subsequent interview, Dr. Siddiqui made it clear that she had no idea that Majid Khan was
a "bad man" and intended attacks on the United States at the time that she offered to help him by
setting up a mailbox on his behalf in Baltimore, Maryland. See Ex. B at 539-40.

information that would support the government's suspicion that she was a terrorist operative contradicts the government's account that she is evasive, manipulative and cunning.

In what follows in the course of interviews over the next two weeks is a puzzling, labyrinthine and contradictory account by Dr. Siddiqui of her so-called missing five years. Dr. Siddiqui admitted that shortly after Majid Khan was arrested, she went into hiding by staying with the family of Al Baluchi, the nephew of Khaled Sheik Mohammed, who she eventually married in order to be able to continue to live with his family. See id. at 255. She denied that she knew that he was involved in terrorist acts while they were married and she was staying with his family (she learned only through the news after he was arrested that he was associated with Al Qaeda). See id. at 256. According to Dr. Siddiqui, Al Baluchi's family asked her to leave them when her husband was arrested. See id. at 233. According to her own account, she then moved to a small apartment in the Defense/ Clifton area of Karachi. See id. at 400. She claimed that a short time after moving there a man named Abu Lababa issued a fatwa for her to do biological research in order to develop defenses for her country should Pakistan be attacked by an enemy. See id. at 233-34 & 242. She did this for about 6 months. See id. at 243.

Notably, Dr. Siddiqui stated that she met Abu Lababa and did research for him before opening up the mailbox for Majid Khan but this directly contradicts earlier interviews where she stated that she lived with Al Baluchi's family after opening up the mailbox. This is one of many examples in which Dr. Siddiqui's memory and her sense of chronology turns into a jumble, arguably due to her mental illness and has led to the psychologists retained by defense counsel to view her as a poor reporter of events. See, e.g., Ex. A at 8 ("Dr. Siddiqui's report of her own experiences has also varied"). After staying in a small apartment in the Defense/ Clifton area of Karachi, Dr. Siddiqui allegedly moved to the Nazimabad district where she lived as a servant in

the quarters of a family home. <u>See</u> Ex. B at 402 & 404. According to Dr. Siddiqui, she moved to this new location in order to hide from Abu Lababa. <u>See id.</u> It is from this home that Dr. Siddiqui allegedly made her various trips to Afghanistan in search of her alleged husband.

We note that in the interviews of Dr. Siddiqui's son by FBI agents without counsel or adult supervision, he gave a different account as to where she was staying (with him) before they were arrested in Ghazni, Afghanistan. He claimed that they lived together in Multan with Dr. Siddiqui's mother. <u>See</u> Ex. B at 1241. He also intimated that Dr. Siddiqui met with what appeared to be jihadists and that he believed that they were on a suicide mission in Ghazni. <u>See</u> Ex. B at 1243 & 1246. Notably, Ahmed Siddiqui provided a very detailed description of the block and house where he allegedly stayed with his mother in Multan. <u>See</u> Ex. B at 1248-49. We assume that the government has investigated Ahmed's account and were not able to confirm it as we have requested numerous times of the government to provide information related to Dr. Siddiqui's whereabouts during the missing five years and received nothing in response. To underscore the limited credibility of Ahmed's account of where he and his mother were during the missing years, the government has noted that he has provided different versions of their whereabouts during the "missing five years" since his interview by the FBI immediately after his arrest. <u>See</u> copy of the letter from the government to defense counsel dated May 26, 2009 at 1 annexed hereto as Exhibit "J." Further, as previously noted, Ahmed's account of the purpose in traveling to Ghazni to Afghan interviewers -- to distribute documents to local inhabitants -- makes no sense since the documents that Dr. Siddiqui possessed when arrested were written in English and Urdu, neither of which languages are spoken in Afghanistan.

20

### 2.    History And Characteristics Of Dr. Siddiqui

### Dr. Siddiqui's Childhood, Education and Arranged Marriage

Dr. Siddiqui was born in either Multan or Karachi, Pakistan on March 2, 1972. See Ex. B at 404 & 536. Shortly after she was born, her family moved to Zambia. See id, at 404. Eventually, her family moved back to Karachi where she spent the majority of her childhood. See id. at 404 & 536-37. Her father Mohammad Salay Siddiqui was a physician (now deceased) and her mother Ismaat Siddiqui (retired and unwell) was a social worker. See id. at 536. Dr. Siddiqui has two siblings: (1) Muhammad Siddiqui who lives in the vicinity of Houston where he is employed as an architect; and (2) Fowzia Siddiqui who is a neurologist practicing in Karachi, Pakistan. See id. at 536-37. Ms. Ismaat Siddiqui and Dr. Fowzia Siddiqui and her family live in the home where Dr. Siddiqui was raised in Karachi, Pakistan. Mohammad Ahmed Siddiqui, Dr. Siddiqui's oldest child who was born on November 29, 1996, lives with his aunt and grandmother in Karachi, Pakistan. Dr. Siddiqui's other two children, Mariam Bint Khan and Suleman Siddiqui, were born on September 5, 1998 and September 3, 2003 respectively. Mariam suddenly appeared on the doorstep of the Siddiqui family home in Karachi, Pakistan in March of this year; Suleman remains missing.

In 1989, Dr. Siddiqui was issued a students visa to study in the United States. At first, she enrolled in the University of Houston in the spring of 1990 and studied there for three semesters. Then she transferred to the Massachusetts Institute of Technology where she graduated with a Bachelors Degree in Biology in February of 1995. See id. at 924 & GX 400. In the latter part of 1995 or early part of 1996, Dr. Siddiqui applied to the Neuroscience Ph.D. program at Brandeis University; she was admitted into the program at or around March 21, 1996 and she accepted the offer at or around April 1, 1996.

21

In or around November of 1995, Dr. Siddiqui married Mohammad Amjad Khan by telephone. See id. at 794. It was an arranged marriage. See id. at 794 & 538. In or around December of 1995, Dr. Siddiqui and her husband lived together in the Boston area. See id. at 794. It appears that the marriage between Dr. Siddiqui and her husband, which lasted approximately seven years, was full of conflict and according to accounts of Dr. Siddiqui, faculty with whom she was close at Brandeis University, and a social worker in the Boston area, the ex-husband physically abused Dr. Siddiqui and her children. See id. at 197, 231, 397 & 552, 784-86, 795, 1267, 1276.

When Dr. Siddiqui received her Ph.D. in neuroscience from Brandeis University in or around February of 2001 (GX 401), she allegedly started and supervised for a few months a pre-school program that she ran out of her apartment attended by her own children, the children of her sister and other neighbors' children. See id. at 538. Shortly after September 11, 2001, Dr. Siddiqui apparently returned home to Pakistan with her children to attend to her ailing father. See id. In or around January of 2002, Dr. Siddiqui returned to Boston with her children to live with her ex-husband for about four or five months before returning to Karachi, Pakistan. See id. at 538-39.

### Dr. Siddiqui's Divorce From Her Ex-Husband And Subsequent Disappearance

In or around June of 2002, Dr. Siddiqui and her ex-husband returned to Pakistan and ultimately divorced by the fall of that year. See id. at 1284. According to Dr. Siddiqui's account in an interview with an FBI agent (an account that coincides with that of other members of her family), this divorce precipitated her father's heart attack that led to his death in August of 2002. See id. at 398 & 1284.

According to her mother, Dr. Siddiqui was very upset in the wake of her divorce. <u>See id.</u> at 1276. While living with her mother, Dr. Siddiqui was very isolated – she neither socialized with friends nor did she go to the mosque. <u>See id.</u> at 1278 & 1285. In or around March of 2003, Ms. Ismaat Siddiqui encouraged her daughter to go live with her uncle in Islamabad for a change of scenery. See id. Again, according to her mother, Dr. Siddiqui left with her three children for Islamabad on the spur of the moment to stay with her uncle. <u>See id.</u> at 1277. After Dr. Siddiqui telephoned her the day that she departed from what her mother assumed was the railroad station, Ismaat Siddiqui never saw or heard from her daughter again until she called her mother in the spring of 2009 from FMC Carswell. <u>See id.</u>

In the aftermath of Dr. Siddiqui's disappearance, her mother was visited by two strangers at her home whose threats directed at her appeared connected to Dr. Siddiqui's disappearance. Two days after Dr. Siddiqui left her house, a stranger broke into the family house and told Ismaat Siddiqui not to make a noise. <u>See id.</u> at 1277. Shortly after this incident a man drove up to her house on a motorcycle and told her in a threatening manner that if she remained quiet about her daughter she would get her back. <u>See id.</u> at 1283.

In an interview with ████████, ████████████████ recounted a story that indicated that Dr. Siddiqui had a basis to be concerned about her welfare during the years that she went missing. ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████. <u>See id.</u> As

23



Whether we account for Dr. Siddiqui's missing years as having been caused by her abduction by a governmental or non-governmental entity (as some accounts would have it), by going "into hiding" to avoid questioning by American intelligence agencies (as the government would have it), or because she was forced to lend assistance to jihadist organizations (as other accounts would have it), Dr. Siddiqui's experience of those years must have involved trauma because she reappeared in Afghanistan in 2008 accompanied by only one of her three children.

### Evidence Of Dr. Siddiqui's Mental Illness

There is much in the record to suggest that Dr. Siddiqui had and currently suffers from serious mental illness so we will not belabor the point. As the record currently stands, two forensic evaluators hired by the government diagnosed Dr. Siddiqui as malingering. Two forensic evaluators hired by defense counsel diagnosed Dr. Siddiqui as presenting serious mental illness, one of whom viewed her as incompetent to stand trial. See Forensic Psychological Evaluation of Dr. Kucharski dated June 20, 2009 at 17 ("It is therefore my opinion that Dr. Siddiqui is currently not competent to stand trial ... [c]urrently [she] presents with a delusional disorder paranoid type and significant depression"); see also Ex. A (Confidential Psychological Evaluation by Dr. Barry Rosenfeld dated July 12, 2010) at 11 ("In sum, considerable evidence appears to support the conclusion that Dr. Siddiqui suffers from a genuine and severe mental disorder that emerged prior to her arrest"). One forensic evaluator of the Bureau of Prison, Dr. Leslie Powers, diagnosed Dr. Siddiqui as presenting serious mental illness to the point of incompetence and then changed her mind after conferring with the government evaluators. As Dr. Barry Rosenfeld indicates in his report, Dr. Powers's evaluation, the one upon which the

24

Court placed considerable reliance, appears the most unstable as she conceded that she would change her mind again if she were presented with evidence that Dr. Siddiqui suffered a traumatic incident to explain her "florid" presentation. See Ex. A at 10. In any event, the evidence is compelling that Dr. Siddiqui has and is currently presenting with serious mental illness and that evidence becomes only more compelling the longer she continues her odd behavior with dissipating rewards for presenting them.

Dr. Rosenfeld offers a compelling account that Dr. Siddiqui's current mental illness has either been present for awhile or at least was in a "prodromal" period since her days in Boston. See id. at 6. Of particular note to Dr. Rosenfeld is the account of Dr. Yousef Abou Aballan who knew Dr. Siddiqui when she was still an undergraduate at MIT. At that point in time, Dr. Aballan viewed her as a compelling speaker and public figure whose future appeared promising. See id. A few years later, he noted that she had become odd and was "always by herself." Id. More significantly, at this point in time, Dr. Siddiqui was unable to find a community of like-minded persons in any Muslim organization in the Boston area, including extremist groups. See id.

In finding further basis for believing that Dr. Siddiqui's mental illness had an onset during her Boston years, Dr. Rosenfeld notes that she never pursued a professional position in her area of expertise. See id. at 3. Rather, she chose to spend her time teaching young children in an informal "nursery school" in her home and to hand out Korans to interested persons through the aegis of the Institute of Islamic Research. See id.

Dr. Rosenfeld's and Dr. Aballan's diagnosis of mental illness appearing during the Boston years is further substantiated by some of the discovery received in the proceeding. For example, ████████ interviewed the managing agents of apartments where Dr. Siddiqui stayed

25

while living in Boston and two noted that she complained of innocent incidents occurring in the building and affecting her family – like a water leak in her apartment or an alarm triggered accidentally by her children – as the product of anti-Muslim animus. See Ex. B at 1302-03. This conduct appears to have a continuation in the account of Dr. Siddiqui's conduct after her divorce and before she left the family home in Karachi in or around March of 2003. Her own mother described her conduct as withdrawn and sullen, reminiscent of Dr. Aballan's account of her always being alone, which prompted Ms. Siddiqui to suggest to her daughter that she go visit her uncle. See Ex. B at 1278 & 1285.

At this moment, it appears that Dr. Siddiqui's mental illness reached such an acute point that she withdrew from her own family into an isolation from which she has not returned. Her brother speaks painfully of his sister's metaphorical disappearance since she was brought to the United States for this criminal proceeding. Throughout the process he has tried to help her in every way that he can – visit her when she was in Carswell; hire her the best lawyers he could find; attend every day of trial. Yet, for all of his efforts, his sister will still at moments become suspicious of his motives and withdraw from his attempts to communicate with her.

Dr. Siddiqui is clearly a troubled woman whose withdrawal from the world renders her isolated not only from her family but from everyone else, including extremist groups who would want to make use of her. Even if extremist groups wanted to make use of her and Dr. Siddiqui allowed herself to be made use of, a low likelihood indeed, Dr. Rosenfeld convincingly argues that her mental illness has sealed her off from the sophisticated thinking she was once capable of at MIT and Brandeis University because the notes that she had in her possession, which are characterized so ominously by the government as a "roadmap for destruction," are actually an indication of her current low intellectual functioning. See Ex. A at 6 ("The materials found in

26

Dr. Siddiqui's possession after her arrest also support the contention that her mental state had markedly deteriorated during the months or years preceding her arrest, as they include numerous seemingly implausible ideas and beliefs … These implausible ideas and beliefs are particularly striking given her obvious pre-morbid intelligence (having completed degrees [at] MIT and Brandeis) and her limited background in the biological and physical sciences").

**B.      The Need for the Sentence Imposed**

        **1.      To Reflect The Seriousness Of The Offense, To Promote Respect For The Law, And To Provide Just Punishment For The Offense**

        The sentence that we seek of twelve years reflects the seriousness of the offense, promotes respect for the law and provides just punishment because it is only a slight variance from the advisory Sentencing Guidelines range applicable for attempted murder accompanied by the brandishing of a firearm. As discussed more fully below, Dr. Siddiqui's advisory Sentencing Guidelines range is arrived at by applying the offense level associated with attempted murder, finding that her Criminal History Category is I, and then adding seven years to the Guidelines range of 70-87 months as required by 924(c) for a grand total of 154 months. The sentence that we seek, 144 months, is only 10 months less than the range advised by the Guidelines framework.

        The slight variance downward that we seek is justified by the peculiar circumstances of this case. Dr. Siddiqui is not the typical defendant who attempts to murder another human being. She has no history to suggest that she has a violent past. There is no plausible evidence to support the government's theory that she is a terrorist. The centerpiece of the government's theory in this regard is the documents that were found in her possession at the time of her arrest in Ghazni. While the government has expended tremendous resources investigating what Dr.

Siddiqui was doing on the day that she was arrested and the days and months and years before her arrest, they never filed an indictment alleging that she was or supported terrorists. Thus, Dr. Siddiqui remains an atypical defendant in an attempted murder case.

What further justifies the slight variance downwards that we seek is Dr. Siddiqui's mental illness that certainly played a role in her conduct. For someone who suffers paranoid ideations such as Dr. Siddiqui, the circumstance of a team of American soldiers coming into a room where she is held captive where her biggest fear is being transferred into the custody of Americans and brought to Gitmo must have been terrifying. To Dr. Siddiqui, what she confronted, assuming as fact her paranoid frame of mind, was either an escape or certain torture in the hands of the Americans. Accepting this framework, what Dr. Siddiqui did is understandable, if not excusable, and it makes her conduct atypical and justifies a slight variance downwards from the advisory Sentencing Guidelines range.

### 2.    To Protect the Public from Further Crimes of Dr. Siddiqui

Section 3553(a)(2)(C) requires the Court to consider the need to protect the public from future crimes of a particular defendant, in this case Dr. Siddiqui. We understand that the Court, in light of our continued emphasis upon Dr. Siddiqui's serious mental illness and the role it played in her offense conduct, has to speculate as to Dr. Siddiqui's future dangerousness when addressing the issue as to what sentence will protect the public from her. First, we must assume that Dr. Siddiqui will be deported to Pakistan after she serves the sentenced imposed by this Court. Second, Dr. Siddiqui's notoriety after this criminal proceeding renders it highly unlikely that she will be able to blend back into any general population abroad and from the vantage point of anonymity engage in further offense conduct. Her notoriety will ensure that all of her movements upon release will be carefully observed by intelligence communities all over the

28

world. Third, we would emphasize a point that Dr. Kucharski, a forensic psychologist retained
by defense counsel for the purposes of the competency hearing, made recently to the defense
team. He observed that Dr. Siddiqui's act of violence on July 18, 2008 has to be viewed as
highly context-specific. If a normal person were in a strange land and arrested and brought to a
precinct where very few spoke their language and they could not predict their fate, they would be
acutely anxious. If they lived in a land where rumors were widespread that Americans
committed atrocities to detainees and they had a reasonable fear that they were going to be
transferred as a detainee to the Americans, their anxiety level would be ratcheted up. If then they
heard unannounced those very Americans stomping into the room where they were detained and
shouting, "Where's the detainee?" as certain accounts would have it, most persons, even those in
their right mind, would be terrified. As Dr. Kucharski noted, under such circumstances, a normal
person would be subject to instinctual activity in response to a flight/fight situation. From this
perspective, what Dr. Siddiqui did was not so far removed from what a person would do who
lacked mental illness. If Dr. Siddiqui had acted in a violent manner in response to an innocent
gesture like a smile from a person standing alongside of her on a platform waiting for a train,
then future dangerousness would be a real concern. But that is not the situation here. Dr.
Siddiqui's conduct was close enough within the range of a normal person in her circumstances
(in a strange land torn by war and taken captive by local authorities who do not speak her
language and are sure to hand her over to the Americans) that fears of future dangerousness are
not warranted. Of note here is the fact that Dr. Siddiqui has no criminal history in a life in
which, according to Dr. Rosenfeld, she has probably been suffering from psychotic symptoms
since at least the early to mid-1990s. That clean track record gives us confidence that the Court

29

need not fear that Dr. Siddiqui poses a threat to the public should she be released after a substantial amount of time in prison.

### 3.   To Afford Adequate Deterrence To Criminal Conduct

18 U.S.C. §3553(a)(2)(B) instructs the Court to consider whether the sentence requested by the parties provides adequate deterrence to criminal conduct. Reason dictates that a term of imprisonment can, in certain circumstances, provide general deterrence; but 18 U.S.C. §3553(a) also instructs that a sentence should not be "greater than necessary." (stating that a sentence may not be greater than necessary to comply with the purposes of punishment.)

With respect to this factor of general deterrence, we respectfully submit that the analysis here dovetails the discussion of the factors regarding the imposition of a sentence that reflects the seriousness of the offense conduct, promotes respect for the law and represents just punishment. Here, where the sentence requested is but a minor variance from the advisory Sentencing Guidelines range and the variance is based on quite extraordinary circumstances, the sentence sought is bound to promote general deterrence because it involves a substantial amount of time and hews closely to the recommendation of the United States Sentencing Commission. This would not be a case of a dramatically lenient sentence imposed against a backdrop of a much more serious advisory Sentencing Guidelines range. In such circumstances, the factor of general deterrence recedes into the background.

### C.   The Sentencing Guidelines Considered

United States v. Crosby and now Gall v. United States, both require sentencing courts to consider the advisory Sentencing Guidelines as one of many factors when sentencing a defendant. In the PSR, the Probation Office provides analysis of Dr. Siddiqui's advisory Sentencing Guidelines range as outlined below.

30

The Probation Office sets Dr. Siddiqui's base offense level at 33 as they view her attempted murder counts as constituting an attempt at first-degree member. See PSR, ¶ 38. The Probation Office arrives at offense level 33 by noting that the advisory Sentencing Guidelines for violations of 18 U.S.C. § 2332, § 1114 and § 111 are found in §§ 2A2.1 and 2A2.2. See id. The Probation Office uses § 2A2.1 apparently because it incorporates the more serious offense attempted murder. See id. Without explanation or any reference to the fact that the jury found that Dr. Siddiqui did not commit attempted murder with premeditation, the Probation Office views Dr. Siddiqui's "actions" as "constitut[ing] first degree murder" and thus warranting a base offense level of 33. See id.

The Probation Office notes the possibility that three victim-related adjustments may be applicable to Dr. Siddiqui's conduct. First, there is the suggestion that because some witnesses allegedly heard Dr. Siddiqui say that she wanted to "kill Americans" a three-level "hate crime" enhancement might be warranted. See PSR, ¶¶ 40-41. Second, there is the suggestion that her conduct may be characterized as motivated by the victims' status as United States employees or officers. See PSR, ¶ 42. The Probation Office actually applied this enhancement and increased Dr. Siddiqui's offense level by 6 levels. See id. Finally, the Probation Office applied the terrorism enhancement to Dr. Siddiqui's offense level based on her alleged statement that she wanted to "kill Americans" and her possession of paper and electronic documents "that detailed her intent to hurt U.S. citizens and destroy U.S. landmarks." PSR, ¶ 43. Application of the terrorism enhancement added 12 levels to her offense level and raised her criminal history category from I to VI. See PSR, ¶¶ 43 & 53. According to the Probation Office, Dr. Siddiqui's adjusted offense level of 51 and Criminal History Category of VI framed an advisory Sentencing Guidelines range of life. See PSR, ¶ 90. Further, the Probation Office noted that Count 4

31

required imposition of a mandatory 360-month term of imprisonment to run consecutively to the

term of prison imposed for the other counts. See id. We would note that the Probation Office

prepared the PSR before the Supreme Court held that the factual issue as to whether a firearm

was a machine gun for the purposes of a violation of 18 U.S.C. § 924(c)(1)(A)(iii) must be

presented to the jury. See United States v. O'Brien, 130 S. Ct. 2169 (2010). In light of O'Brien,

the maximum consecutive sentence that the Court may impose for a 18 U.S.C. § 924(c) violation

without the jury finding that the firearm was a machine gun is 10 years. See Harris v. United

States, 556 U.S. 545 (2002) (holding that the factual questions of "brandishing" and

"discharging" a firearm with respect to a violation 18 U.S.C. § 924(c) may be found by a

sentencing court and are sentencing factors).

Finally, the Probation Office notes that the government views Dr. Siddiqui as having

obstructed justice by malingering mental illness and offering perjured testimony at the trial. See

PSR, ¶¶ 32-33. The Probation Office defers to the Court as to whether an obstruction of justice

enhancement is warranted. See PSR, ¶ 45.

### 1. The Probation Office Errs In Finding A Base Offense Level Of 33 As Dr. Siddiqui's Conduct Is Not Analogous To First-Degree Murder

Recognizing the critical role of the jury in determining the degree of guilt in homicide

related crimes, the Court, at the Government's urging, submitted the question of whether Dr.

Siddiqui acted with premeditation to the jury. That submission was in accordance with the long

standing principle of jurisprudence   incorporated into the "Due Process Clause" of the

Constitution—wherein the jury determines the degree of guilt where homicide is concerned. See

Ring v. Arizona, 536 U.S. 584, 599 (2002), ("[t]he English jury's role in determining critical

facts in homicide cases was entrenched. As fact-finder, the jury has the power to determine not

32

only whether the defendant was guilty of homicide but also the degree of the offense. [...] By the time the Bill of Rights was adopted, the jury's right to make these determinations was unquestioned." (internal cites omitted)). The jury in this case returned a finding that Dr. Siddiqui did not act with premeditation.

Under Section 2A2.1(a)(2)) of the Federal Sentencing Guidelines, conviction of unpremeditated attempted murder corresponds to a base level of 27 for the offense. Apparently, unaware of the jury's findings, the Probation Office determined that the attempted homicide had been committed with malice aforethought and pursuant to 2A2.1(a)(1), recommended a base level of 33 corresponding to a finding of premeditation for the attempted murder counts on which Dr. Siddiqui was convicted.[9] See PSR, ¶ 38. Whether the Probation Office's finding was out of ignorance, or indifference to the jury's findings and their fundamental role of determining the degree of guilt, the Court should give it no weight.

The Supreme Court has repeatedly upheld that due process requires the court to respect the findings of a jury when it comes to sentencing. See Apprendi v. New Jersey, 530 U.S. 466, 483 (2000) (holding that the Sixth Amendment does not permit a defendant to be "exposed . . . to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone."); Ring v. Arizona, 536 U.S. 584, 599 (U.S. 2002) (holding that the court's adoption of sentencing factors necessary to impose the death penalty, in contradiction to the jury's findings, violated the Due Process Clause); Blakely v. Washington, 542 U.S. 296, 303-04 (2004), (finding that, for Apprendi purposes, the "standard range" was the statutory

---

[9] Section 2A2.1(a)(1) of the Sentencing Guidelines, a base offense level of 33 is warranted where the "object of the offense would have constituted first degree murder" as defined by 18 U.S.C. § 1111. Section 1111, in turn, defines first degree murder in pertinent part as "the unlawful killing of a human being with malice aforethought."

maximum, despite being below the maximum sentence, and thus any facts found justifying a sentence above the standard range must be found by a jury).

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court applied the teachings of Apprendi, Ring, and Blakely to the federal sentencing regime. The Court held that the upper end of the then-mandatory federal sentencing guidelines was the statutory maximum, even though it was below the maximum sentence established by Congress. Thus, judicial fact-finding used to justify a sentence above the range contemplated by the guidelines violated the Sixth Amendment. Id. at 233-35. While the Court, in effect, reinstated judicial fact finding to divert from the standard range by finding the mandatory nature of the guideline unconstitutional, see id. at 245-246, any fact necessary to support a sentence exceeding the maximum authorized by the facts (as established by a plea of guilty or a jury verdict) had to be admitted by a defendant or proved to a jury beyond a reasonable doubt. See id., at 232 ("the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.") Nothing in the decision suggests that it permits judicial findings to directly override the findings of the jury, imposing an enhancement based on a degree of criminality explicitly rejected by the jury particularly where such an enhancement would have the effect of doubling the defendant's base sentence, as is the case here.[10] Accordingly, counsel respectfully suggests that the Court should reject the Probation Office's determination and, in accordance with the jury's verdict, find that Dr. Siddiqui's base offense level for attempted murder is 27.

---

[10] Attempted murder has a base offense level of 27, which advises, in conjunction with a Criminal History Category of I, a sentence of 70-87 months. Attempted murder that would have constituted first degree murder has an offense level of 33, which advises, again in conjunction with a Criminal History Category of I, a sentence of 135-168 months. The difference amounts to a doubling in sentencing exposure.

2.    The Probation Office Errs In Applying
      The Terrorism Enhancement

The terrorism enhancement of the advisory Sentencing Guidelines reads in pertinent part

as follows:

§ 3A1.4 Terrorism

(a) If the offense is a felony that involved, or was intended to promote, a federal
crime of terrorism, increase by 12 levels; but if the resulting offense level is less
than level 32, increase to level 32.

(b) In each such case, the defendant's criminal history category from Chapter
Four (Criminal History and Criminal Livelihood) shall be Category VI.

An application note to this enhancement provides a definition of "federal crime of terrorism,"

which is as follows: "For purposes of this guideline, 'federal crime of terrorism' has the meaning

given that term in 18 U.S.C. 2332b(g)(5)." The definition of "federal crime of terrorism" as

defined by 18 U.S.C. § 2332b(g)(5) is as follows: " an offense that – (A) is calculated to

influence or affect the conduct of government by intimidation or coercion, or to retaliate against

government conduct; and (B) is a violation of [various enumerated offense conduct including

attempted murder of United States officers and/or employees and United States nationals]."

The Second Circuit has recently interpreted the terrorism enhancement to consist of two

different theories upon which it can be based: (1) where the defendant's offense or relevant

conduct "involved" a federal crime of terrorism, which is interpreted to mean that the defendant

"committed, attempted, or conspired to commit a federal crime of terrorism;" and (2) where the

defendant's offense or relevant conduct "intended to promote" a federal crime of terrorism,

which is interpreted to mean that the defendant "encourage[d], further[ed], or [brought] about a

federal crime of terrorism." United States v. Awan, 07-4315, 2010 WL 2347081 (2d Cir. June

14, 2010). In distinguishing these two theories upon which the terrorism enhancement can be

based, the Second Circuit noted that while the first theory required the government to demonstrate that the offense conduct of the defendant was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," the second theory had a different requirement. See id. at *6. Instead of requiring the government to show that the defendant engaged in conduct "calculated to influence or affect the conduct of government," the second theory required the government to show that the defendant's conduct "encourage[d], further[ed], or [brought about]" the federal crime of terrorism of another. See id.

With respect to the question as to whether Dr. Siddiqui's offense conduct for which she was convicted constituted an offense for which the terrorism enhancement is applicable under the first theory, the answer is a simple no. In Awan, the Second Circuit clarified that "calculated" presumes that the defendant planned the act that constituted the federal crime of terrorism. See id. at *7. Here, the jury's verdict precludes the government from seeking a terrorism enhancement based on the first theory because they found that Dr. Siddiqui did not attempt to murder the United States officials and/or employees or United States nationals with premeditation.

On the verdict sheet, with respect to both Count One and Two, the attempted murder of United States nationals and the attempted murder of United States officials and employees respectively, the jury was asked in the event of finding guilty on either or both Counts whether the defendant committed either act with premeditation. See copy of the verdict sheet annexed hereto as Exhibit "K." With respect to both Counts, the jury found the defendant guilty but found that she committed the alleged acts without premeditation. See Tr. at 2129-30.

With respect to the first theory upon which the government can base the terrorism enhancement, the so-called "involved" theory, the only Counts applicable are Counts One and Two as they both are one of the enumerated offenses in subsection (B) of 18 U.S.C. § 2332b(g)(5). As the jury found that with respect to both of these Counts, Dr. Siddiqui engaged in the conduct without premeditation, she necessarily did so without planning, which amounts to engaging in conduct that was without calculation, a requirement for the terrorism enhancement under the first theory.[11] Thus, with respect to Counts One and Two, the jury's finding of no

---

[11] There can be no question that the government directly presented to the jury the theory that Dr. Siddiqui intended (read alternatively "planned") to kill members of the United States interview team that came to question her and the jury rejected this theory. During the closing, the government presented a host of background facts that they believed indicated Dr. Siddiqui's animus towards Americans. Her alleged rants about wanting to kill Americans and her possession of documents that were alleged to be roadmaps for terrorist attacks on the United States were but a few examples that the government presented to the jury as evidence that Dr. Siddiqui was on a mission in Afghanistan to kill Americans and she found an opportunity to do so in the context of the room in the Afghanistan National Police headquarters where she was detained on July 18, 2008. The government's theory of Dr. Siddiqui's attempted murder as a calculated and premeditated act warranting a terrorism enhancement is clearly encapsulated in the following argument to the jury:

> And if you find the defendant guilty of that crime, of that first count, you are going to be asked a second question and that's whether the defendant acted with premeditation. Premeditation means after deliberation, after thinking it over. And here we know the defendant acted with premeditation. You know that because throughout the trial you have heard time and time again from all different types of witnesses that this woman, the defendant, hated Americans. You heard that from the Afghans who had her in custody from July 17 to July 18, you see that in the documents that she had on her the night before, and you know that when the Americans walked in the defendant hid, she waited. She waited before she acted, and that is premeditation.

Tr. at 1969.

Here, the government carefully marshaled all of the Rule 404(b) evidence and clearly packaged it in a manner to suggest that Dr. Siddiqui was a terrorist who turned her captivity into a terrorist mission. Let there be no mistake — the government presented this theory and the jury flatly rejected it.

premeditation precludes the Court from basing the terrorism enhancement on the offense conduct alleged therein under the "involved federal crime of terrorism" theory.[12]

Should the government base the terrorism enhancement on the second theory outlined in Awan, then they would clearly have the burden to prove that Dr. Siddiqui's conduct for which she was convicted (or relevant conduct) somehow "encourage[d], further[ed], or [brought] about" a federal crime of terrorism of another. Under this theory, the government appears to have three insurmountable hurdles – first, the government would have to identify a federal crime of terrorism separate and apart from Dr. Siddiqui's offense conduct; second, the government would have to identify how that federal crime of terrorism was "encouraged" or "furthered" or "brought about" by Dr. Siddiqui's offense conduct; and third, the government would have to identify the offenders who committed this separate federal crime of terrorism.[13]   We respectfully

---

[12] We respectfully request the right to reply to any allegations by the government that Dr. Siddiqui was "involved" in a "federal crime of terrorism" through a theory of relevant conduct. We have made discovery requests of the government in anticipation of litigating the terrorism enhancement and the response that we have received to those requests sheds very little light on the theory upon which the government intends to base a terrorism enhancement. See letter of defense counsel to the government dated March 27, 2010 and the letter of government counsel to Dawn M. Cardi, Esq. dated April 30, 2010 annexed hereto as Exhibit "L." The Presentence Investigation Report also does not articulate the theory upon which the Probation Office seeks the terrorism enhancement. See Presentence Investigation Report dated April 7, 2010, ¶ 43. Should the government seek the terrorism enhancement for uncharged conduct – for example, providing material support to terrorists – the effort should be rejected as a transparent attempt to move beyond the limits of conduct related to the offense of conviction in order to get a terrorist conviction "based on bench trial rather than jury trial." United States v. Allen, 488 F.3d 1244, 1255 (10th Cir. 2007). As the Allen court recognized, "the relatedness principle [constraining the ambit of relevant conduct] keeps the system from straying too far beyond the Sixth Amendment line." Id. As this Court has repeatedly observed, this proceeding was a relatively simple case of attempted murder. The government should not be allowed to turn it into a terrorism case at sentencing.

[13] We respectfully submit that the government will be especially hard pressed to demonstrate that Dr. Siddiqui's conduct "encouraged," "furthered," or "brought about" the federal crime of terrorism of another since her actions were viewed by the jury as unplanned, spontaneous and an instinctual response. It seems beyond dispute that in order for an act to be viewed as done with an intent to encourage, further, or bring about the actions of another, it has to be foreseen and

submit that there is nothing in the record, as defined by the government in its letter to defense counsel dated April 30, 2010, to support this second theory upon which to base the terrorism enhancement.[14]

### 3.    There Is No Basis For Imposing A "Hate Crime" Enhancement

In the PSR, the Probation Office provides a possible basis for the application of the so-called "hate crime" enhancement pursuant to § 3A1.1 of the Sentencing Guidelines. For the very same reason that the terrorism enhancement is inapplicable to Dr. Siddiqui's offense conduct — the fact that the jury found that her actions were without premeditation — we respectfully submit that the "hate crime" enhancement should not be applied. It would defy logic to apply the "hate crime" enhancement, which implies that the defendant consciously chose to target in advance certain victims, where a jury finds that the conduct at issue was instinctual and spur of the moment.

§ 3A1.1 of the Sentencing Guidelines provides in relevant part as follows:

### Hate Crime Motivation or Vulnerable Victim

(a)    If the finder of fact at trial or, in the case of a plea of guilty or nolo contendere, the court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, disability, or sexual orientation of any person, increase by 3 levels.

---

planned in advance. There is nothing in the record to suggest that Dr. Siddiqui foresaw or planned to be captured by Afghan police authorities and then interviewed by U.S. military personnel, never mind foreseeing one of said U.S. military personnel leaving his rifle unattended where she could grab it and attempt her escape from Afghan authorities. Just stating this theory is enough to dismiss it as absurd.

[14] Again, we respectfully request the right to reply to the government's sentencing submission should they argue that under a theory of relevant conduct Dr. Siddiqui "encourage[d]" or "further[ed]" or "brought about" a federal crime of terrorism of another party.

In one of the application notes to this enhancement, special attention is drawn to the fact that

"special evidentiary requirements govern the application of this subsection." § 3A1.1, Appl.

Note 1. The "special evidentiary requirements" referred to include the requirement that where

there is a trial the finder of fact must find "beyond a reasonable doubt" that the defendant

"intentionally selected any victim ... because of the actual or perceived ... national origin ... of

any person." Here, where the jury expressly found that Dr. Siddiqui's attempted murder was not

planned in any manner, it is a matter of logic that she could not be characterized as having

"intentionally selected" any of her victims based on their perceived national origin.[15]

  Even if the Probation Office and government were to ignore the "special evidentiary

requirements" of the "hate crime" enhancement, they would still fail to present evidence beyond

a reasonable doubt that Dr. Siddiqui intentionally selected her victims based on their perceived

national origin. Whatever Dr. Siddiqui may have shouted while in Afghan custody or right

before she was shot or after she was shot (and there is certainly very little consensus between the

various witnesses, both American and Afghan, as to what she said with respect to alleged anti-

American sentiment), it is beyond dispute that her primary concern was not to be taken to an

American prison where she believed she would be tortured or raped. See Tr. at 1820 (████,

noting that Dr. Siddiqui frequently begged her Afghan captors not to turn her over to the

Americans). The record as it currently stands makes perfectly clear that Dr. Siddiqui behaved

like a desperate and feral captive who tried multiple times to escape from her Afghan captors.

According to Afghan witnesses she struggled and bit her Afghan captors when they prevented

---

[15] Since the jury did not render a finding about premeditation with respect to the assault charges, the enhancement cannot be applied because the threshold requirement for its application is a jury finding of intentional selection. Arguably, the enhancement cannot be applied to the attempted murder charges for the same reason in that the jury was not charged directly with answering the question as to whether Dr. Siddiqui intentionally selected her victims based on perceived national origin.

her from escaping twice. See id. at 1821. She did not assault and bite her Afghan captors
because they were Afghan; she assaulted and bit her Afghan captors because she viewed them as
persons who would facilitate her transport to American officials who would, in turn, bring her to
sites where she would be tortured or raped. What the record supports by implication is the
proposition that Dr. Siddiqui would have struggled and bit anyone, whatever their race, ethnicity
or national origin, if she perceived that they would hand her over to any authorities that would
bring her to an American prison. Under such a scenario, the "hate crime" enhancement is simply
not applicable.

### 4.    There Is No Basis For An Enhancement For Targeting An Official Victim

Amongst the victim enhancements in the Sentencing Guidelines is one entitled "Official
Victim" triggered where the victim was: "(A) a government officer or employee ... and [] the
offense of conviction was motivated by such status." See U.S.S.G., § 3A1.2(a). The
enhancement increases the offense level by 3 and where the conduct involves offenses against
the person, such as attempted murder, the offense level is increased by 6. See U.S.S.G., §
3A1.2(a) & (b). As noted above, the Probation Office seeks to enhance Dr. Siddiqui's offense
level by 6 as per subsection § 3A1.2(a) & (b). See PSR, ¶ 42.

We acknowledge that the Second Circuit has recently opined that a jury finding that a
defendant who without provocation conspired to murder officers or employees of the United
States is sufficient to trigger the "Official Victim" enhancement. See In re Terrorist Bombings,
552 F.3d 93, 155 (2d Cir. 2008). Here, however, it cannot be said that Dr. Siddiqui's offense
conduct tracked that of El Hage. She did not carefully and deliberately plan an unprovoked
attack of United States officers and employees in order to contribute to the ongoing terrorist
efforts of an organization at war with the United States. As the jury found, Dr. Siddiqui's

conduct was spontaneous and unpremeditated and directed at everyone who attempted to take
her captive. She struggled with her Afghan captors. She struggled with her American captors.
She would have struggled with any captor. Such indiscriminate struggling as a factual matter
does not satisfy the implied mens rea of the "Official Victim" enhancement, which assumes an
animus that distinguishes and targets certain victims  · specifically, government officers and
employees. Such distinguishing and targeting posits a frame of mind that was not exhibited by
Dr. Siddiqui from the moment that she was arrested in the evening of July 17th to the moment
that was tried to escape twice from her Afghan captors to the moment that she tried her final
escape when the U.S. Military and accompanying interview team arrived in the room where she
was held.

5.    There Is No Basis For An Enhancement
       For Obstruction of Justice

        The Probation Office notes the government's position that Dr. Siddiqui's offense conduct
may warrant an enhancement for obstruction of justice under two theories: (1) that by
malingering symptoms of serious mental illness she somehow obstructed justice; and (2) that she
perjured herself while testifying at trial. See PSR, ¶¶ 32-33. As the Court has conceded that at
the base of Dr. Siddiqui's exaggerated symptoms lurks the possibility of serious mental illness,
an obstruction of justice enhancement based on malingering is unwarranted. As for perjury, the
Court should also reject this basis for the enhancement because the contradictions in statements
upon which the government alleges perjury arise from interviews taken after Dr. Siddiqui was
shot and on medication that spanned over many hours across two weeks. Further, Dr. Siddiqui
was not prepared for her testimony. Under such conditions where Dr. Siddiqui's testimony was
minutely compared and found to differ from statements made in across a hundred pages of FBI
reports without the assistance of counsel to identify the government's likely questions under

cross and remind her of earlier statements, an obstruction of justice enhancement is patently unfair.

### Dr. Siddiqui's Mental Health Issues Should Not Serve As A Basis For An Obstruction Of Justice Enhancement

While the Probation Office's suggestion that Dr. Siddiqui's malingering mental illness warrants an obstruction of justice enhancement is not novel, there is certainly limited case law on the issue. It appears that the Second Circuit has yet to render an opinion that provides guidance to defense attorneys as to those circumstances where there is a bona fide basis for requesting a competence evaluation and where such a request risks providing the basis for an enhancement.

The Eleventh Circuit has provided limited guidance on the issue. See United States v. Patti, 337 F.3d 1317 (11th Cir. 2003); United States v. Diaz, No. 09-11848, 2010 WL 1767248 (11th Cir. May 4, 2010).

In Patti, the court found two bases for an obstruction of justice enhancement: (1) the defendant falsely claimed amnesia after a car accident; and (2) he engaged in arson in order to destroy incriminating documents in his accounting office. See Patti, 337 F.3d at 1325. The defendant in Patti engaged in a series of tactics to delay proceedings. He filed multiple motions for the judge's recusal. Shortly after losing these motions, he was allegedly involved in a car accident that triggered amnesia about the tax evasion for which he stood accused and after a hearing he was found to be malingering the amnesia symptoms. And then the court found believable the testimony of coconspirators who stated that they were instructed to destroy the defendant's office in order to get rid of certain documents material to the criminal proceeding. Under this set of circumstances, where feigning mental illness could be easily seen as one of many efforts to interrupt the course of the criminal proceedings, an obstruction of justice enhancement was warranted.

43

In Diaz, the defendant's obstructive behavior was similarly obvious. At the commencement of his criminal proceeding, the defendant claimed to be having difficulties understanding his attorney because he was under medical treatment for a brain injury suffered from a past accident. See Diaz, 2010 WL 1767248, at *9. A mental examination performed by the Bureau of Prison resulted in a finding that the defendant was malingering. See id. The defendant next decided to enter a plea of guilty. See id. He did so and then prior to sentencing he decided once again to claim that he was mentally ill, had been coerced into pleading guilty, and wished to go to trial. See id. The defendant then asserted a defense of guilty by reason of insanity, which triggered another round of evaluations resulting in another finding of malingering. See id. In fact, the defendant's own expert retained for trial could not support a finding that he was insane at the time of the offense conduct. Under these circumstances, similar to Patti in that the defendant's course of conduct was clearly intended to interrupt and delay the course of the criminal proceeding to an extent that his own expert could not provide cover by an opinion or a diagnosis of any mental illness, an obstruction of justice enhancement was warranted.

Here, the government cannot frame Dr. Siddiqui's malingering as one episode in a course of conduct meant to derail the criminal proceedings against her. In order to participate in the derailing of her own criminal proceedings, Dr. Siddiqui would have to confer with her counsel or seek the assistance of psychological staff at the prison where she is housed or write directly to the Court with applications that would slow or stop the progress towards trial or sentencing. There simply is no history of such conduct. Unlike the majority of defendants who are deemed malingerers, including the defendants in Patti and Diaz, Dr. Siddiqui never insisted that she was mentally ill nor did she seek a defense based on a mental state. Throughout the course of her

44

incarceration, she has repeatedly avoided encounters with psychological staff, encounters that might otherwise trigger concerns about her competence. As the Court knows, Dr. Siddiqui has refused to assist her counsel so we have been unable to do anything on her behalf that might place procedural hurdles in the way of trial or sentencing. Finally, in all of her correspondence to the Court, Dr. Siddiqui has done nothing that could be construed as an application that sought a hearing or procedure that proved to be a waste of time.

Most importantly, the Court has itself conceded that Dr. Siddiqui may very well have "some mental health issues" that warranted closer evaluation by experts and the Court. See Order Finding Defendant Competent to Stand Trial dated at 25. Unlike the defendants in Patti and Diaz, the assessment of Dr. Siddiqui's mental health was not unanimous amongst the experts who evaluated her. The Bureau of Prison psychologist who evaluated her changed her assessment over time, a striking indication of Dr. Siddiqui's complex presentation of symptoms. While two government experts diagnosed Dr. Siddiqui as malingering, defense counsel's expert, a psychologist who specialized in malingering, opined that she was doing no such thing. If ever there were a close call in terms of an assessment of mental illness – not perhaps the assessment of incompetence, which is a difficult standard to meet – it would be here.

Where the issue of mental illness is as present as it appears to be with Dr. Siddiqui and its relation to her ability to assist in her own defense is clear, counsel and the Court are right to proceed to a competency hearing and to clarify such an important issue. For the Court now to impose an obstruction of justice enhancement for the exploration of this issue which was at the instigation of all counsel and not Dr. Siddiqui – for she has always insisted that she is competent – would defy all common and legal sense. Thus, we respectfully request that the Court reject the

45

Probation Office's suggestion that the diagnosis of malingering by the government's experts is a basis for imposing a two-level enhancement on Dr. Siddiqui's offense level.

### The Government's Allegations Of Perjury Should Be Rejected And An Enhancement Based On Same Should Be Denied

According to the Probation Office, the government will seek an obstruction of justice enhancement based on Dr. Siddiqui's testimony at trial. The statements that the government views as perjurious are as follows: (1) Dr. Siddiqui's statement that she did not know how to use a gun; (2) her statement that she never took a firearm course while at MIT; (3) her statements denying writing certain documents and possessing them on the day of her arrest on July 17, 2008; and (4) her statements where she denied having made previous statements to FBI agents while they interrogated her before reading her Miranda rights and while she was heavily sedated. See PSR, ¶ 33.

### Statements About Familiarity With Firearms

It is true that the government posed questions to Dr. Siddiqui about her familiarity with firearms and the questions and answers with respect to this issue were typical of the difficulties anyone who attempts to question Dr. Siddiqui and get her to answer responsively. We respectfully submit that Dr. Siddiqui's difficulties in remaining on script is due to mental illness; the government argues that it is an indication of her cunning and manipulativeness. In any event, under conditions where answers to questions are frequently an inextricable mix of responsive and no-responsive answers such as Dr. Siddiqui provided, finding a basis for perjury is impossible. The pattern of questioning went something like the following: the government posed a question, Dr. Siddiqui provided a non-responsive answer; the government posed a series of follow-up questions, Dr. Siddiqui continued with her non-responsive answers; finally, the government bluntly posed a simple question that required a yes or no answer and Dr. Siddiqui,

out of frustration and untutored by her counsel not to answer a question that she could not

answer as a simple yes or no, provided the yes or no answer that the government now finds

perjurious and a basis for obstruction. Take, for example, the following line of questioning:

> Q. Ma'am, you have if [sic] a some familiarity with firearms, don't you?
> A. No, I don't.
> Q. Is it your testimony that you have no familiarity at all with firearms?
> A. Familiarity? I look at a gun and I know it is a gun. But I couldn't tell the
> different brands of them, how to use them, operate them, those kinds of things,
> no.
> ...
> Q. Ma'am, when you were a student at MIT –
> A. I am not that good an artist. I can tell you that. I cannot draw a hand and
> there are these hands.
> Q. Ma'am when you were a student at MIT, isn't it true that you took a gun
> course?
> A. A what course?
> Q. A gun course.
> A. Gun course?
> Q. Correct.
> A. A gun course?
> Q. Pistol safety course?
> A. Oh, you mean the physical education they had? That was a course probably. I
> – probably so. I may have. Everybody used to take it. I remember now. It is a
> possibility.
> Q. I will ask you a different question. Isn't it true in the early 1990s when you a
> [sic] student at MIT you took a pistol course at the Braintree Rifle & Pistol Club
> just outside of Boston, isn't that true.
> A. I have no recollection of that. Absolutely not.
> Q. Isn't it true as part of that course you fired hundreds of rounds on a firing
> range?
> A. I have no recollection of that. There is no way I can
> Q. Well –
> A. Actually you can take that as a no.

Tr. 1731-33. Dr. Siddiqui's responses to this line of questioning pivot back and forth between

yes and no. Her immediate response is to deny unqualifiedly familiarity with firearms. In the

next breath, she remembers that there was a firearm course taught at MIT through physical

education and she appears to remember taking the course. In the next breath, she qualifies her

memory to say that "[i]t is a possibility" that she may have taken the course. When the

government narrows the line of questioning to a specific course that she may have taken at a rifle club in Braintree, Dr. Siddiqui then becomes confused and stated that she had no recollection of taking such a course. Note that this is not a denial of taking the course but a statement indicating her lack of memory as to taking such a course. When the government pursues this line of questioning, Dr. Siddiqui, out of frustration, characterizes her own response as no.

In reviewing this line of questioning, it is clear that Dr. Siddiqui has no sensitivity as to the importance of her thoughtful responses to the questions and she utterly lacked the kind of preparation by counsel that would have identified likely cross-examination questions and how to answer in a manner that was both careful, thoughtful, truthful without overstating what she knew or remembered. On the important question as to whether she has any familiarity with firearms, Dr. Siddiqui changed her answer dramatically from an absolute no to an absolute yes in the course of brief questioning when she suddenly remembered that course at MIT. On the issue of the Braintree course, it is likely that if the government had proceeded along this line of questioning, Dr. Siddiqui might have remembered taking this course too a few questions later. Dr. Siddiqui's dramatically changing responses to questions was due to her mental-health issues. Her refusal to confer with counsel before being examined was also due to her mental-health issues. All in all, the inconsistencies that the government wants to characterize as perjurious are, in fact, the byproduct of a mentally ill person testifying on her own behalf. It seems to defy fundamental fairness that a mentally ill person who counsel attempted to prevent from testifying for the very reason that she was bound to trip herself up in inconsistent testimony but whom the Court allowed to testify in order to protect her right to testify, should, in the end, be penalized for doing so. We respectfully request that the Court reject the

48

government's view that the answers to this line of questioning should serve as the basis for an obstruction of justice enhancement.

### Dr. Siddiqui's Statements About Writing And Possessing Certain Documents Do Not Warrant An Obstruction of Justice Enhancement

The statements that Dr. Siddiqui made at trial regarding documents that were in her possession at the time of her arrest follow the same pattern as the line of questioning about her familiarity with firearms: the government posed questions and Dr. Siddiqui provided partially responsive and partially non-responsive answers. The difference between this line of questioning and the line of questioning about familiarity with firearms is that here Dr. Siddiqui does not become impatient and provide an unambiguous "yes" or "no." The line of questioning was as follows:

Q. Ma'am, you had a number of documents in your possession that day, correct?
A. I can't testify to that either if it is correct or not. Because as I said I was in a daze. I mean, I didn't check my bags really. I didn't prepare them exactly.
Q. Is it your testimony that you don't know whether you had documents with you that day?
A. Did I have documents with me? What was in my bag was not – it wasn't stuff that · · it was given to me, that bag.
Q. Isn't it true that you had a number of documents that were handwritten?
A. That I had a document · a number of documents that were handwritten.
Q. Isn't that true?
A. You mean in my life? ...
A. I don't know. I mean, the bag was not mine. It was given to me. So I don't necessarily go through each and every thing in it at that day or whatever. I don't know what was put in it.

...
Q. This is one of the documents that you had with you on July 17th, right?
A. I can't testify to that as I said.
Q. This document is in your handwriting, correct?
A. It is a possibility.
Q. Is it your testimony that you can't tell whether this is your handwriting or not, ma'am?
A. No. Well, just by looking at this, I would not · · I would not be able to tell but I don't want to lie. It is stuff that has been copied from a magazine and I

49

remember -- I can't testify to this because I don't remember the words. In the
secret prison --

...

The Court. She is just asking if this is your handwriting. That was her question.
A. Just by looking at this page, I cannot say.

...

Q. Now, this is another document that you had in your possession on July 17th,
right?

...

A. I am not claiming anything was in my possession that I know of because I
don't know that that purse was given to me. I do not know what was put in it,
what was added later, what was done. I don't know that.

...

The Court. Is any of this your handwriting?
A. Looking at this, I don't know.

Tr. 1728-32. In this line of questioning, it is important to note that Dr. Siddiqui refused to be

pinned down on the two questions that the government appears to believe resulted in perjury: did

you possess these documents on July 17th and are some of them in your handwriting. To both of

these questions, Dr. Siddiqui repeatedly states in sum and substance, "I don't know." As the

government fails to pin her down on either of these questions, we respectfully submit that her

answers cannot be perjurious and thus a basis for an obstruction of justice enhancement.

### Dr. Siddiqui's Failure To Remember Hundreds Of Pages
### Of Her Prior Statements Cannot Be The Basis
### For An Obstruction Of Justice Enhancement

The government appears to argue that Dr. Siddiqui's statements at trial where she denied

making previous statements while being interviewed for two weeks after she was shot on July

18, 2008 constitute perjury and triggers the obstruction of justice enhancement. As mentioned

above, in light of Dr. Siddiqui's mental-health issues and the fact that counsel did not have the

opportunity to review with her statements that she allegedly made and were memorialized in so-

called 302 reports, the Court should not impose an obstruction of justice enhancement for any

alleged inconsistencies between her post-arrest statements and her trial testimony.

At trial, the government confronted Dr. Siddiqui with the following post-arrest statements that she made while heavily medicated and recovering from a gunshot wound over the course of approximately two weeks of interviews that spanned whole days without being read her <u>Miranda</u> rights or offered the assistance of counsel to protect her rights by providing advice and taking copious notes of what was being said. First, the government noted that Dr. Siddiqui had stated to Agent "Bruce" that she picked up the gun to look at it. <u>See</u> Tr. at 1746. In response to which, she emphatically denied every speaking to "Bruce," but a few seconds later she observed, "I don't remember at all which day I spoke to what and who." Tr. at 1747. Second, the government confronted Dr. Siddiqui with having asked "Angela" what sentence a person would receive in the United States for attempted murder. <u>See</u> Tr. at 1748. To which Dr. Siddiqui responded, "I don't remember that at all. I don't remember, but she used to talk a lot about a lot of things. I don't remember asking that." <u>Id.</u> A few moments later, the government confronted Dr. Siddiqui with having observed to "Angela" that "spewing bullets at soldiers is bad but everyone there was still taking care of you." <u>Id.</u> In response to being confronted with this statement, Dr. Siddiqui remembered during the course of her interviews that an agent joked in her presence that there were numerous versions as to what occurred in the room where Dr. Siddiqui was shot and her statement may have arisen in the context where the versions were being humorously recounted. <u>See</u> Tr. at 1749. The government next confronted Dr. Siddiqui with having asked "Angela" what a person would be charged with if they shot a gun but ended up being shot themselves. <u>See</u> <u>id.</u> Dr. Siddiqui responded, "I don't remember those words. Those are not my words. I don't talk like that at all." <u>Id.</u> The government asked Dr. Siddiqui if she had stated that she was surprised that the United States was "taking such good care of you under the circumstances." Tr. at 1750. Dr. Siddiqui responded, "I don't know about that, but it

is not a surprise for me that the U.S. took care – took care." Tr. at 1750. When the government

tried to return to the question as to whether Dr. Siddiqui had admitted to possessing certain

documents allegedly found in her possession while being interviewed by "Angela," she stated, "I

can't – well, I didn't -- I don't remember telling her that I had them ever in my possession." Tr.

at 1751. In a final effort to get Dr. Siddiqui to admit that she had stated to "Angela" that she had

prepared certain documents allegedly found on her person on the night of her arrest on July 17,

2008, she replied as follows:

> I did not prepare anything. I did mention translating something from an English
> book that was some kind of an Army manual that was given to me, lied to me,
> saying that whatever, but it was under torture of children. That's why I ask
> everybody repeatedly, how much can you bear it? If anybody can, I would like to
> see, and then I didn't see it doing any harm to anybody. But I'm not claiming that
> picture you show. I don't draw. I could never have drawn those pictures, so I
> don't know what that's all about.

Tr. at 1753. Upon close examination, Dr. Siddiqui's response to the government's question

hinges on her understanding of "prepare," by which she means the creator of the content rather

than the scribe. As the government does not clarify its understanding of "prepare" as being

synonymous with either "creator" or "scribe" or both, Dr. Siddiqui's answer remains ambiguous

and impervious to a claim of perjury.

In reviewing this line of questioning in which the government confronted Dr. Siddiqui

with statements that she allegedly made to agents, it must be emphasized that all but one of her

responses is to the effect of "I don't know." The only statement that she emphatically denies

making is the one she allegedly made to "Bruce" (i.e., picking up the gun) and even with respect

to this statement she qualified her emphatic denial by noting that she did not remember who she

spoke to or what she said during the course of these interviews. See Tr. at 1747. Thus, her

emphatic denial of the statement to Bruce was only transitory.

In light of the fact that Dr. Siddiqui does not affirmatively deny making any of the statements with which the government confronts her at trial, she cannot be said to have engaged in perjury. Even if she could be accused of inconsistent statements, which we do not believe she can, the circumstances of these ongoing interviews would make it fundamentally unfair to penalize her for perjury. She was recovering from a gunshot wound and heavily medicated at the time. She had no idea how she was going to be treated by officials of a country that she believed was going to bring her to Gitmo and torture her so she was probably anxious to please her captors. She did not have the assistance of counsel to advise her as to the care with which to present her statements, to help her clarify her statements and to copiously write down her statements as they were said in order to compare them with the 302s that the government eventually generated after the fact. Finally, Dr. Siddiqui was without the assistance of counsel at the time of trial when she took the stand on her own behalf. In a case where there is at least a hundred pages of post-arrest statements, counsel ordinarily requires weeks to prepare a defendant in anticipation of cross-examination where the prosecutor will certainly monitor testimony for the slightest deviation from prior statements. It is a challenging task for attorney and client to keep these statements in mind and recount the narrative of the offense conduct in line with the previous statements. Here, Dr. Siddiqui, due to her mental illness, effectively had no access to counsel to prepare for her examination and for all we know never reviewed the 302s that summarized her previous statements. Quite frankly, it would be startling under such circumstances if Dr. Siddiqui remembered everything she had previously said. Being human, and a highly troubled human at that, Dr. Siddiqui failed to remember statements that she had made to agents, hardly a basis for characterizing her testimony as perjurious and a basis for an obstruction of justice enhancement.

53

6.     **Dr. Siddiqui Is Not Subject To A Mandatory Minimum**
       **Of Thirty Years Because The Fact That She Allegedly Used**
       **A Machine Gun Was Not Decided By The Jury**

Count 4 charged a violation of section 924(c)(1)(B), alleging in the relevant section that

"during and in relation to a crime of violence for which she may be prosecuted in a court of the

United States, *used, brandished  and discharged* U.S. Army Officer One's M-4 rifle *(a*

*machinegun)* in connection with the crimes described in Counts One, Two and Three."

Indictment, ¶ 12 (emphasis added).

According to 18 U.S.C. § 924(c)(1)(A), the use, carrying or possession of a firearm, in

conjunction with a crime of violence, triggers the following penalties:

(i) [] a term of imprisonment of not less than 5 years;
(ii) if the firearm is brandished, [] a term of imprisonment of not less than 7 years; and
(iii) if the firearm is discharged, [] a term of imprisonment of not less than 10 years.

18 U.S.C. § 924(c)(1)(A).

According to 18 U.S.C. § 924(c)(1)(A), if the firearm possessed by a person convicted of

a violation of the same subsection is a "machine gun" that "person shall be sentenced to a term of

imprisonment of not less than 30 years." 18 U.S.C. § 924(c)(1)(B).

The allegation that U.S. Army Officer One's M-4 rifle was a machinegun situated the

alleged conduct in subsection (B)(ii) and, consequently, mandated a term of imprisonment of not

less than 30 years.  Alternatively, if the weapon were not found to be a machinegun, as alleged,

then the allegation that Dr. Siddiqui used, brandished, and discharged the weapon situated the

conduct in subsection (A)(i), requiring a mandatory minimum term of imprisonment of not less

than 10 years consecutive to any other sentence but only if it were determined that she

discharged the weapon.  In short, Count 4 alleged a violation of subsection 924(c)(1)(B), along

with all of the lesser crimes included in subsection 924(c)(1)(A).

In contrast to Count 4's allegation that Dr. Siddiqui had discharged a machine gun during the commission of a violent felony, the Court, at the government's request, and over defense counsel's objection, confined its instructions to the jury to the least serious course of conduct contemplated by section 924(c)(1)(A) – that of simple use of a firearm during the commission of an offense.[16] To wit, the Court instructed the jury as follows:

> To satisfy the second element of Count Four, the government must prove beyond a reasonable doubt that the defendant knowingly *used or carried a firearm* during and in relation to the commission of the underlying crime of violence. Count Four alleges that the defendant did *"use and carry" a firearm.* Where, as here, both using and carrying are charged, the government need only prove one or the other, not both.

Tr. at 2077 lines 11-16.

The Court further defined a firearm for the jury as "any weapon which will or is designed to, or may be readily converted to, expel a projectile by the action of an explosive." Tr. at 2077 lines 11-16. Pursuant to the Court's instruction, the jury was therefore not required to find, as an element of the crime, that the firearm used by Dr. Siddiqui was a "machinegun." Instead, the jury could, and necessarily did, find only that Dr. Siddiqui used a "firearm," placing her conduct within subsection (A) rather than subsection (B) as had been alleged.

Despite the fact that jury was not instructed on whether or not the firearm allegedly used by Dr. Siddiqui was a machinegun, the PSR recommended that the minimum sentence for Count 4 was 30 years, based on her use of a machinegun. Because the jury was not required to address the issue of whether the firearm used by Dr. Siddiqui was a machine gun, this recommendation is premised on the erroneous belief that application of the mandatory minimum for use of a machine gun contained in subsection (B) was a sentencing factor that could be applied by the Court, rather than an element of the crime.

---

[16] The defense objected to the instruction requested by the government for failing to allege that the weapon in question was the M-4 rifle.

The proper role of the jury in the application of the "machinegun" mandatory minimum has been the subject of extended debate and contrary findings within the Federal courts. Compare United States v. Branch, 91 F.3d 699 (5th Cir. Tex. 1996) and United States v. Alborola-Rodriguez, 153 F.3d 1269 (11th Cir. Fla. 1998) (sentencing factor for court) with United States v. Alerta, 96 F.3d 1230 (9th Cir. Guam 1996) (element for jury). The Supreme Court initially ended the circuit split in Castillo v. United States, 530 U.S. 120 (U.S. 2000) by finding that pursuant to the then existing language of section 924(c)(1), the use of a machinegun was an element of the offense that had to be found by the jury. Thereafter, Congress amended the language of section 924(c)(1) setting off the debate anew, resulting once again in a split within the Circuits as to whether the use of a machinegun was an element. Compare United States v. O'Brien, 542 F.3d 921 (1st Cir. Mass. 2008) (holding that whether the weapon was a machinegun is a factual element to be determined to the jury) with United States v. Cassell, 530 F.3d 1009 (D.C. Cir. 2008) (holding that machinegun is a sentencing factor).

Whatever debate that existed concerning the role of the jury at the time that the PSR was prepared, however, has been quashed in the interim by the Supreme Court's decision in United States v. O'Brien, 130 S. Ct. 2169 (U.S. 2010). In O'Brien the defendants carried firearms during an attempted robbery of an armored car. Count 3 of their indictment charged them with a violation of subsection 924(c)(1)(A)(i). Count 4 further alleged that one of the weapons carried by the defendants was machinegun, in violation of subsection 924(c)(1)(B)(ii). Prior to trial the Government moved to dismiss Count 4, maintaining that subsection 924(c)(1)(B)(ii)'s machinegun provision remained as a sentencing enhancement to be determined by the District Court upon a conviction of Count 3. See id. A unanimous Court rejected the Government's assertion, holding that "(t)he fact that a firearm was a machinegun is an element to be proved to

the jury beyond a reasonable doubt, not a sentencing factor to be proved to the judge at sentencing." id.

The same necessarily holds true in this case. Although the Government did not move for the Court to dismiss the allegation that the weapon used was a machinegun, as was the case in O'Brien, they accomplished the equivalent by requesting that the Court instruct the jury only on the use of a firearm, rather than adding an element for the machinegun. Because the additional element of whether the weapon used was a machinegun was out of the jury's consideration, the conduct considered by the jury with regards to Count 4 was necessarily limited to a violation of subsection 924(c)(1)(A).

Subsection 924(c)(1)(A) contains three potential mandatory minimum sentences for use of a firearm—five years for simple use, seven years for brandishing, and ten years for discharging of a firearm. Pursuant to Harris v. United States, 536 U.S. 545 (U.S. 2002) the question of which of the mandatory minimum applies in the defendant's case is sentencing factor that may be determined by the Court.

Counsel concedes that the jury's finding of attempted murder requires the Court to find that the defendant took a substantial step by brandishing or discharging a firearm.[17] Because the PSR did not address the question of whether Dr. Siddiqui brandished or discharged the firearm, the Court would be within its rights to return the report for reconsideration of the issue. Counsel,

---

[17] The jury instruction left all possibilities open. See Transcript at 2077, line 25 and 2078 lines 1-5 ("This does not mean that the defendant must actually fire or attempt to fire the weapon, although those obviously would constitute use of the weapon. Brandishing, displaying, or even referring to the weapon so that others present knew that the defendant had the firearm available if needed all constitute use of the firearm.") Despite this fact, counsel acknowledges that because Dr. Siddiqui was convicted of attempted murder, she necessarily must have taken a substantial step toward the commission of a crime. While substantial step would not have required her to actually discharge a firearm, the jury necessarily found that she brandished it with the intent to fire in order to satisfy a guilty verdict on attempted murder.

however, does not believe that this is necessary, given the Court's familiarity with the facts in this case.

However, counsel submits that the evidence proffered in this case does not show that Dr. Siddiqui necessarily discharged a firearm. While the Government's witnesses uniformly reported that Dr. Siddiqui discharged a weapon, there is substantial reason to believe that she did not. The forensic evidence simply failed to confirm that she discharged a weapon. There was no gun shot residue, bullet fragments or shells recovered at the scene of the crime that could have been traced to an M4 rifle. This stands in sharp contrast to the ample forensic evidence left by the bullets from the pistol that was used to shoot Dr. Siddiqui. Moreover, the photographs of the scene taken *before the incident* clearly establish error in the Government's theory that she fired two shots into the wall behind the soldiers.

In light of the forensic evidence and the divergent accounts of U.S. military witnesses as to the specific issue as to how many shots Dr. Siddiqui allegedly fired and where she was aiming, we respectfully submit that the Court can find only that she brandished the M-4 on the day that she was shot. Thus, she is subject only to a mandatory minimum sentence of 7 years consecutive to any other sentence that the Court may impose.

### 7.    Conclusion

It is the position of defense counsel that Dr. Siddiqui's adjusted offense level is 27 and her Criminal History Category is I. Her base offense level is 27 as per § 2A2.1(a)(2). As none of the enhancements suggested by the government and the Probation Office are applicable, Dr. Siddiqui's adjusted offense level is also 27. With a Criminal History Category of I and an offense level of 27, Dr. Siddiqui's advisory Sentencing Guidelines is 70-87 months. As Count Four requires a mandatory consecutive sentence of 7 years, any term of prison that the Court

58

imposes for the other Counts must be followed by a mandatory minimum sentence of 7 years.

If the Court were to impose the lowest possible sentence within the advisory Sentencing

Guidelines range and the mandatory minimum of 7 years required by Count Four, Dr. Siddiqui

would receive a sentence of 154 months or between 12 and 13 years.  For the reasons outlined

below, we respectfully request that the Court impose a sentence of 12 years.

**CONCLUSION**

For all the reasons outlined above, we respectfully request on behalf of Dr. Siddiqui that

the Court impose a sentence of 12 years.

Dated: July 15, 2010
       New York, New York

DAWN M. CARDI & ASSOCIATES

/s/

Dawn M. Cardi
Chad L. Edgar
Two Park Place, 19th Floor
New York, New York 10016
212.481.7770 (tel.)
212.684.3008 (fax)
cardiesq@aol.com
*Attorneys for defendant Aafia Siddiqui*

/s/
Linda Moreno, Esq.
P.O. Box 10987
Tampa, FL 33697
813.247.4500 (tel.)
813.386.6211 (fax)
*Attorney for Aafia Siddiqui*

59

_____/s/_____
Charles Swift, Esq.
SWIFT & MCDONALD, P.S.
2003 Western Avenue, #330
Seattle, WA 98121
206.441.3377 (tel.)
206.448.2252 (fax)
*Attorney for Aafia Siddiqui*

_____/s/_____
Elaine Whitfield Sharp, Esq.
196 Atlantic Avenue
Marblehead, MA 01945
781.639.1862 (tel.)
781.639.1771 (fax)
*Attorney for Aafia Siddiqui*