# EXHIBIT A

BARRY ROSENFELD, PH.D., A.B.P.P.
CLINICAL PSYCHOLOGIST
NYS LICENSE 012049

875 WEST END AVENUE
SUITE # 1-B
NEW YORK, NY 10025
TEL: 212-721-2745
ROSENFELD@FORDHAM.EDU

DEPT. OF PSYCHOLOGY
FORDHAM UNIVERSITY
BRONX, NY 10458
TEL: 718-817-3794
FAX: 718-817-3699

July 13, 2010

### Confidential Psychological Evaluation

Re:   **Aafia Siddiqui**
      **U.S. v. Aafia Siddiqui**
      **08 Cr. 826 (RMB)**

Aafia Siddiqui was referred for a psychological evaluation by her attorney, Dawn Cardi.
Specific questions posed by Ms. Cardi were whether Ms. Siddiqui suffers from a mental disorder
and if so, whether this disorder contributed substantially to her actions in the instant offense.
Because Dr. Siddiqui refused to cooperate with the evaluation, the opinions below are based on a
combination of available records and collateral interviews.

**Sources of Information:**
1.   Observations and brief interactions with Aafia Siddiqui, conducted by Barry Rosenfeld,
     Ph.D., June 24 and July 9, 2010
2.   Telephone interview with Muhammed Siddiqui, conducted by Barry Rosenfeld, Ph.D.,
     July 7, 2010
3.   Telephone interview with Dr. Yousef Abou Allaban, conducted by Barry Rosenfeld,
     Ph.D., July 8, 2010
4.   Forensic Evaluation, signed by Leslie Powers, Ph.D., and Robert Gregg, Ph.D., dated
     November 6, 2008
5.   Forensic Psychiatric Evaluation, signed by Gregory B. Saathof, M.D., dated March 15,
     2009
6.   Forensic Evaluation, signed by Sally C. Johnson, M.D., dated March 16, 2009
7.   Forensic Update, signed by Leslie Powers, Ph.D., and Robert Gregg, Ph.D., dated May 4,
     2009
8.   Forensic Psychological Evaluation, signed by L. Thomas Kucharski, Ph.D., dated June
     20, 2009
9.   Deposition of Leslie Powers, Ph.D., dated June 24, 2009
10.  Deposition of Camille Kempke, M.D., dated July 1, 2009
11.  Competency Hearing transcript, dated July 6, 2009
12.  Defendant's Proposed Findings of Fact, submitted by Dawn Cardi and Associates, dated
     July 20, 2009
13.  Order Finding Defendant Competent to Stand Trial, signed by U.S. District Judge
     Richard M. Berman, dated July 29, 2009
13.  Trial transcript (excerpt), dated January 28, 2010

Aafia Siddiqui cont.
U.S. v. Aafia Siddiqui
08 Cr. 826 (RMB)
p. 2

14.    Medical records (partial), Federal Bureau of Prisons, dated October 2, 2008 through
       December 31, 2009
15.    Federal Bureau of Investigation Interview summaries (302 reports) regarding Aafia
       Siddiqui, dated July 20, 2008 through September 3, 2008
16.    Federal Bureau of Investigation Interview summaries (302 reports) regarding Ali Ahsan,
       dated July 29, 2008 through August 21, 2008
17.    Federal Bureau of Investigation Interview summaries (302 reports) regarding ████████
       ████████, dated January 2 through 6, 2009
18.    Sealed Complaint number 08 Mag. 1697
19.    Indictment number 08 Cr. 826
20.    Notes (typed and handwritten), undated (recovered from Dr. Siddiqui's possession)
21.    Miscellaneous writings and messages, undated
22.    Email messages sent to Professor Sekuler, dated February 11 through March 1, 2003
23.    Master Chronology prepared by Dawn M. Cardi and Associates, dated June 15, 2009

**Overview:** Dr. Aafia Siddiqui, a 38 year-old Pakistani woman, was arrested in July of 2008, in
Ghazni, Afghanistan. During an interrogation by U.S. military and investigative personnel, Dr.
Siddiqui was apparently left unrestrained and within reach of a loaded rifle. Dr. Siddiqui
reportedly obtained the rifle and fired the weapon at the military personnel and investigative
personnel, none of whom received any injuries (although Dr. Siddiqui was shot in the abdomen).
She was subsequently charged with attempted murder of U.S. nationals, attempted murder of
U.S. officers and employees, and armed assault of U.S. officers, employees, discharge of a
firearm during a crime of violence, and assault of U.S. officers and employees.

Following her transfer to the Metropolitan Detention Center in Brooklyn, New York, Dr.
Siddiqui was determined to be suffering from a severe mental disorder and was transferred to a
Federal Medical Center (FMC) in Carswell, Texas, for an evaluation of her competency to stand
trial. In November of 2008, the evaluating psychologists at FMC Carswell (Drs. Powell and
Gregg) opined that Dr. Siddiqui suffered from a mental disorder, specifically Major Depressive
Episode, severe, with psychotic features, and was incompetent to stand trial. However, two
subsequent evaluators retained by the U.S. Attorney's Office, Drs. Sally Johnson and Gregory
Saathof, concluded that Dr. Siddiqui had fabricated her psychiatric symptoms in order to evade
punishment (i.e., malingering), and was not mentally ill or incompetent. Following these
evaluations, Drs. Powers and Gregg issued a revised report, reaching the same conclusion (that
Dr. Siddiqui was malingering and competent to stand trial), although her treating psychiatrist,
Dr. Kempke, continued to opine that Dr. Siddiqui suffered from a psychotic mental disorder
(Paranoid Schizophrenia). A psychologist retained by Dr. Siddiqui's attorneys, Dr. L. Thomas
Kucharski, also concluded that Dr. Siddiqui was psychotic, but diagnosed her with a Delusional
disorder. Despite these contradictory opinions, Judge Berman ruled that Dr. Siddiqui was indeed
competent to stand trial, and she was subsequently convicted (in February of 2010) of all
charges. She is currently awaiting sentencing.

**Relevant Background Information:** Dr. Siddiqui's personal and social background has been extensively documented in prior reports and is not repeated in detail here. In addition, because Dr. Siddiqui refused to participate in the evaluation with the undersigned examiner, the information described below is based on the available records (which, at times, contained discrepant or even contradictory information). In brief, Dr. Siddiqui was born in Pakistan, on March 2, 1972, and raised in Zambia and Pakistan. She moved to Houston, Texas in 1991, to live with her older brother, Muhammed Siddiqui, and attend the University of Houston. She subsequently transferred to the Massachusetts Institute of Technology, where she graduated with a Bachelor's degree in Biology in 1995. Following completion of her undergraduate degree, Dr. Siddiqui enrolled in the doctoral program in Cognitive Neuroscience at Brandeis University, receiving her Ph.D. in 2001. Despite her educational achievements, Dr. Siddiqui's work history appears quite limited, and was largely comprised of childcare and volunteer work for Isalmic organizations. Of note, an email exchange with her dissertation mentor, Dr. Sekular, in the Spring of 2003, indicated that she was seeking work, preferably in the U.S. (and at a relatively unskilled level, such as laboratory assistant), but anticipated being alone, without her children.

While in graduate school, Dr. Siddiqui, along with her husband and sister, established the Institute of Islamic Research and Teaching. Dr. Siddiqui's brother, Muhammed Siddiqui, explained that the goal of this institute was to put into practice the ideas that formed the basis of Dr. Siddiqui's graduate research, by improving the way in which children are taught. However, an acquaintance of Dr. Siddiqui's during the years she lived in the Boston area, Dr. Yousef Abou Aballan (a psychiatrist), explained that Dr. Siddiqui was forced to develop her own organization because she was unable to conform her beliefs and actions to even the most radical organizations. He explained that "she does not conform to any ideology of a Muslim group – extremist or liberal," and recalled that there was an organization that was aligned with al Qaeda and involved in facilitating terrorist activities, but that Dr. Siddiqui was not able to sustain a relationship with them ("there were extremist groups in Boston – she was not part of them. They were including people for military training – she was not part of them. She joined them for a short period of time, but she never continued – they were affiliated with al Qaeda").

Dr. Siddiqui was married in 1995, to Mohammed Amjad Khan, a physician, with whom she had 3 children (now 13, 11 and 6 years old, although the youngest has not been seen for several years and was reported by Dr. Siddiqui to be deceased). For most of their married life, Drs. Siddiqui and Khan and their older children lived in the metropolitan Boston area, but shortly after completing her doctorate, the family moved to Pakistan, reportedly because of her father's worsening health (he died shortly afterwards). Although they returned to Massachusetts briefly in 2002, Dr. Siddiqui returned to Pakistan with their children in 2002, where the couple filed for divorce. The reasons for their divorce (which is uncommon among arranged marriages) are not altogether clear, although Dr. Siddiqui has described her ex-husband as physically abusive towards herself and the children (and her report has been supported by collateral informants). Dr. Abou Aballan recalled Dr. Siddiqui expressing concern over the safety of her children, stating

Aafia Siddiqui cont.
U.S. v. Aafia Siddiqui
08 Cr. 826 (RMB)
p. 4

"my husband has been abusing my children." He explained that Dr. Siddiqui requested that he
see the children to intervene, but was extremely "paranoid" about the possible involvement of
the authorities and refused to bring the children to his clinic.

Dr. Siddiqui reportedly remarried in 2003, to Ammar Al Baluchi, a man alleged to be the
nephew of the renowned terror suspect, Khalid Sheikh Muhammed. Little information is
available regarding this brief relationship, but when interviewed by the FBI while recovering
from gunshot wounds sustained during the instant offense, Dr. Siddiqui stated that they had only
known one another a few days before they were married. He was reportedly arrested a few days
or weeks after they were married. Although she stated that she traveled to Afghanistan, several
years after his disappearance, in search of her missing husband ("Siddiqui traveled to
Afghanistan to see if her husband was there"), at other times she has indicated that she believed
he has been unjustly detained at the Guantanamo Bay detention facility.

Very little, if any, accurate information is available regarding Dr. Siddiqui's whereabouts during
the five years between her disappearance (in 2003) and her arrest (in July of 2008). However, in
an interview ▓▓▓▓▓▓▓, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, claimed to have seen ▓▓▓
▓▓▓▓ on several occasions, including twice (in 2003 and 2005) while she was riding in a
taxicab in Karachi, Pakistan, each time with the same taxi driver. Given the likelihood of such a
random sighting in one of the largest cities in the world, the credibility of his report is highly
questionable. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ During interviews conducted while she was
recovering from the gunshot wounds sustained during the instant offense, Dr. Siddiqui reported
having worked as a lab technician at the Karachi Institute of Technology in 2003, and living in
the Naxmimabad district of Karachi from 2005 until she left for Afghanistan. Other sources,
however, suggest that Dr. Siddiqui was held captive for at least part of the 5-year period in which
she was missing, and may have been the victim of torture during this period of captivity
(discussed in more detail below).

In a series of interviews conducted in the weeks following her arrest, Dr. Siddiqui's eldest son
(Mohammed Ahmed) provided extensive information regarding the whereabouts of himself and
his mother, some of which appeared inconsistent with either Dr. Siddiqui's report or other
available evidence. For example, Dr. Siddiqui's son reportedly stated that his entire family had
been killed in the 2005 earthquake that devastated northern Pakistan, and identified the woman
he was traveling with (his mother) as "Saliha." He stated that he had been living with "Saliha"
and her mother for several years, having met in a refugee camp after the earthquake. The
accuracy of his report, however, appears questionable.

Consistent with the report of her son, Dr. Siddiqui was found to be in possession of a large number of documents (many of which were written in Urdu and translated into English) and potentially harmful chemicals at the time of her arrest, including a series of documents describing how to create, store and handle toxic chemicals, a listing of different viruses and illnesses (along with their consequences), and a number of short stories regarding her life in the U.S. Many of these documents appear either frankly irrational (e.g., using magnets to control airplanes or gliders) or largely irrelevant (e.g., one document provides an extensive comparison of the properties of iron and copper). For example, one document describes a hypothetical "solar furnace" using a "dish to focus sunlight" and a mechanism for influencing "drone" airplanes.

Interviews conducted after her arrest, while Dr. Siddiqui was recovering from the gunshot wounds sustained during the instant offense, also revealed seemingly unrealistic ideas and beliefs. For example, in an Investigation Summary dated July 21, 2008, Dr. Siddiqui reported that she "had been able to intimidate the Pakistani government to stop military action which would kill children. She would accomplish this through the use of acid she obtained which could be thrown at people's feet."

Dr. Siddiqui's behavior since her arrest has also varied considerably, with periods in which she reported hallucinatory-like experiences (e.g., seeing her children or a dog in her cell), frequent regressive behaviors (putting her fingers in her ears to block out the voice of individuals attempting to interview her – including the undersigned evaluator), and refusing to work with her attorneys. Although some evaluators have concluded that her behaviors are indicative of deliberate symptom fabrication or exaggeration (i.e., malingering), others have concluded that Dr. Siddiqui indeed suffers from a psychotic mental disorder. Of note, however, many of Dr. Siddiqui's regressive behaviors have continued, largely unabated, even after she was found to be competent and subsequently convicted of all charges. For example, Dr. Siddiqui has continued to refuse to participate in psychological evaluations, including those arranged by her attorneys to assist in her defense (e.g., with the undersigned examiner), and continues to refuse contact with most individuals involved with her case.

**Clinical Formulation:** The primary question underlying the present evaluation pertains to whether Dr. Siddiqui does, or ever has suffered from a major mental disorder. A related question pertains to when, if present, these symptoms began to emerge and what, if any effect these symptoms have had on her behavior. This assessment is, of course, complicated by Dr. Siddiqui's refusal to participate in the evaluation process, as she continues to refuse to be interviewed by evaluators, including those retained by her own attorneys, or engage in psychological testing. Thus, the level of certainty that might be possible in a more complete evaluation is considerably more limited in the present case. Nevertheless, the available data support a number of conclusions regarding Dr. Siddiqui's mental state, both at present as well as at the time of the instant offense.

Perhaps most important is the question of whether Dr. Siddiqui suffered from a mental disorder prior to the instant offense; a number of factors support the conclusion that she did. Foremost among these is the marked deterioration in her functioning during the decade prior to her disappearance. Dr. Yousef Abou Aballan recalled Dr. Siddiqui as a highly articulate, extremely impressive young woman when he first met her at an Islamic conference in 1993. Although still an undergraduate student at MIT, he characterized her speech as "eloquent" and "very inspiring." Yet he recalled that several years later, she had become "very odd – always by herself … she was not the bright, sophisticated lady I had seen … her way of interacting was not normal." He stated that she had difficulty fitting in with any of the Muslim organizations in Boston and added that her beliefs did not "conform to any ideology of a Muslim group – extremist or liberal." Of note, Dr. Abou Aballan (a psychiatrist) characterized her as "like a paranoid person" and speculated that the deterioration and symptoms he observed may have reflected a "prodromal" period (i.e., the gradual onset of symptoms leading up to a schizophrenic illness). It should be noted that while Dr. Siddiqui's brother has, in recent months, characterized his sister as having markedly deteriorated, he stated that he was unaware of any significant psychological difficulties or functional problems during the years prior to her disappearance (although he also noted that he had only limited contact with her during these years).

Unfortunately, attempts to contact Dr. Siddiqui's mentors at Brandeis University were unsuccessful, limiting the ability to ascertain whether a similar deterioration in her functioning was evident to the faculty during her latter years of graduate school or after her graduation. However, Dr. Siddiqui's career trajectory, completing a challenging graduate program and doctoral dissertation, but struggling to find work even as a laboratory assistant, as well as the development of seemingly pronounced animosity towards Jewish individuals (despite having just completed several years at a university with a substantial proportion of Jewish faculty and students) raises questions as to whether the apparent change in her functioning was indicative of an emerging mental disorder (e.g., Paranoid Schizophrenia).

The materials found in Dr. Siddiqui's possession after her arrest also support the contention that her mental state had markedly deteriorated during the months or years preceding her arrest, as they include numerous seemingly implausible ideas and beliefs (some of which are noted above). These implausible ideas and beliefs are particularly striking given her obvious pre-morbid intelligence (having completed degrees and MIT and Brandeis) and her limited background in the biological and physical sciences. Although she offered seemingly plausible explanations for some of these materials, she also appeared to maintain her belief that many of the ideas were realistic. For example, she claimed "viruses can be altered in many ways, such as altering a virus so that it only attack [sic] adults and not children." However, she acknowledged her "research was outdated since it had been so long since she studied biology, so she did not believe any of the research she provided would successfully create such a virus." Given the suggestion, by other evaluators, that Dr. Siddiqui has indeed attempted to assist in the creation of biological weapons to be used against the U.S., and that her presentation during the past two years is a deliberate

(and sophisticated) attempt to evade prosecution, the contrast between her pre-morbid functioning and the information found in her possession appears particularly noteworthy.

Dr. Siddiqui's behavior during the past two years that she has been incarcerated also reveals considerable paranoia, disorganized thinking, and bizarre behavior, all of which are suggestive of a psychotic mental disorder. For example, a number of evaluators (e.g., Drs. Kempke and Kucharski) have described her thinking as "tangential," jumping from topics to topic. She has frequently exhibited regressive behaviors, such as refusing to speak with evaluators or her attorneys and putting her fingers in her ears to block out the voice of people speaking to her. Numerous bizarre beliefs are also described in the reports of prior evaluators (e.g., that Pakistani President Musharaf was involved in a conspiracy involving the Indian secret police that resulted in the killing of thousands of children). Indeed, even after 6 months of treatment and observation by FMC Carswell staff, her treating psychiatrist, Dr. Kempke, continued to express the belief that Dr. Siddiqui suffers from Paranoid Schizophrenia.

Although the observations detailed above are suggestive of a psychotic mental disorder that emerged in the years prior to her disappearance (i.e., Paranoid Schizophrenia or Schizoaffective disorder), other diagnostic explanations are also possible, including a chronic depressive disorder due to her abusive and deteriorating marital relationship or a delusional disorder with primarily persecutory features. The latter diagnosis, which was offered by one evaluator (Dr. Kucharski), would not explain the bizarre quality of many of Dr. Siddiqui's beliefs (although some of her beliefs are not overtly bizarre or wholly implausible), nor the extended deterioration in other areas of her functioning (e.g., as described by Dr. Abou Aballan). Likewise, while a diagnosis of chronic depression is also plausible (particularly given her report of severe abuse on the part of her ex-husband), the grandiose quality of Dr. Siddiqui's beliefs is inconsistent with a primary depressive disorder as the source of her psychotic symptoms. Rather, a diagnosis of paranoid schizophrenia (as offered by her treating psychiatrist, Dr. Kempke) or a Schizoaffective disorder (i.e., schizophrenia with co-morbid symptoms of depression), appears to be the most plausible explanation for the symptoms and observations presented above.

Despite the seemingly strong possibility that Dr. Siddiqui began to experience symptoms of a psychotic disorder many months prior to her disappearance (and indeed, may have gone into hiding *because* of her paranoid ideation), there are nevertheless indications that point to traumatic experiences during the period of time prior to her transfer to U.S. custody. For example, when asked about her children during the period of time she was recovering from gunshot wounds, Dr. Siddiqui reportedly "did not wish to discuss her children because it was too painful." During one interview she reportedly stated "she left them in the custody of her sister and she does not know where they are now or if they are even alive" but in other interviews has indicated that her children have been the source of threats or deliberate harm.

Aafia Siddiqui cont.
U.S. v. Aafia Siddiqui
08 Cr. 826 (RMB)
p. 8

Dr. Siddiqui's report of her own experiences has also varied. For example, in an investigation
summary dated August 1, 2008, Dr. Siddiqui reportedly stated "while she was detained by the
Afghani authorities, she was beaten and assaulted 'in ways you cannot think of.' Siddiqui
refused to elaborate on that statement." However, in more recent exchanges, Dr. Siddiqui has
reportedly claimed that she has been held in a "secret prison," but has continued to refuse to
provide details regarding her experiences. In her courtroom testimony, Dr. Siddiqui stated that, if
asked, she would have explained "my kids are being held and I am under threat that if I don't say
what I've been told hundreds of times to say, if I mess up, they will kill my daughter, rape my
daughter, kill her, and the baby was already gone ... I never got to tell [the investigator] because I
was confused. I thought this was a game. That is how they played the game before. Two people
would come and torture and give information 100 times."

The possibility that Dr. Siddiqui has been the victim of genuine abuse and mistreatment is also
consistent with the ███████████████████ (who provided a largely negative picture of Dr.
Siddiqui). ████████████████████████████████████████████████████
███████████████████████████████████████████████Likewise, Dr. Siddiqui's
assertion (to an U.S. investigator shortly after her arrest) that she "is often followed in Pakistan
by men she believes are working for 'a' government and trying to capture her" echoes this
concern, and raises some questions about the extent to which some of her seemingly paranoid
perceptions may have been justified.

Many of Dr. Siddiqui's behaviors during the present incarceration are also consistent with a
history of torture or severe trauma, including her hyper-reactivity during "strip searches," her
refusal to be examined by physicians (including female physicians), and her resistance to
providing details regarding her traumatic experiences (particularly regarding her children).
Although Dr. Siddiqui's disclosure of some (albeit limited) aspects of past traumatic experiences
several months after her incarceration have been identified as suggestive of malingering (e.g., in
the report of Dr. Johnson), the gradual disclosure of traumatic information is extremely common
among genuine survivors of torture and abuse. Of course, while depression and paranoia are
common reactions to torture, the presence of these symptoms alone is certainly insufficient to
verify a history of torture or abuse. Indeed, as noted above, Dr. Siddiqui initially reported that
she had been the victim of abuse after her arrest but prior to her transfer to U.S. custody (i.e., by
the Afghani authorities), raising questions as to when any reported abuses might have occurred.
Likewise, the continued uncertainty regarding her children's whereabouts during the period of
her disappearance, along with her son's presence at the time of her arrest, highlight the
possibility that Dr. Siddiqui may have indeed been "free" to carry out her activities while her
children were either held hostage or threatened. Research (including some conducted by this
examiner) has indicated that the abuse, torture and killing of a family member is significantly
more likely to result in severe psychological symptoms (including Post-traumatic Stress Disorder
symptoms) than abuse directed towards oneself. Of course, abuse of her children would not

explain Dr. Siddiqui's aversion to strip searches (nor the psychotic symptoms described above), but it would explain her post-arrest statements indicating that she had some freedom to travel, yet believed that her children had been killed. Moreover, it is certainly possible that Dr. Siddiqui was both the victim of severe abuse (whether towards herself, her children or both) AND had begun to develop a severe mental disorder prior to her disappearance. However, the latter diagnosis raises questions about the accuracy of Dr. Siddiqui's perceptions of events, which obscures any ability to determine which of her reports may be accurate versus delusional.

Despite the evidence pointing to presence of a genuine psychotic mental disorder (Paranoid Schizophrenia or Schizoaffective disorder), the possibility of malingering must be addressed, particularly given that several evaluators have concluded that Dr. Siddiqui's symptoms and clinical presentation have been fabricated in a sophisticated attempt to evade prosecution. Dr. Kucharski, in his report of June, 2009, detailed a number of reasons why malingering appears unlikely, which will not be repeated here. However several points warrant note, including the obvious possibility that while Dr. Siddiqui may have exaggerated or even fabricated some aspects of her report or symptom presentation, she may nevertheless suffer from a severe mental disorder (as acknowledged by all of the prior evaluators). Indeed, given Dr. Siddiqui's obvious pre-morbid intelligence (and considerable background in psychology which, given her doctorate in cognitive neuroscience, is far more extensive than her background in the biological or physical sciences), one would expect a highly sophisticated presentation rather than the florid and inconsistent symptoms she has presented (e.g., visual hallucinations – which have been labeled by some as malingering and others as genuine hypnogogic phenomena). Moreover, prior evaluators have cited the variability in Dr. Siddiqui's clinical presentation as evidence of malingering, it would be simply illogical for an intelligent "malingerer" to deviate from a presentation that had apparently convinced several doctors that she is genuinely ill. On the other hand, variability in symptom presentation is quite common among genuinely mentally ill individuals, particularly in the context of varying levels of stressors.

Several evaluators have also highlighted the discrepancy between available records and Dr. Siddiqui's reported sleep disturbance and eating patterns. Yet these evaluators do not address the possibility that her report may simply be incorrect (as would be expected of a severely mentally ill individual), but not deliberately fabricated. Moreover, while sleep disturbance can be indicative of a wide range of psychiatric diagnoses, it is neither unusual (particularly in a prison setting) nor diagnostic (i.e., the lack of a severe sleep disturbance does not preclude the possibility of a severe mental disorder). Such reasoning is pervasive throughout the reports of Drs. Johnson and Saathof, who repeatedly cite the lack of consistent evidence of a sleep disturbance or bizarre behaviors (in the eyes of non-professional staff) as indication of malingering. Of course, it is also well established that even floridly psychotic individuals are capable of behaving in a manner that appears "normal," even for extended periods of time, and the lack of florid symptoms is particularly common among individuals suffering from some forms of schizophrenia (i.e., Paranoid Schizophrenia and Schizoaffective disorder). Dr.

Aafia Siddiqui cont.
U.S. v. Aafia Siddiqui
08 Cr. 826 (RMB)
p. 10

Siddiqui's courtroom testimony may well reflect this very ability, as she appeared capable of providing rational answers to questions without overt evidence of bizarre ideation or responding. Yet this presentation, while not stereotypical of Schizophrenia, does not preclude the possibility of a genuine psychotic mental disorder. Moreover, when indications of tangential thinking are subtle, they have occasionally been misinterpreted as evidence of inconsistencies (e.g., p. 16 of Dr. Saathof's report, interpreting her shift in topic to an inability to consistently describe the imaginary visitors she perceived).

Perhaps the evaluator with the greatest opportunity to observe and evaluate Dr. Siddiqui, Dr. Leslie Powers, is noteworthy for having initially determined that Dr. Siddiqui was mentally ill and incompetent to stand trial, but then changing her opinion to conclude that she was malingering. Although this change suggests that extended observation revealed that Dr. Siddiqui's symptoms, while initially convincing, were ultimately fabricated, it certainly raises questions about the expertise of this evaluator. More importantly, in her deposition, Dr. Powers, attributed her changed opinion to having received information from the evaluators retained by the U.S. Attorney's Office (both of whom had already concluded that Dr. Siddiqui was malingering). This circularity – with Dr. Powers relying on the impressions of Drs. Johnson and Saathof, and Drs. Johnson and Saathof citing the opinion of Dr. Powers, is not acknowledged in their written reports. Moreover, Dr. Powers repeatedly acknowledged that her opinion regarding the presence of a genuine mental disorder (versus malingering) would change again if credible evidence of captivity or trauma were presented, indicating continued uncertainty in her clinical opinion.

Finally, the consistency of Dr. Siddiqui's presentation over the past several months (i.e., while awaiting sentencing) is also noteworthy, as she has never attempted to link her psychiatric symptoms to either the instant offense or the allegations of terrorist activities. Although she has at times implied that some of her actions might have been due to fear over her children's safely, she has never attributed her actions to psychiatric symptoms (that are reportedly "malingererd"). Furthermore, her regressive behaviors and continued refusal of mental health evaluations or collaboration with her attorneys is clearly disadvantageous, now that she has been convicted of all charges and faces a potentially lengthy prison sentence. Hence, the possibility that she might simply be repatriated to Pakistan, which was cited as evidence of the potential secondary gain for malingering, is no longer realistic. Of course, it is possible that the "secondary gain" for malingering has simply shifted to securing a more desirable placement (e.g., a return to FMC Carswell), such a conclusion appears highly unlikely, and far outweighed by the disadvantages of facing sentencing without the opportunity to present a thorough mental health evaluation as mitigation. Moreover, as noted by Dr. Kucharski, Dr. Siddiqui continues to insist that she is NOT mentally ill, nor was she incompetent to stand trial.  This presentation is quite common among genuinely mentally ill individuals, but highly unlikely among those attempting to feign mental illness.

Aafia Siddiqui cont.
U.S. v. Aafia Siddiqui
08 Cr. 826 (RMB)
p. 11

In sum, considerable evidence appears to support the conclusion that Dr. Siddiqui suffers from a genuine and severe mental disorder that emerged prior to her arrest, and may also have been the victim of some significant trauma (whether towards herself or her children). On the other hand, while relatively little evidence points to the possibility of deliberate symptom exaggeration, the possibility of malingering cannot be conclusively ruled out. Indeed, while all of the prior evaluators have offered conclusions, it is clear to this evaluator that the limited data available, coupled with frequently contradictory observations and historical data, prevent any conclusions with sufficient certainty. The above formulation represents, in this evaluator's opinion, the most plausible explanation for the available data, given the caveats and limitations in this evaluation.

Barry Rosenfeld, Ph.D.
Licensed Clinical Psychologist
Diplomate (Forensic), American Board of Professional Psychology
Associate Professor, Department of Psychology, Fordham University