UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

            - v. -          :          08 Cr. 826 (RMB)

AAFIA SIDDIQUI,          :

            Defendant.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S
## SENTENCING SUBMISSION


PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America


Christopher L. LaVigne
David M. Rody
Jenna M. Dabbs
Assistant United States Attorneys

      -Of Counsel-

**TABLE OF CONTENTS**

I.  Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  Siddiqui's Apprehension in Ghazni, Afghanistan . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.  Items Recovered from Siddiqui . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    C.  Siddiqui's Time in Afghan Custody . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    D.  Notification to the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    E.  Travel to ANP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    F.  Siddiqui's Attempt To Murder United States Personnel . . . . . . . . . . . . . . . . . . . . 8

    G.  Siddiqui's Treatment and Transfer to the United States . . . . . . . . . . . . . . . . . . . 13

    H.  Indictment, Competency Proceeding, Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

II.  Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    B.  Siddiqui's Guidelines Range is Life . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        1.  Siddiqui's Base Offense Level is 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        2.  A Six-Level Increase Applies for Targeting an Official Victim . . . . . . . . . . . 27

        3.  The Terrorism Enhancement Applies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        4.  A Three-Level Hate Crime Enhancement Applies . . . . . . . . . . . . . . . . . . . 37

        5.  A Two-Level Increase Applies for Obstruction . . . . . . . . . . . . . . . . . . . . . 40

        6.  Mandatory Minimum Consecutive Guideline . . . . . . . . . . . . . . . . . . . . . . . 44

        7.  The Total Guidelines Range . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    C.  Consideration of the 3553(a) Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

III.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

i

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

    - v. -          :          08 Cr. 826 (RMB)

AAFIA SIDDIQUI,          :

             Defendant.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S
## SENTENCING SUBMISSION

On July 18, 2008, Aafia Siddiqui, the defendant, attempted to kill United States personnel who were preparing to interview her at an Afghan National Police Compound (the "ANP Compound") in Ghazni City, Afghanistan.  Siddiqui picked up an unattended machinegun, aimed it at United States personnel, and pulled the trigger.

The individuals Siddiqui attempted to kill included: (1) Captain Robert Snyder (United States Army); (2) the Chief Warrant Officer (United States Army); (3) Ahmed Gul (United States Army Contract Interpreter); (4) Medic Dawn Card (United States Army); (5) Jawid Amin (United States Army Contract Interpreter); (6) John Jefferson (Federal Bureau of Investigation ("FBI"); and (7) Erik Negron (FBI).

After a two week trial, a jury found beyond a reasonable doubt that Aafia Siddiqui attempted to kill these individuals.

Siddiqui now faces a maximum sentence of life imprisonment and a mandatory minimum consecutive sentence of ten years' imprisonment.  Taking into account all of the aggravating factors associated with her offenses, the United States Sentencing Guidelines (the "Guidelines") provide for a sentence of life imprisonment, followed consecutively by a

mandatory minimum sentence of ten years' imprisonment.

Considering the Guidelines range and the factors enumerated under Title 18, United States Code, Section 3553(a), the Government believes that such a sentence would be reasonable.

## I.    STATEMENT OF FACTS

### A.    Siddiqui's Apprehension in Ghazni, Afghanistan

On July 17, 2008, Siddiqui was with her twelve-year old son in the vicinity of a local bazaar in Ghazni City, Afghanistan.  (PSR ¶ 13.)[1]  Prior to this date, a source advised members of the ANP that a woman and young boy might be traveling to Ghazni City, Afghanistan to carry out an attack.  (PSR ¶ 12.)[2]

The ANP was alerted to Siddiqui's presence and responded.  (PSR ¶ 13.)  The ANP approached Siddiqui and her child, but were unable to communicate with them in local dialects (Pashtu or Dhari).  Accordingly, the ANP enlisted the assistance of a shopkeeper (who spoke Urdu) to speak with her.  (Def. Ex. B at 1721.)  Siddiqui provided conflicting explanations for what she was doing in Ghazni City, and declined the ANP's efforts to assist her.  (Def. Ex. B

---

[1]    Throughout this memorandum, "GX [NUMBER]" refers to various Government exhibits that were admitted or marked at trial; "Def. Mem." refers to the defendant's sentencing memorandum; "Def. Mem. Ex. [LETTER]" refers to various defense exhibits that were submitted in connection with its sentencing memorandum; "Govt. Mem. Ex. A" refers to the documents attached to this memorandum, which documents the Government is submitting under seal; "Competency Hearing GX [LETTER]" refers to Government exhibits introduced at the competency hearing; "PSR" refers to the pre-sentence investigation report that was prepared by the United States Probation Department; and "Tr." refers to the trial transcript.

[2]    Ghazni City is located in Ghazni Province, Afghanistan next to Highway 1.  (PSR ¶ 12.)  In July 2008, the United States Army had troops stationed at a Forward Operating Base ("FOB Ghazni") there, owing to a large Taliban presence in the area.

at 1721.)  Siddiqui and her son attempted to walk away.  (Def. Ex. B at 1714.)  The ANP then

arrested her, and she resisted.  While resisting, Siddiqui made a number of statements, including

various anti-American statements, to the ANP.  (Def. Ex. B at 1717, 1721.)

### B.    Items Recovered from Siddiqui

When the ANP detained Siddiqui, they recovered a number of items from her.

These items included: (1) various personal effects, such as clothing, makeup, hair products, and

feminine products; (2) approximately two pounds of sodium cyanide; (3) a number of

handwritten notes (in English and Urdu) that referenced "enemies" –  including the United States

– and that discussed the construction of various types of weapons; (4) a number of pre-printed

materials that contained instructions on making various types of explosives; and (5) a computer

thumb drive containing various electronic documents, certain of which referenced "enemies"

(including the United States) and discussed various ways to create weapons with chemical

compounds.

Among the handwritten documents (which were in Siddiqui's handwriting and

certain of which bore her fingerprints) were the following excerpts written in English:

- "Do the unthinkable: Attack enemies on gliders. . . .  Attack using laser beams." (GX 127A-1.)

- "Need booby traps + 'dummy' shelters (metal deposits) to fool enemy's radar."  (GX 140A-2.)

- "To kill or 'mess up' drones. etc.  How about thin pointed 'charged towers' that discharge their electricity upon the drone as it approaches near or over them."  (GX 142A-1.)

- "Bomb (mine-sniffer sub): remote controlled sniffer destroys underwater mines (US navy)."  (GX 142A-1.)

- "a 'mass casualty attack' . . . NY City monuments: Empire State

3

Bld., Statue of Liberty, Brooklyn Bridge, etc." (GX 142A-1.);

- "Dirty Bomb: Need few oz. radioactive material (e.g. cobalt 60
  from food irradiation facility) . . . wrap cobalt 60 around a [u/i]
  bomb, detonate it & shower a city w deadly fall out. . . .  To detect
  dirty bombs, gamma and other radiation sensors @ airports [or]
  seaports [or] police depts (but still not all covered in America). . . .
  Practical dirty bomb would work by causing FEAR, not much
  deaths."  (GX 142A-1.)

Certain of the handwritten materials recovered from the defendant were written in

Urdu and referenced the construction of various weapons, including, for example, a "match gun"

(GX 141A-2) and various other explosive-type devices, such as bombs, nitric acid (GX 131A-

1T), dynamite (GX 132A-1T), fertilizer explosives (GX 135A-1T), and gunpowder (GX 134A-

1T).[3]  Excerpts of certain of the items written in Urdu include the following (as translated):

- "The enemy uses the 'air strikes' as the most effective way to harm Muslims
  nowadays, which is really harmful to Muslims."  (GX 129A-1T.)

- "It is better to die while fighting infidels than to die or become
  handicapped by one's own negligence and carelessness when
  making weapons . . .  If, despite exercising cautions, God has
  willed that the person gets wounded or becomes a martyr from his
  own weapons, then let it be!  God is great!" (GX 130A-1T.)

- "It is better to build shelters for Mujahedeen to hide in the
  mountains, in jungles, deserts, in remote and suburban areas, so
  that if they become targets of the enemy, most of the bombs will
  fall on empty grounds, rendering the bombs useless."  (GX 140A-
  2T.)

- "[i]n your area, about 30 miles from Kabul, there is a long strip of
  land where high quality of copper deposits is available in
  abundance, which is being stolen by the infidel occupiers, and
  being taken to their countries!"  (GX 129A-2T.)

---

[3]     As the defense notes, the substance of certain Urdu documents recovered from the
defendant include items that can be found on alarming internet-web sites, including
"bombshock.com" and the "anarchist cookbook."  (Def. Exs. E-I.)

The pre-printed materials recovered from the defendant consisted of various recipes for creating homemade bombs and destructive devices, including C-4 and urea nitrate. (*See* Competency Hearing GX N (under seal).)  Those materials also included a published article about how to destroy satellites.

The computer thumb drive contained documents of a similar character, including: (1) discussions of jihadist training and recruitment (such as summaries of proposed training courses); (2) repeated references to ways to attack the United States (which also was labeled an "enemy"); (3) references to the United States as an "occupier"; (4) discussions of the construction of chemical and biological weapons; and (5) a biographical essay by Siddiqui entitled "I am Not a Terrorist."  (PSR ¶ 15.)  Excerpts from certain documents on the thumb drive include:

- A summary of proposed training courses for 4th and 5th grade children, with a heading: "BASIC INFO. ABOUT PRESENT-DAY ENEMIES (The Americans, Europeans, Russians, Hindus, The Munafiqueen Governments, The Yahud, The Orientals (potential enemies – China, Japan etc)."  (Govt. Mem. Ex. A at 1.)

- "[G]rant my brothers who were striving in your path – selling this life for the next – please grant them a permanent release from the prisons all over the world. Make their resolve even stronger to fight against your enemies, who deserve no mercy."  (PSR ¶ 15.)

- "Equip these people with weapons – new weapons that the world has yet to witness, small weapons that can easily be transported, targeted weapons that will only kill criminals and spare the innocent, and deadly weapons that will scare the enemies of Allah into stopping their carnage."  (Govt. Mem. Ex. A at 16.)

- "Don't let the blood of the martyred be wasted!  If we do, then beware, for we may end up being counted as supporters of tyranny, injustice and murder." (Def. Ex. B at 599.)

- A document discussing poisons which states "[f]or enemy land: a) Can go into supermarkets and randomly inject fruits with poisons, as well as other items that are usually eaten raw. . . .  This may not kill as many people, but the panic, fear,

and economic loss will be substantial if done properly.  inshaAllah." (Govt. Mem. Ex. A at 3.)

While Siddiqui did not have any explosives or weapons on her, she did have sodium cyanide and various other chemicals, certain of which (according to reference materials) can be used in explosives.  (Def. Ex. B at 1653-54.).  Sodium cyanide is highly toxic and is lethal when ingested even in small doses (including less than five milligrams).  *See* http://capsnet.usc.edu/LabSafety/documents/SodiumCyanide.pdf (last accessed July 25, 2010). When Siddiqui was arrested, she was in possession of *two pounds* of this material, which had the potential to cause immense harm.[4]

### C.   Siddiqui's Time in Afghan Custody

After she was arrested, the ANP transported Siddiqui to the ANP Compound, where she was held until the following day.  While in ANP custody, Siddiqui repeatedly made anti-American statements.  When speaking with one ANP Officer ("ANP Officer 1"), Siddiqui referred to the United States as the "invaders." (Tr. at 1820.)  Siddiqui also advised ANP Officer 1 that she was against the "foreigners" (Tr. at 1800), and that she considered anyone who worked under the British or American flags to be an American (Tr. at 1820).  While Siddiqui stated that she was not against Afghans, she added that any Afghan who worked with an American was just like an American.  (Tr. at 1820.)  Siddiqui also repeatedly asked another ANP Officer, Abdul Qadeer, not to turn her over to the Americans, and indicated to him that she hates Americans.

---

[4]      As the defense indicates, sodium cyanide is combustible when combined with various other chemicals such as acid.  (Def. Mem. at 9.)

(Def. Ex. C at 18.)[5]

While in Afghan custody, Siddiqui tried to escape on two separate occasions.  On one such occasion, Siddiqui tried to escape from a second floor room with her son.  (Tr. at 1801-02.)  When the ANP stopped Siddiqui, she bit one of the officers and threatened to blow him (and others) up by using a can that she had in her possession.  (Def. Ex. C at 19; Tr. at 1801-02.)

### D.    Notification to the United States

After Siddiqui was detained by the ANP, Afghan authorities alerted United States Army Captain Caleb Threadcraft.  The Afghan officials drove to the Provincial Coordinating Center and met with Threadcraft.  (Tr. at 242-45.)  There, these officials provided Threadcraft with various items that were recovered from Siddiqui.  When Threadcraft saw these items, he immediately alerted FOB Ghazni to what he had seen, and then traveled to the ANP Compound where Siddiqui was being held.  Threadcraft was denied permission to take Siddiqui into custody.  Thereafter, Threadcraft provided to the U.S. Army at FOB Ghazni all of the items recovered from Siddiqui that the Afghans gave to him.  (Tr. at 252.)  U.S. Army personnel inspected these items and – based on their determination that the ANP's detainee could be a United States citizen or pose a threat to the continental United States – reached out to the FBI.  (Tr. at 252-53, 1009-10, 1373-74.)  In response, the FBI immediately dispatched two special

---

[5]    The defense sentencing memorandum does not address all of these statements. Instead, the defense relies on a variety of supposed inconsistencies in FBI interview reports of *uncalled* Afghan witnesses to suggest that the Afghans' account of what happened should be viewed with "a skeptical eye."  (Def. Mem. at 12.)  The defense fails to acknowledge, however, that even their own Afghan witnesses testified at length about various anti-American statements that Siddiqui made while in Afghan custody.  (*See, e.g.,* Tr. at 1800, 1820; Def. Ex. C at 18.)

agents from FOB Salerno to FOB Ghazni.  (Tr. at 275-77, 1139-40.)[6]

E.    **Travel to ANP**

On July 18, a team of United States military and law enforcement personnel

assembled at FOB Ghazni.  Their purpose was to travel to the ANP Compound to interview

Siddiqui and collect DNA and fingerprints.  (Tr. at 1144-46, 1376.)  Members of this team (the

"Interview Team") included: (1) Captain Robert Snyder; (2) the Chief Warrant Officer; (3)

Ahmed Gul; (4) Medic Dawn Card; (5) Jawid Amin; (6) John Jefferson; (7) Erik Negron; (8)

Sergeant Kenneth Cook; and (9) Sergeant Lamont Williams.   Before leaving FOB Ghazni, all

members of the Interview Team (including the United States Army personnel, the FBI agents,

and contract interpreters) were dressed in uniform (*i.e.* fatigues).  (Tr. at 410, 1149, 1255.)

After the Interview Team arrived at the ANP Compound, they initially split up to

locate Siddiqui but were ultimately directed to a second floor room of one of the buildings at the

compound.  The room was small – about 26 feet by 13 feet – and was partitioned by a yellow

curtain, which stretched across its entire length.[7]

F.    **Siddiqui's Attempt To Murder United States Personnel**

Captain Snyder entered the second floor room first.  When Snyder entered the

---

[6]    The Army's determination that the detainee could be a United States citizen was
based in part on the fact that the materials recovered from Siddiqui were written in English and
referenced landmarks in the United States.  At the time the FBI was dispatched to FOB Ghazni,
Aafia Siddiqui had been wanted for questioning since 2003.  (PSR ¶ 22.)

[7]    The ANP initially believed that Siddiqui could be a suicide bomber and contacted
the Afghan Ministry of Interior ("MOI").  (Def. Ex. C at 18.)  MOI officials arrived at the ANP
Compound on the morning of July 18 and went to the second floor room where Siddiqui was
held.  According to Qadeer, the ANP had restrained Siddiqui at that time because of her prior
escape attempts.  Qadeer further testified that the MOI officials directed the ANP to remove
Siddiqui's restraints, given that she was a woman.  (Def. Ex. C at 6, 20.)

room, he encountered a number of Afghans.  Snyder had no idea that Siddiqui was left unsecured

behind the curtain.  (Tr. at 150.)  Snyder introduced himself to the Afghans, identifying himself

as a soldier with the U.S. Army, and said that he was there to participate in questioning the

detainee and to assist in determining who she was.  (Tr. at 161.)

A number of other members of the Interview Team filtered in next, including the

Chief Warrant Officer, Medic Card, Ahmed Gul, and FBI Special Agents Negron and Jefferson.

When the Chief Warrant Officer entered the room, he was carrying his M4-A1 rifle (the "M4

Rifle"), which was loaded.  (Tr. at 1066-67, 1089; GX 55.)  This rifle is a machinegun; it can fire

on semiautomatic and automatic mode by pulling the trigger.  (Tr. at 836, 1076.)  The Chief

Warrant Officer walked towards an available seat in the room, which was immediately next to

the curtain.  (Tr. at 162.)  Before sitting down, the Chief Warrant Officer glanced behind the

curtain and did not see anyone there.  (Tr. at 1073.)  Ahmed Gul stood next to the Chief Warrant

Officer.  (Tr. at 422.)

The Chief Warrant Officer took off his M4 Rifle, placed it on "safe" mode,

ejected the stand (as he demonstrated at trial), and set it down next to him.  (Tr. 1074-76, 1093-

94.)  The Chief Warrant Officer then turned to speak with the Afghans about interviewing the

detainee.  (Tr. at 1077.)

When the Chief Warrant Officer put down his M4 Rifle, Siddiqui walked towards

the curtain, picked up the M4 Rifle, and pointed it directly at members of the Interview Team.

(Tr. at 1077, 1107, 1270.)

When this happened, Captain Snyder was sitting in a chair directly across from

the curtain.  (Tr. at 158.)  To his right, Snyder heard words to the effect of "May the blood of

9

[something] be on your either head or hands." (Tr. at 165.)  Snyder saw Siddiqui aiming the M4

Rifle directly at him; he distinctly remembered staring down the barrel of the M4 Rifle.  At that

time, Snyder thought he was going to die.  Snyder characterized Siddiqui as "a vision of hatred"

and testified that he believed  "her intent was to follow through with what she was doing . . . .

[t]o shoot, to shoot at us, to shoot at me." (Tr. at 171.)  At that second, Snyder came "to the

realization that there was no way I was going to be able to get out of that line of fire in time."

(Tr. at 171-72.)

   Medic Dawn Card also saw Siddiqui pointing the gun right at her, directly down

the row of chairs where she was sitting.  (Tr. at 968.)  Card saw the curtain flutter a bit, turned,

and then witnessed Siddiqui "standing there with an M4." (Tr. at 967.)  Special Agent Negron

was also sitting in the room, on a diagonal from Siddiqui.  Negron suddenly "saw the [M4 ] rifle

being held by two hands sticking from behind the curtain into our room." (Tr. at 1179, 1180.)

The gun was pointed into the room.  (Tr. at 1179-80.)  Jawid Amin recalled hearing a sound to

his left, which was a female saying "get the fuck out of here." (Tr. at 1270.)  Amin then turned

and saw Siddiqui holding the M4 Rifle.  (Tr. at 1270.)

   Ahmed Gul heard Snyder say, "she got [a] gun" (or words to that effect), turned,

threw open the curtain, and saw Siddiqui aiming the gun directly into the room.  (Tr. 427, 459.)

The Chief Warrant Officer turned to see Siddiqui pointing his M4 Rifle at him and others in the

room.  (Tr. at 1077, 1127.)  The Chief Warrant Officer remembers the barrel of the gun "right by

my head." (Tr. at 1082.)

   After Siddiqui grabbed the M4 Rifle, she hesitated or fumbled with it for a brief

moment.  (Tr. at 172; *see also* Tr. at 435-36, 968 (discussing how Siddiqui "was fumbling" with

the M4 Rifle).)  Siddiqui then fired, and attempted to fire, the M4 Rifle, intending to kill as many United States soldiers as possible.  The image of Siddiqui firing the M4 Rifle was paralyzing – Medic Dawn Card "remember[ed] thinking that I needed to get out of the room because I was going to die if I didn't, but I couldn't move."  (Tr. at 968; *see also* Tr. at 427, 437.)  The Chief Warrant Officer believed that "[m]en's lives were in danger."  (Tr. at 1080).  Amin ran out of the room because he "[didn't] want to get killed."  (Tr. at 1271.)

Heroically, Gul lunged at Siddiqui, and attempted to wrestle the gun away from her as she continued to fire the gun.   (Tr. at 428, 437, 1080, 1082.)   Gul and Siddiqui struggled over the M4 Rifle, with Siddiqui trying to push Gul away, and Gul trying to direct the gun up in the air so no soldiers would get shot.  (Tr. at 428.)  Recollections vary as to how many shots Siddiqui ultimately was able to fire, ranging from approximately one to four shots.  (Tr. at 1125, 1181, 1273, 1334, 1386.)

Around the same time, the Chief Warrant Officer drew his revolver and aimed it at Siddiqui.  (Tr. at 1078, 1096.)  Siddiqui used Gul's body as a shield to avoid getting shot.  (Tr. at 428, 439.)  The Chief Warrant Officer then fired at least two shots at Siddiqui, hitting her once in the stomach.  This caused Siddiqui to let go of the M4 Rifle.  (Tr. at 429, 1078, 1081-82, 1125.)

Despite having been disarmed and shot, Siddiqui was undeterred.  Siddiqui threw herself at members of the Interview Team who were trying to subdue her.  Siddiqui punched them; kicked them; slapped them; tried to bite them; and spit at them.  (Tr. at 181, 1084, 1182-83.)  As Siddiqui did this, she repeatedly screamed anti-American statements.  Witnesses recall her saying:  "Death to America." (Tr. at 1084); "I am going to kill all you Americans.  You are

11

going to die by my blood." (Tr. at 361); "I want to kill Americans.  I want to kill Americans."

(Tr. at 1182, 1183)  "I want to kill Americans.  Don't touch my blood or you will die." (Tr. at

1184-85); "I will kill all you mother fuckers." (Tr. at 1084); "I hate you." (Tr. at 1341); *see also*

Tr. at 445 (Gul recalls hearing Siddiqui say "blood" and "American").  Throughout this

encounter, Siddiqui "had a look of hate in her eyes."  (Tr. at 976; *see also* Tr. at 1341 (Sergeant

Williams describing Siddiqui "yelling at [United States personnel] like she just hated them").)

The U.S. personnel eventually restrained and subdued Siddiqui.  While restrained,

Siddiqui asked – over and over again – for the Interview Team to "just kill [her]."  (Tr. at 178,

180, 979.)   The Interview Team instead focused on saving Siddiqui's life.  (Tr. at 181, 1184-85.)

 Right at the scene of the shooting, Medic Card began treating Siddiqui's gunshot wound.  Card

wrapped gauze around the wound, checked her pulse, and determined that Siddiqui was stable.

(Tr. at 971-72, 1085-86.)  After Siddiqui was stabilized, members of the Interview Team carried

her down the stairs.  While they were carrying her, Siddiqui continued to resist; she kicked

Captain Snyder (who was holding her feet) approximately eight to ten times.  (Tr. at 183, 977.)

When the Interview Team arrived outside the building, it was chaotic.  The

Interview Team encountered a row of Afghan forces (approximately 50 to 150) (Tr. at 185,

1187, 1344), who displayed weapons – including rifles and a Rocket Propelled Grenade ("RPG")

(Tr. at 1189, 1344-45, 1391).  This stand-off caused Agent Negron to instruct an interpreter to

tell members of these forces that Negron would kill them if they did not holster their weapons.

(Tr. at 1189.)  Even outside the ANP Compound, Siddiqui continued to be combative, as she

attempted to kick members of the Interview Team.  (Tr. at 1190.)

The Interview Team then immediately transported Siddiqui to FOB Ghazni for

12

medical treatment.  (Tr. at 1088, 1192-93, 1396.)  The Interview Team saved Siddiqui's life.

Medic Dawn Card candidly explained her conflict in treating Siddiqui:

> A:  At that point I removed myself from the [treating] table at [FOB Ghazni].
>
> Q:  Why did you do that?
>
> A:  Because I became angry and I could no longer do my job effectively.
>
> Q:  And why is that?
>
> A:  Because [Siddiqui] had just shot at me, and now I was treating her.  I was kind of mad.

(Tr. at 980.)[8]

### G.   Siddiqui's Treatment and Transfer to the United States

The same day (July 18), Siddiqui was transported to FOB Orgun-E, where she

received several hours of medical treatment.  (Tr. at 377-79, 1199.)  Siddiqui was then

---

[8]   At trial, the defense also played depositions of ANP Officer 1 and Qadeer, who testified, in sum and substance, that they observed an individual (whom they believed to be an American soldier) walk behind the curtain and that they then heard shots.  Neither witness testified that they saw the actual shooting, or what led up to it.  Further, these Officers' version of events even differed from the testimony of Siddiqui, who claimed to have approached the curtain in order to escape, and then got shot.  In addition, as the defense correctly notes, these witnesses provided a starkly different version of the July 18 shooting when they were interviewed by United States law enforcement (well before the depositions and trial).  Indeed, ANP Officer 1, for example, advised that he was not even in the second floor room at the time of shooting, but instead was down the hall, questioning Siddiqui's son.  The defense suggests that these discrepancies are the result of faulty questioning, the witnesses' lack of appreciation for the solemnity of the interview process, mis-translation, mis-transcription, or some undue pressure placed on the witnesses.  (Def. Mem. at 11, 12 n.4.)  The Government submits that these witnesses were properly questioned by United States authorities using a qualified translator, and that the version of events they provided to United States law enforcement was accurately memorialized.  Moreover, United States law enforcement put absolutely no pressure on these witnesses to tailor any remarks or statements that they made.

transported to Bagram Airbase on July 19, 2008.  (Tr. at 377-78, 1201.)  At Bagram, Siddiqui

received medical treatment for approximately two weeks.  During this period, Siddiqui spoke

with FBI agents at length regarding her past.  On various occasions, Siddiqui admitted to FBI

agents that she did in fact pick up the M4 Rifle at the ANP Compound on July 18, 2008, but

stated that she never fired it.

On August 4, 2008, Siddiqui was transported from Bagram Airbase to the United

States.  At the time, Siddiqui was charged in a criminal complaint with the following counts: (1)

attempting to murder United States officers and employees, in violation of Title 18, United

States Code, Section 1114; and (2) armed assault of United States officers and employees, in

violation of Title 18, United States Code, Section 111.  Upon her arrival to the United States,

Siddiqui was arraigned on the Complaint and was assigned an attorney to represent her in this

proceeding pursuant to the Criminal Justice Act.

### H.    Indictment, Competency Proceeding, Trial

On September 2, 2008, a grand jury sitting in this District returned an indictment

against the defendant, charging her with the following seven counts relating to the July 18, 2008

shooting: (1) attempting to kill United States nationals in violation of Title 18, United States

Code, Section 2332(b) (Count One); (2) attempting to kill United States officers and employees

in violation of Title 18, United States Code, Section 1114 (Count Two); (3) armed assault of

United States officers and employees in violation of Title 18, United States Code, Section 111(b)

(Count Three); (4) discharging a firearm during a crime of violence in violation of Title 18,

United States Code, Section 924(c) (Count Four); and (5) assaulting United States officers and

employees in violation of Title 18, United States Code, Section 111(a) (Counts Five through

Seven).

In October 2008, with the consent of the Government and defense counsel, the Court ordered that Siddiqui be transported to the Federal Medical Center in Carswell, Texas ("FMC Carswell") to undergo a competency evaluation, pursuant to Title 18, United States Code, Section 4241.  Initially, in a November 2008 report, FMC Carswell concluded that Siddiqui was not competent to stand trial.  Subsequent evaluators (Dr. Sally Johnson and Dr. Gregory Saathoff) found that Siddiqui was competent to stand trial, and in May 2009 FMC Carswell ultimately concluded that Siddiqui was competent to stand trial.  A defense-retained forensic psychiatrist found that Siddiqui was not competent to stand trial.

After obtaining reports from four separate mental health professionals relating to Siddiqui's competence, and after reviewing the videotaped depositions of two mental health professionals who treated Siddiqui on a regular basis, the Court conducted a competency hearing on July 6, 2009.  Siddiqui was transported from FMC Carswell back to the Metropolitan Detention Center ("MDC") for the competency hearing.[9]

On July 29, 2009, the Court concluded by a preponderance of the evidence that Siddiqui was competent to stand trial.  (7/29/09 Order at 16.)  The Court reasoned that:

> Dr. Siddiqui has sufficient present ability to consult with her
> lawyers with a reasonable degree of rational understanding and she
> also has a rational as well as a factual understanding of the
> proceedings against her.  The Court concludes that she understands
> the nature of the charges and can assist counsel with her defense.

(7/29/09 Order at 17.)  This assessment was based on various forensic reports, the testimony

---

[9]      Siddiqui has remained at the MDC since the competency hearing.  While incarcerated at both FMC Carswell and the MDC, Siddiqui has been in contact with, and visited in person by, members of the Pakistani Consulate.

introduced at the competency hearing (including by way of deposition), the exhibits introduced

in connection with that hearing, and the Court's observations of the defendant in court.  (7/29/09

Order at 33.)

Subsequent to its competency determination, the Court permitted three additional

defense attorneys – who were compensated by the Government of Pakistan – to represent

Siddiqui.  This was in addition to her CJA-appointed counsel.[10]  Moreover, Siddiqui was

afforded every opportunity to confront witnesses who testified against her, to confer with her

counsel, and to be present in court.  (Tr. at 1167.)

At trial, the Government called six eyewitnesses to Siddiqui's attempted murder,

along with three witnesses who heard the shooting.  The Government also presented other

witnesses and evidence, including various items that were recovered from Siddiqui on July 17

and expert witnesses on ballistics and fingerprints.  Siddiqui attended every day of her trial, save

a few instances where she was excused for disruptive behavior.  (*See, e.g.*, Tr. at 1165.)

The defense team called its own ballistics expert witness and introduced the

videotaped depositions of two Afghan law enforcement witnesses who were at the ANP

Compound on the date of the shooting.  In addition, Siddiqui testified in her own defense.

Before permitting Siddiqui to testify, the Court further concluded:

> [S]ubsequent to the July 2009 finding by me that Dr. Siddiqui is
> competent to proceed in this trial . . . .  I personally have seen no
> evidence that she has become incompetent to proceed and indeed
> having viewed her demeanor over months . . . I am personally of
> the view that her mental health has strengthened, if anything, since

---

[10]     As the Court noted at trial, Siddiqui had "some six to eight very skillful attorneys,
a dream team, if you will, at almost limitless expense.  Some of her counsel are paid for by the
government of Pakistan . . . and others of them are paid by the United States."  (Tr. at 1167.)

last July notwithstanding the possibility of some mental health
issues, which I noted in the competency decision.

(Tr. at 1783.)

On February 2, 2010, a twelve member jury – after deliberating less than two

days – found beyond a reasonable doubt that Siddiqui was guilty of every count in the

Indictment.  The jury did not find, however, that Siddiqui committed Counts One and Two with

premeditation.

## II.    ARGUMENT

For the reasons that follow, Siddiqui faces a Guidelines range of life

imprisonment on Counts One through Three and Counts Five through Seven of the Indictment.

In addition, by statute Siddiqui faces a mandatory minimum sentence of 10 years' imprisonment

on Count Four, which must run consecutively to any sentence imposed on the other counts.[11]  In

light of the heinous and deliberate character of Siddiqui's crime, the Government believes that a

Guidelines sentence is reasonable.

### A.    <u>Applicable Law</u>

Although the Guidelines no longer play a mandatory role at sentencing, they

nevertheless continue to play a critical role in trying to achieve the "basic aim" that Congress

tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for

those who have committed similar crimes in similar ways." *United States* v. *Booker*, 543 U.S.

220, 252 (2005).  In furtherance of that goal, judges are required to "consider the Guidelines

---

[11]    As discussed further below, prior to the Supreme Court's recent decision in
*United States* v. *O'Brien*, 130 S. Ct. 2169 (2010), Siddiqui faced a mandatory minimum
consecutive sentence of 30 years' imprisonment on Count Four.

17

'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' § 3553(a)(4), the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims, §§ 3553(a)(1), (3), (5)-(7) (main ed. and Supp. 2004)." *Id*. at 259-60.  As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" – that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

In light of *Booker*, district courts now engage in a three-step sentencing procedure. *See United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  First, the Court must determine the applicable Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id*. at 112.  Second, the Court must consider whether a departure from that Guidelines range is appropriate. *Id*.  Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. *Id*. at 113.

Although the Guidelines are no longer mandatory, the Second Circuit has instructed district judges to consider them "faithfully" when sentencing. *Crosby*, 397 F.3d at 114.  "Booker did not signal a return to wholly discretionary sentencing." *United States* v. *Rattoballi*, 452 F.3d 127, 132 (2d Cir. 2006) (citing *Crosby*, 397 F.3d at 113).  Indeed, the Second Circuit has held that the Guidelines range for a particular defendant is "a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005); *see also United States* v. *Cavera*, 550 F.3d

18

180, 188 (2d Cir. 2008) (observing that sentencing judges should "begin all sentencing proceedings by calculating . . . the applicable Guidelines range" before reaching "individualized judgment in each case").  As the Court of Appeals has observed, the Guidelines "'cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'" *Rattoballi*, 452 F.3d at 133 (quoting *United States* v. *Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc)).

Courts may not presume that the appropriate sentence necessarily lies within the Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."  *Gall*, 552 U.S. at 49-50 & n.6.  Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives,"  *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349.  Thus, to the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  *Gall*, 552 U.S. at 50.

One of the important reasons why the Guidelines should be given substantial weight is that they represent the reasoned judgment of the United States Sentencing

Commission.  *See Rattoballi*, 452 F.3d at 133.  The Sentencing Commission is a body of experts

whose statutory mission is to apply "research, experience, and analysis" to promulgate

guidelines that will "further the basic purposes of criminal punishment: deterrence,

incapacitation, just punishment, and rehabilitation."  U.S.S.G. Ch. 1, Pt. A, § 2.  Because these

basic purposes of criminal punishment – which essentially mirror the purposes that this Court

must consider pursuant to Section 3553(a)(2) – are inherently abstract, it is difficult to overstate

the value of the perspective of a national commission whose charter is to collect and analyze data

on sentences imposed throughout the nation.  Absent the national perspective they provide, it is

hard to imagine how the sentencing factor identified in Section 3553(a)(6) – namely, "the need

to avoid unwarranted disparities among defendants with similar records who have been found

guilty of similar conduct" – could be meaningfully considered at all.

> **B.**    **Siddiqui's Guidelines Range is Life**

Siddiqui was convicted at trial of all seven counts with which she was charged:

(1) attempted murder of United States nationals (Count One); (2) attempted murder of United

States officers and employees (Count Two); (3) armed assault of United States Officers and

Employees (Count Three); (4) discharge of a firearm during a crime of violence (Count Four);

and (5) assault of United States officers and employees (Counts Five through Seven).

Pursuant to the grouping rules contained in Section 3D1.2 of the Guidelines,

Counts One through Three and Counts Five through Seven are grouped together, as these counts

are part of a course of conduct with a single criminal objective.  (*See* PSR ¶ 36.)  Under the

Guidelines, Count Four is not grouped with any other count, as it requires a mandatory minimum

term of ten years' imprisonment, which must run consecutively to the sentence imposed on the

remaining counts.  (*See* PSR ¶ 37.)

### 1.      Siddiqui's Base Offense Level is 33

The Government agrees with the Probation Department's conclusion that the base

offense level for Counts One through Three and Counts Five through Seven is 33, pursuant to

Section 2A2.1(a)(1) of the Guidelines.  (*See* PSR ¶ 38.)  Section 2A2.1(a)(1) sets forth the

applicable base offense level for the crime of attempted first degree murder, which is defined in

relevant part as any "murder perpetrated by poison, lying in wait, or any other kind of willful,

deliberate, malicious, and premeditated killing."  18 U.S.C. § 1111(a).  The offense of "murder"

is defined in the same section as "the unlawful killing of a human being with malice

aforethought."[12]

An act is done with "premeditation" if it is done after deliberation; specifically, if

it is done after one who is capable of reflecting does in fact reflect, at least for a short period of

time.  *See United States* v. *Mulder*, 273 F.3d 91, 117 (2d Cir. 2001); *United States* v. *Shaw*, 701

F.2d 367, 393 (5th Cir. 1983) ("There must be some appreciable time for reflection and

consideration before execution of the act, although the period of time does not require the lapse

of days or hours or even minutes.") (internal citation omitted).  There is no requirement,

however, that such deliberation or reflection last for any particular period of time.  *See Shaw*,

701 F.2d at 392 ("no particular period of time is necessary for such deliberation and

premeditation"); *United States* v. *Brown*, 518 F.2d 821, 828 (7th Cir. 1975) ("the length of time

---

[12]      The defense incorrectly states in its sentencing submission that the definition of *first degree* murder, pursuant to Title 18, United States Code, Section 1111, is "the unlawful killing of a human being with malice aforethought."  The jury in this case was charged appropriately that in order to convict the defendant of the offense of attempted murder, of whatever degree, they had to find unanimously, beyond a reasonable doubt, that the defendant acted with malice aforethought.

of premeditation is not material").  Moreover, evidence of prior conduct or threats made before

the attempted murder is relevant to a finding of premeditation.  *See Mulder*, 273 F.3d at 117.

Section 2A2.1(a)(1) of the Guidelines – and the corresponding base offense level

of 33 – is properly applied because Siddiqui in fact committed the crime of attempted first

degree murder.  Siddiqui took control of the Chief Warrant Officer's M4 Rifle, switched the

safety off, pointed the rifle into a room full of people, and pulled the trigger.  Siddiqui attempted

to kill all of the people in that room.  It was only through sheer good luck and the brave

intervention of Ahmed Gul that none of the people in the room that day lost their lives as a result

of Siddiqui's malicious, deliberate, and brazen conduct.

Between the time that the Interview Team entered the second floor room – where

Siddiqui was (unbeknownst to them) left unrestrained behind the curtain – and the time when the

Chief Warrant Officer left the M4 Rifle unattended, Siddiqui made a decision.  Siddiqui's

conduct that day – deciding to pick up the M4 Rifle, actually picking up the M4 Rifle, pointing it

at the people in the room, and firing it – reflects her deliberate and considered decision to

attempt to kill United States personnel.  The fact that the crime unfolded in a matter of seconds,

and that Siddiqui had only a short period of time to reflect before she acted, do not render her

actions anything less than premeditated.  Similarly, the fact that Siddiqui took advantage of an

opportunity that presented itself – namely, the Chief Warrant Officer's placement of his M4

Rifle on the floor next to the curtain – rather than carrying out a specific plot that she herself had

been planning for an extensive period of time, does not render her conduct anything other than

premeditated.

The statements made by Siddiqui in the course of this offense further support the

conclusion that her conduct was the product of deliberation, however brief.  The witnesses to this incident testified that as she pointed the rifle, Siddiqui shouted various things, including "get the fuck out of here" and  "may the blood of [something] be on your head or hands."  These witnesses also described how Siddiqui struggled and fought long after being disarmed, repeatedly shouting anti-American statements, including "I want to kill Americans," "Death to America," and "I will kill all you mother fuckers."  Siddiqui made these statements as she punched, kicked, and clawed the personnel whom she attempted to murder just moments before and who were now trying to subdue her and provide her life-saving medical care.[13]

Indeed, it is no coincidence that the woman who (just the day before) possessed numerous documents containing anti-American sentiments and evidencing her intent to use violence against the United States, was the same woman who made a deliberate decision to try to kill American soldiers and personnel on July 18.  Siddiqui's deliberate and specific intent to harm Americans is clear from the materials she had in her possession when she was first detained by Afghan authorities on July 17, 2008.  These materials included references to the United States as an "enemy" or "infidel," and discussed various ways to construct weapons that could inflict harm on a serious scale.  Indeed, one of the handwritten notes references a "mass casualty attack," and lists various United States landmarks, such as the Statue of Liberty and Grand Central Station.  This is but a sampling of the various materials that the Government has

---

[13]     The defense characterizes these witnesses' versions of Siddiqui's statements as "not to be trusted" (Def. Mem. at 15) because not every witness recalls Siddiqui stating the exact same thing, and because the aftermath of the shooting occurred in such a short time frame. Beyond the obvious fact that such brief and dramatic circumstances make it almost inevitable that there would be minor inconsistencies in the witnesses' statements, this characterization ignores the fact that these witnesses' recollections still share one constant – Siddiqui hatefully and dramatically verbalized her intent and desire to kill United States personnel.

provided to the Court throughout the course of the competency hearing and at trial, and does not even include the similar number of such materials that were retrieved from the computer thumb drive that Siddiqui possessed on July 17, 2008.

Despite these facts, the defense argues that since the question of premeditation was put to the jury and since the jury failed to find unanimously that Siddiqui acted with premeditation, the Court cannot now make a different finding for purposes of calculating the applicable Guidelines range. Accordingly, the defense submits that the applicable Guideline is Section 2A2.1(a)(2), which would result in a base offense level of 27 instead of 33.

The defense's argument is unfounded in law. It is well-settled that a sentencing court is authorized to make factual findings by a preponderance of the evidence. *See United States* v. *Watts*, 519 U.S. 148, 156 (1997) (Government's proof supporting a greater Guidelines range need be shown only by a preponderance of the evidence). This "judicial authority to find facts relevant to sentencing by a preponderance of the evidence[, where, as here, those facts do not serve to increase the applicable maximum sentence,] survives *Booker*." *United States* v. *Florez*, 447 F.3d 145, 156 (2d Cir. 2006) (*citing United States* v. *Garcia*, 413 F.3d 201, 220 n.15 (2d Cir. 2005)); *see also United States* v. *Crosby*, 397 F.3d 103, 112 (2d Cir. 2005) (explaining that "with the mandatory use of the Guidelines excised, the traditional authority of a sentencing judge to find all facts relevant to sentencing will encounter no Sixth Amendment objection").

Thus, the sentencing court still possesses the authority to make such factual findings relevant to sentencing, particularly for the determination of the applicable advisory Guidelines range. *See Rita* v. *United States*, 551 U.S. 338, 352 (2007) (noting that "many individual guidelines apply higher sentences in the presence of special facts, . . . [and that] [i]n

24

many cases, the sentencing judge, not the jury, will determine the existence of those facts");
*United States* v. *Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008) ("[s]entencing judges may find
facts relevant to determining a Guidelines range by a preponderance of the evidence, so long as
that Guidelines sentence is treated as advisory and falls within the statutory maximum authorized
by the jury's verdict"); *United States* v. *Vaughn*, 430 F.3d 518, 526 (2d Cir. 2005) ("district
courts remain statutorily obliged to calculate Guidelines ranges in the same manner as before
*Booker* and to find facts relevant to sentencing by a preponderance of the evidence").

      There is a distinction between factual findings that increase applicable statutory
maximum penalties – which findings effectively constitute elements of the offense – and those
factual findings that relate to the determination of the applicable advisory sentencing Guidelines
range.[14]  The defense appears to recognize this distinction in noting that the Supreme Court in
*Booker* "reinstated judicial fact finding" by concluding that the Guidelines must be advisory in
order to pass constitutional muster.  (Def. Mem. at 34.)  In fact, *Booker* and the preceding cases
cited by the defense never interfered with the longstanding practice of authorizing the sentencing
court to make factual findings relevant to sentencing determinations.

      Indeed, there is ample precedent for sentencing courts to make factual findings
that relate to the applicable advisory Guidelines range, even where jury determinations differ.
*See, e.g., Florez*, 447 F.3d at 156 (rejecting defendant's claim that the district court erred by
attributing 10-30 kilos of heroin to the defendant for sentencing purposes when the jury found

---

[14]     It was the Government's request in this case to put the question regarding premeditation to the jury.  In objecting to that request, the defense made clear its agreement with the Government that premeditation is not an element of the offenses charged in Counts One and Two.  The Government took the position, however, that such a question could properly be submitted to the jury and the Court agreed.

the defendant was only involved with 3-10 kilos of heroin); *United States* v. *Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005) (holding that a sentencing court "may find facts relevant to sentencing by a preponderance of the evidence, even where the jury acquitted the defendant of that conduct, as long as the judge does not impose (1) a sentence in the belief that the Guidelines are mandatory, (2) a sentence that exceeds the statutory maximum authorized by the jury verdict, or (3) a mandatory minimum sentence . . . not authorized by the verdict"); *United States* v. *Williams*, 399 F.3d 450, 452-53 (2d Cir. 2005) (district court declined to make a discretionary downward departure under the Guidelines, taking into account its finding that the defendant had acted deliberately, despite the fact that the jury had acquitted the defendant of willful conduct, while convicting him of acting knowingly and recklessly).

The Government submits that the Court should conclude that Siddiqui acted with premeditation based on the facts proven at trial.  The Government does not urge this position out of disrespect for the jury's determination, but rather out of fidelity to the factual circumstances of the offense and the resulting view that Siddiqui in fact committed the offense of attempted first degree murder.[15]

After hearing the first group of United States personnel enter the room and announce themselves as American soldiers, Siddiqui knew that Americans – the people she had written about, the people she had labeled the "invaders," and the people she wanted to kill –

---

[15]    It also is not clear from the jury's verdict that they determined (by a preponderance of the evidence) that the defendant did *not* commit this crime with premeditation. Rather, the jury simply was not unanimous as to whether the Government had proven this question beyond a reasonable doubt.  (Tr. at 2123.)  It thus is perfectly appropriate for the Court to answer this question for sentencing purposes, especially where the standard for the jury's determination (beyond a reasonable doubt) is much higher than the standard applicable to the Court's finding at sentencing (by a preponderance of the evidence).

were there to see her.  Siddiqui prepared herself and – as can be inferred from the trial testimony – hid in the room behind the curtain and waited for her chance.  When the Chief Warrant Officer placed his M4 Rifle on the floor next to the curtain, Siddiqui saw her opportunity and she took it.  The fact that Siddiqui could not have known in advance that the Chief Warrant Officer's rifle would become accessible to her does not make what she did any less deliberate.  Siddiqui calmly picked up the rifle, switched off the safety, pointed it at the United States personnel, and pulled the trigger.  The witnesses who testified at trial described Siddiqui's demeanor in those moments.  Captain Snyder described her as a "vision of hatred."  The witnesses who were there, looking right at Siddiqui as she attempted to take their lives, did not describe her as frantic, desperate or confused.  Even after she was disarmed, Siddiqui continued to fight, shouting, among other things, "I hate Americans," "I want to kill you motherfuckers," and "death to America," as she punched and kicked the United States personnel who were attempting to subdue her.

Her conduct was not senseless or thoughtless.  It was deliberate and premeditated.  Siddiqui should be punished accordingly.

### 2.    A Six-Level Increase Applies for Targeting an Official Victim

Pursuant to Section 3A1.2(b) of the Guidelines, the base offense level of 33 is increased by six levels because (1) the victims of the offenses were government officers and employees – namely United States military personnel, contract interpreters employed by the United States military, and Special Agents of the Federal Bureau of Investigation, (2) the offenses of conviction were motivated by the victims' status as United States government personnel, and (3) the base offense level was set under Chapter 2, Part A of the Guidelines

(Offenses Against the Person).   U.S.S.G. § 3A1.2(b).  The Probation Department also correctly concluded that this enhancement applies.  (*See* PSR ¶ 42.)

There is no dispute that the victims of Siddiqui's offenses were government officers and employees, and that Siddiqui had knowledge of their official status.  The defense argues, however, that Siddiqui's offenses were not motivated by the victims' status, since "she did not carefully and deliberately plan an unprovoked attack of United States officers and employees in order to contribute to the ongoing terrorist efforts of an organization at war with the United States."  (Def. Mem. at 41.)  This strained reading of the enhancement for targeting an official victim is baseless.

The evidence at trial clearly established that Siddiqui's offense was motivated by the fact that the members of the Interview Team were United States government officers and employees.  Siddiqui was well aware that the personnel she tried to kill (and thereafter assaulted) were United States government personnel: they were in United States military uniforms on July 18, and they (specifically Captain Snyder) identified themselves as United States Army soldiers.  Indeed, the fact that Siddiqui was convicted for attempting to murder United States officers and employees, and assaulting United States officers and employees, is – *standing alone* – sufficient to establish the applicability of this enhancement.  *See In re Terrorist Bombings*, 552 F.2d 93, 155 (2d Cir. 2008) (for defendant charged with murder of United States nationals, "[t]he jury's verdict alone is sufficient to trigger the government victim enhancement").  Moreover, as Siddiqui was assaulting her victims, she repeatedly shouted anti-American sentiments, making it clear that her animus was specifically directed at these victims because they were agents of the United States.  That is precisely the sort of motivation contemplated by the official victim

enhancement.

The defense argues that Siddiqui simply struggled with her "American captors" just as she struggled with her "Afghan captors," and that this lack of selectivity and distinction requires the conclusion that Siddiqui was not motivated by the official status of the Interview Team when she tried to kill them. This mis-states the law. The "official victim" enhancement applies even if the victim's status is not the offender's sole or primary motivating factor. Indeed, even if the defense's characterization of Siddiqui's motivation is credited – *i.e.* that she was just trying to escape – the enhancement for targeting an official victim is properly applied. "Official" victims were the only possible victims capable of taking Siddiqui (as she allegedly feared) into captivity. Their status, therefore, was not merely incidental to Siddiqui's conduct and the six level enhancement properly applies. *See, e.g., United States* v. *River-Alonso*, 584 F.3d 829, 836 (9th Cir. 2009) (official victim enhancement applies where defendant knows the victim is a federal officer and assaults the officer in an attempt to get away or evade capture); *United States* v. *Salim*, 549 F.3d 67, 75-76 (2d Cir. 2008) (assault of federal corrections officer in attempt to obtain key as part of plan to assault visiting defense counsel was motivated by official status of victim); *United States* v. *Abbott*, 221 Fed. Appx. 186, 189 (4th Cir. 2007) ("A person who kidnaps and ransoms an official cannot avoid the enhancement by claiming that he only did it for the money. All that § 3A1.2 requires is that the offender targeted the victim because of the victim's official status.") (emphasis in original); *United States* v. *Bennett*, 368 F.3d 1343, 1358 (11th Cir. 2004) (enhancement applied where defendant shot police officer entering his home to execute a search warrant) (overturned on other grounds); *United States* v. *Garcia*, 34 F.3d 6, 8-9, 13 (1st Cir. 1994) (finding crime motivated by law enforcement officer's

status when defendant tried to run over officer in order to escape arrest).

> ### 3.      The Terrorism Enhancement Applies

The Government submits that the terrorism enhancement, found in the Guidelines at Section 3A1.4(a), applies in this case.  The Guidelines terrorism enhancement applies "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism," U.S.S.G. § 3A1.4(a), which is "an offense that – (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of – (i) section . . . 1114 . . . [or] 2332 . . . ." 18 U.S.C. § 2332b(g)(5), *cited in* U.S.S.G. § 3A1.4, comment. (n.1); *see United States* v. *Awan*, 607 F.3d 306, 311 (2d Cir. 2010); *United States* v. *Salim*, 549 F.3d 67, 76-79 (2d Cir. 2008).  Under the Guidelines, if the crime of conviction "is a felony that involved, or was intended to promote, a federal crime of terrorism," the sentencing court must increase the defendant's offense level by 12 or to level 32, whichever is greater, *and* must increase the defendant's Criminal History Category to VI.  *See* U.S.S.G. § 3A1.4.  The Second Circuit has recognized that "Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."  *United States* v. *Meskini*, 319 F.3d 88, 92 (2d Cir. 2003).

In enacting Section 3A1.4, Congress and the Sentencing Commission plainly recognized the serious nature of offense conduct involving, or promoting, terrorism, and undertook to increase significantly the penalties for such conduct across a panoply of criminal statutes.  More specifically, in 1994, Congress directed the Commission to create a sentencing

guideline that increased the penalty for crimes which did not have terrorism as an element, but

which involved or were intended to promote terrorism:

> The United States Sentencing Commission is directed to amend its
> sentencing guidelines to provide an appropriate enhancement for
> any felony, whether committed within or outside the United States,
> that involves or is intended to promote international terrorism,
> unless such involvement or intent is itself an element of the crime.

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, Title XII, §

120004.  In the commentary to Sentencing Guidelines Amendment 526, which promulgated

Section 3A1.4, the Commission stated:

> Section 120004 of the Violent Crime Control and Law
> Enforcement Act of 1994 directs the commission to provide an
> appropriate enhancement for any felony that involves or is
> intended to promote international terrorism. The amendment
> addresses this directive by adding a Chapter Three enhancement at
> § 3A1.4 (International Terrorism) in place of the upward departure
> provision at § 5K2.15 (Terrorism).  The effective date of this
> amendment is November 1, 1995.

U.S.S.G., App. C, Amend. 526.

In *United States* v. *Awan*, 607 F.3d 306 (2d Cir. 2010), the Second Circuit held

that the two prongs of the terrorism enhancement – namely, the "involved" and "intended to

promote" prongs – are independent and have separate meanings.  "[A] defendant's offense

'involves' a federal crime of terrorism when his offense includes such a crime, *i.e.*, the defendant

committed, attempted, or conspired to commit a federal crime of terrorism as defined in 18

U.S.C. § 2332b(g)(5), or his relevant conduct includes such a crime."  *Id*. at 313-14; *see also*

*United States* v. *Stewart*, 590 F.3d 93, 138 (2d Cir. 2009).  With respect to the second prong, the

Second Circuit has held that the "intended to promote" prong "applies where the defendant's

offense is intended to encourage, further, or bring about a federal crime of terrorism, even

31

though the defendant's own crime of conviction or relevant conduct may not include a federal

crime of terrorism." *Awan*, 607 F.3d at 314.

When she shot at and attempted to kill the Interview Team, Siddiqui committed

offenses involving federal crimes of terrorism. She was convicted of attempted murder under

Title 18, United States Code, Sections 1114 and 2332, both of which are enumerated offenses for

purposes of Section 2332b(g)(5)(B). Siddiqui's conduct further satisfies the second component

of the definition of a "federal crime of terrorism," namely, her conduct was "calculated to

influence or affect the conduct of government by intimidation or coercion, or to retaliate against

government conduct." 18 U.S.C. § 2332b(g)(5)(A). Siddiqui's own statements as she carried

out these crimes, as well as the extensive materials found in her possession only hours before the

attack transpired, make clear that on July 18, 2008 it was her objective and specific intent, in

firing at the Interview Team, both to influence or affect the conduct of government by

intimidation, and also to retaliate against government conduct.[16]

As described in more detail in Section I above, when she was first detained by the

ANP, Siddiqui was in possession of numerous documents and a thumb drive containing

additional documents which in no uncertain terms identified the United States as the enemy,

contained numerous proposals for ways to harm the United States, its people, and its interests,

(both at home and abroad), and which took issue with the presence of United States personnel –

the presence of the "infidels" and the "enemy" – in the Middle East. When Siddiqui heard that

the United States military had arrived to speak with her, she seized the opportunity to take action

---

[16]     While certainly not binding on the Court, before charging Siddiqui with violating
Title 18, United States Code, Section 2332, the Government was required to – and did – obtain
certification from then Attorney General Michael B. Mukasey that Siddiqui's conduct on July 18
"was intended to coerce, intimidate, or retaliate against a government or a civilian population."
18 U.S.C. § 2332(d).

against the enemy, to kill the Americans and in so doing, to influence their conduct and retaliate against them.  When the Chief Warrant Officer placed his M4 Rifle on the ground within view of Siddiqui, she grabbed the weapon, pointed it at the United States personnel assembled in the room, and fired, in an effort to kill them all.  As she fired the weapon, Siddiqui shouted anti-American sentiments, clearly and repeatedly.  She made explicit, through her own words and her conduct, her intention to kill Americans, to cause "death to America."  Members of the United States military are clearly representatives of the United States government, particularly where – as here – they are present and carrying out their official duties in foreign lands.  Indeed, the materials in Siddiqui's possession make it clear that American soldiers stationed in Afghanistan were among the specific enemies she wished to eliminate.  Siddiqui heard the servicemen introduce themselves and explain why they were there, and she could see that they were dressed in United States military uniforms.  A violent attack against government personnel, for something other than a personal vendetta, clearly falls within the category of conduct contemplated by the Guidelines terrorism enhancement, because its goal is to influence or affect the conduct of government by intimidation or coercion.  *See, e.g., Salim*, 549 F.3d at 79 (terrorism enhancement appropriate where defendant incarcerated in the United States physically attacked a corrections officer at the MCC in order to, ultimately, influence the actions of the district court judge presiding over the defendant's case) (remanding to the district court because district court incorrectly held that application of the terrorism enhancement requires transnational conduct); *United States* v. *Salim*, No. 01 Cr. 002 (DAB), Order (S.D.N.Y. July 8, 2010) ("On remand from the Second Circuit, it is clear to the Court that Section 3A1.4 [*i.e.*, the terrorism enhancement] is applicable.").  And in this instance, Siddiqui's conduct was calculated

both to affect the conduct of government through intimidation, and also to retaliate against the United States government for its presence in Afghanistan and other foreign territories.

        In its sentencing submission, the defense has suggested that Siddiqui acted as she did on July 18, 2008, because she was terrified of being captured by the American forces and simply wished to escape. This argument completely overlooks the evidence presented at trial relating to Siddiqui's own statements made in the course of the attack. Those statements indicate a hatred of the United States and United States interests, not a desire to escape. This argument further overlooks the materials that were in Siddiqui's possession hours before the attack, which materials evidence a clear intention to take affirmative steps to harm the United States in a variety of frightening ways. However, even crediting this characterization of Siddiqui's intent in the moments leading up to and during the attack, the terrorism enhancement still applies.

        To the extent Siddiqui's motivation was to escape, her conduct was still calculated both to affect the conduct of government – namely, to prevent the soldiers from taking her into custody – and also to retaliate against the conduct of the government, based on her belief that the soldiers were there for the express purpose of taking her into United States custody. The Second Circuit has held that a defendant who commits a crime knowing that her crime will influence or affect the conduct of government satisfies the terms of Section 2332b(g)(5)(A), even if her particular motivation in committing the crime is something different, such as greed, the desire to impress others, or the desire to bring about an end to her own life. *See Awan*, 607 F.3d at 317 ("Thus, a person who murders a head of state, for instance, sure in the knowledge that his crime will influence or affect the conduct of government, satisfies the terms of § 2332b(g)(5)(A) even if his particular motivation in committing the murder is to impress a more established

terrorist with his abilities."). Section 2332b(g)(5)(A) "does not require proof of a defendant's particular motive," or the specific "rationale for an actor's particular conduct." *Awan*, 607 F.3d at 317. What is required is a showing that the defendant's conduct was "planned or contrived" to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. *Id.*; *see also Stewart*, 590 F.3d at 138. In committing the crime of attempted murder, Siddiqui certainly knew – indeed intended – that her conduct would influence or affect the conduct of government. By even the defense's contention, it was calculated to do so by effecting her release – even if her particular motivation in committing the crime was, as the defense has suggested, simply a desire to escape the prospect of United States detention.

The defense argues, once again, that the jury's failure to find that the defendant acted with premeditation in committing the offenses of attempted murder of United States Nationals and United States officers and employees, forecloses the applicability of the terrorism enhancement. According to the defense, the jury effectively found that Siddiqui did not "plan" the offense, and therefore the offense cannot be deemed to have been "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," as is required under Section 2332b(g)(5)(A). The defense is incorrect. First, as explained above, her attack was premeditated. It was the product of deliberation, however brief, and not an unthinking or random course of conduct. Second, the requirement of "calculation" is a specific intent requirement relating to the defendant's knowledge or state of mind in the time period in which she acted. It is not synonymous with a more colloquial meaning of "planned," as the defense would suggest, such that in order for the terrorism enhancement to apply, the Government must prove that the defendant prepared a detailed blueprint of the ANP Compound

and tracked the movements of the American forces that day, or anything of the sort. However quickly the defendant reacted to the circumstances that presented themselves, she most certainly made a conscious decision to act in a manner that was calculated – a manner that was planned or contrived – both to influence or affect the conduct of government, and to retaliate against government conduct. Siddiqui's attempt to kill United States personnel was clearly undertaken with the knowledge that it would provoke some response – perhaps that she herself would be attacked and killed, or that she would succeed in intimidating the specific individuals in the room, and perhaps the broader United States military as a result of her unprovoked attack. The fact that the defendant did not pre-arrange the circumstances does not detract from the way she ultimately behaved, or her obvious purpose in doing so.

Relatedly, the defense argues in effect that since the Government did not supersede in this case to charge Siddiqui with providing material support to a terrorist organization, and since "[t]here was nothing found on Dr. Siddiqui the day that she was arrested that suggests that she was planning, supporting, or encouraging a terrorist operation, or had knowledge about the same," (Def. Mem. at 3), Siddiqui is therefore not a terrorist and should not be punished as one. As an initial matter, the Government certainly disagrees with the defense's characterization of the import of the materials found on Siddiqui's person when she was detained by the ANP. Regardless of that, however, the argument that the offense of conviction must be material support, or that the defendant must have been affirmatively linked to a broader terrorist organization or plot in order for the terrorism enhancement to apply is completely without merit. The very definition of a "federal crime of terrorism" is far broader than the defense's implication that only those individuals who plan and carry out large-scale terrorist attacks, or are proven to

be members of terrorist groups, fall within the purview of the Guideline.  *See Salim*, 549 F.3d at 78 ("The sentencing enhancement for a federal crime of terrorism is not limited to conduct that constitutes an offense under section 2332b; it applies to any conduct that meets the definition of subsection (g)(5).")  The Guideline references a variety of statutes to which the enhancement may apply, including Section 1114.  To suggest that a defendant must have provided material support for this enhancement to apply completely ignores the plain language of the statute.  Indeed, the Second Circuit has approved the application of the terrorism enhancement in very different circumstances from what one might view as a classic example of terrorism.  *See id.* at 79.

In sum, the Government submits that the Court should find that the terrorism enhancement applies, given the facts of this case.  Taken together, (1) Siddiqui's conduct, (2) the materials that were in her possession shortly before the attack, and which evidence a clear intent to harm the United States, as well as exhortations to violent opposition to the United States' presence in foreign territories such as Afghanistan, and (3) the statements made by Siddiqui herself as she attempted to kill the United States personnel in the room, warrant the finding that she committed a federal crime of terrorism.  When she fired the M4 Rifle at the Interview Team, Siddiqui committed specifically enumerated offenses that were calculated both to influence or affect the conduct of government, and to retaliate against government conduct.  Her conduct was the very definition of a federal crime of terrorism warranting the enhancement recommended by the Guidelines.

### 4.    A Three-Level Hate Crime Enhancement Applies

Pursuant to Section 3A1.1(a) of the Guidelines, the Government submits that the

defendant's base offense level should be increased by three levels because "the finder of fact at trial . . . determine[d] beyond a reasonable doubt that the defendant intentionally selected" her victims as the object of the offense because of their actual or perceived "national origin" or "ethnicity."  As such, Siddiqui's offenses of conviction were hate crimes and warrant enhancement under this Guideline.  The jury in this case convicted Siddiqui of attempting to murder United States Nationals, among other things, and the Second Circuit has held that such a jury verdict satisfies the special evidentiary requirements which govern Section 3A1.1(a).  *See In re Terrorist Bombings*, 552 F.2d 93, 153-54 (2d Cir. 2008) (upholding application of hate crime enhancement where defendant was convicted of conspiring to murder officers or employees of the United States, despite defendant's claim that he was motivated by political ideology as opposed to hatred).[17]

   The evidence at trial of Siddiqui's animus and hatred towards Americans, in connection with the offenses of conviction, was extensive.  The materials in Siddiqui's possession at the time of her detention by Afghan authorities on July 17, 2008, contain explicit references to inflicting harm on the United States and its citizens, through various types of attacks.  These materials refer to the American forces in Afghanistan as infidels and enemies. Siddiqui characterized her Afghan captors, from whom she did attempt to escape on repeated occasions, as Americans, and repeatedly pleaded with them not to deliver her into United States custody.  When the United States personnel arrived at the second floor room of the ANP Compound and announced who they were, the defendant attempted to kill them minutes later.  In addition, the statements made by the defendant in the course of committing the offenses of

---

[17]   The Probation Department has deferred to the Court as to whether this enhancement should apply.  (*See* PSR ¶¶ 40-41.)

conviction directly establish her hatred of Americans, and the fact that she intentionally attacked the Interview Team because of their perceived national origin.  In short, there was extensive proof at trial that Siddiqui selected the victims of her offenses based on their perceived national origin.

The defense contends that the jury's failure to find that Siddiqui acted with premeditation renders the application of this Guidelines enhancement impossible, because, the defense submits, the hate crime enhancement implies that the defendant "consciously chose to target in advance certain victims."  (Def. Mem. at 39.)  This argument again overlooks the extensive evidence – principally the documents and other materials in Siddiqui's possession at the time of her detention – which suggests that she did in fact consciously choose to target in advance certain victims.  Putting that aside, however, there is no such requirement – in the text of the Guideline itself or in the case law construing this provision – that the defendant's targeting of particular victims be planned in advance of the commission of the crime in order for the hate crimes enhancement to apply.  The fact that Siddiqui did not have advance knowledge that the Interview Team was coming to speak with her, or that she would have access to a firearm upon their arrival, does not change the fact that once presented with these circumstances, Siddiqui attempted to kill as many United States personnel as possible.

The defense also submits that Siddiqui "behaved like a desperate and feral captive" who "would have struggled and bit anyone, whatever their . . . national origin, if she perceived that they would hand her over to any authorities that would bring her to an American prison."  (Def. Mem. at 41.)  This argument totally and inappropriately disregards the fact that Siddiqui conveyed her views towards America to her Afghan captors on July 17 and 18, in the

myriad of writings that were recovered from her on July 17, and to United States personnel immediately before, during, and after the shooting.

### 5.    A Two-Level Increase Applies for Obstruction

Pursuant to Section 3C1.1 of the Guidelines, the Government submits that the defendant's base offense level should be increased by two levels because Siddiqui willfully obstructed the administration of justice with respect to this prosecution, by committing perjury as to material matters when she testified at trial.  *See United States* v. *Dunnigan*, 507 U.S. 87, 94 (1993) (obstruction of justice enhancement applies when a defendant testifying under oath "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory").  In short, Siddiqui testified that she never picked up the M4 Rifle, that she never pointed the rifle at the United States personnel assembled in the room, and that she never fired the M4 Rifle.  In contrast, the jury found Siddiqui guilty of attempting to murder United States Nationals and United States officers and employees, by virtue of her grabbing the M4 Rifle and shooting it at the members of the Interview Team.  The defendant's perjury with respect to the material facts underlying the offenses of conviction cannot be characterized as anything other than blatant.

For sentencing purposes, perjury need only be proved by a preponderance of the evidence.  *See United States* v. *Khedr*, 343 F.3d 96, 102 (2d Cir. 2003)*; United States* v. *Ben-Shimon*, 249 F.3d 98, 102 (2d Cir. 2001).  Moreover, it is well settled that "the obstruction of justice enhancement [under Section 3C1.1] . . . is *mandatory* once its factual predicates have been established."  *United States* v. *Friedman*, 998 F.2d 53, 58 (2d Cir. 1993) (emphasis added); *accord United States* v. *Ortiz*, 251 F.3d 305, 306 (2d Cir. 2001) ("'[u]nder the Guidelines . . . the

sentencing court is required to adjust a defendant's offense level upward' if the defendant

obstructed justice") (quoting *United States* v. *Lincecum*, 220 F.3d 77, 80 (2d Cir. 2000)).

Accordingly, if the sentencing judge finds facts that give rise to this enhancement, the

enhancement must be imposed for purposes of the Guidelines' calculation.

Where the Government moves for a Section 3C1.1 enhancement based on the

defendant's perjured testimony, "a sentencing court must find that the defendant 1) willfully and

2) materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c)

as to a material matter." *United States* v. *Zagari*, 111 F.3d 307, 329 (2d Cir. 1997). With regard

to the wilfulness requirement, the Government must prove that "the defendant's statements

unambiguously demonstrate an intent to obstruct." *United States* v. *Kelly*, 147 F.3d 172, 178-79

(2d Cir. 1998); *see also Khedr*, 343 F.3d at 102. With regard to the "materiality" requirement,

the commentary to Section 3C1.1 defines "material" evidence to mean "evidence, fact, statement

or information that, if believed, would tend to influence or affect the issue under determination."

U.S.S.G. § 3C1.1, comment. (n.6). Thus, if the Court finds that the defendant "has clearly lied"

in a statement made under oath, the Court "need do nothing more to satisfy *Dunnigan* than to

point to the obvious lie and find that the defendant knowingly made a false statement on a

material matter." *United States* v. *Williams*, 79 F.3d 334, 337-38 (2d Cir. 1996); *see Lincecum*,

220 F.3d at 80.

The Second Circuit has explicitly held that "[w]here, as here, the defendant's

testimony relates to an essential element of [her] offense, such as [her] state of mind or [her]

participation in the acts charged in the indictment, the judgment of conviction necessarily

constitutes a finding that the contested testimony was false." *United States* v. *Bonds*, 933 F.2d

152, 155 (2d Cir. 1991) (per curiam).

Siddiqui's testimony regarding the events of July 18, 2008 was unequivocal – she

denied ever touching the M4 Rifle and she denied firing it:

> Q:  For the 18th of July, Dr. Siddiqui, did you ever pick up an
> M4 rifle and aim it at anybody?
>
> A:  This is the biggest joke that I've been kind of sometimes
> been forced to smile under my scarf. Of course not.
>
> Q:  Did you ever fire an M4 rifle at anybody?
>
> A:  No. No.

(Tr. at 1719-20.)

> Q:  It is your testimony that you never picked up a gun in the
> room that day, is that correct?
>
> A:  It is my testimony that – what I told you is my testimony.  I
> am not testifying to anything extra that I don't remember.  I
> am not.
>
> Q:  Are you saying that you don't remember whether you
> picked up a gun?
>
> A:  I am not saying – I am not saying that.  I am telling you
> what you know.  I walked towards the person and I was
> shot and then I was shot again and then I fainted.  I – my
> head does not believe that anybody would leave a gun lying
> around.  I don't think any of the American soldiers would
> be so irresponsible as to lay a gun lying around in a room
> full of people, a detainee can walk up and operate it so fast
> when that detainee has never in her life seen an M4, does
> know how to use it.  This is crazy.  It is too crazy.  I am
> sorry.  It is just ridiculous. . . .
>
> Q:  Isn't it true, ma'am, that you picked up an M4 rifle in the
> room that day?
>
> A:  Isn't it true?  I just told you.  I answered that already.  It is
> not.

42

(Tr. at 1741-42.)[18]

Siddiqui clearly stated under oath that she never even picked up the M4 Rifle.  In finding Siddiqui guilty of Counts One through Four, the jury concluded beyond a reasonable doubt that Siddiqui picked up the M4 Rifle and attempted to kill United States personnel. Accordingly, the two level obstruction enhancement is warranted and beyond dispute.

In its sentencing submission the defense focuses – for 12 pages – on the argument that an enhancement for obstruction of justice is not appropriate where the basis for the enhancement is the defendant's alleged malingering symptoms of mental illness and the defendant's alleged perjury based on inconsistencies between her trial testimony and prior statements made to the FBI.[19]  Not once in this 12 page discussion does the defense address the fact that Siddiqui testified under oath and expressly denied having engaged in the conduct with which she was charged and of which she was ultimately convicted.  The Government believes that Siddiqui has malingered symptoms of mental illness at various stages of this case, and that Siddiqui repeatedly perjured herself when she testified at trial – including with respect to statements she had made previously to the FBI, her familiarity with firearms, and her knowledge

---

[18]     Siddiqui's explanation for what did happen was completely implausible.  Siddiqui claimed that she approached the curtain and peeked from behind it in order to see if she could escape.  (Tr. at 1716-17, 1740.)  According to Siddiqui, a United States Army officer saw her from across the room, screamed words to the effect of "she's loose," and then shot her from across the room.  (Tr. at 1717, 1740.)  Siddiqui further claims she was shot by another individual and ultimately was shot about three times.  (Tr. at 1740.)  In fact, the evidence showed that Siddiqui was shot once, suffering two gunshot wounds (corresponding to the entry and exit of the bullet).  (Tr. at 1851.)

[19]     The defense characterizes the only basis for the obstruction of justice enhancement to be paragraphs 32 and 33 of the PSR, which rely on specific instances of Siddiqui's conduct (not including her denial of picking up or shooting the M4 Rifle).  The PSR is prepared by the Probation Department.  It does not constitute – or in any way limit – the arguments the Government can make at sentencing or the findings the Court can make as to the applicability of various Guideline enhancements.

of various documents shown to her in the course of her testimony.  Nevertheless, the Court need not even address these particulars in determining that an enhancement for obstruction of justice is mandated.[20]

Siddiqui's perjury in this case was blatant and it concerned the central issue in this case – whether she attempted to kill members of the Interview Team.  The suggestion that an enhancement for obstruction of justice is "patently unfair" (Def. Mem. at 43) is frivolous.

### 6.    Mandatory Minimum Consecutive Guideline

Count Four of the Indictment charged Siddiqui with violating Title 18, United States Code, Sections 924(c)(1)(A)(iii) and 924(c)(1)(B)(ii).

The Guideline applicable to a violation of Title 18, United States Code, Section 924(c) is Section 2K2.4.  Subsection (b) of this Guideline provides that

> (b)    Except as provided in subsection (c), if the defendant, whether or not convicted of another crime, was convicted of violating section 924(c) . . . the guideline sentence is the minimum term of imprisonment required by statute. Chapters Three and Four shall not apply to that count of conviction.

The statutes with which Siddiqui was charged in Count Four provide as follows:

> (c)(1)(A) . . . . [A]ny person who, during and in relation to any crime of violence . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence . . .

> (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

> (iii) if the firearm is discharged, be sentenced to a term of

---

[20]    Examples of this perjury are replete throughout trial.  Siddiqui denied, for example, taking a gun course at the Braintree Rifle & Pistol Club while enrolled at MIT (Tr. at 1731-33), yet Gary Woodworth subsequently identified her as someone with whom she spent approximately six hours at a gun range outside Boston (Tr. at 1839-41).

imprisonment of not less than 10 years;

(B) If the firearm possessed by a person convicted of a violation of this subsection –

(ii) is a machinegun or a destructive device . . . the person shall be sentenced to a term of imprisonment of not less than 30 years.

(D) Notwithstanding any other provision of law –

(ii) No term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence. . . during which the firearm was used, carried, or possessed.

18 U.S.C. §§ 924(c)(1)(A)(iii), (B)(ii), D(ii).[21]  Thus, Section 2K2.4 of the Guidelines provides that the term of imprisonment applicable to Count Four is the minimum term of imprisonment that the statute requires (which is set forth in Sections 924(c)(A)(ii), (A)(iii), or B(ii)).

Here, the jury was instructed that to convict Siddiqui of Count Four of the Indictment, they needed to find beyond a reasonable doubt that "the defendant knowingly used or carried a firearm during and in relation to the commission of the underlying crime of violence."  (Tr. at 2077.)  Moreover, Count Four of the Indictment specifically alleged that "SIDDIQUI used, carried, brandished and discharged U.S. Army Officer One's M4 Rifle (a machinegun) in connection with the crimes described in Counts One, Two and Three." (Indictment ¶ 12.)  The jury was not asked to find if the firearm was either (1) brandished or discharged; or (2) a machinegun.

It is well-settled that after a defendant is convicted of violating Title 18, United

---

[21]    The term "machinegun" is defined in Title 26, United States Code, Section 5845(b).  *See* 18 U.S.C. § 921(a)(23).  A "machinegun" is defined as: "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b).

States Code, Section 924(c)(1)(A)(i), the Court may find by a preponderance of the evidence whether the enhancements set forth in  subsections (ii) and (iii) apply.  It is black letter law that these two enhancements – of seven and ten years – are sentencing factors that may be found by the Court.  *See United States* v. *O'Brien*, 130 S. Ct. 2169, 2179 (2010) ("Sections 924(c)(1)(A)(ii) and (iii) provide sentencing enhancements for brandishing or discharging the firearm, and the Court has held that these enhancements are sentencing factors to be found by a judge."); *Harris* v. *United States,* 536 U.S. 545 (2002) (holding that facts triggering a mandatory minimum consecutive sentence under Section 924(c) – *i.e.*, whether a firearm was possessed, brandished, or discharged – are not elements of the crime but are instead sentencing factors that are properly found by the Court at sentencing by a preponderance of the evidence); *United States* v. *Gomez*, 580 F.3d 94, 104 (2d Cir. 2009).

> Here, overwhelming evidence clearly shows that Siddiqui not only brandished (which the defense concedes (Def. Mem. at 57)), but also discharged the M4 Rifle.  Six separate witnesses saw and heard Siddiqui fire the M4 Rifle.  The witnesses were unequivocal on this point.  (*See* Tr. at 168 (Snyder); 427 (Gul); 968 (Card); 1078, 1082 (Chief Warrant Officer); 1180-81 (Agent Negron); 1270-71 (Amin).)  In addition, three separate witnesses testified that they heard shots that sounded like they came from an M4 Rifle, followed by pistol shots.  (*See* Tr. at 398-99 (Jefferson); 1336-37 (Williams); 1386-87 (Cook).)  The Government submits that the jury credited this testimony beyond a reasonable doubt in finding Siddiqui guilty of attempted murder in Counts One and Two of the Indictment.  Accordingly, any sentence that the Court imposes on Count Four must be a mandatory minimum sentence of 10 years and must run consecutive to any term of imprisonment that is imposed on Counts One through Three and

Counts Five through Seven.  *See* 18 U.S.C. §924(c)(1)(A)(iii).

The defense argument that the forensic evidence "simply failed to confirm" (Def.

Mem. at 58) that Siddiqui fired the gun is utterly flawed.  First, six different eyewitnesses

testified that they saw and heard Siddiqui fire the M4 Rifle, and three different eyewitnesses

testified that they heard this happen.  Their testimony should be credited and that should end the

Court's inquiry on this point.

Second, a lack of forensic evidence does not mean an event did not happen.  This

was best illustrated at trial by the fact that although no one disputed that the Chief Warrant

Officer fired at least two 9-mm rounds at Siddiqui, only one 9-mm bullet was recovered.  One 9-

mm bullet is missing just like the M4 shell casings are missing.  We know M4 shells were

recovered, however, as defense witness ANP Officer 1 testified that he saw what he believed

were inch-and-a-half-long American rifle shells in the second floor room immediately after the

shooting.  (Tr. at 1811-13.)  And, Qadeer testified that he also recalled seeing three shells on the

floor after the shooting.  (Def. Ex. C at 33.)

Third, given the location of the crime scene, the lack of forensic evidence is not

surprising.  The ANP Compound was in the middle of a war zone and was not secured after this

shooting.  It took the FBI six days to get to the ANP Compound to begin their evidence

collection process.  Both the defense and Government experts agreed that this lack of control of

the crime scene was problematic and contributed to lost evidence.[22]

_____

[22]     Moreover, the suggestion that the "photographs" (a reference to the videotape of the second floor room before the shooting) "establish error" in the Government's "theory" (Def. Mem. at 58) is wrong.  As the Court and counsel are aware, it was the Government who brought the videotape – which had previously been provided to the defense in the course of discovery – to the Court's and counsel's attention during the course of trial.  The Government did so after it realized that the videotape showed that the two holes in the wall opposite the curtain (as conveyed in Gordon Hurley's photos) could not have been caused by gunfire on July 18.  The

Accordingly, a preponderance of the evidence shows that Siddiqui both brandished and discharged the M4 Rifle and that the mandatory minimum consecutive sentence of ten years' imprisonment applies.

In addition to the above enhancements (*i.e.* Section 924(c)(1)(A)(ii) and (iii)), Section 924(c)(1)(B)(ii) provides that a mandatory minimum consecutive sentence of 30 years' imprisonment must be imposed where the firearm at issue was a machinegun.  In light of *Harris*, the Government believed that this enhancement was – like subsections (A)(ii) and (A)(iii) – a sentencing factor to be found by the Court.  The defense accurately notes, however, that in May 2010 the Supreme Court held that whether the firearm used or possessed was a machinegun – *i.e.* a violation of Title 18, United States Code, Section 924(c)(1)(B)(ii) – is an element of the offense that must be found by the jury.  *See United States* v. *O'Brien*, 130 S. Ct. 2169.  The jury in this case did not explicitly find – as they were not asked – that the gun possessed by Siddiqui on July 18, 2008, was a machinegun.  As a matter of law, Siddiqui is thus only subject to a mandatory minimum consecutive sentence of 10 years on Count Four, rather than 30 years.[23]

Regardless of whether the Court is *required* to impose a mandatory minimum consecutive sentence of 30 years' imprisonment on Count Four, Section 924(c) reflects Congress's assessment that such a sentence for Count Four would be appropriate.[24]  In

---

discovery that those two particular holes could not have been caused by the gunfire on July 18 in no way changes the Government's theory that Siddiqui fired the M4 Rifle at members of the Interview Team and tried to kill them.

[23]    Accordingly, the Probation Department's determination that a mandatory minimum consecutive 30 year sentence of imprisonment applies to Count Four is incorrect.  (*See* PSR ¶ 37.)

[24]    Even after *O'Brien*, the maximum sentence permitted by law for a violation of Section 924(c) remains a sentence of life imprisonment.  *See United States* v. *Farmer*, 583 F.3d 131, 151 (2d Cir. 2009); *United States* v. *Johnson*, 507 F.3d 793, 798 (2d Cir. 2007); *see also*

legislating the applicable penalties for Section 924(c), Congress determined that using a machinegun during a crime of violence warranted a sentence of no less than 30 years' imprisonment to run consecutive to the sentence imposed on the other counts.  Such an increased penalty recognizes the moral depravity of committing violent crimes with machineguns, which can inflict horror and damage on a massive scale.  *See O'Brien*, 130 S. Ct. at 2178 (recognizing "[t]he immense danger posed by machineguns [and] the moral depravity in choosing the weapon").

Moreover, while the Court did not submit this question to the jury, there can be no serious dispute that – if asked – the jury would have found that the gun used and carried by Siddiqui on July 18 was a machinegun.  The theory of the Government's case was that Siddiqui fired – and attempted to fire – an M4 Rifle at the Interview Team.  Indeed, the Indictment specifically alleged that Siddiqui used the M4 Rifle, which it characterized as a machinegun. (*See* Indictment ¶ 4.)  There was no testimony or evidence suggesting that Siddiqui picked up any other type of weapon that day.  Nor can there be any dispute that the M4 Rifle is a machinegun as defined by Title 26, United States Code, Section 5845(b).  FBI firearms expert Carlo Rosati testified that the M4 Rifle used by Siddiqui was a machinegun capable of firing at least a "three round burst," (Tr. at 836), and the Chief Warrant Officer also testified that this weapon fired on both semiautomatic and automatic modes (Tr. at 1076).  That testimony was unchallenged.

Therefore, although the Court is no longer *required* to sentence Siddiqui to a minimum consecutive sentence of 30 years' imprisonment on Count Four, such a sentence would be appropriate.  And, while a strict application of the Guidelines provides for a Guideline

---

*Harris* v. *United States*, 536 U.S. 545, 573 (2002) (Thomas, J., dissenting).

sentence of 10 years' imprisonment on Count Four, the Government submits that a sentence of 30 years' imprisonment on this count reflects the intent of both Congress and the Sentencing Commission, and would therefore be appropriate.

### 7.  The Total Guidelines Range

Based on the analysis above, Siddiqui has a total offense level of 56.  This is based on: (1) a base offense level of 33, pursuant to Section 2A2.1(a)(1); (2) a six-level enhancement pursuant to Section 3A1.2(b) (targeting official victims); (3) a twelve-level enhancement pursuant to Section 3A1.4(a) (the terrorism enhancement); (4) a two-level enhancement pursuant to Section 3C1.1 (obstructing justice); and (5) a three-level enhancement pursuant to Section 3A1.1(a) (hate crime motivation).  In addition, because the terrorism enhancement applies, Siddiqui faces a criminal history category of VI, pursuant to Section 3A1.4(b).  The corresponding Guidelines range for Counts One through Three and Counts Five through Seven is life imprisonment.  The applicable Guideline for Count Four of the Indictment is a mandatory minimum sentence of 10 years' imprisonment, which must run consecutive to the sentence imposed on Counts One through Three and Counts Five through Seven.

Accordingly, the Guidelines range for Siddiqui's offenses of conviction is a sentence of life imprisonment, to be followed by a mandatory minimum consecutive sentence of 10 years' imprisonment.[25]

### C.  Consideration of the 3553(a) Factors

Title 18, United States Code, Section 3553(a) provides that (in addition to the Guidelines) the Court should consider the following factors at sentencing:

---

[25]  The defense is not seeking any downward departures from the Guidelines and the Government submits that no such departures apply.

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Various aspects of this case counsel in favor of the sentence called for under the Guidelines.

First, and most importantly, the nature and circumstances of this offense show that Siddiqui tried to kill as many United States personnel as possible on July 18, 2008. Her intended victims consisted of people who were (and are) serving the United States and who placed themselves in harm's way the minute they stepped outside FOB Ghazni. None of these personnel anticipated the series of events that transpired after the Chief Warrant Officer placed his M4 Rifle down on the floor of the second floor room of the ANP Compound. Siddiqui tried to surprise the Interview Team and murder as many Americans as possible.

Through happenstance and the courageous actions of Ahmed Gul, no Americans were hit or seriously injured. But Siddiqui's actions on July 18 demonstrate dangerousness and her sheer will and desire to kill Americans. Siddiqui was prepared to die that day in, what was in her mind, a blaze of glory. She indicated this by pleading with United States personnel to let her die and not treat her. Even more disturbing is the fact that Siddiqui harbors these sentiments

51

despite having lived in the United States for almost ten years, where she was educated at some of this country's finest institutions.

It is simply offensive to argue – as the defense does – that the "victim" of Siddiqui's behavior was "none other than herself" (Def. Mem. at 1) and that Siddiqui is "clearly her own worst enemy" (Def. Mem. at 5).  The true victims of Siddiqui's crimes were the men and woman she attempted to, and very nearly did, murder: Captain Robert Snyder, the Chief Warrant Officer, Medic Dawn Card, Jawid Ahmin, Ahmed Gul, Special Agent Erik Negron, and Special Agent John Jefferson.  Those people suffered the same harm experienced by every victim of an attempted murder who is not physically injured: the emotional and psychological harms of their harrowing, near-death experience.

Moreover, on July 18, Siddiqui had one enemy – the United States.  This was the same "enemy" that Siddiqui referenced in countless writings that were recovered from her on July 17.  When Siddiqui finally was presented with the opportunity to attack these "enemies," she took it.  Had Siddiqui not been captured on July 17, it is unclear what she would have done. Not only did Siddiqui have a trove of incriminating documents on her when she was detained by the ANP, Siddiqui also was in possession of two pounds of sodium cyanide.  Given the lethality of sodium cyanide, Siddiqui held in her hands the potential to inflict serious damage on the public with this chemical if she so chose.  It defies common sense to suggest that Siddiqui's possession of these materials was innocuous.  It is clear that harm was averted when United States personnel detained Siddiqui and saved her life, even though she had just tried to kill them.

Similarly, defense counsel's suggestion that Siddiqui is not a "typical defendant" (Def. Mem. at 27) who attempts to murder another human being is baseless.  Siddiqui's own

writings and statements – before, during, and after the shooting – demonstrate that Siddiqui's actions on July 18 were anything but "atypical."  (Def. Mem. at 28.)  Rather, Siddiqui's actions were completely consistent with her expressed (oral and written) thoughts.[26]

Second, throughout this entire case, Siddiqui has demonstrated a disrespect for the Court and for this process.  At various proceedings, Siddiqui has interrupted the Court and the testimony of witnesses at opportunistic times and demanded that things proceed the way she wants.  The Court recognized this at the competency hearing, when it noted that:

> Dr. Siddiqui's demeanor – which initially had been polite and appropriate – changed almost instantaneously after AUSA LaVigne stated at the conclusion of his cross examination: "You have been sitting here for two hours. . ."; "Ms. Siddiqui is right here, correct?"; "Have there been any outbursts? [There had not been.]"; "Have you seen Ms. Siddiqui speak to her attorney? [She had done so.]" Immediately thereupon, Dr. Siddiqui became much more loquacious, outspoken and difficult in the courtroom.

(7/29/09 Order at 36.)  Siddiqui engaged in similar gamesmanship at trial.  On countless occasions she attempted to interject her version of events relating to the case – including a number of falsely exculpatory statements – when witnesses were testifying.  (*See*, *e.g.*, Tr. at 1004 ("I feel sorry for your double problem. You are going to take Captain Snyder's blame on you too."); Tr. at 1165.)

While Siddiqui put the Government to its proof by proceeding to trial – as she had every right to do – Siddiqui has shown no remorse for what she did.  Siddiqui elected to take the

---

[26]     At trial, the Government did not argue that Siddiqui was a member of – or affiliated with – a terrorist organization and is not relying on any such argument at sentencing. The suggestion, however, that Siddiqui is somehow less culpable because she has not been indicted on terrorism-related charges (Def. Mem. at 27) is nonsensical in the circumstances of this case.  The defendant was convicted on all counts in the Indictment based on her conduct on July 18.  The fact that Siddiqui has not been indicted on terrorism-related charges in no way lessens her culpability for what she did.

stand in her defense and she blatantly lied about the events of July 18, and about countless other facts, including her prior training in firearms and various statements she made to the FBI after she was shot. This was readily apparent from the content of her answers, and from her demeanor on the witness stand. It was obvious to any courtroom observer that Siddiqui simply was making things up as she went along.

Defense counsel attributes various aspects of Siddiqui's presentation to mental health issues. To date, Siddiqui has been evaluated by *five* separate mental health professionals (certain of whom observed her on a daily basis at FMC Carswell). There has been an extensive competency proceeding, in which five different mental health professionals testified; two by deposition and three before the Court. And, the Court now has before it hundreds of pages of medical records of Siddiqui, along with hundreds of other pages of materials regarding her case (provided in the context of the competency hearing and trial).

Over a year ago the Court found Siddiqui competent to stand trial, and has since found that she has the mental faculties to testify in her own defense. While the Court has recognized the possibility that Siddiqui may have some mental health issues (7/29/09 Order at 25), the Court also commented at trial that Siddiqui's mental health condition has improved since July 2009. (Tr. 1783.) At trial, Siddiqui put to rest any issues regarding her competency as she was able to answer questions, deftly maneuver around questions, put forward her defense, and clearly communicate themes that she viewed as central to her defense. Her description of what transpired during the incident was neither incoherent nor irrational – she admitted to being left unrestrained in the second floor room, she admitted that she heard Americans come into the room, and she admitted to approaching the partition of the curtain to escape. She simply lied

when she denied ever picking up the M4 Rifle.

In short, even if Siddiqui does have some mental health issues, they did not play any role in her offense, and they are not of the type that would warrant a substantially lower sentence than that recommended by the Guidelines.[27]

****

A severe sentence in this case is necessary.  It is necessary to protect the public from future crimes by Siddiqui, it is necessary to reflect the seriousness of the offense, and it is necessary to promote respect for the law and provide just punishment.

Siddiqui's crime was horrific in its intent.  If she accomplished what she intended, several United States personnel would be dead.  Siddiqui intended to kill as many United States personnel as possible that day and she did so because of her animus towards the United States. Her actions were fueled by the sentiments she expressed in her writings (recovered on July 17) and in the various statements she made before, during, and after the shooting.

The sentence suggested by the defense – 12 years – is woefully insufficient.

The Guidelines convey this.  Even if certain enhancements are found not to apply, for example, the Guidelines provide for a sentence exceeding 30 years' imprisonment.  More to the point, even if the terrorism enhancement is found not to apply, the final offense level for Siddiqui's crimes would still be 44, based on: a base offense level of 33 (since the crime was attempted first degree murder); a six-level enhancement (targeting official victims); a three-level

---

[27]     Importantly, Siddiqui has demonstrated the ability and capacity to function in society.  She spent several years in the United States where she obtained advanced degrees at the Massachusetts Institute of Technology ("MIT") and Brandeis University.  She performed exceptionally well at these institutions, as she herself emphasized in her testimony.  (Tr. at 1699-1704; GX 400, 401.)

enhancement (hate crime); and a two-level enhancement (obstruction).  Applying a criminal

history category of I results in a Guidelines range of life, to be followed by a mandatory

minimum consecutive sentence of 10 years' imprisonment.

> If the terrorism enhancement is found not to apply, and if Siddiqui's base offense

level is found to be 27 (for attempted second degree murder), but all of the other enhancements

referenced above are applied, then Siddiqui still faces a Guidelines range – based on an offense

level of 38 and a criminal history category of I – of 235-293 months, followed by a mandatory

minimum consecutive sentence of 10 years' imprisonment, or a sentence of approximately 30-34

years' imprisonment.

> Importantly, in light of the Supreme Court's May 2010 *O'Brien* decision, because

the jury did not explicitly find that the M4 Rifle was a machinegun, Siddiqui no longer faces a

mandatory minimum consecutive sentence of 30 years' imprisonment.  Had the jury been asked

this question, it is beyond dispute that Siddiqui would be facing a mandatory minimum sentence

of 30 years' imprisonment, to run consecutively to whatever sentence the Court would impose on

Counts One through Three and Counts Five through Seven.  Thus, prior to the Court's *O'Brien*

decision, the *minimum* sentence that could have been imposed on Siddiqui on Count Four alone

was 30 years' imprisonment, well above the 12 year term of imprisonment suggested by the

defense.

> Indeed, a 30 year sentence would have been required, purely based on Siddiqui's

use of the M4 Rifle during her underlying crime of violence (attempted murder).  Factoring in

the materials and documents that Siddiqui had in her possession on July 17, the frequent anti-

American statements Siddiqui made throughout the days and hours leading up to the July 18

shooting, and Siddiqui's perjured testimony at trial, a Guidelines sentence of life imprisonment consecutively followed by a term of imprisonment of 10 years' imprisonment is reasonable.

**III.     CONCLUSION**

            For all of the foregoing reasons, the Government submits that the applicable Guidelines range to Siddiqui's conviction is life imprisonment, to be followed by a mandatory minimum consecutive sentence of ten years' imprisonment.  In light of the heinous nature of Siddiqui's crimes, the Government believes that such a sentence is reasonable.

Dated: New York, New York
       July 29, 2010

                       Respectfully submitted,

                       PREET BHARARA
                       United States Attorney

By:   _____/s/_____
                       CHRISTOPHER L. LAVIGNE
                       DAVID M. RODY
                       JENNA M. DABBS
                       Assistant United States Attorneys
                       (212) 637-2325/2304/2212

## CERTIFICATE OF SERVICE

CHRISTOPHER L. LAVIGNE, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury that a true and correct copy of the foregoing was served via electronic filing on the below-listed date on:

Dawn M. Cardi, Esq.
2 Park Avenue, 19th Floor
New York, NY 10016

Elaine Whitfield Sharp, Esq.
Whitfield Sharp & Sharp
196 Atlantic Avenue
Marblehead, MA 01945

Charles Swift, Esq.
Swift & McDonald PS
2003 Western Ave., Suite 330
Seattle, WA 98121

Linda Moreno, Esq.
P.O. Box 10985
Tampa, FL 33679

Dated:          New York, New York
                July 29, 2010

_____/s/_____
                Christopher L. LaVigne
                David M. Rody
                Jenna M. Dabbs
                Assistant United States Attorneys
                (212) 637-2325/2304/2212