UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA,                                   08 Cr. 826 (RMB)

- against -

AAFIA SIDDIQUI,

                              Defendant.

------------------------------------------------------------X

## REPLY SENTENCING MEMORANDUM
## OF DEFENDANT AAFIA SIDDIQUI

DAWN M. CARDI & ASSOCIATES
  Dawn M. Cardi, Esq.
  Chad L. Edgar, Esq.
Two Park Avenue, 19th Floor
New York, New York 10025
Tel.: 212.481.7770
Fax: 212.684.3008
*Attorneys for Aafia Siddiqui*

Linda Moreno, Esq.
P.O. Box 10987
Tampa, FL 33697
Tel. (813) 247-4500
Fax (813) 386-6211
*Attorney for Aafia Siddiqui*

SWIFT & MCDONALD, P.S.
  Charles Swift
2003 Western Avenue, #330
Seattle, WA 98121
Tel. (206) 441-3377
Fax (206) 448-2252
*Attorney for Aafia Siddiqui*

Elaine Whitfield Sharp, Esq.
196 Atlantic Avenue
Marblehead, MA 01945
Tel. (781) 639-1862
Fax (781) 639-1771
*Attorney for Aafia Siddiqui*

# TABLE OF CONTENTS

Table of Contents ................................................................i

INTRODUCTION ...............................................................1

ARGUMENT....................................................................4

I.    The Government Fails To Prove That
      Dr. Siddiqui's Impulsive Actions Driven By Mental Illness
      Can Be Construed As "Calculated" .....................................4

II.   The Question As To Whether Dr. Siddiqui Committed
      Attempted Premeditated Murder Was Answered By The Jury ...................13

III.  The Government Fails To Prove That Dr. Siddiqui's Offense Conduct
      Warrants A Three-Level Hate Crime Enhancement ................................16

IV.   The Obstruction Of Justice Enhancement Should Not Be Applied
      To A Defendant Who Suffers From Mental Illness And Experienced Trauma ...18

V.    The Court Should Find That Dr. Siddiqui At Most Brandished
      But Did Not Discharge The M-4 Rifle
      That Is The Basis For the 924(c) Count ..............................................20

VI.   A Non-Guidelines Sentence Is Warranted
      Because There Is No Evidence That Dr. Siddiqui Is A Terrorist ...................22

CONCLUSION................................................................24

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

UNITED STATES OF AMERICA,

         - against —

                                   08 CR 826 (RMB)

AAFIA SIDDIQUI,

                    Defendants.

------------------------------------------------------------- X

## REPLY SENTENCING MEMORANDUM OF DEFENDANT AAFIA SIDDIQUI

    Defendant Aafia Siddiqui (hereafter, "Dr. Siddiqui" or "Siddiqui"), through her undersigned counsel, respectfully submits this Reply Sentencing Memorandum for the Court's consideration in connection with her sentencing scheduled for September 23, 2010.

## INTRODUCTION

    The government appears to believe that by endlessly repeating the substance of the Rule 404(b) evidence introduced at trial, which included: (1) pocket litter that contained irrational musings like designing airplanes to fly on a wire to assist them in evading surface-to-air missiles; (2) inconsistent accounts of her alleged anti-American statements while attempting her escape from her American interrogators; and (3) the fact that she carried sodium cyanide, will magically transform this attempted murder case into a terrorism case. The government's repetitions prove to be hollow incantations.

    While the government insists that Dr. Siddiqui's attempted murder of members of the United States military team that came to interrogate her in Ghazni City (the "Interview Team")

was an alleged terrorist act, they cannot deny that the record is bereft of any evidence that she engaged in any long-term planning of these attempted murders. Let us not forget that the government bears the burden of proof with respect to all of the enhancements that they seek. Implicitly conceding that Dr. Siddiqui did not engage in any long-term planning with respect to her attempted murders, the government hopes to obtain the terrorism enhancement by arguing that "calculated" – a key word in the provision – means "intended" rather than its plain meaning: "undertaken after careful estimation of the likely outcome" or "made or planned to accomplish a certain purpose; deliberate." The American Heritage Dictionary of the English Language, 4th ed. (Houghton Mifflin Co. 2000). The jury found that Dr. Siddiqui's attempted murder counts were done without premeditation – in other words, without deliberation or planning and thus was not "calculated." The inquiry over the terrorism enhancement should begin and end with that finding. No terrorism enhancement is warranted here.

The government's attempt to circumvent the jury's finding on the issue of premeditated murder by arguing that the base offense level should be 33 rather than 27 should also be rejected. Putting aside the fact that defense counsel believed that in putting the question of premeditation to the jury we were agreeing that the jury would be the final arbiters of the question, we respectfully submit that the government's failure to convince the jury that Dr. Siddiqui's actions were premeditated is the most damning criticism of the quality of the evidence they marshaled to support their theory. Once again, we invoke the jury's finding of no premeditation as our strongest argument that Dr. Siddiqui's base offense level should be 27 rather than 33.

With respect to the "hate crime" enhancement, we respectfully submit that the government's comparison of Dr. Siddiqui's conduct with the conduct of actual terrorists like El Hage is misguided. Unlike El Hage whose violent actions clearly targeted United States

nationals, Dr. Siddiqui's violent actions encompassed persons of any and all national origins who threatened to convey her into American custody. The government has no real reply to our argument that Dr. Siddiqui's resistance was not only directed at the Americans who came to interrogate her but also the Afghans who initially detained her. In light of the fact that the government has the burden of proof here, their inability to answer this material difference between the conduct of El Hage and Dr. Siddiqui justifies denying their request for the "hate crime" enhancement.

Finally, with respect to the obstruction of justice enhancement, we respectfully submit that Dr. Siddiqui's mental illness prevented her from having a thorough understanding and appreciation of the responsibilities that come with testifying on one's own behalf. Without counsel's assistance, she made statements under oath that clearly blended first-hand knowledge on the one hand and assumptions based on "logic" and "reason" on the other -- a mistake that defendants frequently make until they are tutored by counsel to be more thoughtful in their responses to questions under oath. If Dr. Siddiqui had made the statement that she did not touch the M-4 after receiving the assistance of counsel in preparing for her testimony and there was no evidence of mental illness, then we would concede the "obstruction of justice" enhancement. But those are not the facts here. In light of these peculiar circumstances, the Court should give Dr. Siddiqui the benefit of doubt and deny the government's request for an "obstruction of justice" enhancement.

While the government tried to convince the jury and is attempting to convince the Court that Dr. Siddiqui is a terrorist and thus justify their request for imposition of a life sentence, the government's efforts should be rejected. The jury's rejection of the government's efforts to characterize Dr. Siddiqui as on a terrorist mission on July 17, 2008 speaks volumes as to the

quality of the evidence that supports the government's theory.  We respectfully submit that the government's failure to convince the jury that Dr. Siddiqui is a terrorist justifies the Non-Guidelines sentence that we seek of 12 years.

## ARGUMENT

I.   **The Government Fails To Prove That
Dr. Siddiqui's Impulsive Actions Driven By Mental Illness
Can Be Construed As "Calculated"**

In the initial sentencing memorandum, defense counsel argued that application of the terrorism enhancement is triggered where a defendant commits one of the enumerated acts identified in 18 U.S.C. § 2332b(g)(5) in a manner that indicates the kind of calculation and planning that would support the inference that the conduct was intended to "influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5).  An exhaustive review of the cases where the terrorism enhancement has been applied makes clear that the defendants who have been subject to this enhancement have engaged in offense conduct involving plots and plans that took shape over a considerable amount of time.  See United States v. Awan, 607 F.3d 306 (2d Cir. 2010) (affirming imposition of terrorism enhancement where for many years the defendant served as a funnel for financial aid to a terrorist group that he knew was engaging in terrorism); United States v. Stewart, 590 F.3d 93, 146 (2d Cir. 2009) (affirming imposition of terrorism enhancement where the conduct at issue was "committed over an extended period of time, involv[ing] repeated acts of deception, and … significant planning"); United States v. Christianson, 586 F.3d 532, 534 (7th Cir. 2009) (affirming imposition of terrorism enhancement on members of the Earth Liberation Front who carefully planned the destruction of an experiment on forest trees by the United States Forest Service); United States v. Ashqar, 582 F.3d 819, 821-22 (7th Cir. 2009)

(affirming imposition of terrorism enhancement on the defendant who was asked to testify in grand jury as to the activities of Hamas that violated specific United States statutes and refused even after the Court granted him immunity and ordered him to testify); United States v. Salim, 549 F.3d 67, 71-72 (2d Cir. 2008) (affirming imposition of terrorism enhancement where defendant implemented a plan developed over many months to attack his attorney in order to force the presiding judge to appoint a new attorney); In re Terrorist Bombings of U.S. Embassies in East Africa (El Hage), 552 F.3d 93 (2d Cir. 2008) (affirming imposition of terrorism enhancement where defendant served as a close associate of Bin Laden, served as the head of the Nairobi al Qaeda cell and was an important planner behind the African embassy bombings); United States v. Aref, 04 Cr. 402, 2007 WL 804814, at *2 (N.D.N.Y. March 14, 2007) (imposing terrorism enhancement where defendant considered for a few months and then decided to assist in the importation of a surface-to-air missile into the United States in order to assassinate the Pakistani ambassador and thereby teach the Pakistan government a lesson); United States v. Garey, 383 F. Supp. 2d 1374, 1376 (M.D. Ga. 2005) (imposing terrorism enhancement where defendant made numerous telephone calls to local government authorities threatening to use weapons of mass destruction in order to extort money), aff'd 546 F.3d 1359 (11th Cir. 2008); United States v. Benkahla, 530 F.3d 300, 304 (4th Cir. 2008) (affirming imposition of terrorism enhancement where the defendant repeatedly perjured himself about knowledge of jihadist activities amongst members in his community during two grand jury proceedings and multiple ancillary proceedings involving the FBI, even though he was granted immunity for testifying truthfully); United States v. Assi, 586 F. Supp. 2d 841 (E.D. Mich. 2008) (applying enhancement where defendant admitted that he sought to provide a GPS aviation device, night-vision goggles and a bullet-proof vest to key members of Hizballah with the intention of assisting the campaign

of intimidating the Israeli government into withdrawing from Lebanon); United States v. Harris, 434 F.3d 767, 774 (5th Cir. 2005) (affirming imposition of terrorism enhancement where defendant threw a "Molotov cocktail" at a local municipal building in retaliation for his recent two arrests and police investigation of his father); United States v. Dowell, 430 F.3d 1100 (10th Cir. 2005) (affirming imposition of terrorism enhancement where defendant and others met to plan the arson of an IRS office to destroy records and proceeded to do so thereby knowingly obstructing the due administration of the IRS laws by use of force); United States v. Mandhai, 375 F.3d 1243, (11th Cir. 2004) (affirming imposition of the terrorism enhancement where defendant's goal in bombing public utilities was to cause civil strife and upheaval in Miami in order to demand the release of Muslim prisoners and changes in government foreign policy); United States v. Meskini, 319 F.3d 88 (2d Cir. 2003) (affirming terrorism enhancement where defendant assisted the millennial bomber after ongoing discussions of the importance of bringing jihad to the United States homeland by recruiting an accomplice, facilitating their meeting and providing documents to effect their departure from the United States after executing the plot); United States v. Graham, 275 F.3d 490, 518-19 (6th Cir. 2001) (applying the terrorism enhancement where the defendant and others conspired to attack various public sites and officials in order to overthrow local and federal governments through planning and preparations that spanned years). The application of the terrorism enhancement under such circumstances makes sense because Congress had plots like the bombing of the World Trade Center in 1993 and the Alfred P. Murrah building in Oklahoma in 1995 as the framework through which it contemplated substantive changes to the enhancement in the past. See H.R. Rep. 104-383 (Comprehensive Antiterrorism Act of 1995), 1995 WL 731698 at *47. The draconian penalties that attend the terrorism enhancement – the upward adjustment of the offense level by 12 and the

horizontal adjustment of the criminal history category to VI -- seems particularly warranted where a defendant or defendants contemplate elaborate attacks on civil or military populations in "cold blood." The "cold blood" state of mind that has been a staple of criminal justice jurisprudence is a colloquialism for "premeditation" and has always been viewed as an especially culpable <u>mens rea</u> in the realm of murder and attempted murder. It would make sense that the terrorism enhancement would be reserved for and only triggered by those defendants who "in cold blood" planned attacks on either civilian and/or military populations in order to "influence or affect the conduct of government."

The government obviously objects to our reading of "calculated" as synonymous with "planning" or "plotting" and construes the term to mean little other than "intend" or so it appears. But the government's construction begs the question as to why the term "calculated" was used as opposed to "intended." It is worth noting that the use of the term "calculated" in the terrorism enhancement is unique and no other provision within the guideline uses it. Such a unique use of a term suggests that it is not being used interchangeably with terms like "intend" but is being used advisedly and rather offers the meaning that corresponds with the plain meaning that the government too readily rejects -- "undertaken after careful estimation of the likely outcome" or "made or planned to accomplish a certain purpose; deliberate." The <u>American Heritage Dictionary of the English Language</u>, 4th ed. (Houghton Mifflin Co. 2000). If "calculated" is being used in this manner, as we suggest it is in light of the cases where the terrorism enhancement has been applied, then it is synonymous with "premeditation" and the jury decided the issue in Dr. Siddiqui's favor.

The government's notion that "calculated" is simply a "specific intent requirement" is unpersuasive in light of the fact that "calculated" is an unusual legal term and there appears to be

no authority for the assertion. See Government's Sentencing Submission dated July 29, 2010 (hereafter "Gov't Sent. Memo") at 35-36. Further, in light of Dr. Siddiqui's mental illness and the circumstances in which the offense conduct occurred, stating that the terrorism enhancement requires a showing of "specific intent" only creates further problems for the government. It is well settled that evidence of mental illness may negate the intent element of a specific intent crime. See United States v. Dupre, 339 F. Supp. 2d 534, 539 (S.D.N.Y. 2004).

Here, there is considerable evidence that Dr. Siddiqui suffers from serious mental illness. While the government continues to recite the fact that she was found competent to stand trial, even the government must concede that the standard for competence is low and those suffering from serious mental defects have frequently been found competent (for example, Ted Kaczynski, the so-called "Unabomber" who was found to present serious mental illness, was found competent like Dr. Siddiqui by none other than Dr. Sally Johnson). Dr. Siddiqui's writings, her outbursts in court, her inability to establish relations with her counsel or family for that matter, all suggest that she is hardly a rational actor in "normal" circumstances. Under stressful circumstances like custody in a foreign land like Afghanistan, her already erratic thinking must have been pushed to a breaking point. When she heard the American troops arrive in the very room where she was detained and thus was confronted with the presentation of her worst fears – being transferred into the custody of the Americans – she must have "freaked out" for the lack of a better term. While the government recites in slow motion all of the actions that she must have taken to grab the unattended rifle in the misplaced effort to support a hypothesis of "deliberation," see, e.g., Gov't Sent. Memo at 22, the fact remains that these events took only a minute or two and clearly satisfy the description of unpremeditated action in the sense that what she did was a "spur of the moment resort to violence in the face of sudden emotion or

8

desperation." United States v. Wong, 877 F. Supp. 96, 99 (E.D.N.Y. 1995) (observing the kind of circumstances where it would be inappropriate to find premeditated murder). The jury saw Dr. Siddiqui throughout the course of the proceeding. They saw her erratic behavior and irrational thinking, most of which was self-destructive and, at times, pathetic. Next to this image of her, the government placed an image of a cold, calculating jihadist who set out to harm American troops by any means necessary. Because of the nature of the trial and the theory of defense, defense counsel for the most part sat mute while the government reiterated time and time again the contents of the writings that were found on Dr. Siddiqui, which included the alleged "roadmaps for the destruction" of American landmarks like the Empire State Building. The government suggested over and over again that Dr. Siddiqui was a jihadist caught red-handed by Afghan authorities and adapted her mission to destroy Americans when she was about to be handed over to them for detainment. Time and time again, the government placed this image before the jury's eyes as the real Dr. Siddiqui and the jury considered that image and saw the defendant as she behaved in court, imagined how such a mentally-ill person would handle the stressful situation of U.S. soldiers marching into a room to interrogate her in a moment of intense stress and rejected the image that the government offered. As should the Court.

Finally, the government appears to argue that Dr. Siddiqui's conduct falls squarely within the kind of conduct that triggers the terrorism enhancement because the Second Circuit has held that any violent attack against government personnel other than for a personal vendetta triggers the enhancement because "its goal is to influence or affect the conduct of government by intimidation or coercion." Gov't Sent. Memo at 33 (citing United States v. Salim 549 F. 3d 67, 79 (2d Cir. 2008)). The government clearly overstates the holding of Salim by arguing that any action other than a personal vendetta would trigger the terrorism enhancement. First, factually,

Salim is much more than simply a "violent attack." It involved a "violent attack" that involved premeditation, which sets it apart from this case. In Salim, the defendant planned over the course of months a plot to take his attorneys hostage in order to force the court to provide him with new, court-appointed counsel. In a highly premeditated manner, the defendant in Salim contemplated a plot that would involve physically overpowering a corrections officer in order to proceed with the hostage plan. The defendant in Salim devised his plan in advance, in "cold blood," and in a premeditated manner. While he may not have anticipated the exact manner in which he would overpower the corrections officer who would stand in his way to proceeding with his plot, the defendant in Salim anticipated and embraced the possibility that it might involve some form of assault. Here, the government simply cannot argue that Dr. Siddiqui devised a plan in advance, in "cold blood" as it were, to shoot her way out of the room where she was confronted by the members of the Interview Team. And for the purposes of the terrorism enhancement, that makes all the difference in the world.

Further, the government's characterization of the terrorism enhancement clearly fashions it in a manner that leaves it co-extensive with the "official victim" enhancement. Citing Salim, the government states that "[a] violent attack against government personnel, for something other than a personal vendetta, clearly falls within the category of conduct contemplated by the Guidelines terrorism enhancement." Gov't Sent. Memo at 33. If the government meant to make this statement about the "official victim" enhancement, we might agree. In considering the "official victim" enhancement, it is fair to categorize a defendant's attack of a government official into two spheres: attacks motivated by personal animus (e.g., a personal grudge over money perhaps) and attacks motivated by animus towards the government official's duties (e.g., resistance to an arrest). If the defendant's attack is informed by motives related to the

government official's execution of duties, then the "official victim" enhancement is certainly triggered. In arguing that the "terrorism enhancement" shares the same definition as the "official victim" enhancement, however, the government errs twice: first, it defines the enhancements in a manner that renders them indistinguishable and thus, triggers the prohibition of impermissible double counting; and second, the government wholly omits the "calculation" prong of the "terrorism enhancement" inquiry.

Clearly the government's articulation of what conduct is contemplated by the "terrorism enhancement" is too broad. By omitting any mention of the kind of planning and "cold blooded" calculation that is the hallmark of the kind of conduct contemplated by the "terrorism enhancement," the government conflates the "official victim" and "terrorism" enhancement in a manner that raises constitutional concerns. An articulation of the "terrorism enhancement" that does more justice to its language, especially what is meant by "calculated," would make clear that Dr. Siddiqui's conduct was far afield from the kind of conduct that was contemplated by this enhancement.

Should the Court agree with the government that the terrorism enhancement is co-extensive with the "official victim" enhancement, we would respectfully request that the Court find that Dr. Siddiqui's offense conduct falls well outside the heartland of the kind of conduct contemplated by this enhancement and horizontally depart from the criminal history category of VI to I.

It is well-established in this Circuit and elsewhere that sentencing courts may partially or wholly undo the terrorism enhancement's increase in a defendant's criminal history category pursuant to § 4A1.3 of the Sentencing Guidelines. See United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003); United States v. Benkahla, 501 F. Supp. 2d 748, 758 (E.D. Va. 2007). The court

in Benkahla provided a two-pronged standard for the exercise of discretion pursuant to § 4A1.3.

First, the court noted that the defendant had no criminal history previous to the offense conduct

that was characterized as triggering the terrorism enhancement.  Second, the court noted that the

defendant was unlikely to commit another act of terrorism because he was not a terrorist.  "He

does not share the same characteristics or the conduct of a terrorist, and in turn, he does not share

the same likelihood of recidivism, the difficulty of rehabilitation, or the need for incapacitation."

Benkahla, 501 F. Supp. 2d at 759.

In applying the Benkahla standard to Dr. Siddiqui, it is indisputable that she has no

criminal history and thus she satisfies the first prong.  With respect to the second prong, we offer

the opinion of Dr. Kucharski who was cited in our opening sentencing memorandum as stating

that Dr. Siddiqui is unlikely to engage again in the kind of violent conduct for which she was

convicted.  As the government's version of events would have it, Dr. Siddiqui was under the

sway of radicals during the missing five years; assuming that to be the case as a worst-case

scenario, there is nothing in the record of these proceedings to link her directly to terrorist

activity during those five years other than incomprehensible and contradictory statements that

she made while recovering from her gunshot wound.  Further, there has been nothing but rank

speculation on the part of the government that Dr. Siddiqui was on a terrorist mission the day she

was arrested in Afghanistan on July 17, 2008.  Rather, her conduct on the day she was arrested

(from making herself conspicuous in the marketplace of Ghazni City to acting erratically while

detained at the Afghan National Police headquarters), the papers that she had on her person, her

conduct during the course of her trial, all indicate that she suffered and continues to suffer from

serious mental illness.  To Dr. Kucharski, it is significant that Dr. Siddiqui has been at liberty for

many years and there is no credible evidence that she has ever engaged in a terrorist act.  As

mentioned in our initial memorandum and Dr. Barry Rosenfeld's report annexed thereto, according to Dr. Yousef Abou-Allaban, one of her peers while she was in Boston in the 1990s and early 2000s, Dr. Siddiqui could not conform her conduct or beliefs with any Muslim organization, even extremist groups. To be blunt, Dr. Siddiqui was and is too disorganized and too much of a contrarian to be of any use to any terrorist organization that would wish to make use of her. Further, upon her release, as a quasi-public figure in Pakistan (where she undoubtedly will be deported), she will be so closely followed that it will be nearly impossible for her to have the opportunity, never mind the inclination, to engage in terrorist activity. Thus, here as in <u>Benkahla</u>, the Court should find that Dr. Siddiqui is unlikely to be a recidivist and should adjust her criminal history category to I should the Court view the terrorism enhancement as warranted.

**II.  The Question As To Whether Dr. Siddiqui Committed Attempted Premeditated Murder Was Answered By The Jury**

We are surprised by the government's attempt at a second bite of the apple in arguing that the question as to whether Dr. Siddiqui committed attempted premeditated murder – thus, establishing a base offense level of 33 rather than 27 – could still be found by the Court even though the jury found that she did not.

The government makes the creative argument that sentencing courts reserve the right effectively to overturn the findings of juries at the sentencing phase because of the differential between the standard of proof of "beyond a reasonable doubt" and "preponderance of the evidence." Gov't Sent. Memo at 25-26. This argument completely misunderstands <u>United States v. Booker</u>, 543 U.S. 220 (2005).

In <u>Booker</u>, the Supreme Court found that the government had to plead and prove "beyond a reasonable doubt" any fact that substantially increased the punishment of the defendant. <u>See</u>

Booker, 543 U.S. at 233-35. The Supreme Court then gave latitude in sentencing to courts by making the Sentencing Guidelines advisory. What the Supreme Court did not do, however, was reverse Apprendi v. New Jersey, 530 U.S. 466 (2000), and permit a sentencing court to raise the statutory maximum or mandatory minimum. Indeed, if the Supreme Court had permitted the trial court to make such an increase by the "preponderance of the evidence" when a finding by the jury "beyond a reasonable doubt" was necessary to increase substantially a sentence, then United States v. O'Brien would have come out differently.

In O'Brien, 130 S.Ct. 2169 (2010), the Supreme Court found in its unanimous decision that in order to apply a machine gun enhancement to increase the maximum sentence from ten to thirty years for the use of a firearm, the facts would have to be pled and proven "beyond a reasonable doubt." Despite the O'Brien decision, the government clings steadfastly to their argument that they may raise Dr. Siddiqui's sentencing exposure from the statutory maximum of twenty years to life in prison without the fact being proven "beyond a reasonable doubt."[1] Such an increase in Dr. Siddiqui's sentence would clearly be in violation of her Sixth Amendment rights as set out in Apprendi, Booker and O'Brien. In fact, doing so would not only violate the recent interpretation of Sixth Amendment requirements in sentencing, it would also be in violation of the historic role that juries have played in determining the level of a murder and corresponding sentence as recognized in Ring v. Arizona, 536 U.S. 584, 599 (2002) ("The

---

[1] Dr. Siddiqui's maximum sentence for Counts One, Two and Three is twenty years because individual victims were not separately charged or identified, and therefore Dr. Siddiqui may only be punished once for each Count, and Counts One, Two and Three are multiplicitous for the purpose of sentencing because they each describe the same course of conduct. There is no showing that Congress intended multiple punishments for the same course of conduct. See United States v. Marrale, 695 F.2d 658 (2d Cir. 1982); United States v. Seda, 978 F.2d 779 (2d Cir. 1992); accord United States v. Liller, 991 F.2d 61 (2d Cir. 1993); United States v. Rogers, 898 F. Supp. 219, 222 (S.D.N.Y. 1995); see also Whalen v. United States, 445 U.S. 684, 694, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980).

English jury's role in determining critical facts in homicide cases was entrenched. As fact-finder, the jury had the power to determine not only whether the defendant was guilty of homicide but also the degree of the offenses.")

Even if the court were to find that the standard for raising the maximum to life for Counts One and Two could be found by a "preponderance of the evidence," it is likely that the jury applied this standard when answering the question of premeditation in the negative. When the Court discussed the government's burden to prove the elements of Count One or Two, the Counts with which the question of premeditation was associated, the Court made clear that the standard was "beyond a reasonable doubt." In discussing the question of premeditation, however, the Court never mentioned that the government had to prove premeditation "beyond a reasonable doubt." See Tr. at 2061-2 & 2068.[2] Thus, it is altogether unclear that we can assume what the government wants us to assume – that the jury answered the question of premeditation under the more stringent standard and thus might have answered the question differently if informed by the less stringent sentencing standard of "preponderance of the evidence."

In any event, it is an often-observed principle that a sentencing court may and should view the jury's acquittal of alleged conduct as an indication of the weakness of the evidence respecting that conduct. See, e.g., United States v. Vaughn, 430 F.3d 518, 527 (2d Cir. 2005) ("Rather, district courts should consider the jury's acquittal when assessing the weight and quality of the evidence presented by the prosecution and determining a reasonable sentence"). It is worth noting that the government used the most incendiary of material to support the theory that Dr. Siddiqui attempted to murder members of the Interview Team with premeditation by

---

[2] We note that the Court and the government assumed that the question of premeditation was to be decided under the "beyond a reasonable doubt" standard. See Tr. at 2123. We respectfully submit, however, that this assumption never appeared as part of the jury instructions on the issue of premeditation.

citing and reciting all of the so-called Rule 404(b) material that the government viewed as indicative of her animus towards Americans and her alleged intent to kill Americans and all those allied with them.  Although such material has the potential to draw out instinctual reactions in juries sitting within the shadow of the no-longer-existent World Trade Towers, the verdict here demonstrated that reason could not be so easily swayed.  The verdict established implicitly, if not in fact, that Dr. Siddiqui was neither the suicide bomber nor the jihadist zealot that the government made her out to be.

To our view, the answer to the question of premeditation suggested that the jury viewed Dr. Siddiqui similarly to our retained experts who diagnosed her as a woman troubled by mental illness and ill-equipped to handle rationally the threat of being in the custody of another set of hands about which she feared the worst.  In light of the circumstances in which Dr. Siddiqui found herself and the panic that clearly characterized her reaction to the threat of being transferred into the custody of American soldiers, her conduct is best characterized as the "spur of the moment resort to violence in the face of sudden emotion or desperation." United States v. Wong, 877 F. Supp. 96, 99 (E.D.N.Y. 1995).  Under these circumstances, the Court should not find that Dr. Siddiqui attempted first-degree murder and thus her base offense level should be 27 rather than 33.

III.   **The Government Fails To Prove That Dr. Siddiqui's Offense Conduct Warrants A Three-Level Hate Crime Enhancement**

The government appears to argue that the Second Circuit has held that a conviction for attempted murder of a U.S. national is a sufficient basis for application of the hate-crime enhancement pursuant to § 3A1.1(a) of the Sentencing Guidelines. See Gov't Sent. Memo at 38 (citing In re Terrorist Bombings ("El Hage"), 552 F.3d 93, 153 (2d Cir. 2008)).  Once again, the government is cavalier in their statement of applicable law.  In El Hage, the Second Circuit

dismissed the argument that it would be akin to impermissible double-counting for the sentencing court to apply the "hate crime" enhancement for a violation of attempted murder of United States nationals because the victims' status as a United States national appeared to be an element of the crime. The Second Circuit noted that "it is the very fact that [the defendant] was convicted of [this] offense[] that justifies the application of the hate crime ... enhancement[]." El Hage, 552 F.3d at 153. In so observing, the Second Circuit was merely recognizing that the victims' status as United States nationals indicated, and could very well support, the hate-crime enhancement rather than preclude it based on a double-counting challenge. See id. Nonetheless, the Second Circuit, in making this observation, was not holding that a violation of this statute necessarily requires application of the enhancement, for counsel to El Hage did not make the argument that we made in our initial memorandum that the national origin of the victims of Dr. Siddiqui's offense and relevant conduct (i.e., her escape attempts) included Afghanis and Americans.[3]

In response to the government's request to apply the "hate-crime" enhancement, we once again emphasize what the evidence clearly shows – that Dr. Siddiqui was desperate to avoid being transferred into American custody. She was not on a mission to kill Americans as the government would have it. She was on a mission to avoid the transfer of custody and would have bit, clawed and attacked anyone of whatever national origin in order to escape that fate. At

---

[3] We note that there appear to be very few examples of the kind of "automatic" application of the hate-crime enhancement that the government appears to seek with respect to Dr. Siddiqui's conviction for attempted murder of United States nationals. Where a jury finds as one of the elements of a crime that a victim's race or national origin was a motivating factor of the crime, then it would follow that the "hate-crime" enhancement would be automatic. See United States v. Smith, 08 Cr. 10386, 2010 WL 510634, **6 (9th Cir. Feb. 12, 2010). As the government cannot show that the jury answered in the affirmative the question as to whether Dr. Siddiqui targeted the victims of her attempted murder based solely on their national origin, the hate-crime enhancement cannot be automatically applied.

the end of the day, the government is left with inconsistent anti-American rants and nonsensical notes of attacks on American landmarks by a mentally-ill woman thousands of miles away from the United States as the full extent of their proof of her anti-American animus. Certainly, the special evidentiary requirements of the "hate-crime" enhancement – a jury finding beyond a reasonable doubt that the defendant selected her victims based on their national origin – require more than the government is able to marshal. The Court should deny the government's request to apply the hate-crime enhancement.

IV.    **The Obstruction of Justice Enhancement Should Not Be Applied To A Defendant Who Suffers From Mental Illness And Experienced Trauma**

The government argues that Dr. Siddiqui's conviction for attempting to murder United States nationals and United States officers by picking up an M-4 and pointing it at them in the Afghan National Police headquarters on July 18, 2008 clearly requires the Court to impose an obstruction of justice enhancement because she denied doing so under oath. See Gov't Sent. Memo at 42-44. In response, defense counsel reiterates the argument submitted in our initial sentencing memorandum that applying an obstruction of justice enhancement on a defendant who suffers serious mental illness, appears not to have a full appreciation of the gravity of testifying under oath and refused to be prepared by counsel for the ordeal would be unwarranted. In light of Dr. Siddiqui's mental illness, it is unclear whether it can be fairly said that she willfully committed perjury. See, e.g., United States v. Turner, 324 F.3d 456 (6th Cir. 2003) (observing that the obstruction of justice enhancement could not be applied where the defendant's mental issues left him without the mental capacity to "willfully obstruct justice"). Saying so would assume that Dr. Siddiqui had an appreciation of the solemnity of the oath and chose not to follow its directives. We respectfully submit that the record of her mental illness, especially Dr. Kucharski's finding that Dr. Siddiqui was not competent to stand trial, supports

our claim that she did not have a full understanding or appreciation of the requirements of testifying on her own behalf.

Further, it is common understanding that with serious and traumatic injuries such as Dr. Siddiqui suffered on July 18, 2008 come bouts of memory lapses surrounding the time in which those injuries were suffered. Whether it be because the seriousness of her injuries caused trauma or the blows that she took to her head caused amnesia, it could very well be that Dr. Siddiqui has no real memory or limited memory of the events leading up to her shooting. It is interesting to note in this regard that when Dr. Siddiqui was asked by the government whether she did or did not remember whether she picked up the M-4, she responded by evading the question.

> I am not saying – I am not saying that. I am telling you what you know. I walked towards the person and I was shot and then I was shot again and then I fainted. I – my head does not believe that anybody would leave a gun lying around. I don't think any of the American soldiers would be so irresponsible as to lay a gun laying around in a room full of people, a detainee can walk up and operate it so fast what that detainee has never in her life seen an M4, does know how to use it. This is crazy. It is too crazy. I am sorry. It is just ridiculous ...

Tr. 1742. At this moment in her testimony, Dr. Siddiqui does not appear to be relying on her memory of events beyond reciting that she started walking towards someone and then was shot. Beyond that memory, she resorts to logic by observing that it would be impossible that one of the members of the Interview Team would be so careless as to leave an M-4 unattended where there was a detainee in the room who could grab it. It is as if the government senses that Dr. Siddiqui on this crucial point remains uncommitted as to whether she in fact grabbed the gun because the prosecutor immediately asked: "Isn't it true, ma'am, that you picked up an M4 rifle in the room that day?" To which Dr. Siddiqui responded, "I just told you. I answered that already. It is not." Here, Dr. Siddiqui does not clarify that her memory is that she did not pick up the rifle but rather she refers back to her previous statement where she was forced to resort to logic to reject

the government's theory that she grabbed the M-4 rifle. In this passage upon which the government rests its theory of perjury, it is clear that Dr. Siddiqui's memory of events is unclear and that she rounds it out with logic rather than recollection. Unfortunately, she was without the assistance of counsel to assist her in understanding the difference between what she knew from memory and what she knows from logic or reason and how to distinguish them in the course of providing testimony under oath during an examination. It is a mistake that witnesses frequently make when providing testimony – they are not always careful to distinguish what they know from first-hand knowledge and what they know from secondary sources. Through practice, witnesses come to appreciate the difference and can be taught to distinguish them carefully while testifying. We never had the opportunity to teach Dr. Siddiqui that difference and her lack of practice in this regard and her mental illness make holding her accountable for her statements unwarranted, if not unfair. Clearly, under such circumstances, it cannot be said that she willfully offered perjured testimony. Thus, we respectfully submit that the Court should reject the government's request that Dr. Siddiqui's offense level be adjusted upwards by two levels for obstruction of justice.

V.     **The Court Should Find That Dr. Siddiqui At Most Brandished
       But Did Not Discharge The M-4 Rifle
       That Is The Basis For The 924(c) Count**

As the Court is no doubt aware, in the aftermath of the trial, we came into possession of a document that purported to be a Significant Action Report, a kind of form generated by the Department of Defense in response to significant events that occur in the field, that related to the shooting incident involving Dr. Siddiqui. This document was significant for at least two reasons: first, in describing the shooting incident, the document wholly omitted the government's allegation that Dr. Siddiqui discharged the M-4 when she gained possession of it; and second, it

indicated that the Department of Defense was commencing an investigation of the incident. We immediately conferred with the government because we needed to know: (1) if the government possessed this document at any point in order to consider a <u>Brady</u> motion; and (2) whether the government had any other documents related to the investigation mentioned by the Department of Defense. When the government's response to our inquiries were not forthcoming, we wrote to the Court to seek its assistance in obtaining a timely response from the government. In a letter to the Court dated August 23, 2010, the government provided a response to our inquiries by noting in sum and substance the following: (1) that the document at issue appeared to be genuine; (2) they were declassifying a version of the document in the possession of the Department of Defense so that discussion of the Significant Action Report could proceed without having to file such discussions under seal; and (3) a thorough search of the databases and files of the Department of Defense did not produce any further documents related to the Significant Action Report or any investigations of the incident that had not already been produced to defense counsel. The only outstanding questions that the government left unanswered were the source of the Significant Action Report and whether that source was an eye-witness to the shooting.

Bearing in mind the fact that the government has the burden of proof in all findings of fact at sentencing, we respectfully submit that they have failed to prove that Dr. Siddiqui fired the M-4 and thus the sentence applicable pursuant to the 924(c) Count is a mandatory minimum sentence of 7 years to run consecutively to any other sentence. While the government continues to recite the corroborating eye-witness testimony of the members of the Interview Team as the compelling evidence of the discharge of the M-4, defense counsel has the forensic evidence to support the reality that Dr. Siddiqui never shot the rifle. Where eye-witnesses may have imperfect memories and may be tempted to conform their account of events to accommodate the

stories of other witnesses, forensic evidence does not – and cannot – lie. Further, defense counsel's contention that Dr. Siddiqui never fired the rifle is now supported by a report that wholly omits any mention of Dr. Siddiqui firing a shot and that report was generated at a time nearest to the time when the events being described occurred. In a sense, the report has the credibility of a 911 call in that its immediacy ensures that it is unaffected by the embroidering of time and lapsed memory and unaffected by the inevitable tailoring that arises when witnesses confer with other witnesses as was inevitably the case with the members of the Interview Team who were in the room where Dr. Siddiqui was shot. In light of the evidence that supports the very real probability that Dr. Siddiqui never fired the M-4, we respectfully submit that the Court should find that she is subject to a seven-year – and not a ten-year –sentence to run consecutively to any other sentence imposed as per 924(c).

VI.    **A Non-Guidelines Sentence Is Warranted**
       **Because There Is No Evidence That Dr. Siddiqui Is A Terrorist**

If the government were forthright, they would admit that their closing argument was an attempt to convince the jury that Dr. Siddiqui was a terrorist by the endless repetition of the Rule 404(b) evidence. In mentioning to a jury sitting in New York City that Dr. Siddiqui had documents that appeared to mention an attack on the Empire State Building, the government sought to overcome the jury's reason by resort to emotion and scare tactics. In spite of their efforts to overcome reason, the government failed in the effort to convince the jury that Dr. Siddiqui was a terrorist who with premeditation sought to kill Americans. We respectfully submit that this finding supports our position that Dr. Siddiqui should not receive the kind of draconian sentences meted out to actual terrorists but one that takes into account her peculiar circumstances, not least of which is her mental illness. A sentence in the vicinity of twelve years is reasonable.

The government suggests that a Guidelines sentence, including the numerous enhancements that they seek, is warranted here because it was only a matter of good fortune that O'Brien was decided in the manner that it was. If O'Brien had been decided in advance of the trial, the government notes that they would have submitted to the jury the question as to whether Dr. Siddiqui used a machine gun. While the government's argument has a superficial appeal, the obvious response is that there is a real difference between a defendant who possesses, has access to and actively chooses to use a machine gun in the course of an act of violence versus a defendant such as Dr. Siddiqui who grabs whatever firearm is available in order to effect an escape, if she in fact grabbed the M-4. Clearly, the legislature's view that a defendant's use of a machine gun is repugnant and deserves severe punishment is triggered in the first scenario rather than the second.

## CONCLUSION

For all the reasons outlined above and in our initial sentencing memorandum, we respectfully request on behalf of Dr. Siddiqui that the Court impose a Non-Guidelines sentence of 12 years.

Dated: September 9, 2010
New York, New York

DAWN M. CARDI & ASSOCIATES

/s/

_____

Dawn M. Cardi
Chad L. Edgar
Two Park Place, 19th Floor
New York, New York 10016
212.481.7770 (tel.)
212.684.3008 (fax)
cardiesq@aol.com
*Attorneys for defendant Aafia Siddiqui*

_____/s/_____
Linda Moreno, Esq.
P.O. Box 10987
Tampa, FL 33697
813.247.4500 (tel.)
813.386.6211 (fax)
*Attorney for Aafia Siddiqui*

_____/s/_____
Charles Swift, Esq.
SWIFT & MCDONALD, P.S.
2003 Western Avenue, #330
Seatlle, WA 98121
206.441.3377 (tel.)
206.448.2252 (fax)
*Attorney for Aafia Siddiqui*

24

_____/s/_____
Elaine Whitfield Sharp, Esq.
196 Atlantic Avenue
Marblehead, MA 01945
781.639.1862 (tel.)
781.639.1771 (fax)
*Attorney for Aafia Siddiqui*